# USPS-NALC JCAM

2014

## Joint Contract Administration Manual

United States Postal Service
and
National Association
of Letter Carriers, AFL-CIO

GOVERNMENT EXHIBIT
C3

July 2014

NALC Shop Steward
Delivery Unit Manager

RE:    July 2014 Edition of the USPS-NALC Joint Contract Administration Manual

Enclosed is the revised July 2014 edition of the Joint Contract Administration Manual (JCAM) for your use as a resource in your local administration of the National Agreement.  Jointly prepared by the NALC and the Postal Service, the narrative portions of the manual explain how the contract should be applied based on national level grievance settlements, arbitration awards and agreements.

One copy has been provided to your delivery unit for the use of both the NALC and management.  It should be accessible to both at all times.

When a dispute arises, you should go to the JCAM first to see if the issue in dispute is addressed.  If the issue is addressed in the JCAM, any dispute should be resolved in accordance with that guidance.

Please replace prior editions of the JCAM with the enclosed 2014 edition.  The JCAM will continue to be updated with additional material as we continue to narrow our differences and expand our joint understanding of the National Agreement at the national level.  We encourage you to use the JCAM to insure local contract compliance and to foster more professional working relationships.

Doug Tulino, Vice President
Labor Relations, U. S. Postal Service

Fredric V. Rolando, President
National Association of Letter Carriers

# USPS - NALC Joint Contract Administration Manual

United States Postal Service
475 L'Enfant Plaza SW
Washington DC 20260-4101

National Association of
Letter Carriers, AFL-CIO
100 Indiana Avenue NW
Washington DC 20001-2144

July 2014

# Introduction

This jointly prepared USPS/NALC *Joint Contract Administration Manual* (JCAM) supercedes all previous editions. Publication of the JCAM was undertaken in good faith in order to educate the local parties and facilitate the resolution of disputes concerning issues on which the national parties are in agreement.

While the parties at the national level still dispute the proper application of some portions of the Collective Bargaining Agreement, there are significant areas of agreement. The JCAM represents the parties' effort to inform labor and management in the field of these areas of agreement and encourage consistency and compliance with the issues treated. The narrative explanation of the Collective Bargaining Agreement contained in the JCAM should be considered dispositive of the joint understanding of the parties at the national level.  Some sections of the contract do not have a narrative explanation.  No inference should be drawn from the lack of explanatory language.

The actual language contained in the Collective Bargaining Agreement appears in text boxes. Shaded contract language means the provision does not normally apply to the city letter carrier craft. The small text boxes found in the right-hand margin next to contract language identifies where the memos referenced in the contract language text boxes are located in the JCAM.

# Preface

The JCAM is self-explanatory and speaks for itself. It is not intended to, nor does it, increase or decrease the rights, responsibilities, or benefits of the parties under the Collective Bargaining Agreement. It neither adds to, nor modifies in any respect, the current Collective Bargaining Agreement.

At each step of the grievance/arbitration procedure the parties are required to jointly review the JCAM in order to facilitate resolution of disputes. The JCAM may be introduced in arbitration as dispositive of those issues covered by the manual. If introduced as evidence in arbitration, the document shall speak for itself. Without exception, no testimony shall be permitted in support of the content, background, history or any other aspect of the JCAM's narrative.

The parties at the national level will update the JCAM at least once each calendar year. The parties at the local level should exercise caution to ensure that they are working from the most current issue of the JCAM and apply any revisions or modifications prospectively from the date of revision.

# ARTICLE 1 UNION RECOGNITION

Preamble

**PREAMBLE**

This Agreement (referred to as the **2011** National Agreement) is entered into by and between the United States Postal Service (hereinafter referred to as the "Employer") and the National Association of Letter Carriers, AFL-CIO (hereinafter referred to as the "Union"), **pursuant to an Arbitration Award issued January 10, 2013. In accordance with the terms of this Award,** the Agreement is effective as of **the date of the Award** unless otherwise provided.

**ARTICLE 1. UNION RECOGNITION**

1.1

**Section 1. Union**
The Employer recognizes the National Association of Letter Carriers, AFL-CIO as the exclusive bargaining representative of all employees in the bargaining unit for which it has been recognized and certified at the national level—City Letter Carriers.

The Postal Reorganization Act of 1970 (PRA) transformed the Post Office Department into an independent establishment of the government of the United States, "The United States Postal Service." The PRA also gave postal employees the right to bargain collectively over their wages, hours and working conditions. The law states that the Postal Service "shall accord exclusive recognition to a labor organization when the organization has been selected by a majority of the employees in an appropriate unit as their representative." This PRA mandate followed the concept of "exclusive recognition" that had long served as the basis for collective bargaining in the private sector. The doctrine holds that only one labor organization can represent "all employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment..." (Labor-Management Relations Act, Section 9(a).)

NALC is the exclusive bargaining agent representing city delivery carriers. Although NALC membership is not limited to members of the city letter carrier craft, NALC is the exclusive representative of all city letter carriers—the *only* organization entitled to represent letter carriers in their collective bargaining relationship with the U.S. Postal Service. Despite the doctrine of exclusive representation, Article 17.2.E provides that a steward may be designated to represent a craft other than the steward's own—if the unions involved approve and notify the Postal Service in writing.

The positions currently designated in the letter carrier craft—and thus within the jurisdiction of NALC for representational purposes—are listed in Article 41.1.A.

Article 1.1 does not speak directly to the question of the precise juris-

diction of NALC or of those unions which are exclusive bargaining representatives for other groups of U.S. Postal Service employees.

Other unions exclusively representing large, national groups of Postal Service craft employees are:

APWU—American Postal Workers Union (AFL-CIO):  clerks, maintenance employees and motor vehicle employees;

NPMHU—National Postal Mail Handlers Union, Division of Laborers' International Union (AFL-CIO):  mail handlers; and

NRLCA—National Rural Letter Carriers' Association:  rural letter carriers.

NALC and unions representing these other postal crafts all negotiated together and executed joint National Agreements with the U.S. Postal Service covering the periods 1971-73 and 1973-75.  The NRLCA bargained separately for its 1975-78 Agreement.  In 1978, 1981, 1984, 1987 and 1990 NALC and APWU (the "Joint Bargaining Committee") negotiated jointly while the unions representing mail handlers and rural carriers negotiated separate agreements.  In 1994 and thereafter, NALC negotiated and arbitrated its National Agreements separately from APWU.  Presently each of the four major postal unions has a separate National Agreement with the Postal Service.

1.2
**Section 2. Exclusions**

The employee group set forth in Section 1 above does not include, and this Agreement does not apply to:

1. Managerial and supervisory personnel;
2. Professional employees;
3. Employees engaged in personnel work in other than a purely non-confidential clerical capacity;
4. Security guards as defined in Public Law 91-375, 1201(2);
5. All Postal Inspection Service employees;
6. Employees in the supplemental work force as defined in Article 7;
7. Rural letter carriers;
8. Mail handlers;
9. Maintenance Employees;
10. Special Delivery Messengers;
11. Motor Vehicle Employees; or
12. Postal Clerks.

Managerial and supervisory personnel are excluded from the bargaining unit by the terms of Article 1.2 as well as by the provisions of the Postal

Reorganization Act (See 39 U.S.C. 1202(2)). However, letter carriers serving in a temporary supervisory position (204b) are still considered to be craft employees and continue to accrue uninterrupted seniority in the letter carrier craft (Article 41.1.A.2). (Fasser, NB-S-6859, June 30, 1977, C-03288; Aaron, H1N-4J-C 8187, March 22, 1985, C-04925; and Mittenthal A8-W-939, January 27, 1982, C-00580.)

Members of the supplemental workforce, which was previously defined as being comprised of casuals, are excluded from the bargaining unit. The supplemental workforce (casuals) was eliminated effective December 10, 2007 by the Memorandum of Understanding, *Re: Article 7.1*.

**MEMORANDUM OF UNDERSTANDING BETWEEN THE UNITED STATES POSTAL SERVICE AND THE NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Article 7.1**

The parties agree that the November 21, 2006 effective date of the National Agreement does not apply to the employment of Transitional Employees or the elimination of the supplemental workforce (casuals). The parties further agree that no city letter carrier casuals will be on the rolls later than December 9, 2007. Any dispute over the beginning date for city letter carrier casuals may be addressed only by the parties at the national level.

Date: September 11, 2007

1.3 **Section 3. Facility Exclusions**

This Agreement does not apply to employees who work in other employer facilities which are not engaged in customer services and mail processing, previously understood and expressed by the parties to mean mail processing and delivery, including but not limited to Headquarters, Area Offices, Information Service Centers, Postal Service Training and Development Institute, Oklahoma Postal Training Operations, Postal Academies, Postal Academy Training Institute, Stamped Envelope Agency, Supply Centers, Mail Equipment Shops, or Mail Transport Equipment Centers.

1.4 **Section 4. Definition**

Subject to the foregoing exclusions, this Agreement shall be applicable to all employees in the regular work force of the U.S. Postal Service, as defined in Article 7, at all present and subsequently acquired installations, facilities, and operations of the Employer, wherever located.

Article 1.4 provides that, subject to the exclusions listed in Article 1, Sections 2 and 3, all members of the regular workforce as defined in Article 7.1.A are members of the bargaining unit. Article 7.1 defines the regular work force as being comprised of full-time, part-time regular and

part-time flexible employees. Full-time flexible employees are also part of the regular workforce. In addition, city carrier assistant employees are members of the bargaining unit as provided for in Article 7.1.C.

1.5

**Section 5. New Positions**

A. Each newly created position shall be assigned by the Employer to the national craft unit most appropriate for such position within thirty (30) days after its creation. Before such assignment of each new position the Employer shall consult with the Union for the purpose of assigning the new position to the national craft unit most appropriate for such position. The following criteria shall be used in making this determination:

1. existing work assignment practices;

2. manpower costs,

3. avoidance of duplication of effort and "make work" assignments;

4. effective utilization of manpower, including the Postal Service's need to assign employees across craft lines on a temporary basis;

5. the integral nature of all duties which comprise a normal duty assignment;

6. the contractual and legal obligations and requirements of the parties.

B. The Union shall be notified promptly by the Employer regarding assignments made under this provision. Should the Union dispute the assignment of the new position within thirty (30) days from the date the Union has received notification of the assignment of the position, the dispute shall be subject to the provisions of the grievance and arbitration procedure provided for herein.

Article 1.5 requires that before assigning a new position to the most appropriate national craft bargaining unit, the Postal Service must consult with the NALC. Additionally, it contains standards that must be used in making assignments of new positions to the appropriate unit, and provides that the NALC will be promptly notified of the decision as to which bargaining unit a new position has been assigned. Any dispute as to that assignment is grievable at the national level within 30 days from the date the union receives notification of the assignment.

1.6.A

**Section 6. Performance of Bargaining Unit Work**

A. Supervisors are prohibited from performing bargaining unit work at post offices with 100 or more bargaining unit employees, except:

1. in an emergency;

2. for the purpose of training or instruction of employees;

3. to assure the proper operation of equipment;

4. to protect the safety of employees; or

5. to protect the property of the USPS.

The prohibition against supervisors performing bargaining unit work also applies to acting supervisors (204b). The PS Form 1723, which shows the times and dates of the 204b detail, is the controlling document for determining whether an employee is in a 204b status. A separate PS Form 1723 is used for each detail. A single detail may not be broken up on multiple PS Forms 1723 for the purpose of using a 204b on overtime in lieu of a bargaining unit employee. Article 41.1.A.2 requires that a copy of the PS Form 1723 be provided to the union at the local level.

An acting supervisor (204b) may not be used in lieu of a bargaining-unit employee for the purpose of bargaining unit overtime. An employee detailed to an acting supervisory position will not perform bargaining unit overtime immediately prior to or immediately after such detail on the day he/she was in a 204b status unless all available bargaining unit employees are utilized. However, an employee may work bargaining unit overtime, otherwise consistent with the provisions of Article 8, on the day before or the day after a 204b detail (Step 4, H0N-5R-C 13315, August 30, 1993, M-01177).

Branches that wish to determine whether a post office has 100 or more bargaining unit employees should contact their national business agent. The Settlement Agreement NC-E-4716, November 24, 1978 (M-00206) between the NALC and USPS, which was intended to be of general application, provides that "where additional work hours would have been assigned to employees but for a violation of Article 1.6.A, and where such work hours are not *de minimis*, the employee(s) whom management would have assigned the work, shall be paid for the time involved at the applicable rate." (*de minimis* means "trifling, unimportant, inconsequential.")

An emergency is defined in Article 3.F as "an unforeseen circumstance or a combination of circumstances which calls for immediate action in a situation which is not expected to be of a recurring nature."

**1.6.B**

B. In offices with less than 100 bargaining unit employees, supervisors are prohibited from performing bargaining unit work except as enumerated in Section 6.A.1 through 5 above or when the duties are included in the supervisor's position description.

(The preceding Article, Article 1, shall apply to **City Carrier Assistant** Employees.)

Article 1.6.B prohibits supervisors in offices with less than 100 bargaining unit employees from performing letter carrier bargaining unit work

except for the reasons enumerated in Article 1.6.A.1 through 5, or when the duties being performed are included in the supervisor's position description.

The Step 4 decision NC-C-9746, March 3, 1978 (M-00200) provides that no matter what appears in a supervisor's job description, it does not authorize the supervisor to "perform bargaining unit work as a matter of course every day," but rather "to meet established service standards." Furthermore, the prearbitration settlement H7N-2M-C 443, May 17, 1988 (M-00832), provides that where the phrase "distribution tasks" or "may personally perform non-supervisory tasks" is found in a supervisor's job description, this does not include casing mail into letter carrier cases.

# ARTICLE 2 NON-DISCRIMINATION AND CIVIL RIGHTS

2.1 **Section 1. Statement of Principle**

The Employer and the Union agree that there shall be no discrimination by the Employer or the Union against employees because of race, color, creed, religion, national origin, sex, age, or marital status.

In addition, consistent with the other provisions of this Agreement, there shall be no unlawful discrimination against handicapped employees, as prohibited by the Rehabilitation Act.

[see Memo, page **152**]

**This Memo is located on *JCAM* page 2-2.**

2.2 **Section 2. Committees**

There are established at the national and area levels Joint Committees on Human Rights. The committees will be composed of a representative of the Union and responsible management officials. The committees may develop affirmative action proposals on all matters affecting minority groups. The committees will also be advised of the plan for site selection for facilities planned for national postal mail networks and major metropolitan areas, and review availability of adequate housing and public transportation. The committees shall meet as required at mutually agreeable times.

2.3 **Section 3. Grievances**

Grievances arising under this Article may be filed at Formal Step A of the grievance procedure within fourteen (14) days of when the employee or the Union has first learned or may reasonably have been expected to have learned of the alleged discrimination, unless filed directly at the national level, in which case the provisions of this Agreement for initiating grievances at that level shall apply.

(The preceding Article, Article 2, shall apply to **City Carrier Assistant** Employees.)

Article 2 gives letter carriers the contractual right to object to and remedy alleged discrimination by filing a grievance. Grievances alleging discrimination may be filed directly at Formal Step A of the grievance procedure. However, if a grievance concerning discrimination is filed at Informal Step A instead, it is not procedurally defective for that reason.

Additionally, in accordance with federal law and regulations letter carriers have legal recourse to remedy alleged work place discrimination through the EEOC and the federal courts.

Article 2 also gives letter carriers the contractual right to object to and remedy alleged violations of the Rehabilitation Act through the grievance procedure. Postal Service guidelines concerning reasonable accommodation are contained in Handbook EL-307, *Reasonable Accommodation, An Interactive Process*.

The Memorandum of Understanding reprinted below is incorporated into the National Agreement. It establishes specific obligations concerning the Postal Service's duty to reasonably accommodate deaf and hard of hearing employees and applicants under the Rehabilitation Act.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Deaf and Hard of Hearing**

**REASONABLE ACCOMMODATION FOR THE DEAF AND HARD OF HEARING**

MANAGEMENT'S RESPONSIBILITY

Management has an obligation to reasonably accommodate Deaf and Hard of Hearing employees and applicants who request assistance in communicating with or understanding others in work related situations, such as:

a. During investigatory interviews which may lead to discipline, discussions with a supervisor on job performance or conduct, or presentation of a grievance.

b. During some aspects of training including formal classroom instruction.

c. During portions of EAP programs and EEO counselings.

d. In critical elements of the selection process such as during testing and interviews.

e. During employee orientations, safety talks, CFC and savings bond drive kick-off meetings.

f. During the filing or meetings concerning an employee's OWCP claim.

Reasonable accommodation must be approached on a highly individualized, case by case basis. The individual's input must be considered prior to making a decision regarding accommodation.

IMPLEMENTATION

This obligation is met by selecting an appropriate resource from the variety of resources available. In selecting a resource, the following, among others, should be considered, as appropriate:

— The ability of the deaf or hard of hearing employee to understand various methods of communication and the ability of others to understand the deaf or hard of hearing employee.

— The importance of the situation as it relates to work requirements, job rights, and benefits.

— The availability and cost of the alternative resources under consideration.

— Whether the situation requires confidentiality.

Available resources which should be considered include:

a. Installation heads are authorized to pay for certified interpreters. Every effort will be made to provide certified interpreters when deemed necessary by an application of the principles set forth herein.

b. In some states, the Division of Vocational Rehabilitation (DVR) provides interpreters at no charge. When a decision is made that an interpreter is the appropriate accommodation and a DVR interpreter is not available, other methods of securing an interpreter should be used.

c. Volunteer interpreters or individuals skilled in signing may be obtained from the work force or from the community. The skill level of such persons should be considered.

d. In some situations, written communications may be appropriate. The deaf or hard of hearing employee's ability to understand written communications should be considered.

e. Supervisors, training specialists, EAP, and EEO counselors may be trained in sign language.

f. Deaf or hard of hearing applicants should normally be scheduled for a specific examination time when an interpreter will be available.

g. State or Federal relay services may provide a way for a deaf or hard of hearing employee to conduct postal business by telephone with other employees and customers.

Management will provide the following assistance for deaf and/or hard of hearing employees:

a. All films or videotapes designed for the training or instruction of regular work force employees developed on or after October 1, 1987, shall be opened or closed captioned. To the extent practicable, existing films or videotapes developed nationally that will continue to be used by deaf or hard of hearing employees with some frequency, will be opened or closed captioned.

b. Special telecommunications devices for the deaf will be installed in all postal installations employing deaf employees in the regular work force. Special telecommunications devices or telephone volume control devices will be installed for hard of hearing employees whenever a hard of hearing employee requests and needs such a reasonable accommodation in order to communicate by phone. These devices will be available to deaf and/or hard of hearing employees for official business and in the case of personal emergencies. As appropriate, Management will provide training to staff on the use of these special telecommunications devices.

c. A visual alarm will be installed on all moving powered industrial equipment in all postal installations employing deaf employees in the regular work force or in any installation where such a reasonable accommodation is requested and necessary for a hard of hearing employee.

d. Visual fire alarm will be installed in all new postal installations (installations for which the U.S. Postal Service, as of June 12, 1991, had not awarded a contract for the design of the building) where the Postal Service installs audible fire alarms. The parties will discuss and seek to agree at the local level about the installation in such other facilities as may be appropriate.

JOINT LABOR-MANAGEMENT MEETINGS

Discussion of problem areas with regard to the use of certified sign interpreters, enhancement of job opportunities for the deaf and hard of hearing, type of special telecommunications devices or volume control devices to be installed, installation of visual alarms or other systems such as tactile devices at other than new postal installations, and the availability of new technologies which may help deaf and hard of hearing employees perform a variety of tasks are appropriate matters for consideration at Joint Labor-Management meetings. Discussion of such matters at

Labor-Management meetings is not a prerequisite to the filing or processing of a grievance.

# ARTICLE 3 MANAGEMENT RIGHTS

The Employer shall have the exclusive right, subject to the provisions of this Agreement and consistent with applicable laws and regulations:

A. To direct employees of the Employer in the performance of official duties;

B. To hire, promote, transfer, assign, and retain employees in positions within the Postal Service and to suspend, demote, discharge, or take other disciplinary action against such employees;

C. To maintain the efficiency of the operations entrusted to it;

D. To determine the methods, means, and personnel by which such operations are to be conducted;

E. To prescribe a uniform dress to be worn by letter carriers and other designated employees; and

F. To take whatever actions may be necessary to carry out its mission in emergency situations, i.e., an unforeseen circumstance or a combination of circumstances which calls for immediate action in a situation which is not expected to be of a recurring nature.

(The preceding Article, Article 3, shall apply to **City Carrier Assistant** Employees.)

The Postal Service's "exclusive rights" under Article 3 are basically the same as its statutory rights under the Postal Reorganization Act, 39 U.S.C. Section 1001(e). While postal management has the right to "manage" the Postal Service, it must act in accordance with applicable laws, regulations, contract provisions, arbitration awards, letters of agreement, and memoranda. Consequently, many of the management rights enumerated in Article 3 are limited by negotiated contract provisions. For example, the Postal Service's Article 3 right to "suspend, demote, discharge, or take other disciplinary action against" employees is subject to the provisions of Articles 15 and 16.

**Article 3.F Emergencies.** This provision gives management the right to take whatever actions may be necessary to carry out its mission in emergency situations. An emergency is defined as "an unforeseen circumstance or a combination of circumstances which calls for immediate action in a situation which is not expected to be of a recurring nature."

**Emergencies—Local Implementation Under Article 30.** Article 30.B.3 provides that a Local Memorandum of Understanding (LMOU) may include, among other items, "Guidelines for the curtailment or termination of postal operations to conform to orders of local authorities or as local conditions warrant because of emergency conditions."

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 16 of 472. PageID #: 834

Page 3-2 NALC-USPS Joint Contract Administration Manual - July 2014

USPS000556

# ARTICLE 4 TECHNOLOGICAL AND MECHANIZATION CHANGES

Both parties recognize the need for improvement of mail service.

4.1 **Section 1. Advance Notice**

The Union will be informed as far in advance of implementation as practicable of technological or mechanization changes which affect jobs including new or changed jobs in the area of wages, hours or working conditions. When major new mechanization or equipment is to be purchased and installed, the Union at the national level will be informed as far in advance as practicable, but no less than 90 days in advance.

The provisions of Articles 4.1 and 4.2 are administered and enforced by the parties at the national level. These provisions are not properly the subject of local grievances. However, local branches should immediately bring to their national business agent's attention any matters they believe are covered by these provisions.

The union at the national level will be informed as far in advance as practicable, but no less than ninety days in advance, when major new mechanization or equipment is to be purchased and installed which will affect jobs.

4.2 **Section 2. Labor-Management Committee**

There shall be established at the national level a Joint-Labor Management Technological or Mechanization Changes Committee composed of an equal number of representatives of management and Union. Notice to said Committee shall satisfy the notice requirements of the preceding paragraph. Upon receiving notice, said Committee shall attempt to resolve any questions as to the impact of the proposed change upon affected employees and if such questions are not resolved within a reasonable time after such change or changes are operational, the unresolved questions may be submitted by the Union to arbitration under the grievance-arbitration procedure. Any arbitration arising under this Article will be given priority in scheduling.

There shall be at the national level a Joint Labor-Management Technological and Mechanization Changes Committee composed of an equal number of union and management representatives. Any unresolved dispute resulting from proposed changes upon affected employees may be submitted by the union to arbitration. Any arbitration arising under Article 4 will be given priority in scheduling.

4.3 **Section 3. New Jobs**

Any new job or jobs created by technological or mechanization changes shall be offered to present employees capable of being trained

> to perform the new or changed job and the Employer will provide such training. During training, the employee will maintain his/her rate. It is understood that the training herein referred to is on the job and not to exceed sixty (60) days. Certain specialized technical jobs may require additional and off-site training.
>
> An employee whose job is eliminated, if any, and who cannot be placed in a job of equal grade shall receive rate protection until such time as that employee fails to bid or apply for a position in the employee's former wage level.
>
> The obligation hereinabove set forth shall not be construed to, in any way, abridge the right of the Employer to make such changes.

Article 4.3 requires management to offer any new jobs created by technological or mechanization changes to present employees capable of being trained to perform the new or changed job. National Arbitrator Snow held in H7C-NA-C 96, May 20, 1993 (C-13007) that the Postal Service had an obligation to offer newly created Remote Video Encoding Jobs to current employees. On-the-job training for any new job created by technological or mechanization changes shall not exceed sixty days. During training, the employees will maintain their pay rate.

**Rate Protection.** Article 4.3 provides that if an employee's job is eliminated due to mechanization or technological change, and if the employee cannot be placed in a job of equal grade, the employee shall receive a rate protection until such time as he/she fails to bid or apply for a position in his/her former wage level. The saved grade provided for in this section is governed by the provisions of Section 421.53 of the *Employee and Labor Relations Manual (ELM)*.

See also Article 9.6 which contains a general provision requiring the Postal Service to continue all the salary rate retention provisions contained in ELM Section 421.5.

# ARTICLE 5 PROHIBITION OF UNILATERAL ACTION

The Employer will not take any actions affecting wages, hours and other terms and conditions of employment as defined in Section 8(d) of the National Labor Relations Act which violate the terms of this Agreement or are otherwise inconsistent with its obligations under law.

(The preceding Article, Article 5, shall apply to **City Carrier Assistant** Employees.)

**Prohibition on Unilateral Changes.** Article 5 prohibits management taking any unilateral action inconsistent with the terms of the existing agreement or with its obligations under law. Section 8(d) of the National Labor Relations Act prohibits an employer from making unilateral changes in wages, hours or working conditions during the term of a collective bargaining agreement.

In H1N-5G-C 14964, March 11, 1987 (C-06858) National Arbitrator Bernstein wrote concerning Article 5:

> The only purpose the Article can serve is to incorporate all the Service's "obligations under law" into the Agreement, so as to give the Service's legal obligations the additional status of contractual obligations as well. This incorporation has significance primarily in terms of enforcement mechanism—it enables the signatory unions to utilize the contractual vehicle of arbitration to enforce all of the Service's legal obligations. Moreover, the specific reference to the National Labor Relations Act is persuasive evidence that the parties were especially interested in utilizing the grievance and arbitration procedure spelled out in Article 15 to enforce the Service's NLRB commitments.

Not all unilateral actions are prohibited by the language in Article 5—only those affecting wages, hours or working conditions as defined in Section 8(d) of the National Labor Relations Act. Additionally, certain management decisions concerning the operation of the business are specifically reserved in Article 3 unless otherwise restricted by a specific contractual provision.

### Past Practice

The following explanation represents the national parties' general agreement on the subject of past practice. The explanation is not exhaustive, and is intended to provide the local parties general guidance on the subject. The local parties must insure that the facts surrounding a dispute in which past practice plays a part are surfaced and thoroughly developed so an informed decision can be made.

Article 5 may also limit the employer's ability to take a unilateral action where a valid past practice exists. While most labor disputes can be resolved by application of the written language of the Agreement, it has long been recognized that the resolution of some disputes require the examination of the past practice of the parties.

**Defining Past Practice**

In a paper given to the National Academy of Arbitrators, Arbitrator Mittenthal described the elements required to establish a valid past practice:

- First, there should be clarity and consistency. A course of conduct which is vague and ambiguous or which has been contradicted as often as it has been followed can hardly qualify as a practice. But where those in the plant invariably respond the same way to a particular set of conditions, their conduct may very well ripen into a practice.

- Second, there should be longevity and repetition. A period of time has to elapse during which a consistent pattern of behavior emerges. Hence, one or two isolated instances of certain conduct do not ordinarily establish a practice. Just how frequently and over how long a period something must be done before it can be characterized as a practice is a matter of good judgment for which no formula can be devised.

- Third, there should be acceptability. The employees and supervisors alike must have knowledge of the particular conduct and must regard it as the correct and customary means of handling a situation. Such acceptability may frequently be implied from long acquiescence in a known course of conduct. Where this acquiescence does not exist, that is, where employees constantly protest a particular course of action through complaints and grievances, it is doubtful that any practice will be created.

- One must consider, too, the underlying circumstance which give a practice its true dimensions. A practice is no broader than the circumstances out of which it has arisen, although its scope can always be enlarged in the day-to-day administration of the agreement. No meaningful description of a practice can be made without mention of these circumstances. For instance, a work assignment practice which develops on the afternoon and midnight shifts and which is responsive to the peculiar needs for night work cannot be automatically extended to the day shift. The point is that every practice must be carefully related to its origin and purpose.

- Finally, the significance to be attributed to a practice may possibly be affected by whether or not it is supported by mutuality. Some practices are the product, either in their inception or in their application, of a joint understanding; others develop from choices made by the

employer in the exercise of its managerial discretion without any intention of a future commitment.

### Functions of Past Practice

In the same paper, Arbitrator Mittenthal notes that there are three distinct functions of past practice:

**To Implement Contract Language.** Contract language may not be sufficiently specific to resolve all issues that arise. In such cases, the past practice of the parties provides evidence of how the provision at issue should be applied. For example, Article 15, Section 2, Step 3 of the 1978 National Agreement (and successor agreements through the 2000 National Agreement) required the parties to hold Step 3 meetings. The contract language, however, did not specify where the meetings were to be held. Arbitrator Mittenthal held that in the absence of any specific controlling contract language, the Postal Service did not violate the National Agreement by insisting that Step 3 meetings be held at locations consistent with past practice (N8-NAT-0006, July 10, 1979, C-03241).

**To Clarify Ambiguous Language.** Past practice is used to assess the intent of the parties when the contract language is ambiguous, that is, when a contract provision could plausibly be interpreted in one of several different ways. A practice is used in such circumstances because it is an indicator of how the parties have mutually interpreted and applied the ambiguous language. For example, in a dispute concerning the meaning of an LMOU provision, evidence showing how the provision has been applied in the past provides insight into how the parties interpreted the language. If a clear past practice has developed, it is generally found that the past practice has established the meaning of the disputed provision.

**To Implement Separate Conditions of Employment.** Past practice can establish a separate enforceable condition of employment concerning issues where the contract is "silent." This is referred to by a variety of terms, but the one most frequently used is *the silent contract*. For example, a past practice of providing the local union with a file cabinet may become a binding past practice, even though there are no contract or LMOU provisions concerning the issue.

### Changing Past Practices

The manner by which a past practice can be changed depends on its purpose and how it arose. Past practices that implement or clarify existing contract language are treated differently than those concerning the "silent contract."

**Changing Past Practices that Implement or Clarify Contract Language.** If a binding past practice clarifies or implements a contract provision, it becomes, in effect, an unwritten part of that provision.

Generally, it can only be changed by changing the underlying contract language, or through bargaining.

**Changing Past Practices that Implement Separate Conditions of Employment.** If the Postal Service seeks to change or terminate a binding past practice implementing conditions of employment concerning areas where the contract is silent, Article 5 prohibits it from doing so unilaterally without providing the union appropriate notice. Prior to making such a change unilaterally, the Postal Service must provide notice to the union and engage in good faith bargaining over the impact on the bargaining unit. If the parties are unable to agree, the union may grieve the change.

Management changes in such "silent" contracts are generally not considered violations if 1) the company changes owners or bargaining unit, 2) the nature of the business changes, or 3) the practice is no longer efficient or economical. The first of these has rarely arisen in Postal Service cases involving its numerous bargaining units.

A change in local union leadership or the arrival of a new postmaster or supervisor is not, in itself, sufficient justification to change or terminate a binding past practice, as noted in the previous paragraph.

# ARTICLE 6 NO LAYOFFS OR REDUCTION IN FORCE

(1) Each employee who is employed in the regular work force as of the date of the Award of Arbitrator James J. Healy, September 15, 1978, shall be protected henceforth against any involuntary layoff or force reduction.

It is the intent of this provision to provide security to each such employee during his or her work lifetime.

Members of the regular work force, as defined in Article 7 of the Agreement, include full-time regulars, part-time employees assigned to regular schedules and part-time employees assigned to flexible schedules.

(2) Employees who become members of the regular work force after the date of this Award, September 15, 1978, shall be provided the same protection afforded under (1) above on completion of six years of continuous service and having worked in at least 20 pay periods during each of the six years.

(3) With respect to employees hired into the regular work force after the date of this Award and who have not acquired the protection provided under (2) above, the Employer shall have the right to effect layoffs for lack of work or for other legitimate reasons. This right may be exercised in lieu of reassigning employees under the provisions of Article 12, except as such right may be modified by agreement. Should the exercise of the Employer's right to lay off employees require the application of the provisions of Chapter 35 of Title 5, United States Code, employees covered by that Chapter with less than three years of continuous civilian federal service will be treated as "career conditional" employees.

The Employer's right as established in this Section shall be effective July 20, 1979.

The following terms as to the employees' and Employer's rights and the rules and procedures to be followed in the implementation of Article 6 are a part of the September 15, 1978 Final Resolution and shall be final and binding upon the parties:

**A. Coverage**

6.A.1

**1. Employees protected against any involuntary layoff or force reduction.**

Those employees who occupy full-time, part-time regular or part-time flexible positions in the regular work force (as defined in Article 7) on September 15, 1978, are protected against layoff and reduction in force during any period of employment in the regular work force with the United States Postal Service or successor organization in his or her lifetime. Such employees are referred to as "protected employees."

Other employees achieve protected status under the provisions of A.3 below.

6.A.2

**2. Employees subject to involuntary layoff or force reduction.**

Except as provided in A.1 and A.3, all employees who enter the regular work force, whether by hire, transfer, demotion, reassignment, reinstatement, and reemployment on or after September 16, 1978, are subject to layoff or force reduction and are referred to as "non-protected employees."

6.A.3

**3. Non-protected employees achieving protected status.**

(a) A non-protected employee achieves protected status upon completion of six years of continuous service in their regular work force. The service requirement is computed from the first day of the pay period in which the employee enters the regular work force. To receive credit for the year, the employee must work at least one hour or receive a call-in guarantee in lieu of work in at least 20 of the 26 pay periods during that anniversary year.

Absence from actual duty for any of the following reasons will be considered as "work" solely for the purposes of this requirement:

(1) To the extent required by law, court leave, time spent in military service covered by Chapter 43 of Title 38, or time spent on continuation of pay, leave without pay or on OWCP rolls because of compensable injury on duty.

(2) Time spent on paid annual leave or sick leave, as provided for in Article 10 of the Agreement.

(3) Leave without pay for performing Union business as provided for in Article 24 of the Agreement.

All other unpaid leave and periods of suspension or time spent in layoff or RIF status will not be considered work. Failure to meet the 20 pay period requirement in any given anniversary year means the employee must begin a new six year continuous service period to achieve protected status.

(b) Temporary details outside of the regular work force in which the employee's position of record remains in the regular work force count toward fulfilling the 20 pay periods of work requirement per year.

(c) If a non-protected employee leaves the regular work force for a position outside the Postal Service and remains there more than 30 calendar days, upon return the employee begins a new service period for purposes of attaining six years continuous service.

(d) If a non-protected employee leaves the regular work force and returns within two years from a position within the Postal Service the employee will receive credit for previously completed full anniversary years, for purposes of attaining the six years continuous service.

6.B.1

**B. Preconditions for Implementation of Layoff and Reduction in Force.**

1. The affected Union(s) shall be notified at the Regional level no less than 90 days in advance of any layoff or reduction in force that an excess of employees exists or will exist at an installation and that a layoff and reduction in force may be necessary. The Employer will explain to the Union(s) the basis for its conclusion that legitimate business reasons require the excessing and possible separation of employees.

6.B.2

2. No employee shall be reassigned under this Article or laid off or reduced in force unless and until that employee has been notified at least 60 days in advance that he or she may be affected by one or the other of these actions.

6.B.3

3. The maximum number of excess employees within an installation shall be determined by seniority unit within each category of employees (full-time, part-time regular, part-time flexible). This number determined by the Employer will be given to the Union(s) at the time of the 90-day notice.

6.B.4

4. Before implementation of reassignment under this Article or, if necessary, layoff and reduction in force of excess employees within the installation, the Employer will, to the fullest extent possible, separate all casuals within the craft and minimize the amount of overtime work and part-time flexible hours in the positions or group of positions covered by the seniority unit as defined in this Agreement or as agreed to by the parties. In addition, the Employer shall solicit volunteers from among employees in the same craft within the installation to terminate their employment with the Employer.

   Employees who elect to terminate their employment will receive a lump sum severance payment in the amount provided by Part 435 of the Employee and Labor Relations Manual, will receive benefit coverage to the extent provided by such Manual, and, if eligible, will be given the early retirement benefits provided by Section 8336(d)(2) of Title 5, United States Code and the regulations implementing that statute.

6.B.5

5. No less than 20 days prior to effecting a layoff, the Employer will post a list of all vacancies in other seniority units and crafts at the same or lower level which exist within the installation and within the commuting area of the losing installation. Employees in an affected seniority unit may, within 10 days after the posting, request a reassignment under this Article to a posted vacancy. Qualified employees will be assigned to such vacancies on the basis of seniority. If a senior non-preference eligible employee within the seniority unit indicates no interest in available reassignment, then such employee becomes exposed to layoff. A preference eligible employee within the seniority unit shall be required to accept such a reassignment to a vacancy in the same level at the installation, or, if none exists at the installation, to a vacancy in the same level at an installation within the commuting area of the losing installation.

If the reassignment is to a different craft, the employee's seniority in the new craft shall be established in accordance with the applicable seniority provisions of the new craft.

**C. Layoff and Reduction in Force**

6.C.1

1. **Definition.** The term "layoff" as used herein refers to the separation of non-protected, non-preference eligible employees in the regular work force because of lack of work or other legitimate, non-disciplinary reasons. The term "reduction in force" as used herein refers to the separation or reduction in the grade of a non-protected veterans' preference eligible in the regular work force because of lack of work or other legitimate non-disciplinary reasons.

6.C.2

2. **Order of layoff.** If an excess of employees exists at an installation after satisfaction of the preconditions set forth in (B) above, the Employer may lay off employees within their respective seniority units as defined in the Agreement.

6.C.3

3. **Seniority units for purposes of layoff.** Seniority units within the categories of full-time regular, part-time regular, and part-time flexible, will consist of all non-protected persons at a given level within an established craft at an installation unless the parties agree otherwise. It is the intent to provide the broadest possible unit consistent with the equities of senior non-protected employees and with the efficient operation of the installation.

6.C.4

4. **Union representation.** Chief stewards and union stewards whose responsibilities bear a direct relationship to the effective and efficient representation of bargaining unit employees shall be placed at the top of the seniority unit roster in the order of their relative craft seniority for the purposes of layoff, reduction in force, and recall.

6.C.5

5. **Reduction in force.** If an excess of employees exists at an installation after satisfaction of the preconditions set forth in (B) above and after the layoff procedure has been applied, the Employer may implement a reduction in force as defined above. Such reduction will be conducted in accordance with statutory and regulatory requirements that prevail at the time the force reduction is effected. Should applicable law and regulations require that other non-protected, non-preference eligible employees from other seniority units be laid off prior to reduction in force, such employees will be laid off in inverse order of their craft seniority in the seniority unit.

   In determining competitive levels and competitive areas applicable in a force reduction, the Employer will submit its proposal to the Union(s) at least 30 days prior to the reduction. The Union(s) will be afforded a full opportunity to make suggested revisions in the proposal. However, the Employer, having the primary responsibility for compliance with the statute and regulations, reserves the right to make the final decision with respect to competitive levels and competitive areas. In making its decision with respect to competitive levels and competitive areas the Employer shall give no greater retention security to preference eligibles than to non-preference eligibles except as may be required by law.

**D. Recall Rights**

6.D.1

1. Employees who are laid off or reduced in force shall be placed on recall lists within their seniority units and shall be entitled to remain on such lists for two years. Such employees shall keep the Employer informed of their current address. Employees on the lists shall be notified in order of craft seniority within the seniority unit of all vacant assignments in the same category and level from which they were laid off or reduced in force. Preference eligibles will be accorded no recall rights greater than non-preference eligibles except as required by law. Notice of vacant assignments shall be given by certified mail, return receipt requested, and a copy of such notice shall be furnished to the local union president. An employee so notified must acknowledge receipt of the notice and advise the Employer of his or her intentions within 5 days after receipt of the notice. If the employee accepts the position offered he or she must report for work within 2 weeks after receipt of notice. If the employee fails to reply to the notice within 5 days after the notice is received or delivery cannot be accomplished, the Employer shall offer the vacancy to the next employee on the list. If an employee declines the offer of a vacant assignment in his or her seniority unit or does not have a satisfactory reason for failure to reply to a notice, the employee shall be removed from the recall list.

6.D.2

2. An employee reassigned from a losing installation pursuant to B.5 above and who has retreat rights shall be entitled under this Article to exercise those retreat rights before a vacancy is offered to an employee on the recall list who is junior to the reassigned employee in craft seniority.

6.E

**E. Protective Benefits**

1. **Severance pay.** Employees who are separated because of a layoff or reduction in force shall be entitled to severance pay in accordance with Part 435 of the Employee and Labor Relations Manual.

2. **Health and Life Insurance Coverage.** Employees who are separated because of a layoff or a reduction in force shall be entitled to the health insurance and life insurance coverage and to the conversion rights provided for in the Employee and Labor Relations Manual.

6.F

**F. Union Representation Rights**

1. The interpretation and application of the provisions of this Award shall be grievable under Article 15. Any such grievance may be introduced at Step B and shall be subject to priority arbitration.

2. The Employer shall provide to the affected Union(s) a quarterly report on all reassignments, layoff and reductions in force made under this Article.

3. Preference eligibles are not deprived of whatever rights of appeal such employees may have under applicable laws and regulations. If the employee appeals under the Veterans' Preference Act, however, the time limits for appeal to arbitration and the normal contractual arbitration scheduling procedures are not to be delayed

as a consequence of that appeal; if there is an MSPB appeal pending as of the date the arbitration is scheduled by the parties, the grievant waives access to the grievance-arbitration procedure beyond Step B.

6.G **G. Intent**

The Employer shall not lay off, reduce in force, or take any other action against a non-protected employee solely to prevent the attainment of that employee of protection status.

**(Additional no layoffs or reduction in force provisions regarding City Carrier Assistant Employees are found in Appendix B.)**

**Background.** Article 6 was created in its current form by Arbitrator Healy's interest arbitration awards that decided the terms of the 1978-1981 National Agreement. An initial award of September 14, 1978 established the basic right of Postal Service management to lay off certain employees under certain specific conditions. The second award, issued February 26, 1979, set forth the details of the current Article 6.

**Lifetime Protection for Employees On Rolls in 1978.** Article 6 provides lifetime protection against layoff for employees who were in the regular workforce on September 15, 1978. Employees with lifetime protection against layoff are referred to as "protected employees." Lifetime protection is not lost by those employees on the rolls on September 15, 1978 who later leave the Postal Service and then are rehired after any break in service or who transfer from one office to another.

**"Non-protected employees"** are defined as those who enter the regular workforce whether by hire, transfer, demotion, reassignment, reinstatement, or re-employment on or after September 16, 1978. They are subject to layoff or reduction in force—until they achieve "protected" status.

**Layoff Protection After Six Years.** Non-protected employees achieve protected status upon completion of six years of continuous service in the regular workforce, which includes all part-time flexible, full-time flexible, full-time regular and part-time regular carriers. To receive credit, such employees must work at least one hour or receive a call-in guarantee (Article 8.8) in lieu of work in at least 20 of the 26 pay periods during each of the six consecutive "anniversary years." The "anniversary year" begins on the first day of the pay period in which the employee enters the regular work force.

**Details of Service Requirement.** For the purpose of the six-year requirement, absence from work for any of the following reasons is considered to be "work:"

(1) To the extent required by law: (a) court leave, (b) certain time spent in military service covered Chapter 43 of Title 38, or (c) time spent on continuation of pay (COP), leave without pay (LWOP), or on the OWCP rolls because of compensable injury on duty (Article 6.A.3(a)(1));

(2) Time spent on paid annual or sick leave (Article 6.A.3(a)(2));

(3) Time spent on leave without pay (LWOP) for performing union business as provided for in Article 24 of the Agreement (Article 6.A.3(a)(3)); and

(4) Temporary details outside the regular workforce in which the employee's position of record remains in the regular force (Article 6.A.3(b)).

The parties do not currently agree upon the extent to which time spent on other leave without pay covered by the Family Medical Leave Act (FMLA) is considered "work" for the purpose of the six-year requirement.

The period of continuous service is "broken" when a non-protected employee leaves the regular workforce for a position outside the Postal Service and fails to return within thirty calendar days, or when such an employee leaves the regular workforce for a position within the Postal Service and fails to return within two years (Article 6.A.3(c), (d)).

**"Layoff" and "Reduction in Force."** Article 6 defines "layoff" as the separation of non-protected, non-preference eligible employees in the regular workforce because of lack of work or other legitimate, non-disciplinary reasons. "Reduction in force" refers to the separation or reduction in the grade of a non-protected veterans' preference eligible in the regular workforce because of lack of work or other legitimate, non-disciplinary reasons (See "Preference Eligible Carriers").

**Procedural Protections.** Article 6 provides certain procedural protections. For instance, management may not implement a layoff or reduction in force without at least ninety days notification to the union, sixty days notification of layoff to the affected employee, and posting of any available vacancies no less than twenty days prior to layoff. Grievances regarding Article 6 may be introduced at Step B and are subject to priority arbitration.

**Article 6 Untested.** As of this writing postal management has never used layoff or reduction in force procedures to separate a letter carrier. So these provisions have not been interpreted in the grievance procedure or in arbitration.

**City Carrier Assistant Employees.** Appendix B, 3. Other Provisions, Section A—Article 6 of the 2011 National Agreement indicates the effect of city carrier assistant employment on the layoff of career employees.

**APPENDIX B**

**Appendix B is the reprinting of Section I of the 2013 Das Award, the creation of a new non-career employee category.**

**3. OTHER PROVISIONS**

**A. Article 6 – No Layoffs or Reduction in Force**

Prior to laying off career city letter carriers in an installation, management will, to the extent possible, offer the impacted employee the opportunity to work any letter carrier assignments being performed by CCA employees, or if necessary, separate CCA employees. There will be no out-of-schedule pay provided to the impacted employees.

**Preference Eligible Carriers.** It should be noted that "preference eligible" letter carriers have special rights under the Veterans' Preference Act regarding separation or reduction in grade. (Federal law defines a "preference eligible" veteran at Title 5 United States Code Section 2108; see EL-312, Section 483.) Preference eligible employees may have different or greater rights under the law than those set forth in Article 6.

A preference eligible employee may file both a grievance and an MSPB appeal on a separation or reduction in grade. However, Article 6 provides that a preference eligible employee who exercises appeal rights under the Veterans' Preference Act thereby waives access to the grievance procedure beyond Step B when there is an MSPB appeal pending as of the date the grievance is scheduled for arbitration by the parties. The date of the arbitration scheduling letter is considered "the date the arbitration is scheduled by the parties" for the purposes of Article 6.F.3 (See Article 16.9 for further explanation of dual filings).

# ARTICLE 7 EMPLOYEE CLASSIFICATIONS

Article 7.1 establishes the employee classifications within the letter carrier craft. It also contains provisions establishing limits on the work hours of non-career city carrier assistant and transitional employees in order to protect career employment and the work hours of career employees.

7.1.A

> **Section 1. Definition and Use**
>
> **A. Regular Work Force.** The regular work force shall be comprised of two categories of employees which are as follows:
>
> 1. **Full-Time.** Employees in this category shall be hired pursuant to such procedures as the Employer may establish and shall be assigned to regular schedules consisting of five (5) eight (8) hour days in a service week.
>
> 2. **Part-Time.** Employees in this category shall be hired pursuant to such procedures as the Employer may establish and shall be assigned to regular schedules of less than forty (40) hours in a service week, or shall be available to work flexible hours as assigned by the Employer during the course of a service week.

**Job Classifications.** Article 7.1.A defines the three basic classifications of career letter carriers: (1) full-time with a guaranteed weekly schedule consisting of five eight-hour days in a service week; (2) part-time regulars, who have regular schedules of less than 40 hours; and (3) part-time flexibles, who have flexible work hours rather than a fixed schedule and have no weekly work hour guarantees. Full-time flexible employees are also career letter carriers and part of the regular workforce. The city carrier assistant workforce is defined separately by Article 7.1.C.

**Part-Time Regulars.** The Step 4 Settlement D94N-4D-C 98031046, August 12, 1998 (M-01337), provides that:

> Part-time regulars are regular work force employees who are assigned to work regular schedules of less than 40 hours in a service week. Part-time regular schedules should not be altered on a day-to-day or week-to-week basis.
>
> Part-time regulars are normally to be worked within the schedules for which they are hired. They can occasionally be required to work beyond their scheduled hours of duty. However, their work hours should not be extended on a regular or frequent basis.
>
> It was also agreed that part-time employees who are expected to be available to work flexible hours as assigned during the course of a service week should be classified as part-time flexibles.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Part-Time Regular City Letter Carriers**

During the term of the 2011 National Agreement, the number of part-time regular city letter carriers employed by the Postal Service may not exceed the number of part-time regular city carriers on the rolls the date of this agreement.

Date: January 10, 2013

The part-time regular city letter carrier cap is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS
2011 USPS/NALC NATIONAL AGREEMENT**

**1. The Memorandum of Understanding, *Re: Part-Time Regular City Letter Carriers,* establishes a cap on city letter carrier part-time regular employees as the number employed on the effective date of the 2011 National Agreement. What is the cap?**

682.

**2. Is the limit of 682 part-time regular employees a national cap or is it limited to locations that employed part-time regular city letter carriers on the effective date of the 2011 National Agreement?**

It is a national cap.

7.1.B

**B. Transitional Work Force. (Note: The transitional work force will be phased out within 90 days of the effective date of this Agreement.)**

The transitional work force shall be comprised of noncareer, bargaining unit employees as follows:

1. The number of transitional employees who may be employed in any period, other than December, shall not exceed 3.5% of the total number of career city carriers covered by this Agreement.
2. The number of transitional employees employed in a district, other than December, may not exceed 6% of the total number of career city carriers employed in that district.
3. Over the course of a pay period, the Employer will make every effort to ensure that qualified and available part-time flexible employees are utilized at the straight-time rate prior to assigning such work to transitional employees working in the same work location and on the same tour, provided that the reporting guarantee for transitional employees is met.

> 4. Transitional employees shall be hired pursuant to such procedures as the Employer may establish. They will be hired for a term not to exceed 360 calendar days for each appointment. Transitional employees will have a break in service of at least 5 days between appointments.
>
> [see Memo, page **156**]

The Transitional Employee (TE) category of the city letter craft was eliminated in the 2011 National Agreement by the Memorandum of Understanding *Re: Transitional Employees* which required TEs to be phased out within 90 days of the effective date of the Das Interest Arbitration Award (January 10, 2013).

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: Transitional Employees**

All provisions of the 2006 USPS/NALC National Agreement that were applicable to transitional employees, including related Memoranda of Understanding and other agreements or policy statements, will continue during the period that transitional employees will be phased out (within 90 days of the effective date of the 2011 Agreement).

Dated: January 10, 2013

The phasing out of transitional employees is further addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS
2011 USPS/NALC NATIONAL AGREEMENT**

**1. What is the last date that transitional employees may be on the rolls?**

April 10, 2013.

Transitional Employee Memos and Q&As can be found on JCAM pages 7-45 through 7-58.

7.1.C

> **C. City Carrier Assistant Employees (CCAs)**
>
> **The city carrier assistant work force shall be comprised of noncareer, bargaining unit employees, as follows:**
>
> **1. City carrier assistants may perform the full range of letter carrier duties. The number of city carrier assistants**

**who may be employed in any reporting period shall not exceed 15% of the total number of full-time career city carriers in that District.**

**2. In order to meet the fundamental changes in the business environment, including, but not limited to flexible windows which may be necessary to develop and provide new products and services, the Employer has the right to hire up to 8,000 CCAs in addition to those authorized in paragraph 1, above. The number of such city carrier assistants who may be employed in any reporting period shall not exceed 8% of the total number of full-time career city carriers in that District. CCAs hired under this Section will be so designated on their PS Form 50.**

**District 15 Percent Limit on City Carrier Assistant Employees.** Article 7.1.C.1 restricts the number of city carrier assistant employees employed district-wide in the city carrier craft to 15% of the total number of full-time career city carriers in that District.

Article 7.1.C.2 provides the Postal Service the right to hire up to 8,000 additional CCAs to meet fundamental changes in the business environment. Within that 8,000 CCA cap, the number of CCAs cannot exceed 8% of the total number of full-time career city carriers in a District. CCAs hired under this Section will be designated as such on their PS Form 50.

Hiring and caps for CCAs are further addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

QUESTIONS AND ANSWERS
2011 USPS/NALC NATIONAL AGREEMENT

**2. How will the provisions of Article 7.1.C be monitored for compliance?**

The CCA caps will be monitored at the national level. The Postal Service will provide the national union with a report every other pay period that lists, by District, the number and type of CCA (Article 7.1.C.1 and 7.1.C.2) and the number of full-time regular city letter carriers. Any dispute over compliance with the CCA caps will be addressed at the national level.

**4. In determining CCA caps is the number of CCAs "rounded" for percentage purposes?**

No. Under Article 7.1.C.1 of the 2011 USPS/NALC National Agreement the number of CCAs shall not exceed 15% of the total number of full-time career city letter carriers in each District. Regarding the 8,000 CCAs employed under Article 7.1.C.2, the number in an individual District can be no more than 8% of the full-time career city letter carriers in that District.

**5. Are CCAs employed under Article 7.1.C.2 limited to sites directly affected by "fundamental changes in the business environment"?**

No. However, the number of this type of CCA that may be employed is limited to 8,000 nationwide and no more than 8% of the number of full-time career city letter carriers in a District.

**6. What are the occupational codes and designation activity codes for CCAs?**

CCA occupational codes are as follows: CCAs employed under Article 7.1.C.1 of the National Agreement are either 2310-0045 (City Carrier Assistant 1, CC-01) or 2310-0047 (City Carrier Assistant Tech 1, CC-02). CCAs employed under Article 7.1.C.2 of the National Agreement are either 2310-0046 (City Carrier Assistant 2, CC-01) or 2310-0048 (City Carrier Assistant Tech 2, CC-02). The designation activity code for all city carrier assistants is 84-4.

**15. May CCAs hold dual appointments?**

No.

**18. If a transitional employee is deployed to active duty in the military during the period of testing, will he/she have the opportunity to be hired as a CCA upon return from active duty?**

Yes, consistent with applicable laws and regulations.

**78. Will CCAs be assigned a Postal Service Employee Identification Number (EIN) and Personal Identification Number (PIN)?**

Yes.

For additional information regarding the hiring and caps of CCAs, see the complete joint Q&As found on pages 7-20 through 7-30.

7.1.C.3

**3. City carrier assistants shall be hired pursuant to such procedures as the Employer may establish. City carrier assistants shall be hired for terms of 360 calendar days and will have a break in service of 5 days between appointments.**

The term of employment for CCAs is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

QUESTIONS AND ANSWERS
2011 USPS/NALC NATIONAL AGREEMENT

**12. Does the five-day break between CCA 360-day appointments refer to five calendar or work days?**

Five calendar days.

**13. May a CCA employed under Article 7.1.C.1 or Article 7.1.C.2 be appointed to a term of less than 360 days?**

No. The only exception is when a transitional employee is hired as a CCA after a one day break during implementation of the 2011 National Agreement. In such case, the total period between beginning of the transitional employee appointment and the end of the initial CCA appointment is 360 calendar days.

**16. Must a CCA go through the normal pre-employment screening process (i.e. drug screen, background check, medical assessment, motor vehicle record check, etc.) when reappointed or hired immediately after a transitional employee appointment?**

No.

7.1.C.4

**4. Over the course of a service week, the Employer will make every effort to ensure that qualified and available part-time flexible employees are utilized at the straight-time rate prior to assigning such work to CCAs working in the same work location and on the same tour, provided that the reporting guarantee for CCA employees is met.**

The issue of temporary assignments of CCAs to other post offices (installations) is addressed by the Memorandum of Understanding, *Re: City Carrier Assistants – Temporary Assignments to Other Post Offices.*

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: City Carrier Assistants - Temporary Assignments to Other Post Offices**

The parties agree to the following regarding the temporary assignment of city carrier assistants (CCAs) outside their employing post office (installation) to another post office (installation):

1. CCAs will normally work in their employing post office but may be assigned to work in another post office in the local travel area (Handbook F-15, Section 7-1.1.1.1) within the same district on an occasional basis (the assignment may be for a partial day or several consecutive days, depending on local circumstances). Sunday CCA work assignments are not subject to the occasional basis limitation.

2. Temporary assignments must otherwise be consistent with the National Agreement (e.g. assigning CCAs to work outside their employing office may not violate Article 7.1.C.4 in the temporary office or the letter carrier paragraph in the employing office).

3. Management will schedule CCAs to work in other post offices in advance of the reporting date whenever practicable.

4. When the need arises to temporarily assign CCAs outside their employing post office, management will, to the extent practicable, use volunteer CCAs from the delivery unit providing assistance as long as the volunteers will be in a similar pay status (e.g straight-time rate, regular overtime rate, penalty overtime rate). If sufficient volunteers are not found, CCAs from the delivery unit providing assistance will be temporarily assigned to the other installation in reverse relative standing order whenever practicable as long as the junior CCAs are in a similar pay status.

5. CCAs who are required or volunteer to work outside their employing office may receive payment for mileage for the difference between their residence and employing office provided the difference is greater (Handbook F-15, Section 7-1.1.1.2.d).

The procedures outlined above are effective on December 7, 2013; however, either party may terminate this agreement by providing 30 days written notice to the other party. This agreement is reached without prejudice to the position of either party in this or any other matter and may only be cited to enforce its terms.

Date: December 5, 2013

The issue of permanent voluntary reassignments for CCAs during an appointment is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**26. May CCAs be permanently reassigned from one post office (installation) to another during their appointment?**

Yes, provided the employee's current appointment is being voluntarily terminated. To avoid a break in service a permanent reassignment to a different installation must be effected on the first day of a pay period.

**27. Is there a "lock-in" period that a CCA must meet before being reassigned to another installation?**

There is no lock-in period a CCA must satisfy before becoming eligible to reassign to another installation. Eligibility to move between installations is generally intended to address situations where an individual CCA would like to be reassigned to another installation for personal reasons and there is an agreement between the "losing" and "gaining" installation heads.

## 2011-2016 National Agreement Appendix B and March 6, 2014 Joint Questions and Answers on CCAs and Other Contract Provisions

**APPENDIX B**

**Appendix B is the reprinting of Section I of the 2013 Das Award, the creation of a new non-career employee category.**

I. NON-CAREER COMPLEMENT

The parties shall establish a new job classification called City Carrier Assistant (CCA).

**1. GENERAL PRINCIPLES**

a. The CCA work force is comprised of noncareer, city letter carrier bargaining unit employees.

b. CCA employees shall be hired for terms of 360 calendar days and will have a break in service of 5 days between appointments.

c. The provisions for determining the number of CCA employees that may be employed are found in Article 7.1.C.

d. The Postal Service shall provide a report every other pay period with information needed to monitor compliance with the above provision.

e. The hourly rate for CCA employees shall be established in accordance with Table 2, Step BB. Transitional Employees (TEs) employed as of the date of this Agreement who become CCAs shall be paid at Step AA of Table 2. The parties may mutually agree to increase the CCA pay rates should they determine it necessary for the recruitment or retention of CCAs. Adjustments to salary shall be in accordance with Article 9.7.

f. When hired, a CCA's relative standing in an installation is determined by his/her original CCA appointment date to the installation, using Article 41.2.B.6.(a) where applicable, and adding the time served as a city letter carrier transitional employee for appointments made after September 29, 2007 in any installation.

g. When the Postal Service hires new city letter carrier career employees, CCA employees within the installation will be converted to full-time regular career status to fill such vacancies based on their relative standing. A CCA who does not accept the career opportunity will not lose his/her relative standing for future career opportunities.

h. CCA employees may be separated at any time during their term of appointment for lack of work. Separations for lack of work shall be by inverse relative standing in the installation. Such separations are not grievable except where the separations are pretextual. CCAs separated for lack of work will be given preference for reappoint-

ment ahead of other CCAs with less relative standing in the installation if the need for hiring arises within 18 months of their separation.

i. CCA employees are separated for 5 days between appointments. When operational circumstances indicate that reappointment for a CCA(s) is not needed and the installation employs a CCA(s) with lower relative standing, the CCA(s) will be reappointed and the CCA(s) with the lower standing in the installation will be separated instead. Such separation of a CCA(s) with the lowest relative standing is not grievable except where the separation is pretextual. These CCAs separated for lack of work during or upon completion of their term of appointment will be given a preference for reappointment ahead of other CCAs with less relative standing in the installation provided the need for hiring arises within 18 months of separation.

j. All current transitional employees will be given the opportunity to be employed as CCAs, consistent with their test results and legal requirements. These employment opportunities and the phasing out of the transitional employee category will occur within 90 days of the effective date of this Agreement.

k. As Part-time Flexible (PTF) employees are converted to full-time in accordance with existing contractual processes, the PTF classification shall be phased out. There shall be no new hiring of PTF employees.

l. CCA is the only noncareer category in the NALC bargaining unit.

m. Opting provisions applicable to CCA employees (Article 41.2.B.4) are applicable beginning 90 days after the effective date of this Agreement.

**2. CONTRACT PROVISIONS**

The following articles and portions of articles of the National Agreement apply to CCA employees as outlined below:

Article 1
Article 2
Article 3
Article 5

**ARTICLE 7**
**EMPLOYEE CLASSIFICATION**

**Section 1. Definition and Use**

*****

**B. Transitional Work Force** (Note: The transitional work force will be phased out within 90 days of the effective date of this Agreement.)

*****

**C. City Carrier Assistant Employees**

The city carrier assistant work force shall be comprised of noncareer, bargaining unit employees, as follows:

1. City carrier assistants may perform the full range of letter carrier duties. The number of city carrier assistants who may be employed in any reporting period shall not exceed 15% of the total number of full-time career city carriers in that District.

2. In order to meet the fundamental changes in the business environment, including, but not limited to flexible windows which may be necessary to develop and provide new products and services, the Employer has the right to hire up to 8,000 CCAs in addition to those authorized in paragraph 1, above. The number of such city carrier assistants who may be employed in any reporting period shall not exceed 8% of the total number of full-time career city carriers in that District. CCAs hired under this Section will be so designated on their PS Form 50.

3. City carrier assistants shall be hired pursuant to such procedures as the Employer may establish. City carrier assistants shall be hired for terms of 360 calendar days and will have a break in service of 5 days between appointments.

4. Over the course of a service week, the Employer will make every effort to ensure that qualified and available part-time flexible employees are utilized at the straight-time rate prior to assigning such work to CCAs working in the same work location and on the same tour, provided that the reporting guarantee for CCA employees is met.

**Section 3. Employee Complements**

A. The Employer will staff at least one full-time regular city letter carrier per one full-time regular city letter carrier route, as defined in Article 41.1.A.1, plus each Carrier Technician position; however, the Employer's obligation shall not exceed a ratio of 1.18 full-time regular city letter carriers per full-time city letter carrier routes. As long as part-time flexible employees remain on the rolls, the Employer shall staff all postal installations which have 200 or more workyears of employment in the regular work force as of the date of this Agreement with 88% full-time employees in the letter carrier craft.

**ARTICLE 8**

**HOURS OF WORK**

**Section 2. Work Schedules**

A. The employee's service week shall be a calendar week beginning at 12:01 a.m. Saturday and ending at 12 midnight the following Friday.

B. The employee's service day is the calendar day on which the majority of work is scheduled. Where the work schedule is distrib-

uted evenly over two calendar days, the service day is the calendar day on which such work schedule begins.

**Section 3. Exceptions**

*****

CCA employees will be scheduled in accordance with Section 2, A and B, of this Article.

**Section 4. Overtime Work**

**Sections 4 A. B. C. E. and F apply to CCAs.**

**Section 7. Night Shift Differential**

**Section 8. Guarantees**

*****

D. Any CCA employee who is scheduled to work and who reports to work in a post office or facility with 200 or more workyears of employment shall be guaranteed four (4) hours of work or pay. CCAs at other post offices and facilities will be guaranteed two (2) hours work or pay.

**Section 9. Wash-Up Time**

**ARTICLE 9**

**SALARIES AND WAGES**

**Section 7. CCA Employees**

The hourly rates for CCA employees shall be established in accordance with Table 2. These rates shall be adjusted for any general increases provided in Article 9.2.

In addition, CCAs will receive the following wage adjustments:

Effective November 16, 2013, the CCA hourly rates in Table 2 shall be increased by 1.0%.

Effective November 15, 2014, the CCA hourly rates in Table 2 shall be increased by 1.0%.

Effective November 14, 2015, the CCA hourly rates in Table 2 shall be increased by 1.5%.

**ARTICLE 11**

**HOLIDAYS**

*****

**Section 6. Holiday Schedule**

**D. City Carrier Assistant Employees**

Qualified CCAs will be scheduled for work on a holiday or designated holiday after all full-time volunteers are scheduled to work on their holiday or designated holiday. They will be scheduled, to the extent possible, prior to any full-time volunteers or non-volunteers being scheduled to work a non-scheduled day or any full-time non-volunteers being required to work their holiday or designated holiday. If the parties have locally negotiated a pecking order that would schedule full-time volunteers on a nonscheduled day, the Local Memorandum of Understanding will apply.

Article 14
Article 15
Article 17
Article 18

**ARTICLE 19**

**HANDBOOKS AND MANUALS**

*****

Article 19 shall apply in that those parts of all handbooks, manuals and published regulations of the Postal Service, which directly relate to wages, hours, or working conditions shall apply to CCA employees only to the extent consistent with other rights and characteristics of CCA employees provided for in this Agreement. The Employer shall have the right to make changes to handbooks, manuals and published regulations as they relate to CCA employees pursuant to the same standards and procedures found in Article 19 of the National Agreement.

Article 20
Article 22
Article 23
Article 24

**ARTICLE 26**

**UNIFORMS AND WORK CLOTHES**

*****

**Section 3. City Carrier Assistant**

When the CCA has completed ninety (90) work days, or has been employed for 120 calendar days, whichever comes first, the CCA will be provided with an annual uniform allowance equal to the amount provided to career employees in Section 2.A. Time served as a Transitional Employee will count toward the 90/120 day requirement.

The uniform purchases are reimbursed by the Postal Service directly to the vendor. Uniforms will be returned by CCAs separated and not reappointed.

Article 27
Article 28
Article 31
Article 32
Article 34
Article 35
Article 36
Article 42
Article 43

Only the following Memorandums of Understanding from the 2011 National Agreement shall apply to CCA employees:

Use of Privately Owned Vehicles
Leave Sharing
Leave Without Pay
Processing of Post-Removal Grievances
Interest on Back Pay
Bereavement Leave

**3. OTHER PROVISIONS**

**A. Article 6 - No Layoffs or Reduction in Force**

Prior to laying off career city letter carriers in an installation, management will, to the extent possible, offer the impacted employee the opportunity to work any letter carrier assignments being performed by CCA employees, or if necessary, separate CCA employees. There will be no out-of-schedule pay provided to the impacted employees.

**B. Article 10 - Leave**

**GENERAL**

1. Purpose. Annual leave is provided to CCA employees for rest, recreation, emergency purposes, and illness or injury.

   a. Accrual of Annual Leave. CCA employees earn annual leave based on the number of hours in which they are in a pay status in each pay period.

| Rate of Accrual | Hours in Pay Status | Hours of Annual Leave Earned Per Pay Period |
|---|---|---|
| 1 hour for each unit of 20 hours in pay status in each pay period | 20 | 1 |
| | 40 | 2 |
| | 60 | 3 |
| | 80 | 4 (max.) |

    b. Biweekly Crediting. Annual leave accrues and is credited in whole hours at the end of each biweekly pay period.

c. Payment For Accumulated Annual Leave. A separating CCA employee may receive a lump-sum payment for accumulated annual leave subject to the following condition:

A CCA employee whose separation is effective before the last Friday of a pay period does not receive credit or terminal leave payment for the leave that would have accrued during that pay period.

**AUTHORIZING ANNUAL LEAVE**

1. General. Except for emergencies, annual leave for CCA employees must be requested on Form 3971 and approved in advance by the appropriate supervisor.

2. Emergencies and Illness or Injury. An exception to the advance approval requirement is made for emergencies and illness or injury; however, in these situations, the CCA employee must notify appropriate postal authorities as soon as possible as to the emergency or illness/injury and the expected duration of the absence. As soon as possible after return to duty, CCA employees must submit Form 3971 and explain the reason for the emergency or illness/injury to their supervisor. Supervisors approve or disapprove the leave request. When the request is disapproved, the absence may be recorded as AWOL at the discretion of the supervisor as outlined in **Item 2, Approval/ Disapproval, under Form 3971** below.

**UNSCHEDULED ABSENCE**

1. Definition. Unscheduled absences are any absences from work that are not requested and approved in advance.

2. CCA Employee Responsibilities. CCA employees are expected to maintain their assigned schedule and must make every effort to avoid unscheduled absences. In addition, CCA employees must provide acceptable evidence for absences when required.

**FORM 3971, REQUEST FOR, OR NOTIFICATION OF, ABSENCE**

1. Purpose. Application for annual leave is made in writing, in duplicate, on Form 3971, Request for, or Notification of, Absence.

2. Approval/Disapproval. The supervisor is responsible for approving or disapproving application for annual leave by signing Form 3971, a copy of which is given to the CCA employee. If a supervisor does not approve an application for leave, the disapproved block on Form 3971 is checked and the reasons given in writing in the space provided. When a request is disapproved, the reasons for disapproval must be noted. AWOL determinations must be similarly noted.

**C. Article 12 - Reassignment**

In order to minimize the impact on employees in the regular work force, the Employer agrees to offer the impacted employee the opportunity to work any letter carrier duty assignments performed by CCA employees, or to separate, to the extent possible, CCA employees working in the city carrier craft and installation prior to excessing any regular city letter carrier out of the installation.

**D. Article 15 - Grievance Procedure**

CCA employees will have access to the grievance procedure for those provisions that apply to CCA employees.

**E. Article 16 - Discipline Procedure**

CCAs may be separated for lack of work at any time before the end of their term. Separations for lack of work shall be by inverse relative standing in the installation. Such separation of the CCA(s) with the lowest relative standing is not grievable except where it is alleged that the separation is pretextual. CCAs separated for lack of work before the end of their term will be given preference for reappointment ahead of other CCAs with less relative standing in the installation, provided the need for hiring arises within 18 months of their separation.

CCAs may be disciplined or removed within the term of their appointment for just cause and any such discipline or removal will be subject to the grievance arbitration procedure, provided that within the immediately preceding six months, the employee has completed ninety (90) work days, or has been employed for 120 calendar days (whichever comes first) of their initial appointment. A CCA who has previously satisfied the 90/120 day requirement either as a CCA or transitional employee (with an appointment made after September 29, 2007), will have access to the grievance procedure without regard to his/her length of service as a CCA. Further, while in any such grievance the concept of progressive discipline will not apply, discipline should be corrective in nature.

In the case of removal for cause within the term of an appointment, a CCA shall be entitled to advance written notice of the charges against him/her in accordance with the provisions of Article 16 of the National Agreement.

**F. Article 21 - Health Insurance**

After an initial appointment for a 360-day term and upon reappointment to another 360-day term, any eligible noncareer CCA employee who wants to pay health premiums to participate in the Federal Employees Health Benefits (FEHB) Program on a pre-tax basis will be required to make an election to do so in accordance with applicable procedures. A previous appointment as a transitional employee will count toward qualifying for participation in FEHB, in accordance with the Office of Personnel Management (OPM) regulations. The total cost of health insurance is the responsibility of the noncareer CCA employee except as provided below.

Beginning in Plan Year 2014, the Postal Service will make a bi-weekly contribution to the total premium for any CCA employee who wishes to participate in the USPS Noncareer Health Care Plan (USPS Plan) equal to the greater of (a) $125, or (b) the minimum required by the Patient Protection and Affordable Care Act, and applicable regulations, for self-only. The CCA employee is fully responsible for the cost of premiums for any health insurance plan beyond a self-only plan. Any CCA employee wishing to make their health care contribution on a pre-tax basis will be required to make an election to do so in accordance with applicable procedures. All CCA employees will be eligible for the USPS Plan within a reasonable period from the date of hire and entry into a pay status, consistent with the requirements established under the Patient Protection and Affordable Care Act.

If for any reason the USPS Plan is not available to a CCA, or if a CCA elects more than self-only coverage, the Postal Service will make a bi-weekly contribution for any eligible CCA who selects an NALC Consumer Driven Health Plan equal to the greater of (a) $125, or (b) the minimum required by the Patient Protection and Affordable Care Act, and applicable regulations, for self-only.

**G. Retirement Savings Plan**

If the NALC establishes a 401k retirement savings plan for CCA employees, the Postal Service agrees to implement the necessary steps for payroll deductions for this plan.

**ARTICLE 41**

**LETTER CARRIER CRAFT**

**Section 2.B**

***

4. Part-time flexible letter carriers may exercise their preference by use of their seniority for vacation scheduling and for available full-time craft duty assignments of anticipated duration of five (5) days or more in the delivery unit to which they are assigned. **City carrier assistants may exercise their preference (by use of their relative standing as defined in Section 1.f of the General Principles for the Non-Career Complement in the Das Award) for available full-time craft duty assignments of anticipated duration of five (5) days or more in the delivery unit to which they are assigned that are not selected by eligible career employees.**

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: City Carrier Assistant Opportunities**

In order to provide the potential for career opportunities to city carrier assistants beyond their employing installation, a joint Task Force will be established to explore ways to expand opportunities for career city carrier positions within the district.

The Task Force will consist of two members appointed by the NALC and two members appointed by the Postal Service. The Task Force shall convene within 15 days of this agreement and will function for a period of one year, unless extended by mutual extent. The Task Force will provide reports and recommendations to the NALC President and the Vice President, Labor Relations, or their designees on a quarterly basis.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: City Carrier Assistant (CCA) Annual Leave**

Article 30 of the National Agreement and Local Memorandum of Understanding provisions do not apply to city carrier assistant employees, except as follows:

During the local implementation period, the parties may agree to include provisions into the local memorandum of understanding to permit city carrier assistant employees to apply for annual leave during choice vacation periods, as defined in Article 10.3.D of the National Agreement. Granting leave under such provisions must be contingent upon the employee having a leave balance of at least forty (40) hours.

In addition, the parties will explore at the national level appropriate options regarding current policies for paying terminal leave.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS
UNION, AFL-CIO**

**Re: Additional Resources - Holiday Carrier Assistant**

The Postal Service may employ holiday carrier assistants during the four week December period as operationally necessary, effective December 2014.

Holiday carrier assistants are subject to the following:

- The hourly rate will be the same as that for City Carrier Assistants.
- Over the course of a service week, the Employer will make every effort to ensure that available city carrier assistants are utilized at the straight-time rate prior to assigning such work to holiday carrier assistants working in the same work location.
- When an opportunity exists for overtime full-time employees on the appropriate Overtime Desired List will be selected to perform such work prior to assigning holiday carrier assistants to work overtime in the same work location where the employees regularly work.

The Postal Service shall provide the NALC with reports on the number of holiday carrier assistants hired.

**LETTER OF INTENT**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: City Carrier Assistants – Opting**

With the establishment of the city carrier assistant position, the following changes concerning opting will be incorporated in to the Joint Contract Administration Manual.

**JCAM Page 41-10**

**Eligibility for opting.** Full-time reserve letter carriers, full-time flexible schedule letter carriers, unassigned full-time carriers, part-time flexible carriers, **and city carrier assistants** may all opt for hold-down assignments.

**JCAM Page 41-13**

**Removal From Hold-Down.** There are exceptions to the rule against involuntarily removing employees from their hold-downs. Part-time flexible **and city carrier assistant** employees may be "bumped" from their hold-downs to provide sufficient work for full-time employees. Full-time employees are guaranteed forty hours of work per service week. Thus they may be assigned work on routes held down by part-time **or city carrier assistant** employees if there is not sufficient work available for them on a particular day. (H1N-5D-C 6601, September 11, 1985, M-00097)

**JCAM Page 41-14**

In such situations, the part-time flexible **or city carrier assistant** employee's opt is not terminated. Rather, the employee is temporarily

"bumped" on a day-to-day basis. Bumping is still a last resort, as reflected in a Step 4 settlement. (H1N-5D-C 7441, October 25, 1983, M-00293), which provides that:

A PTF **or city carrier assistant,** temporarily assigned to a route under Article 41, Section 2.B. shall work the duty assignment unless there is no other eight-hour assignment available to which a full-time carrier could be assigned. A regular carrier may be required to work parts or "relays" of routes to make up a full-time assignment. Additionally, the route of the "holddown" to which the **PTF or city carrier assistant** opted may be pivoted if there is insufficient work available to provide a full-time carrier with eight hours of work.

Another exception occurs if the Local Memorandum allows the regular carrier on a route to "bump" the Carrier Technician to another route when the regular carrier is called in on a non-scheduled day to work on his/her own route. In such cases, the Carrier Technician is allowed to displace an employee who has opted on an assignment on the technician's string if none of the other routes on the string are available. In such cases a part-time flexible **or city carrier assistant** employee's opt is not terminated. Rather, he/she is temporarily "bumped" on a day-to-day basis. (See Step 4, N8-N-0176, January 9, 1980, M-00154.)

**PTF Pay Status and Opting.** Although a part-time flexible **or city carrier assistant** employee who obtains a hold-down must be allowed to work an assignment for the duration of the vacancy, he or she does not assume the pay status of the full-time regular carrier being replaced. A part-time flexible **or city carrier assistant** carrier who assumes the duties of a full-time regular by opting is still paid as a part-time flexible **or city carrier assistant as appropriate** during the hold-down. While they must be allowed to work the assignment for the duration of the vacancy, PTFs **and city carrier assistants** are not guaranteed eight hours daily or forty hours weekly work by virtue of the hold-down alone.

Nor do PTFs **or city carrier assistants** receive holiday pay for holidays which fall within the hold-down period by virtue of the hold-down. Rather, **part-time flexible employees** continue to be paid for holidays as PTFs per Article 11.7. **City carrier assistants are not covered by Article 11.7.**

**JCAM Page 41-15**

**Remedies and Opting.** Where the record is clear that a PTF **or city carrier assistant** was the senior available employee exercising a preference on a qualifying vacancy, but was denied the opt in violation of Article 41.2.B.4, an appropriate remedy would be a "make whole" remedy in which the employee would be compensated for the difference between the number of hours actually worked and the number of hours he/she would have worked had the opt been properly awarded.

In those circumstances in which a PTF **or city carrier assistant** worked forty hours per week during the opting period (or forty-eight hours in the case of a six-day opt), an instructional "cease and desist" resolution would be appropriate. This would also be an appropriate remedy in

those circumstances in which a reserve letter carrier or an unassigned letter carrier was denied an opt - in violation of Article 41.2.B.3.

These changes will be implemented with the establishment of the city carrier assistant positions and be enforced without regard to the actual publishing of these changes in a revised JCAM incorporating these changes.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: Article 12.1 - Probationary Period**

City carrier assistants who successfully complete at least two successive 360 day terms after the date of this agreement will not serve a probationary period when hired for a career appointment, provided such career appointment directly follows a city carrier assistant appointment.

**QUESTIONS AND ANSWERS**

1. How is the Article 7.3.A ratio of full-time regular city letter carriers per route determined?

**Response:** The ratio is determined based on the number of full-time city letter carrier routes nationwide.

2. When there is an opportunity for conversion to career status in an installation and that installation has both part-time flexible and CCA employees available for conversion, who is converted?

**Response:** The part-time flexible employees would be converted to full-time regular prior to conversion of the CCAs.

**QUESTIONS AND ANSWERS
2011 USPS/NALC NATIONAL AGREEMENT**

The attached jointly-developed document provides the mutual understanding of the national parties on issues related to the 2011 USPS/NALC National Agreement. It is separated in two sections: the first concerning city carrier assistants (CCAs) and the second section addresses other contractual provisions. This document fully replaces the May 22, 2013, Questions and Answers, 2011 USPS/NALC National Agreement. This document may be updated if agreement is reached on additional matters concerning the new collective bargaining agreement.

**City Carrier Assistants
Joint Questions and Answers**

**1. What is the last date that transitional employees may be on the rolls?**

April 10, 2013.

**2. How will the provisions of Article 7.1.C be monitored for compliance?**

The CCA caps will be monitored at the national level. The Postal Service will provide the national union with a report every other pay period that lists, by District, the number and type of CCA (Article 7.1.C.1 and 7.1.C.2) and the number of full-time regular city letter carriers. Any dispute over compliance with the CCA caps will be addressed at the national level.

**3. Are transitional employees who were on their 5-day break on the effective date of the 2011 National Agreement (1/10/13) eligible for the higher Step AA hourly pay rate if hired to a CCA position?**

Yes.

**4. In determining CCA caps is the number of CCAs "rounded" for percentage purposes?**

No. Under Article 7.1.C.1 of the 2011 USPS/NALC National Agreement the number of CCAs shall not exceed 15% of the total number of full-time career city letter carriers in each District. Regarding the 8,000 CCAs employed under Article 7.1.C.2, the number in an individual District can be no more than 8% of the full-time career city letter carriers in that District.

**5. Are CCAs employed under Article 7.1.C.2 limited to sites directly affected by "fundamental changes in the business environment"?**

No. However, the number of this type of CCA that may be employed is limited to 8,000 nationwide and no more than 8% of the number of full-time career city letter carriers in a District.

**6. What are the occupational codes and designation activity codes for CCAs?**

CCA occupational codes are as follows: CCAs employed under Article 7.1.C.1 of the National Agreement are either 2310-0045 (City Carrier Assistant 1, CC-01) or 2310-0047 (City Carrier Assistant Tech 1, CC-02). CCAs employed under Article 7.1.C.2 of the National Agreement are either 2310-0046 (City Carrier Assistant 2, CC-01) or 2310-0048 (City Carrier Assistant Tech 2, CC-02). The designation activity code for all city carrier assistants is 84-4.

**7. Can city letter carrier transitional employees apply for CCA vacancies in installations other than their employing office?**

Yes.

**8. Which score is used if a city letter carrier transitional employee with an active test score retakes the exam?**

The most recent test score is used.

**9. What is a passing score on the postal exam?**

70.

**10. How long does a previous test score remain active for non-career employees?**

6 Years.

**11. Will reinstatement-eligible former career employees and veterans eligible for direct career appointment under VRA or because of their 30 percent or higher disability status be eligible for noncompetitive consideration for CCA employment?**

Yes.

**12. Does the five-day break between CCA 360-day appointments refer to five calendar or work days?**

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 52 of 472. PageID #: 870

Five calendar days.

**13. May a CCA employed under Article 7.1.C.1 or Article 7.1.C.2 be appointed to a term of less than 360 days?**

No. The only exception is when a transitional employee is hired as a CCA after a one day break during implementation of the 2011 National Agreement. In such case, the total period between the beginning of the transitional employee appointment and the end of the initial CCA appointment is 360 calendar days.

**14. Can a transitional employee turn down an offer to be hired as a CCA in one installation and remain eligible to be hired as a CCA in a different installation?**

Yes, provided the employee applied for a position in the other installation(s).

**15. May CCAs hold dual appointments?**

No.

**16. Must a CCA go through the normal pre-employment screening process (i.e. drug screen, background check, medical assessment, motor vehicle record check, etc.) when reappointed or hired immediately after a transitional employee appointment?**

No.

**17. May CCAs who have an on the job illness or injury be assigned to work in other crafts?**

Only if the assignment to another craft is consistent with Section 546 of the Employee and Labor Relations Manual and relevant Department of Labor regulations.

**18. If a transitional employee is deployed to active duty in the military during the period of testing, will he/she have the opportunity to be hired as a CCA upon return from active duty?**

Yes, consistent with applicable laws and regulations.

**19. Does the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA) apply to CCAs?**

Yes.

**20. How are CCAs considered when applying the Letter Carrier Paragraph?**

CCAs are considered as auxiliary assistance. Accordingly, management must seek to use CCAs at either the straight-time or regular overtime rate prior to requiring letter carriers not on the overtime desired list or work assignment list to work overtime on their own route on a regularly scheduled day.

**21. Is there a limit on the number of hours CCAs may be scheduled on a workday?**

Yes, CCAs are covered by Section 432.32 of the Employee and Labor Relations Manual, which states: *Except as designated in labor agreements for bargaining unit employees or in emergency situations as determined by the PMG (or designee), employees may not be required to work more than 12 hours in 1 service day. In addition, the total hours of daily service, including scheduled work hours, overtime, and mealtime, may not be extended over a period longer than 12 consecutive hours. Postmasters, Postal Inspectors, and exempt employees are excluded from these provisions.*

**22. Do CCAs receive Night Differential or Sunday Premium?**

CCAs receive Night Differential as defined in Article 8.7 of the National Agreement. CCAs do not receive Sunday Premium.

**23. Do CCAs have a work hour guarantee?**

Yes, CCAs employed in post offices and facilities with 200 or more workyears of employment have a four hour work guarantee and CCAs employed in all other post offices have a two hour work guarantee.

**24. Are there rules covering work hour guarantees for a CCA who has a gap between two periods of work?**

Yes. If a CCA is notified prior to clocking out that he/she should return within two hours, it is considered a split shift and no new work hour guarantee applies. However, if a CCA is notified prior to clocking out that he/she is to return after two hours, the CCA must be given another work hour guarantee pursuant to Article 8.8 (two or four hours depending on office size).

**25. Can CCAs be required to remain on "stand-by" or remain at home for a call-in on days they are not scheduled to work?**

No.

**26. May CCAs be permanently reassigned from one post office (installation) to another during their appointment?**

Yes, provided the employee's current appointment is being voluntarily terminated. To avoid a break in service a permanent reassignment to a different installation must be effected on the first day of a pay period.

**27. Is there a "lock-in" period that a CCA must meet before being reassigned to another installation?**

There is no lock-in period a CCA must satisfy before becoming eligible to reassign to another installation. Eligibility to move between installations is generally intended to address situations where an individual CCA would like to be reassigned to another installation for personal reasons and there is an agreement between the "losing" and "gaining" installation heads.

**28. After a CCA becomes a career employee does he/she serve a lock-in period for transfers as defined by the Memorandum of Understanding, *Re: Transfers*?**

Yes.

**29. May CCAs carry over leave from one appointment to another?**

No. Currently any accrued annual leave is paid out at the end of a 360-day term. However, the national parties will explore appropriate options regarding current policies for paying terminal leave to CCAs.

**30. Do separated transitional employees receive payment for accrued annual leave?**

Yes, all transitional employees will receive terminal leave payment at the end of their appointment, including transitional employees who directly (after a one day break) receive CCA appointments. Payment will be at the transitional employee rate effective under the 2006 National Agreement.

**31. Do CCAs that are converted to career status carry their annual leave balance over when hired?**

No. Currently, CCAs receive a terminal leave payment for any leave balance at the end of the CCA appointment.

**32. Are CCAs covered by the Memorandum of Understanding, *Re: Bereavement Leave*?**

Yes, however, CCAs do not earn sick leave and therefore may only request annual leave or leave without pay for bereavement purposes.

**33. Do leave provisions outlined in Article 10 of the National Agreement apply to CCAs?**

No. Leave provisions for CCA employees are addressed on pages 18-19 of the January 10, 2013 Interest Arbitration Award (Das).

**34. Does Article 30 of the National Agreement apply to CCAs?**

No, except as provided in the Memorandum of Understanding, *Re: City Carrier Assistant (CCA) Leave,* on page 23 of the January 10, 2013 Interest Arbitration Award (Das).

**35. Does a CCA who receives a career appointment go through a 90 calendar day probationary period as a career city letter carrier?**

Yes, except in the following circumstances:

- The employee has successfully completed two successive 360-day appointments as a CCA, provided the career appointment directly follows a CCA appointment. See Memorandum of Understanding, *Re: Article 12.1 – Probationary Period.*
- The employee was a city carrier transitional employee placed into a CCA position following a one-day break in service in accordance with the January 31, 2013 Memorandum of Understanding, *Re: Break in Service.* The TE service does not apply, but completion of a total of 720 days as a CCA in successive appointments satisfies the two successive 360-day appointments required by the Memorandum of Understanding, *Re: Article 12.1 - Probationary Period.*
- When, during the term of the Memorandum of Understanding, *Re: Sunday Delivery - City Carrier Assistant Staffing*, the employee is converted to full-time career status and successfully served as a city carrier transitional employee directly before his/her initial CCA appointment.

**36. Will CCAs have access to the grievance procedure if disciplined or removed?**

A CCA who has completed 90 work or 120 calendar days of employment within the immediate preceding six months has access to the grievance procedure if disciplined or removed. A CCA who has previously satisfied the 90/120 day requirement either as a CCA or transitional employee (with an appointment made after September 29, 2007), will have access to the grievance procedure without regard to length of service as a CCA.

**37. Can a CCA serve as a union steward?**

Yes.

**38. Will the union be allowed to address newly hired CCAs as part of the orientation process?**

Yes. The provisions of Article 17.6 of the National Agreement apply to CCAs. Accordingly, the union is to be provided ample opportunity to address all newly hired CCAs as part of the hiring process.

**39. Is the union provided an opportunity to discuss health insurance, pursuant to Article 17.6, when a CCA becomes a career employee?**

Yes, the union will be provided time to address the NALC Health Benefit Plans that are available to career employees.

**40. Do former transitional employees go through the full orientation process when hired as CCAs?**

Only if the employee was not provided orientation when hired as a transitional employee. However, the union will be provided time, as defined in Article 17.6 of the National Agreement to address those CCAs that went through the full orientation process as transitional employees.

**41. If a current transitional employee is a member of the union and they are hired as a CCA do they have to execute a new Form 1187 to remain a member of the union?**

No.

**42. Are CCAs allowed to participate in the Federal Employees Health Benefits Program?**

The following applies until health benefits plan year 2014. After an initial appointment for a 360-day term and upon reappointment to another 360-day term, any eligible noncareer CCA who wants to pay health care premiums to participate in the Federal Employees Health Benefits (FEHB) Program on a pre-tax basis will be required to make an election to do so in accordance with applicable procedures. A previous appointment as a transitional employee will count toward qualifying for participation in FEHB, in accordance with the Office of Personnel Management (OPM) regulations. The total cost of health insurance is the responsibility of the noncareer CCA. Health benefits available for CCAs beginning with health plan year 2014 are addressed at page 20 of the January 10, 2013 Interest Arbitration Award (Das).

**43. To qualify for Health Benefits must a CCA serve the entire 360-day initial appointment before a second 360-day appointment?**

To qualify for the Federal Employees Health Benefits Program, CCAs must first have completed one full year (365 days) of current continuous employment, including breaks of five days or less, regardless of when the five-day break occurs.

**44. Do the provisions of Article 21.5 (Health Benefit Brochures) apply when a CCA becomes a career employee?**

Yes.

**45. Are CCAs entitled to higher level pay under Article 25 of the National Agreement?**

No.

**46. How does a CCA who is hired as a grade CC-01 receive proper compensation when assigned to a City Carrier Technician (grade CC-02) position?**

In such case the CCA's PS Form 50 must be revised to reflect that he/she is assigned to a Carrier Technician position. This will require designation to the proper City Carrier Assistant Tech occupational code (either 2310-0047 or 2310-0048).

**47. When does a CCA become eligible for a uniform allowance?**

Upon completion of 90 work days or 120 calendar days of employment as a CCA, whichever comes first. CCAs who have previously satisfied the 90/120 day requirement as a transitional employee (with an appointment made after September 29, 2007), become eligible for a uniform allowance when they begin their first CCA appointment.

**48. What defines the anniversary date for the purpose of annual uniform allowance eligibility for a CCA?**

The calendar date the CCA initially becomes eligible for a uniform allowance.

**49. How is the uniform anniversary date determined for a CCA who is converted to career status?**

The employee retains the same anniversary date held as a CCA.

**50. How is a uniform allowance provided to a CCA?**

When a CCA becomes eligible for a uniform allowance, funds must be approved through an eBuy submission by local management. After approval, a Letter of Authorization form must be completed and provided to the employee within 14 days of the eligibility date. The CCA takes the completed form to a USPS authorized vendor to purchase uniform items. The Letter of Authorization can be located on the Uniform Program website on the Blue Page under Labor Relations.

**51. How are uniform items purchased?**

Uniform items can only be purchased from USPS licensed vendors. A list of all authorized Postal Service Uniform vendors is located under the Labor Relations website: *Uniform Program* from the Blue Page and also on Liteblue under *My HR*, and look for the link for *Uniform Program*.

**52. How does a licensed uniform vendor receive payment for uniform items purchased by a CCA?**

The licensed vendor creates an itemized invoice of the sale, provides a copy of the invoice to the CCA, and sends the original invoice for payment to the local manager identified on the Letter of Authorization. Upon receipt, the local manager certifies the invoice and pays the vendor using the office Smartpay card.

**53. If a CCA does not use the full allowance before his/her appointment ends, does the allowance carry-over into the next appointment when the appointment begins before the next uniform anniversary date?**

Yes, however, the CCA cannot purchase uniform items during his/her five calendar day break between appointments. If the full annual uniform allowance is not used before the next anniversary date, the remaining balance for that year is forfeited.

**54. Does the annual uniform anniversary date change when a CCA is separated for lack of work and then rehired as a CCA after his/her anniversary date has passed?**

Yes, in this situation a new anniversary date is established on the date of reappointment and the CCA is provided a full annual uniform allowance within 14 days of the new anniversary date.

**55. What happens to the annual uniform allowance for a CCA that has an anniversary date, is separated for lack of work, and then rehired as a CCA before their next uniform anniversary date?**

A CCA that is separated under this circumstance retains his/her anniversary date. If there is no uniform allowance balance remaining at the point of separation, the matter will be considered closed. If the CCA had any part of the annual uniform allowance available at the point of separation, the remaining balance will be redetermined upon reappointment as follows: If the period of separation exceeded 89 calendar days, the remaining balance will be reduced by 10 percent of the annual uniform allowance for the first 90 calendar days and then by 10 percent for each full 30 calendar days thereafter. In no event will such redetermination result in a negative balance for the employee.

**56. Will CCAs receive the additional credit authorized under Article 26.2.B with their first uniform allowance following conversion to career status?**

Yes.

**57. How is time credited for transitional employee employment when determining relative standing for CCAs?**

All time spent on the rolls as a city letter carrier transitional employee after September 29, 2007 will be added to CCA time in an installation to determine relative standing. Breaks in transitional employee service are not included in the relative standing period.

**58. How is placement on the relative standing roster determined when two or more CCAs have the same total time credited for relative standing?**

First, the relative standing on the hiring list (appointment register) will be used to determine the CCA with higher relative standing (See Article 41.2.B.6.[a]). If a tie remains then the formula outlined in Article 41.2.B.7 is applied.

**59. For time spent as a city letter carrier transitional employee, does it matter where an individual was employed when determining relative standing?**

No. All time on the rolls as a transitional employee after September 29, 2007 counts toward relative standing regardless of the installation(s) in which the transitional employee was employed.

**60. Does time credited toward relative standing for time worked as a transitional employee after September 29, 2007 transfer from one installation to another once hired as a CCA?**

Yes.

**61. Does relative standing earned as a CCA in one installation move with a CCA who is separated and is later employed in another installation?**

No.

**62. How is relative standing determined for a CCA who is employed in an installation, then permanently moves to a different installation and then is subsequently reemployed in the original installation?**

Relative standing in this situation is based on the date the employee is reemployed in the original installation and is augmented by time served as a city letter carrier transitional employee for appointments made after September 29, 2007 (in any installation).

**63. How is a tie addressed when more than one employee is placed in full-time career city letter carrier duty assignments in an installation on the same date through either transfer/reassignment or CCA conversion to full-time?**

Placement on the seniority list is determined by the following:

• If two or more full-time career assignments in an individual installation are filled on the same date by only CCAs, placement on the career city letter carrier craft seniority list will be determined based on the relative standing in the installation.

• When two or more full-time career assignments in an individual installation are filled on the same date by only career employees through reassignment/transfer, placement on the city carrier craft seniority list will be determined by application of Article 41.2.B.7 of the National Agreement, as appropriate.

• Current career employees will normally be placed ahead of CCAs on the seniority list when two or more full-time career assignments are being filled in an individual installation on the same date from both reassigned/transferred and CCA employees. An exception may occur when the CCA(s) with the highest relative standing has previous career service. In such case the CCA(s) will be placed ahead of the career employee only if he/she is determined to be senior to the transferred/reassigned employee by application of Article 41.2.B.7 of the National Agreement. In no case will a CCA with lower relative standing be placed on the seniority list ahead of a CCA with higher relative standing who is converted to career on the same date in the installation.

**64. Will CCAs be allowed to opt on (hold-down) vacant duty assignments?**

Yes, after April 10, 2013.

**65. Is there a waiting period for a new CCA (no former experience as a career city letter carrier or city carrier transitional employee) before the employee can opt on a hold-down?**

Yes, 60 calendar days from the date of appointment as a CCA. Once the CCA has met this requirement there is no additional waiting period for applying for/being awarded a hold-down when the employee is converted to career.

**66. Is there a difference in the application of opting (hold-down) rules between part-time flexible city carriers and CCAs?**

No.

**67. Can a CCA be taken off an opt (hold-down) in order to provide a part-time flexible employee assigned to the same work location with 40 hours of straight-time work over the course of a service week (Article 7, Section 1.C)?**

Yes, a CCA may be "bumped" from an opt if necessary to provide 40 hours of straight-time work over the course of a service week to part-time flexible letter carriers assigned to the same work location. In this situation the opt is not terminated. Rather, the CCA is temporarily taken off the assignment as necessary on a day-to-day basis.

**68. What is the pecking order for awarding hold-down assignments?**

Hold-down assignments are awarded to eligible career letter carriers by highest to lowest seniority first and then to eligible CCAs by highest to lowest relative standing in the installation.

**69. Will the 5-day break in service between 360-day terms end an opt (hold-down)?**

No.

**70. Does the 5-day break at the end of a 360-day appointment create another opt (hold-down) opportunity?**

Only where the break creates a vacancy of five work days. In such case the opt is for the five day period of the break.

**71. Will CCAs be offered part-time regular city carrier vacancies?**

While there is no prohibition against a CCA requesting a part-time regular vacancy, the Postal Service is under no obligation to offer or place a CCA into such vacancy.

**72. When there is an opportunity for conversion to career status in an installation and that installation has both part-time flexible and CCA employees available for conversion, who is converted?**

The part-time flexible employees are converted to full-time regular prior to offering conversion to CCAs.

**73. When there is a career conversion opportunity for a CCA, how are CCA employees converted?**

CCAs are offered conversion opportunities to full-time regular on a highest to lowest relative standing order basis within an installation.

**74. May a CCA decline an opportunity for conversion to full-time regular?**

Yes, rejection of a conversion offer does not impact the employee's relative standing as a CCA.

**75. Will CCAs attend the carrier academy?**

Newly hired CCAs in Districts that use the carrier academy program will attend the training.

**76. Will transitional employees hired as CCAs attend the carrier academy?**

If the transitional employee did not previously attend the carrier academy and the District uses the carrier academy program, the employee will attend the training.

**77. May CCAs enter into City Carrier Transportation (Driveout) Agreements, as defined in Article 41.4 of the National Agreement?**

No, Article 41.4 does not apply to CCAs. However, the Memorandum of Understanding, *Re: Use of Privately Owned Vehicles* applies to CCAs. In circumstances where the postmaster or station manager determines that use of a personal vehicle is necessary for business purposes, a CCA may voluntarily elect to use his/her vehicle. Such agreement must be made through PS Form 8048, Commercial Emergency Vehicle Hire, with the daily rate for vehicle use mutually agreed to by the postmaster or station manager and the employee. The postmaster or station manager must then forward the completed form to the servicing Vehicle Maintenance Facility manager.

**78. Will CCAs be assigned a Postal Service Employee Identification Number (EIN) and Personal Identification Number (PIN)?**

Yes.

**Other Provisions**
**Joint Questions and Answers**

**1. The Memorandum of Understanding, *Re: Part-Time Regular City Letter Carriers,* establishes a cap on city letter carrier part-time regular employees as the number employed on the effective date of the 2011 National Agreement. What is the cap?**

682.

**2. Is the limit of 682 part-time regular employees a national cap or is it limited to locations that employed part-time regular city letter carriers on the effective date of the 2011 National Agreement?**

It is a national cap.

**3. Under the terms of the August 30, 2013, Memorandum of Understanding, *Re: Residual Vacancies - City Letter Carrier Craft,* may part-time regular city letter carriers request reassignment to full-time residual vacancies?**

Yes, part-time regular city letter carriers are considered in the same manner as transfer/reassignment requests from full-time city letter carriers.

**Note:** The Memorandum of Understanding, *Re: Residual Vacancies - City Carrier Craft* has expired. It has been replaced with the March 31, 2014 Memorandum of Understanding, *Re: Full-time Regular Opportunities - City Letter Carrier Craft*. This question and answer will apply to the Memorandum of Understanding, *Re: Full-time Regular Opportunities - City Letter Carrier Craft* for as long as this MOU remains in effect.

**4. How will the provisions of Article 7.3.A be monitored for compliance?**

The Postal Service will provide the national union with a report every other pay period that lists the number of full-time city letter carrier routes defined in Article 41.1.A by

category, the number of Carrier Technician positions, and total number of full-time city letter carriers.

**5. How is the Article 7.3.A ratio of full-time regular city letter carriers per route determined?**

The ratio is determined based on the number of full-time city letter carrier routes nationwide.

**6. Will the part-time flexible employee classification be phased out?**

Yes, as part-time flexible (PTF) employees are converted to full-time in accordance with existing contractual processes, the PTF classification shall be phased out. There shall be no new hiring of PTF employees.

**7. When will the change to the annual uniform allowance be implemented for career city letter carriers?**

It is anticipated that the change will be effective in April 2013.

7.2.A

**Section 2. Employment and Work Assignments**

A. Normally, work in different crafts, occupational groups or levels will not be combined into one job. However, to provide maximum full-time employment and provide necessary flexibility, management may establish full-time schedule assignments by including work within different crafts or occupational groups after the following sequential actions have been taken:

1. All available work within each separate craft by tour has been combined.

7.2.A.2

2. Work of different crafts in the same wage level by tour has been combined.

The appropriate representatives of the affected Unions will be informed in advance of the reasons for establishing the combination full-time assignments within different crafts in accordance with this Article.

**Combining Craft Duties To Create Full-Time Assignments.** Article 7.2.A permits management to combine duties from different crafts, occupational groups or pay levels to create full-time duty assignments under limited circumstances. Under Article 7.2.A.1, management may combine work from different occupational groups or crafts only after it has first combined all available work within each separate craft, by tour. Under Article 7.2.A.2, management may combine work from different pay levels only after it has combined the work of different crafts in the same wage level, by tour. In either case, management must provide the affected unions with advance notification of the reasons for establishing the combination full-time assignments.

**Rural Carriers Excluded.** A combined position under Article 7.2.A may include the work of only the crafts covered by the 1978 National Agreement—i.e., letter carrier, clerk, motor vehicle, maintenance and mail handler. Rural carriers are excluded. See the discussion below of Article 7.2.B & C and the related memorandum of understanding.

7.2.B

B. In the event of insufficient work on any particular day or days in a full-time or part-time employee's own scheduled assignment, management may assign the employee to any available work in the same wage level for which the employee is qualified, consistent with the employee's knowledge and experience, in order to maintain the number of work hours of the employee's basic work schedule.

7.2.C

C. During exceptionally heavy workload periods for one occupational group, employees in an occupational group experiencing a light workload period may be assigned to work in the same wage level, commensurate with their capabilities, to the heavy workload area for such time as management determines necessary.

[see Memo, page **155**]

**This Memo is located on *JCAM* page 7-32 and 7-33.**

**Cross-Craft Assignments.** Article 7, Sections 2.B and 2.C set forth two situations in which management may require career employees to perform work in another craft. This may involve a carrier working in another craft or an employee from another craft performing carrier work.

**Insufficient Work.** Under Article 7.2.B, management may require an employee to work in another craft at the same wage level due to insufficient work in his or her own craft. This may affect a full-time employee or a part-time regular employee for whom there is "insufficient work" on a particular day to maintain his or her weekly schedule as guaranteed under Article 8.1. Or it may apply to any employee working under the call-in guarantees of Article 8.8—i.e., a regular called in on a non-scheduled day, or a PTF employee called in on any day. This section permits management to avoid having to pay employees for not working.

**Exceptional Workload Imbalance.** Article 7.2.C provides that under conditions of exceptionally heavy workload in one craft or occupational group and light workload in another, any employee may be assigned to perform other-craft work in the same wage level.

**Limits on Management's Discretion to Make Cross-craft Assignments.** A national level arbitration award has established that management may not assign employees across crafts except in the restrictive circumstances defined in the National Agreement (National Arbitrator Richard Bloch, A8-W-0656, April 7, 1982, C-04560). This decision is controlling although it is an APWU arbitration case; it was decided under the joint NALC/APWU-USPS 1981 National Agreement and the language of Article 7.2.B & C has not changed since then. Arbitrator Bloch interpreted Article 7.2.B & C as follows (pages 6-7 of the award):

> Taken together, these provisions support the inference that Management's right to cross craft lines is substantially limited. The exceptions to the requirement of observing the boundaries arise in situations that are not only unusual but also reasonably unforeseeable. There is no reason to find that the parties intended to give Management discretion

to schedule across craft lines merely to maximize efficient personnel usage; this is not what the parties have bargained. That an assignment across craft lines might enable Management to avoid overtime in another group for example, is not, by itself, a contractually sound reason. It must be shown either that there was "insufficient work" for the classification or, alternatively, that work was "exceptionally heavy" in one occupational group and light, as well, in another.

Inherent in these two provisions, as indicated above, is the assumption that the qualifying conditions are reasonably unforeseeable or somehow unavoidable. To be sure, Management retains the right to schedule tasks to suit its need on a given day. But the right to do this may not fairly be equated with the opportunity to, in essence, create "insufficient" work through intentionally inadequate staffing. To so hold would be to allow Management to effectively cross craft lines at will merely by scheduling work so as to create the triggering provisions of Subsections B and C. This would be an abuse of the reasonable intent of this language, which exists not to provide means by which the separation of crafts may be routinely ignored but rather to provide the employer with certain limited flexibility in the fact of pressing circumstances. ...

**Remedy For Violations.** As a general proposition, in those circumstances in which a clear contractual violation is evidenced by the fact circumstances involving the crossing of crafts pursuant to Article 7.2.B & C, a "make whole" remedy involving the payment at the appropriate rate for the work missed to the available, qualified employee who had a contractual right to the work would be appropriate. For example, after determining that management had violated Article 7.2.B, Arbitrator Bloch in case H8S-5F-C 8027/A8-W-0656 (C-04560) ruled that an available Special Delivery Messenger on the Overtime Desired List should be made whole for missed overtime for special delivery functions performed by a PTF letter carrier.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Article 7, 12 and 13 - Cross Craft and Office Size**

A. It is understood by the parties that in applying the provisions of Articles 7, 12 and 13 of this Agreement, cross craft assignments of employees, on both a temporary and permanent basis, shall continue as they were made among the six crafts under the 1978 National Agreement.

B. It is also agreed that where this Agreement makes reference to offices/facilities/installations with a certain number of employees or man years, that number shall

include all categories of bargaining unit employees in the office/facility/installation who were covered by the 1978 National Agreement.

Date: August 19, 1995

**Rural Carriers Excluded.** Paragraph A of this Memorandum of Understanding (National Agreement page 155) provides that the crossing craft provisions of Article 7.2 (among other provisions) apply only to the crafts covered by the 1978 National Agreement—i.e., letter carrier, clerk, motor vehicle, maintenance and mail handler. So crosscraft assignments may be made between the carrier craft and these other crafts, in either direction, in accordance with Article 7.2. However, rural letter carriers are not included. So crosscraft assignments to and from the rural carrier craft may not be made under Article 7.2. They may be made only in "emergency situations" as explained below.

**Crossing Crafts in "Emergency" Situations.** In addition to its Article 7 rights, management has the right to work carriers across crafts in an "emergency" situation as defined in Article 3, Management Rights. Article 3.F states that management has the right:

> 3.F. To take whatever actions may be necessary to carry out its mission in emergency situations, i.e., an unforeseen circumstance or a combination of circumstances which calls for immediate action in a situation which is not expected to be of a recurring nature.

This provision gives management a very limited right to make crosscraft assignments. Management's desire to avoid additional expenses such as penalty overtime does *not* constitute an emergency.

**Counting Employees or Workyears.** Paragraph B of the memorandum provides that only the crafts covered by the 1978 National Agreement—i.e., letter carrier, clerk, motor vehicle, maintenance, and mail handler—are counted when any Agreement provision refers to the number of employees or "man years" in an office, facility or installation. In the 1998 National Agreement the term "man year" was changed to "workyear."

For example, Article 7.3.A below requires management to maintain at least an 88 percent full-time carrier craft work force in installations which have 200 or more workyears of employment. See also Article 8.8.C, which provides a call-in guarantee of four hours of work or pay "in a post office or facility with 200 or more workyears of employment per year," and two hours in smaller facilities.

7.3 **Section 3. Employee Complements**

**Maximization of Full-Time Employees.** Article 7, Section 3 contains the National Agreement's main "maximization" language, setting forth management's obligations to create *full-time regular* letter carrier positions. Sections 3.A-3.D set forth the following requirements.

7.3.A

> A. **The Employer will staff at least one full-time regular city letter carrier per one full-time regular city letter carrier route, as defined in Article 41.1.A.1, plus each Carrier Technician position; however, the Employer's obligation shall not exceed a ratio of 1.18 full-time regular city letter carriers per full-time city letter carrier routes. As long as part-time flexible employees remain on the rolls,** the Employer shall staff all postal installations which have 200 or more workyears of employment in the regular work force as of the date of this Agreement with 88% full-time employees in the letter carrier craft.

How the provisions of Article 7.3.A will be monitored and how the ratio of full-time city letter carriers per route is determined are addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**4. How will the provisions of Article 7.3.A be monitored for compliance?**

The Postal Service will provide the national union with a report every other pay period that lists the number of full-time city letter carrier routes defined in Article 41.1.A by category, the number of Carrier Technician positions, and the total number of full-time city letter carriers.

**5. How is the Article 7.3.A ratio of full-time regular city letter carriers per route determined?**

The ratio is determined based on the number of full-time city letter carrier routes nationwide.

The conversion of part-time flexibles is addressed in the Memorandum of Understanding, *Re: Part-Time Flexible Conversions* in the 2011 National Agreement.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Part-Time Flexible Conversions**

It is anticipated that during the term of the 2011 National Agreement, sufficient full-time duty assignments will become available through attrition to accommodate the conversion of part-time flexible employees currently on the rolls to full-time status. The parties recognize that there may be certain circumstances where conversion opportunities are not available for individual part-time flexible employees. The parties will explore ways to provide full-time conversion opportunities to such employees.

Date: January 10, 2013

The PTF classification of letter carriers is being phased out as stated in Appendix B, 1. General Principles, Section k. of the 2011 National Agreement.

> **APPENDIX B**
>
> **Appendix B is the reprinting of Section I of the 2013 Das Award, the creation of a new non-career employee category.**
>
> 1. GENERAL PRINCIPLES
>
> k. As Part-time Flexible (PTF) employees are converted to full-time in accordance with existing contractual processes, the PTF classification shall be phased out. There shall be no new hiring of PTF employees.

The phasing out of PTF employees is further addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**6. Will the part-time flexible employee classification be phased out?**

Yes, as part-time flexible (PTF) employees are converted to full-time in accordance with existing contractual processes, the PTF classification shall be phased out. There shall be no new hiring of PTF employees.

**200 or More Workyears.** Whether an installation is classified as a 200 workyear office is determined as of the National Agreement's effective date. The classification does not change during the life of the Agreement. The hours of bargaining-unit employees in the crafts covered by the 1978 National Agreement are counted in making this determination; see the memorandum of understanding and related discussion under Article 7.3.B & C. The *On Rolls Complement Report* provided to NALC on an accounting period basis is used to monitor compliance with the 88 percent full-time requirement for 200 workyear offices.

**Counting Employees.** Although the work hours of five postal crafts are counted to determine classification as a 200 workyear installation, the 88 percent full-time requirement applies to *letter carriers* working at such facilities. Only regular work force letter carriers are included in the 88/12 calculation. Full-time regular carriers, including reserve and unassigned regulars, and full-time flexible carriers (see explanation below) are counted as "full-time employees." Part-time flexibles and part-time regulars are counted as *not* full-time.

**Counting Full-time Flexibles.** Although existing full-time flexible carriers may be counted as full-time in measuring compliance with the 88 percent requirement, Arbitrator Mittenthal found that, if an office fell below the required full-time percentage at the same time that a part-time flexible met the criteria for conversion to full-time flexible under the MOU, "the Postal Service must first convert pursuant to the [88]% staffing requirement and thereafter convert pursuant to the Memoranda." Thus, the conversions to full-time flexible under the MOU would be in addition to the conversions to full-time regular necessary to bring the office to 88 percent (National Arbitrator Mittenthal, H1C-NA-120, September 5, 1989, C-09340). See also the discussion of full-time flexible carriers following Article 7.3.D.

**Remedy for Violation.** The appropriate remedy for violations of Article 7.3.A was specified in a national memorandum of understanding dated April 14, 1989 (M-00920). The parties agreed that the remedy will be the following:

> Any installation with 200 or more man years of employment in the regular workforce which fails to maintain the staffing ratio in any accounting period, shall immediately convert and compensate the affected part-time employee(s) retroactively to the date which they should have been converted as follows:
>
> A. Paid the straight time rate for any hours less than 40 hours (five 8 hour days) worked in a particular week.
>
> B. Paid the 8 hour guarantee for any day of work beyond five (5) days.
>
> C. If appropriate, based on the aforementioned, paid the applicable overtime rate.
>
> D. Further, the schedule to which the employee is assigned when converted will be applied retroactively to the date the employee should have been converted and the employee will be paid out-of-schedule pay.
>
> E. Where application of Items A-D above, shows an employee is entitled to two or more rates of pay for the same work or time, management shall pay the highest of the rates.

**7.3.B**

> B. The Employer shall maximize the number of full-time employees and minimize the number of part-time employees who have no fixed work schedules in all postal installations; however, nothing in this paragraph B shall detract from the USPS' ability to use the awarded full-time/part-time ratio as provided for in paragraph 3.A. above.

Article 7.3.B establishes a general obligation to maximize the number of full-time employees and minimize the number of part-time flexible employees in all postal installations. However, in the 1990 National Agreement the following sentence was added: "nothing in this paragraph B shall detract from the USPS' ability to use the awarded full-time/part-time ratio as provided for in paragraph 3.A. above." This means that if management has met the 88 percent full-time staffing requirement for 200 workyear offices provided by Article 7.3.A, then

Article 7.3.B does not require any further maximization of full-time positions.

7.3.C

> C. A part-time flexible employee working eight (8) hours within ten (10), on the same five (5) days each week and the same assignment over a six month period will demonstrate the need for converting the assignment to a full-time position.

**Demonstration of Regular Schedule and Assignment.** A PTF carrier working a regular schedule meeting the criteria of Article 7.3.C on the same assignment for six months demonstrates the need to convert the duties to a full-time assignment. The six months must be continuous (Step 4, H7N-3W-C 27937, April 14, 1992, M-01069). Time spent on approved paid leave does not constitute an interruption of the six month period, except where the leave is used solely for purposes of rounding out the workweek when the employee otherwise would *not* have worked (Step 4, H7N-2A-C 2275, April 13, 1989, M-00913). For the purposes of Article 7.3.C, a part-time flexible employee not working all or part of a holiday or observed holiday (as defined in Article 11) does not constitute an interruption in the six-month period.

Where the Local Memorandum of Understanding provides for rotating days off, a PTF employee who works the same rotating schedule, eight hours within ten, five days each week on the same uninterrupted temporarily vacant duty assignment over a six-month period has met the criteria of Article 7.3.C of the National Agreement (Step 4, A94 N-4A-C 97040950, January 7, 2000, M-01398).

National Arbitrator Mittenthal held in H1N-2B-C-4314, July 8, 1985 (C-05070), that time spent by a PTF on an assignment opted for under the provisions of Article 41 (Article 41.2.B) counts toward meeting these maximization criteria. However, the provisions of Article 7.3.C will be applied to an uninterrupted temporary vacant duty assignment only once (Step 4, A94N-4A-C 97040950, January 7, 2000, M-01398).

Article 7.3.C applies to all installations regardless of size (Step 4, H7N-3F-C 39104, December 6, 1991, M-01032).

7.3.D

> D. Where a count and inspection of an auxiliary city delivery assignment indicates that conversion to a full-time position is in order, conversion will be made.
>
> [see Memos and Letter of Intent, pages **147, 156-157**]

**These Memos and Letter of Intent are located below.**

**Auxiliary Route Growth to Full-Time.** To accommodate growing routes, Article 7.3.D provides for the conversion of an auxiliary route to full-time when a route inspection shows the route has become a full-time assignment. See M-39, Section 242.122 which provides that regular routes should consist of as nearly 8 hours daily work as possible.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE AND
THE JOINT BARGAINING COMMITTEE
(American Postal Workers Union, AFL-CIO, and
National Association of Letter Carriers, AFL-CIO)**

**Re: Article 7.3**

Part-time flexible employees with three (3) or more years of service in the same craft and same installation on the effective date of this award, who are employed in an office with 200 or more man years of employment will not have their average weekly workhours reduced as a result of the revision to Article 7.3 of the 1990 National Agreement.

Nothing shall preclude management from reducing such hours for other legitimate reasons.

The average weekly workhours for the part-time flexible employees with three (3) or more years of service will be the weekly workhour average for the 12 months prior to the effective date of this Agreement. The weekly workhour average cannot exceed forty (40) hours or be combined with any paid leave to exceed forty (40) hours.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE UNITED STATES POSTAL SERVICE
AND NATIONAL ASSOCIATION
OF LETTER CARRIERS, AFL-CIO**

**Re: Maximization/Full-time Flexible - NALC**

Where a part-time flexible has performed letter carrier duties in an installation at least 40 hours a week (8 within 9, or 8 within 10, as applicable), 5 days a week, over a period of 6 months (excluding the duration of seasonal periods on seasonal routes, defined in Article 41, Section 3.R of the National Agreement), the senior part-time flexible shall be converted to full-time carrier status.

This criteria shall be applied to postal installations with 125 or more man years of employment.

It is further understood that part-time flexibles converted to full-time under this criteria will have flexible reporting times, flexible nonscheduled days, and flexible reporting locations within the installation depending upon operational requirements as established on the preceding Wednesday.

The parties will implement this in accordance with their past practice.

Date: July 21, 1987

**LETTER OF INTENT
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Maximization**

This letter memorandum sets forth our mutual intent regarding the attached Memorandum of Understanding relating to maximization.

1. This Memorandum of Understanding is in settlement of the arbitration pending in case No. N8-NA-141, and satisfies the obligations of the parties pursuant to the Arbitrator's decision in N8-NA-0141 and the Memorandum of Understanding relating to maximization dated September 15, 1978.

2. The initial 6 month measuring period to be evaluated pursuant to the Memorandum of Understanding shall be August 1, 1980, through January 31, 1981. Conversions based upon this initial period shall be made no sooner than April 1, 1981, and are expected to be concluded by May 1, 1981. This conversion process shall not interfere with or delay conversions which would otherwise be implemented pursuant to the existing National Agreement. Henceforth, the 6 month measuring periods will be monitored on a continuing basis, and conversions required shall be implemented promptly.

3. Conversions required pursuant to this Memorandum of Understanding shall be in addition to (but not duplicative of) conversions that may be required pursuant to existing provisions of the National Memorandum of Understanding. The criteria established by this Memorandum of Understanding are supplementary to, not in limitation or diminishment of, existing criteria in the National Agreement.

4. Subject to operational requirements, the intent of the parties is to avoid unnecessary disruptions in existing patterns of reporting times, non-scheduled days and reporting locations for those PTFs converted pursuant to these criteria, to the extent the duties of the position converted are consistent with those performed by the PTF during the measuring period.

5. Employees converted to full-time positions pursuant to this Memorandum of Understanding may bid on assignments posted for bids by employees in the craft, and shall be full-time regular city letter carriers under the National Agreement.

6. In those installations where conversions have been made under this Memorandum of Understanding, and there are subsequent reversions or excessing, any reductions in full-time letter carrier positions shall be from among those position(s) converted pursuant to this Memorandum of Understanding until they are exhausted.

7. The parties will establish a national level committee to review and resolve any problems relating to the initial period of implementation, in accordance with their mutually expressed intentions. Accordingly, grievances filed at the local level relating to the initial period of implementation shall be stayed without prejudice to either party, and the time limits deemed extended by mutual consent, in order to permit review by the national committee. Upon such review, questions of fact may be referred to the normal grievance machinery.

8. The parties recognize their continuing obligation to discuss other respects in which maximization may be implemented in accordance with the National Agreement.

Date: February 3, 1981.

**Full-time Flexible Positions and Maximization.** A 1978 memorandum of understanding similar to the 1987 memorandum above first established a type of letter carrier status—"full-time flexible"—not mentioned in Article 7. The 1981 Letter of Intent reprinted above was created in settlement of a grievance brought under the 1978 memorandum, and remains in effect under the 1987 memorandum. The currently effective 1987 memorandum applies the full-time flexible maximization

requirement to offices with *125* or more workyears of employment; the 1978 memorandum applied only to installations with *150* or more workyears of employment.

**Another Maximization Requirement.** The memorandum creates a separate, additional obligation to maximize full-time positions beyond the maximization obligations of Article 7.3.A-D. See paragraph 3 of the Letter of Intent. In other words, even though management has complied, for example, with the 88 percent full-time requirement in a 200 workyear facility (Article 7.3.A), further conversions to full-time flexible may still be required when the requirements of this memorandum are met. As noted above under Article 7.3.A, if an office falls below 88 percent, conversions must first be made to full-time regular to bring the office to 88 percent. However, after full-time flexible positions have been created these are counted as full-time toward the 88 percent requirement.

This specific maximization obligation is similar to that of Article 7.3.C, because it is triggered by a PTF carrier working a relatively regular schedule over a six month period. However, where Article 7.3.C requires work on the *same assignment*, this memorandum requires only that the PTF carrier be performing *letter carrier duties* of any kind.

**39-Hour Report.** Every pay period, the Postal Service provides the NALC with a report that lists the names of PTF city letter carriers who have worked 39 hours or more during each service week during the previous six months in offices with 125 or more work years. This report is distributed by the NALC to its branches through its regional offices. It is designed to make it unnecessary for shop stewards to regularly request timekeeping data to monitor the Maximization Memorandum.

If a name is listed in an installation, it does not automatically result in the conversion of the senior PTF to full-time flexible in that installation. Local management may examine the work hours of the listed PTF to determine if all the criteria of the memorandum has been met.

In order for the hours worked to meet those criteria, the hours worked must be eight hours within nine or eight hours within ten (based on the size of the office), worked over five days of the service week (not six or seven), not during seasonal periods on a seasonal route, and worked in the performance of city letter carrier craft duties.

Local management may also review the actual number of hours worked each day and week of the six month period. By tracking of 39 hours rather than 40 hours each service week, the parties recognized that a conversion should be made if the PTF missed the 40 hours by only minutes on a day or days during the service week. In addition, local management may examine whether approved leave was used solely to reach

the triggering level of hours worked during any of the service weeks during the six month period.

If there is no dispute that all these criteria have been met, then the senior part-time flexible employee, not necessarily the part-time flexible employee listed on the report, shall be converted to full-time flexible city letter carrier status in the installation. In such cases there is no need for the union to request additional timekeeping data or conduct any additional investigation. However, if local management asserts that an employee listed in the report did not meet all the conversion criteria discussed above, the union should be given the data which management relied upon to make the decision. The union is not precluded from disputing local management's decision through the grievance procedure.

This process has been developed by the national parties to avoid grievances and cumbersome exchanges of information requests and rebuttal on the issue, focus on the exchange of information, and insure that the intent of the national parties is determined at the local level.

**Nature of Full-time Flexible Position.** When a PTF carrier's work over a 6-month period meets the criteria of this memorandum, the senior PTF must be converted to full-time flexible (FTF). Under the memorandum a full-time flexible carrier has a flexible schedule which is established week-to-week and posted on the Wednesday preceding the service week. However, that schedule may involve varying daily reporting times, varying nonscheduled days and varying reporting locations within the installation depending on operational requirements.

The Letter of Intent, reprinted above, provides the following:

- Full-time flexible assignments are incumbent only assignments. They are not filled when vacated (Step 4, G94N-4G-C 99225675, January 13, 2000, M-01400);
- Full-time flexible employees may bid on full-time regular positions (paragraph 5);
- Subject to operational requirements, full-time flexibles should not be subjected to unreasonable disruptions in reporting times, nonscheduled days and reporting locations (paragraph 4); and
- Full-time flexible employees are subject to reductions in full-time positions when reversions (Article 41.1) or excessing (Article 12.5) takes place. Nothing in paragraph 6 of the Letter of Intent changes the parties' understanding that any excessing still must be from the junior full-time carrier, regardless of his/her status as full-time regular or full-time flexible.

**Applying the Maximization Provisions in Withholding Situations.** Ordinarily management staffs installations with sufficient full-time employees to fill the full-time bargaining unit positions. This changes when the Postal Service is withholding full-time positions in an installation under the provisions of Article 12.5.B.2. Under that provision, management may withhold positions for other employees who may be reassigned involuntarily (excessed) (See JCAM pages 12-13 through 12-15). During withholding, the maximization provisions are applied as follows:

**Article 7.3.A.** National Arbitrator Mittenthal ruled in H7N-3D-C-22267, October 26, 1990 (C-10343), that an installation may fall below the Article 7.3.A percentage full-time staffing requirement when residual full-time positions are being withheld under Article 12.5.B.2.

**Article 7.3.C.** If an office is under withholding at the time the Article 7.3.C triggering criteria are met, a full-time position should be created pursuant to Article 7.3.C, posted for bids and the resulting residual vacancy withheld pursuant to Article 12.5.B.2 (Interpretive Step Settlement, C98N-4C-C 02070691, December 20, 2002, M-01475).

**Article 7.3.D.** If an office is under withholding at the time the criteria are met, the auxiliary route should be converted to a full-time assignment pursuant to this provision. The new position should be posted for bids and the resulting **residual** vacancy withheld pursuant to Article 12.5.B.2.

**FTF Memorandum.** Full-time flexible assignments are incumbent only assignments and may not be withheld under the provisions of Article 12.5.B.2 of the National Agreement (Prearbitration Settlement, F90N-4F-C-93022407, July 18, 2000, M-01432).

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: City Carrier Assistant Opportunities**

In order to provide the potential for career opportunities to city carrier assistants beyond their employing installation, a joint Task Force will be established to explore ways to expand opportunities for career city carrier positions within the district.

The Task Force will consist of two members appointed by the NALC and two members appointed by the Postal Service. The Task Force shall convene within 15 days of this agreement and will function for a period of one year, unless extended by mutual extent. The Task Force will provide reports and recommendations to the NALC President and the Vice President, Labor Relations, or their designees on a quarterly basis.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS
UNION, AFL-CIO**

**Re: Additional Resources - Holiday Carrier Assistant**

The Postal Service may employ holiday carrier assistants during the four week December period as operationally necessary, effective December 2014.

Holiday carrier assistants are subject to the following:

- The hourly rate will be the same as that for City Carrier Assistants.
- Over the course of a service week, the Employer will make every effort to ensure that available city carrier assistants are utilized at the straight-time rate prior to assigning such work to holiday carrier assistants working in the same work location.
- When an opportunity exists for overtime full-time employees on the appropriate Overtime Desired List will be selected to perform such work prior to assigning holiday carrier assistants to work overtime in the same work location where the employees regularly work.

The Postal Service shall provide the NALC with reports on the number of holiday carrier assistants hired.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: Delivery and Collection of Competitive Products**

The parties are aware that the Postal Service is discussing arrangements with suppliers of retail products to have the Postal Service collect and deliver such products both within and outside of normal business hours and days.

The parties recognize the value to the Postal Service, its customers and the public of utilizing a cost-effective, uniformed city letter carrier work force for the collection and delivery of such products.

Accordingly, the Board awards the following:

The collection and delivery of such products which are to be delivered in city delivery territory, whether during or outside of normal business days and hours, shall be assigned to the city letter carrier craft. The Postal Service will schedule available city letter carrier craft employees in order to comply with the previous sentence. However, the parties recognize that occasionally circumstances may arise where there are no city letter carrier craft employees available. In such circumstances, the Postal Service may assign other

employees to deliver such products, but only if such assignment is necessary to meet delivery commitments to our customers.

The parties will monitor whether the city carrier assistant employees authorized by Article 7, Section 1.C of the National Agreement are sufficient to permit the Postal Service to meet the fundamental changes in the business environment, including, but not limited to flexible windows which may be necessary to develop and provide new products and services. Additional CCAs may be jointly authorized based on such review.

Date: January 10, 2013

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: Break in Service**

For the purposes of implementation of the 2011 National Agreement between the United States Postal Service and the National Association of Letter Carriers, AFL-CIO, the parties agree that transitional employees who are hired as City Carrier Assistants (CCA) on or before April 11, 2013 will be given a one day break between appointments. The transitional employee will be separated effective Saturday, Day 1 of the Pay Period, be off the rolls on Sunday, Day 2 of the Pay Period (one day break), and hired as a City Carrier Assistant effective Monday, Day 3 of the Pay Period.

The length of the initial CCA appointment for such employees will be for the balance of a 360 day appointment (i.e. the total period from beginning of the transitional employee appointment until the conclusion of the initial CCA appointment will be 360 days). This one day break will not impact employees' eligibility for health benefits or any other right or entitlement otherwise provided under the collective bargaining agreement.

Transitional employees hired as CCAs will be paid at their transitional employee rate through April 19, 2013.

This agreement is intended solely to facilitate staggering CCA breaks between appointments. The parties agree that all other CCA appointments made pursuant to Article 7.1.C.1 or Article 7.1.C.2 of the National Agreement will be for 360 day terms. This agreement is without prejudice to either party in this or any other matter and may not be cited in any matter other than to enforce its terms.

## Transitional Employee Memos and Q&As

The Transitional Employee (TE) category of the city letter craft was eliminated in the 2011 National Agreement by the Memorandum of Understanding, *Re: Transitional Employees* which required TEs to be phased out within 90 days of the effective date of the Das Interest Arbitration Award (January 10, 2013).

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: Transitional Employees**

All provisions of the 2006 USPS/NALC National Agreement that were applicable to transitional employees, including related Memoranda of Understanding and other agreements or policy statements, will continue during the period that transitional employees will be phased out (within 90 days of the effective date of the 2011 Agreement).

Date: January 10, 2013

The phasing out of transitional employees is further addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**1. What is the last date that transitional employees may be on the rolls?**

April 10, 2013.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: Transitional Employees-Additional Provisions**

ARTICLE 6

**Layoff of Career Employees:**

a. Prior to laying off career employees, management will offer the impacted employees the opportunity to work any existing letter carrier craft transitional assignments within the installation.

b. There will be no out-of-schedule pay provided to the impacted employees for these temporary assignments.

ARTICLE 10

I. GENERAL

A. Purpose. Annual leave is provided to transitional employees for rest, recreation, emergency purposes, and illness or injury.

1. Accrual of Annual Leave. Transitional employees earn annual leave based on the number of hours in which they are in a pay status in each pay period.

| Rate of Accrual | Hours in Pay Status | Hours of Annual Leave Earned Per Pay Period |
|---|---|---|
| 1 hour for each unit of 20 hours in pay status in each pay period | 20 | 1 |
| | 40 | 2 |
| | 60 | 3 |
| | 80 | 4 (max.) |

2. Biweekly Crediting. Annual leave accrues and is credited in whole hours at the end of each biweekly pay period.

3. Payment For Accumulated Annual Leave. A separating transitional employee may receive a lump-sum payment for accumulated annual leave subject to the following condition:

a. A transitional employee whose separation is effective before the last Friday of a pay period does not receive credit or terminal leave payment for the leave that would have accrued during that pay period.

II. AUTHORIZING ANNUAL LEAVE

A. General. Except for emergencies, annual leave for transitional employees must be requested on Form 3971 and approved in advance by the appropriate supervisor.

B. Emergencies and Illness or Injury. An exception to the advance approval requirement is made for emergencies and illness or injury; however, in these situations, the transitional employee must notify appropriate postal authorities as soon as possible as to the emergency or illness/injury and the expected duration of the absence. As soon as possible after return to duty, transitional employees must submit Form 3971 and explain the reason for the emergency or illness/injury to their supervisor. Supervisors approve or disapprove the leave request. When the request is disapproved, the absence may be recorded as AWOL at the discretion of the supervisor as outlined in Section IV.B below.

III.UNSCHEDULED ABSENCE

A. Definition. Unscheduled absences are any absences from work that are not requested and approved in advance.

B. Transitional Employee Responsibilities. Transitional employees are expected to maintain their assigned schedule and must make every effort to avoid unscheduled

absences. In addition, transitional employees must provide acceptable evidence for absences when required.

IV. FORM 3971, REQUEST FOR, OR NOTIFICATION OF, ABSENCE

A.  Purpose. Application for annual leave is made in writing, in duplicate, on Form 3971, Request for, or Notification of, Absence.

B.  Approval/Disapproval. The supervisor is responsible for approving or disapproving application for annual leave by signing Form 3971, a copy of which is given to the transitional employee. If a supervisor does not approve an application for leave, the disapproved block on Form 3971 is checked and the reasons given in writing in the space provided. When a request is disapproved, the reasons for disapproval must be noted. AWOL determinations must be similarly noted.

ARTICLE 12

Reassignment of Career Employees Outside of a Section, Craft, or Installation.

a. Prior to reassigning career employees outside of a section, the craft, or installation, management will offer impacted career employees, on a seniority basis, the opportunity to work any existing letter carrier craft transitional assignments within the installation.

b. There will be no out-of-schedule pay provided to the impacted employees for these temporary assignments.

TE Hire versus Excessing

A full time letter carrier may not be excessed and the resulting vacancy filled by a TE, except where management can demonstrate that, as a result of legitimate operational changes, there is insufficient work to continue to support a full-time position. For example, management may not abolish a full-time route position and excess the full-time letter carrier and hire or assign one or more TEs to perform the work of the abolished position, unless management can demonstrate that the work cannot be performed on a full-time basis in compliance with the requirements of the National Agreement.

ARTICLE 16

Transitional employees may be separated at any time upon completion of their assignment or for lack of work. Such separation is not grievable except where the separation is pretextual. Transitional employees may otherwise be removed for just cause and any such removal will be subject to the grievance-arbitration procedure, provided the employee has completed ninety (90) work days, or has been employed for 120 calendar days, whichever comes first. Further, in any such grievance, the concept of progressive discipline will not apply. The issue will be whether the employee is guilty of the charge against him or her. Where the employee is found guilty, the arbitrator shall not have the authority to modify the discharge. In the case of removal for cause, a transitional employee shall be entitled to advance written notice of the charges against him/her in accordance with the provisions of Article 16 of the National Agreement.

ARTICLE 21

After an initial appointment for a 360-day term and upon reappointment to another 360-day term, any eligible noncareer transitional employee who wants to pay health premiums to participate in the Federal Employees Health Benefits (FEHB) Program on a pre-tax basis

will be required to make an election to do so in accordance with applicable procedures. The total cost of health insurance is the responsibility of the noncareer transitional employee.

Date: September 11, 2007

* * *

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: TRANSITIONAL EMPLOYEES/PART-TIME FLEXIBLE CONVERSIONS**

1. All part-time flexibles (PTFs) currently on the rolls will be offered an opportunity to convert to full-time regular status by November 20, 1994. The conversion opportunity may be contingent on the PTF's agreement to move to an available full-time assignment during this period. However, it is the intent of the parties that any such requirement to change offices will not be utilized by management as a device to discourage conversions and that inconvenience and disruption to PTFs will be minimized.

   PTFs will be converted to available full-time assignments in their current installation. If insufficient fulltime assignments are available to accommodate all PTFs in an installation, the remaining PTFs will be offered the opportunity to transfer to available full-time assignments within the commuting area, and the local union will be provided a list of all such assignments. The local union representative will be responsible for ascertaining the preferences, by use of seniority, of the PTFs who decide to accept a conversion opportunity in another installation and for communicating that preference to management. If PTFs from different installations seek the same assignment in another installation, craft seniority will determine which PTF gets that conversion opportunity.

   If the foregoing process does not result in the offer of a conversion to all PTFs in an installation, the Postal Service will identify other conversion opportunities, including assignments outside the commuting area, during the conversion period. Any decision by a PTF to transfer to another office under this agreement will be considered voluntary.

2. In lieu of the DSSA analysis provided in the January 16, 1992, NALC Transitional Employee (TE) arbitration award, the parties will use the impact formula contained in the September 21, 1992, Hempstead Memorandum of Understanding to determine the number of TE hours allowed in a delivery unit due to automation impact. All such TEs will be separated in a delivery unit when Delivery Point Sequencing (DPS) is on-line and operational.

3. The parties further agree that in offices (automation impacted or non-impacted) where the number of PTF conversions exceeds the number of TEs allowed under the above impact formula, additional TEs may be hired to replace such PTF attrition. All such TEs will be separated from the rolls by November 20, 1994.

4. All pending national grievances seeking conversion of PTFs will be resolved by offering the affected PTFs the opportunity to convert to full-time regular assign-

ments on a priority basis pursuant to this agreement. This agreement is without prejudice to the positions of either party with respect to any interpretive issue.

5. The parties at the local level will meet to review the current TE complement and pending TE or PTF grievances as follows:

- The meeting will occur after the joint training and during the local meeting on Hempstead issues;
- The parties will attempt to resolve any pending grievances, including appropriate remedies for violations, if any. The Postal Service's liability, if any, will be limited to any TE hours in excess of that allowed by paragraphs 2 and 3 above which occurred prior to the date of this agreement;
- If TE hours in a delivery unit exceed that allowed by paragraphs 2 and 3 above, management must, no later than 3/1/93, either: (1) relocate TEs to another delivery unit to stay within the allowable limits; or (2) reduce work hours per TE, so as to stay within the allowable limits; or (3) remove excess TEs from the rolls.

6. The parties herein express the desirability of affording future career employment opportunities to TEs. Consistent with that view, the parties agree to jointly explore the feasibility of such career opportunities, consistent with applicable law.

Date: December 21, 1992.

* * *

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: Transitional Employee Employment Opportunities**

In the interest of enhancing career employment opportunities for NALC transitional employees (TE), the Postal Service and the NALC agree to the following:

1. NALC TEs who have completed 180 days of employment as a TE and are still on the TE rolls may take the entrance examination for a career city letter carrier position. Only one such opportunity will be provided each eligible TE pursuant to this memorandum.

2. Eligible TEs who wish to take the examination must submit their request to their personnel office. The examination will be administered to eligible TEs who have submitted a request on a periodic basis, but no less than once each quarter.

3. The TEs' examination results will be scored, and passing scores will be merged with the appropriate existing city letter carrier register. Thereafter, normal competitive selection procedures will apply in making career city letter carrier appointments.

4. Eligible TEs who already have a passing test score on the city letter carrier register may take the examination again pursuant to this memorandum. At the request of the TE,

the score will be placed on the register in accordance with the current competitive selection procedure.

5. This memorandum will expire on **May 20, 2016.**

Date: **January 10, 2013**

* * *

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: Transitional Employees (Flat Sequencing System)**

Upon ratification of the Agreement, the Employer shall have authority to hire up to 8,000 transitional employees (TEs). The Employer may maintain this level of transitional employment for the duration of all phases of Flat Sequencing System (FSS) implementation. TEs hired under this Memorandum will be so designated on their PS Form 50.

In any district, the number of these TEs shall not exceed 8% of the authorized city carrier complement for that district. The parties understand that due to uncertainties with the implementation of FSS, there may be circumstances that require some modification to the above-referenced cap. It is agreed that any exception to this cap can only be made by the Vice President, Labor Relations and the President, National Association of Letter Carriers. Previously established prerequisites and criteria for the hiring and utilization of transitional employees, such as those found in Article 7.1.C.1 and Appendix B of the 2001-2006 National Agreement, are not applicable.

Provisions establishing the wages, benefits and employment term for TEs, such as those found in revised Article 7.1.B.3 and 7.1.B.4, Article 9.7, and the Memorandum Re: Transitional Employees-Additional Provisions shall apply. The existing MOU Re: Transitional Employee Employment Opportunities shall be applicable to these employees.

Date: September 11, 2007

* * *

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS**

**Re: Transitional Employees/Part-time Flexible Conversions**

The parties mutually agree that Article 12 of the National Agreement creates a requirement to withhold sufficient residual vacancies in order to minimize dislocation and inconvenience of excess employees. However, that obligation is limited to the number of residual vacancies necessary to accommodate any planned excessing events.

The parties recognize that certain locations may be withholding residual vacancies for excessing events that have been completed, and that other residual positions that are not being withheld remain vacant. Additionally, Postal Service systems may list residual vacancies that are no longer vacant or do not exist.

The parties also understand that with the changing mail mix, an opportunity for growth ties in time sensitive, cost competitive product markets that include ecommerce transactions which could require flexible delivery windows.

Accordingly, we agree to the following:

1. The Postal Service will fill the approximately 1,265 residual vacant Carrier Technician (CC-02) positions provided such positions still exist and remain vacant. Positions will be filled through either a) assignment of unassigned full-time regular or full-time flexible city letter carriers in the installation pursuant to Article 41.1.A.7 of the National Agreement; or b) conversion and assignment of part-time flexible city letter carriers in the installation. In the event there is an insufficient number of unassigned regular, full-time flexible, or part-time flexible city letter carriers to fill the positions, and there are no qualified transfer requests to the installation, transitional employees may be assigned to fill the positions until career employees become available.

2. The Postal Service agrees to fill 1,400 residual vacant full-time City Letter Carrier (CC-01) positions by conversion and assignment of part-time flexible city letter carriers within their installation.

3. The National Association of Letter Carriers (NALC) agrees that the Postal Service may employ up to 3,400 transitional employees in addition to those authorized under Article 7.1 of the National Agreement and the Memorandum of Understanding, Re: Transitional Employees (Flat Sequencing System). Management will determine when and where to employ these additional transitional employees and will share that information with NALC consistent with paragraph 6 below. Transitional employees hired under this Memorandum will be so designated by assignment of a unique occupational code. All transitional employee provisions will apply to transitional employees hired under this agreement, including the requirement that the Postal Service provide the NALC with a report every other pay period that indicates the number of transitional employees on the rolls.

4. For every transitional employee hired pursuant to paragraph 3 above, the Postal Service will convert a part-time flexible city letter carrier to full-time regular status within their installation. These conversions (a maximum of 3,400) are in addition to those required by paragraphs 1 and 2 above. While the Postal Service will determine where these additional conversions will be made, residual vacant full-time city letter carrier (CC-01) positions that remain after conversions pursuant to paragraph 2 above, will be filled as part of the conversions under this paragraph, provided there is a part-time flexible city carrier available in the installation. The Postal Service will share information regarding conversions with the NALC consistent with paragraph 6 below. Reemploying a transitional employee after a break in service or hiring a transitional employee to replace a transitional employee does not require an additional conversion of a part-time flexible city letter carrier to full-time status.

5. The parties will establish a joint work group at the national level to discuss and attempt to resolve issues concerning vacant residual positions, the continued need

to withhold positions, and the process for recording residual vacancies in Postal Service systems. The joint work group will meet within 30 days of the date of this agreement and will function for a 12-month period, unless extended by mutual agreement of the parties.

6. Conversions to full-time regular and filling residual vacancies pursuant to paragraphs 1 and 2 above will be made as soon as practicable and will be completed within 90 days of this agreement. Conversions to full-time regular pursuant to paragraph 4 will be completed within two pay periods of the transitional employees hire date. Prior to converting part-time flexible employees to full-time regular, filling residual vacancies, and employing additional transitional employees, the Postal Service will meet and discuss with the NALC at the national level the placement of the additional transitional employees and the locations of part-time flexible conversions and residual vacancies filled.

7. This agreement is effective from the date of signature. The Postal Service may maintain the additional transitional employees authorized under paragraph 3 above for a period of one year from the date of appointment, unless extended by mutual agreement of the parties, or this agreement is modified by the terms of a new collective bargaining agreement.

This agreement is reached without prejudice to either party's position in this or any other matter and, other than for the purpose of enforcing its terms, may not be cited in any other proceeding or forum, including interest arbitration.

This agreement is not intended to settle pending grievances on the conversion and placement of part-time flexible employees in City Letter Carrier (CC-01) residual vacancies. Any pending grievances regarding the conversion to CC-02 positions in paragraph 1 of this MOU are considered closed.

Dated: October 9, 2012

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: Transitional Employees/Part-Time Flexible Conversions MOU**

The above-referenced Memorandum of Understanding **(dated October 9, 2012)** has been modified by the 2011 National Agreement as follows:

1. The second sentence of paragraph 5 will now read: "The joint work group will meet within 30 days of the date of this agreement and will function through the term of the 2011 National Agreement."

2. The second sentence (and new third sentence) of paragraph 7 will now read: "The Postal Service may maintain the additional transitional employees authorized under paragraph 3 above until the transitional employee category is phased out and/or those transitional employees have the opportunity to become City Carrier Assistants (CCAs) in accordance with Section 1.j. of the **General Principles for the Non-Career Complement in the Das Award.** Once these transitional employees become CCAs, they

shall be counted as part of the cap outlined in Article 7.1.C of the National Agreement." Paragraphs 1, 2, 4, and 6 will remain in effect until those provisions are fully implemented.

Date: January 10, 2013

* * *

## QUESTIONS AND ANSWERS (42)
## NALC TRANSITIONAL EMPLOYEES

The attached jointly-developed document provides the mutual understanding of the national parties on issues related to NALC Transitional Employees. This document may be updated as agreement is reached on additional matters related to transitional employees.

**Date: February 20, 2009**

**1. When may transitional employees be hired under the terms of the 2006 National Agreement?**
Transitional employees may be hired after ratification of the National Agreement (September 11, 2007) under either the provisions of Article 7 or the Memorandum of Understanding, Re: Transitional Employees (Flat Sequencing System), provided that the national and/or district caps are not exceeded.

**2. In determining transitional employee caps is the number of transitional employees "rounded up" for percentage purposes?**
No. Under Article 7.1.B of the 2006 USPS/NALC National Agreement the number of transitional employees shall not exceed 3.5% of the total number of on-rolls career city carriers nationwide, and may not exceed 6% of the total number of career city carriers employed in the district. Regarding transitional employees employed under the Memorandum of Understanding, RE: Transitional Employees (Flat Sequencing System), the number shall not exceed 8% of the authorized city carrier complement for the district.

**3. Must a transitional employee go through a medical assessment when reappointed?**
The current requirements for a medical assessment upon reappointment are contained in Handbook EL-312, Section 572, which states in relevant part:

Reappointment. An applicant who has had a break in postal service of more than one year must have a new medical assessment. If the break in service is less than one year, a new assessment is not required, provided all the following conditions are met:

(1) A medical assessment and determination of medical suitability were obtained for the individuals previous employment.

(2) The duties of the new position for which the applicant was selected are not more physically demanding than those required in the last position.

(3) The new application and other suitability screening material does not indicate the need for a new medical assessment.

**4. Will transitional employees who were on the rolls on September 11, 2007 with 359 day appointments have their appointments changed to 360 days?**

Yes

**5. The Memorandum of Understanding Re: Transitional Employees (Flat Sequencing System) includes the following requirement: "In any district, the number of these TEs shall not exceed 8% of the authorized city carrier complement for that district." What is the authorized city carrier complement for a district?**
For the purposes of defining the subject Memorandum, "authorized city carrier complement for that district" means the number of on-rolls career city carriers employed in the district.

**6. How will transitional employee caps be monitored for compliance?**
The caps will be monitored at the national level. The Postal Service will provide the national union with separate reports for each type of transitional employee (Article 7.1 and FSS MOU). These reports will be provided to the national union every other pay period and will identify both nationally and by district the number of transitional employees and percentage compared to career letter carriers on rolls.

**7. What are the occupational codes and designation activity codes for transitional employees?**
Transitional employee occupational codes are as follows: Transitional employees employed under Article 7.1.B of the National Agreement are either 2310-0030 City Carrier (Transitional Employee) CC-01 or 2310-0040 Carrier Tech (Transitional Employee) CC-02. Transitional employees employed under the Memorandum of Understanding, Re: Transitional Employees (Flat Sequencing System) are either 2310-0031 City Carrier (Transitional Employee-MOU) CC-01 or 2310-0041 Carrier Tech (Transitional Employee-MOU) CC-02. The designation activity code for all city letter carrier transitional employees is 834.

**8. Are transitional employees who are employed under the Memorandum of Understanding, Re: Transitional Employees (Flat Sequencing System) limited to sites directly impacted by FSS?**
No, but the number of this type of transitional employee is limited to 8,000 nationwide through the duration of all phases of Flat Sequencing System (FSS) implementation. In any district, the number of these transitional employees shall not exceed 8% of the authorized city carrier complement for that district.

**9. If casuals are "converted" to transitional employee, must they have an immediate break in service?**
Yes, the casual must have at least a five day break in service prior to being appointed as a transitional employee.

**10. May transitional employees hold dual appointments?**
Currently dual appointments for transitional employees are not authorized.

**11. May city letter carrier transitional employees be assigned to work in other crafts?**
Only under emergency conditions, as defined by Article 3 of applicable collective bargaining agreements.

**12. May transitional employees who have an on the job illness or injury be assigned to work in other crafts?**
Only if the assignment to another craft is consistent with Section 546 of the Employee and Labor Relations Manual and relevant Department of Labor regulations.

**13. Are transitional employee employment records coded to identify the number of transitional employee appointments served?**
No.

**14. Can transitional employees be temporarily assigned outside their employing post office (installation) to another post office (installation) within the district?**
Transitional employees will normally work in their employing post office but may be assigned to work in another office within the same district on an occasional basis. Such temporary assignments must otherwise be consistent with the National Agreement (e.g. assigning transitional employees to work outside their employing office may not violate Article 7.1.B.3 in the temporary office or the letter carrier paragraph in the employing office.)

**15. May transitional employees be permanently moved from one post office (installation) to another during their appointment?**
Yes, provided the employee's current assignment is being terminated voluntarily or, as defined in the Memorandum of Understanding, Re: Transitional Employees - Additional Provisions, due to completion of assignment or lack of work. To avoid a break in service, a permanent move to another installation must be effected on the first day of a pay period.

**16. Is there a limit on the number of hours transitional employees may be scheduled on a workday?**
Yes, transitional employees are covered by Selection 432.32 of the Employee and Labor Relations Manual, which states: Except as designated in labor agreements for bargaining unit employees or in emergency situations as determined by the PMG (or designee), employees may not be required to work more than 12 hours in 1 service day. In addition, the total hours of daily service, including scheduled work hours, overtime, and mealtime, may not be extended over a period longer than 12 consecutive hours. Postmasters, Postal Inspectors, and exempt employees are excluded from these provisions.

**17. Do transitional employees have a work hour guarantee?**
Yes, Article 8, Section 8.D of the National Agreement provides the following: Any transitional employee who is scheduled to work and who reports for work shall be guaranteed four (4) hours' work or pay.

**18. Are transitional employees covered by leave provisions of Articles 10 and 30 of the National Agreement?**
No. The granting of annual leave to transitional employees is covered by the Memorandum of Understanding, Re: Transitional Employees - Additional Provisions.

**19. May transitional employees carry over leave from one appointment to another?**
No. Transitional employees may be paid for any accrued leave pursuant to the Memorandum of Understanding, Re: Transitional Employees - Additional Provisions

**20. Are transitional employees covered by the Memorandum of Understanding, Re: Bereavement Leave?**
Yes, however, transitional employees do not earn sick leave and therefore, may only request annual leave or leave without pay for bereavement purposes.

**21. Does a transitional employee who receives a career appointment go through a probationary period as a career employee?**
Yes.

**22. Does the Memorandum of Understanding, Re: Transfers, still apply?**
Yes, the Transfer Memorandum was not altered by either the revision to Article 7.1 of the National Agreement or the Memorandum of Understanding, Re: Transitional Employees (Flat Sequencing System). Accordingly, unless hiring transitional employees to fill or backfill for residual assignments being withheld pursuant to Article 12 of the National Agreement, the "at least one in four" or "at least one in six" rules for reassignments remain in effect when hiring.

**23. Do the reassignment ratios in the Transfer Memorandum apply when transitional employees are immediately reappointed (precisely at the conclusion of the five day break) or when directly appointed to fill a vacancy resulting from the early (voluntary or disciplinary) separation of another Transitional Employee?**
No.

**24. Has the conversion to eCareer impacted transitional employee requests to take the entrance examination pursuant to the memorandum of Understanding, Re: Transitional Employee Employment Opportunities?**
Yes, using eCareer all applicants, including transitional employees, can take the entrance examination whenever a position is posted. The applicant will then be given the opportunity to take the exam as part of the application process. The applicant chooses the exam date and location to fit their personal schedule. Once the applicant takes the exam, the exam score is automatically uploaded into their candidate profile and remains there for any future vacancy opportunities. There is no need to retest until the standard time period associated with the exam expires. (Currently 6 years for the 473 Examination.) An applicant may retest after four months of the initial test when applying for a posting. To assist transitional employees locate available opportunities, notice of all city carrier vacancies advertised in eCareer within a district will be posted on official bulletin boards in offices that employ transitional employees within the district of the vacancy.

**25. Will transitional employees have access to the grievance procedure if removed?**
Yes, consistent with the Memorandum of Understanding, Re: Transitional Employees - Additional Provisions, which states:

Transitional employees may be separated at any time upon completion of their assignment or for lack of work. Such separation is not grievable except where the separation is pretextual. Transitional employees may otherwise be removed for just cause and any such removal will be subject to the grievance-arbitration procedure, provided the employee has completed ninety (90) work days, or has been employed for 120 calendar days, whichever comes first. Further, in any such grievance, the concept of progressive discipline will not apply. The issue will be whether the employee is guilty of the charge against him or her. Where the employee is found guilty, the arbitrator shall not have the authority to modify the discharge. In the case of removal for cause, a transitional employee shall be entitled to advance written notice of the charges against him/her in accordance with the provisions of Article 16 of the National Agreement.

**26. Does the concept of progressive discipline apply to transitional employees?**
No. If just cause exists for discipline, the only action that can be initiated against a transitional employee is separation. Such action is subject to the grievance/arbitration procedure, but the action cannot be modified by an arbitrator; the separation can only be upheld or rejected in its entirety. However, the parties are not prohibited from agreeing to a lesser penalty during discussions at earlier steps of the grievance -arbitration procedure.

**27. Can a transitional employee serve as a union steward?**
Yes.

**28. Do Article 17.3 and 17.4 of the National Agreement apply to transitional employees serving as union stewards?**
Yes.

**29. Will the union be allowed to address transitional employees during new employee orientation?**
Yes. The provisions of Article 17.6 of the National Agreement apply to transitional employees. Accordingly, the union is to be provided ample opportunity to address newly hired city carrier transitional employees during orientation.

**30. Are transitional employees allowed to participate in the Federal Employees Health Benefits Program?**
The Memorandum of Understanding, Re: Transition Employees - Additional Provisions, provides the following: "After an initial appointment for a 360-day term and upon reappointment to another 360-day term, any eligible noncareer transitional employee who wants to pay health care premiums to participate in the Federal Employees Health Benefits (FEHB) Program on a pre-tax basis will be required to make an election to do so in accordance with applicable procedures. The total cost of health insurance is the responsibility of the noncareer transitional employee."

**31. To qualify for Health Benefits must a transitional employee serve the entire 360 day initial appointment before a second 360 day appointment?**
To qualify for Federal Employees Health Benefits, transitional employees must first have completed one full year (365 days) of current continuous employment, including breaks of five days or less, regardless of when the five-day break occurs.

**32. May a Transitional Employee have more than a five day break after a 360 day appointment and still be qualified for Federal Employee Health Benefits?**
A transitional employee who has a break in service of more than 5 days following a 360 day appointment will not be eligible for health benefits.

**33. Are transitional employees entitled to higher level pay under Article 25 of the National Agreement?**
No. Article 25 does not apply to transitional employees. However, Article 9.7 of the National Agreement requires that transitional employees be paid at Step A of the position to which assigned. Accordingly, if a transitional employee is assigned to a vacant Carrier Technician position, the employee will be paid at Step A of CC-02.

**34. How does a transitional employee who is employed in grade CC-01 but later assigned to a Carrier Technician position (CC-02) receive higher level pay?**
In such case the transitional employee's PS Form 50 must be revised to reflect assignment to the Carrier Technician position. This will require designation to the proper CC-02 occupational code (either 2310-0040 or 2310-0041).

**35. May transitional employees be assigned to vacant duty assignments?**
Yes, consistent with the following: The posting and bidding provisions of Article 41.1.A and the opting provisions of Article 41.2.B, and provisions of Article 25 for temporarily filling higher level vacancies still apply. However, transitional employees may be assigned to cover residual or temporary vacancies not filled through those procedures.

**36. Will transitional employees be allowed to opt on vacant duty assignments?**
No.

**37. May a transitional employee be assigned to a residual vacancy rather than converting an available part-time flexible city letter carrier to full-time?**

Unless the residual vacancy is being withheld pursuant to Article 12 of the National Agreement, the assignment should normally be filled pursuant to Section 722 of Handbook EL-312, which states: "A full-time residual position is filled by assigning an unassigned full-time employee or a full-time flexible employee. The conversion to full-time of a qualified part-time flexible employee with the same designation or occupation code as the vacancy should occur only after unassigned full-time employees have been assigned. Part-time flexible employees must be changed to full-time regular positions, if appropriate, within the installation in the order specified by the applicable collective bargaining agreement."

**38. May a Transitional Employee be assigned to full-time residual city letter carrier vacancy rather than hiring a career employee when the vacancy is not withheld pursuant to Article 12, no unassigned regular or full-time flexible is available or assignment, and no part-time flexible employee is available for conversion?**
In this limited circumstance, the full-time residual vacancy should be filled by accepting a qualified career employee transfer request. Such transfers will count toward the appropriate reassignment ratio, even if it is necessary to count such a transfer(s) toward a future hiring event. If there are no qualified requests for transfer pending at the time of the vacancy, a transitional employee may be assigned to the residual vacancy.

**39. Will city carrier transitional employees attend the carrier academy?**
Newly hired transitional employees will attend the carrier academy if it is part of the hiring and training process used in the district, provided the employee did not previously attend the training. This also applies to the classroom portion of the training for city carrier casuals who are appointed to transitional employee positions.

**40. Can a transitional employee act as a temporary supervisor (204B)?**
Yes.

**41. May transitional employees enter into City Carrier Transportation (Driveout) Agreements, as defined in Article 41.4 of the National Agreement.**
No. Article 41.4 does not apply to transitional employees. However, in circumstances where the postmaster or station manager determines that use of a personal vehicle is necessary for business purposes, a transitional employee may voluntarily elect to use his/her vehicle. Such agreement must be made through PS Form 8048, Commercial Emergency Vehicle Hire, with the daily rate for vehicle use mutually agreed to by the postmaster or station manager and the employee. The postmaster or station manager must then forward the completed form to the servicing Vehicle Maintenance Facility manager.

**42. Will transitional employees be assigned a Postal Service Employee Identification Number (EIN) and Personal Identification Number (PIN)?**
Yes.

# ARTICLE 8 HOURS OF WORK

8.1 **Section 1. Work Week**

The work week for full-time regulars shall be forty (40) hours per week, eight (8) hours per day within ten (10) consecutive hours, provided, however, that in all offices with more than 100 full-time employees in the bargaining units the normal work week for full-time regular employees will be forty hours per week, eight hours per day within nine (9) consecutive hours. Shorter work weeks will, however, exist as needed for part-time regulars.

8.2 **Section 2. Work Schedules**

A. The employee's service week shall be a calendar week beginning at 12:01 a.m. Saturday and ending at 12 midnight the following Friday.

B. The employee's service day is the calendar day on which the majority of work is scheduled. Where the work schedule is distributed evenly over two calendar days, the service day is the calendar day on which such work schedule begins.

C. The employee's normal work week is five (5) service days, each consisting of eight (8) hours, within ten (10) consecutive hours, except as provided in Section 1 of this Article. As far as practicable the five days shall be consecutive days within the service week.

**Service Week.** Article 8.2.A defines the "service week" of bargaining-unit employees. The service week begins at 12:01 a.m. Saturday and ends at 12 midnight the following Friday. Defining the service week enables the parties to make and enforce rules about weekly hours guarantees, limits on weekly work hours, overtime paid for work over a certain number of hours during a service week, etc.

The service week is not necessarily the same as a "week" for vacation planning purposes (Article 10.3.E). The "FLSA work week" also has a different definition (Article 8.4, FLSA Overtime).

**Service Day.** Article 8.2.B defines the "service day" for pay and overtime purposes. The definition is more important for employees in other crafts than for letter carriers, who are seldom scheduled to work past midnight into another calendar day. The service day is defined as the calendar day on which the majority of work is scheduled. Where the work schedule is distributed evenly over two calendar days, the service day is the calendar day on which such work schedule begins.

**Full-Time Employee Schedules.** Read together, Article 8, Sections 1 and 2.C provide that the work week for *all* full-time carriers (i.e., full-time regulars and full-time flexibles—including unassigned regulars, reserve regulars and Carrier Technicians), consists of five days, forty hours per week, and eight hours per day within ten consecutive hours. Additionally, in all offices with more than 100 full-time employees in

the bargaining units the eight hours per day must be within nine consecutive hours.

**Days Off.** The schedule of a regular employee must include fixed or rotating days off on a permanent basis (Article 30.B.2). As far as practicable the five days of an employee's fixed regular schedule must be consecutive days within the service week (Article 8.2.C).

**Five Minute Leeway Rule.** Regardless of exactly what an employee's regular schedule is, there is the question of whether the employee is compensated for *all time worked* at either the straight-time or the overtime rate, whichever is applicable (Article 8.4). This issue often arises in regard to the "5-minute leeway rule" contained in the F-21 Handbook (incorporated into the National Agreement through the provisions of Article 19). Once an employee's time on the clock exceeds the employee's established work schedule for that day by more than five minutes, the total time for that day becomes payable time. In an effort to avoid additional costs and administrative burdens, the Postal Service tries to ensure that an employee does *not accumulate a daily total of more than five minutes of clock time* in excess of the employee's schedule worked time—unless, of course, the employee is assigned to work overtime.

8.3

**Section 3. Exceptions**

The above shall not apply to part-time employees and transitional employees.

Part-time employees will be scheduled in accordance with the above rules, except they may be scheduled for less than eight (8) hours per service day and less than forty (40) hours per normal work week.

**CCA** employees will be scheduled in accordance with Section 2, A and B, of this Article.

**Part-Time Regulars.** Articles 8.1 and 8.2 apply to part-time regulars except that their regular schedule may be less than eight hours per service day and less than forty hours per normal work week. The Postal Service may not create part-time regular assignments with six-day schedules (National Arbitrator Nolan, B94N-4B-C-97027260, December 27, 2002, C-23852).

**Work Schedules of Part-Time Flexible, Transitional Employees, and City Carrier Assistant Employees.** Article 8.3 makes clear that the normal work week defined by Article 8.2.C does not apply to part-time flexibles, transitional employees, or CCAs who have no daily 8-hour or weekly 40-hour guarantees. Moreover, the language in Article 7.1.A.2 provides that part-time flexibles "shall be available to work flexible hours as assigned by the Employer during the course of a service week," which means that PTFs may be scheduled to work more or less than 5 days per week and more or less than 8 hours per day.

The issue of availability of a CCA who is not scheduled to work is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**25. Can CCAs be required to remain on "stand by" or remain at home for a call-in on days they are not scheduled to work?**

No.

**Overtime—PTF and City Carrier Assistant Employees.** The overtime rate provisions of Article 8.4.B regarding work in excess of 8 hours in a service day or 40 hours in a service week do apply to part-time flexible and city carrier assistant employees—as well as all bargaining unit employees (Article 8.4.B).

8.4

**Section 4. Overtime Work**

A. Overtime pay is to be paid at the rate of one and one-half (1½) times the base hourly straight time rate.

(The preceding paragraph, Article 8.4.A., shall apply to **City Carrier Assistant** Employees.)

B. Overtime shall be paid to employees for work performed only after eight (8) hours on duty in any one service day or forty (40) hours in any one service week. Nothing in this Section shall be construed by the parties or any reviewing authority to deny the payment of overtime to employees for time worked outside of their regularly scheduled work week at the request of the Employer.

(The preceding paragraph, Article 8.4.B., shall apply to **City Carrier Assistant** Employees.)

C. Penalty overtime pay is to be paid at the rate of two (2) times the base hourly straight time rate. Penalty overtime pay will not be paid for any hours worked in the month of December.

(The preceding paragraph, Article 8.4.C., shall apply to **City Carrier Assistant** Employees.)

**Postal Overtime.** All bargaining unit employees are paid postal overtime for time spent in a pay status in excess of 8 hours in a service day and/or in excess of 40 hours in a service week. Hours "in pay status" include hours of actual work and hours of paid leave.

**Postal Overtime Pay Rate.** The contractual overtime rate of pay is one and one-half times the base straight-time rate. The overtime rate for part-time flexible employees is the same as the overtime rate for full-time regular employees in the same step and grade. This rate is slightly less than one and one-half times the part-time flexible base straight-time

hourly rate. This is a consequence of part-time flexible employees receiving a slightly higher regular straight-time hourly rate than full-time regulars in order to compensate them for not receiving paid holidays (Article 11.7).

**FLSA Overtime.** Totally independent of the contract are those provisions of the federal Fair Labor Standards Act governing overtime for all bargaining-unit employees who *actually work more than 40 hours* during the employee's FLSA work week. The *FLSA overtime rate* is one and one-half times the employee's "regular rate" of pay for all hours of actual work in excess of 40 hours in the FLSA work week.

The "regular rate" of pay is computed by adding the employee's total compensation (including night differential, Sunday premium, territorial COLA and higher-level pay, and excluding pay for leave hours, contract overtime pay, out-of-schedule premium pay and penalty overtime pay) for all hours *actually worked* (excluding paid leave hours but including steward's duty time and time off authorized under the 7.01 rule) during the FLSA work week and then dividing the dollar total by the number of hours the employee actually worked during the FLSA work week. Detailed FLSA overtime regulations can be found in Section 444.21 of the *Employee and Labor Relations Manual*.

Because certain pay premiums are included in the calculation of the FLSA overtime rate, an employee may receive a higher rate of pay for FLSA overtime than for postal overtime.

**Penalty Overtime Rate.** The penalty overtime rate is two times the employee's base straight-time hourly rate. Article 8.4.E provides that, excluding December, part-time flexible and city carrier assistant employees are paid at the penalty overtime rate for all work in excess of ten hours in a service day or fifty-six hours in a service week. Article 8.4.D provides that full-time regular employees will be paid at the penalty overtime rate for any overtime work in contravention of the restrictions in Article 8.5.F. For the purposes of the application of Article 8, Sections 4 and 5 of the National Agreement, "December" consists of four consecutive service weeks which are identified each year in the Postal Bulletin.

**Out-of-Schedule Premium.** Article 8.4.B refers to the out-of-schedule premium provisions contained in the ELM Section 434.6. They provide that out-of-schedule premium is paid at the postal overtime rate to eligible full-time bargaining unit employees for time worked outside of, and instead of, their regularly scheduled workday or workweek when employees work on a temporary schedule at the request of management.

Only full-time regular and full-time flexible letter carriers may receive out-of-schedule pay. However, this rule does not preclude part-time employees from receiving a monetary remedy for contractual scheduling violations when warranted by fact circumstances (e.g. violations of

Article 41.2.B.4). A full-time flexible employee's "regular" schedule for the purpose of this provision is the schedule established on the preceding Wednesday (Article 7).

An employee does not receive out-of-schedule pay when his or her schedule is changed to provide limited or light duty (National Arbitrator Gamser, N8-NA-0003, March 12, 1980, C-03212), when the employee is attending a recognized training session, or when the employee is allowed to make up time due to tardiness in reporting for duty (ELM Section 434.622).

Note also that letter carriers who fill temporarily vacant Carrier Technician positions under the provisions of Article 25 assume the hours of the vacancy as provided by the prearbitration settlement H8N-3P-C 32705, January 27, 1982, (M-00431), which states:

> Details of anticipated duration of one week (five working days within seven calendar days) or longer to temporarily vacant Carrier Technician positions shall be filled per Article 25, 1981 National Agreement. When such temporary details involve a schedule change for the detailed employee, that employee will assume the hours of the vacancy without obligation to the employer for out-of-schedule overtime.

**Rules for Out-of-Schedule Premium.** In the letter carrier craft the out-of-schedule premium provisions *are applicable only in cases where management has given advance notice* of the change of schedule by Wednesday of the preceding service week. In all other cases a full-time employee is entitled to work the hours of his or her regular schedule or receive pay in lieu thereof and the regular overtime rules apply—not the out-of-schedule premium rules.

- If notice of a temporary change is given to a full-time employee by Wednesday of the preceding service week, even if this change is revised later, management has the right to limit the employee's work hours to the hours of the revised schedule and out-of-schedule premium is paid for those hours worked outside of, and instead of, his or her regular schedule.
- If notice of a temporary schedule change is *not* given to a full-time employee by Wednesday of the preceding service week, the employee is entitled to work her or his regular schedule and the out-of-schedule provisions do not apply. In this case any hours worked in addition to the employee's regular schedule are not considered out-of-schedule premium hours. Instead, they are paid as overtime hours worked in excess of 8 hours per service day or 40 hours per service week.

Out-of-schedule premium hours cannot exceed the unworked portion of the full-time employee's regular schedule. If employees work their full regular schedule, then any additional hours worked are not instead of

their regular schedule and are not considered as out-of-schedule premium hours. Any hours worked which result in paid hours in excess of 8 hours per service day or 40 hours per service week are paid at the overtime rate.

**Out-of-Schedule Premium - Daily Schedule Examples**

| Example Number | Hours Worked | Total Hours Worked | Premium Hours | Straight Time Hours | Overtime Hours |
|---|---|---|---|---|---|
| 1* | 8:00 am-4:30 pm | 8 | 0 | 8 | 0 |
| 2 | 6:00 am-2:30 pm | 8 | 2 | 6 | 0 |
| 3 | 6:00 am-3:30 pm | 9 | 1 | 7 | 1 |
| 4 | 6:00 am-4:30 pm | 10 | 0 | 8 | 2 |

* Original, permanent schedule

**Daily Schedule Examples.** The following examples, which refer to the chart above, illustrate the out-of-schedule premium rules.

- **Example 1.** This is the employee's original, permanent schedule of 8:00 a.m.—4:30 p.m. and an 8-hour workday. The employee receives 8 hours of straight-time pay.
- **Example 2.** For examples 2 through 4, the employee has received advance notice by Wednesday of the preceding service week of a schedule change to 6:00 a.m.-2:30 p.m. In this example the employee works the revised schedule's hours only, and receives two hours of out-of-schedule premium for the hours 6:00-8:00 a.m., which were worked outside of and instead of the regular schedule.
- **Example 3.** The employee works the revised schedule plus one additional hour. The employee receives one hour of out-of-schedule premium pay, because of time worked outside of and instead of his or her regular schedule. However, out-of-schedule premium hours cannot exceed the unworked hours of the employee's permanent schedule (there is only one such hour here), so the extra work hour is paid as contract overtime rather than out-of-schedule premium.
- **Example 4.** In this example the employee works the revised schedule plus two hours of overtime. Two hours of postal overtime are paid but no out-of-schedule premium, because the employee has worked his or her full, permanent schedule.

**Weekly Schedule Example.** For example, an employee's regular schedule is Monday through Friday and she is given timely notice of a temporary schedule change to Sunday through Thursday, with the same daily work hours. She works 8 hours per day Sunday through Thursday. The hours worked on Sunday are out-of-schedule premium hours provided they are worked instead of the employee's regularly scheduled hours on Friday. However, if the employee also works her regular schedule on Friday, then there can be no out-of-schedule premium

hours.  The employee is paid overtime for the hours worked in excess of 40 during the service week.

**Voluntary Schedule Changes.**  There may be situations in which full-time employees wish to have their regular schedules temporarily changed for their *own* convenience.  Out-of-schedule premium is not paid when a change in a full-time employee's schedule meets *all three* of the following criteria:

1. The requested change in schedule is for the personal convenience of the employee—not for the convenience of management.  Note: Arbitrator Gamser held in case AB-C-341 (C-00161) that management is not relieved of the obligation to pay out-of-schedule premium by informing employees who volunteered for higher level assignments that such assignments would be considered to be "at the request of the employee."  Additionally, Arbitrator Mittenthal determined in case A8-W-939, January 27, 1982 (C-00580), that acting supervisors (204b), or the "employee-supervisors" in the grievances before him were "entitled to the out-of schedule premium during their details as temporary supervisors."  He based his decision both on an October 10, 1975 Postal Service directive which authorized the payment of out-of-schedule premium to acting supervisors, and the four year practice of following that directive prior to the NLRB decision which management believed supported a change in that policy.

2. The employee has signed a PS Form 3189, *Request for Temporary Schedule Change for Personal Convenience.*

3. Management and the union's representative (normally the certified steward in the employee's work location) agree to the change and both sign the PS Form 3189.

**8.4.D**

> D. Penalty overtime pay will be paid to full-time regular employees for any overtime work in contravention of the restrictions in Section 5.F.

**Penalty Overtime Entitlement of Full-time Employees.**  A full-time employee receives penalty overtime pay at two times the base straight-time rate (Article 8.4.C) for work beyond the limits stated in Article 8.5.F, which are, excluding December:

- Overtime worked on more than four of the employee's five scheduled days in a service week;
- Work over ten hours on a regularly scheduled day;
- Work over eight hours on a non-scheduled day; or
- Work over six days in a service week.

This provision applies only to full-time regular and full-time flexible employees.

8.4.E

> E. Excluding December, part-time flexible employees will receive penalty overtime pay for all work in excess of ten (10) hours in a service day or fifty-six (56) hours in a service week.
>
> (The preceding paragraph, Article 8.4.E., shall apply to **City Carrier Assistant** Employees.)

**Penalty Overtime for Other Employees.** Excluding December, Article 8.4.E requires the payment of penalty overtime at two times the base straight-time rate (Article 8.4.C) for all work beyond ten hours in a service day or 56 hours in a service week. Article 8.4.E applies to part-time flexible and city carrier assistant employees. Part-time regular employees are in the same category as PTFs for penalty overtime purposes.

8.4.F

> F. Wherever two or more overtime or premium rates may appear applicable to the same hour or hours worked by an employee, there shall be no pyramiding or adding together of such overtime or premium rates and only the higher of the employee's applicable rates shall apply.
>
> (The preceding paragraph, Article 8.4.F., shall apply to **City Carrier Assistant** Employees.)

**No Pyramiding of Overtime Rates.** Because Article 8.4.F prohibits the "pyramiding" or adding together of overtime and premium rates, it generally results in a "ceiling" on postal overtime of two times the employee's base rate—the penalty overtime rate, which is the highest premium pay rate. However, night shift differential (Article 8.7) is added to overtime premium rates because the night shift differential is not a "premium" for the purpose of this section. Employees receiving "Christmas Work Pay" (Article 11.4.B) also receive applicable night differential and Sunday premiums (ELM Exhibit 434.8).

8.5

> **Section 5. Overtime Assignments**
>
> When needed, overtime work for regular full-time employees shall be scheduled among qualified employees doing similar work in the work location where the employees regularly work in accordance with the following:

**Overtime Assignment Rules Apply to Full-time Employees.** The introduction to Article 8.5 clarifies that its provisions as a whole apply only to full-time regular or full-time flexible employees who are "needed" to work overtime. This provision does not require management to use a full-time employee desiring to work overtime in preference to a part-time flexible or city carrier assistant working overtime.

Management normally has the right to assign overtime work to full-time employees rather than to a PTF or CCA. An exception to this general principle is management's requirement to provide auxiliary assistance (See JCAM pages 8-14 through 8-16) before requiring letter carriers not

on the ODL or Work Assignment List to work overtime on their own route on a regularly scheduled day. This exception is explained following Article 8.5.C.2.d under the heading, "Implementing Memorandum on 'Letter Carrier Paragraph.'"

**Acting Supervisors.** An acting supervisor (204b) may not be assigned bargaining-unit overtime in lieu of a bargaining-unit employee. The PS Form 1723 is the controlling document for determining whether an employee is in a 204b status. See Article 1.6 for a complete discussion of this issue.

**8.5.A**

> A. Employees desiring to work overtime shall place their names on either the "Overtime Desired" list or the "Work Assignment" list during the two weeks prior to the start of the calendar quarter, and their names shall remain on the list until such time as they remove their names from the list. Employees may switch from one list to the other during the two weeks prior to the start of the calendar quarter, and the change will be effective beginning that new calendar quarter.

**Signing Overtime Lists.** Full-time letter carriers, including full-time flexibles, who want to work overtime may place their names on either the "Overtime Desired List" or the "Work Assignment List," but not both. Carriers may sign a list or switch between lists only during the two weeks prior to the beginning of the calendar quarter. There is an exception for employees who were on military leave during the sign up period. They are always permitted to sign the list upon return to work (Step 4, H4N-1K-C 41588, April 8, 1988, M-00820, and the Joint Statement on Overtime, M-00833). Carriers newly promoted from part-time flexible to full-time regular status must normally wait until the beginning of the next calendar quarter before they can sign a list.

Unless the Local Memorandum of Understanding provides otherwise, the following rules apply:

- A full-time flexible letter carrier assigned to another overtime "section" within an installation during a quarter may sign the Overtime Desired List or the Work Assignment List in the new section immediately if he/she was on the list in the old section. See Article 8.5.C.2.c for a discussion of determining "equitability" in such circumstances.

- A full-time regular letter carrier who bids or is transferred to another overtime "section" within an installation may sign the Overtime Desired List or the Work Assignment List in the new unit immediately if he/she was on the list in the old section (See the Joint Statement on Overtime, M-00833). See Article 8.5.C.2.c for a discussion of determining "equitability" in such circumstances.

- A full-time letter carrier who is excessed to another installation or who exercises retreat rights under the provisions of Article 12 may sign the Overtime Desired List or the Work Assignment List in the new installation immediately if he/she was on the list in the old installation. See Article 8.5.C.2.c for a discussion of determining "equitability" in such circumstances.

The 1984 National Memorandum of Understanding on overtime provides that "normally, employees on the overtime desired list who don't want to work more than 10 hours a day or 56 hours a week shall not be required to do so as long as employees who do want to work more than 10 hours a day or 56 hours a week are available to do the needed work without exceeding the 12-hour and 60-hour limitations." (The complete text of this memorandum is reprinted at the end of this Article.) To implement this agreement, the parties have agreed that an asterisk may be used on the Overtime Desired List to distinguish between those who wish to work more than 10 hours in a day and those who do not. Once a carrier signs a list, his or her name remains on the list from quarter to quarter until the carrier asks that it be removed. Carriers may remove their names from a list *at any time* during the quarter. However, management need not immediately honor the request if the employee is needed for overtime work on the day the request is made (See the Joint Statement on Overtime, JCAM pages 8-31 through 8-33, M-00833). Management may not unilaterally remove an employee's name from the Overtime Desired List. However, employees on the Overtime Desired List are required to work overtime except as provided in Article 8.5.E (Prearbitration Settlement H4N-5K-C 4489, September 13, 1988, M-00858).

**8.5.B**

| B. "Overtime Desired" lists will be established by craft, section or tour in accordance with Article 30, Local Implementation. |
|---|

**Establishment of Overtime Desired Lists.** The subject of whether the Overtime Desired List is established "by section and/or tour" may be locally negotiated under the provisions of Article 30.B.14. However, as a practical matter, in most installations letter carriers do not work during more than one tour.

Local Memorandum of Understanding provisions on this subject might provide, for example, that separate Overtime Desired Lists be maintained by defined sections, by individual stations by zones, for parcel post routes, for collection routes, etc. See Article 30 in this publication.

The "Work Assignment" list is distinct from the regular overtime list discussed in Article 8.5.C.2. It is discussed in a separate section below.

**8.5.C.1**

| **C.1. (Reserved)** |
|---|

**Reserved Section.** In the 1990 and earlier National Agreements this section contained provisions that did not apply to the letter carrier craft.

When the references to other crafts were deleted in the 1994 National Agreement, Article 8.5.C.1 was intentionally reserved to avoid renumbering the remainder of Article 8.5.C.

8.5.C.2

> **5.C.2.a.** When during the quarter the need for overtime arises, employees with the necessary skills having listed their names will be selected from the "Overtime Desired" list.
>
> **5.C.2.b** During the quarter every effort will be made to distribute equitably the opportunities for overtime among those on the "Overtime Desired" list.
>
> **5.C.2.c.** In order to insure equitable opportunities for overtime, overtime hours worked and opportunities offered will be posted and updated quarterly.

**Equitable Distribution of Overtime Opportunities.** Seniority does *not* govern the availability of overtime work for those letter carriers who wish to work overtime. Nor is overtime distributed on a rotating basis. Rather, Article 8.5.C.2 provides that for those carriers who sign the Overtime Desired List, overtime "*opportunities*" must be distributed "*equitably*" (i.e., fairly). This does not mean that actual overtime hours *worked* must be distributed *equally*.

National Arbitrator Bernstein ruled in H1N-5G-C 2988, August 14, 1986 (C-06364), that in determining "equitable" distribution of overtime, the number of *hours* of overtime as well as the number of *opportunities* for overtime must be considered. Overtime worked on a letter carrier's own route on a regularly scheduled day is not counted or considered in determining whether overtime has been equitably distributed among carriers on the list. Missed opportunities for overtime—i.e. one OTDL carrier worked instead of another—must be made up for with equitable distribution of overtime during the quarter unless the bypassed carrier was not available—i.e. the carrier was on leave or working overtime on his/her own route on a regularly scheduled day, etc. (See the explanation under Article 8.5.C.2.d).

Since full-time flexible employees may have flexible reporting locations within an installation (Article 7), determining whether overtime has been "equitably" distributed can become complex. Of course, if a full-time flexible works within the same overtime "section" for an entire quarter, determining whether overtime has been equitably distributed during the quarter is perfectly straight-forward. However, a full-time flexible letter carrier assigned to another overtime "section" during a quarter may be entitled to sign the Overtime Desired List in the new section immediately if he/she was on the list in the old section (Article 8.5.A). In such cases the right to an "equitable" share of overtime is only in the new section and is only determined from the time the full-time flexible letter carrier signed the Overtime Desired List in the new section. Overtime worked in the section to which previously assigned is not a consideration. However, full-time flexible employees will not be

moved to another overtime section solely to circumvent the provisions of Article 8.5.C above. The same rule applies in the case of full-time regular letter carriers who sign the Overtime Desired List in a new overtime section or a new installation during the quarter (Article 8.5.A).

If opting on an assignment under the provisions of Article 41.2.B.3 results in a six day work week, only work over eight hours on the sixth day is counted in determining whether overtime has been equitably distributed among carriers on the list (Article 41.2.B.3).

**Remedies.** National Arbitrator Howard Gamser ruled in NC-S-5426, April 3, 1979 (C-3200) that the Postal Service must pay employees deprived of "equitable opportunities" for the overtime hours they did not work only if management's failure to comply with its contractual obligations under Article 8.5.C.2 shows "a willful disregard or defiance of the contractual provision, a deliberate attempt to grant disparate or favorite treatment to an employee or group of employees, or caused a situation in which the equalizing opportunity could not be afforded within the next quarter." In all other cases, Gamser held, the proper remedy is to provide "an equalizing opportunity in the next immediate quarter, or pay a compensatory monetary award if this is not done..."

National Arbitrator Benjamin Aaron ruled in H8N-5B-C-17682, April 12, 1983 (C-03319), that management violated Article 8.5 when it assigned a carrier not on the Overtime Desired List to carry a route on overtime on his non-scheduled day rather than splitting up the route between available carriers from the list. Aaron ruled that management must have "good cause" before going off the list.

**Overtime and Annual Leave.** Normally, employees, including employees on the Overtime Desired List, who have scheduled annual leave, including incidental annual leave, immediately preceding and/or following non-scheduled days will not be required to work overtime on the non-scheduled days. The intent of the parties is to allow employees to make advance plans for non-scheduled days. It is not the intent of the parties to create a means to circumvent the scheduling provisions of Article 8. Employees on the ODL, if they desire, may advise their supervisor in writing of their availability to work on a non-scheduled day that is in conjunction with approved annual leave (Step 4, H1N-5H-C-18583, March 12, 1984, M-00492; Step 4, E94N-4E-C 98053676, October 22, 1998, M-01367).

**Request for Temporary Schedule Change.** The intent of submitting a PS Form 3189 which requests an earlier leaving time is to obtain approval for the employee to leave at that earlier time. Consequently, it is inappropriate for management to approve such a form and then require the employee to work post-tour overtime in other than an emer-

gency situation. When a PS Form 3189 requesting an earlier leaving time is approved, the requesting employee will be passed over for any overtime worked on that day as being unavailable. Thus, no grievances may be filed if employees with an approved PS Form 3189 are passed over. Likewise, no grievances will be filed on behalf of employees required to work overtime as a result of passing over an employee with an approved PS Form 3189 (Step 4, H7N-3W-C 36013, May 25, 1992, M-01079).

**Overtime and Holiday Scheduling.** Much of what is often considered "overtime" worked by full-time employees on their holiday or designated holiday is not overtime. Rather it is "Holiday Worked Pay" or "Holiday Scheduling Premium." The only work that is contractually overtime for full-time employees working on a holiday or designated holidays is work beyond eight hours in a day (ELM Section 434.131). Furthermore, work up to eight hours on a non-scheduled day assigned under the provisions of Article 11.6 is not considered in determining equitability. This is because the employees assigned the overtime in such situations are not "selected from the Overtime Desired List" under the provisions of Article 8.5.C.2.a. Rather, they are selected under the provisions of Article 11.6 and any applicable LMOU provisions.

The provisions of Article 11 only apply to scheduling full-time employees to work eight hours on their holiday, designated holiday or non-scheduled day. The provisions of Article 8 apply to scheduling work beyond eight hours on those days. Therefore, only work over eight hours on a non-scheduled day, holiday or designated holiday scheduled under the provisions of Article 11.6 is considered and counted toward determining equitability at the end of the quarter. National Arbitrator Mittenthal held in H4N-NA-C 21 (2nd Issue), January 19, 1987 (C-06775) that a regular employee who volunteers to work on a holiday or designated holiday has only volunteered to work eight hours. A regular volunteer cannot work beyond the eight hours without supervision first exhausting the ODL.

**8.5.C.2.d**

> **5.C.2.d.** Recourse to the "Overtime Desired" list is not necessary in the case of a letter carrier working on the employee's own route on one of the employee's regularly scheduled days.

**Not Counted Toward "Equitability."** Article 8.5.C.2.d provides that "recourse to the Overtime Desired List is not necessary in the case of a letter carrier working on the employee's own route on one of the employee's regularly scheduled days." As a consequence, overtime accrued by a carrier working on the carrier's own route on a regularly scheduled day is not considered or counted in determining whether overtime has been "equitably" distributed among carriers on the list.

Additionally, overtime not worked because a carrier is working overtime on his/her own route on a regularly scheduled day is not considered an "opportunity missed" and is not made up to maintain equitability. This is because the carrier was not available to work the overtime. This situation is controlled by the prearbitration settlement of H8N-5D-C 18624, July 1, 1982 (M-00135), which states in relevant part:

> 1) Overtime worked by a letter carrier on the employee's own route on one of the employee's regularly scheduled days is not counted as an overtime opportunity for the purposes of administration of the Overtime Desired List.
>
> 2) Overtime that is concurrent with (occurs during the same time as) overtime worked by a letter carrier on the employee's own route on one of the employee's regularly scheduled days is not counted as an "opportunity missed" for the purposes of administration of the Overtime Desired List.

**Carrier Technicians.** Overtime worked by a Carrier Technician on the Overtime Desired List on the specific route to which properly assigned on a given day, is not counted or considered in determining whether overtime has been "equitably" distributed among carriers on the list. Overtime worked by a Carrier Technician on the Overtime Desired List is counted in the consideration of the equitable distribution of overtime hours at the end of the quarter when: a) the overtime is not on a regularly scheduled day or b) the overtime is worked on any route in the delivery unit other than the specific route to which properly assigned on a given day (Step 4, C94N-4C-C 98099737, October 2, 1998, M-01323).

**The "Letter Carrier Paragraph."** For many years Article 8.5.C.2.d also gave management the right to require a letter carrier working on his/her own route on a regularly scheduled day to work mandatory overtime rather than assigning the overtime to a carrier from the Overtime Desired List. However, in the Overtime Memorandum first negotiated as part of the 1984 National Agreement, the Postal Service and the NALC added the following qualification, known as the "letter carrier paragraph."

> In the Letter Carrier Craft, where management determines that overtime or auxiliary assistance is needed on an employee's route on one of the employee's regularly scheduled days and the employee is not on the overtime desired list, the employer will seek to utilize auxiliary assistance, when available, rather than requiring the employee to work mandatory overtime.

(The complete text of this memorandum is reprinted at the end of this article.)

National Arbitrator Mittenthal ruled in H4N-NA-C 21, June 26, 1986 (C-06297), that the letter carrier paragraph is an enforceable obligation.

**Implementing Memorandum on "Letter Carrier Paragraph."** A memorandum of understanding signed December 20, 1988 (M-00884) further explained the requirement to seek to use auxiliary assistance before requiring letter carriers not on the ODL or Work Assignment List to work overtime on their own route on a regularly scheduled day. Management must seek to use all of the following to provide auxiliary assistance:

- part-time flexibles at the straight-time or regular overtime rate
- city carrier assistant employees at the straight-time or regular overtime rate
- available full-time regular employees such as unassigned or reserve regulars at the straight-time rate
- full-time carriers from the Overtime Desired List at the regular overtime rate

However, the memo states that management does not have to use ODL carriers to provide auxiliary assistance if such an assignment would mean that the ODL carriers would be working *penalty overtime*. In that limited situation—if no auxiliary assistance is available without going into penalty overtime—management can require full-time regular carriers not on the Overtime Desired List to work overtime on their own routes on a regularly scheduled day. Remember that this limited exception applies only when a full-time non-ODL letter carrier is required to work overtime on his/her own assignment on a regularly scheduled day.

Before requiring a non-ODL carrier to work overtime on a non-scheduled day or off his/her own assignment, management must seek to use a carrier from the ODL, even if the ODL carrier would be working penalty overtime (Article 8.5.D).

The memo goes on to state that "the determination of whether management must use a carrier from the ODL to provide auxiliary assistance must be made on the basis of the rule of reason." For example, management is not required to use a carrier from the ODL when the travel time would be excessive for the amount of assistance being given. The full text of the memorandum is reprinted at the end of this article.

A Carrier Technician's "own route" for the purpose of applying Article 8.5.C.2.d and the "Letter Carrier Paragraph" is the specific route to which properly assigned on a given day. Overtime on any other route on the string is not considered to be on the Carrier Technician's "own route" and may only be required under the provisions of Article 8.5.D, below (Step 4, E94N-4E-C 98097684, October 2, 1998, M-01322).

Application of the Letter Carrier Paragraph for CCAs is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**20. How are CCAs considered when applying the Letter Carrier Paragraph?**

CCAs are considered as auxiliary assistance. Accordingly, management must seek to use CCAs at either the straight-time or regular overtime rate prior to requiring letter carriers not on the overtime desired list or work assignment list to work overtime on their own route on a regularly scheduled day.

The parties have also agreed to the following MOU regarding temporary assignments of CCAs to other post offices.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: City Carrier Assistants - Temporary Assignments to Other Post Offices**

The parties agree to the following regarding the temporary assignment of city carrier assistants (CCAs) outside their employing post office (installation) to another post office (installation):

1. CCAs will normally work in their employing post office but may be assigned to work in another post office in the local travel area (Handbook F-15, Section 7-1.1.1.1) within the same district on an occasional basis (the assignment may be for a partial day or several consecutive days, depending on local circumstances). Sunday CCA work assignments are not subject to the occasional basis limitation.

2. Temporary assignments must otherwise be consistent with the National Agreement (e.g. assigning CCAs to work outside their employing office may not violate Article 7 1.C.4 in the temporary office or the letter carrier paragraph in the employing office).

3. Management will schedule CCAs to work in other post offices in advance of the reporting date whenever practicable.

4. When the need arises to temporarily assign CCAs outside their employing post office, management will, to the extent practicable, use volunteer CCAs from the delivery unit providing assistance as long as the volunteers will be in a similar pay status (e.g straight-time rate, regular overtime rate, penalty overtime rate). If sufficient volunteers are not found, CCAs from the delivery unit providing assistance will be temporarily assigned to the other installation in reverse relative standing order whenever practicable as long as the junior CCAs are in a similar pay status.

5. CCAs who are required or volunteer to work outside their employing office may receive payment for mileage for the difference between their residence and employing office provided the difference is greater (Handbook F-15, Section 7-1.1.1.2.d).

The procedures outlined above are effective on December 7, 2013; however, either party may terminate this agreement by providing 30 days written notice to the other party. This agreement is reached without prejudice to the position of either party in this or any other matter and may only be cited to enforce its terms.

Date: December 5, 2013

**8.5.D**
> 8.5.D If the voluntary "Overtime Desired" list does not provide sufficient qualified people, qualified full-time regular employees not on the list may be required to work overtime on a rotating basis with the first opportunity assigned to the junior employee.

**Mandatory Overtime.** One purpose of the Overtime Desired List is to excuse full-time carriers not wishing to work overtime from having to work overtime. Before requiring a non-ODL carrier to work overtime on a non-scheduled day or off his/her own assignment on a regularly scheduled day, management must seek to use a carrier from the ODL, even if the ODL carrier would be working penalty overtime. However, if the Overtime Desired List does not provide sufficient qualified full-time regulars for required overtime, Article 8.5.D permits management to move off the list and require non-ODL carriers to work overtime on a *rotating basis* starting with the junior employee. This rotation begins with the junior employee at the beginning of each calendar quarter. Absent an LMOU provision to the contrary, employees who are absent on a regularly scheduled day (e.g. sick leave or annual leave) when it is necessary to use non-ODL employees on overtime will be passed over in the rotation until the next time their name comes up in the regular rotation.

Management *may* seek non-ODL *volunteers* rather than selecting non-volunteers on the basis of juniority. Normally, carriers not on the Overtime Desired List may not grieve the fact that they were not selected to work overtime.

The provisions of Article 8.5.D do not apply in the case of full-time letter carriers working on their own assignment on a regularly scheduled day. That situation is governed by Article 8.5.C.2.d as amended by the letter carrier paragraph above.

**8.5.E**
> 8.5.E Exceptions to C and D above if requested by the employee may be approved by local management in exceptional cases based on equity (e.g., anniversaries, birthdays, illness, deaths).

**Exceptional Situations May Excuse Mandatory Overtime.** This language is intended to serve as a guideline for local management in excusing employees from overtime work because of "exceptional" situations. Consequently, the four examples listed in the parentheses are illustrative of the kinds of cases to which management should give full consideration in excusing employees from overtime. However, as Arbitrator Sylvester Garrett held in NC-C-7933, January 8, 1979 (C-03226), that Article 8.5.E "reflects an intent to confer relatively broad discretion on local management to excuse employees from overtime work for any one of a number of legitimate reasons 'based on equity'."

**8.5.F**

> F. Excluding December, no full-time regular employee will be required to work overtime on more than four (4) of the employee's five (5) scheduled days in a service week or work over ten (10) hours on a regularly scheduled day, over eight (8) hours on a non-scheduled day, or over six (6) days in a service week.

Article 8.5.F applies to both full-time regular and full-time flexible employees. The only two exceptions to the work hour limits provided for in this section are for all full-time employees during the month of December and for full-time employees on the Overtime Desired List during any month of the year (Article 8.5.G). Both work and paid leave hours are considered "work" for the purposes of the administration of Article 8.5.F and 8.5.G.

National Arbitrator Mittenthal ruled in H4N-NA-C-21, April 11, 1986 (C-05860), that an employee on the ODL does not have the option of accepting or refusing work over eight hours on a non-scheduled day, work over six days in a service week or overtime on more than four of the five scheduled days in a service week; instead an employee on the ODL must be required to work up to 12 hours in a day and 60 hours in a week before management may require employees not on the ODL to work overtime. Arbitrator Mittenthal's award does not extend to situations involving a letter carrier working on his or her own route on a regularly scheduled day (See the discussion under 8.5.C.2.d and 8.5.G).

**8.5.G**

> G. Full-time employees not on the "Overtime Desired" list may be required to work overtime only if all available employees on the "Overtime Desired" list have worked up to twelve (12) hours in a day or sixty (60) hours in a service week. Employees on the "Overtime Desired" list:
>
> 1. may be required to work up to twelve (12) hours in a day and sixty (60) hours in a service week (subject to payment of penalty over time pay set forth in Section 4.D for contravention of Section 5.F); and
>
> 2. excluding December, shall be limited to no more than twelve (12) hours of work in a day and no more than sixty (60) hours of work in a service week.
>
> However, the Employer is not required to utilize employees on the "Overtime Desired" list at the penalty overtime rate if qualified employees on the "Overtime Desired" list who are not yet entitled to penalty overtime are available for the overtime assignment.
>
> [see Memos **and Letter of Intent**, pages **172-176**]

**These Memos and Letter of Intent are located in the *JCAM*, pages 8-28 through 8-30.**

Article 8.5.G provides that employees on the Overtime Desired List may be required to work up to 12 hours per day and 60 hours per week. It further provides that the 12 and 60 hour restrictions do not apply to employees on the Overtime Desired List during the month of December.

**Employees Desiring Up to 10 Hours Per Day.** The 1984 Overtime Memorandum states, in part: "Normally, employees on the overtime desired list who don't want to work more than l0 hours a day or 56 hours a week shall not be required to do so as long as employees who do want to work more than 10 hours a day or 56 hours a week are available to do the needed work without exceeding the 12 and 60-hour limitations." (The complete text of this memorandum is reprinted at the end of this Article.) The parties have agreed that an asterisk may be used on the Overtime Desired List to distinguish between those who wish to work more than ten hours and those who do not.

**Maximum Hours—60 Hour Limit.** National Arbitrator Mittenthal ruled in H4N-NA-C 21 "Fourth Issue," June 9, 1986 (C-06238) that the 12- and 60-hour limits are absolutes—a full-time employee may neither volunteer nor be required to work beyond those limits. Limitations regarding part-time employees are governed by the ELM Section 432.32 (See Maximum Hours-12 Hour Limit).

The 12/60 limitations are inclusive of all hours, including any type of leave taken, consistent with the 20-hour overtime limit (see M-00859 below).

Accordingly, holiday leave pay is credited toward the 12/60 limitation. Additionally, if an employee works on a holiday for which holiday leave is paid, those hours worked in excess of the holiday leave hours paid would also count toward the 12/60 limit (Step 4, I90N-4I-C-94023487, June 9, 1994, M-01180).

In H4N-NA-C 21 "Third Issue," September 11, 1987 (C-07323) Arbitrator Mittenthal ruled that an employee sent home in the middle of a scheduled day, because of the bar against employees working more than 60 hours in a service week, is entitled to be paid for the remainder of his or her scheduled day.

On October 19, 1988 the national parties signed the following Memorandum of Understanding (M-00859):

> The parties agree that with the exception of December, full-time employees are prohibited from working more than 12 hours in a single work day or 60 hours within a service week. In those limited instances where this provision is or has been violated and a timely grievance filed, full-time employees will be compensated at an additional premium of 50 percent of the base hourly straight time rate for those hours worked beyond the 12 or 60 hour limitation. The employment of this remedy shall not be construed as an agreement by the parties that the Employer may exceed the 12 and 60 hour limitation with impunity.
>
> As a means of facilitating the foregoing, the parties agree that excluding December, once a full-time employee reaches 20 hours of over-

> time within a service week, the employee is no longer available for any additional overtime work. Furthermore, the employee's tour of duty shall be terminated once he or she reaches the 60th hour of work, in accordance with Arbitrator Mittenthal's National Level Arbitration Award on this issue, dated September 11, 1987, in case numbers H4N-NA-C 21 (3rd issue) and H4C-NA-C 27 (C-07323).

National Arbitrator Snow held in A90N-4A-C 94042668, November 30, 1998 (C-18926) that the Memorandum of Understanding above (M-00859) provides the exclusive remedy for violations of the 12 and 60 hour work limits in Article 8.5.G.2.

**Article 8.5.G Violations During a Service Week.** The remedy of 50 percent of the base hourly straight-time rate provided in the Memorandum above applies for each hour worked in excess of twelve on a service day (excluding December) by a full-time employee. The remedy of 50 percent of the base hourly straight-time rate also applies for each hour worked by a full-time employee in excess of the sixty during the same service week (excluding December) in which the full-time employee has exceeded twelve hours in a service day. For example, if during the same service week a full-time employee worked 14 hours on Monday and ended up with 62 hours for the week on Friday, four hours would have been worked in violation of the Article 8.5.G restrictions. The appropriate remedy in this example would be four hours of pay at 50 percent of the base hourly straight-time rate—two for Monday and two for Friday. In this example, the carrier should have been instructed to "clock off" and go home on Friday when the sixtieth hour was reached. The employee would then be paid any applicable guarantee time for the remainder of the service day.

In those circumstances where the same work hours of a full-time employee simultaneously violate both the twelve hour and sixty hour limits, only a single remedy of 50 percent of the base hourly straight-time rate is applied. For example, if a full-time employee worked 14 hours on Friday, resulting in a 62 hour workweek, only two hours would have been worked in violation of the Article 8.5.G restrictions. The appropriate remedy in this example would be two hours of pay at 50 percent of the base hourly straight time rate (Step 4, J94N-4J-C 99050117, September 6, 2001, M-01445).

**Maximum Hours—12 Hour Limit.** The overtime limits in Article 8.5.G apply only to full-time regular and full-time flexible employees. However, Section 432.32 of the *Employee and Labor Relations Manual (ELM)* provides the following rule that applies to all employees:

> Except as designated in labor agreements for bargaining unit employees or in emergency situations as determined by the PMG (or designee), employees may not be required to work more than 12 hours

> in 1 service day. In addition, the total hours of daily service, including scheduled work hours, overtime, **and mealtime,** may not be extended over a period longer than 12 consecutive hours. Postmasters, Postal Inspectors, and exempt employees are excluded from these provisions. (Emphasis added)

Because this language limits total daily service hours, including work and mealtime, to 12 hours, an employee is effectively limited to 11½ hours per service day of work plus a ½-hour meal. However, the ELM also permits the collective bargaining agreement to create exceptions to this general rule.

The only exception to this rule in the NALC National Agreement is for full-time employees on the Overtime Desired List or "Work Assignment" list who, in accordance with Article 8.5.G, "may be required to work up to twelve hours in a day." Since "work," within the meaning of Article 8.5.G does not include mealtime, the "total hours of daily service" for carriers on the Overtime Desired List may extend over a period of 12½ consecutive hours. This exception does not apply to full-time employees who are *not* on the Overtime Desired List or Work Assignment List.

National Arbitrator Snow held in B90N-4B-C 94027390, August 20, 1996 (C-15699) that the ELM Section 432.32 restrictions apply to transitional as well as career employees.

The application of the ELM Section 432.32 to CCAs is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**21. Is there a limit on the number of hours CCAs may be scheduled on a workday?**

Yes, CCAs are covered by Section 432.32 of the Employee and Labor Relations Manual, which states: *Except as designated in labor agreements for bargaining unit employees or in emergency situations as determined by the PMG (or designee), employees may not be required to work more than 12 hours in 1 service day. In addition, the total hours of daily service, including scheduled work hours, overtime, and mealtime, may not be extended over a period longer than 12 consecutive hours. Postmasters, Postal Inspectors, and exempt employees are excluded from these provisions.*

**The "Work Assignment List."** The Work Assignment List is distinct from the regular Overtime Desired List discussed in Article 8.5.C.2. It was established by a Letter of Intent dated May 28, 1985. The full text of the Work Assignment Agreement is reprinted at the end of this article.

The Work Assignment List was established for full-time letter carriers who only want to work overtime on their own assignment on regularly scheduled days. Signing up for the Work Assignment overtime does not create any entitlement or obligation to work overtime on a non-scheduled day. For purposes of overtime on a non-scheduled day or on other than their own assignment, carriers on the Work Assignment List are treated *exactly the same as any other full-time carriers not on the Overtime Desired List*—They may only be required to work overtime under the provisions of Article 8.5.D.

Full-time letter carriers who sign the Work Assignment List are considered to be available for up to 12 hours per day on regularly scheduled days. However, the Work Assignment Agreement recognizes that it is normally in the parties' best interests not to require employees to work beyond 10 hours per day, and managers should not require "work assignment" volunteers to work beyond 10 hours "unless there is no equally prompt and efficient way to have the work performed."

Management may assign an employee from the regular ODL to work regular overtime to avoid paying penalty pay to a carrier who has signed for Work Assignment overtime. This exception does not apply during the December exclusion period when penalty overtime is not paid. Management may always assign another carrier to perform the work at the straight-time rate rather than assigning overtime to a carrier on the Work Assignment List. Management may also assign PTFs and CCAs at the straight-time or overtime rate (up to the ELM limitations).

Reserve letter carriers and unassigned regulars on the Work Assignment List are considered available for overtime on the specific route they are assigned on a given day.

**Carrier Technicians on the Work Assignment List** are considered available for overtime on any of the routes on their string. Subject to the penalty overtime exceptions discussed above, this provision should be applied as follows:

- A Carrier Technician who has signed for Work Assignment overtime has both a right and an obligation to work any overtime that occurs on any of the five component routes on a regularly scheduled day.

- When overtime is required on the regularly scheduled day of the route of a carrier who is on the ODL and whose Carrier Technician is on the Work Assignment List, the Carrier Technician is entitled to work the overtime.

- When overtime is required on the regularly scheduled day of the route of a carrier who is on the Work Assignment List and whose Carrier Technician is also on the Work Assignment List, the regular carrier on the route is entitled to work the overtime.

8.6

**Section 6. Sunday Premium Payment**

Each employee whose regular work schedule includes a period of service, any part of which is within the period commencing at midnight Saturday and ending at midnight Sunday, shall be paid extra compensation at the rate of 25 percent of the employee's base hourly rate of compensation for each hour of work performed during that period of service. An employee's regularly scheduled reporting time shall not be changed on Saturday or Sunday solely to avoid the payment of Sunday premium payment.

**Sunday Premium Payment.** A carrier who works on a Sunday or any work period that falls partly on a Sunday, receives Sunday premium pay—an extra 25 percent of the base hourly straight-time rate. The "no pyramiding" provisions of Article 8.4.F apply to the Sunday premium.

An eligible employee who is scheduled by management to work and does work on a non-overtime basis on a Sunday, even if the employee was scheduled on Sunday pursuant to a request for a temporary schedule change for personal convenience, is entitled to Sunday premium pay under Article 8.6 of the National Agreement (National Arbitrator Das, H7C-4S-C 29885, April 15, 2005, C-30878).

Sunday Premium for CCAs is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**22. Do CCAs receive Night Differential or Sunday Premium?**

CCAs receive Night Differential as defined in Article 8.7 of the National Agreement. CCAs do not receive Sunday Premium.

8.7

**Section 7. Night Shift Differential**

For time worked between the hours of 6:00 p.m. and 6:00 a.m., career employees shall be paid additional compensation at the applicable flat dollar amount at each pay grade and step in accordance with Appendix A attached hereto.

(The preceding **paragraph,** Article 8.7, shall apply to **City Carrier Assistant** Employees.)

**Night shift differential.** The "no pyramiding" provisions of Article 8.4.F do not apply to the night shift differential because the night shift differential is not considered a "premium" under Article 8.4.F.

Night differential for CCAs is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**22. Do CCAs receive Night Differential or Sunday Premium?**

CCAs receive Night Differential as defined in Article 8.7 of the National Agreement. CCAs do not receive Sunday Premium.

**APPENDIX A**

**TABLE THREE**
**CITY CARRIER (CC) SCHEDULE**
**NIGHT DIFFERENTIAL RATES**
**EFFECTIVE JANUARY 12, 2013 (PP 03-2013)**
**RSC Q1 (NALC)**

**FULL-TIME AND PART-TIME REGULAR EMPLOYEE HOURLY RATES**

| GRADE | A / I | B / J | C / K | D / L | E / M | F / N | G / O | H |
|---|---|---|---|---|---|---|---|---|
| CC1 | $1.12 | $1.25 | $1.35 | $1.45 | $1.46 | $1.47 | $1.48 | $1.50 |
| | $1.51 | $1.52 | $1.53 | $1.55 | $1.56 | $1.57 | $1.58 | |
| CC2 | $1.19 | $1.32 | $1.38 | $1.48 | $1.49 | $1.50 | $1.52 | $1.53 |
| | $1.54 | $1.56 | $1.57 | $1.58 | $1.60 | $1.61 | $1.63 | |

**PART-TIME FLEXIBLE EMPLOYEE HOURLY RATES**

| GRADE | A / I | B / J | C / K | D / L | E / M | F / N | G / O | H |
|---|---|---|---|---|---|---|---|---|
| CC1 | $1.16 | $1.29 | $1.40 | $1.50 | $1.51 | $1.53 | $1.54 | $1.55 |
| | $1.57 | $1.58 | $1.59 | $1.60 | $1.62 | $1.63 | $1.64 | |
| CC2 | $1.23 | $1.37 | $1.43 | $1.53 | $1.55 | $1.56 | $1.57 | $1.59 |
| | $1.60 | $1.62 | $1.63 | $1.64 | $1.66 | $1.67 | $1.69 | |

**TABLE FOUR**
**CITY CARRIER (CC) SCHEDULE**
**NIGHT DIFFERENTIAL RATES**
**EFFECTIVE JANUARY 12, 2013 (PP 03-2013)**
**RSC Q2 (NALC)**

| GRADE | A / I | B / J | C / K | D / L | E / M | F / N | G / O | H |
|---|---|---|---|---|---|---|---|---|
| CC1 | $0.97 | $1.02 | $1.06 | $1.10 | $1.15 | $1.19 | $1.23 | $1.28 |
| | $1.32 | $1.36 | $1.41 | $1.45 | $1.49 | $1.54 | $1.58 | |
| CC2 | $1.00 | $1.05 | $1.09 | $1.14 | $1.18 | $1.23 | $1.27 | $1.32 |
| | $1.36 | $1.41 | $1.45 | $1.50 | $1.54 | $1.59 | $1.63 | |

**NATIONAL ASSOCIATION OF LETTER CARRIERS (NALC)**
**CITY CARRIER ASSISTANT**
**NIGHT DIFFERENTIAL RATES**
**EFFECTIVE JANUARY 12, 2013 (PP03-2013)**
**RSC Q8**

| GRADE | BB | AA |
|---|---|---|
| CC1 | $1.16 | $1.16 |
| CC2 | $1.23 | $1.23 |

8.8.A

> **Section 8. Guarantees**
>
> A. An employee called in outside the employee's regular work schedule shall be guaranteed a minimum of four (4) consecutive hours of work or pay in lieu thereof where less than four (4) hours of work is available. Such guaranteed minimum shall not apply to an employee called in who continues working on into the employee's regularly scheduled shift.

**Regular Schedule Employee Call-in Guarantees.** Article 8.8.A applies to full-time regular, full-time flexible and part-time regular employees (Step 4, H8N-3W-C 26065, May 27, 1981, M-00575). Full-time and part-time regular employees called in outside of the employee's regular work schedule but on a regularly scheduled workday will be guaranteed four consecutive hours of work (or pay in lieu of work). This guarantee does not apply when the employee continues to work into the employee's regular scheduled shift. Although full-time flexible employees do not have *permanent* regular schedules, they must be assigned weekly schedules by Wednesday of the prior week (Article 7). This is considered their schedule for the purpose of administering the guarantee provisions of Article 8, Sections 8.A and B.

When an employee completes a scheduled tour, clocks out, and then is notified to clock in and resume working, that is considered a call back. All bargaining unit employees are guaranteed 4 hours work or pay if called back to work on a day when they have completed their assignments and clocked out. This guarantee is applicable to any size office.

8.8.B

> B. When a full-time regular employee is called in on the employee's non-scheduled day, the employee will be guaranteed eight hours work or pay in lieu thereof.

**Pay Guarantee For Full-Time Employee on Non-Scheduled Day.** A full-time regular or full-time flexible employee called in on a non-scheduled day is guaranteed 8 hours of work (or pay in lieu thereof). This guarantee also applies on a holiday or designated holiday.

8.8.C

> C. The Employer will guarantee all employees at least four (4) hours work or pay on any day they are requested or scheduled to work in a post office or facility with 200 or more workyears of employment per year. All employees at other post offices and facilities will be guaranteed two (2) hours work or pay when requested or scheduled to work.

**Part-Time Flexible Employee Call-In Guarantees.** Article 8.8.C, applies only to part-time flexible employees (National Arbitrator Mittenthal, H4N-NA-C 21, September 11, 1987, C-07323).

- A part-time flexible employee requested or scheduled to work in a post office or facility with 200 or more workyears of employment is guaranteed four hours of work (or pay in lieu of work). If branch officers need to determine if their post office has 200 or more

workyears of employment, they should contact their national business agent.

- A part-time flexible employee requested or scheduled to work in a post office or facility with fewer than 200 workyears of employment is guaranteed two hours of work (or pay in lieu of work).
- ELM Section 432.62 further provides that a part-time flexible employee who is called back to work on a day the employee has completed an assignment and clocked out is guaranteed four hours of work or pay regardless of the size of the office.
- National Arbitrator Britton held in H1N-3U-C-28621, December 13, 1988 (C-08530) that the two or four hour guarantee provided for in Article 8.8.C does not apply to PTF employees who are initially scheduled to work, but called at home and directed not to report to work prior to leaving for work.
- **Split Shifts.** When PTF employees work a split shift or are called back, the following rules apply (Step 4, H8N-1N-C 23559, January 27, 1982, M-00224):
  1) When a part-time flexible employee is notified prior to clocking out that he or she should return within two hours, this will be considered as a split shift and no new guarantee applies.
  2) When a part-time flexible employee, prior to clocking out, is told to return after two hours:
     - The employee must receive the applicable guarantee of two or four hours work or pay for the first shift, and;
     - The employee must be given another minimum guarantee of two hours work or pay for the second shift. This guarantee is applicable to any size office.
  3) All part-time flexible employees who complete their assignment, clock out and leave the premises regardless of intervals between shifts, are guaranteed four hours of pay if called back to work. This guarantee is applicable to any size office.

8.8.D

> D. **Any CCA employee who is scheduled to work and who reports to work in a post office or facility with 200 or more workyears of employment shall be guaranteed four (4) hours of work or pay. CCAs at other post offices and facilities will be guaranteed two (2) hours work or pay.**

**City Carrier Assistant Employee Call-in Guarantees.**

CCA work hour guarantees are addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**23. Do CCAs have a work hour guarantee?**

Yes, CCAs employed in post offices and facilities with 200 or more workyears of employment have a four hour work guarantee and CCAs employed in all other post offices have a two hour work guarantee.

- **Split Shifts—City Carrier Assistant Employees.** The parties have agreed to the following rules for CCA work hour guarantees when there is a gap between two periods of work:

1. When a CCA is notified prior to clocking out that he/she should return within two hours, it is considered a split shift and no new work hour guarantee applies.
2. When a CCA is notified prior to clocking out that he/she is to return after two hours, the CCA must be given another work hour guarantee pursuant to Article 8.8 (two or four hours depending on the office size).

Split shifts for CCAs is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**24. Are there rules covering work hour guarantees for a CCA who has a gap between two periods of work?**

Yes. If a CCA is notified prior to clocking out that he/she should return within two hours, it is considered a split shift and no new work hour guarantee applies. However, if a CCA is notified prior to clocking out that he/she is to return after two hours, the CCA must be given another work hour guarantee pursuant to Article 8.8 (two or four hours depending on office size).

**Waiving guarantees.** The Step 4 settlement H4N-2D-C 40885, November 14, 1988 (M-00879) provides that "Management may not solicit employees to work less than their call-in guarantee, nor may employees be scheduled to work if they are not available to work the entire guarantee. However, an employee may waive a guarantee in case of illness or personal emergency." This procedure is addressed in the ELM Section 432.63.

8.9

**Section 9. Wash-Up Time**

Installation heads shall grant reasonable wash-up time to those employees who perform dirty work or work with toxic materials. The amount of wash-up time granted each employee shall be subject to the grievance procedure.

(The preceding paragraph, Article 8.9, shall apply to **City Carrier Assistant** Employees.)

**Wash-Up Time.** Article 8.9 establishes a general obligation, enforceable through the grievance procedure, for installation heads to grant reasonable wash-up time to those employees who perform dirty work or work with toxic materials.

**Wash-Up Time—Local Implementation.** Article 30.B.1 authorizes the local parties to negotiate "additional or longer wash-up periods" as part of a Local Memorandum of Understanding (Article 30).

Articles 8.9 and 30.B.1 prohibit negotiation of LMOU provisions that provide wash-up time to all employees without consideration of whether they perform any dirty work or are exposed to toxic materials. Local parties remain free to define the employees who satisfy those conditions (National Arbitrator Nolan, B98N-4B-I-01029365 and 01029288, July 25, 2004, C-25374). This rule does not negate the provisions of Article 30.C or the Article 30 Memorandum, which address existing LMOU provisions (See JCAM page 30-4 through 30-6).

**MEMORANDUM OF UNDERSTANDING<br>BETWEEN THE<br>UNITED STATES POSTAL SERVICE<br>AND THE<br>NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

This Memorandum of Understanding represents the parties consensus on clarification of interpretation and issues pending national arbitration regarding letter carrier overtime as set forth herein. In many places in the country there has been continued misunderstanding of the provisions of Article 8 of the National Agreement; particularly as it relates to the proper assignment of overtime to letter carriers. It appears as if some representatives of both labor and management do not understand what types of overtime scheduling situations would constitute contract violations and which situations would not. This Memorandum is designed to eliminate these misunderstandings.

1. If a carrier is not on the Overtime Desired List (ODL) or has not signed up for Work Assignment overtime, management must not assign overtime to that carrier without first fulfilling the obligation outlined in the "letter carrier paragraph" of the Article 8 Memorandum. The Article 8 Memorandum provides that ". . . where management determines that overtime or auxiliary assistance is needed on an employee's route on one of the employee's regularly scheduled days and the employee is not on the overtime desired list, the employer will seek to utilize auxiliary assistance, when available, rather than requiring the employee to work mandatory overtime." Such assistance includes utilizing someone from the ODL when someone from the ODL is available.

2. The determination of whether management must use a carrier from the ODL to provide auxiliary assistance under the letter carrier paragraph must be made on the basis of the rule of reason. For example, it is reasonable to require a letter carrier on the ODL to travel for five minutes in order to provide one hour of auxiliary assistance. Therefore, in such a case, management must use the letter carrier on the ODL to provide auxiliary assistance. However, it would not be reasonable to require a letter carrier on the ODL to travel 20 minutes to provide one hour of auxiliary assistance. Accordingly, in that case, management is not required to use the letter carrier on the ODL to provide auxiliary assistance under the letter carrier paragraph.

3. It is agreed that the letter carrier paragraph does not require management to use a letter carrier on the ODL to provide auxiliary assistance if that letter carrier would be in penalty overtime status.

4. It is further agreed that the agreement dated July 12, 1976, signed by Assistant Postmaster General James C. Gildea and NALC President James H. Rademacher, is not in effect. In cases where management violates the letter carrier paragraph by failing to utilize an available letter carrier on the ODL to provide auxiliary assistance, the letter carrier on the ODL will receive as a remedy compensation for the lost work opportunity at the overtime rate.

5. There is normally no monetary remedy for a carrier improperly required to work overtime on his own route. However, on a one-time, nonprecedential basis, the Postal Service will pay $7 for each hour of overtime worked to each carrier who has a timely grievance pending at Step 2 or 3 as of the date of this agreement In order to recover, the grievant must establish that he/she was not on the ODL or work assignment list and was required to work overtime in violation of the principles set forth above.

Date: December 20, 1988

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE AND**
**JOINT BARGAINING COMMITTEE**
**(American Postal Workers Union, AFL-CIO, and**
**National Association of Letter Carriers, AFL-CIO)**

**Re: Article 8**

Recognizing that excessive use of overtime is inconsistent with the best interests of postal employees and the Postal Service, it is the intent of the parties in adopting changes to Article 8 to limit overtime, to avoid excessive mandatory overtime, and to protect the interests of employees who do not wish to work overtime, while recognizing that bona fide operational requirements do exist that necessitate the use of overtime from time to time. The parties have agreed to certain additional restrictions on overtime work, while agreeing to continue the use of overtime desired lists to protect the interests of those employees who do not want to work overtime, and the interests of those who seek to work limited overtime. The parties agree this memorandum does not give rise to any contractual commitment beyond the provisions of Article 8, but is intended to set forth the underlying principles which brought the parties to agreement.

The new provisions of Article 8 contain different restrictions than the old language. However, the new language is not intended to change existing practices relating to use of employees not on the overtime desired list when there are insufficient employees on the list available to meet the overtime needs. For example, if there are five available employees on the overtime desired list and five not on it, and if 10 workhours are needed to get the mail out within the next hour, all ten employees may be required to work overtime. But if there are 2 hours within which to get the mail out, then only the five on the overtime desired list may be required to work.

The parties agree that Article 8, Section 5.G.l., does not permit the Employer to require employees on the overtime desired list to work overtime on more than 4 of the employee's 5 scheduled days in a service week, over 8 hours on a nonscheduled day, or over 6 days in a service week.

Normally, employees on the overtime desired list who don't want to work more than 10 hours a day or 56 hours a week shall not be required to do so as long as employees who do want to work more than 10 hours a day or 56 hours a week are available to do the needed work without exceeding the 12-hour and 60-hour limitations.

*In the Letter Carrier Craft, where management determines that overtime or auxiliary assistance is needed on an employee's route on one of the employee's regularly scheduled days and the employee is not on the overtime desired list, the employer will seek to utilize auxiliary assistance, when available, rather than requiring the employee to work mandatory overtime.* (Emphasis added)

In the event these principles are contravened, the appropriate correction shall not obligate the Employer to any monetary obligation, but instead will be reflected in a correction to the opportunities available within the list. In order to achieve the objectives of this memorandum, the method of implementation of these principles shall be to provide, during the 2-week period prior to the start of each calendar quarter, an opportunity for employees placing their name on the list to indicate their availability for the duration of the quarter to work in excess of 10 hours in a day. During the quarter the Employer may require employees on the overtime desired list to work these extra hours if there is an insufficient number of employees available who have indicated such availability at the beginning of the quarter.

The penalty overtime provisions of Article 8.4 are not intended to encourage or result in the use of any overtime in excess of the restrictions contained in Article 8.5.F.

**LETTER OF INTENT BETWEEN
THE UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Work Assignment Overtime**

A. The Postal Service will provide the opportunity, on a quarterly basis, for full-time letter carriers to indicate a desire for available overtime on their work assignment on their regularly scheduled days.

B. All full-time letter carriers are eligible to indicate their desire for "work assignment" overtime and by doing so are to work the overtime as specified on their regularly scheduled days.

T-6 or utility letter carriers would be considered available for overtime on any of the routes in their string.

Reserve Letter Carriers and unassigned regulars desiring "work assignment" overtime would be eligible for overtime on the assignment on which they are working on a given day.

C. An annotation on the overtime desired list (ODL) may be used to identify employees desiring "work assignment" overtime.

D. The ODL provided for in Article 8, Section 5, would continue to function.

E. "Work assignment" overtime will not be considered in the application of Article 8, Section 5.C.2.b.

F. Once management determines that overtime is necessary for full-time letter carriers, if the carrier has signed up for "work assignment" overtime, the carrier is to work the overtime as assigned by management.

G. Full-time carriers signing up for "work assignment" overtime are to be considered available for up to 12 hours per day on regularly scheduled days. However, the parties recognize that it is normally in their best interests not to require employees to work beyond 10 hours per day, and managers should not require "work assignment" volunteers to work beyond 10 hours unless there is no equally prompt and efficient way in which to have the work performed.

H. Penalty pay would be due for work in excess of 10 hours per day on 4 of 5 regularly scheduled days.

Penalty pay would be due for overtime work on more than 4 of the employee's 5 scheduled days.

I. Management could schedule employees from the ODL to avoid paying penalty pay to the carrier on his/her own work assignment.

J. With respect to overtime work opportunities for employees on the fifth regularly scheduled day, the parties recognize a dispute exists concerning scheduling obligations which would involve hours in excess of the limitations in Article 8, Section 5.F, i.e., the fifth day in this case.

This issue is one of those we identified to be placed expeditiously before an arbitrator.

K. Implementation of such a scheduling approach should occur July 1, 1985.

L. Grievances presently within the system which deal with the issue of "overtime on a carrier's own assignment" should be released from their current "on hold" status, and processed within the system with a concerted effort by the parties toward settlement.

Date: May 28, 1985.

**Joint Statement on Overtime**
**June 8, 1988**
**M-00833**

This Joint Statement on Overtime represents the parties' consensus on those commonly encountered situations where a uniform application of overtime procedure is required. This Joint Statement is restricted to those issues specifically set forth herein, but may from time to time be amended to add or refine additional overtime issues jointly identified by the parties.

**Signing Overtime Lists**

Carriers may sign an Overtime Desired List (OTDL) only during the two week period prior to the start of each calendar quarter.

An exception exists for letter carriers on military leave during the sign-up period. They are permitted to sign the OTDL upon return to work.

Unless local memoranda provide otherwise when a carrier bids or is transferring between units during a calendar quarter, he/she may sign the OTDL in the gaining unit, if he/she was on the OTDL in the losing unit.

Full-time regular letter carriers, including those on limited or light duty, may sign up for either the regular Overtime Desired List (10 or 12 hour) or the "work assignment" overtime, but not both.

Whether or not an employee on limited or light duty is actually entitled to overtime depends upon his/her physical and/or mental limitations.

A letter carrier may request that his/her name be removed from an Overtime Desired List at any time during the quarter. However, management does not have to immediately honor the request if the employee is needed for overtime on the day the request is made.

**Regular Overtime List**

Letter carriers signing the Overtime Desired List who prefer to work in excess of 10 hours on a scheduled day up to the maximum of 12 hours on a scheduled day should indicate their preference on the list.

A letter carrier who signs the regular Overtime Desired List is obligated to work overtime when requested. However, Article 8, Section 5.E., provides that employees on the OTDL may be excused from working overtime in exceptional cases.

**Work Assignment**

"Work assignment" overtime was established by a memorandum of understanding dated May 28, 1985.

Full-time carriers signing up for "work assignment" overtime are to be considered available for up to 12 hours per day on regularly scheduled days. However, the parties recognize that it is normally in their best interests not to require employees to work beyond 10 hours per day, and managers should not require "work assignment" volunteers to work beyond 10 hours unless there is no equally prompt and efficient way to have the work performed.

Signing up for the work assignment overtime does not create any entitlement or obligation to work overtime on a non-scheduled day.

T-6 or utility letter carriers would be considered available for overtime on any of the routes on their string.

Reserve letter carriers and unassigned regulars are considered available for overtime on the assignment they are working on a given day.

Management may use an employee from the regular OTDL to work regular overtime to avoid paying penalty pay to a carrier who has signed for work assignment overtime; further management may assign any other carrier to perform the work at the straight time rate.

**Overtime Distribution**

The Overtime Desired Lists control the distribution of overtime only among full-time regular letter carriers. Management may assign overtime to a PTFS or casual employees rather than to full-time regular employees who are either signed up for "work assignment" overtime or OTDL.

The OTDL is not used when scheduling for holiday coverage.

Overtime opportunities for carriers on the regular OTDL are not distributed by seniority or on a rotating basis. Nor is a carrier on the regular OTDL ever entitled to any specific overtime, even if it occurs on his/her own route.

Rather, Article 8, Section 5.C.2.b, requires that overtime opportunities must be equitably distributed during the quarter. Accordingly, whether or not overtime opportunities have been equitably distributed can only be determined on a quarterly basis. In determining equitability consideration must be given to total hours as well as the number of opportunities.

Management may require letter carriers on the regular Overtime Desired List to work overtime occurring on their own route on a regularly scheduled day. Overtime worked by carriers on their own route, on a regularly scheduled day is not considered in determining whether overtime opportunities have been equitably distributed. This situation is controlled by Article 8, Section 5.C.2.d, and the prearbitration settlement of H8N-5D-C 18624, July 1, 1982 (M-00135), which states in relevant part:

1) Overtime worked by a letter carrier on the employee's own route on one of the employee's regularly scheduled days is not counted as an "overtime opportunity" for the purposes of administration of the Overtime Desired List.

2) Overtime that is concurrent with (occurs during the same time as) overtime worked by a letter carrier on the employee's own route on one of the employee's regularly scheduled days is not counted as an "opportunity missed" for the purposes of administration of the Overtime Desired List.

**Mandatory Overtime**

The "letter carrier paragraph" of the 1984 Overtime memorandum obligates management to seek to use auxiliary assistance, when available, rather than requiring a regular letter carrier not on the Overtime Desired List to work overtime on his/her own assignment on a regular scheduled day.

When full-time regular employees not on the Overtime Desired List are needed to work overtime on other than their own assignment, or on a non-scheduled day, Article 8, Section 5.D, requires that they be forced on a rotating basis beginning with the junior employee. In such circumstances management may, but is not required to seek volunteers from non-OTDL employees.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: Article 8 Task Force**

The scheduling and administration of overtime is frequently a source of controversy and disputes between the parties. In an effort to address this issue, a national level Task Force will be established for the purpose of developing and evaluating improvements to the overtime process.

The Task Force will consist of four members appointed by the NALC and four members appointed by the Postal Service. The Task Force is authorized to test alternate methods of administering overtime.

The Task Force shall convene within 15 days of this agreement and will function for a period of one year, unless extended by mutual agreement. The Task Force will provide reports and recommendations to the NALC President and the Vice President, Labor Relations, or their designees on a quarterly basis.

If a test or any component of a test is deemed to be satisfactory, the parties will enter into agreements necessary to allow for implementation.

Date: January 10, 2013

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 122 of 472. PageID #: 940

Page 8-34 NALC-USPS Joint Contract Administration Manual - July 2014

USPS000662

# ARTICLE 9 SALARIES AND WAGES

Article 9 is the central wage article of the National Agreement. It sets forth the amounts and timing of salary increases including general wage increases and cost-of-living adjustments (COLA).

9.1

**Section 1. Salary and Wage Schedules**

**Employees with career appointments before January 12, 2013 shall be paid and earn step increases according to the rates and waiting periods outlined in Table One.**

**Employees appointed to career positions on or after January 12, 2013 shall be paid and earn step increases according to the rates and waiting periods outlined in Table Two.**

9.2

**Section 2. Basic Annual Salary**

Effective **November 16, 2013**—the basic annual salary for each grade and step **of Table One and Table Two** shall be increased by an amount equal to **1.0%** of the basic annual salary for the grade and step **in effect on the date of this Agreement.**

Effective **November 15, 2014**—the basic annual salary for each grade and step **of Table One and Table Two** shall be increased by an amount equal to **1.5%** of the basic annual salary for the grade and step **in effect on the date of this Agreement.**

Effective **November 14, 2015**—the basic annual salary for each grade and step **of Table One and Table Two** shall be increased by an amount equal to **1.0%** of the basic annual salary for the grade and step **in effect on the date of this Agreement.**

**[see pay tables on pages 27 and 28]**

**These pay tables located on JCAM page 9-14.**

**General Wage Increases.** Article 9.2 provides for three general wage increases of 1.0, 1.5, and 1.0 percent through November 14, 2015.

**PTFs.** The "proportional application to hourly rate employees" means that part-time flexible carriers, who are paid on an hourly basis and have no guaranteed annual salaries, receive these raises in their hourly rates.

9.3

**Section 3. Cost of Living Adjustment**

**A. Definitions**

1."Consumer Price Index" refers to the "National Consumer Price Index for Urban Wage Earners and Clerical Workers," published by the Bureau of Labor Statistics, United States Department of Labor (1967=100) and referred to herein as the "Index."

2. "Consumer Price Index Base" refers to the Consumer Price Index for the month of **July 2012** and is referred to herein as the "Base Index."

9.3.B

**B. Effective Dates of Adjustment**

Each **eligible** employee covered by this Agreement shall receive cost-of-living adjustments, upward, in accordance with the formula in Section 3.C, below, effective on the following dates:

| Index | Payment Effective: |
|---|---|
| **January 2013** | **Second full pay period after release of the January 2014 Index** |
| **July 2013** | **Second full pay period after release of the July 2014 Index** |
| **January 2014** | **Second full pay period after release of the January 2014 Index** |
| **July 2014** | **Second full pay period after release of the July 2014 Index** |
| **January 2015** | **Second full pay period after release of the January 2015 Index** |
| **July 2015** | **Second full pay period after release of the July 2015 Index** |
| **January 2016** | **Second full pay period after release of the January 2016 Index** |

C. The basic salary schedules provided for in **Table One and Step O of Table Two of** this Agreement shall be increased **one** cent per hour for each full 0.4 of a point increase in the applicable Index above the Base Index.

D. **Steps A through N in the basic salary schedules provided for in Table Two of this Agreement shall receive COLAs calculated using the formula in paragraph C adjusted proportionally to each step's percentage of Step O.**

**E.** In the event the appropriate Index is not published on or before the beginning of the effective payroll period, any adjustment required will be made effective at the beginning of the second payroll period after publication of the appropriate Index.

**F.** No adjustment, retroactive or otherwise, shall be made due to any revision which may later be made in the published figures for the Index for any month mentioned in 3.B, above.

**G.** If during the life of this Agreement, the BLS ceases to make available the CPI-W (1967=100), the parties agree to use the CPI-W (1982-84=100) at such time as BLS ceases to make available the CPI-W (1967=100). At the time of change to the CPI-W (1982-84=100), the cost-of-living formula in Section 3.C will be recalculated to provide the same cost-of-living adjustment that would have been granted under the formula using the CPI-W (1967=100).

**Seven Cost-of-Living Adjustments.** Article 9.3 provides for seven cost-of-living adjustments, also known as COLA raises, at six-month intervals starting the second full pay period after the release of the January 2014 CPI-W.

**The Consumer Price Index.** COLA raises are variable and based on the rise in the Consumer Price Index, which Article 9.3.A.1 defines as

the "National Consumer Price Index for Urban Wage Earners and Clerical Workers," or CPI-W, published monthly by the U.S. Department of Labor's Bureau of Labor Statistics (BLS). The BLS also publishes a different index known as the "Consumer Price Index for All Urban Consumers," or "CPI-U," which is the CPI widely reported in the news.

The Consumer Price Index (either CPI-W or CPI-U) tracks the cost of a fixed "market basket" of goods each month. The cost of this "market basket" is set equal to 100 points in a given "base year" so that later price changes may be compared to it. The base year of the CPI-W used in the National Agreement is 1967. In December 1995, the CPI-W (1967=100) was 449.5. This means that it cost about 4½ times as much to purchase the same "market basket" of goods in December 1996 as it did in 1967.

Article 9.3.A.2 establishes the CPI-W of July 2012 as the "Base Index" which is used to determine COLA increases during the term of the Agreement. Article 9.3.B sets the time of each COLA increase, to follow shortly after the BLS's release of the CPI-W at six-month intervals.

**COLA Formula.** Article 9.3.C states the formula on which COLA raises are *based—one cent per hour for each full four-tenths (0.4) of a point increase above the Base Index*. So, for example, the January 1996 CPI-W was 451.9, which was 2.3 points above the Base Index of 449.6. 0.4 divides 5 times into 2.3 (with a 0.3 remainder), so the first COLA raise under the Agreement was 5 cents per hour or, multiplying by 2080 annual hours, $104.00 annually. Similarly, the July 1996 CPI-W was 459.7, another 7.8 points higher than the January index of 451.9. With the 0.3 remainder from the first increase, the additional rise above the base was 8.1 points. Dividing by 0.4 yields 20 cents per hour (with a 0.1 remainder). 2080 hours X 20 cents per hour = $416.00 annually, the amount of the National Agreement's second COLA raise.

Article 9.3.C also provides that each COLA raise shall become part of "basic" salary.

**Potential CPI Change.** Article 9.3.G ensures continuity of the COLA provisions should the BLS decide to discontinue the CPI-W (1967=100) during the contract's term. If that should happen, the parties will use instead the CPI-W (1982-84=100), which measures price increases the same way but with a base of 1982-84=100. In addition, Article 9.3.C's COLA formula would be changed to ensure that carriers receive COLA raises equal to what they would have received under the CPI-W (1967=100).

**Different CPI Bases.** Although the 1982-84 based CPI-W reflects the same *percentage* increases in prices, it produces less *numerical* increase than the CPI-W (1967=100) for the same percentage increase in inflation. For example, from December 1994 to December 1996 the CPI-W (1982-84=100) rose from 147.2 to 155.9, an increase of 8.7 points.

During the same time period the CPI-W (1967=100) rose from 438.6 to 464.3, a rise of 25.7 points. The two indexes measured the identical price increases and both rose by 5.9 percent in the two-year period. However, the numerical point increases are different—8.7 points versus 25.7 points. Under the current COLA language the 25.7 point increase in the CPI-W (1967=100), divided by 0.4, yields a COLA raise of *64 cents per hour*. But if COLA raises were based on the CPI-W (1982-84=100), the point increase of 8.7 points would yield (when divided by 0.4) *21 cents per hour*. This is why a switch to the CPI-W (1982-84=100) would necessitate a revision of the COLA formula.

**"Basic" Salary Versus "Base" Salary.** The 1994-1998 National Agreement brought an end to a decades-long practice in letter carriers' compensation—it eliminated the difference between "basic" salary increases and cost-of-living-adjustment (COLA) raises, which had been known as "base" salary increases. As a result, all COLA increases since the 1994 Agreement are immediately made part of "basic" salary used to compute retirement benefits.

Since the 1970's, National Agreements had differentiated between negotiated *general wage increases* of a fixed percentage or flat amount, and *COLA increases*, which are variable based on the rise in the Consumer Price Index (CPI). The general wage increases were added to so-called "basic" salary (a term that appeared in 1978) which is the basis for *calculating retirement benefits* under the Civil Service Retirement System (CSRS) and Federal Employees' Retirement System (FERS). That is, the "high-3 average" salary is calculated from "basic" pay and both letter carriers and USPS pay retirement contributions calculated on "basic" pay.

Before the 1994-1998 National Agreement, COLA increases, on the other hand, were added to "base" salary but not to "basic" at the time they became effective. So each letter carrier had two salary rates—a "basic rate" that excluded COLA increases accumulated during the term of an agreement, and a "base rate" that included the COLA increases. The "base" salary rate was used to figure overtime and shift premiums, call-in pay, leave pay and holiday pay, but not to compute retirement benefits.

During the 1970s the parties agreed that, at the start of each new National Agreement, the total of accumulated COLA increases paid during the preceding Agreement would be "rolled-in"—added to what became known in 1978 as the "basic" salary rate. In this way the credit for COLA raises would start to apply toward raising the "high-3" for retirement purposes.

This system changed with the 1981 contract, which *delayed* the roll-in of previously accumulated COLA by another full contract term for most employees. So, for instance, the roll-in of $3,619 in COLA increases accumulated during the 1978-1981 National Agreement was delayed; rather than occurring near the start of the 1981 Agreement, the roll-in occurred for most employees in October 1984.

An exception was made for employees who were eligible for optional retirement or who would become eligible for it within six years after the start of the 1981 Agreement. Those employees exercised an *option* that permitted them to roll-in their COLA in November 1981. This *roll-in option* protected carriers whose "high-3" salary and retirement benefits otherwise would have been reduced as a result of the three-year roll-in delay.

The automatic, immediate roll-in of COLA to basic salary means that carriers begin to earn retirement credit on their COLA increases as soon as they are paid.

9.4

**Section 4. Application of Salary Rates**

The Employer shall continue the current application of salary rates for the duration of this Agreement.

**Section 5. Granting Step Increases**

The Employer will continue the program on granting step increases for the duration of this Agreement.

[see Memo, page **179**]

**This Memo is located on *JCAM*, below.**

**Step Increases.** In the 1990 contract the parties agreed, in the national Memorandum of Understanding reprinted below, that step increases would not be delayed for performance reasons. The Memorandum remains effective during the term of the 2011 National Agreement.

**MEMORANDUM OF UNDERSTANDING<br>BETWEEN THE<br>UNITED STATES POSTAL SERVICE AND<br>THE JOINT BARGAINING COMMITTEE<br>(American Postal Workers Union, AFL-CIO and the<br>National Association of Letter Carriers, AFL-CIO)**

**Re: Granting Step Increases**

The parties agree that periodic step increases will not be withheld for reason of unsatisfactory performance and that all other aspects of the current step increase procedures remain unchanged, unless otherwise provided for by the 1990 National Agreement.

The Employee and Labor Relations Manual (ELM) shall be amended to conform with the above stated agreement.

**Step Increase Progression.** The step increase program is contained in Section 422.13 of the *Employee and Labor Relations Manual,* which sets forth the following progression for CC Grade 1 and 2 city letter carriers who received career appointments before January 12, 2013:

**STEP PROGRESSION**
**(Career appointment before January 12, 2013)**

| From Step | To Step | Waiting Period (in weeks) |
|---|---|---|
| A | B | 96 |
| B | C | 96 |
| C | D | 44 |
| D | E | 44 |
| E | F | 44 |
| F | G | 44 |
| G | H | 44 |
| H | I | 44 |
| I | J | 44 |
| J | K | 34 |
| K | L | 34 |
| L | M | 26 |
| M | N | 26 |
| N | O | 24 |

The step progression waiting period between steps was modified by the Das Interest Arbitration Award for career letter carriers who receive career appointments on or after January 12, 2013. The waiting period between steps is 46 weeks for each step. The award did not change the number of steps (A–O) or the total time to reach step O (12.4 years).

**STEP PROGRESSION**
**(Career appointment on or after January 12, 2013)**

| From Step | To Step | Waiting Period (in weeks) |
|---|---|---|
| A | B | 46 |
| B | C | 46 |
| C | D | 46 |
| D | E | 46 |
| E | F | 46 |
| F | G | 46 |
| G | H | 46 |
| H | I | 46 |
| I | J | 46 |
| J | K | 46 |
| K | L | 46 |
| L | M | 46 |
| M | N | 46 |
| N | O | 46 |

The "promotion pay anomaly" occurs when a letter carrier is promoted to a higher grade, begins a new waiting period for the next step increase in that grade, and as a result *earns less* for certain periods than if the carrier had never been promoted. This anomaly occurs because in certain situations the carrier would have received a step increase earlier if he or she had not been promoted. The anomaly is an unintended result of the 1984 contract negotiations, in which the interest arbitration panel added several new steps to letter carriers' pay-grade levels.

The anomaly typically occurs when a CC Grade 1 carrier is promoted to a CC Grade 2 Carrier Technician position. For example, consider the case of a carrier hired in October 2001 at CC Grade 1, Step A whose first scheduled step increase—to CC Grade 1, Step B—was set for August 2003.

In December 2002, after serving 60 weeks, she bid on a Grade 2 Carrier Technician position and was required to begin a new waiting period for a step increase to Grade 2, Step B. Her pay increased immediately by approximately $1,701 annually. Yet 36 weeks later she would have received a step increase to Grade 1, Step B had she not been promoted—which would have raised her salary by $3,327 annually. So, 36 weeks after her promotion, the carrier was earning $34,918 annually at Grade 2, Step A, or $1,626 less than what she would have earned had she never been promoted.

In this case the pay anomaly abated when the carrier reached Grade 2, Step B because that salary was higher than that for Grade 1, Step B. However, the anomaly then recurred 60 weeks later, when she would have received a step increase to Grade 1, Step C had she never been promoted. This is because the Grade 1, Step C salary exceeds that for Grade 2, Step B. In fact, the anomaly would continue off and on until the carrier reaches Grade 2, Step D. From that point forward, the carrier's Grade 2 salary would generally be above what she would have earned by staying in Grade 1.

**1990 Settlement.** In 1990 the NALC and Postal Service reached an agreement to resolve the promotion pay anomaly. It provided that:

> No employee will, as a consequence of a promotion, at any time be compensated less than that employee would have earned if the employee had not been promoted but had, instead, merely advanced in step increments in that employee's grade as a result of fulfilling the waiting time requirements for step increases. This includes affected employees who are or were promoted to a higher grade and subsequently reassigned to their former grade.
>
> For each pay period following promotion the employee's basic salary will be compared to the basic salary the employee would have received for that pay period if the employee had not been promoted. For those periods the latter amount is higher, the difference will be paid to the employee in a one-time lump sum payment.

The lump sum payments provided by the settlement are calculated based on all paid hours, including paid leave. This includes straight-time hours, overtime hours and any applicable premium pay. The lump sums are paid on a quarterly basis on a schedule determined at the beginning of each calendar year. Because these payments are not part of a carrier's "basic" pay, they are not considered when determining CSRS or FERS contributions or figured as part of the "high-3" average salary for retirement purposes.

**Who is Affected.** The promotion pay anomaly ordinarily affects only those carriers who are at Step C or below. Except in a few cases in which a carrier loses more than 88 weeks in waiting for a promotion, by the time a carrier reaches Step D the pay schedule works as intended—the promotion to a higher grade results in a salary that is continuously higher than what the carrier would have received in the lower grade.

**Return to the Former Lower Grade.** The 1990 settlement agreement also required that Section 422 of the *Employee and Labor Relations Manual* (ELM) be modified to make clear that employees returning to a former lower grade must be assigned to the step and the next step increase date as if service had been uninterrupted in the lower grade. In other words, all time, including time spent in the higher grade, is credited toward determining the date of the next periodic step increase in the lower grade. As a practical matter, this means that any Carrier Technician who later successfully bids on a route ends up exactly where they would have been, in pay terms, had they never left Grade 1. In such situations, the time temporarily "lost" as a result of beginning a new waiting period in Grade 2 is fully restored.

Additionally, the parties have agreed that, "The step and next step date assignment for a city letter carrier following a reduction in grade will be determined as follows: (1) To Former Lower Grade. The employee is assigned to the step and next step date as if service had been uninterrupted in the lower grade since the last time held. (2) To New Lower Grade. The employee is assigned to the step and next step date in the lower grade as if all postal service had been in the lower grade" (Prearbitration Settlement, Q06N-4Q-C 11008195, April 23, 2013, M-01811).

**Repromotion to a Higher Grade.** A particularly complex situation arises in the occasional case of carriers repromoted to Grade 2—that is, when periods in Grade 2 are interrupted by a period in Grade 1. This situation is controlled by the provisions of the ELM Section 422.232. That section specifies that a repromoted employee is placed in the higher grade with credit toward the next periodic step increase as if the employee had remained continuously in that previously held higher grade.

For example, say a carrier was promoted from Grade 1, Step B to Grade 2, Step B, and then returned to Grade 1, Step B and subsequently received a step increase to Grade 1, Step C. If the carrier then successfully bids on a Grade 2 position a second time, he will not necessarily be

placed in Grade 2, Step C. This is because he started a new waiting period for his increase to Grade 2, Step C when he first was promoted to Grade 2. Upon his return to Grade 2 his waiting period for the Step C increase will be reestablished as if he had never returned to Grade 1.

**Calculating Promotion Pay Anomaly Payments.** Generally speaking, so long as the individual service history and hours information about an employee are correct, anomaly payments will be calculated and paid correctly by the Postal Service. In a few cases, carriers may experience difficulty receiving the correct payments because there are mistakes in their service histories in Postal Service records. In such cases the carrier or the union representative should contact the national business agent's office for assistance.

If it is determined that a carrier's step placement or waiting period was incorrectly established in the past, the Postal Service will calculate the amount of the resulting over- or under-payments. In the case of overpayments, it is possible that the Postal Service will initiate an employer claim under the provisions of Article 28. In the case of underpayments, the Postal Service will make the carrier whole by making a separate payment. Such payments are made to correct a mistake and should not be confused with promotion pay anomaly payments.

**The ELM and the Promotion Pay Anomaly.** Relevant language pertaining to the promotion pay anomaly appears in Section 422 of the ELM:

**422.223 Promotion Rules.**

**a(1)(a).** The employee receives a promotional increase equal to two times the most prevalent step in the former grade for a promotion of one or two grades (three times for a promotion of three or more grades). Add this increase to the employee's former basic wage and slot the employee to the closest step in the new grade. If the increased salary falls between two steps of the new grade, place the employee at the next higher step. A new step waiting period begins unless the employee is promoted to a bargaining unit grade previously held (i.e., repromotion), in which case see 422.123a(4).

**a(1)(b).** No employee is at any time compensated less as a consequence of a promotion than that employee would have been if the employee had not been promoted but, instead, advanced in step increments in the lower grade by fulfilling the waiting time requirements necessary for step increases. This rule includes employees who were promoted to a higher grade and subsequently reassigned to their former grade. If, during any pay period following the promotion, the employee's basic wage is less than the employee would have received for that pay period if the employee had not been promoted, the difference is paid to the employee in a lump sum payment.

**422.123. Promotion Rules.**

**a(4). Repromotion.** An employee is repromoted if he or she is promoted to a bargaining unit grade previously held, or to one equivalent to the one previously held, before a change to lower level, as defined further under 421.5. When a repromotion occurs, the employee is assigned to the step in the repromoted grade or its equivalent, with waiting period credit toward the next step date as if he or she had remained continuously in that previously held grade.

**422.125. Reductions in Grade.** Assignments are made as follows:

**a. General**. Reductions in grade include voluntary changes to lower level, management-initiated change to lower level, and demotions.

**b. Step and Next Step Date Assignment.** Assignments are made as follows:

(1) Step. The employee's current salary is moved to the lower grade. If the current salary falls between two steps in the lower grade, the salary is set at the higher of the two steps. The salary may not be set below the minimum or above the maximum of the lower grade.

(2) Next Step Date. Creditable service in the former position is maintained toward the next step increase, with the following exceptions:

(a) If the employee's salary is increased by at least one most prevalent step in the former grade, a new step waiting period begins on the effective date of the reduction in grade (see 421.45c).

(b) If the waiting period time already served equals or exceeds that required to advance to the next step following the reduction in grade, the employee is advanced one additional step and a new step waiting period begins on the effective date of the reduction in grade.

9.6

**Section 6. Protected Salary Rates**

The Employer shall continue the current salary rate protection program for the duration of this Agreement.

**Salary Rate Retention.** Section 6 specifically continues in effect the three salary rate retention provisions contained in Section 421.5 of the *Employee and Labor Relations Manual* (ELM). These are:

1. **Protected rate**, ELM Section 421.51—Under the circumstances described in this section a career employee assigned to a lower grade position will continue to receive the salary paid in the previous grade, for a maximum period of two calendar years.
2. **Saved rate**, ELM Section 421.52—An employee receives permanent "saved rate" salary protection when management gives him or her a permanent, nondisciplinary and involuntary assignment to a lower grade due to a management action such as a change in job ranking criteria affecting more than one person under the same job description. Saved rate protection is also available to employees receiving a "red circle" salary amount in excess of the maximum for the grade.
3. **Saved grade,** ELM Section 421.53—Saved grade provisions can be invoked only in accordance with the applicable bargaining agreement (e.g. Articles 4.3 or 41.3.O). The saved grade is in effect indefinitely unless the employee fails to bid for vacant jobs in the saved grade for which he or she is qualified.

9.7

**Section 7. City Carrier Assistants (CCAs)**

**The CCA hourly rates in Table Two (Steps AA and BB) shall be adjusted by the general increases provided for in Article 9.2. In addition, CCAs will receive the following wage adjustments:**

**Effective November 16, 2013, the CCA hourly rates in Table Two shall be increased by 1.0%.**

**Effective November 15, 2014, the CCA hourly rates in Table Two shall be increased by 1.0%.**

**Effective November 14, 2015, the CCA hourly rates in Table Two shall be increased by 1.5%.**

**City Carrier Assistants (CCAs) Wages.** Section 7 provides that city carrier assistants are hired at the hourly rates as stated in Table Two (Steps AA and BB). They also receive three general wage increases as provided for in Article 9.2 and three additional wage adjustments of 1.0, 1.0, and 1.5 percent ending on November 14, 2015.

The determination of which step a CCA will be paid is addressed in Appendix B, 1. General Principles, Section e of the 2011 National Agreement.

**APPENDIX B**

**Appendix B is the reprinting of Section I of the 2013 Das Award, the creation of a new non-career employee category.**

**1. GENERAL PRINCIPLES**

e. The hourly rate for CCA employees shall be established in accordance with Table 2, Step BB. Transitional Employees (TEs) employed as of the date of this Agreement who become CCAs shall be paid at Step AA of Table 2. The parties may mutually agree to increase the CCA pay rates should they determine it necessary for the recruitment or retention of CCAs. Adjustments to salary shall be in accordance with Article 9.7.

The pay rate for CCAs who were TEs on their 5-day break on the day of the award is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**3. Are transitional employees who were on their 5-day break on the effective date of the 2011 National Agreement (1/10/13) eligible for the higher Step AA hourly pay rate if hired to a CCA position?**

Yes.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE AND**
**THE JOINT BARGAINING COMMITTEE**
**(American Postal Workers Union, AFL-CIO and the**
**National Association of Letter Carriers, AFL-CIO)**

**Re: Granting Step Increases**

The parties agree that periodic step increases will not be withheld for reason of unsatisfactory performance and that all other aspects of the current step increase procedures remain unchanged, unless otherwise provided for by the 1990 National Agreement.

The Employee and Labor Relations Manual (ELM) shall be amended to conform with the above stated agreement.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

Re: Upgrade of NALC Represented Employees

It is hereby agreed by the United States Postal Service and the National Association of Letter Carriers, AFL-CIO, that, based on Arbitrator Fleischli's September 19, 1999, Interest Arbitration Award regarding the upgrade of NALC represented grade 5 employees and maintaining the existing salary differential for NALC represented grade 6 carrier technician employees as well as other considerations, the following procedures will apply.

1. UPGRADE OF NALC REPRESENTED GRADE 5 EMPLOYEES

a. Effective November 18, 2000, all NALC represented grade 5 employees will be upgraded to new NALC grade 1. The upgrade applies to full-time, part-time regular, part-time flexible, and transitional employees. The parties further agree that the new NALC grade 1 salary schedule shall be implemented, effective November 18, 2000.

b. All NALC represented grade 5 employees will be upgraded to new NALC grade 1 based on a step-to-step upgrade procedure. Effective November 18, 2000, employees will be upgraded to new NALC grade 1 at the same step they previously held in grade 5. As an example, grade 5 step A employees will be upgraded to new NALC grade 1 step A, while grade 5 step O employees will be upgraded to new NALC grade 1 step O. All upgraded employees will receive waiting period credit applied towards their next step for accumulated weeks served in their current step.

2. MAINTAINING THE CARRIER TECHNICIAN DIFFERENTIAL

a. In order to maintain the carrier technician differential, effective November 18, 2000, NALC represented grade 6 carrier technician employees (occupation code 2310-2010) will be placed into new NALC grade 2. NALC represented grade 6 vehicle operations and maintenance assistant employees (occupation code 2310-2012) will not be placed into new NALC grade 2. Instead, these employees will continue to be paid at new NALC grade 1. The parties further agree that the new NALC grade 2 salary schedule shall be implemented, effective November 18, 2000.

b. New NALC grade 2 salaries will be developed by applying the dollar differential by step between NALC grades 5 and 6 as of November 18, 2000. This dollar differential will then be added to new NALC grade 1, by step, to create new NALC grade 2, by step, effective November 18, 2000.

c. NALC grade 6 carrier technician employees will be placed into new NALC grade 2 based on a step-to-step procedure. Effective November 18, 2000, NALC grade 6 carrier technician employees will be placed into the new NALC grade 2 at the same step they previously held in grade 6. As an example, grade 6 step A employees will be placed into the new NALC grade 2 step A, while grade 6 step O employees will be placed into the new NALC grade 2 step O. All employees placed into the new NALC grade 2 will receive waiting period credit applied towards their next step based on accumulated weeks served in their current step.

3. ADDRESSING THE PROMOTION PAY ANOMALY

The parties intend to continue discussions either prior to or during national negotiations in 2001 in an effort to permanently resolve the promotion pay anomaly associated with the NALC salary schedule.

The parties agree this Memorandum of Understanding is a full and complete settlement of any claims that have been, or could be, asserted against the Postal Service with regard to the upgrade provisions of Arbitrator Fleischli's September 19, 1999, Interest Arbitration Award. This Memorandum of Understanding is being entered into on a non-precedential basis and may not be cited or used in any forum whatsoever, except to enforce its provisions.

Date: March 21, 2000

**Table One**
**City Carrier (CC) Schedule**
**Full-Time Annual Basic Rates**
**Effective January 12, 2013 (PP 03-2013)**

**RSC Q1 (NALC)**

| CC Grade | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | Most Prev. Step |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 44,292 | 48,046 | 49,502 | 52,292 | 52,676 | 53,062 | 53,441 | 53,825 | 54,210 | 54,589 | 54,973 | 55,356 | 55,742 | 56,128 | 56,508 | 386 |
| 2 | 46,211 | 50,203 | 50,295 | 53,151 | 53,566 | 53,983 | 54,393 | 54,805 | 55,224 | 55,627 | 56,044 | 56,459 | 56,869 | 57,292 | 57,704 | 417 |
| **Part-Time Flexible Employees - Hourly Basic Rates** | | | | | | | | | | | | | | | | |
| 1 | 22.15 | 24.02 | 24.75 | 26.15 | 26.34 | 26.53 | 26.72 | 26.91 | 27.11 | 27.29 | 27.49 | 27.68 | 27.87 | 28.06 | 28.25 | |
| 2 | 23.11 | 25.10 | 25.15 | 26.58 | 26.78 | 26.99 | 27.20 | 27.40 | 27.61 | 27.81 | 28.02 | 28.23 | 28.43 | 28.65 | 28.85 | |
| **Part-Time Regular Employees - Hourly Basic Rates** | | | | | | | | | | | | | | | | |
| 1 | 21.29 | 23.10 | 23.80 | 25.14 | 25.33 | 25.51 | 25.69 | 25.88 | 26.06 | 26.24 | 26.43 | 26.61 | 26.80 | 26.98 | 27.17 | |
| 2 | 22.22 | 24.14 | 24.18 | 25.55 | 25.75 | 25.95 | 26.15 | 26.35 | 26.55 | 26.74 | 26.94 | 27.14 | 27.34 | 27.54 | 27.74 | |
| **Step Increase Waiting Periods (In Weeks)** | | | | | | | | | | | | | | | | |
| Steps (From-To) | | A-B | B-C | C-D | D-E | E-F | F-G | G-H | H-I | I-J | J-K | K-L | L-M | M-N | N-O | YRS. |
| Grades 1 - 2 | | 96 | 96 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 34 | 34 | 26 | 26 | 24 | 12.4 |

**Table Two**
**City Carrier (CC) Schedule**
**Full-Time Annual Basic Rates**
**Effective January 12, 2013 (PP 03-2013)**

**RSC Q2 (NALC)**

| CC Grade | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | Most Prev. Step |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 34,752 | 36,306 | 37,860 | 39,414 | 40,968 | 42,522 | 44,076 | 45,630 | 47,184 | 48,738 | 50,292 | 51,846 | 53,400 | 54,954 | 56,508 | 1,554 |
| 2 | 35,488 | 37,075 | 38,662 | 40,249 | 41,835 | 43,422 | 45,009 | 46,596 | 48,183 | 49,770 | 51,357 | 52,943 | 54,530 | 56,117 | 57,704 | 1,587 |
| **Hourly Basic Rates** | | | | | | | | | | | | | | | | |
| 1 | 16.71 | 17.45 | 18.20 | 18.95 | 19.70 | 20.44 | 21.19 | 21.94 | 22.68 | 23.43 | 24.18 | 24.93 | 25.67 | 26.42 | 27.17 | |
| 2 | 17.06 | 17.82 | 18.59 | 19.35 | 20.11 | 20.88 | 21.64 | 22.40 | 23.16 | 23.93 | 24.69 | 25.45 | 26.22 | 26.98 | 27.74 | |
| **% Step O** | | | | | | | | | | | | | | | | |
| 1 | 61.50% | 64.25% | 67.00% | 69.75% | 72.50% | 75.25% | 78.00% | 80.75% | 83.50% | 86.25% | 89.00% | 91.75% | 94.50% | 97.25% | 100.00% | |
| 2 | 61.50% | 64.25% | 67.00% | 69.75% | 72.50% | 75.25% | 78.00% | 80.75% | 83.50% | 86.25% | 89.00% | 91.75% | 94.50% | 97.25% | 100.00% | |
| **Step Increase Waiting Periods (In Weeks)** | | | | | | | | | | | | | | | | |
| Steps (From-To) | | A-B | B-C | C-D | D-E | E-F | F-G | G-H | H-I | I-J | J-K | K-L | L-M | M-N | N-O | YRS. |
| Grades 1 - 2 | | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 12.4 |

**National Association of Letter Carriers (NALC)**
**City Carrier Assistant (CCA) Schedule**
**Hourly Rates**

**RSC Q7 (NALC)**

| CCA Grade | | BB | AA | |
|---|---|---|---|---|
| 1 | | 15.00 | 16.25 | |
| 2 | | 15.32 | 16.59 | |

# ARTICLE 10 LEAVE

**Sources for Leave Rules**

The rules governing the various types of Postal Service leave are contained in several source documents:

**Article 10.** Article 10 contains the National Agreement's general provisions concerning the leave program. Article 10 guarantees continuation of the leave program (Sections 1-2), outlines the national program for the use of annual leave through vacation planning (Sections 3-4), provides for sick leave (Section 5), and states certain additional leave rules concerning minimum leave charges and leave without pay (LWOP) (Section 6).

- **ELM Subchapter 510.** Article 10.2 specifically incorporates Subchapter 510 of the *Employee and Labor Relations Manual*. Subchapter 510 (Sections 511- 519) contains the specific regulations controlling leave for career letter carriers.
- **City Carrier Assistant Employees.** Leave provisions regarding City Carrier Assistant Employees are found in Appendix B and applicable Memorandums of Understanding in the 2011 National Agreement.
- **National Memorandums of Understanding.** Certain National Memorandums of Understanding, appearing on pages 179-187 of the National Agreement, also address leave issues.
- **Local Memorandums of Understanding.** Many important features of letter carrier leave are governed by local leave programs, which are negotiated locally under Article 30, Local Implementation, and contained in Local Memorandums of Understanding (LMOUs).
- **Federal Law.** The Family and Medical Leave Act (FMLA) is a federal law that entitles eligible employees to time off to care for a new child, to care for a seriously ill family member and for an employee's serious medical problems. The detailed rules governing the FMLA are found in the federal law and in the Code of Federal Regulations (Chapter 29 C.F.R. Part 825).

This material explains the main provisions of Article 10, summarizes other important leave rules and gives references to more detailed provisions concerning leave. It does not attempt to cover all of the detailed leave regulations contained in the ELM Subchapter 510 or the FMLA.

**10.1**

> **Section 1. Funding**
>
> The Employer shall continue funding the leave program so as to continue the current leave earning level for the duration of this Agreement.

10.2

**Section 2. Leave Regulations**

The leave regulations in Subchapter 510 of the Employee and Labor Relations Manual, insofar as such regulations establish wages, hours and working conditions of employees covered by this Agreement, shall remain in effect for the life of this Agreement.

## Continuation of Leave Program

Article 10.1 and 10.2 guarantee continuation of the leave program and refer to the detailed leave regulations published in the ELM.

Subchapter 510 of the ELM contains the detailed Postal Service regulations concerning the administration of the leave program. There are several categories of leave available for absences: Annual Leave (Section 512), Sick Leave (Section 513), LWOP (Section 514), Court Leave (Section 516), Military Leave (Section 517), and Administrative Leave (Section 519). Within these sections there may be distinctions defined for bargaining-unit, nonbargaining-unit, full-time, part-time regular and part-time flexible employees. In addition, Section 515 contains regulations concerning absences covered by the Family and Medical Leave Act and Section 518 contains regulations concerning holidays.

### Annual Leave

Annual leave is paid vacation time. The rate of annual leave earnings is based on "creditable service," that is, total cumulative federal service (employment), including certain kinds of military service (ELM Section 512.2, Determining Annual Leave Category).

New employees earn annual leave but are not credited with the leave and may not take it prior to completing 90 days of continuous employment (ELM Section 512.313(b)). There is an exception for employees who transfer without a break in service.

Annual leave is paid at an employee's regular straight-time rate and is limited to a maximum of eight hours during any single day.

As explained further below, letter carriers typically use annual leave in three ways:

1. By annual bidding in advance, based on seniority, on vacation time as specified in this Article and in the Local Memorandum of Understanding (LMOU);
2. Other requests for annual leave, as needed throughout the year.
3. Emergency annual leave taken for emergencies.

**Annual Leave Accrual—Full-Time Employees.** Full-time employees earn annual leave as set forth in the ELM Section 512.311, reproduced below. They are credited with the year's annual leave at the start of each leave year.

**512.311 Full-Time Employees**

**a. Accrual Chart. Full-time employees earn annual leave based on their number of creditable years of service.**

| Leave Category | Creditable Service | Maximum Leave Per Year |
|---|---|---|
| 4 | Less than 3 years | 4 hours for each full biweekly pay periods; i.e., 104 hours (13 days) per 26-period leave year. |
| 6 | 3 years but less than 15 years | 6 hours for each full biweekly pay period plus 4 hours in last pay period in leave year; i.e., 160 hours (20 days) per 26-period leave year. |
| 8 | 15 years or more | 8 hours for each full biweekly pay period; i.e., 208 hours (26 days) per 26-period leave year. |

**b. Credit at Beginning of Leave Year.** Full-time employees are credited at the beginning of the year with the total number of annual leave hours that they will earn for that leave year.

**Annual Leave Accrual—Part-Time Employees**. Part-time employees earn annual leave as set forth in the ELM Exhibit 512.312, reproduced here. ELM Section 512.312.b provides that PTFs are credited with annual leave earnings at the end of each biweekly pay period.

Exhibit 512.312
**Accrual and Crediting Chart for Part-Time Employees**

| Leave Category | Creditable Service | Maximum Leave per Year | Rate of Accrual | Hours in Pay Status | Hours of Leave Earned per Period |
|---|---|---|---|---|---|
| 4 | Less than 3 years. | 104 hours, or 13 days per 26-period leave year or 4 hours for each biweekly pay period. | 1 hour for each unit of 20 hours in pay status. | 20<br>40<br>60<br>80 | 1<br>2<br>3<br>4 (max.) |
| 6 | 3 years but less than 15 years. | 160 hours, or 20 days per 26-period leave year or 6 hours for each full biweekly pay period, plus 4 hours in last pay period in leave year. | 1 hour for each unit of 13 hours in pay status. | 13<br>26<br>39<br>52<br>65<br>78 | 1<br>2<br>3<br>4<br>5<br>6 (max.) |
| 8 | 15 years or more. | 208 hours, or 26 days per 26-period leave year or 8 hours for each full biweekly pay period. | 1 hour for each unit of 10 hours in pay status. | 10<br>20<br>30<br>40<br>50<br>60<br>70<br>80 | 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8 (max.) |

[1]Except that the accrual for the last pay period of the calendar year may be 10 hours, provided the employee has the 130 creditable hours or more in a pay status in the leave year for leave purposes.

**27 Pay Period Leave Year.** The accrual charts listed above are based on a 26 pay period leave year. In leave years with 27 pay periods, employees will earn additional leave. When determining if a leave year has 27 pay periods, remember a leave year differs from a calendar year. The 27th pay period in a leave year is not necessarily labeled pay period 27. A leave year is defined as the year beginning with the first day of the first complete pay period in a calendar year and ending on the day before the first day of the first complete pay period in the following calendar year.

**Annual Leave Accrual—City Carrier Assistants (CCAs).** CCA annual leave accrual is governed by Appendix B, 3. Other Provisions, Section B - Article 10 in the 2011 National Agreement. CCAs are credited with one hour of annual leave for each twenty hours spent in a pay status during each biweekly pay period. CCA "annual leave" is used both for the usual annual leave purposes (rest, recreation, emergencies, etc.) as well as for illness or injury in lieu of sick leave.

**APPENDIX B**

**Appendix B is the reprinting of Section I of the 2013 Das Award, the creation of a new non-career employee category.**

**3. OTHER PROVISIONS**

**B. Article 10 – Leave**

**GENERAL**

1. Purpose. Annual leave is provided to CCA employees for rest, recreation, emergency purposes, and illness or injury.

   a. Accrual of Annual Leave. CCA employees earn annual leave based on the number of hours in which they are in a pay status in each pay period.

| Rate of Accrual | Hours in Pay Status | Hours of Annual Leave Earned Per Pay Period |
|---|---|---|
| | 20 | 1 |
| | 40 | 2 |
| | 60 | 3 |
| | 80 | 4 (max.) |

   b. Biweekly Crediting. Annual leave accrues and is credited in whole hours at the end of each biweekly pay period.

   c. Payment For Accumulated Annual Leave. A separating CCA employee may receive a lump-sum payment for accumulated annual leave subject to the following condition:

A CCA employee whose separation is effective before the last Friday of a pay period does not receive credit or terminal leave payment for the leave that would have accrued during that pay period.

**AUTHORIZING ANNUAL LEAVE**

1. General. Except for emergencies, annual leave for CCA employees must be requested on Form 3971 and approved in advance by the appropriate supervisor.

2. Emergencies and Illness or Injury. An exception to the advance approval requirement is made for emergencies and illness or injury; however, in these situations, the CCA employee must notify appropriate postal authorities as soon as possible as to the emergency or illness/injury and the expected duration of the absence. As soon as possible after return to duty, CCA employees must submit Form 3971 and explain the reason for the emergency or illness/injury to their supervisor. Supervisors approve or disapprove the leave request. When the request is disapproved, the absence may be recorded as AWOL at the discretion of the supervisor as outlined in **Item 2, Approval/Disapproval, under Form 3971** below.

**UNSCHEDULED ABSENCE**

1. Definition. Unscheduled absences are any absences from work that are not requested and approved in advance.

2. CCA Employee Responsibilities. CCA employees are expected to maintain their assigned schedule and must make every effort to avoid unscheduled absences. In addition, CCA employees must provide acceptable evidence for absences when required.

**FORM 3971, REQUEST FOR, OR NOTIFICATION OF, ABSENCE**

1. Purpose. Application for annual leave is made in writing, in duplicate, on Form 3971, Request for, or Notification of, Absence.

2. Approval/Disapproval. The supervisor is responsible for approving or disapproving application for annual leave by signing Form 3971, a copy of which is given to the CCA employee. If a supervisor does not approve an application for leave, the disapproved block on Form 3971 is checked and the reasons given in writing in the space provided. When a request is disapproved, the reasons for disapproval must be noted. AWOL determinations must be similarly noted.

**Annual Leave Sharing.** Management Instruction (MI) EL-510-2003-2 sets forth the policy guidelines and standard procedures for administering the Annual Leave Sharing Program referenced in the Employee and Labor Relations Manual, Section 512.64, Annual Leave Sharing, and it obsoletes the 1999 Instructions. The MI EL-510-1999-4 did not amend or supersede the provisions of the collective bargaining agreement negotiated between the Postal Service and the National Association of Letter Carriers (National Prearbitration Settlement, Q94N-4Q-C 00002159, December 14, 2004, M-01531).

On September 11, 2007, the parties agreed to modify the Leave Sharing Memorandum. Originally, the memorandum allowed career postal employees to donate annual leave to another career postal employee—but only within a postal district's geographical area. The modified memorandum removed the geographic restriction in cases where the donating employee and the receiving employee are members of the same family (son or daughter, parent and spouse as defined in the ELM Section 515.2). See Memo on Leave Sharing on JCAM page 10-18.

10.3.A

**Section 3. Choice of Vacation Period**

A. It is agreed to establish a nationwide program for vacation planning for employees in the regular work force with emphasis upon the choice vacation period(s) or variations thereof.

**Vacation Planning—Local Implementation**

Article 10.3 establishes a nationwide program for vacation planning for the regular work force and specifically addresses the selection of the choice vacation period(s). Article 30 provides for local implementation of more specific leave provisions consistent with the general provisions of Article 10.

A new Local Memorandum of Understanding (LMOU) may be negotiated shortly after each new National Agreement is finalized. The LMOU is negotiated between the parties at the local level pursuant to Article 30 and covers, among other items, the operation of local vacation selection. The LMOU typically sets forth a system where the leave year is divided into times known as the "choice vacation period" (also called "prime time") and other times which are outside the choice vacation period ("non-prime time"). For example, the choice vacation period might run from the first week of May through the last week of October.

The LMOU usually provides that full-time regular and part-time flexible letter carriers bid, based on seniority, for blocks of continuous vacation time (annual leave). Part-time regulars also may bid on vacation time, but they are a separate category for bidding on vacation time, and their seniority is normally restricted to this category. Key LMOU provisions may establish the percentage of carriers (or a fixed number of carriers) to receive vacation each week, both during the choice vacation period and during the non-choice periods. The number of carriers that must be permitted off during the choice vacation period is typically higher than the number during non-prime time.

The procedures for bidding on blocks of vacation time are controlled by the LMOU. Typically the bidding allows carriers to select available vacation slots by seniority, until all carriers have made vacation selections. Full-time regulars may bid based on all credited annual leave, including the year's annual leave credited at the start of the leave year.

The LMOU also may set forth procedures for making vacation selections during times *outside* of the choice vacation period; this may be handled by a second round of bidding based on seniority. In addition, the LMOU may contain rules for handling other requests for annual leave, which may be requested by individual carriers as needed throughout the year, outside of the vacation bidding process.

**10.3.B**

> B. Care shall be exercised to assure that no employee is required to forfeit any part of such employee's annual leave.

**Leave Carryover.** A letter carrier may carry over up to 440 hours (55 days) of accumulated annual leave from one leave year to the next (ELM Section 512.321a). Any amount beyond the carryover maximum is forfeited.

Leave carryover for City Carrier Assistant Employees is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**29. May CCAs carry over leave from one appointment to another?**

No. Currently any accrued annual leave is paid out at the end of a 360-day term. However, the national parties will explore appropriate options regarding current policies for paying terminal leave to CCAs.

**31. Do CCAs that are converted to career status carry their annual leave balance over when hired?**

No. Currently, CCAs receive a terminal leave payment for any leave balance at the end of the CCA appointment.

**Avoiding Forfeiture of Annual Leave.** Supervisors should exercise care to assure that no bargaining-unit employees have to forfeit any part of their annual leave. For their part, employees must be sure to submit sufficient leave requests. Stewards should encourage carriers to keep a watchful eye on their leave balances and vacation plans.

**10.3.C**

> C. The parties agree that the duration of the choice vacation period(s) in all postal installations shall be determined pursuant to local implementation procedures.

**Duration of Choice Period.** Article 10.3.C should be read in conjunction with any applicable LMOU provisions negotiated pursuant to Article 30.B.5. Article 10.3.C recognizes that the choice vacation period(s) may vary among installations. This section empowers local installation heads and branches to engage in local implementation under Article 30 to determine the duration of the choice vacation period. The

duration normally varies among LMOUs. During local implementation, the choice period's duration is closely related to the issue of how many carriers are permitted to take vacation during the choice period—a subject under Article 10.3.D.1 & 2, and Article 30.B.9.

**10.3.D**

D. Annual leave shall be granted as follows:

1. Employees who earn 13 days annual leave per year shall be granted up to ten (10) days of continuous annual leave during the choice period. The number of days of annual leave, not to exceed ten (10), shall be at the option of the employee.

2. Employees who earn 20 or 26 days annual leave per year shall be granted up to fifteen (15) days of continuous annual leave during the choice period. The number of days of annual leave, not to exceed fifteen (15), shall be at the option of the employee.

**Number of Continuous Days Off.** Article 10.3.D.1 establishes that those employees who have less than three years of creditable service will be granted a maximum of ten continuous days of annual leave. Article 10.3.D.2 establishes that those employees with more than three years of creditable service will be granted a maximum of fifteen continuous days of annual leave for their choice vacation period selection(s).

These sections do not foreclose the right of an employee to request additional annual leave continuous with the maximum number of days applicable in either Article 10.3.D.1 or 3.D.2 above. Nor does it preclude an employee being granted additional annual leave during the choice vacation period(s) if there are fewer employees on annual leave than the maximum number or percentage negotiated in a LMOU pursuant to Article 30.B.9 (Step 4, AC-C 10648, March 17, 1977, M-00865).

**10.3.D.3**

3. The subject of whether an employee may at the employee's option request two (2) selections during the choice period(s), in units of either 5 or 10 working days, the total not to exceed the ten (10) or fifteen (15) days above, may be determined pursuant to local implementation procedures.

**Requesting One or Two Vacation Selections.** Article 10.3.D.3 should be read in conjunction with any applicable LMOU provisions established pursuant to Article 30.B.7. This section allows the LMOU to determine if the maximum number of days of continuous annual leave for choice vacation selection will be requested as a single block of either ten or fifteen continuous days or as two separate blocks of either five or ten continuous days each. For instance, an employee who has

fifteen days may request ten continuous days of annual leave in May and five continuous days in August.

10.3.D.4

> 4. The remainder of the employee's annual leave may be granted at other times during the year, as requested by the employee.

**Other Annual Leave Requests.** Article 10.3.D.4 should be read in conjunction with Article 10.3.A & 4.C and with any applicable LMOU provisions established pursuant to Article 30.B.12. It establishes that employees may request annual leave in addition to their selection(s) for choice vacation period(s) (Article 10.4.C).

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: City Carrier Assistant (CCA) Annual Leave**

Article 30 of the National Agreement and Local Memorandum of Understanding provisions do not apply to city carrier assistant employees, except as follows:

During the local implementation period, the parties may agree to include provisions into the local memorandum of understanding to permit city carrier assistant employees to apply for annual leave during choice vacation periods, as defined in Article 10.3.D of the National Agreement. Granting leave under such provisions must be contingent upon the employee having a leave balance of at least forty (40) hours.

In addition, the parties will explore at the national level appropriate options regarding current policies for paying terminal leave.

10.3.E

> E. The vacation period shall start on the first day of the employee's basic work week. Exceptions may be granted by agreement among the employee, the Union representative and the Employer.

**Start of Vacation Period.** Article 10.3.E establishes that the first day of an employee's vacation period(s) shall start on the first day of the employee's basic work week. Exceptions may be granted when the employee, the NALC representative and the employer agree. This section should be read in conjunction with any applicable LMOU provisions established pursuant to Article 30.B.6, which states that the local parties can determine the beginning day of an employee's vacation period selection(s). Where the LMOU provides that the employee's vacation period selection(s) begins on a day other than the first day of an employee's basic work week, the LMOU is controlling.

10.3.F

> F. An employee who is called for jury duty during the employee's scheduled choice vacation period or who attends a National, State, or

Regional Convention (Assembly) during the choice vacation period is eligible for another available period provided this does not deprive any other employee of first choice for scheduled vacation.

**Jury Duty or NALC Convention Interrupting Vacation.** Article 10.3.F provides that if an employee serves on jury duty, attends a National, State, or Regional convention or assembly during the employee's scheduled choice vacation period, the employee is entitled to another choice vacation period selection(s). However, that employee can not deprive any other employee of his/her scheduled vacation period(s). The provisions of this section should be read in conjunction with any applicable LMOU provisions established pursuant to Articles 30.B.8 & B.20. Those sections authorize an LMOU to determine whether those absences will be charged to the choice vacation period and whether annual leave for union activities requested prior to the determination of the choice vacation period will be a part of the local vacation plan. (See Article 24, Employees on Leave with Regard to Union Business.)

10.4 **Section 4. Vacation Planning**

The following general rules shall be observed in implementing the vacation planning program:

10.4.A A. The Employer shall, no later than November 1, publicize on bulletin boards and by other appropriate means the beginning date of the new leave year, which shall begin with the first day of the first full pay period of the calendar year.

**Notification of Start of New Leave Year.** Article 10.4.A should be read in conjunction with any applicable LMOU provisions established pursuant to Article 30.B.11. The local installation head must notify all employees when the new leave year will begin. Where LMOU provisions established pursuant to Article 30.B.11 provide for another date and means of notifying employees, the LMOU is controlling.

10.4.B B. The installation head shall meet with the representatives of the Union to review local service needs as soon after January 1 as practical. The installation head shall then:

1. Determine the amount of annual leave accrued to each employee's credit including that for the current year and the amount he/she expects to take in the current year.
2. Determine a final date for submission of applications for vacation period(s) of the employee's choice during the choice vacation period(s).
3. Provide official notice to each employee of the vacation schedule approved for each employee.

**Deadline to Apply; Official Notice of Schedule.** Articles 10.4.B.2 & 10.4.B.3 should be read in conjunction with any applicable LMOU provisions established pursuant to Articles 30.B.4 & B.10, under which the

local parties may negotiate LMOU provisions concerning, respectively: (1) the final date for employees to submit applications for choice vacation period(s); and (2) how management must give employees official notice of their approved vacation schedule.

**10.4.C**

> C. A procedure in each office for submission of applications for annual leave for periods other than the choice period may be established pursuant to the implementation procedure above.

**Applying For Annual Leave Outside Choice Period.** Article 10.4.C should be read in conjunction with Article 10.3.A & 3.D.4 and any applicable LMOU provisions established pursuant to Article 30.B.12. The LMOU may provide for two different kinds of leave rules under Article 30.B.12:

**(a) Selections Outside the Choice Period.** An LMOU may establish additional rounds of bidding immediately following the choice selections, enabling carriers to make advance vacation selections during times *outside* the choice vacation period (or during any remaining time during the choice period).

**(b) Other Requests for Annual Leave.** In addition, an LMOU may specify rules governing other requests for annual leave which are made as the need arises throughout the year rather than through the advance annual vacation bidding process. For example, a carrier might win tickets to a World Series game the following week and request leave to attend. A typical LMOU might specify that such leave requests must be made prior to the posting of the next week's schedule. It also might specify how long management has to reply to such requests, set forth procedures for handling daily leave, and specify priorities—by seniority or first-come, first served—for both advance and daily requests for annual leave.

Where LMOU provisions do not cover rules concerning annual leave of this type, the ELM Section 512.61(a) provides, "For all regular employees, both full-time and part-time, vacation leave is granted when requested—to the extent practicable."

**10.4.D**

> D. All advance commitments for granting annual leave must be honored except in serious emergency situations.

**Honoring Advance Commitments For Annual Leave.** Article 10.4.D requires management to honor annual leave approved in advance, in nearly all circumstances.

**Emergency Annual Leave.** In an emergency a carrier need not obtain advance approval for leave, but must notify management as soon as possible about the emergency and the expected duration of the absence. The carrier must submit PS Form 3971 and explain the reason for the absence to the supervisor as soon as possible (ELM Section 512.411-12).

10.5

**Section 5. Sick Leave**

The Employer agrees to continue the administration of the present sick leave program, which shall include the following specific items:

A. Credit employees with sick leave as earned.

B. Charge to annual leave or leave without pay (at employee's option) approved absence for which employee has insufficient sick leave.

C. Employee becoming ill while on annual leave may have leave charged to sick leave upon request.

D. For periods of absence of three (3) days or less, a supervisor may accept an employee's certification as reason for an absence.

**Sick Leave**. Article 10.5 provides for the continuation of the sick leave program, whose detailed regulations are contained in the ELM Section 513. Section 513.1 defines sick leave as leave which "insures employees against loss of pay if they are incapacitated for the performance of duties because of illness, injury, pregnancy and confinement, and medical (including dental or optical) examination or treatment."

**Sick Leave Accrual.** Full- and part-time employees accrue sick leave as shown in the ELM Section 513.21:

**513.21 Accrual Chart**

| Employee Category | Time Accrued |
|---|---|
| a. Full-time employees | 4 hours for each full biweekly pay period—i.e., 13 days (104 hours) per 26-period leave year. |
| b. Part-time employees | 1 hour for each unit of 20 hours in pay status up to 104 hours (13 days) per 26-period leave year. |

Sick leave is credited at the end of each pay period and can accumulate without any limitation of yearly carryover amounts (ELM Section 513.221).

**27 Pay Period Leave Year.** The accrual charts listed above are based on a 26 pay period leave year. In leave years with 27 pay periods employees will earn additional leave. (See JCAM page 10-4 for further explanation.)

**City Carrier Assistant Employees.** City Carrier Assistant employees do not earn sick leave. Rather, they receive "annual" leave to be used for rest, recreation, emergency purposes as well as illness or injury (See explanation under Article 10.2).

**Sick Leave Use.** Letter carriers apply for sick leave, either in advance or after returning to work, by submitting a PS Form 3971. When an employee has an unexpected need for sick leave, he or she must notify the appropriate postal authorities as soon as possible of the illness or injury and the expected duration of the absence. Upon returning to work, the employee must submit a PS Form 3971 (ELM Section 513.332).

In applying the ELM Section 513.332 in the context of the RMD (Resource Management Database) process, ACSs (Attendance Control Supervisors) may ask questions necessary to make FMLA determinations and to determine whether the absence is due to an on-the-job injury or for a condition which requires the ELM Section 865 return-to-work procedures in a manner consistent with the findings in this decision, but may not otherwise require employees to describe the nature of their illness/injury (National Arbitrator Das, Q00C-4Q-C-03126482, January 28, 2005, C-25724).

ELM Section 513.65 provides, "If an employee becomes ill while on annual leave and the employee has a sick leave balance, the absence may be charged to sick leave."

Sick leave is paid at the employee's regular straight-time rate, and limited to maximums of 8 hours per day, 40 per week and 80 per pay period (ELM Section 513.421(b)).  Full-time employees may request paid sick leave on any scheduled workday of the employee's basic workweek (ELM Section 513.411).  Part-time employees receive sick leave in accordance with the ELM Section 513.42 which provides:

**513.42 Part-Time Employees**

513.421 General

a. Absences due to illness are charged as sick leave on any day that an hourly rate employee is scheduled to work except national holidays.

Exception: If employees shown to be eligible in 434.422 elect to receive annual leave credit in lieu of holiday leave pay (see 512.65), sick leave may be charged to supplement work hours, up to the limit of their regular work schedule, on the holiday worked, provided the requirements of section 513.32 are met.

b. Except as provided in 513.82, paid sick leave may not exceed the number of hours that the employee would have been scheduled to work, up to:

(1) A maximum of 8 hours in any 1 day.

(2) 40 hours in any 1 week.

(3) 80 hours in any one pay period. If a dispute arises as to the number of hours a part-time flexible employee would have been scheduled to work, the schedule will be considered to have been equal to the average hours worked by other part-time flexible employees in the same work location on the day in question.

c. Limitations in 513.421b apply to paid sick leave only and not to a combination of sick leave and workhours. However, part-time flexible employees who have been credited with 40 hours or more of paid service (work, leave, or a combination of work and leave) in a service week are not granted sick leave during the remainder of that service week. Absences, in such cases, are treated as nonduty time which is not chargeable to paid leave of any kind. (Sick leave is not intended to be used to supplement earnings of employees.)

The restriction in the ELM Section 513.421.c on granting sick leave to PTF employees "who have been credited with 40 hours or more paid

service" applies only to PTF employees who have already been credited with 40 hours of service at the time the sick leave request is made (Step 4, I94N-4I-C 98093715, December 22, 1998, M-01374).

Note that the exception in the ELM Section 513.421.a above does not apply to letter carriers.

**Sick Leave Authorization.** The conditions for authorization of sick leave are outlined in Section 513.32 of the ELM. When a request for sick leave is disapproved, the supervisor must check the block "Disapproved" and write the reason(s) on the PS Form 3971, and note any alternative type of leave granted (ELM Section 513.342). If sick leave is disapproved and the absence is nonetheless warranted, the supervisor may approve, at the employee's option, annual leave or LWOP (ELM Section 513.63).

If the employee does not have sufficient sick leave to cover the absence, at the option of the employee any difference may be charged to annual leave and/or LWOP (ELM Section 513.61). Likewise, if the employee does not have any sick or annual leave for an approved absence, the approved absence may be charged to LWOP (ELM Section 513.62).

**Medical Certification.** ELM Section 513.361 and .362 establish three rules:

a.  For absences of more than three days, an employee must submit "medical documentation or other acceptable evidence" in support of an application for sick leave ("three days" means three *scheduled workdays*; Step 4, H1N-5B-C 3428, November 3, 1983, M-00489); and

b.  For absences of three days or less a supervisor may accept an employee's application for sick leave without requiring verification of the employee's illness (unless the employee has been placed in restricted sick leave status, in which case verification is required for every absence related to illness regardless of the number of days involved); however,

c.  For absences of three days or less a supervisor may require an employee to submit documentation of the employee's illness "when the supervisor deems documentation desirable for the protection of the interests of the Postal Service."

Numerous disputes have arisen over situations in which a supervisor has required an employee not in restricted sick leave status to provide medical documentation for an illness of three days or less. Generally, to challenge such a decision successfully the union should demonstrate that the supervisor acted arbitrarily, capriciously or unreasonably in requiring the employee to obtain medical documentation. The union should be prepared to show that the grievant has a good overall sick leave record and no record of abuse.

Consistent with the Rehabilitation Act, the parties agree that the ELM Sections 513.362 and 513.364 do not require the employee to provide a diagnosis (USPS correspondence, August 3, 2007, M-01629).

Employees who are on extended periods of sick leave must submit at regular intervals, but not more frequently than once every 30 days, satis-

factory evidence of their continued inability to perform their regular duties, unless "a responsible supervisor has knowledge of the employee's continuing incapacity for work" (ELM Section 513.363).

**Restricted Sick Leave.** Management may place an employee in "restricted sick leave" status, requiring medical documentation to support every application for sick leave, if: (a) management has "evidence indicating that an employee is abusing sick leave privileges"; or (b) if management reviews the employee's sick leave usage on an individual basis, first discusses the matter with the employee and otherwise follows the requirements of the ELM Section 513.391.

**Advance Sick Leave.** Up to 30 days (240 hours) of sick leave may be *advanced* to an employee with a serious disability or ailment if there is reason to believe the employee will return to duty (ELM Section 513.511). The USPS installation head has authority to approve such requests. An employee need not use up all annual leave before receiving advance sick leave.

**Sick Leave for Dependent Care**

The National Agreement provides a right to use sick leave in certain situations, known as Sick Leave for Dependent Care. Under language contained in the national Memorandum of Understanding (reprinted at the end of this Article), a letter carrier is entitled to use up to 80 hours of Sick Leave for Dependent Care per year:

> …to give care or otherwise attend to a family member with an illness, injury or other condition which, if an employee had such condition, would justify the use of sick leave by that employee. Family members shall include son or daughter, parent, and spouse as defined in ELM Section 515.2. Approval of sick leave for dependent care will be subject to normal procedures for leave approval.

The right to use paid sick leave *does not* add to the amount of sick leave earned. Rather, it enables a carrier to *use earned sick leave for a new purpose*—caring for an ailing family member.

The carrier's right to Sick Leave for Dependent Care under the contract is separate and different from the right to leave under the Family and Medical Leave Act of 1993, explained below. Sick Leave for Dependent Care is a benefit established by the National Agreement; the FMLA is a federal law. Still, there are certain overlaps. For instance, the definitions of son, daughter, spouse and parent used for Sick Leave for Dependent Care are the same as the FMLA definitions—so an employee may take time off to care for the same persons under both Sick Leave for Dependent Care and the FMLA.

10.6

> **Section 6. Minimum Charge for Leave**
>
> The minimum unit charged for sick leave and annual leave for regular work force employees as defined in Article 7, Section 1.A, is one hundredth of an hour (.01 hour).

Employees may utilize annual and sick leave in conjunction with leave without pay, subject to the approval of the leave in accordance with normal leave approval procedures. The Employer is not obligated to approve such leave for the last hour of the employee's scheduled workday prior to and/or the first hour of the employee's scheduled workday after a holiday.

[see Memos, pages **179-187**]

(Additional leave provisions regarding **City Carrier Assistant** Employees are found in **Appendix B.**)

**These Memos are located in the *JCAM*, pages 10-17 through 10-21.**

**Minimum Charge for Leave** The one-hundredth-of-an-hour minimum leave usage amount means, for example, that an employee who obtains advance approval for 2-3 hours of sick leave for a doctor's appointment and who returns to work and clocks in after 2 hours and 37 minutes, will be charged only for the amount of sick leave actually used, rounded to the hundredth of an hour.

**Leave Without Pay**

An employee may request unpaid time off—leave without pay (LWOP)—by submitting a PS Form 3971. If the requested LWOP is for more than 30 days, the application must contain a written statement giving the reason for the requested LWOP absence (ELM Section 514.51).

As a general rule, management may grant LWOP as a matter of administrative discretion. There are certain exceptions concerning disabled veterans, military reservists and members of the National Guard (ELM Section 514.22).

A national Memorandum of Understanding establishes that an employee need not exhaust annual leave and/or sick leave before requesting leave without pay (ELM Exhibit 514.4(d)). Furthermore, the parties have agreed that if requested, an employee may use LWOP for an FMLA-covered absence.

**Administrative Leave** is governed by the provisions of Section 519 of the *Employee and Labor Relations Manual (ELM)*. It is defined as absence from duty authorized by appropriate postal officials without charge to annual or sick leave and without loss of pay. The ELM authorizes administrative leave under certain circumstances for various reasons such as civil disorders, state and local civil defense programs, voting or registering to vote, blood donations, attending funeral services for certain veterans, relocation, examination or treatment for on-the-job illness or injury and absence from duty due to "Acts of God." National Arbitrator Parkinson ruled in case J90M-1J-C 95047374, December 8, 2000 (C-23564), that the term "without loss of pay" in the definition of administrative leave means that employees should also receive night differential while on such leave if they would have otherwise earned it.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Sick Leave for Dependent Care**

The parties agree that, during the term of the 2011 National Agreement, sick leave may be used by an employee to give care or otherwise attend to a family member with an illness, injury or other condition which, if an employee had such condition, would justify the use of sick leave by that employee. Family members shall include son or daughter, parent, and spouse as defined in ELM Section 515.2. Up to 80 hours of sick leave may be used for dependent care in any leave year. Approval of sick leave for dependent care will be subject to normal procedures for leave approval.

**Date: January 10, 2013**

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Bereavement Leave**

City letter carriers may use a total of up to three workdays of annual leave, sick leave or leave without pay, to make arrangements necessitated by the death of a family member or attend the funeral of a family member. Authorization of leave beyond three workdays is subject to the conditions and requirements of Article 10 of the National Agreement, Subsection 510 of the Employee and Labor Relations Manual and the applicable local memorandum of understanding provisions.

Definition of Family Member. "Family member" is defined as a:

(a) Son or daughter — a biological or adopted child, stepchild, daughter-in-law or son-in-law;

(b) Spouse;

(c) Parent; or

(d) Sibling—brother, sister, brother-in-law or sister-in-law; or

(e) Grandparent.

Use of Sick Leave. For employees opting to use available sick leave, the leave will be charged to sick leave for dependent care, if eligible.

Documentation. Documentation evidencing the death of the employee's family member is required only when the supervisor deems documentation desirable for the protection of the interest of the Postal Service.

Date: September 11, 2007

**(The preceding Memorandum of Understanding, Bereavement Leave, applies to City Carrier Assistant Employees.)**

**Note:** As clarification, in-laws covered by the Memorandum of Understanding, *Re: Bereavement Leave* include the spouse of a child (whether biological, adopted, or stepchild). The memorandum also applies to the parents and siblings of the employee's spouse (whether biological or adoptive).

Bereavement leave for City Carrier Assistant Employees is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**32. Are CCAs covered by the Memorandum of Understanding, *Re: Bereavement Leave*?**

Yes, however, CCAs do not earn sick leave and therefore, may only request annual leave or leave without pay for bereavement purposes.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: Leave Sharing**

The Postal Service will continue a Leave Sharing Program during the term of the **2011** Agreement under which career postal employees will be able to donate annual leave from their earned annual leave account to another career postal employee, within the same geographic area serviced by a postal district. In addition, career postal employees may donate annual leave to other family members that are career postal employees without restriction as to geographic location. Family members shall include son or daughter, parent, and spouse as defined in ELM Section 515.2. Single donations must be of 8 or more whole hours and may not exceed half of the amount of annual leave earned each year based on the leave earnings category of the donor at the time of donation. Sick leave, unearned annual leave, and annual leave hours subject to forfeiture (leave in excess of the maximum carryover which the employee would not be permitted to use before the end of the leave year), may not be donated, and employees may not donate leave to their immediate supervisors. To be eligible to receive donated leave, a career employee (a) must be incapacitated for available postal duties due to serious personal health conditions or pregnancy and (b) must be known or expected to miss at least 40 more hours from work than his or her own annual leave and/or sick leave balance(s), as applicable, will cover, and (c) must have his or her absence approved pursuant to standard attendance policies. Donated leave may be used to cover the 40 hours of LWOP required to be eligible for leave sharing.

For purposes other than pay and legally required payroll deductions, employees using donated leave will be subject to regulations applicable to employees in LWOP status and will not earn any type of leave while using donated leave. Donated leave may be carried over from one leave year to the next without limitation.

Donated leave not actually used remains in the recipient's account (i.e., is not restored to donors). Such residual donated leave at any time may be applied against negative leave balances caused by a medical exigency. At separation, any remaining donated leave balance will be paid in a lump sum.

**Date: January 10, 2013**

(The preceding Memorandum of Understanding, Leave Sharing, applies to **City Carrier Assistant** Employees.)

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Return to Duty**

The parties reaffirm their understanding concerning the review of medical certificates submitted by employees who return to duty following extended absences due to illness.

We mutually agree to the following:

1. To avoid undue delay in returning an employee to duty, the on-duty medical officer, contract physician, or nurse should review and make a decision based upon the presented medical information the same day it is submitted.

Normally, the employee will be returned to work on his/her next workday provided adequate medical documentation is submitted within sufficient time for review.

2. The reasonableness of the Service in delaying an employee's return beyond his/her next workday shall be a proper subject for the grievance procedure on a case-by-case basis.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE AND**
**THE JOINT BARGAINING COMMITTEE**
**(American Postal Workers Union, AFL-CIO, and**
**National Association of Letter Carriers, AFL-CIO)**

**Re: Leave Policy**

The parties agree that local attendance or leave instructions, guidelines, or procedures that directly relate to wages, hours, or working conditions of employees covered by this Agreement, may not be inconsistent or in conflict with Article 10 or the Employee and Labor Relations Manual, Subchapter 510.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE AND**
**THE JOINT BARGAINING COMMITTEE**
**(American Postal Workers Union, AFL-CIO, and**
**National Association of Letter Carriers, AFL-CIO)**

**Re: Paid Leave and LWOP**

The parties agree that an employee need not exhaust annual leave and/or sick leave before requesting leave without pay. As soon as practicable after the signing of the 1990 National Agreement, Employee and Labor Relations Manual (ELM) Exhibit 514.4(d) will be amended to conform to this Agreement.

The parties further agree that this Memorandum does not affect the administrative discretion set forth in ELM Part 514.22, nor is it intended to encourage any additional leave usage.

Grievance Number H7C-NA-C 61 is withdrawn.

**(The preceding Memorandum of Understanding, Paid Leave and LWOP, applies to City Carrier Assistant Employees.)**

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: Clarification of Regulations for National Day of Observance**

The parties agree that the following procedures will apply to affected employees if the Postmaster General or designee determines that the Postal Service will participate in a National Day of Observation (e.g., National Day of Mourning), subsequent to the declaration of a National Day of Observance having been made by Executive Order of the President of the United States.

1. Full-time employees whose basic work week includes the National Day of Observance as a scheduled work day but who are not directed to report for work, will be granted administrative leave for that day.

2. Full-time employees whose basic work week includes the National Day of Observance as a scheduled work day, and who perform service, will be granted a day of administrative leave at a future date, not to exceed eight hours.

3. Full-time employees whose basic work week includes the National Day of Observance as a non-scheduled day and are not directed to report for work, will be granted a day of administrative leave at a future date.

4. If the National Day of Observance is a full-time employee's non-scheduled day and the employee is scheduled to work, the employee will receive overtime pay, plus up to eight hours of future administrative leave for the number of hours worked.

5. The same provisions apply to part-time regular employees as apply to full-time employees. The total hours of administrative leave should only equal the scheduled hours for the National Day of Observance, which may be less than eight hours. However, part-time regular employees whose basic work week includes the National Day of Observance as a non-scheduled work day and who are not directed to report for work on the National Day of Observance will be granted a day of administrative leave at a future date equal to the average number of daily paid hours in their schedule for the service week previous to the service week in which the National Day of Observance occurs, which may be less than eight hours.

6. Part-time flexible employees should be scheduled based on operational needs. Part-time flexible employees who work will be granted a day of administrative leave at a later date. The day of administrative leave will be based on the number of hours actually worked on the National Day of Observance, not to exceed eight hours. Part-time flexible employees who are not directed to work on the National Day of Observance will be granted administrative leave at a future date equal to the average number of daily paid hours during the service week previous to the service week in which the National Day of Observance occurs, not to exceed eight hours.

7. Transitional employees will only receive pay for actual work hours performed on the National Day of Observance. They will not receive administrative leave.

8. If an employee is on leave or Continuation of Pay on the National Day of Observance, the employee will be granted a day of administrative leave at a future date, not to exceed eight hours.

9. An employee on OWCP, AWOL, suspension or pending removal on the National Day of Observance will not be granted administrative leave. If the employee on AWOL, suspension or pending removal is returned to duty and made whole for the period of AWOL, suspension or removal, the employee may be eligible for administrative leave for the National Day of Observance if the period of suspension or removal for which the employee is considered to have been made whole includes the National Day of Observance. Such determination will be made by counting back consecutive days from the last day of the suspension or removal to determine if the employee had been made whole for the National Day of Observance.

10. Where provisions in this Memorandum of Agreement provide for a day of administrative leave to be taken at a future date, such leave must be granted and used within six months of the National Day of Observance or by the end of the Fiscal Year, whichever is later. However, administrative leave will not be granted to employees who are on extended leave for the entire period between the Day of Observance and six months from that date, or between the Day of Observance and the end of the Fiscal Year, whichever is later.

11. Administrative leave taken at a future date must be taken at one time.

12. Administrative leave to be taken at a future date may, at the employee's option, be substituted for previously scheduled but not used annual leave.

13. Administrative leave to be taken at a future date should be applied for by using the same procedures which govern the request and approval of annual leave consistent with Local Memoranda of Understanding.

Date: May 4, 2000

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE AND**
**THE JOINT BARGAINING COMMITTEE**
**(American Postal Workers Union, AFL-CIO, and**
**National Association of Letter Carriers, AFL-CIO)**

**Re: PTF Court Leave**

1. Effective September 26, 1987, part-time flexible employees who have completed their probationary period shall be eligible for court leave as defined in Employee and Labor Relations Manual Part 516.1 and Part 516.31.

2. Appropriate provisions of the applicable handbooks and manuals shall be amended to carry out these changes consistent with the principles expressed in paragraphs 3, 4, and 5 below. The handbooks and manuals, including Part 516 of the Employee and Labor Relations Manual, shall be amended pursuant to Article 19, except that the sixty (60) day notice of such changes shall be waived.

3. A part-time flexible employee will be eligible for court leave if the employee would otherwise have been in a work status or annual leave status. If there is a question concerning the status, the part-time flexible employee will be eligible if the employee was in work status or annual leave status on any day during the pay period immediately preceding the period of court leave.

4. If eligibility is established under paragraph 3, the specific amount of court leave for an eligible part-time flexible employee shall be determined on a daily basis as set forth below:

a. If previously scheduled, the number of straight-time hours the Employer scheduled the part-time flexible employee to work;

b. If not previously scheduled. the number of hours the part-time flexible employee worked on the same service day during the service week immediately preceding the period of court leave;

c. If not previously scheduled and if no work was performed on the same day in the service week immediately preceding the period of court leave, the guarantee as provided in Article 8, Section 8, of the National Agreement, provided the part-time flexible would otherwise have been requested or scheduled to work on the day for which court leave is requested.

5. The amount of court leave for part-time flexible employees shall not exceed 8 hours in a service day or 40 hours in a service week.

Date: July 21, 1987

**INTERPRETIVE STEP SETTLEMENT
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS
AFL-CIO**

**Re: Q98N-4Q-C 01051141 (M-01468)**

The interpretive issue is whether or not the RMD or its web-based counterpart enterprise Resource Management System (eRMS), violates the National Agreement.

It is mutually agreed that no national interpretive issue is fairly presented. The parties agreed to settle this case based on the following understandings:

- The eRMS will be the web-based version of RMD, located on the Postal Service intranet. The eRMS will have the same functional characteristics as RMD.
- The RMD/eRMS is a computer program. It does not constitute a new rule, regulation or policy, nor does it change or modify existing leave and attendance rules and regulations. When requested in accordance with Articles 17.3 and 31.3, relevant RMD/eRMS records will be provided to local shop stewards.
- The RMD/eRMS was developed to automate leave management, provide a centralized database for leave-related data and ensure compliance with various leave rules and regulations, including the FMLA and Sick Leave for Dependent Care Memorandum of Understanding. The RMD/eRMS records may be used by both parties to support/dispute contentions raised in attendance-related actions.
- When requested, the locally set business rule, which triggers a supervisor's review of an employee's leave record, will be shared with the NALC branch.
- Just as with the current process, it is management's responsibility to consider only those elements of past record in disciplinary action that comply with Article 16.10 of the National Agreement. The RMD/eRMS may track all current discipline, and must reflect the final settlement/decision reached in the grievance-arbitration procedure.
- An employee's written request to have discipline removed from their record, pursuant to Article 16.10 of the collective bargaining agreement, shall also serve as the request to remove the record of discipline from RMD/eRMS.
- Supervisor's notes of discussions pursuant to Article 16.2 are not to be entered in the "supervisor's notes" section of RMD/eRMS.
- RMD/eRMS users must comply with the Privacy Act, as well as handbooks, manuals and published regulations relating to leave and attendance.
- RMD/eRMS security meets or exceeds security requirements mandated by AS-818.
- It is understood that no function performed by RMD/eRMS now or in the future may violate the National Agreement.

Date: September 9, 2002

# ARTICLE 11 HOLIDAYS

11.1

**Section 1. Holidays Observed**

The following ten (10) days shall be considered holidays for full-time and part-time regular scheduled employees hereinafter referred to in this Article as "employees":

New Year's Day
Martin Luther King, Jr.'s Birthday
Presidents Day
Memorial Day
Independence Day
Labor Day
Columbus Day
Veterans' Day
Thanksgiving Day
Christmas Day

Only full-time regular, full-time flexible and part-time regular employees receive holiday pay. Part-time flexible employees do not. Instead, as explained under Article 11.7, part-time flexible employees are paid at a slightly higher straight-time hourly rate to compensate them for not receiving paid holidays.

11.2

**Section 2. Eligibility**

To be eligible for holiday pay, an employee must be in a pay status the last hour of the employee's scheduled workday prior to or the first hour of the employee's scheduled workday after the holiday.

An employee who has been granted any paid leave is considered to be "in a pay status."

**Section 3. Payment**

11.3.A

A. An employee shall receive holiday pay at the employee's base hourly straight time rate for a number of hours equal to the employee's regular daily working schedule, not to exceed eight (8) hours.

Full-time employees receive eight hours of holiday pay. Part-time regular employees scheduled to work a minimum of five days per service week are paid for the number of hours in their regular schedule. Part-time regular employees who are regularly scheduled to work less than five days per service week receive holiday pay only if the holiday falls on a regularly scheduled workday (ELM Section 434.421).

11.3.B

B. Holiday pay is in lieu of other paid leave to which an employee might otherwise be entitled on the employee's holiday.

Holiday pay "replaces" other approved paid leave which the employee would otherwise receive on the holiday. For example, employees who would otherwise receive sick or annual leave on the holiday would not have this time charged against their sick and annual leave balance.

11.4

**Section 4. Holiday Work**

A. An employee required to work on a holiday other than Christmas shall be paid the base hourly straight time rate for each hour worked up to eight (8) hours in addition to the holiday pay to which the employee is entitled as above described.

B. An employee required to work on Christmas shall be paid one and one-half (1 1/2) times the base hourly straight time rate for each hour worked in addition to the holiday pay to which the employee is entitled as above described.

An employee who works on a holiday (except Christmas Day) or day designated as their holiday will be paid at the base straight-time rate for each hour worked, up to eight. Overtime is paid for work in excess of eight hours (ELM Section 434.53(a)).

Regular employees who are required to work on Christmas Day or their designated Christmas holiday are paid an additional 50 percent of their base hourly straight-time rate for up to eight hours of Christmas worked pay, in addition to their holiday worked pay. Part-time flexible employees receive an additional 50 percent Christmas worked pay for hours actually worked on Christmas Day—December 25 (ELM Section 434.52).

**Guarantees.** A full-time employee who is "called in" to work on a holiday or a day designated as the employee's holiday is guaranteed eight hours of work (or pay if there is less than eight hours of work available).

11.5

**Section 5. Holiday on Non-Work Day**

A. When a holiday falls on Sunday, the following Monday will be observed as the holiday. When a holiday falls on Saturday, the preceding Friday shall be observed as the holiday.

B. When an employee's scheduled non-work day falls on a day observed as a holiday, the employee's scheduled workday preceding the holiday shall be designated as that employee's holiday.

11.6.A

**Section 6. Holiday Schedule**

A. The Employer will determine the number and categories of employees needed for holiday work and a schedule shall be posted as of the Tuesday preceding the service week in which the holiday falls.

B. As many full-time and part-time regular schedule employees as can be spared will be excused from duty on a holiday or day designated as their holiday. Such employees will not be required to work on a holiday or day designated as their holiday unless all casuals and part-time flexibles are utilized to the maximum extent possible, even if the

payment of overtime is required, and unless all full-time and part-time regulars with the needed skills who wish to work on the holiday have been afforded an opportunity to do so.

11.6.C

C. An employee scheduled to work on a holiday who does not work shall not receive holiday pay, unless such absence is based on an extreme emergency situation and is excused by the Employer.

D. Qualified **CCAs** will be scheduled for work on a holiday or designated holiday after all full-time volunteers are scheduled to work on their holiday or designated holiday. They will be scheduled, to the extent possible, prior to any full-time volunteers or non-volunteers being scheduled to work a nonscheduled day or any full-time non-volunteers being required to work their holiday or designated holiday. If the parties have locally negotiated a pecking order that would schedule full-time volunteers on a nonscheduled day, the Local Memorandum of Understanding will apply.

The intent of Article 11.6 is to permit the maximum number of full-time regular, full-time flexible and part-time regular employees to be off on the holiday should they desire not to work while preserving the right of employees who wish to work their holiday or designated holiday.

Article 11.6.B provides the scheduling procedure for holiday assignments. Keep in mind that Article 30.B.13 provides that "the method of selecting employees to work on a holiday" is a subject for discussion during the period of local implementation. The Local Memorandum of Understanding (LMOU) may contain a local "pecking order." In the absence of LMOU provisions or a past practice concerning holiday assignments, the following minimum pecking order should be followed:

1) All part-time flexible employees to the maximum extent possible, even if the payment of overtime is required.
2) All full-time regular, full-time flexible and part-time regular employees who possess the necessary skills and have volunteered to work on their holiday or their designated holiday—by seniority.
3) City carrier assistant employees.
4) All full-time regular, full-time flexible and part-time regular employees who possess the necessary skills and have volunteered to work on their non-scheduled day—by seniority.
5) Full-time regular, full-time flexible and part-time regular employees who possess the necessary skills and have not volunteered on what would otherwise be their non-scheduled day—by inverse seniority.
6) Full-time regular, full-time flexible and part-time regular employees who possess the necessary skills and have not volunteered on what would otherwise be their holiday or designated holiday—by inverse seniority.

Adverse inferences concerning whether a "pecking order" contained in an LMOU is in conflict or inconsistent with the language of Article 11.6 should not be drawn solely because the parties at the national level have agreed to a "default pecking order."

**Holiday Schedule Posting.** The provisions of Article 11.4.A concerning straight-time pay for holiday work apply to all full-time employees whose holiday schedule is properly posted in accordance with this section. If the holiday schedule is not posted as of Tuesday preceding the service week in which the holiday falls, a full-time employee required to work on his or her holiday or designated holiday, or who volunteers to work on such day, will receive holiday scheduling premium for each hour of work, up to eight hours. However, the ELM Section 434.53.c(2) provides that:

> **ELM 434.53.c(2)** In the event that, subsequent to the Tuesday posting period, an emergency situation attributable to Act(s) of God arises that requires the use of manpower on that holiday in excess of that scheduled in the Tuesday posting, full-time regular employees who are required to work or who volunteer to work in this circumstance(s) do not receive holiday scheduling premium.

Additionally, if a full-time employee replaces another *full-time employee* who was scheduled to work and calls in sick or is otherwise unable to work after Tuesday deadline, the replacement employee *is not eligible* for holiday scheduling premium. This is true even if the employee being replaced was on a regular work day (rather than a holiday or designated holiday). In B90N-4B-C 94029392, November 28, 1997 (C-17582) National Arbitrator Snow ruled that "...whether the replaced employee is scheduled for a regular day or for his or her holiday is of no consequence with regard to the application of Employee and Labor Relations Manual Section 434.533(c)." Note: This is currently ELM Section 434.53.c(3).

Full-time employees who are scheduled after the Tuesday deadline to replace a properly scheduled *part-time flexible employee* who calls in sick or is otherwise unable to work *are eligible* for holiday scheduling premium (Step 4, NC-C-4322, April 14, 1977, M-00150).

The posting of a holiday schedule on the Tuesday preceding the service week in which the holiday falls is to include part-time flexible employees who at that point in time are scheduled to work on the holiday in question. If additional part-time flexible employees are scheduled after the Tuesday posting, there is no entitlement to additional compensation for those part-time flexible employees who are scheduled after the posting deadline.

Arbitrator Mittenthal held in H4N-NA-C 21 (2nd Issue), January 19, 1987 (C-06775) that a regular employee who volunteers to work on a holiday or designated holiday has only volunteered to work eight hours. A regular volunteer cannot work beyond the eight hours without supervision first exhausting the ODL. He also ruled that management may not ignore the holiday "pecking order" provisions to avoid the payment of penalty overtime and remanded the issue of remedy for such violations to the parties. The relationship between Article 11 and the overtime provisions of Article 8 is discussed further under Article 8.5.

The Memorandum of Understanding dated October 19, 1988 (M-00859) provides:

> The parties agree that the Employer may not refuse to comply with the holiday scheduling "pecking order" provisions of Article 11.6 or the provisions of a Local Memorandum of Understanding in order to avoid payment of penalty overtime. The parties further agree to remedy past and future violations of the above understanding as follows.
>
> 1. Full-time employees and part-time regular employees who file a timely grievance because they were improperly assigned to work their holiday or designated holiday will be compensated at an additional premium of 50 percent of the base hourly straight time rate.
>
> 2. For each full-time employee or part-time regular employee improperly assigned to work a holiday or designated holiday, the Employer will compensate the employee who should have worked but was not permitted to do so, pursuant to the provisions of Article 11.6, or pursuant to a Local Memorandum of Understanding, at the rate of pay the employee would have earned had he or she worked on that holiday.

While Mittenthal ruled that it was a violation to ignore the "pecking order" to avoid payment of penalty overtime, he did indicate that "...the Postal Service can, of course, choose from among the part-time flexibles (or from among the regular volunteers, etc.) in order to limit its labor cost. That kind of choice would not conflict with the 'pecking order'."

National Arbitrator Fasser ruled in NC-C-6085, August 16, 1978 (C-02975) on the appropriate remedy for violations of Article 11.6. He found that when an employee who volunteered to work on a holiday or designated holiday is erroneously not scheduled to work, "the appropriate remedy now is to compensate the overlooked holiday volunteer for the total hours of lost work."

11.7

**Section 7. Holiday Part-Time Employee**

A part-time flexible schedule employee shall not receive holiday pay as such. The employee shall be compensated for the ten (10) holidays

> by basing the employee's regular straight time hourly rate on the employee's annual rate divided by 2,000 hours. For work performed on December 25, a part-time flexible schedule employee shall be paid in addition to the employee's regular straight time hourly rate, one-half (1/2) times the employee's regular straight time hourly rate for each hour worked up to eight (8) hours.

Both Article 11.1 & 11.7 provide that part-time flexible employees do not receive holiday pay. Instead, Article 11.7 provides that the holiday pay that regular carriers receive is "built into" the regular hourly rate for part-time flexible employees. This explains why a part-time flexible's hourly pay is always higher than that of a regular employee at the same level and step. Under the provisions of Article 11.7, the straight-time hourly rate for a part-time flexible is computed by dividing the annual salary for a full-time regular at that level and step by 2,000 hours, rather than the 2,080 figure used to calculate the full-time regular's hourly rate. The difference of eighty hours is exactly equivalent to a regular employee's pay for ten holidays.

For example: Effective November 17, 2001, a Grade 1, Step A full-time regular carrier's annual salary was $32,735. Dividing this by 2,080 results in a straight-time hourly rate for a full-time regular in that grade and step of $15.74. However, dividing the same number by 2,000 results in a straight-time hourly rate for a Grade 1, Step A part-time flexible of $16.37.

# Article 12 Principles of Seniority, Posting and Reassignments

## Introduction

Article 12 addresses a wide variety of subjects including probationary employees, seniority, posting, bidding, reassignments, withholding, excessing and voluntary transfers. It has a complicated numbering system. For example, Article 12.5.C.5.b (2) (a). Consequently, it can appear more complex than it really is. Furthermore, some of its provisions do not apply to the letter carrier craft. The sections of Article 12 that do not expressly apply to the letter carrier craft are indicated by using gray shading. The gray shading is for the convenience of the user and without prejudice to either party's position concerning the applicablity of those provisions in any specific situation or dispute. To make it easier to locate the applicable provisions, the JCAM divides Article 12 into the following sections.

| | | |
|---|---|---|
| Section 1 | Page 12-2 | Probationary Employees |
| Section 2 | Page 12-5 | Principles of Seniority |
| Section 3 | Page 12-7 | Principles of Posting |
| Section 4 | Page 12-8 | Introduction and Overview—Excessing and Withholding |
| Section 5 | Page 12-13 | Withholding Positions |
| Section 6 | Page 12-16 | Principles of Excessing |
| Section 7 | Page 12-23 | Delivery Unit Optimization (DUO) |
| Section 8 | Page 12-26 | Discontinuance of an Independent Installation |
| Section 9 | Page 12-28 | Consolidation of an Independent Installation |
| Section 10 | Page 12-29 | Station or Branch Transferred or Made Independent |
| Section 11 | Page 12-30 | Employees Excess to a Section |
| Section 12 | Page 12-33 | Reduction of Employees in an Installation |
| 12.1 | Page 12-34 | Excessing to Other Crafts within an Installation |
| 12.2 | Page 12-36 | Excessing to the Letter Carrier Craft in Other Installations |
| 12.3 | Page 12-38 | Excessing to Other Crafts in Other Installations |
| 12.4 | Page 12-39 | Supplementary Rules |
| Section 13 | Page 12-41 | Provisions Not Applicable to the Letter Carrier Craft |
| Section 14 | Page 12-43 | Reassigning and Excessing Part-Time Employees |
| Section 15 | Page 12-45 | Voluntary Transfers |

## JCAM Section 1. Probationary Employees

12.1.A

**Section 1. Probationary Period**

A. The probationary period for a new employee shall be ninety (90) calendar days. The Employer shall have the right to separate from its employ any probationary employee at any time during the probationary period and these probationary employees shall not be permitted access to the grievance procedure in relation thereto. If the Employer intends to separate an employee during the probationary period for scheme failure, the employee shall be given at least seven (7) days advance notice of such intent to separate the employee. If the employee qualifies on the scheme within the notice period, the employee will not be separated for prior scheme failure.

**[see Memo, page 150]**

**Probationary Employees.** Career employees serving their probationary period are members of the bargaining unit and have access to the grievance procedure on all matters pertaining to their employment except separation.

The Postal Service has a right to separate probationary employees at any time during their probationary period without establishing "just cause." Employees separated during the probationary period are contractually barred from filing a grievance concerning the separation. This includes challenges to their separation on the grounds of alleged noncompliance with the procedures in Section 365.32 of the ELM. However, a dispute as to whether or not the Postal Service's action separating the employee occurred during the probationary period is arbitrable because that is a precondition to the applicability of Article 12.1.A (National Arbitrator Shyam Das, Q98C-4Q-C 99251456, September 10, 2001, C-22547).

EL-312, Section 775.1.C provides that "[e]mployees who were serving their probationary period at the time of entry into active duty and who met the probationary time period while serving on active duty are considered as having met the probationary time."

A city carrier assistant who receives a career appointment must go through a probationary period as a career employee under certain conditions. This issue is addressed by the Memorandum of Understanding, *Re: Article 12.1 – Probationary Period* from the 2011 National Agreement.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Article 12.1 - Probationary Period**

City carrier assistants who successfully complete at least two successive 360 day terms after the date of this agreement will not serve a probationary period when hired for a

career appointment, provided such career appointment directly follows a city carrier assistant appointment.

Probationary periods for CCAs converted to career status directly following a CCA appointment is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**35. Does a CCA who receives a career appointment go through a 90 calendar day probationary period as a career city letter carrier?**

Yes, except in the following circumstances:

• The employee has successfully completed two successive 360-day appointments as a CCA, provided the career appointment directly follows a CCA appointment. See Memorandum of Understanding, *Re: Article 12.1 – Probationary Period.*

• The employee was a city carrier transitional employee placed into a CCA position following a one-day break in service in accordance with the January 31, 2013 Memorandum of Understanding, *Re: Break in Service.* The TE service does not apply, but completion of a total of 720 days as a CCA in successive appointments satisfies the two successive 360-day appointments required by the Memorandum of Understanding, *Re: Article 12.1 - Probationary Period.*

• When, during the term of the Memorandum of Understanding, *Re: Sunday Delivery - City Carrier Assistant Staffing,* the employee is converted to full-time career status and successfully served as a city carrier transitional employee directly before his/her initial CCA appointment.

**City Carrier Assistant Employees.** CCA employees are members of the bargaining unit and have access to the grievance procedure on those provisions that apply to CCAs. The question of whether or not a CCA has access to the grievance procedure if separated or disciplined is addressed in Appendix B, 3. Other Provisions, Section E – Article 16 of the 2011 National Agreement.

**APPENDIX B**

**Appendix B is the reprinting of Section I of the 2013 Das Award, the creation of a new non-career employee category.**

**3. OTHER PROVISIONS**

**E. Article 16 - Discipline Procedure**

CCAs may be separated for lack of work at any time before the end of their term. Separations for lack of work shall be by inverse relative standing in the installation. Such separation of the CCA(s) with the lowest relative standing is not grievable except where it is alleged that the separation is pretextual. CCAs separated for lack of work before the end of their term will be given preference for reappointment ahead of other CCAs with less relative standing in the installation, provided the need for hiring arises within 18 months of their separation.

CCAs may be disciplined or removed within the term of their appointment for just cause and any such discipline or removal will be subject to

the grievance arbitration procedure, provided that within the immediately preceding six months, the employee has completed ninety (90) work days, or has been employed for 120 calendar days (whichever comes first) of their initial appointment. A CCA who has previously satisfied the 90/120 day requirement either as a CCA or transitional employee (with an appointment made after September 29, 2007), will have access to the grievance procedure without regard to his/her length of service as a CCA. Further, while in any such grievance the concept of progressive discipline will not apply, discipline should be corrective in nature.

In the case of removal for cause within the term of an appointment, a CCA shall be entitled to advance written notice of the charges against him/her in accordance with the provisions of Article 16 of the National Agreement.

**12.1.B** B. The parties recognize that the failure of the Employer to discover a falsification by an employee in the employment application prior to the expiration of the probationary period shall not bar the use of such falsification as a reason for discharge.

**Falsification of Employment Applications.** This section provides that even if the Postal Service does not discover during the probationary period that an employee has falsified an employment application, the falsification may still be used as a reason for discharge. However, this section does not change the provisions of Article 16.1 requiring that non-probationary employees may only be disciplined for "just cause."

**12.1.C** C. When an employee completes the probationary period, seniority will be computed in accordance with this Agreement as of the initial day of full-time or part-time employment.

Probationary employees hired directly after a CCA appointment have limited "seniority" rights. For example, opting eligibility for probationary employees is addressed in the answer to question 65 of the Questions and Answers 2011 USPS/NALC National Agreement (See JCAM page 7-28).

Additionally, when their seniority is established after the completion of the probationary period, time spent in a probationary status is included and their seniority is computed as of the initial day of appointment as a career employee.

**12.1.D** D. When an employee who is separated from the Postal Service for any reason is rehired, the employee shall serve a new probationary period. If the separation was due to disability, the employee's seniority shall be established in accordance with Section 2, if applicable.

This provision applies only to career employees that have been separated and rehired by the Postal Service.

## JCAM Section 2. Principles of Seniority

12.2.A

> **Section 2. Principles of Seniority**
>
> A. Except as specifically provided in this Article, the principles of seniority are established in the craft Articles of this Agreement.

The language provides that the seniority rules contained in Article 41 govern, except as specifically provided in Article 12. Whenever the seniority rules in Article 12 are inconsistent with the rules in Article 41, the rules in Article 41 prevail.

12.2.B

> B. An employee who left the bargaining unit on or after July 21, 1973 and returns to the same craft:
>
> 1. will begin a new period of seniority if the employee returns from a position outside the Postal Service; or
> 2. will begin a new period of seniority if the employee returns from a non-bargaining unit position within the Postal Service, unless the employee returns within 2 years from the date the employee left the unit.

This section can only be understood when read in conjunction with Article 41.2.A.2 & 41.2.F.

**Returning from a Different Installation.** If an employee leaves an installation and later returns to the letter carrier craft, Article 12.2.B is not applicable. Rather, Article 41.2.A.2 requires that in such cases the employee begin a new period of seniority. The only exception to this rule is when letter carriers exercise the Article 12 retreat rights described under Section 5.

**Returning to Same Installation.** Article 12.2.B & Article 41.2.F, read together, provide for three different situations concerning the seniority of carriers who leave the bargaining unit, never leave the installation, and who then return to the carrier craft on or after July 21, 1978:

1. If the carrier left the unit prior to July 21, 1973, then Article 41.2.F would apply, and the carrier would pick up whatever seniority he or she had at the time of departure from the unit, but would not receive credit for time spent out of the unit.

2. If the carrier left the unit on or after July 21, 1973 and returned within 2 years, then Article 41.2.F again applies and the carrier would receive credit for the seniority he or she had prior to leaving the bargaining unit.

3. A carrier who left the unit on or after July 21, 1973 and returns later than 2 years following the date of departure, begins a new period of seniority. (Article 41.2.F does not apply; rather Article 12.2.B.2 takes care of the entire matter.)

CARRIERS RETURNING TO THE BARGAINING UNIT
AT THE SAME INSTALLATION AFTER JULY 21, 1978
(HAVING NEVER LEFT THE INSTALLATION)

| | **Left craft before July 21, 1973** | **Left craft on or after July 21, 1973** |
|---|---|---|
| **Outside of bargaining unit two years or less** | Not Applicable | Loses only time spent outside of the bargaining unit |
| **Outside of bargaining unit two years or more** | Loses only time spent outside of the bargaining unit | Begins a new period of seniority |

## JCAM Section 3. Principles of Posting

12.3.A

> **Section 3. Principles of Posting**
>
> A. To insure a more efficient and stable work force, an employee may be designated a successful bidder no more than seven (7) times during the duration of this Agreement unless such bid:
>
> 1. is to a job in a higher wage level;
> 2. is due to elimination or reposting of the employee's duty assignment; or
> 3. enables an employee to become assigned to a station closer to the employee's place of residence.

**Bidding Restrictions.** Employees are entitled to be successful bidders seven times during the life of the Agreement without restriction. Eight or more successful bids are contingent upon meeting at least one of the listed criteria. The bidding exceptions listed in this section are to be applied from the first bid (Step 4, H1C-3P-C 36488, M-00313 and Step 4, H1N-5G-C 26398, May 2, 1985, M-00305).

The period for counting bids during the term of the 2011 National Agreement began on January 10, 2013, the date of the Das Interest Arbitration Award.

The bidding restrictions in this section apply only to those positions posted under the provisions of Article 41.1.B.2 and to voluntary transfers under the provisions of Article 12.5.C.5.b.1.a. They do not apply to opting under the provisions of Article 41.2.B, bidding under the provisions of Article 41.3.O, restricted bidding under the provisions of Article 12.5.C.4, or to positions applied for under the provisions of Article 25 (Step 4, H1N-1E-C 25953, May 21, 1984, M-00513).

12.3.B

> B. Specific provisions for posting for each craft are contained in the craft posting provisions of this Agreement.

Article 12.3.B provides that with the exception of the bidding restrictions in Article 12.3.A, postings and bidding are governed by the provisions of Article 41.

## JCAM Section 4. Introduction and Overview—Excessing and Withholding, Article 12, Sections 4 and 5

The provisions of Article 12 of the 2011 National Agreement are substantially the same as those in the 1994 National Agreement. Despite the fact that NALC has negotiated separately since 1994, the parties agreed to leave the provisions of Article 12 unchanged in order to reflect their understanding that there was to be no change in their application. As a result, Article 12.4 & 12.5 still contain references to other bargaining units and have entire sections that have no application in the letter carrier craft. The sections that do not apply to the letter carrier craft will be specifically identified below.

Viewed from a broad perspective, the excessing provisions of Article 12 are intended to protect career postal employees by providing a mechanism for reducing the number of career employees faster than is possible through normal attrition. These provisions are inherently complicated since they were negotiated to be applied in a variety of different situations. The Article 12 excessing provisions fall into two main sections: Article 12.4, 12.5.A & 12.5.B contain the general principles that apply to all excessing situations. Article 12.5.C contains the various provisions that apply in specific excessing situations.

**Superseniority.** The excessing provisions of Article 12.4 & 12.5 must be read in conjunction with the "superseniority" provisions of Article 17.3, which provide in pertinent part:

> While serving as a steward or chief steward, an employee may not be involuntarily transferred to another tour, to another station or branch of the particular post office or to another independent post office or installation unless there is no job for which the employee is qualified on such tour, or in such station or branch, or post office.

The superseniority rights of stewards supersede the provisions of Article 12. Thus, stewards are the last to be excessed from a section, the craft or an installation regardless of their seniority or their full or part-time status (National Arbitrator Britton, H4N-5C-C 17075, November 28, 1988, C-08504 and Step 4, H1N-2B-C 7422, October 25, 1983, M-00077).

**12.4.A**

> **Section 4. Principles of Reassignments**
>
> A. A primary principle in effecting reassignments will be that dislocation and inconvenience to employees in the regular work force shall be kept to a minimum, consistent with the needs of the service. Reassignments will be made in accordance with this Section and the provisions of Section 5 below.

**Article 12, Section 4.A.** This section is applicable to all excessing situations. It states the general rule, repeated in Article 12.5.B.1, that dislocation and inconvenience to employees in the regular work force must be kept to a minimum. To accomplish this Article 12.5.C identifies the different circumstances under which excessing may occur and the correct procedures in each.

When an LMOU identifies sections for reassignments to the same craft within an installation as authorized by Article 30.B.18, the special rules provided for in Article 12.5.C.4.b apply.

When management needs to reduce the number of employees in an installation other than by attrition, the following applies:

- Management must seek to excess employees to another craft in the same installation under the provisions of Article 12.5.C.5.a(4).
- Then, management must seek to excess employees to the same craft in another installation under the provisions of Article 12.5.C.5.b(1).
- Finally, management may then seek to excess employees to another craft in another installation under the provisions of Article 12.5.C.5.b(2).

For example, it is a violation for management to excess a clerk to the carrier craft in another installation under the provisions of Article 12.5.C.5.b(2) when it could instead have excessed the clerk to a clerk craft position in another installation under the provisions of Article 12.5.C.5.b(1).

**12.4.B**

> B. When a major relocation of employees is planned in major metropolitan areas or due to the implementation of national postal mail networks, the Employer will apply this Article in the development of the relocation and reassignment plan. At least 90 days in advance of implementation of such plan, the Employer will meet with the Unions at the national level to fully advise the Unions how it intends to implement the plan. If the Unions believe such plan violates the National Agreement, the matter may be grieved.
>
> Such plan shall include a meeting at the regional level in advance (as much as six months whenever possible) of the reassignments anticipated. The Employer will advise the Unions, based on the best estimates available at the time, of the anticipated impact; the numbers of employees affected by craft; the locations to which they will be reassigned; and, in the case of a new installation, the anticipated complement by tour and craft. The Unions will be periodically updated by the Region should any of the information change due to more current data being available.

**Article 12, Section 4.B.** This section is administered at the national level with the assistance of the National Business Agents in the affected regions. Any branches impacted by such a "major relocation" will be kept informed through the office of the National Business Agent.

**12.4.C**

> C. When employees are excessed out of their installation, the National Business Agent of the Union may request at the Area level a comparative work hour report of the losing installation 60 days after the excessing of such employees.
>
> If a review of the report does not substantiate that business conditions warranted the action taken, such employees shall have their retreat rights activated. If the retreat right is denied, the employees have the right to the grievance-arbitration procedure.

**Comparative Work Hour Report.** Prior to a change made in the 2001 National Agreement, Comparative Work Hour Reports were requested at the national level.  Now they are requested by the National Business Agent through the Area Manager, Labor Relations.  The National Business Agent may request the comparative work hour report of the losing installation sixty days after excessing.

The comparative work hour report will include the following for the thirty days prior to and thirty days after the excessing: Total number of employees, total straight-time work hours, total overtime work hours, total limited duty work hours and total light duty work hours in each of the following categories:

- Full-time regular and full-time flexible letter carriers
- Part-time regular letter carriers
- Part-time flexible letter carriers
- City carrier assistant letter carriers

A comparative work hour report is used to analyze whether excessing outside the installation was warranted by business conditions.  If a Step B Team requires a Comparative Work Hour Report to decide a grievance concerning excessing outside an installation, the grievance will be remanded to the Formal Step A level to be held until the report is received. The report will become part of the official record of the grievance. If the Formal Step A parties are unable to resolve the grievance after the report is received, the grievance may be re-appealed to Step B.

**Retreat Rights.** If, upon analysis, the Comparative Work Hour Report indicates that excessing was not necessary, excessed city letter carriers shall have their retreat rights activated. Failure to activate retreat rights under such circumstances may be subject to a separate timely grievance.

**12.4.D**

> D. In order to minimize the impact on employees in the regular work force, the Employer agrees to separate, to the extent possible, casual employees working in the affected craft and installation prior to excessing any regular employee in that craft out of the installation. The junior full-time employee who is being excessed has the option of reverting to part-time flexible status in his/her craft, or of being reassigned to the gaining installation.

Whenever management proposes to excess letter carriers out of an installation, or excess employees, regardless of craft, from another installation into the letter carrier craft, all casual employees in the losing installation must first be separated "to the extent possible."

The casual classification of letter carrier was eliminated in the 2006 National Agreement.

A junior full-time employee always has the option of voluntarily reverting to part-time flexible status in his/her own craft and installation rather than being excessed to another installation. However, the Postal Service may never require an employee to revert to part-time flexible status in such circumstances. Any full-time letter carrier who chooses to revert to PTF status instead of being excessed in accordance with Article 12 will be counted as a full-time letter carrier for application of the provisions of Article 7 of the National Agreement.

12.5.A

**Section 5. Reassignments**

**A. Basic Principles and Reassignments**

Article 12.5.A.1-8 are merely a table of contents for the application of Article 12.5.C. As indicated below, each of the numbered sections in Article 12, Section 5.A.1-8 refers to a specific section of Article 12.5.C.

12.5.A.1

When it is proposed to:
1. Discontinue an independent installation;

The reference is to Article 12.5.C.1.

12.5.A.2

2. Consolidate an independent installation (i.e., discontinue the independent identity of an installation by making it part of another and continuing independent installation);

The reference is to Article 12.5.C.2.

12.5.A.3

3. Transfer a classified station or classified branch to the jurisdiction of another installation or make an independent installation;

The reference is to Article 12.5.C.3.

12.5.A.4

4. Reassign within an installation employees excess to the needs of a section of that installation;

The reference is to Article 12.5.C.4.

12.5.A.5

5. Reduce the number of regular work force employees of an installation other than by attrition;

The reference is to Article 12.5.C.5.

**12.5.A.6**

6. Centralized mail processing and/or delivery installation (Clerk Craft only);

The reference is to Article 12.5.C.6 which does not apply to the letter carrier craft.

**12.5.A.7**

7. Reassignment—motor vehicles;

The reference is to Article 12.5.C.7 which does not apply to the letter carrier craft.

**12.5.A.8**

8 . Reassignment—part-time flexibles in excess of quota; such actions shall be subject to the following principles and requirements.

The reference is to Article 12.5.C.8.

**12.5.B.1**

**B. Principles and Requirements**

1. Dislocation and inconvenience to full-time and part-time flexible employees shall be kept to the minimum consistent with the needs of the service.

This section repeats the general rule contained in Article 12.4.A. See Article 12.4.A for a complete explanation.

## JCAM Section 5. Withholding Positions

**12.5.B.2**

> 2. The Vice Presidents Area Operations shall give full consideration to withholding sufficient full-time and part-time flexible positions within the area for full-time and part-time flexible employees who may be involuntarily reassigned. When positions are withheld, management will periodically review the continuing need for withholding such positions and discuss with the NBA the results of such review.

Withholding full and part-time residual vacancies under this provision is not merely a management right, it is an obligation in order to keep "dislocation and inconvenience" to full-time and part-time flexible employees to the minimum consistent with the needs of the service. National Arbitrator Gamser, wrote in NC-E-16340, December 7, 1979 (C-05904) as follows:

> There is no question that [the] National Agreement imposed upon management *an obligation to anticipate dislocations which might occur and to withhold full-time vacancies* for the purpose of preserving as many opportunities for regular full-time employees to avoid the dislocation of moving out of the area by bidding into such full-time positions when they were forced out of their regular positions. Such a requirement was agreed to by the parties to several previous national negotiations, regardless of the craft or crafts represented on the union side of the bargaining table, because both labor and management recognized that full-time employees, in this instance, were members of a career work force, with tenure and stability of employment to be protected wherever possible, with rights which superseded those with a less protected career status regardless of craft. That is obviously why the provisions of the earlier Article XII and those of Appendix A, pertinent to this proceeding, as well as those of the present Article XII, did not impose a restriction upon the Area Postmaster General to withhold vacant full time positions only for the benefit and protection of employees who are members of the same craft as that in which the vacancy exists. (Emphasis added)

Thus, it is a violation of the National Agreement for management to fail to withhold residual positions under the provisions of Article 12.5.B.2 when it can reasonably be anticipated that there will be a need to excess employees. If, for example, a letter carrier is excessed to another installation because management failed to withhold a residual position in the carrier's own installation even though the need for excessing could reasonably have been anticipated, a contract violation has occurred.

**Length of Withholding.** There is no established contractual time limit on the length of time management may withhold residual positions. Rather, Arbitrator Gamser wrote in case NC-E-16340, December 7, 1979 (C-05904), that the parties must apply "a rule of reason based upon the facts and circumstances then existing." Whether management

has been reasonable in a particular case depends on the full facts and circumstances. Gamser held that the Postal Service had not violated the National Agreement by withholding letter carrier positions for approximately one year.

**Number of Withheld Positions.** Management may not withhold more positions than are reasonably necessary to accommodate any planned excessing. Article 12.5.B.2 only authorizes management to withhold "sufficient ... positions within the area for full-time and part-time flexible employees who may be involuntarily reassigned."

There are no blanket rules that can be used to determine whether management is withholding an excessive number of positions, or withholding positions for longer than necessary. Rather, each situation must be examined separately based upon local fact circumstances. Generally, this involves calculating the number of positions that will be reduced, the length of time over which the reductions will occur and then determining whether the reductions will occur faster than can be accommodated by normal attrition.

Withholding positions for excessing is only justified when positions in the losing craft or installation must be reduced faster than can be accomplished through normal attrition. Projections of anticipated attrition must take into account not only local historical attrition data, but also the age composition of the employees. Installations with a high percentage of employees approaching retirement age can reasonably anticipate higher attrition than installations with younger employees. Thus, accurate projections require an examination of the local fact circumstances rather than the mere application of a national average attrition rate.

- Once management has determined that withholding is necessary, part-time flexibles should not be converted to full-time status within the area of withholding until management has withheld sufficient authorized positions.
- The goal should be to keep dislocation and inconvenience to full-time and part-time flexible employees to the minimum consistent with the needs of the service.
- Management may not withhold Carrier Technician positions in anticipation of excessing employees from another craft. Article 12.5.B.9, 12.5.C.5.a(4) and 12.5.C.5.b(2) require that when employees are excessed into another craft, they must meet the minimum qualifications for the position. The minimum qualification standards for Carrier Technician positions include one year of experience as a city carrier (See Qualification Standards for Carrier Technician—Q7-02: Occupation Code: 2310-2010). Clerks can not meet the minimum experience requirements for Carrier Technician positions except when former letter carriers will be excessed back into the letter carrier craft.

- Management may not withhold letter carrier positions in anticipation of excessing employees from lower level positions.  The provisions of Article 12.5.C.5.a(4) & 12.5.C.5.b(2) specifically require that when excess employees are excessed to other crafts it must be to positions in the same or lower level.

- Full-time flexible assignments are incumbent only assignments and may not be withheld under the provisions of Article 12.5.B.2 of the National Agreement (Prearbitration Settlement, F90N-4F-C 93022407, July 18, 2000, M-01432).

**Periodic Reviews.**  Effective with the change in the 2001 National Agreement, area management will periodically review the continuing need for withholding positions and discuss the results of such review with the National Business Agents. The issues that should be discussed include, but are not limited to:

- The excessing that has occurred and the projected future need for excessing,

- The currently effective withholding notices,

- The continuing need for withholding,

- The vacancies currently being withheld in the letter carrier craft.

Additionally, the parties at the national level created a joint work group in the Memorandum of Understanding, *Re: Transitional Employees/ Part-time Flexible Conversions* (M-01797) to discuss and attempt to resolve issues concerning vacant residual positions, the continued need to withhold positions, and the process for recording residual vacancies in Postal Service systems. Pursuant to the Das Interest Arbitration Award dated January 10, 2013, the length of time this joint work group will function was extended through the term of the 2011 National Agreement.

## JCAM Section 6. Principles of Excessing

**12.5.B.3**

> 3. No employee shall be allowed to displace, or "bump" another employee, properly holding a position or duty assignment.

Excessed employees may normally be placed only in residual vacancies. This includes withheld residual assignments that have been opted for under the provisions of Article 41.2.B.  Employees excessed under the terms of the National Agreement are never allowed to displace or bump the incumbent employees in bid positions.

When two or more employees are excessed into the same unit at the same time, or when there are more residual vacancies than employees being excessed into a unit, management must allow the excessed employees to exercise their preference by use of their seniority.

**12.5.B.4**

> 4. Unions affected shall be notified in advance (as much as six (6) months whenever possible), such notification to be at the regional level, except under A.4 above, which shall be at the local level.

**Advance Notice.**  The NALC is entitled to advance notice whenever a letter carrier is excessed or whenever an employee from another craft is excessed into the letter carrier craft.  Whenever possible, as much as six months advance notice must be made to the National Business Agent except in those cases which concern the reassignment to the same craft within an installation of employees excess to the needs of a section of that installation (Article 12.5.C.4).  In these cases notification must be made to the local union.

**12.5.B.5**

> 5. Full-time and part-time flexible employees involuntarily detailed or reassigned from one installation to another shall be given not less than 60 days advance notice, if possible. They shall receive moving, mileage, per diem and reimbursement for movement of household goods, as appropriate, if legally payable, as governed by the standardized Government travel regulations as set forth in the applicable Handbook.

Article 12.5.B.5 establishes two separate rights:

- Full-time and part-time flexible employees involuntarily *detailed or reassigned* from one installation to another shall be given not less than sixty days advance notice, "if possible."  Note that this provision applies not only to those employees who are involuntarily  "reassigned" or excessed from one installation to another, but also to *employees, including part-time flexibles, who are temporarily detailed* on an involuntary basis (Interpretive Settlement, C94N-4C-C 99224809, September 26, 2002, M-01470).

- Eligible excessed employees receive moving, mileage, per diem and reimbursement for movement of household goods in accordance with the regulations contained in the applicable Handbook. Currently the regulations are in the Handbook F-15-C, *Relocation Policy - Bargaining Employees* and F-15, *Travel and Relocation.*

Temporary assignments of CCAs to other post offices (installations) is addressed by the Memorandum of Understanding, *Re: City Carrier Assistants – Temporary Assignments to Other Post Offices*.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: City Carrier Assistants - Temporary Assignments to Other Post Offices**

The parties agree to the following regarding the temporary assignment of city carrier assistants (CCAs) outside their employing post office (installation) to another post office (installation):

1. CCAs will normally work in their employing post office but may be assigned to work in another post office in the local travel area (Handbook F-15, Section 7-1.1.1.1) within the same district on an occasional basis (the assignment may be for a partial day or several consecutive days, depending on local circumstances). Sunday CCA work assignments are not subject to the occasional basis limitation.

2. Temporary assignments must otherwise be consistent with the National Agreement (e.g. assigning CCAs to work outside their employing office may not violate Article 7 1.C.4 in the temporary office or the letter carrier paragraph in the employing office).

3. Management will schedule CCAs to work in other post offices in advance of the reporting date whenever practicable.

4. When the need arises to temporarily assign CCAs outside their employing post office, management will, to the extent practicable, use volunteer CCAs from the delivery unit providing assistance as long as the volunteers will be in a similar pay status (e.g straight-time rate, regular overtime rate, penalty overtime rate). If sufficient volunteers are not found, CCAs from the delivery unit providing assistance will be temporarily assigned to the other installation in reverse relative standing order whenever practicable as long as the junior CCAs are in a similar pay status.

5. CCAs who are required or volunteer to work outside their employing office may receive payment for mileage for the difference between their residence and employing office provided the difference is greater (Handbook F-15, Section 7-1.1.1.2.d).

The procedures outlined above are effective on December 7, 2013; however, either party may terminate this agreement by providing 30 days written notice to the other party. This agreement is reached without prejudice to the position of either party in this or any other matter and may only be cited to enforce its terms.

Date: December 5, 2013

12.5.B.6

> 6. Any employee volunteering to accept reassignment to another craft or occupational group, another branch of the Postal Service, or another installation shall start a new period of seniority beginning with such assignment, except as provided herein.

**Article 12.5.B.6.** This provision is consistent with the provisions of Article 41.2.G.

12.5.B.7

> 7. Whenever changes in mail handling patterns are undertaken in an area including one or more postal installations with resultant successive reassignments of clerks from those installations to one or more central installations, the reassignment of clerks shall be treated as details for the first 180 days in order to prevent inequities in the seniority lists at the gaining installations. The 180 days is computed from the date of the first detail of a clerk to the central, consolidated or new installation in that specific planning program. If a tie develops in establishing the merged seniority roster at the gaining installation, it shall be broken by total continuous service in the regular work force in the same craft.

**Article 12.5.B.7.** This section does not apply to the letter carrier craft.

12.5.B.8

> 8. In determining seniority of special delivery messengers who received career status under Civil Service Regulation 3.101, that period of continuous service as a special delivery messenger prior to attaining career status shall be included.

**Article 12.5.B.8.** This section does not apply to the letter carrier craft.

12.5.B.9

> 9. Whenever in this Agreement provision is made for reassignments, it is understood that any full-time or part-time flexible employee reassigned must meet the qualification requirements of the position to which reassigned.

**Article 12.5.B.9.** The minimum qualification standards for Carrier Technician positions include one year of experience as a city carrier and either successful completion of a four year high school curriculum, or a second year of postal experience. If employees from other crafts do not meet this requirement, they may not be excessed into Carrier Technician positions. See also the discussion of withholding Carrier Technician positions under Article 12.5.B.2.

12.5.B.10

> 10. Whenever the provisions of this Section establishing seniority are inconsistent with the provisions of the Craft Article of this Agreement, the provisions of the Craft Article shall prevail.

**Article 12.5.B.10.** This language requires that the craft article seniority provisions determine the seniority of employees excessed from one craft to another. Under the provisions of Article 41.2.G employees from another craft excessed into the letter carrier craft begin a new period of

seniority. They will be junior to all current part-time flexibles, and not just one day junior to the junior full-time regular.

12.5.B.11

> 11. It is understood that any employee entitled hereunder to a specific placement may exercise such entitlement only if no other employee has a superior claim hereunder to the same position.

**Article 12.5.B.11.** This section states the self-evident. If two or more employees are entitled to "a specific placement," the position must be given to the employee with the "superior claim." Seniority should be used to determine which employee has the "superior claim."

12.5.B.12

> 12. Surplus U.S. Postal Service employees - Surplus U.S. Postal Service employees from non-mail processing and non-mail delivery installations, regional offices, the U.S. Postal Service Headquarters or from other Federal departments or agencies shall be placed at the foot of the part-time flexible roll and begin a new period of seniority effective the date of reassignment.

**Article 12.5.B.12.** This provision is consistent with the provisions of Article 41.2.G.

**Additional Excessing Issues.**

**Limited and Light Duty.** Employees working in light or limited duty assignments are included in all excessing activity and exercise retreat rights by seniority.

**Signing the ODL.** A full-time letter carrier who is excessed to another installation or who exercises retreat rights under the provisions of Article 12 may sign the Overtime Desired List or the Work Assignment List in the new installation immediately upon reporting if he/she was on the list in the old installation (Article 8.5.A).

**Excessing by Juniority.** When management proposes to excess employees (full-time, part-time regular, or part-time flexible) into a city letter carrier duty assignment in a different installation, the junior employee with the same status (full-time, part-time regular, or part-time flexible) should be excessed. Excessing for full-time employees in the letter carrier craft was previously done by grade. This was changed by the Memorandum of Understanding, *Re: Involuntary Reassignment Without Regard to Level* and the Memorandum of Understanding, *Re: Involuntary Reassignment – Preference Eligible* as part of the Das Interest Arbitration Award dated January 10, 2013. The full text of these MOUs is shown on JCAM pages 12-21 and 12-22.

**Bidding.** Employees continue to have bidding rights in the section/installation from which they will be excessed until the excessing actually occurs. If the effective date of the excessing is prior to the closing date of the posting, the bid is void.

**Grievances.** When a grievance is filed on excessing activity, it is normally not necessary to file separate grievances concerning the notice and the actual excessing. It is the intent of the parties to minimize the number of grievances filed on the excessing activity, and no procedural arguments should be made regarding which excessing activity is grieved. In grievances concerning the excessing of a letter carrier to another craft, NALC continues to represent the employee after the excessing date on those greivances.

**Full-Time Flexibles.** The Memorandum of Understanding entitled Maximization/Full-time Flexibles (Article 7) provides that where a part-time flexible has performed letter carrier duties in an installation at least forty hours a week, five days a week, over a period of six months, the senior part-time flexible shall be converted to full-time carrier status. The Letter of Intent implementing this memorandum states in relevant part:

> In those installations where conversions have been made under this Memorandum of Understanding, and there are subsequent reversions or excessing, any reductions in full-time letter carrier positions shall be from among those position(s) converted pursuant to this Memorandum of Understanding until they are exhausted.

The above paragraph addresses reductions in full-time positions when reversions or excessing outside an installation or to another craft takes place. Nothing in this paragraph changes the parties' understanding that any excessing still must be from the junior full-time carrier, regardless of their status as full-time regular or full-time flexible.

The effect of CCAs on the reassigning and excessing of career employees is addressed in Appendix B, 3. Other Provisions, Section C - Article 12 of the 2011 National Agreement.

**APPENDIX B**

**Appendix B is the reprinting of Section I of the 2013 Das Award, the creation of a new non-career employee category.**

**3. OTHER PROVISIONS**

**C. Article 12 - Reassignment**

In order to minimize the impact on employees in the regular work force, the Employer agrees to offer the impacted employee the opportunity to work any letter carrier duty assignments performed by CCA employees, or to separate, to the extent possible, CCA employees working in the city carrier craft and installation prior to excessing any regular city letter carrier out of the installation.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: Involuntary Reassignment Without Regard to Level**

The following modification to Article 12 of the National Agreement will apply as it relates to the involuntary reassignment of city letter carriers who are excessed into a city letter carrier duty assignment in a different installation:

A. City letter carriers will be involuntarily reassigned by juniority and status (full-time, part-time regular, or part-time flexible) without regard to pay grade. City letter carriers who are involuntarily reassigned to an assignment in a lower pay grade will be provided Saved Grade pursuant to Employee and Labor Relations Manual, Section 421.53.

B. The involuntarily reassigned or senior in lieu of volunteer city letter carrier will be placed into a withheld city letter carrier residual vacancy in the gaining installation at the same, lower, or higher pay level.

C. Upon being involuntarily reassigned, an impacted city letter carrier will receive retreat rights, by seniority, to a vacant position in the same pay grade as that formerly held in the original installation. Retreat rights are terminated when an offer to retreat is made, regardless of whether the excessed city letter carrier accepts or rejects the offer. However, if an opportunity to retreat to a different pay grade in the original installation occurs first, it will be offered to impacted employees by seniority without regard to pay grade. An offer to retreat to a different pay grade will be made only once to each excessed city letter carrier per excessing event. Failure to accept an offer to a different pay grade does not exhaust a city letter carrier's retreat rights to his/her original pay grade.

D. Saved Grade provided under this agreement will be discontinued for city letter carriers who fail to accept a retreat opportunity back to a Grade Q-2 vacancy in his/her original installation.

E. Withheld residual duty assignments that would be part of an Article 41.3.O posting if the positions were occupied, will be made available for selection during the 41.3.O bidding process, unless such withheld residual assignment(s) has already been selected by or assigned to an employee subject to involuntary or a senior in lieu of a junior reassignment pursuant to Article 12.

Date: January 10, 2013

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: Involuntary Reassignment-Preference Eligible**

The following procedure will apply for the involuntary reassignment of Grade Q-2 veteran preference eligible city letter carriers who are excess to the needs of an installation and reassigned into duty assignments in the letter carrier craft:

A. Identify the number of preference eligible Grade Q-2 city letter carriers who are identified as excess to the needs of an installation.

B. Identify the available withheld Grade Q-2 duty assignments within the withholding radius of the losing installation.

C. Offer and assign available residual withheld duty assignments to city letter carriers identified as excess, without regard to level of assignments or non-preference/preference eligible status of the employee(s) pursuant to the Memorandum of Understanding *Re: Involuntary Reassignment Without Regard to Level.*

D. If a preference eligible Grade Q-2 city letter carrier declines to select an available Grade Q-2 duty assignment that remains unselected, he/she will be assigned to that position. If there is more than one available Grade Q-2 assignment, the employee will be assigned to the position closest to his/her original installation.

E. An impacted preference eligible city letter carrier may elect reassignment to an available withheld Grade Q-1 duty assignment. In such case the employee will receive Saved Grade pursuant to Employee and Labor Relations Manual, Section 421.53. To make a selection to a lower level duty assignment, the preference eligible city letter carrier must expressly waive his/her rights to appeal such reassignment through the grievance arbitration process, the Merit Systems Protection Board, and the Equal Employment Opportunity Commission.

F. When reassignment of an excess Grade Q-2 preference eligible employee through the above provisions is not possible, the most junior non-veteran preference eligible Grade Q-2 city letter carrier in an installation within the withholding radius that has an available residual Grade Q-1 duty assignment will be reassigned to the residual Grade Q-1 vacancy. Such reassigned city letter carrier will receive Saved Grade pursuant to Employee and Labor Relations Manual, Section 421.53. The veteran preference eligible city letter carrier will then be assigned to the resulting vacant Q-2 assignment in that installation.

G. If reassignment cannot be accomplished through items A-F of this memorandum, the affected preference eligible city letter carrier will be assigned to the closest available withheld residual Grade Q-2 (or equivalent) vacancy from the losing installation.

H. When a non-veteran preference Q-2 city letter carrier is reassigned pursuant to item F of this agreement the National Business Agent will be notified prior to such reassignment.

Date: January 10, 2013

## JCAM Section 7. Delivery Unit Optimization (DUO)

This section includes the memorandums of understanding regardng Delivery Unit Optimization (DUO).

When all city carrier assignments from one work location are permanently moved to another location(s) and the movement of letter carriers is not covered by Article 12.5.C.1, 12.5.C.2, or 12.5.C.3, the DUO rules apply. The Memorandum of Understanding, *Re: Delivery Unit Optimization* addresses notice, seniority, hold-downs, Article 25 assignments, and previously approved leave when a DUO occurs.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Delivery Unit Optimization**

Delivery Unit Optimization (DUO) refers to a process that includes permanently moving all city carrier assignments from one location to another location(s).

Regarding the city letter carrier craft, the parties agree to the following principles when Delivery Unit Optimization results in moving city letter carriers from one installation to another:

1. All city letter carriers and transitional employees will be moved from the losing installation to the gaining installation(s). However, this provision does not alter or modify the rights or obligations of either party under the Memorandum of Understanding, Re. Transitional Employees Additional Provisions.

2. At least 60 days advance notice, whenever possible, will be provided to the Union at the National, Regional, and Local Levels, and to individual city letter carriers who are to be moved to another installation.

3. City letter carriers from both the gaining and losing installations will retain their craft installation seniority and bid assignments. For the purposes of applying Article 41.2.B.7, all craft seniority will be credited as earned at the gaining installation.

4. Hold down assignments obtained pursuant to Article 41.2.B will not be impacted by the movement of city letter carriers under the Delivery Unit Optimization process. Temporary higher level carrier technician assignments obtained pursuant to Article 25.4 of the National Agreement will not be impacted solely by the movement of city letter carriers under the Delivery Unit Optimization process.

5. The parties agree that annual leave requests previously approved in either the gaining or losing installation(s) will be honored except in serious emergency situations, pursuant to Article 10.4.D of the National Agreement.

6. This agreement does not apply to the movement of city letter carriers when installations are discontinued, consolidated, or when a station or branch is transferred or made independent in accordance with Article 12.5.C.1, 12.5.C.2, and 12.5.C.3.

This agreement is reached without prejudice to either party's position on this or any other matter and may only be cited to enforce its terms.

Date: March 22, 2011

The Memorandum of Understanding, *Re: Local Memorandum(s) of Understanding under Delivery Unit Optimization* sets forth the process for resolving differences in the affected Local Memoranda of Understanding when a DUO occurs.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Local Memorandum(s) of Understanding under Delivery Unit Optimization**

Delivery Unit Optimization (DUO) refers to a process that includes permanently moving all city carrier assignments from one work location to another location(s).

The parties agree to the following process to address issues related to Local Memoranda of Understanding resulting from Delivery Unit Optimization:

1. The local parties at the gaining installation will identify and discuss any existing Local Memoranda of Understanding (LMOU) provisions from the losing installation(s) that are different from those in the gaining installation(s). While these discussions are not considered Article 30 local implementation, the local parties will make necessary revisions to the LMOU in the gaining installation(s) to accommodate city delivery operations moving from the losing installation(s).
2. Any LMOU issues not resolved at the local level will be referred within 30 days of DUO notice to the Area Manager, Labor Relations (or his/her designee) and the National Business Agent (or his/her designee) for resolution.
3. Any LMOU issue(s) not resolved within 20 days of receipt by the Area and NBA will be forwarded to the parties at the National Level for resolution.
4. Any provision(s) of an LMOU from a losing installation that is made part of the LMOU in the gaining installation(s) will use the date the provision was added to the LMOU in the losing installation for the purpose of applying Article 30.C.
5. In the event city delivery assignment(s) are returned to the losing installation(s), the original LMOU in the losing installation(s) shall be reinstated.
6. This agreement does not apply to the movement of city letter carriers when installations are discontinued, consolidated, or when a station or branch is transferred or made independent in accordance with Article 12.5.C.1, 12.5.C.2, and 12.5.C.3.

This agreement is reached without prejudice to either party's position on this or any other matter and may only be cited to enforce its terms. Either party to this agreement may unilaterally withdraw from this process with 60 days notice to the other party. However, such withdrawal will not impact the provisions of paragraphs 4 and 5, above.

Date: March 22, 2011

The Memorandum of Understanding, *Re: Delivery Unit Optimization - Retreat Rights* addresses the question of what happens if a letter carrier has active retreat rights to a work location affected by a DUO.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Delivery Unit Optimization - Retreat Rights**

Delivery Unit Optimization (DUO) refers to a process that includes permanently moving all city carrier assignments from one work location to another location(s).

The parties agree to the following when DUO results in moving city letter carriers from one installation to another:

Any city carrier(s) who had active retreat rights to the losing installation at the point of DUO implementation will have his/her retreat rights carried forward to the gaining installation. In this situation, retreat rights will be offered to excessed city letter carriers by seniority as defined by the Memorandum of Understanding *Re: Delivery Unit Optimization* and the National Agreement.

In the event city delivery assignment(s) are returned to the losing installation(s), any city carrier(s) who had active retreat rights to the losing installation at the point of DUO implementation will have retreat rights restored to his/her original installation.

This agreement is reached without prejudice to either party's position on this or any other matter and may only be cited to enforce its terms.

Date: April 4, 2012

## JCAM Section 8. Discontinuance of an Independent Installation

**C. Special Provisions on Reassignments**

In addition to the general principles and requirements above specified, the following specific provisions are applicable:

12.5.C.1

1. **Discontinuance of an Independent Installation**

   a. When an independent installation is discontinued, all full-time and part-time flexible employees shall, to the maximum extent possible, be involuntarily reassigned to continuing postal positions in accordance with the following:

   b. Involuntary reassignment of full-time employees with their seniority for duty assignments to vacancies in the same or lower level in the same craft or occupational group in installations within 100 miles of the discontinued installation, or in more distant installations, if after consultation with the affected Unions, it is determined that it is necessary. The Postal Service will designate such installations for the reassignment of excess full-time employees. When two or more such vacancies are simultaneously available, first choice of duty assignment shall go to the senior employee entitled by displacement from a discontinued installation to such placement.

   c. Involuntary reassignment of full-time employees for whom consultation did not provide for placement under C.1.b above in other crafts or occupational groups in which they meet minimum qualifications at the same or lower level with permanent seniority for duty assignments under (1) and (2) below, whichever is lesser:

      (1) One day junior to the seniority of the junior full-time employee in the same level and craft or occupation in the installation to which assigned, or

      (2) The seniority the employee had in the craft from which reassigned.

**Seniority.** The stated seniority rule is inconsistent with Article 41.2.G. Therefore, in accordance with Article 12.5.B.10, the correct seniority under this particular section is that such employees, when reassigned to the letter carrier craft, begin a new period of seniority in accordance with Article 41.2.G.

12.5.C.1.d

d. Involuntary reassignment of part-time flexible employees with seniority in any vacancy in the part-time flexible quota in the same craft or occupational group at any installation within 100 miles of the discontinued installation, or in more distant installations, if after consultation with the affected Unions it is determined that it is necessary, the Postal Service will designate such installations for the reassignment of the part-time flexible employees.

The term "quota" in this section is obsolete (Arbitrator Das, H7C-NA-C 82, March 21, 2000, C-20485). It comes from a long discontinued

staffing practice requiring one part-time flexible employee for every five regulars. There are no longer any "quotas." Rather, staffing ratios are now governed by the provisions of Article 7.3.

**12.5.C.1.e**

> e. Involuntary reassignment of part-time flexible employees for whom consultation did not provide for placement under C.1.d above in other crafts or occupational groups in which they meet minimum qualification at the same or lower level at the foot of the existing part-time flexible roster at the receiving installation and begin a new period of seniority.
>
> f. Full-time employees for whom no full-time vacancies are available by the time the installation is discontinued shall be changed to part-time flexible employees in the same craft and placed as such, but shall for six months retain placement rights to full-time vacancies developing within that time within any installation within 100 miles of the discontinued installation, or in more distant installations, if after consultation with affected Unions it is necessary, U.S. Postal Service will designate such installations for the reassignment of excess full-time employees on the same basis as if they had remained full-time.

This section predates and may be inconsistent with the no-layoff provisions of Article 6 and with statutory protections given preference eligible employees.

**12.5.C.1.g**

> g. Employees, full-time or part-time flexible, involuntarily reassigned as above provided shall upon the reestablishment of the discontinued installation be entitled to reassignment with full seniority to the first vacancy in the reestablished installation in the level, craft or occupational group from which reassigned.

**Retreat Rights.** As in the case of employees excessed under other provisions of Article 12, full- and part-time employees excessed under the provisions of Article 12.5.C.1 have "retreat rights." In the event a discontinued installation is reestablished, excessed employees are entitled to reassignment with full seniority to the first vacancy in the reestablished installation in the craft or occupational group from which they were reassigned. These retreat rights are terminated if excessed employees fail to accept the first available vacancy in the level from which they were excessed. However, if management fails to inform an employee with retreat rights of an available vacancy, that employee's retreat rights are not terminated. Additionally, per the MOU, *Re: Involuntary Reassignment Without Regard to Level,* retreat rights offered to a different pay grade will be made only once to each excessed employee per excessing event. Failure to accept an offer to a different pay grade does not terminate that employee's retreat rights to his/her original pay grade.

## JCAM Section 9. Consolidation of an Independent Installation

12.5.C.2

**2. Consolidation of an Independent Installation**

Consolidation of an independent installation is defined in Article 12.5.A.2, as to "discontinue the independent identity of an installation by making it part of another and continuing independent installation."

12.5.C.2.a

a. When an independent postal installation is consolidated with another postal installation, each full-time or part-time flexible employee shall be involuntarily reassigned to the continuing installation without loss of seniority in the employee's craft or occupational group.

Note that Article 30.E provides for a new period of local implementation concerning the Local Memorandum of Understanding when installations are consolidated.

12.5.C.2.b

b. Where reassignments under 2.a, preceding, result in an excess of employees in any craft or occupational group in the continuing installation, identification and placement of excess employees shall be accomplished by the continuing installation in accordance with the provisions of this Agreement covering such situations.

c. If the consolidated installation again becomes an independent installation, each full-time and part-time flexible employee whose reassignment was necessitated by the previous consolidation shall be entitled to the first vacancy in the reestablished installation in the level and craft or occupational group held at the time the installation was discontinued.

**Retreat Rights.** As in the case of employees excessed under other provisions of Article 12, full- and part-time employees excessed under the provisions of Article 12.5.C.2 have "retreat rights." In the event a consolidated installation again becomes independent, excessed employees are entitled to reassignment with full seniority to the first vacancy in the reestablished installation in the craft or occupational group from which they were reassigned. These retreat rights are terminated if they fail to apply for the first available vacancy in the level from which they were excessed. However, if management fails to inform an employee with retreat rights of an available vacancy, that employee's retreat rights are not terminated. Additionally, per the MOU, *Re: Involuntary Reassignment Without Regard to Level,* retreat rights offered to a different pay grade will be made only once to each excessed employee per excessing event. Failure to accept an offer to a different pay grade does not terminate that employee's retreat rights to his/her original pay grade.

## JCAM Section 10. Station or Branch Transfered or Made Independent

12.5.C.3.a

> 3. **Transfer of a Classified Station or Classified Branch to the Jurisdiction of Another Installation or Made an Independent Installation**
>
> a. When a classified station or classified branch is transferred to the jurisdiction of another installation or made an independent installation, all full-time employees shall at their option remain with the classified station or classified branch without loss of seniority, or remain with the installation from which the classified station or classified branch is being transferred.

This section should be read in conjunction with Article 12.5.C.5.b.1(a) which provides that when routes are transferred from one installation to another, the full-time letter carriers whose routes are transferred have the option of transferring with their routes without loss of seniority.

12.5.C.3.b

> b. A realistic appraisal shall be made of the number of employees by crafts or occupations who will be needed in the station after transfer, and potential vacancies within these requirements created by the unwillingness of employees to follow the station to the new jurisdiction shall be posted for bid on an office-wide basis in the losing installation.
>
> c. If the postings provided in paragraph 3.b, preceding, do not result in sufficient employees to staff the transferred classified station or classified branch, junior employees, by craft or occupational group on an installation-wide seniority basis in the losing installation, shall be involuntarily reassigned to the classified station or classified branch and each employee thus involuntarily reassigned shall be entitled to the first vacancy in such employee's level and craft or occupational group in the installation from which transferred.

**Retreat Rights.** As in the case of employees excessed under other provisions of Article 12, full- and part-time employees excessed under the provisions of this section have "retreat rights" to the first vacancy in such employee's craft or occupational group in the installation from which transferred. These retreat rights are terminated if they fail to accept the first available vacancy in the level from which they were excessed. However, if management fails to inform an employee with retreat rights of an available vacancy, that employee's retreat rights are not terminated. Additionally, per the MOU, *Re: Involuntary Reassignment Without Regard to Level,* retreat rights offered to a different pay grade will be made only once to each excessed employee per excessing event. Failure to accept an offer to a different pay grade does not terminate that employee's retreat rights to his/her original pay grade.

## JCAM Section 11. Employees Excess to a Section

12.5.C.4

4. **Reassignment Within an Installation of Employees Excess to the Needs of a Section**

   a. The identification of assignments comprising for this purpose a section shall be determined locally by local negotiations. If no sections are established immediately by local negotiations, the entire installation shall comprise the section.

   b. Full-time employees, excess to the needs of a section, starting with that employee who is junior in the same craft or occupational group and in the same level assigned in that section, shall be reassigned outside the section but within the same craft or occupational group. They shall retain their seniority and may bid on any existing vacancies for which they are eligible to bid. If they do not bid, they may be assigned in any vacant duty assignment for which there was no senior bidder in the same craft and installation. Their preference is to be considered if more than one such assignment is available.

   c. Such reassigned full-time employee retains the right to retreat to the section from which withdrawn only upon the occurrence of the first residual vacancy in the salary level after employees in the section have completed bidding. Such bidding in the section is limited to employees in the same salary level as the vacancy. Failure to bid for the first available vacancy will end such retreat right. The right to retreat to the section is optional with the employee who has retreat rights with respect to a vacancy in a lower salary level. Failure to exercise the option does not terminate the retreat rights in the salary level in which the employee was reassigned away from the section.
   In the Clerk Craft, an employee may exercise the option to retreat to a vacancy in a lower salary level only to an assignment for which the employee would have been otherwise eligible to bid.

   d. The duty assignment vacated by the reassignment of the junior full-time employee from the section shall be posted for bid of the full-time employees in the section. If there are no bids, the junior remaining unassigned full-time employee in the section shall be assigned to the vacancy.

**Excessing From a Section**. Article 12.5.C.4 provides for special rules when employees are excessed from a section. These rules *are only applicable* when a Local Memorandum of Understanding (LMOU) identifies separate sections within an installation for excessing purposes as authorized by Article 30.B.18. They do not apply when junior unassigned full-time regular letter carriers are assigned under the provisions of Article 41.1.A.7. Nor do they apply when full-time flexible employees are moved between sections since they have flexible reporting times and reporting locations (Article 7).

If an LMOU *does not identify separate sections* for excessing purposes, Article 12.5.C.4(a) provides that the entire installation is considered a

section and none of the rest of Article 12.5.C.4 applies. In such cases, full-time employees are not reassigned within the installation through excessing procedures. Rather, full-time letter carriers move within an installation through the mechanisms of reversion, abolishment, the subsequent posting and bidding under the provisions of Article 41.1, assignment under the provisions of Article 41.1.A.7 & Article 41.3.O, where applicable.

If an LMOU *does identify separate sections* for excessing purposes, then the special rules in Article 12.5.C.4(b-d) apply whenever management proposes to reassign letter carriers within an installation who are excess to the needs of one of the defined sections. These rules give excessed letter carriers "retreat rights" to the first residual vacancy in the same or lower grade that occurs in the section. Failure to accept the first available vacancy at the former grade level in the section ends such retreat rights.

In order to implement these retreat rights, Article 12.5.C.4 provides that as long as an excessed employee has retreat rights to the section, bidding for vacant duty assignments *in the grade level* from which the employee was excessed is subject to the following rules:

- Bidding is limited to employees in the section who were in the section when the employee was reassigned, even if, for example, the LMOU ordinarily provides for installation-wide bidding.
- Bidding for positions in the grade from which the employee was excessed is limited to employees in that grade. For example, if a Grade 2 Carrier Technician is excessed from a section, only Grade 2 letter carriers from the section may bid on Carrier Technician vacancies in the section.
- Bidding for positions in a Grade for which no employees have active retreat rights is not limited. For example, if only Grade 1 carriers have been excessed from the section and have retreat rights to the section, then only bidding on Grade 1 positions is limited, bidding on Grade 2 positions is not.

**Loss of Retreat Rights.** Retreat rights to a section are to the "first residual vacancy" in the section and salary level from which excessed after employees in the section have completed bidding. If an employee with retreat rights fails to accept the first residual vacancy in the section and salary level from which excessed, the retreat rights are ended. This rule is applied as follows:

- If a letter carrier with retreat rights to a Grade 2 position fails to accept a residual Grade 1 position in his/her former section, the retreat right to a Grade 2 position is not terminated.
- If a letter carrier with retreat rights to a Grade 1 position voluntarily bids back to a Grade 2 position in the former section, the carrier's retreat right to a Grade 1 position in the section is not terminated.

However, in such cases the carrier could not bid on Grade 1 positions in the section as long as the bidding is restricted to carriers with retreat rights to Grade 1 positions. Rather, the carrier would have to wait for the first residual Grade 1 vacancy in the section to exercise the continuing retreat right.

- Note that the language of Article 12.5.C.4(c) imprecisely states the rule as being "failure to bid for the first available vacancy will end such retreat right." Technically, employees with retreat rights do not exercise them by "bidding" in the strict sense used elsewhere in the contract—for example, in Article 41.1.A. Rather, they exercise them by simply accepting a residual vacancy. Bidding only occurs to allow an employee to exercise seniority if there is more than one residual vacancy in a section to which an employee has retreat rights.

**Restricted Bidding and Article 41.3.O.** The scope of postings under the provisions of Article 41.3.O can also be affected when an LMOU identifies sections for excessing purposes. National Arbitrator Snow ruled in B90N-4B-C-92021294, March 22, 1996 (C-15248), that if a branch has installation-wide bidding for vacant or newly created duty assignments, then assignments made available for bids under the provisions of Article 41.3.O should also be posted on an installation-wide basis. An exception to this general rule occurs if a branch has defined separate sections for excessing purposes and if an employee has been excessed from the section under the provisions of Article 12.5.C.4. Since Article 12.5.C.4(c) provides the reassigned employee with retreat rights in such cases, as long as an employee has such retreat rights to the section, bidding under the provisions of Article 41.3.O is also limited to employees from the section at the same salary level as the vacancy.

# JCAM Section 12. Reduction of Employees in an Installation

12.5.C.5.a(1)

> 5. **Reduction in the Number of Employees in an Installation Other Than by Attrition**
>
> a. Reassignments within installation. When for any reason an installation must reduce the number of employees more rapidly than is possible by normal attrition, that installation:
>
> (1) Shall determine by craft and occupational group the number of excess employees;
>
> (2) Shall, to the extent possible, minimize the impact on regular work force employees by separation of all casuals;
>
> (3) Shall, to the extent possible, minimize the impact on full-time positions by reducing part-time flexible hours;

This Section applies when the Postal Service needs to reduce the number of employees in an installation more rapidly than is possible through normal attrition. Before excessing the Postal Service must seek to minimize the impact on regular work force employees as follows:

**Casuals.** In HOC-NA-C-12, July 27, 2001 (C-22368), National Arbitrator Snow held that the language of Article 12.5.C.5.a (2) allows the Postal Service discretion in separating casuals to the extent the discretion is exercised consistent with the following agreement among the parties: "All casuals must be removed if it will eliminate the impact on regular workforce employees. The Employer must eliminate all casual employees to the extent that it will minimize the impact on the regular workforce."

**City Carrier Assistants.** In order to minimize the impact on employees in the regular work force, the Employer agrees to offer the impacted employee the opportunity to work any letter carrier duty assignments performed by CCA employees, or to separate, to the extent possible, CCA employees working in the city carrier craft and installation prior to excessing any regular city letter carrier out of the installation. (See JCAM page 12-20.)

**PTF Hours.** This section requires that management must "to the extent possible, minimize the impact on full-time positions by reducing part-time flexible hours" prior to excessing employees.

**Overtime Hours.** Reducing overtime hours should be considered when attempting to minimize the impact on letter carriers subject to excessing.

## JCAM Subsection 12.1. Excessing to Other Crafts within an Installation

**12.5.C.5.a(4)**

(4) Shall identify as excess the necessary number of junior full-time employees in the salary level, craft, and occupational group affected on an installation-wide basis within the installation; make reassignments of excess full-time employees who meet the minimum qualifications for vacant assignments in other crafts in the same installation; involuntarily reassign them (except as provided for letter carriers and special delivery messengers and vehicle service employees in Section C.5.b below) in the same or lower level with seniority, whichever is the lesser of:

(a) One day junior to the seniority of the junior full-time employee in the same level and craft or occupational group in the installation to which assigned, or

(b) The seniority the employee had in the craft from which reassigned.

**Seniority.** National Arbitrator Snow held in H7N-4Q-C 10845, December 19, 1991 (C-11528), that the stated seniority rule is inconsistent with Article 41.2.G. Therefore, in accordance with Article 12.5.B.10, the correct seniority under this particular section is that such employees, when reassigned to the letter carrier craft, begin a new period of seniority in accordance with Article 41.2.G.

**12.5.C.5.a(5)**

(5) The employee shall be returned at the first opportunity to the craft from which reassigned.

This provision is mandatory. Employees excessed to another craft under the provisions of Article 12.5.C.5.a must be returned to the craft from which they were excessed at the first available opportunity.

**12.5.C.5.a(6)**

(6) When returned, the employee retains seniority previously attained in the craft augmented by intervening employment in the other craft.

When an employee is returned to his/her original craft as required by Article 12.5.C.5.a(5), above, seniority is reestablished as if the employee had served continuously in the original craft and had never been excessed.

**12.5.C.5.a(7)**

(7) The right of election by a senior employee provided in paragraph b(3), below is not available for this cross-craft reassignment within the installation.

Under the provisions of Article 12.5.C.5.b(3), below, a senior employee may voluntarily elect to be reassigned to another installation in lieu of a more junior employee from the same craft subject to reassignment. This section makes clear that this right does not apply to reassignments across craft lines within an installation. Note, however, that Article

12.5.C.5.b(5) does apply to reassignments across craft lines within an installation.

This means that a full-time employee has the option of changing to a part-time flexible in the same craft in lieu of being involuntary transferred to another craft.

## JCAM Subsection 12.2. Excessing to the Letter Carrier Craft in Other Installations

**12.5.C.5.b**

b.  Reassignments to other installations after making reassignments within the installation:

(1)  Involuntarily reassign such excess full-time employees starting with the junior with their seniority for duty assignments to vacancies in the same or lower level in the same craft or occupational group in installations within 100 miles of the losing installation, or in more distant installations if after consultation with the affected Union it is determined that it is necessary, the Postal Service will designate such installations for the reassignment of excess full-time employees. However:

Letter carriers excessed under the provisions of Article 12.5.C.5.b keep their seniority.  This is not inconsistent with the provisions of Article 41.2.A.2.

(a)  Whenever full-time letter carrier routes, carrier technician or router assignments are transferred from one installation to another, the full-time letter carriers whose complete routes or assignments are transferred shall have the option of transferring with their routes or assignments, with their seniority. If a full-time letter carrier declines the option of transferring with the route or assignment, any qualified full-time letter carrier in the delivery unit may request, by seniority, to be reassigned with the route or assignment, with their seniority. The request of the senior qualified carrier shall be granted, and shall be counted in accordance with Article 12.3.

**Transfer of Assignments.**  This section may appear out of place since it does not concern excessing. Its purpose is to reduce or eliminate the need for excessing. It provides that when carrier routes, carrier technician or router assignments are transferred from one installation to another, the full-time letter carriers whose assignments are transferred have the option of transferring with their assignments without loss of seniority.  It does not apply to VOMA assignments which are multi-craft positions.  Letter carriers who transfer under this provision do not have retreat rights.

If a full-time letter carrier declines the option of transferring with a route or assignment under this provision, any qualified full-time letter carrier in the delivery unit may request, by seniority, to be reassigned with the route or assignment, with their seniority. This opportunity is only available to other full-time letter carriers in the same delivery unit as the employee whose assignment is being transferred.  If the installation has more than one delivery unit, carriers in delivery units other than the one from which the assignment was transferred do not have this option.

**12.5.C.5.b(1)(b)**

(b) Whenever full-time or part-time motor vehicle craft assignments are discontinued in an installation and there is an excess in a position designation and salary level, the excess shall be adjusted to the maximum extent possible by making voluntary reassignments to vacant motor vehicle craft positions in installations within 100 miles unless the employee applies for a vacancy in a more distant installation. Senior qualified applicants for such vacant positions shall be reassigned. When reassignment is in the same designation and salary level, the reassigned employee retains his/her seniority.

(c) When the entire special delivery messenger unit is moved from one independent installation to another and all special delivery territory is transferred, the special delivery messengers will be reassigned in the gaining unit with full seniority credit for all seniority gained in the craft and installation. When less than the entire special delivery messenger unit is transferred and it is necessary to reassign one or more special delivery messengers to the gaining installation, senior special delivery messengers shall be given option for reassignment. If no special delivery messenger elects to be reassigned, the junior special delivery messenger shall be reassigned.

Article 12.5.C.5.b(1)(b) and 12.5.C.5.b(1)(c) do not apply to the letter carrier craft.

## JCAM Subsection 12.3. Excessing to Other Crafts in Other Installations

**12.5.C.5.b(2)**

> (2) Involuntarily reassign full-time employees for whom consultation did not provide for placement under b(1) above in other crafts or occupational groups in which they meet minimum qualifications at the same or lower level with permanent seniority for duty assignments whichever is lesser of:
>
> (a) one day junior to the seniority of the junior full-time employee in the same level and craft or occupational group in the installation to which assigned, or
>
> (b) the seniority he/she had in the craft from which reassigned.

**Seniority.** The stated seniority rule is inconsistent with Article 41.2.G. Therefore, in accord with Article 12.5.B.10, the correct seniority under this particular section is that such employees, when reassigned to the letter carrier craft, begin a new period of seniority in accordance with Article 41.2.G.

## JCAM Subsection 12.4. Supplementary Rules

**12.5.C.5.b(3)**

> (3) Any senior employee in the same craft or occupational group in the same installation may elect to be reassigned to the gaining installation and take the seniority of the senior full-time employee subject to involuntary reassignment. Such senior employees who accept reassignment to the gaining installation do not have retreat rights.

A senior employee may elect to take the place of the employee subject to involuntary excessing regardless of grade. Senior employees who volunteer for reassignment under this provision do not have retreat rights. This rule applies to:

- Employees excessed to a letter carrier craft position in another installation under the provisions of Article 12.5.C.5.b.1.

- Employees excessed to another craft in another installation under the provisions of Article 12.5.C.5.b.2.

It does not apply to employees excessed to another craft within the same installation (Article 12.5.C.5.a(7)).

The seniority rule stated in this section is not inconsistent with Article 41.2.G.3 since electing to be reassigned under this provision is not considered to be a voluntary transfer within the meaning of Article 41.2.G.3.

> (4) When two or more such vacancies are simultaneously available, first choice of duty assignment shall go to the senior employee entitled by displacement from a discontinued installation to such placement.

This rule applies to:

- Employees excessed to another craft within the same installation under the provisions of Article 12.5.C.5.a.

- Employees excessed to a letter carrier craft position in another installation under the provisions of Article 12.5.C.5.b.1.

- Employees excessed to another craft in another installation under the provisions of Article 12.5.C.5.b.2.

> (5) A full-time employee shall have the option of changing to part-time flexible in the same craft or occupational group in lieu of involuntary reassignment.

This rule applies to:

- Employees excessed to another craft within the same installation under the provisions of Article 12.5.C.5.a.

- Employees excessed to a letter carrier craft position in another installation under the provisions of Article 12.5.C.5.b.1.
- Employees excessed to another craft in another installation under the provisions of Article 12.5.C.5.b.2.

> (6) Employees involuntarily reassigned under b(1) and (2) above, other than senior employees who elect to be reassigned in place of junior employees, shall be entitled at the time of such reassignment to file a written request to be returned to the first vacancy in the level, in the craft or occupational group in the installation from which reassigned, and such request shall be honored so long as the employee does not withdraw it or decline to accept an opportunity to return in accordance with such request.

This rule provides voluntary retreat rights for full-time and part-time employees excessed under the following circumstances:

- Employees excessed to a letter carrier craft position in another installation under the provisions of Article 12.5.C.5.b.1.
- Employees excessed to another craft in another installation under the provisions of Article 12.5.C.5.b.2.

It does not apply to employees excessed to another craft within the same installation. They do not have voluntary retreat rights since Article 12.5.C.5.a(5) requires that they be returned to the craft from which reassigned at the first opportunity.

## JCAM Section 13. Provisions Not Applicable to the Letter Carrier Craft

**12.5.C.5.b(6) continued**

In the Clerk Craft, an employee(s) involuntarily reassigned shall be entitled at the time of such reassignment to file a written request to return to the first vacancy in the craft and installation from which reassigned. Such request for retreat rights must indicate whether the employee(s) desires to retreat to the same, lower, and/or higher salary level assignment and, if so, what salary level(s). The employee(s) shall have the right to bid for vacancies within the former installation and the written request for retreat rights shall serve as a bid for all vacancies in the level from which the employee was reassigned and for all residual vacancies in other levels for which the employee has expressed a desire to retreat. The employee(s) may retreat to only those assignments for which the employee(s) would have been otherwise eligible to bid. If vacancies are available in a specified lower, higher or same salary level, the employee will be given the option. Failure to exercise retreat rights to the first available vacancy terminates such rights. Furthermore, employee(s) electing to retreat to a lower level assignment are not entitled to salary protection.

This part of Article 12.5.C.5.b(6) does not apply to the letter carrier craft.

**12.5.C.6**

**6. Centralized Mail, Processing and/or Delivery Installation (Clerk Craft Only)**

a. When the operations at a centralized installation or other mail processing and/or delivery installation result in an excess of full-time clerks at another installation(s), full-time clerks who are excess in a losing installation(s) by reason of the change, shall be reassigned as provided in Section C.5.b. Reassignments of clerks shall be treated as details for the first 180 days to avoid inequities in the selection of preferred duty assignments by full-time clerks in the gaining installation.

b. Previously established preferred duty assignments which become vacant before expiration of the detail period must be posted for bid and awarded to eligible full-time clerks then permanently assigned in the gaining installation. Excess part-time flexible clerks may be reassigned as provided for in Section C.8.

c. All new duty assignments created in the gaining installation and all other vacant duty assignments in the centralized installation shall be posted for bid. One hundred eighty (180) days is computed from the date of the first detail of an employee. Bidding shall be open to all full-time clerks of the craft involved at the gaining installation. This includes full-time clerks assigned to the gaining installation.

d. When the centralized installation is a new one:

(1) Full-time clerks who apply for reassignment from the losing installation, shall be reassigned with their seniority.

(2) Reassignments shall be in the order of seniority and shall not exceed the number of excess full-time clerks in the losing installation.

(3) The provisions of 5.a, above, apply to reassign junior full-time excess clerks, with their seniority, when there are excess full-time clerks after the reassignment of senior full-time clerks who apply for reassignment.

**Article 12.5.C.6** applies only to the clerk craft. National Arbitrator Snow held in I90N-4I-C-92057810, June 20, 1997 (C-16923), that the provisions of Article 12.5.C.6 do not alter the reassignment rules specified by Article 12.5.C.5 pursuant to which excess employees are reassigned across craft lines within the installation before being assigned to a different installation.

12.5.C.7

7. Reassignments - Motor Vehicle

a. When a vehicle maintenance facility is established to replace an auxiliary garage, full-time and part-time flexible craft positions in the gaining installation are to be posted in the losing installation for applications by full-time and part-time flexible employees, respectively. Senior qualified applicants shall be reassigned without loss of seniority, but not to exceed the number of excess employees in the losing installation.

b. When a vehicle maintenance facility is established to replace vehicle maintenance in a perimeter office, full-time and part-time flexible craft positions in the new maintenance facility shall be posted in the losing installation for applications by full-time and part-time flexible employees, respectively. Senior qualified applicants shall be reassigned without loss of seniority, but not to exceed the number of excess employees in the losing installation.

c. When vehicle operations are changed by transfer from one installation to another, new full-time and part-time flexible craft positions shall be posted for applications in the losing installation by full-time and part-time flexible employees in the craft, respectively. Senior qualified applicants shall be reassigned without loss of seniority, but not to exceed the number of excess employees in the losing installation.

d. After all reassignments have been made to the gaining installation, pursuant to Subsections a, b and c, the new full-time assignments in the gaining installation shall be posted for bids.

e. If, after establishment of a new installation, operations result in further excess at losing installation(s), the procedures in Subsections a, b, c and d, above, apply to reassign senior applicants from the losing installation(s) to positions in the new installation.

**Article 12.5.C.7** applies only to the motor vehicle craft. The provisions of this section *do not* apply to letter carriers in VOMA positions. They remain members of the letter carrier craft. The provisions of this section are relevant to the letter carrier craft only to the extent that management must exhaust its requirements before it may excess motor vehicle craft employees into the letter carrier craft.

## JCAM Section 14. Reassigning and Excessing Part-Time Employees

12.5.C.8

> 8. **Reassignment—Part-Time Flexible Employees in Excess of Quota (Other Than Motor Vehicle)**
>
> Where there are part-time flexible employees in excess of the part-time flexible quota for the craft for whom work is not available, part-time flexibles lowest on the part-time flexible roll equal in number to such excess may at their option be reassigned to the foot of the part-time flexible roll in the same or another craft in another installation.

The term "quota" in this section is obsolete (Arbitrator Das, H7C-NA-C 82, March 21, 2000, C-20485). It comes from a long discontinued staffing practice requiring one part-time flexible employee for every five regulars. There is no longer any "quota." Rather, staffing levels are now governed by the provisions of Article 7.3.

12.5.C.8.a

> a. An excess employee reassigned to another craft in the same or another installation shall be assigned to the foot of the part-time flexible roll and begin a new period of seniority.

This provision is consistent with the provisions of Article 41.2.G.

12.5.C.8.b

> b. An excess part-time flexible employee reassigned to the same craft in another installation shall be placed at the foot of the part-time flexible roll. Upon change to full-time from the top of the part-time flexible roll, the employee's seniority for preferred assignments shall include the seniority the employee had in losing installation augmented by part-time flexible service in the gaining installation.

Questions concerning the seniority of part-time flexible letter carriers excessed into the letter carrier craft in another installation should be addressed to the parties' headquarters representatives.

12.5.C.8.c

> c. A senior part-time flexible in the same craft or occupational group in the same installation may elect to be reassigned in another installation in the same or another craft and take the seniority, if any, of the senior excess part-time flexible being reassigned, as set forth in a and b, above.

This section permits a senior part-time flexible employee from the same installation to voluntarily take the place of a more junior part-time flexible being reassigned. If a part-time flexible from another craft is excessed into the letter carrier craft under the provisions of this section, he or she begins a new period of seniority under the provisions of Article 12.5.C.8.a, above. If a part-time flexible letter carrier is excessed into the letter carrier craft at another installation under the pro-

visions of this section, he or she takes the seniority the more junior employee would have been assigned under the provisions of 12.5.C.8.b, above.

**12.5.C.8.d**

> d. The Postal Service will designate, after consultation with the affected Union, vacancies at installations in which excess part-time flexibles may request to be reassigned beginning with vacancies in other crafts in the same installation; then vacancies in the same craft in other installations; and finally vacancies in other crafts in other installations making the designations to minimize relocation hardships to the extent practicable.
>
> e. Part-time flexibles reassigned to another craft in the same installation shall be returned to the first part-time flexible vacancy within the craft and level from which reassigned.

This provision is mandatory. Employees excessed to another craft under the provisions of Article 12.5.C.8 must be returned to the craft from which they were excessed at the first available opportunity.

**12.5.C.8.f**

> f. Part-time flexibles reassigned to other installations have retreat rights to the next such vacancy according to their standing on the part-time flexible roll in the losing installation but such retreat right does not extend to part-time flexibles who elect to request reassignment in place of the junior part-time flexibles.
>
> g. The right to return is dependent upon a written request made at the time of reassignment from the losing installation and such request shall be honored unless it is withdrawn or an opportunity to return is declined.

**Retreat Rights.** Part-time employees excessed under the provisions of Article 12.5.C.8 have "retreat rights" only if they make a written request at the time of reassignment from the losing installation. These retreat rights are terminated if they fail to accept the first available vacancy.

**12.5.D**

> **D. Part-Time Regular Employees**
>
> Part-time regular employees assigned in the craft units shall be considered to be in a separate category. All provisions of this Section apply to part-time regular employees within their own category.

Part-time regular employees also may be excessed under the provisions of Article 12.5.

## JCAM Section 15. Voluntary Transfers

12.6

> **Section 6. Transfers**
>
> A. Installation heads will consider requests for transfers submitted by employees from other installations.
>
> B. Providing a written request for a voluntary transfer has been submitted, a written acknowledgment shall be given in a timely manner.
>
> **(Additional reassignment and probationary period provisions regarding City Carrier Assistant Employees are found in Appendix B.)**
>
> [see Memos, pages **188-193**]

**These Memos are located on *JCAM* pages 12-21, 12-22, and 12-45 through 12-50.**

**Transfers.** The provisions of Article 12.6 must be read in conjunction with the Memorandum of Understanding on Transfers reprinted below.

The denial of a transfer request is a grievable matter. When the denial of a transfer request is grieved, the disputed decision is by the Postmaster of another installation. Nevertheless, any grievances concerning the denial of a transfer request must be filed with the aggrieved employee's immediate supervisor as required by Article 15.2. Arbitrators from one region have the authority to order Postmasters in another region to accept a transfer request.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE AND**
**THE JOINT BARGAINING COMMITTEE**
**(American Postal Workers Union, AFL-CIO,**
**National Association of Letter Carriers, AFL-CIO)**

> **Re: Transfers**
>
> The parties agree that the following procedures will be followed when career Postal Employees request reassignment from Postal installations in one geographical area of the country to Postal installations in another geographical area. Local reassignments (reassignments within the same MSC, Division, or to adjacent MSCs or Divisions) are covered by the provisions of Section 2 of this memorandum.

The terms MSC and Division are obsolete. Wherever these terms appear in this memorandum, they should be understood as referring to Postal Service districts. Thus, reassignments to the same district or to adjacent districts are now considered "local" transfers and covered by Section 2 of the memorandum.

Transfer Memo 1.A

> **Section 1. Reassignments (Transfers) to other geographical areas.**
>
> A. Installation heads may continue to fill authorized vacancies first through promotion, internal reassignment and change to lower level, transfer from other agencies, reinstatements, etc., consistent with existing regulations and applicable provisions of the National Agreement.

The memorandum obligates management to give full consideration to transfer requests before seeking to fill vacancies with new hires from registers. However, it does not change existing regulations, such as those in the EL-312, concerning first filling vacancies through promotion, internal reassignment and change to lower level, transfer from other agencies, reinstatements, etc.

**Transfer Memo 1.B**

B. Installation heads will afford full consideration to all reassignment requests from employees in other geographical areas within the Postal Service. The requests will be considered in the order received consistent with the vacancies being filled and type of positions requested. Such requests from qualified employees, consistent with the provisions of this memorandum, will not be unreasonably denied. Local economic and unemployment conditions, as well as EEO factors, are valid concerns. When hiring from entrance registers is justified based on these local conditions, an attempt should be made to fill vacancies from both sources. Except in the most unusual of circumstances, if there are sufficient qualified applicants for reassignment at least one out of every four vacancies will be filled by granting requests for reassignment in all offices of 100 or more man-years if sufficient requests from qualified applicants have been received. In offices of less than 100 man-years a cumulative ratio of 1 out of 6 for the duration of the National Agreement will apply.

Transfer requests from qualified employees will not be unreasonably denied. However management may take into account local economic and unemployment conditions and EEO concerns to justify hiring from registers. Except in the most unusual of circumstances, if there are sufficient qualified applicants for reassignment, management must comply with the following minimums:

- In all offices of 100 or more workyears, at least one out of every four vacancies will be filled by granting requests for reassignment.
- In all offices of less than 100 workyears at least one out of every six vacancies during the duration of the National Agreement will be filled by granting requests for reassignment.

**Transfer Memo 1.C**

C. MSCs will maintain a record of the requests for reassignment received in the offices within their area of responsibility. This record may be reviewed by the Union on an annual basis upon request. Additionally, on a semiannual basis local Unions may request information necessary to determine if a 1 out of 4 ratio is being met between reassignments and hires from the entrance registers in all offices of 100 or more man-years.

D. Managers will give full consideration to the work, attendance, and safety records of all employees who are considered for reassignment. An employee must have an acceptable work, attendance, and safety record and meet the minimum qualifications for all positions to which they request reassignment. Both the gaining and losing installation head must be fair in their evaluations. Evaluations must

> be valid and to the point, with unsatisfactory work records accurately documented. An employee must have at least one-year of service in their present installation prior to requesting reassignment to another installation. Employees reassigned to installations under the provisions of this memorandum must remain in the new installation for a period of one year, unless released by the installation head earlier, before being eligible to be considered for reassignment again, except in the case of an employee who requests to return to the installation where he/she previously worked. Employees serving under craft lock-in periods per the provisions of the National Agreement must satisfy those lock-ins prior to being reassigned to other installations.

In evaluating transfer requests managers will give full consideration to the work, attendance, and safety records of all employees who are considered for reassignment. However, local managers may not add additional criteria for accepting transfer requests. For example, a policy of only accepting transfer requests from within the district would be a violation of the memorandum.

Evaluations must be fair, valid and to the point, with unsatisfactory work records accurately documented. They must be based upon an examination of the totality of an employee's individual work record. Evaluations based on the application of arbitrary standards such as a defined minimum sick leave balance do not meet this standard.

Except as otherwise provided, employees reassigned to installations under the provisions of this memorandum must remain in the new installation for a period of one year. This "lock-in" provision is not the same as a "craft lock-in." There are no "craft lock-ins" in the letter carrier craft. Thus, the requirement concerning "employees serving under craft lock-in periods" is not applicable to letter carriers.

**Transfer Memo 1.E**

> E. Installation heads considering employees for reassignment will contact the installation head of the losing installation and arrange for mutually agreeable reassignment and reporting dates. A minimum of thirty days' notice to the losing office will be afforded. Except in the event of unusual circumstances at the losing installations, reasonable time will be provided to allow the installation time to fill vacancies, however, this time should not exceed ninety days.

Read as a whole this section provides that "except in unusual circumstances at the losing installation" the reporting date at the new installation will be a minimum thirty days and should not be more than ninety days after a transfer request is approved. The installation head of the losing installation may not deny an approved transfer.

**Transfer Memo 1.F**

> F. Reassignment granted to a position in the same grade will be at the same grade and step. Step increase anniversaries will be maintained. Where voluntary reassignments are to a position at a lower level, employees will be assigned to the step in the lower grade consistent with Part 420 of the Employee and Labor Relations Manual.

In no case may an employee be required or requested to accept pay at a lower step as a condition for transfer. Employees' periodic step increases following a transfer continue exactly as they would have progressed had the employee not transferred, but instead remained in the original installation. Where voluntary reassignments are to a position at a lower level, for example when a Grade 2 Carrier Technician transfers to a Grade 1 letter carrier position, the employee's step and waiting period for the next step increase will be established in accordance with the normal rules in the ELM Section 420.

**Transfer Memo 1.G**

> G. Employees reassigned under these provisions will be reassigned consistent with the provisions of the appropriate craft article contained in the National Agreement. Employees will not be reassigned to full-time regular positions to the detriment of career part-time flexible employees who are available for conversion at the gaining installation. Seniority for employees transferred per this memorandum will be established consistent with the provisions of the National Agreement.

**Seniority.** The seniority of letter carriers voluntarily transferred to another installation is governed by Article 41.2.G.3 which requires that they begin a new period of seniority. Consequently, they become part-time flexible employees upon transfer. A possible exception exists when transferring to an installation with no part-time flexible letter carriers. In such cases they may immediately be assigned to a full-time status. Also note that the seniority rule for transfers is different than the seniority rule for carriers who have completed mutual exchanges (See "Mutual Exchanges," below).

**Transfer Memo 1.H**

> H. Relocation expenses will not be paid by the Postal Service incident to voluntary reassignment. Such expenses, as well as any resulting interview expenses, must be borne by employees.

All moving expenses must be borne by the employee who requested the transfer. If any time off is necessary to complete the move, it must be covered by annual leave or leave-without-pay.

**Transfer Memo 1.I**

> I. Under no circumstances will employees be requested or required to resign, and then be reinstated in order to circumvent these pay provisions, or to provide for an additional probationary period.

Transferred employees should have continuous service and are not required to serve a new probationary period.

**Transfer Memo 2.A**

**Section 2. Local Reassignments (Transfers)**

A. For local reassignment(s), managers will give full consideration to the work, attendance, and safety records of all employees who are considered for reassignment. An employee must have an acceptable work, attendance, and safety record and meet the minimum qualifications for all positions to which he/she requests reassignment. Both the gaining and losing installation head must be fair in their evaluations. Evaluations must be valid and to the point, with unsatisfactory work records accurately documented. An employee must have at least eighteen months of service in his/her present installation prior to requesting reassignment to another installation. Employees reassigned to installations under the provisions of this paragraph must remain in the new installation for a period of eighteen months (unless released by the installation head earlier) before being eligible to be considered for reassignment again, except in the case of an employee who requests to return to the installation where he/she previously worked. Employees serving under craft lock-in periods per the provisions of the National Agreement must satisfy those lock-ins prior to being reassigned to other installations. Local transfers are included in the 1 out of 4 ratio.

The term "Local Reassignments" means reassignments to the same district or to adjacent districts.

An important difference between local reassignments and reassignments to other geographical areas concerns the mandatory lock-in periods. The lock-in period for local reassignments is eighteen months (unless released by the installation head earlier) except in the case of an employee who requests to return to the installation where he/she previously worked. In contrast, the lock-in period for transfers to other geographical areas is one year. This "lock-in" provision is not the same as a "craft lock-in." There are no "craft lock-ins" in the letter carrier craft. Thus, the requirement concerning "employees serving under craft lock-in periods" is not applicable to letter carriers.

Whether a CCA must serve a "lock-in" when they are converted to career status is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**28. After a CCA becomes a career employee does he/she serve a lock-in period for transfers as defined by the Memorandum of Understanding, *Re: Transfers*?**

Yes.

**Transfer Memo 2.B**

B. The provisions of Section l, paragraphs A, C, E, F, G, H and I are applicable to local reassignments.

C. In those instances where an employee can substantially increase the number of hours (8 hours or more per week) by transferring to another installation and the employee meets the other criteria the lock-in period will be 12 months.

Date: July 21, 1987

**Mutual Exchanges** are exchanges of positions in the complement of different installations. Carriers do not exchange actual bid assignments or pay grades since the vacated bid positions must be posted for bidding in accordance with the provisions of Article 41.1 and the applicable Local Memorandums of Understanding. Section 351.6 of the ELM and the Memorandum of Understanding, *Re: Mutual Exchanges* address mutual exchanges between letter carriers.

**351.6 Mutual Exchanges**

351.61 General Policy

Career employees may exchange positions (subject to the provisions of the appropriate collective bargaining agreement) if the officials in charge at the installations involved approve the exchange of positions. Mutual exchanges must be made between employees in positions at the same grade levels. The following employees are not permitted to exchange positions:

a. Part-time flexible employees with full-time employees.

b. Bargaining employees with nonbargaining employees.

c. Nonsupervisory employees with supervisory employees.

**Exclusions.** Part-time flexible employees may not exchange positions with full-time employees, or bargaining unit employees with nonbargaining employees, or nonsupervisory employees with supervisory employees.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Mutual Exchanges**

The parties agree that in applying the relevant provisions of Section 351.6 of the Employee and Labor Relations Manual, city letter carriers in grades CC-01 and CC-02 are considered as being in the same grade. This agreement applies solely to determining whether employees are eligible for mutual exchanges.

Date: September 11, 2007

Effective with the 2006 National Agreement, the parties agreed that, for the purposes of mutual exchanges, city letter carriers in grade CC-01 and

CC-02 are considered as being in the same grade. Note that this removed what had been a prohibition on such mutual exchanges.

**Mutual Exchanges—Seniority.** Article 41.2.E provides that when mutual exchanges are made between letter carriers, the carriers will retain their seniority or shall take the seniority of the other exchangee, whichever is the lesser. This is different than the seniority rule in Article 41.2.G.3, which applies to other transfers, and which requires that the transferring employee begin a new period of seniority.

**Mutual Exchanges—Full Consideration.** The provisions of the Transfer Memorandum requiring that installation heads afford "full consideration" to all reassignment requests apply to mutual exchanges just as to any other transfers. Such requests "will not be unreasonably denied." In evaluating and responding to mutual exchange requests, installation heads should follow the criteria provided for in the Transfer Memorandum.

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 217 of 472. PageID #: 1035

# ARTICLE 13 ASSIGNMENT OF ILL OR INJURED REGULAR WORKFORCE EMPLOYEES

The provisions of Article 13 govern voluntary requests for light duty work by employees who are temporarily or permanently incapable of performing their normal duties as a result of illness or injury.

The term "light duty" should not be confused with the term "limited duty." The term limited duty is not used in the National Agreement. Rather, the term limited duty was established by 5 Code of Federal Regulations, Part 353—the O.P.M. regulation implementing 5. U.S.C. 8151(b), that portion of the Federal Employees' Compensation Act (FECA) pertaining to the resumption of employment following job-related injury or illness. USPS procedures regarding limited duty are found in Section 540 of the *Employee and Labor Relations Manual (ELM)*. Limited duty may be provided for an employee who is temporarily or permanently incapable of performing his/her normal duties as a result of a job-related compensable illness or injury. National Arbitrator Mittenthal held in H8N-5B-C 22251, November 14, 1983 (C-03855), that Article 13, Section 4.H applies to both light and limited duty situations (see below).

An employee who has suffered a compensable illness or injury may seek permanent light duty work through the procedures provided in Article 13. However, in most circumstances such employees will find the procedures and regulations provided in the ELM Section 540 better suited to their needs. The limited duty provisions contained in the ELM Section 540 will be discussed at the end of this article.

**13.1.A**

**Section 1. Introduction**

A. Part-time regular schedule employees assigned in the craft unit shall be considered to be in a separate category. All provisions of this Article apply to part-time regular schedule employees within their own category.

Part-time regular schedule employees are in a category separate and apart from full- and part-time flexible employees.

**13.1.B**

B. The U.S. Postal Service and the Union recognizing their responsibility to aid and assist deserving full-time regular or part-time flexible employees who through illness or injury are unable to perform their regularly assigned duties, agree to the following provisions and conditions for reassignment to temporary or permanent light duty or other assignments. It will be the responsibility of each installation head to implement the provisions of this Agreement within the installation, after local negotiations.

As discussed below, Article 30.B.15, 16 and 17 allow for the identification of light duty assignments during local implementation. However, the fact that no agreement has been reached does not prevent an eligible employee from requesting available light duty.

13.2.A

**Section 2. Employee's Request for Reassignment**

**A. Temporary Reassignment**

Any full-time regular or part-time flexible employee recuperating from a serious illness or injury and temporarily unable to perform the assigned duties may voluntarily submit a written request to the installation head for temporary assignment to a light duty or other assignment. The request shall be supported by a medical statement from a licensed physician or by a written statement from a licensed chiropractor stating, when possible, the anticipated duration of the convalescence period. Such employee agrees to submit to a further examination by a physician designated by the installation head, if that official so requests.

The following requirements apply to an employee seeking temporary reassignment to light duty work:

- Any full-time regular or part-time flexible employee may request temporary light duty, regardless of length of service.
- The request must be submitted in writing.
- The request must be supported by a medical statement from a licensed physician or by a written statement from a licensed chiropractor.
- The employee bears any cost connected with the statement required under this section.
- The employee must agree to submit to a further examination by a physician designated by the installation head, if requested.
- The Postal Service will be responsible for any costs when it requests a second medical examination.
- The employee may specifically seek light duty or may seek "other assignment" within his/her medical limitations.

13.2.B.1

**B. Permanent Reassignment**

1. Any ill or injured full-time regular or part-time flexible employee having a minimum of five years of postal service, or any full-time regular or part-time flexible employee who sustained injury on duty, regardless of years of service, while performing the assigned duties can submit a voluntary request for permanent reassignment to light duty or other assignment to the installation head if the employee is permanently unable to perform all or part

> of the assigned duties. The request shall be accompanied by a medical certificate from a physician designated by the installation head giving full evidence of the physical condition of the employee, the need for reassignment, and the ability of the employee to perform other duties. A certificate from the employee's personal physician will not be acceptable.

The following requirements apply to an employee seeking permanent reassignment to light duty work:

- An employee must have five years of postal service to be eligible to apply for permanent reassignment due to a non-job related injury or illness.
- Any full- or part-time employee, regardless of length of postal service, may choose to request permanent reassignment duty if unable to perform all or part of his/her assigned duties due to job related illness or injury instead of using the procedures in the ELM Section 540.
- The request must be submitted in writing.
- The request must be accompanied by a medical statement from a physician designated by the installation head. Unlike the case in requests for temporary reassignment, a statement from the employee's own physician is not acceptable.
- The Postal Service will be responsible for the costs of a medical examination required and scheduled by the Postal Service.
- The employee may specifically seek light duty or may seek "other assignment" within his/her medical limitations.

**13.2.B.2**

> 2. The following procedures are the exclusive procedures for resolving a disagreement between the employee's physician and the physician designated by the USPS concerning the medical condition of an employee who has requested a permanent light duty assignment. These procedures shall not apply to cases where the employee's medical condition arose out of an occupational illness or injury. On request of the Union, a third physician will be selected from a list of five Board Certified Specialists in the medical field for the condition in question, the list to be supplied by the local Medical Society. The physician will be selected by the alternate striking of names from the list by the Union and the Employer. The Employer will supply the selected physician with all relevant facts including job description and occupational physical requirements. The decision of the third physician will be final as to the employee's medical condition and occupational limitations, if any. Any other issues relating to the employee's entitlement to a light duty assignment shall be resolved through the grievance-arbitration procedure. The costs of the services of the third physician shall be shared by the Union and the Employer.

The procedures in Article 13.2.B.2 for resolving a disagreement between physicians do not apply to situations involving on-the-job illness or injury. Only OWCP has the authority to resolve disputes concerning the medical condition of employees who have suffered a compensable injury or illness (See *Limited Duty*, pages 13-10 through 13-12).

On request of the union, a third doctor will be selected from a list supplied, in each separate case, by the local Medical Society of certified specialists for the condition in question.

**13.2.C**

> C. Installation heads shall show the greatest consideration for full-time regular or part-time flexible employees requiring light duty or other assignments, giving each request careful attention, and reassign such employees to the extent possible in the employee's office. When a request is refused, the installation head shall notify the concerned employee in writing, stating the reasons for the inability to reassign the employee.

Article 13.2.C requires that installation heads make a bona fide effort to identify light duty work. It further requires management to give the matter "the greatest consideration" and "careful attention." If management does not provide the requested light duty work, it has an obligation to explain in writing why light duty work is unavailable. Disputes concerning the failure to provide light duty work may be addressed through the grievance arbitration procedure.

> **Section 3. Local Implementation**
>
> Due to varied size installations and conditions within installations, the following important items having a direct bearing on these reassignment procedures (establishment of light duty assignments) should be determined by local negotiations.

**13.3.A**

> A. Through local negotiations, each office will establish the assignments that are to be considered light duty within each craft represented in the office. These negotiations should explore ways and means to make adjustments in normal assignments, to convert them to light duty assignments without seriously affecting the production of the assignment.

**13.3.B**

> B. Light duty assignments may be established from part-time hours, to consist of 8 hours or less in a service day and 40 hours or less in a service week. The establishment of such assignment does not guarantee any hours to a part-time flexible employee.

**13.3.C**

> C. Number of Light Duty Assignments. The number of assignments within each craft that may be reserved for temporary or permanent light duty assignments, consistent with good business practices, shall be determined by past experience as to the number of reassignments that can be expected during each year, and the method used in reserving these assignments to

> insure that no assigned full-time regular employee will be adversely affected, will be defined through local negotiations. The light duty employee's tour hours, work location and basic work week shall be those of the light duty assignment and the needs of the service, whether or not the same as for the employee's previous duty assignment.

**Local Implementation.** Article 13.3, together with Article 30.B.15, 16 and 17 provide that the parties may discuss the following during the local implementation period:

- The number of light duty assignments within each craft or occupational group to be reserved for temporary or permanent light duty assignment (Article 30.B.1).
- The method to be used in reserving light duty assignments so that no regularly assigned member of the regular work force will be adversely affected (Article 30.B.16).
- The identification of assignments that are to be considered light duty within each craft represented in the office (Article 30.B.17).

Article 13.3 provides that changes may be made in an employee's regular schedule and work location in order to accommodate a light duty request (Step 4, NC-S 5127, April 15, 1977, M-00734). National Arbitrator Mittenthal held in H1C-4E-C 35028, June 12, 1987 (C-00935) that full-time employees on light duty are not guaranteed eight hours a day or forty hours a week of light duty work. They may be sent home before the end of their tour due to lack of work.

13.4.A

> **Section 4. General Policy Procedures**
>
> A. Every effort shall be made to reassign the concerned employee within the employee's present craft or occupational group, even if such assignment reduces the number of hours of work for the supplemental work force. After all efforts are exhausted in this area, consideration will be given to reassignment to another craft or occupational group within the same installation.

When possible, letter carriers should be provided light duty work within the letter carrier craft. Article 13.4.A obligates management to reduce casual hours, if necessary, in order to provide light duty work in the letter carrier craft for career letter carriers.

13.4.B

> B. The full-time regular or part-time flexible employee must be able to meet the qualifications of the position to which the employee is reassigned on a permanent basis. On a temporary reassignment, qualifications can be modified provided excessive hours are not used in the operation.

13.4.C

> C. The reassignment of a full-time regular or part-time flexible employee to a temporary or permanent light duty or other

assignment shall not be made to the detriment of any full-time regular on a scheduled assignment or give a reassigned part-time flexible preference over other part-time flexible employees.

13.4.D

D. The reassignment of a full-time regular or part-time flexible employee under the provisions of this Article to an agreed-upon light duty temporary or permanent or other assignment within the office, such as type of assignment, area of assignment, hours of duty, etc., will be the decision of the installation head who will be guided by the examining physician's report, employee's ability to reach the place of employment and ability to perform the duties involved.

13.4.E

E. An additional full-time regular position can be authorized within the craft or occupational group to which the employee is being reassigned, if the additional position can be established out of the part-time hours being used in that operation without increasing the overall hour usage. If this cannot be accomplished, then consideration will be given to reassignment to an existing vacancy.

13.4.F

F. The installation head shall review each light duty reassignment at least once each year, or at any time the installation head has reason to believe the incumbent is able to perform satisfactorily in other than the light duty assignment the employee occupies. This review is to determine the need for continuation of the employee in the light duty assignment. Such employee may be requested to submit to a medical review by a physician designated by the installation head if the installation head believes such examination to be necessary.

13.4.G

G. The following procedures are the exclusive procedures for resolving a disagreement between the employee's physician and the physician designated by the USPS concerning the medical condition of an employee who is on a light duty assignment. These procedures shall not apply to cases where the employee's medical condition arose out of an occupational illness or injury. On request of the Union, a third physician will be selected from a list of five Board Certified Specialists in the medical field for the condition in question, the list to be supplied by the local Medical Society. The physician will be selected by the alternate striking of names from the list by the Union and the Employer. The Employer will supply the selected physician with all relevant facts including job description and occupational physical requirements. The decision of the third physician will be final as to the employee's medical condition and occupational limitations, if any. Any other issues relating to the employee's entitlement to a light duty assignment shall be resolved through the grievance-arbitration procedure. The costs of the services of the third physician shall be shared by the Union and the Employer.

The dispute resolution procedure in this section does not apply to situations involving job-related illness or injury. Only OWCP has the

authority to resolve disputes concerning the medical condition of employees who have suffered a compensable injury or illness (See *Limited Duty*, pages 13-10 through 13-12).

The procedure in this section is the same as that in Article 13.2.B.2. It provides that on request of the union, a third doctor will be selected from a list supplied, in each separate case, by the local Medical Society of certified specialists for the condition in question.

**13.4.H**

> H. When a full-time regular employee in a temporary light duty assignment is declared recovered on medical review, the employee shall be returned to the employee's former duty assignment, if it has not been discontinued. If such former regular assignment has been discontinued, the employee becomes an unassigned full-time regular employee.

National Arbitrator Mittenthal held in H8N-5B-C 22251, November 14, 1983 (C-03855), that this provision also applies to employees who have been assigned temporary limited duty work in other crafts under the provisions of the ELM Section 546.

**13.4.I**

> I. If a full-time regular employee is reassigned in another craft for permanent light duty and later is declared recovered, on medical review, the employee shall be returned to the first available full-time regular vacancy in complement in the employee's former craft. Pending return to such former craft, the employee shall be an unassigned full-time regular employee. The employee's seniority shall be restored to include service in the light duty assignment.

When the qualifying conditions in this provision are met, return to the former craft is mandatory. The seniority rule stated in this section is applicable to the letter carrier craft and is an exception to the general rule in Article 41.2.G. Article 13.4.I also applies to employees who have been permanently assigned limited duty work in other crafts under the provisions of the ELM Section 546 (Arbitrator Mittenthal, H8N-5B-C 22251, November 14, 1983, C-03855).

**13.4.J**

> J. When a full-time regular employee who has been awarded a permanent light duty assignment within the employee's own craft is declared recovered, on medical review, the employee shall become an unassigned full-time regular employee.

**13.4.K**

> K. When a part-time flexible on temporary light duty is declared recovered, the employee's detail to light duty shall be terminated.

**13.4.L**

> L. When a part-time flexible who has been reassigned in another craft on permanent light duty is declared recovered, such assignment to light duty shall be terminated. Section 4.I, above, does not apply even though the employee has advanced to full-time regular while on light duty.

13.5

**Section 5. Filling Vacancies Due to Reassignment of an Employee to Another Craft**

When it is necessary to permanently reassign an ill or injured full-time regular or part-time flexible employee who is unable to perform the regularly assigned duties, from one craft to another craft within the office, the following procedures will be followed:

A. When the reassigned employee is a full-time regular employee, the resulting full-time regular vacancy in the complement, not necessarily in the particular duty assignment of the losing craft from which the employee is being reassigned, shall be posted to give the senior of the full-time regular employees in the gaining craft the opportunity to be reassigned to the vacancy, if desired.

The seniority of full-time employees reassigned to another craft under the provisions of this section is determined by Article 13.6.A.

National Arbitrator Bloch held in H1C-4B-C-7361, October 5, 1983 (C-00383) that where a clerk obtained a letter carrier position as a result of a letter carrier being assigned light duty work in the clerk craft under this provision, it was improper to return the former clerk to the clerk craft after the letter carrier successfully grieved the light duty assignment that had been accepted under duress.

13.5.B

B. If no full-time regular employee accepts the opportunity to be assigned to the vacancy in the complement, not necessarily in the particular duty assignment in the other craft, the senior of the part-time flexibles on the opposite roll who wishes to accept the vacancy shall be assigned to the full-time regular vacancy in the complement of the craft of the reassigned employee.

When no full-time regulars in the gaining craft desire to take the vacancy in the losing craft, the vacancy is then offered to part-time flexibles in the gaining craft by seniority. Part-time flexibles so reassigned become full-time regulars upon reassignment. However, under the provisions of Article 13.6.B, they are required to begin a new period of seniority.

13.5.C

C. When the reassigned employee is a part-time flexible, the resulting vacancy in the losing craft shall be posted to give the senior of the full-time regular or part-time flexible employees in the gaining craft the opportunity to be assigned to the part-time flexible vacancy, if desired, to begin a new period of seniority at the foot of the part-time flexible roll.

Full-time regulars from another craft who bid into the letter carrier craft under this provision must begin a new period of seniority and become part-time flexibles.

13.5.D

D. The rule in A and B, above, applies when a full-time regular employee on permanent light duty is declared recovered and is returned to the employee's former craft, to give the senior of the full-time regular or part-time flexible employees in the gaining craft the opportunity, if desired, to be assigned in the resulting full-time regular vacancy in the complement, not necessarily in the particular duty assignment of the losing craft.

13.6

**Section 6. Seniority of an Employee Assigned to Another Craft**

A. Except as provided for in Section 4.I, above, a full-time regular employee assigned to another craft or occupational group in the same or lower level in the same installation shall take the seniority for preferred tours and assignments, whichever is the lesser of (a) one day junior to the junior full-time regular employee in the craft or occupational group, (b) retain the seniority the employee had in the employee's former craft.

B. A part-time flexible employee who is permanently assigned to a full-time regular or part-time flexible assignment in another craft, under the provisions of this Article, shall begin a new period of seniority. If assigned as a part-time flexible, it shall be at the foot of the part-time flexible roll.

The seniority of full-time regulars assigned to other crafts as a result of Article 13 is the lesser of the employee's own seniority or one day junior to the junior full-time employee in the craft to which assigned. This is an exception to Article 41.2.G.2.

**Bidding while on light or limited duty.** A Memorandum of Understanding, H1N-NA-C 119, March 16, 1987 (M-00752), governs bidding by letter carriers on light or limited duty. It provides:

> The following procedures will be used in situations in which a regular letter carrier, as a result of illness or injury, is temporarily unable to work his or her normal letter carrier assignment, and is working another assignment on a light duty or limited duty basis, or is receiving Continuation of Pay (COP) or compensation as a result of being injured on the job, sick leave, or annual leave, or Leave Without Pay (LWOP) in lieu of sick leave.
>
> A) A regular letter carrier who is temporarily disabled will be allowed to bid for and be awarded a letter carrier bid assignment in accordance with Article 41, Section 1.C.1, or, where applicable, in accordance with the provisions of a local memorandum of understanding, provided that the letter carrier will be able to assume the position within the six (6) months from the time at which the bid is placed.
>
> B) Management may, at the time of submission of the bid or at any time thereafter, request that the letter carrier provide medical certification indicating that the letter carrier will be able to perform the duties of the bid-for position within six (6) months of the bid. If the letter carrier fails to provide such certification, the bid shall be disallowed, and, if the assignment was awarded, it shall be reposted for bidding. Under such circumstances, the letter carrier shall not be permitted to re-bid the next posting of that assignment.

C) If at the end of the six (6) month period, the letter carrier is still unable to perform the duties of the bid-for position, management may request that the letter carrier provide new medical certification indicating that the letter carrier will be able to perform the duties of the bid-for position within the second six (6) months after the bid. If the letter carrier fails to provide such new certification, the bid shall be disallowed and the assignment shall be reposted for bidding. Under such circumstances, the letter carrier shall not be permitted to re-bid the next posting of that assignment.

D) If at the end of one (1) year from the placement of the bid the letter carrier has not been able to perform the duties of the bid-for position, the letter carrier must relinquish the assignment, and shall not be permitted to re-bid the next posting of that assignment.

E) It is still incumbent upon the letter carrier to follow procedures in Article 41.1.B.1 to request notices to be sent to a specific location when absent. All other provisions relevant to the bidding process will also apply. Letter carriers who bid to a higher level assignment pursuant to the procedures described in the preamble and Part I Bidding, above, will not receive higher level pay until they are physically able to, and actually perform work in the bid-for higher level position.

If an employee who has accepted, and is working, a light or limited duty assignment subsequently bids and is awarded a new bid position pursuant to this memorandum, there is no contractual requirement to adjust the light or limited duty assignment as a result of the newly awarded bid position. If, however, management determines that a new limited duty assignment is in order, the new assignment must comply with the ELM Section 546.142 relative to the newly awarded bid position.

**Limited Duty** work is work provided for an employee who is temporarily or permanently incapable of performing his/her normal duties as a result of a compensable illness or injury. The term limited duty work was established by Title 5 Code of Federal Regulations, Part 353—the O.P.M. regulation implementing 5. U.S.C. 8151(b), that portion of the Federal Employees' Compensation Act (FECA) pertaining to the resumption of employment following compensable injury or illness. USPS procedures regarding limited duty are found in the ELM Section 540. The Office of Workers' Compensation Programs has the exclusive authority to adjudicate compensation claims and to determine the medical suitability of proposed limited duty work.

However, the ELM Section 546.14 provides for additional rules that must be observed when offering limited duty work.

### 546.14 Disability Partially Overcome

**546.142** Obligation.

When an employee has partially overcome the injury or disability, the USPS has the following obligation:

a. Current Employees. When an employee has partially overcome a compensable disability, the Postal Service must make every effort toward assigning the employee to limited duty consistent with the employee's medically defined work

limitation tolerance (see 546.611). In assigning such limited duty, the Postal Service should minimize any adverse or disruptive impact on the employee. The following considerations must be made in effecting such limited duty assignments:

(1) To the extent that there is adequate work available within the employee's work limitation tolerances, within the employee's craft, in the work facility to which the employee is regularly assigned, and during the hours when the employee regularly works, that work constitutes the limited duty to which the employee is assigned.

(2) If adequate duties are not available within the employee's work limitation tolerances in the craft and work facility to which the employee is regularly assigned within the employee's regular hours of duty, other work may be assigned within that facility.

(3) If adequate work is not available at the facility within the employee's regular hours of duty, work outside the employee's regular schedule may be assigned as limited duty. However, all reasonable efforts must be made to assign the employee to limited duty within the employee's craft and to keep the hours of limited duty as close as possible to the employee's regular schedule.

(4) An employee may be assigned limited duty outside of the work facility to which the employee is normally assigned only if there is not adequate work available within the employee's work limitation tolerances at the employee's facility. In such instances, every effort must be made to assign the employee to work within the employee's craft within the employee's regular schedule and as near as possible to the regular work facility to which the employee is normally assigned.

ELM Section 546.14 specifies the steps that must be taken in seeking limited duty work in order to ensure the assignments are minimally disruptive to the ill or injured employee. The Step 4 Settlement G90N-4G-C 95026885, January 28, 1997 (M-01264), specifically provides that the provisions of the ELM Section 546.141 (currently the ELM Section 546.142) are enforceable through the grievance/arbitration procedure.

Limited duty work in other crafts for CCAs is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**17. May CCA who have an on the job illness or injury be assigned to work in other crafts?**

Only if the assignment to another craft is consistent with Section 546 of the Employee and Labor Relations Manual and relevant Department of Labor regulations.

An employee could be offered a limited duty assignment that meets OWCP's requirements, but fails to meet the requirements of the ELM

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 228 of 472. PageID #: 1046

Section 546.142. Carriers refusing such disputed assignments could risk termination of compensation benefits. These situations are addressed in the Memorandum of Understanding, January 29, 1993 (M-01120), which allows a partially recovered employee to accept a limited duty job offer "under protest" and still pursue a grievance concerning the assignment. The memorandum provides that:

1. By accepting a limited duty assignment, an employee does not waive the opportunity to contest the propriety of that assignment through the grievance procedure, whether the assignment is within or out of his/her craft.

2. An employee whose craft designation is changed as a result of accepting a limited duty assignment and who protests the propriety of the assignment through the grievance procedure shall be represented during the processing of the grievance, including in arbitration, if necessary, by the union that represents his/her original craft.

For example, if a letter carrier craft employee is given a limited duty assignment in the clerk craft, and grieves that assignment, the employee will be represented by the NALC. If a clerk craft employee is given a limited duty assignment in the letter carrier craft, and grieves that assignment, the employee will be represented by the APWU.

USPS000768

# ARTICLE 14 SAFETY AND HEALTH

14.1

**Section 1. Responsibilities**

It is the responsibility of management to provide safe working conditions in all present and future installations and to develop a safe working force. The Union will cooperate with and assist management to live up to this responsibility. The Employer will meet with the Union on a semiannual basis and inform the Union of its automated systems development programs. The Employer also agrees to give appropriate consideration to human factors in the design and development of automated systems. Human factors and ergonomics of new automated systems are a proper subject for discussion at the National Joint Labor-Management Safety Committee.

**Responsibilities.** It is management's responsibility to provide safe working conditions; it is the union's responsibility to cooperate with and assist management in its efforts to fulfill this responsibility.

14.2

**Section 2. Cooperation**

The Employer and the Union insist on the observance of safe rules and safe procedures by employees and insist on correction of unsafe conditions. Mechanization, vehicles and vehicle equipment, and the work place must be maintained in a safe and sanitary condition, including adequate occupational health and environmental conditions. The Employer shall make available at each installation forms to be used by employees in reporting unsafe and unhealthful conditions. If an employee believes he/she is being required to work under unsafe conditions, such employee may:

(a) notify such employee's supervisor who will immediately investigate the condition and take corrective action if necessary;

(b) notify such employee's steward, if available, who may discuss the alleged unsafe condition with such employee's supervisor;

(c) file a grievance at Formal Step A of the grievance procedure within fourteen (14) days of notifying such employee's supervisor if no corrective action is taken during the employee's tour; and/or

(d) make a written report to the Union representative from the local Safety and Health Committee who may discuss the report with such employee's supervisor.

Upon written request of the employee involved in an accident, a copy of the PS Form 1769 (Accident Report) will be provided.

Any grievance which has as its subject a safety or health issue directly affecting an employee(s) which is subsequently properly appealed to arbitration in accordance with the provisions of Article 15 may be placed at the head of the appropriate arbitration docket at the request of the Union.

**Priority Handling of Safety Issues.** Article 14.2 provides a special priority for the handling of safety and health issues, providing for cooperative correction of unsafe conditions and enforcement of safety rules, and requiring special handling of individual safety issues as they arise.

**Safety Grievances Filed at Formal Step A.** Article 14.2.(c) provides that safety and health grievances may be filed directly at Formal Step A of the grievance procedure. However, if a health or safety grievance is filed at Informal Step A instead, it is not procedurally defective for that reason.

**Priority Arbitration Scheduling.** Any grievance which has as its subject a safety or health issue directly affecting an employee(s) which is subsequently properly appealed to arbitration may be placed at the head of the appropriate arbitration docket at the request of the union. The Postal Service will not refuse to schedule a case in accordance with Article 14.2 based solely upon the belief that no safety issue is present. However, placement of a case at the head of the arbitration docket does not preclude the Postal Service from arguing the existence of the alleged "safety" issue or that the case should not have been given priority (Prearbitration Settlement, F94N-4F-C-97024971, February 20, 2001, M-01433).

14.3

**Section 3. Implementation**

To assist in the positive implementation of the program:

A. There shall be established at the Employer's Headquarters level, a Joint Labor-Management Safety Committee. Representation on the Committee, to be specifically determined by the Employer and the Union, shall include one person from the Union and representatives from appropriate Departments in the Postal Service. Not later than 60 days following the effective date of this Collective Bargaining Agreement, designated representatives of the Union and Management will meet for the purpose of developing a comprehensive agenda which will include all aspects of the Employer's Safety Program. Subsequent to the development of this agenda priorities will be established and a tentative schedule will be developed to insure full discussion of all topics. Meetings may also be requested by either party for the specific purpose of discussing additional topics of interest within the scope of the Committee.

The responsibility of the Committee will be to evaluate and make recommendations on all aspects of the Employer's Safety Program, to include program adequacy, implementation at the local level, and studies being conducted for improving the work environment.

The Chair will be designated by the Employer. The Union may designate a coordinator who, in conjunction with the Chair, shall schedule the meetings, and recommended priorities on new agenda items. In addition, the coordinator may assist the Chair in conducting the activities of the Committee. The Employer shall furnish the Union information relating to injuries, illness and safety, including the morbidity and

mortality experience of employees. This report shall be in form of reports furnished OSHA on a quarterly basis.

The Headquarters level Committee will meet quarterly and the Employer and Union Representatives will exchange proposed agenda items two weeks before the scheduled meetings. If problems or items of significant, national nature arise between scheduled quarterly meetings either party may request a special meeting of the Committee. Either party will have the right to be accompanied to any Committee meeting by no more than two technical advisors.

B. There shall be established at the Employer's Area level, an Area Joint Labor-Management Safety Committee, which will be scheduled to meet quarterly. The Employer and Union Representatives will exchange proposed agenda items two weeks before the scheduled meetings. If problems or items of a significant, area nature arise between scheduled quarterly meetings, either party may request a special meeting of the Committee. Either party will have the right to be accompanied to any Committee meeting by no more than two technical advisors.

Representation on the Committee shall include one person from the Union and appropriate representatives from the Postal Service Area Office. The Chair will be designated by the Employer.

C. The Employer will make Health Service available for the treatment of job related injury or illness where it determines they are needed. The Health Service will be available from any of the following sources: U.S. Public Health Service; other government or public medical sources within the area; independent or private medical facilities or services that can be contracted for; or in the event funds, spaces and personnel are available for such purposes, they may be staffed at the installation. The Employer will promulgate appropriate regulations which comply with applicable regulations of the Office of Workers' Compensation Programs, including employee choice of health services.

D. The Employer will comply with Section 19 of the Williams-Steiger Occupational Safety and Health Act.

**OSHA.** The Postal Employees' Safety Enhancement Act of 1998 (PESEA) changed the status of the Postal Service as an employer under the Occupational Safety and Health Act (OSHA). Previously, the Postal Service, as a federal agency, was exempt from the private-sector provisions of the OSHA and was covered only by Section 19 of the Act and Executive Order 12196. When PESEA became effective, the Postal Service, unlike other federal agencies, became fully subject to the OSHA. This means that OSHA has jurisdiction over the Postal Service in matters relating to employee safety and health.

14.4

**Section 4. Local Safety Committee**

At each postal installation having 50 or more employees, a Joint Labor-Management Safety and Health Committee will be established. In installations having fewer than 50 employees, installation heads are encouraged to establish similar committees when requested by the Union. Where no Safety and Health Committee exists, safety and

> health items may be placed on the agenda and discussed at labor-management meetings. There shall be equal representation on the Committee between the Union and management. The representation on the Committee to be specifically determined by the Employer and the Union shall include one person from the Union and appropriate management representatives. The Chair will be designated by the Employer.
>
> It is recognized that under some circumstances, the presence of an additional employee employed at the installation will be useful to the local Safety and Health Committee because of that employee's special expertise or experience with the agenda item being discussed. Under these circumstances, which will not normally be applicable to most agenda items, the employee may, at the request of the Union, be in attendance only for the time necessary to discuss that item. Payment for the actual time spent at such meetings by the employee will be at the applicable straight-time rate, providing the time spent is a part of the employee's regular workday.

**Local Committees.** Article 14.4 requires creation of local, joint safety committees at each installation with fifty or more employees, and encourages creation of committees at smaller facilities when requested by the union. In small facilities without committees, safety and health issues may be discussed in Labor-Management meetings.

14.5

> **Section 5. Subjects for Discussion**
>
> Individual grievances shall not be made the subject of discussion during Safety and Health Committee meetings.

14.6

> **Section 6. Employee Participation**
>
> It is the intent of this program to insure broad exposure to employees, to develop interest by active participation of employees, to insure new ideas being presented to the Committee and to make certain that employees in all areas of an installation have an opportunity to be represented. At the same time, it is recognized that for the program to be effective, it is desirable to provide for a continuity in the committee work from year to year. Therefore, except for the Chair and Secretary, the Committee members shall serve three-year terms and shall at the discretion of the Union be eligible to succeed themselves.

**Employee Participation.** Article 14.6 allows, at the union's discretion, all union members of the Safety and Health Committee to succeed themselves at the conclusion of each three-year term.

14.7

> **Section 7. Local Committee Meetings**
>
> The Safety and Health Committee shall meet at least quarterly and at such other times as requested by a Committee member and approved by the Chair in order to discuss significant problems or items. The meeting shall be on official time. Each Committee member shall submit agenda items to the Secretary at least three (3) days prior to the meeting. A member of the Health Unit will be invited to participate in

the meeting of the Labor-Management Safety and Health Committee when agenda item(s) relate to the activities of the Health Unit.

The local Safety and Health Committee must meet at least quarterly, but may meet more often if it wishes, on official (paid) time.

The language which provides that local Safety and Health Committee meetings "shall be on official time" pertains only to members of the carrier craft. If a local branch has appointed a member of another craft to be its representative, that person is compensated only if the meeting is held during the representative's regular schedule (National Arbitrator Bernstein, H1N-3D-C 40171, April 8, 1987, C-06949).

14.8.A **Section 8. Local Committee Responsibilities**

A. The Committee shall review the progress in accident prevention and health at the installation; determine program areas which should have increased emphasis; and it may investigate major accidents which result in disabling injuries. Items properly relating to employee safety and health shall be considered appropriate discussion items. Upon a timely request, information or records necessary for the local Safety and Health Committee to investigate real or potential safety and health issues will be made available to the Committee.

In addition, the Committee shall promote the cause of safety and health in the installation by:

1. Reviewing safety and health suggestions, safety training records and reports of unsafe conditions or practices.
2. Reviewing local safety and health rules.
3. Identifying employee unsafe work practices and assisting in enforcing safety work rules.
4. Reviewing updated list of hazardous materials used in the installation.
5. Reviewing local dog bite prevention efforts.

The Committee shall at its discretion render reports to the installation head and may at its discretion make recommendations to the installation head for action on matters concerning safety and health. The installation head shall within a reasonable period of time advise the Committee that the recommended action has been taken or advise the Headquarters Safety and Health Committee and the President of the local Union as to why it has not. Any member of the Committee may also submit a written report to the Headquarters Safety and Health Committee in the event the Committee's recommendations are not implemented.

Upon proper written request to the Chair of the Committee, on-the-spot inspection of particular troublesome areas may be made by individual Committee members or a Subcommittee or the Committee as a whole. Such request shall not be unreasonably denied. When so approved, the Committee members shall be on official time while making such inspection.

The Union representative from the local Safety and Health Committee may participate on the annual inspection, conducted by district safety and health services personnel in accordance with ELM Section 824, provided that the Union represents employees at the facility being inspected. In no case shall there be more than one NALC representative on such inspections.

The Union representative from the local Safety and Health Committee may participate on other inspections of the main facility of each post office or other installation with 100 or more workyears of employment in the regular work force, and of an individual station or branch where the station or branch has 100 or more workyears of employment in the regular work force, provided that the Union represents employees at the main facility or station or branch and provided that the Union representative is domiciled at the main facility or station or branch to be inspected. If the Union representative to the local Safety and Health Committee is not domiciled at the main facility or station or branch to be inspected and if the Union represents employees at the main facility or station or branch, at the Union's option, representatives from the Committee may participate on the inspection (at no additional cost for the Employer) or the Union may designate representatives domiciled at the main facility or station or branch to be inspected to participate on the inspection. In no case shall there be more than one NALC representative on such inspections.

**14.8.A**

The Union representative from the local Safety and Health Committee may participate on the annual inspection of each installation with less than 100 workyears of employment in the regular work force, where such Committee exists in the installation being inspected. In those installations that do not have a Safety and Health Committee, the inspector shall afford the opportunity for a bargaining unit employee from the Union, if it represents employees in that installation, to accompany him/her during these inspections. If requested, these bargaining unit employees should be selected by the various exclusive bargaining representatives in that installation. In no case shall there be more than one NALC representative on such inspections.

**14.8.B**

B. An appointed member of a local committee will receive an orientation by the Employer which will include:

1. Responsibilities of the Committee and its members.
2. Basic elements of the Safety and Health Program.
3. Identification of hazards and unsafe practices.
4. Explanation of reports and statistics reviewed and analyzed by the Committee.

**14.8.C**

C. Where an investigation board is appointed by a Vice President, Area Operations or a District Manager to investigate a fatal or serious industrial non-criminal accident and/or injury, the appropriate Union at the installation will be advised promptly. When requested by the Union, a representative from the local Safety and Health Committee will be permitted to accompany the board in its investigation.

**14.8.D**

D. In installations where employees represented by the Union accept, handle and/or transport hazardous materials, the Employer will establish a program of promoting safety awareness through communi-

cations and/or training, as appropriate. Elements of such a program would include, but not be limited to:

14.8.D.1

1. Informational postings, pamphlets or articles in Postal Area Bulletins.
2. Distribution of Publication 52 to employees whose duties require acceptance of and handling hazardous or perishable items.
3. On-the-job training of employees whose duties require the handling and/or transportation of hazardous or perishable items. This training will include, but is not limited to, hazard identification; proper handling of hazardous materials; personal protective equipment availability and its use; cleanup and disposal requirements for hazardous materials.
4. All mailbags containing any hazardous materials, as defined in Publication 52, will be appropriately identified so that the employee handling the mail is aware that the mailbag contains one or more hazardous material packages.
5. Personal protective equipment will be made available to employees who are exposed to spills and breakage of hazardous materials.

Local Safety and Health Committees have review responsibilities over accident prevention and health issues such as the review of safety and health suggestions, safety-related records and rules, dog bite prevention efforts, and the list of hazardous materials.

On-the-spot inspection of particular troublesome areas may be made by individual Committee members, a subcommittee or the Committee as a whole upon proper written request to the Chair of the Committee. Such request shall not be unreasonably denied. When so approved, the Committee members shall be on official time while making such inspection.

A union representative from the local Safety and Health Committee may participate on the annual inspection, conducted by district safety and health services personnel in accordance with the ELM Section 824, provided that the union represents employees at the facility being inspected. In no case shall there be more than one NALC representative on such inspections.

14.9

**Section 9. Field Federal Safety and Health Councils**

In those cities where Field Federal Safety and Health Councils exist, one representative of the Union who is on the Local Safety and Health Committee in an independent postal installation in that city and who serves as a member of such Councils, will be permitted to attend the meetings. Such employee will be excused from regularly assigned duties without loss of pay. Employer authorized payment as outlined above will be granted at the applicable straight time rate, provided the time spent in such meetings is a part of the employee's regular work day.

(The preceding Article, Article 14, shall apply to **City Carrier Assistant** Employees.)

[see Memos, pages **195-196**]

**The Memos are located in the *JCAM*, below.**

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE AND
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: Joint Safety and Accident Control Teams**

The United States Postal Service and the National Association of Letter Carriers agree that it is in the best interest of both parties to have an effective health and safety program. Therefore, it is hereby agreed that representatives of the parties will meet at the national level for the purpose of developing an agenda to ensure the effectiveness of the Headquarters Joint Labor-Management Safety Committee.

The Committee may establish Joint Safety and Accident Control Teams whose aim is to reduce accidents and injuries and promote improved safety performance. The Joint Safety and Accident Control Teams will consider establishing where appropriate, local accident prevention guidelines and procedures for

1) reporting and abating hazardous conditions and practices,
2) expediting resolution of local safety and health issues, and
3) promoting safety awareness and investigating safety and health complaints.

The Joint Safety and Accident Control Teams will develop periodic progress reports to the Headquarters Joint Labor-Management Safety Committee and will make recommendations regarding the program structure where necessary. The Headquarters Joint Labor-Management Safety Committee will monitor the efforts of the local programs with the aim of expanding the Joint Safety and Accident Control Teams if the program is deemed successful by the parties.

It is further understood that nothing in this Memorandum of Understanding is intended to infringe on management or union rights as found in the National Agreement.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE AND
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: District Safety Committees Pilot Program**

The United States Postal Service and the National Association of Letter Carriers, AFL-CIO, agree that it is in their mutual interest to have an effective health and safety program. To that end, the parties agree to further test district safety committees in each area during the term of the **2011** National Agreement.

Under the test program, district safety committees will be phased in incrementally and will consist of two members from each party; with management members selected by the District Manager or designee and union members selected by the National Business Agent or designee. District safety committees will meet quarterly and are responsible for assisting in implementing district-wide safety initiatives, facilitating communication between area and local safety committees, and assisting local committees as determined by the District Manager and NBA. Area Safety Committees are responsible for assisting and monitoring district committees within their jurisdiction during the test period.

The USPS/NALC National Safety Committee will create guidelines for district committees. The National Safety Committee will also establish a methodology for assessing the effectiveness of district safety committees during the test period, and will provide quarterly evaluation reports and recommendations to the NALC President and the Postal Service Vice President, Labor Relations.

It is understood that nothing in this Memorandum of Understanding is intended to add to or detract from management or union rights as found in the National Agreement.

This memorandum expires with the 2011 National Agreement.

Date: **January 10, 2013**

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 238 of 472. PageID #: 1056

Page 14-10 NALC-USPS Joint Contract Administration Manual - July 2014

USPS000778

# ARTICLE 15 GRIEVANCE-ARBITRATION PROCEDURE

15.1

**Section 1. Definition**

A grievance is defined as a dispute, difference, disagreement or complaint between the parties related to wages, hours, and conditions of employment. A grievance shall include, but is not limited to, the complaint of an employee or of the Union which involves the interpretation, application of, or compliance with the provisions of this Agreement or any local Memorandum of Understanding not in conflict with this Agreement.

**Broad Grievance Clause.** Article 15.1 sets forth a broad definition of a grievance. This means that most work related disputes may be pursued through the grievance/arbitration procedure. The language recognizes that most grievances will involve the National Agreement or a Local Memorandum of Understanding. Other types of disputes that may be handled within the grievance procedure may include:

- Alleged violations of postal handbooks or manuals (Article 19);
- Alleged violations of other enforceable agreements between NALC and the Postal Service, such as *Building Our Future by Working Together,* and the Joint Statement on Violence and Behavior in the Workplace. In his award in national case Q90N-4F-C 94024977, August 16, 1996 (C-15697), Arbitrator Snow found that the Joint Statement constitutes a contractually enforceable agreement between the parties and that the union has access to the grievance procedure to resolve disputes arising under it. Additionally, in his discussion of the case, Snow writes that arbitrators have the flexibility in formulating remedies to consider removing a supervisor from his or her "administrative duties," if a violation is found. (Note: The National parties disagree over the meaning of "administrative duties;")
- Disputes concerning the rights of ill or injured employees, such as claims concerning fitness-for-duty exams, first aid treatment, compliance with the provisions of the ELM Section 540 and other regulations concerning OWCP claims (Step 4, G90N-4G-C 95026885, January 28, 1997, M-01264). However, decisions of the Office of Workers' Compensation Programs (OWCP) are not grievable matters. OWCP has the exclusive authority to adjudicate compensation claims, and to determine the medical suitability of proposed limited duty assignments;
- Alleged violations of law (Article 5);
- Other complaints relating to wages, hours or conditions of employment.

**15.2**
**Informal Step A (a)**

**Section 2. Grievance Procedure—Steps**

**Informal Step A**

(a) Any employee who feels aggrieved must discuss the grievance with the employee's immediate supervisor within fourteen (14) days of the date on which the employee or the Union first learned or may reasonably have been expected to have learned of its cause. This constitutes the Informal Step A filing date. The employee, if he or she so desires, may be accompanied and represented by the employee's steward or a Union representative. During the meeting the parties are encouraged to jointly review all relevant documents to facilitate resolution of the dispute. The Union also may initiate a grievance at Informal Step A within 14 days of the date the Union first became aware of (or reasonably should have become aware of) the facts giving rise to the grievance. In such case the participation of an individual grievant is not required. An Informal Step A Union grievance may involve a complaint affecting more than one employee in the office.

An employee or union representative must discuss the grievance with the employee's immediate supervisor within fourteen calendar days of when the grievant or the union first learned, or may reasonably have been expected to learn, of its cause. The date of this discussion is the Informal Step A filing date.

- If the union initiates a grievance on behalf of an individual, the individual grievant's participation in an Informal Step A meeting is neither required nor prohibited.

- If a letter carrier instead files his or her own grievance, management must give the steward or other union representative the opportunity to be present during any portion of the discussion which involves adjustment or settlement of the grievance (Prearbitration Settlement, H7N-5R-C 26829, April 2, 1992, M-01065).

- Should the grievance affect more than one employee in the office, the union may initiate a class grievance on behalf of all affected employees.

**Time Limits.** The fourteen days for filing a grievance at Informal Step A begins the day after the occurrence or the day after the grievant or the union may reasonably have been expected to have learned of the occurrence. For example, if a grievant receives a letter of warning, day one of the fourteen days is the day after the letter of warning is received.

**Continuing violations** are an exception to the general rule stated above. In H1N-5D-C 297, June 16, 1994 (C-13671), National Arbitrator Mittenthal explained the theory of continuing violations as follows:

> Assume for the moment, consistent with the federal court rulings, that the Postal Service incorrectly calculated FLSA overtime for

TCOLA recipients under the ELM. Each such error would have been a separate and distinct violation. We are not dealing here with a single, isolated occurrence. Management was involved in a continuing violation of the ELM. The affected employees (or NALC) could properly have grieved the violation on any day the miscalculation took place and such grievance would be timely provided it was submitted within the fourteen-day time limit set forth in Article 15. This is precisely the kind of case where a "continuing violation" theory seems applicable. To rule otherwise would allow an improper pay practice to be frozen forever into the ELM by the mere failure of some employee initially to challenge that practice within the relevant fourteen-day period.

**15.2**
**Informal Step A (b)**

**Informal Step A (b)**

(b) In any such discussion the supervisor shall have authority to resolve the grievance. The steward or other Union representative likewise shall have authority to resolve the grievance in whole or in part. The local parties are not prohibited from using the Joint Step A Grievance Form to memorialize a resolution reached at an Informal Step A Meeting. No resolution reached as a result of such discussion shall be a precedent for any purpose.

During the Informal Step A discussion the supervisor and the steward (unless the grievant represents him/herself) have the authority to resolve the grievance. Both parties must use the JCAM as their guide to the contract. A resolution at this informal stage does not establish a precedent. While either representative may consult with higher levels of management or the union on an issue in dispute, this section establishes that the parties to the initial discussion of a grievance retain independent authority to settle the dispute.

**15.2**
**Informal Step A (c)**

**Informal Step A (c)**

(c) If no resolution is reached as a result of such discussion, the Union shall be entitled to file a written appeal to Formal Step A of the grievance procedure within seven (7) days of the date of the discussion. Such appeal shall be made by completing the Informal Step A portion of the Joint Step A Grievance Form. At the request of the Union, the supervisor shall print his/her name on the Joint Step A Grievance Form and initial, confirming the date of the discussion.

If the parties are unable to resolve the grievance during the Informal Step A meeting the union may file a written appeal to Formal Step A *within 7 calendar days* after the meeting.

The time limits for filing a grievance at Informal Step A or appealing to Formal Step A may be extended by mutual agreement.

The steward appeals a grievance to Formal Step A by filling out the Informal Step A portion of the NALC-USPS Joint Step A Grievance

Form (PS Form 8190) and sending it to the installation head or designee. The grievance appeal to Formal Step A should include relevant documents that were shared and discussed at the Informal Step A meeting. When appealing a grievance to Formal Step A, day one is the day following the receipt of the supervisor's oral decision. In appealing any grievance beyond Informal Step A, a union representative has until the last day to mail the appeal. Thus, the appeal must be postmarked or signed as received on the seventh day following the Informal Step A decision (for example, on the tenth if the decision is received on the third). To avoid problems union representatives should not wait until the last day.

**15.2 Formal Step A (a)**

**Formal Step A (a)**

(a) The Joint Step A Grievance Form appealing a grievance to Formal Step A shall be filed with the installation head or designee. In any associate post office of twenty (20) or less employees, the Employer shall designate an official outside of the installation as the Formal Step A official, and shall so notify the Union Formal Step A representative.

**15.2 Formal Step A (b)**

(b) Any grievance initiated at Formal Step A, pursuant to Article 2 or 14 of this Agreement, must be filed by submitting a Joint Step A Grievance Form directly with the installation head within 14 days of the date on which the Union or the employee first learned or may reasonably have been expected to have learned of its cause.

The same 14 day time limit applicable for grievances filed at Informal Step A is applicable for those grievances that may be filed directly at Formal Step A. Grievances that *may*, but need not be filed directly at Formal Step A are:

- **Discrimination.** Article 2 of the Agreement forbids discrimination against employees because of race, color, creed, religion, national origin, sex, age, marital status, or (if the employee can adequately perform the job) physical handicap. Any grievance relating to this provision may be initiated at Formal Step A within 14 days of when the employee or the union has first learned or may reasonably have been expected to have learned of the alleged discrimination.
- **Safety and Health.** Article 14.2 provides that if an employee believes that he or she is being required to work under unsafe conditions, the employee may:
  - Notify his/her steward, if available, who may discuss the alleged unsafe condition with the employee's supervisor;
  - Notify his/her supervisor who will immediately investigate the condition and take corrective action if necessary;
  - If no corrective action is taken during the employee's tour, the steward may file a grievance at Formal Step A of the grievance procedure within fourteen days of notifying the employee's supervisor.

**15.2 Formal Step A (c)**

(c) The installation head or designee will meet with the steward or a Union representative as expeditiously as possible, but no later than seven (7) days following receipt of the Joint Step A Grievance Form unless the parties agree upon a later date. In all grievances at Formal Step A, the grievant shall be represented for all purposes by a steward or a Union representative who shall have authority to resolve the grievance as a result of discussions or compromise in this Step. The installation head or designee also shall have authority to resolve the grievance in whole or in part.

**15.2 Formal Step A (d)**

(d) At the meeting the Union representative shall make a full and detailed statement of facts relied upon, contractual provisions involved, and remedy sought. The Union representative may also furnish written statements from witnesses or other individuals. The Employer representative shall also make a full and detailed statement of facts and contractual provisions relied upon. The parties' representatives shall cooperate fully in the effort to develop all necessary facts, including the exchange of copies of all relevant papers or documents in accordance with Articles 17 and 31. The parties' representatives may mutually agree to jointly interview witnesses where desirable to assure full development of all facts and contentions. In addition, in cases involving discharge either party shall have the right to present no more than two witnesses. Such right shall not preclude the parties from jointly agreeing to interview additional witnesses as provided above.

The Formal Step A meeting must be held between the installation head or designee and the branch president or designee as soon as possible but no later than seven calendar days after the installation head receives the Joint Step A Grievance Form (unless the parties agree to an extension). The parties' representatives at Formal Step A shall have the authority to settle or withdraw grievances in whole or in part. Both parties must work together to ensure that each grievance is fully developed.

The union representative at the Formal Step A meeting shall discuss fully the union's position, violation alleged, and corrective action requested. Moreover, the union is entitled to furnish written statements from witnesses or other individuals who have information pertaining to the grievance. Both parties are required to state in detail the facts and contract provisions relied upon to support their positions. The Postal Service is also required to furnish to the union, if requested, any documents or statements of witnesses as provided for in Article 17.3 and Article 31.3.

In non-discharge cases, the parties can mutually agree to jointly interview witnesses at the Formal Step A meeting. In discharge cases, either party can present two witnesses at that meeting—with additional witnesses possible should the parties so mutually agree. As provided in Article 17.4, all witnesses present will be on the clock while traveling to and from the Formal Step A meeting and while in attendance at the

Formal Step A meeting. The union determines whether the grievant's presence is necessary at the Formal Step A meeting (Step 4, H4N-1E-C-28034, May 22, 1987, M-00790).

**Preference Eligible Employees.** Grievances concerning proposed removal actions which are subject to the thirty day notification period in Article 16.5 will be held at Formal Step A of the grievance procedure until the decision letter is issued.

Consistent with the Dispute Resolution Process Memorandum, the employee will remain on the job or on the clock until after the Step B decision has been rendered or 14 days after the appeal is received at Step B, except for emergency or crime situations as provided for in Articles 16.6 and 16.7.

The union does not file a separate grievance on the decision letter. Rather, the union may make additions to the file based on the decision letter at either Formal Step A or Step B. This does not preclude any arguments by management regarding the relevance of the additions.

Grievances concerning proposed removal actions which are not subject to the thirty day notification period in Article 16.5 are not held at the Formal A step pending receipt of the decision letter. Rather, the union may later add the decision letter to the proposed removal grievance. This does not preclude any arguments by management regarding the relevance of the additions.

**15.2 Formal Step A (e)**

(e) Any resolution of a grievance in Formal Step A shall be in writing or shall be noted on the Joint Step A Grievance Form, but shall not be a precedent for any purpose, unless the parties specifically so agree or develop an agreement to dispose of future similar or related problems. If the grievance is resolved, a copy of the resolution will be sent to the steward and supervisor who initially were unable to resolve the grievance.

**15.2 Formal Step A (f)**

(f) The Formal Step A decision is to be made and the Joint Step A Grievance Form completed the day of the meeting, unless the time frame is mutually extended. The Union may appeal an impasse to Step B within seven (7) days of the date of the decision.

**Formal Step A Decision.** The parties must make the Formal Step A decision and complete the Joint Step A Grievance Form on the day of the meeting, unless they agree to extend the time limit. Copies of the completed form must be sent to the steward and supervisor who failed to resolve the dispute at Informal Step A. Resolutions and withdrawals at Formal Step A do not establish a precedent unless the parties specifically agree otherwise. If the grievance is resolved, copies of the resolution must be sent to the steward and supervisor who discussed the grievance at Informal Step A.

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 245 of 472. PageID #: 1063

**Appeal to Step B.** If the grievance is not resolved at Formal Step A, the union may appeal it to Step B within 7 calendar days of the Formal Step A decision date (unless the parties agree to an extension of time for appeal).

**15.2 Formal Step A (g)**

> (g) Additions and corrections to the Formal Step A record may be submitted by the Union with the Step B appeal letter within the time frame for initiating the Step B appeal with a copy to the management Formal Step A official. Any such statement must be included in the file as part of the grievance record in the case.

**Additions and Corrections.** The union may submit written additions and corrections to the Formal Step A record with the Step B appeal within the time limit for filing an appeal to Step B. The filing of any corrections or additions does not extend the time limits for filing the appeal to Step B. At the same time, a copy of the additions and corrections must be sent to the management Formal Step A official. Management may respond by sending additional information to the Step B team which is directly related to the union's additions and corrections provided that it is received prior to the Step B decision. At the same time, a copy must be sent to the union Formal Step A representative. Any statement of additions and corrections must be included in the file as part of the grievance record in the case. A steward is entitled to time on-the-clock to write the Union's statement of corrections and additions (Step 4, A8-S-0309, December 7, 1979, M-01145).

**15.2 Step B (a)**

> **Step B**
>
> (a) Any appeal from an unresolved case in Formal Step A shall be in writing to the Step B team at the appropriate Step B office, with a copy to the Formal Step A representatives, and will include a copy of the Joint Step A Grievance Form, and shall specify the reasons for the appeal.

**Step B—Dispute Resolution Teams.** The Step B teams each consist of two Step B representatives—one appointed by the NALC and the other by the Postal Service. Appeals of unresolved cases at Formal Step A are made in writing to the Step B Dispute Resolution Team. The parties at the national level have agreed any arguments and facts brought forth at either Informal or Formal Step A and properly included in the PS Form 8190/case file are incorporated in the Step B decision, and any of this material may be cited in the event of arbitration.

**15.2 Step B (b)**

> (b) The Step B team will review the appeal and issue a joint report of the decision and any supporting findings within fourteen (14) days of receipt of the appeal at Step B unless the parties mutually agree to extend the fourteen (14) day period. The Step B team will give priority consideration to discussion and decision of removal cases. It is the

responsibility of the Step B team to ensure that the facts and contentions of grievances are fully developed and considered, and resolve grievances jointly. The Step B team may 1) resolve the grievance 2) declare an impasse 3) hold the grievance pending resolution of a representative case or national interpretive case or 4) remand the grievance with specific instructions. In any case where the Step B team mutually concludes that relevant facts or contentions were not developed adequately in Formal Step A, they have authority to return the grievance to the Formal Step A level for full development of all facts and further consideration at that level. If the grievance is remanded, the parties' representatives at Formal Step A shall meet within seven (7) days after the grievance is returned to Formal Step A. Thereafter, the time limits and procedures applicable to Formal Step A grievances shall apply.

**15.2 Step B (c)**

(c) The written Step B joint report shall state the reasons in detail and shall include a statement of any additional facts and contentions not previously set forth in the record of the grievance as appealed from Formal Step A. The Step B team will attach a list of all documents included in the file.

**Review.** The Step B representatives work together in pairs and attempt to resolve grievances jointly. Both Step B representatives are responsible for ensuring that the facts and contentions of grievances are fully developed. The Step B representatives may restate or change a grievance's issue statement as appropriate. The Step B teams must give priority to considering and deciding removal cases.

**Step B Decision.** The Dispute Resolution Team must make a decision within fourteen calendar days after receipt of the appeal from Formal Step A, unless this time limit is mutually extended. The written Step B decision must state the reasons for the decision in detail and include a statement of any additional facts or contentions not set forth in the grievance as appealed from Formal Step A. The Step B team must attach to the decision a list of all documents included in the file.

A Step B decision establishes precedent only in the installation from which the grievance arose. For this purpose, precedent means that the decision is relied upon in dealing with subsequent similar cases to avoid the repetition of disputes on similar issues that have been previously decided in that installation.

**Step B Decision Types.** In deciding a grievance the team chooses among four options. It may:

- **Resolve** the grievance,
- **Impasse** the grievance if the team cannot resolve it,
- **Remand** the grievance to the Formal Step A parties with specific instructions, or
- **Hold** the decision pending resolution of a representative case or national interpretive case.

**Resolve.** A resolved Step B decision may be a compromise settlement, a decision to uphold the grievance in its entirety, or a decision that there is no basis for the grievance. In all three cases the Dispute Resolution Team must produce a written decision stating the issue, the decision and the detailed reasons supporting it. As part of the "educational" design of the Dispute Resolution Process, the Step B decisions should carefully explain the basis of every decision. When a grievance is resolved, the Dispute Resolution Team must send copies of the Step B decision to union and management Formal Step A representatives.

**Remand.** The Dispute Resolution Team may remand a grievance to the Formal Step A parties with specific instructions for further development of the facts or contentions or for other reasons as the team may determine. When a grievance is remanded the parties' Formal Step A representatives must meet to discuss the grievance again within seven calendar days after the remand is returned to Formal Step A. After that the Formal Step A time limits and procedures apply to the remanded grievance.

**Impasse.** If the Dispute Resolution Team cannot resolve a grievance it issues a Step B decision called an "impasse." A Step B impasse decision must state in detail the reasons for the impasse, and also must include a statement of any additional facts and contentions not included in the Formal Step A appeal. The Dispute Resolution Team sends a Step B impasse decision to the NALC National Business Agent and to the union and management Formal Step A representatives.

**Hold.** Grievances may be held pending resolution of a representative case in accordance with the procedures described in Article 15.3.D. Grievances may also be held pending a national interpretive case in accordance with the procedures in Article 15.2 Step B (e), Article 15.2 Interpretive Step, and Article 15.3.F.

**15.2 Step B (d)**

> (d) The Union's National Business Agent (NBA) or designee may appeal an impasse directly to arbitration at the Grievance/Arbitration Processing Center within fourteen (14) days after the receipt of the Step B impasse in accordance with the procedure hereinafter set forth.

The National Business Agent may appeal an impassed grievance to arbitration within fourteen calendar days after receipt of the Step B decision.

**15.2 Step B (e)**

> (e) If either party's representative at Step B or the NBA or Employer's Area representative thereafter maintains that the grievance involves an interpretive issue under the National Agreement, or some supplement thereto which may be of general application, the issue will be discussed with the appropriate National Union /Management Representatives at the Headquarters Level. If either party's National Representative determines the issue to be interpretive, a written notice will be sent to the other party specifying in detail the facts giving rise to the dispute, the precise interpretive issues to be decided and the initiating party's contention. The grievance(s) shall be held at the Step B

level pending discussion at the national level or the outcome of a National Arbitration award.

If either member of the Step B team, or the NBA or USPS Area representative believes that an impassed grievance involves an interpretive issue, the issue will be discussed with the appropriate national union/management representatives at the headquarters level. When either party's national representative determines the issue to be interpretive, a written notice will be sent to the other party specifying in detail the facts giving rise to the dispute, the precise interpretive issues to be decided and the initiating party's contentions. The grievance(s) will be held at the Step B level pending settlement or arbitration of the issue at the national level.

**Interpretive Step**

**Interpretive Step:**

In any interpretive dispute properly initiated at this Step by the appropriate National Union/Management Representative, the parties shall meet at the National level promptly, but in no event later than thirty (30) days after initiating such dispute in an effort to define the precise issues involved, develop all necessary facts and reach agreement. The Union representative shall have authority to resolve the dispute in whole or in part. The Employer's representative shall have authority to resolve the dispute in whole or in part. The parties' national representatives may, by mutual agreement, return any dispute to Step B where (a) the parties agree that no national interpretive issue is fairly presented or (b) it appears that all relevant facts have not been developed adequately. In such event, the parties shall meet at Step B within fifteen (15) days after the dispute is returned to Step B. Thereafter the procedures and time limits applicable to Step B grievances shall apply. Should the parties at the National level fail to reach agreement, then within fifteen (15) days of such meeting each party shall provide the other with a statement in writing of its understanding of the issues involved, and the facts giving rise to the interpretive dispute. In the event the parties have failed to reach agreement within sixty (60) days of the initiation of the dispute, the Union then may appeal it to national arbitration within thirty (30) days thereafter. Any local grievances filed on the specific interpretive issue shall be held in abeyance at the appropriate level pending resolution of the national interpretive dispute.

Interpretive disputes are handled at the headquarters level in accordance with the above procedures.

**15.3.A**

A. The parties expect that good faith observance, by their respective representatives, of the principles and procedures set forth above will result in resolution of substantially all grievances initiated hereunder at the lowest possible step and recognize their obligation to achieve that end. At each step of the process the parties are required to jointly review the Joint Contract Administration Manual (JCAM).

The contract specifically requires that at each step of the grievance/arbitration process the parties review the *Joint Contract Administration*

*Manual (JCAM)*. In the Article 15 Dispute Resolution Process Memorandum, the parties have committed to updating the *JCAM* at least once each calendar year during the life of the National Agreement.

**15.3.B**

> B. The failure of the employee or the Union in Informal Step A, or the Union thereafter to meet the prescribed time limits of the Steps of this procedure, including arbitration, shall be considered as a waiver of the grievance. However, if the Employer fails to raise the issue of timeliness at Formal Step A, or at the step at which the employee or Union failed to meet the prescribed time limits, whichever is later, such objection to the processing of the grievance is waived.

If management fails to raise the issue of timeliness, in writing, at Formal Step A, or at the step at which the employee or Union failed to meet the prescribed time limits, whichever is later, it waives the right to raise the issue at a later time. Management's obligations depend upon the step at which it asserts the grievance was untimely.

- If management asserts that a grievance is untimely filed at Informal Step A, it must raise the issue in the written Formal Step A decision (because Formal Step A is "later" than Informal Step A) or the objection is waived. It is not sufficient to assert during the Informal Step A meeting that a grievance is untimely.

- If management asserts that a grievance is untimely at Formal Step A or later, it must raise the objection in the written decision at the step at which the time limits were not met.

**15.3.C**

> C. Failure by the Employer to schedule a meeting or render a decision in any of the Steps of this procedure within the time herein provided (including mutually agreed to extension periods) shall be deemed to move the grievance to the next Step of the grievance-arbitration procedure.

**Warning.** Article 15.3.C can easily be misunderstood. It *does not* mean that grievances are automatically appealed if management fails to issue a timely decision. Rather, if management fails to issue a timely decision (unless the parties mutually agree to an extension) the union must appeal the case to the next step within the prescribed time limits if it wishes to pursue the grievance. In cases where management fails to issue a timely decision, the time limits for appeal to the next step are counted from the date management's decision was due.

**15.3.D**

> Where the NBA believes that grievances involve the same, or substantially similar issues or facts, one such grievance to be selected by the NBA or designee shall be designated the "representative" grievance. The Area Manager, Labor Relations or designee will determine which, if any, of those grievances will be held for the designated representative case. If the Step B team needs to identify a representative grievance for similar disputes in its jurisdiction, it must forward a copy

of the relevant case files to the appropriate NBA. The Step B team will place those grievances on hold only until such time as the NBA selects a representative case and the Area Manager, Labor Relations or designee determines which, if any, of those grievances, are to be held pending resolution of the representative case. Where the NBA determines a representative case will not be selected, the Step B team will process the held grievances within fourteen (14) days of the NBA's decision. If not resolved at Step B, the "representative" grievance may be appealed to arbitration, or the issue may be referred to the parties' national representatives at the Headquarters level in accordance with the provisions of Article 15, Step B (e). A representative case appealed to arbitration will be placed ahead of other contractual appeals on the appropriate arbitration list.

**15.3.E**  E. Following resolution on the merits of the "representative" grievance, the parties involved in that grievance shall meet at Step B to apply the resolution to the other pending grievances.

**Representative Cases.** When more than one grievance involves the same or substantially similar issues or facts, the NALC National Business Agents may select one grievance as the "representative" grievance. The ultimate resolution of the "representative" grievance will be applied to the remaining grievances held at Step B in accordance the provisions of this section. In the past, disagreements over the applicability of the resolution of the representative grievance were resolved through the grievance/arbitration procedure. However, effective with the 2006 National Agreement, the parties committed in advance that the resolution of the representative grievance will be applicable to the pending grievances which have been previously identified as held by the Area Manager of Labor Relations or his/her designee.

**15.3.F**  F. It is agreed that in the event of a dispute between the Union and the Employer as to the interpretation of this Agreement, such dispute may be initiated at the national level by the President of the Union. Such a dispute shall be initiated in writing and must specify in detail the facts giving rise to the dispute, the precise interpretive issues to be decided and the contention of the Union. Thereafter the parties shall meet at the interpretive step within thirty (30) days in an effort to define the precise issues involved, develop all necessary facts, and reach agreement. Should they fail to agree, then, within fifteen (15) days of such meeting, each party shall provide the other with a statement in writing of its understanding of the issues involved, and the facts giving rise to such issues. In the event the parties have failed to reach agreement within sixty (60) days of the initiation of the dispute at the interpretive step, the Union then may appeal it to arbitration, within thirty (30) days thereafter. Any local grievances filed on the specific interpretive issue shall be held in abeyance at the appropriate level pending resolution of the national interpretive dispute.

Article 15.3.F authorizes the NALC National President to file interpretive grievances directly at the national level and specifies the procedure

to be used in handling such grievances. Any local grievances filed on a specific interpretive issue pending at the national level shall be held in abeyance at the appropriate level pending resolution of the national interpretive dispute.

15.4.A

> **Section 4. Arbitration**
>
> **A. General Provisions**
>
> 1. A request for arbitration shall be submitted within the specified time limit for appeal.

Article 15.2, Step B provides that Step B impasses may be appealed to arbitration within fourteen days after receipt of the decision.

15.4.A.2

> 2. No grievance may be arbitrated at the National level except when timely notice of appeal is given the Employer in writing by the National President of the Union. No grievance may be appealed to Regular or Expedited arbitration except when timely notice of appeal is given in writing to the appropriate management official at the Grievance/Arbitration Processing Center by the certified representative of the Union. Such representative shall be certified to appeal grievances by the National President of the Union to the Employer at the National level.

The NALC National Business Agents have been certified as the representatives authorized to appeal cases to regular or expedited arbitration.

15.4.A.3

> 3. All grievances appealed to arbitration will be placed on the appropriate pending arbitration list in the order in which appealed. The Employer, in consultation with the Union, will be responsible for maintaining appropriate dockets of grievances, as appealed, and for administrative functions necessary to assure efficient scheduling and hearing of cases by arbitrators at all levels.

Article 15.4.A.3 must be read in conjunction with Article 15.5, which provides that the efficient functioning of the arbitration procedure is the "joint responsibility" of the parties. The Postal Service handles the purely administrative aspects of arbitration scheduling in accordance with procedures and policies negotiated with the union.

**Cancellations.** While the Postal Service handles the purely administrative aspects of arbitration scheduling, it *does not* have the unilateral right to cancel an arbitration hearing once it has been scheduled. A September 19, 1989 prearbitration settlement (H7N-3A-D 8257, M-00945) provides that "except as provided under the National Agreement, neither Management nor the Union may unilaterally cancel the hearing of a grievance scheduled for arbitration."

**Ex parte communication** with an arbitrator is strictly prohibited. *Ex parte* communication is any communication, whether orally or in writ-

ing, without the *actual presence or explicit advance concurrence* of the other party. Merely providing the other party with a copy of a communication with an arbitrator (for example with a "cc") does not make an *ex parte* communication permissible. An exception to this rule is communication in the ordinary course of business regarding necessary, routine scheduling matters. In order to underscore the importance of this issue, the parties have agreed to the following Memorandum of Understanding, April 11, 1988, M-00815:

**Memorandum Of Understanding**

> The United States Postal Service and the National Association of Letter Carriers, AFL-CIO, agree that in order to maintain the integrity of the arbitral process, the parties and their agents, employees and representatives should avoid the least appearance of impropriety when making contact with an arbitrator. The parties must maintain an arms length relationship with the arbitrator at all times.
>
> Ex parte communication with an arbitrator regarding the merits of a dispute, whether oral or written, shall not be permitted. Whenever it is necessary to contact an arbitrator relative to the merits of a matter in a dispute, the contact must in all instances be made jointly or with the concurrence of both parties. Ex parte communications made in the ordinary course of business regarding necessary, routine scheduling matters are permissible.
>
> Any dispute arising from the constraints of this agreement must be brought to the attention of the parties signing this Agreement at the national level.

If one party's representative decides to close orally, the other party's representative will not be excluded from the hearing during closing arguments (Prearbitration Settlement, G94N-4G-D 96088399, May 21, 1998, M-01315).

National Arbitrator Snow held in F94N-4F-D 97049958, January 4, 2000 (C-20301), that the Employer violated the parties' collective bargaining agreement when it engaged in *ex parte* communication with an arbitrator during an *in camera* inspection of evidence in the presence of only the Employer's advocate.

The parties should scrupulously observe the prohibition against *ex parte* communication with an arbitrator. Any violation of these rules should be brought to the immediate attention of the responsible officials (Prearbitration Settlement, Q94N-4Q-C 99189739, November 19, 2002, M-01473).

**15.4.A.4**

> 4. In order to avoid loss of available hearing time, except in National level cases, back-up cases should be scheduled to be heard in the event of late settlement or withdrawal of grievances before hearing. The designated advocates will discuss the scheduled cases at least thirty (30) days prior to the scheduled hearing date, if possible. In the event that either party withdraws a case less than five (5) days prior

> to the scheduled arbitration date, and the parties are unable to agree on scheduling another case on that date, the party withdrawing the case shall pay the full costs of the arbitrator for that date. In the event that the parties settle a case or either party withdraws a case five (5) or more days prior to the scheduled arbitration date, the back-up case on the appropriate arbitration list shall be scheduled. If the parties settle a case less than five (5) days prior to the scheduled arbitration date and are unable to agree to schedule another case, the parties shall share the costs of the arbitrator for that date. This paragraph shall not apply to National level arbitration cases.

Article 15.4.A.4 provides back-up cases to avoid the loss of hearing dates. It is administered by the National Business Agents and the Postal Service grievance/arbitration processing center. It requires the parties' designated advocates to discuss scheduled arbitration cases at least thirty days prior to the scheduled hearing date, if possible.

**15.4.A.5**

> 5. Arbitration hearings normally will be held during working hours where practical. Employees whose attendance as witnesses is required at hearings during their regular working hours shall be on Employer time when appearing at the hearing, provided the time spent as a witness is part of the employee's regular working hours.

Union witnesses are considered on-the-clock while appearing at an arbitration hearing during their regular working hours. However, National Arbitrator Mittenthal held in H1N-NA-C-7, February 15, 1985 (C-04657), that the Postal Service is not required to pay union witnesses for the time spent traveling to and from arbitration hearings.

**15.4.A.6**

> 6. All decisions of an arbitrator will be final and binding. All decisions of arbitrators shall be limited to the terms and provisions of this Agreement, and in no event may the terms and provisions of this Agreement be altered, amended, or modified by an arbitrator. Unless otherwise provided in this Article, all costs, fees, and expenses charged by an arbitrator will be shared equally by the parties.

The decisions of arbitrators are final and binding. Arbitration is the last step of the grievance/arbitration procedure and there are no further contractual avenues for management or the union to challenge or appeal an arbitration award. The parties have agreed that filing a grievance for the enforcement of an arbitration award is permitted under Article 15 of the National Agreement.

**15.4.A.7**

> 7. All arbitrators on the Regular Panels and the Expedited Panels and on the National Panel shall serve for the term of this Agreement and shall continue to serve for six (6) months after the conclusion of the collective bargaining

process for a successor Agreement, unless the parties otherwise mutually agree.

**15.4.A.8**

8. Arbitrators on the National and on the Regular and Expedited Panels shall be selected by the method agreed upon by the parties at the National Level.

The appointment of arbitrators to serve on the various panels is administered at the national level.

**15.4.A.9**

9. In any arbitration proceeding in which a Union feels that its interests may be affected, it shall be entitled to intervene and participate in such arbitration proceeding, but it shall be required to share the cost of such arbitration equally with any or all other Union parties to such proceeding. Any dispute as to arbitrability may be submitted to the arbitrator and be determined by such arbitrator. The arbitrator's determination shall be final and binding.

**Intervention.** This provision gives postal unions the right to intervene in each others' arbitration proceedings if they feel that their interests may be affected. National Arbitrator Britton held in case H4N-4J-C-18504, March 16, 1989 (C-08730), concerning NALC and the NRLCA, that the right of a postal union to intervene in a jurisdictional case is not contingent upon the two unions being signatory to a joint contract.

The NALC, when it has intervened in an area level arbitration case pursuant to the provisions of Article 15, Section 4.A.9, has the right to refer the case to the national level to be handled in accordance with the Interpretive Step procedures (National Arbitrator Snow, Q94C-4Q-C 98062054, January 1, 2000, C-20300).

**15.4.B**

**B. Arbitration - Regular**

1. At the Grievance/Arbitration Processing Center three (3) separate lists of cases to be heard in arbitration shall be maintained: (a) one for all removal cases and cases involving suspensions for more than 14 days, (b) one for all cases referred to Expedited Arbitration, and (c) one for all other cases appealed to Regular Arbitration. Separate panels will be established for scheduling (a) removal cases and cases involving suspensions for more than 14 days, (b) for all cases referred to Expedited Arbitration, and (c) for all other cases appealed to Regular Arbitration.
2. Cases will be scheduled for arbitration in the order in which appealed, unless the Union and Employer otherwise agree.
3. Only discipline cases involving suspensions of 14 days or less and those other disputes as may be mutually determined by the parties shall be referred to Expedited Arbitration in accordance with Section C hereof.

> 4. Cases referred to arbitration, which involve removals or suspensions for more than 14 days, shall be scheduled for hearing at the earliest possible date in the order in which appealed.

As provided by Article 15.4.A.3, the Postal Service is responsible for administrative functions necessary to schedule cases in accordance with Article 15.4.B.1-4.

National Arbitrator Snow held in E94N-4E-D 96075418, April 19, 1999 (C-19372) that Article 15.4.B.4 does not preclude an arbitrator from granting a continuance in a removal hearing pending resolution of an underlying disciplinary grievance.

**15.4.B.5**

> 5. If either party concludes that a case referred to Regular Arbitration involves an interpretive issue under the National Agreement or some supplement thereto which may be of general application, that party's representative shall request input from their appropriate National Representatives at the Headquarters level. If either party's representative at the Headquarters level determines the case is interpretive, a notice will be sent to the other party. The case will be held pending the outcome of the National interpretive dispute. If both parties' representatives determine the case does not involve an interpretive issue, the case, if already scheduled for arbitration, will be heard before the same arbitrator who was originally scheduled to hear the case. Further, if the hearing had convened, the case will continue at the same stage of arbitration.

Either parties' headquarters representatives may, upon appropriate notice to the other party, initiate an interpretive dispute concerning a grievance referred to regular arbitration.  This may be done at any time prior to the issuance of the arbitrator's decision (National Arbitrator Mittenthal, H8C-4C-C-12764, January 18. 1983, C-00431). The case will be held pending the outcome of the national interpretive dispute. If both parties' headquarters representatives determine the case does not involve an interpretive issue, the case, if already scheduled for arbitration, will be heard before the same arbitrator who was originally scheduled to hear the case. Further, if the hearing had convened, the case will continue at the same stage of arbitration.

It is agreed that either party may place a case appealed to Regional arbitration on hold, pursuant to Article 15.4.B.5 of the 2001-2006 National Agreement, pending the consideration of an interpretive issue by their national representative at any point prior to an arbitrator issuing a written decision (Interpretive Step, E98N-4E-C 00169070, October 22, 2003, M-01501).

**15.4.B.6**

> 6. The arbitrators on each Regular Panel shall be scheduled to hear cases on a rotating system basis, unless otherwise agreed by the parties.

**15.4.B.7**

> 7. Normally, there will be no transcripts of arbitration hearings or filing of post-hearing briefs in cases heard in Regular Arbitration, except either party at the National level may request a transcript, and either party at the hearing may request to file a post-hearing brief. However, each party may file a written statement setting forth its understanding of the facts and issues and its argument at the beginning of the hearing and also shall be given an adequate opportunity to present argument at the conclusion of the hearing.

**Transcripts.** Article 15.4.B.7 prohibits either party to an arbitration from seeking a transcript without notifying the other party in advance at the headquarters level. After receiving such notification, the national office informs the advocate and other interested representatives.  If one party requests a transcript, that party bears the full cost, unless the other party requests a copy, in which case the expenses will be shared.  By mutual agreement, a copy may be provided to the arbitrator.  The cost of the arbitrator's copy is also shared.

**Post Hearing Briefs.**  National Arbitrator Snow held in H4C-3W-C 8590, March 31, 1993 (C-15480), that this section provides each party with the procedural right to file a post-hearing brief after notifying the other party and the arbitrator of its intent to do so.

If one party's representative decides to close orally, the other party's representative will not be excluded from the hearing during closing arguments (Prearbitration Settlement, G94N-4G-D 96088399, May 21, 1998, M-01315).

**15.4.B.8**

> 8. The arbitrator in any given case should render an award therein within thirty (30) days of the close of the record in the case.

The parties enforce Article 15.4.B.8 by requiring arbitrators to sign a contract before being placed on an arbitration panel.  The contract provides for reduced fees to arbitrators if they fail to issue timely awards.

**15.4.C**

> **C. Arbitration - Expedited**
>
> 1. The parties agree to continue the utilization of an expedited arbitration system for disciplinary cases of 14 days suspension or less which do not involve interpretation of the Agreement and for such other cases as the parties may mutually determine. This system may be utilized by agreement of the Union through its National President or designee and the Vice President, Labor Relations, or designee.

**15.4.C.2**

> 2. If either party concludes that the issues involved are of such complexity or significance as to warrant reference to the Regular

Arbitration Panel, that party shall notify the other party of such reference at least seven (7) days prior to the scheduled time for the expedited arbitration.

**15.4.C.3** 3. The hearing shall be conducted in accordance with the following:

a. the hearing shall be informal;

b. no briefs shall be filed or transcripts made;

c. there shall be no formal rules of evidence;

d. the hearing shall normally be completed within one day;

e. if the arbitrator or the parties mutually conclude at the hearing that the issues involved are of such complexity or significance as to warrant reference to the Regular Arbitration Panel, the case shall be referred to that panel; and

f. the arbitrator may issue a bench decision at the hearing but in any event shall render a decision within forty-eight (48) hours after conclusion of the hearing. Such decision shall be based on the record before the arbitrator and may include a brief written explanation of the basis for such conclusion. These decisions will not be cited as a precedent. The arbitrator's decision shall be final and binding. An arbitrator who issues a bench decision shall furnish a written copy of the award to the parties within forty-eight (48) hours of the close of the hearing.

**15.4.C.4** 4. No decision by a member of the Expedited Panel in such a case shall be regarded as a precedent or be cited in any future proceeding, but otherwise will be a final and binding decision.

The decisions of an expedited arbitrator are final and binding. However, they may not be cited as a precedent.

The Memorandum of Understanding, *Re: Expedited Arbitration* identifies issues that will be resolved using the expedited arbitration procedures as outlined in Article 15.4.C.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: Expedited Arbitration**

The expedited arbitration system will be utilized for the following issues:

- Disciplinary grievances for issues of fourteen (14) day suspensions or less
- Requests for medical certification
- Restricted sick leave
- Individual requests for annual leave, sick leave, advance sick leave, leave without pay or court leave
- Individual holiday scheduling issues
- Article 25, higher level assignments

- Employee claims
- Employer claims of less than $1,000 dollars
- Hold-down assignments

The parties at the National level will continue to attempt to identify and agree upon additional issues to be heard in expedited arbitration.

This does not change either party's right to refer an expedited case to regular arbitration in accordance with the provisions of Article 15, Section 4.C.2, of the National Agreement.

**Date: January 10, 2013**

15.4.D

**D. National Level Arbitration**

1. Only cases involving interpretive issues under this Agreement or supplements thereto of general application will be arbitrated at the National level.

2. A docket of cases appealed to arbitration at the National level shall be maintained. The arbitrators on the National Panel shall be scheduled to hear cases on a rotating system basis, unless otherwise agreed by the parties. Cases on the docket will be scheduled for arbitration in the order in which appealed, unless the Union and Employer otherwise agree.

15.5

**Section 5. Administration**

The parties recognize their continuing joint responsibility for efficient functioning of the grievance procedure and effective use of arbitration. Commencing April 1, 1979, and quarterly thereafter, the Employer will furnish to the President of the Union a copy of a quarterly report containing the following information covering operation of the arbitration procedure at the National level, and for each Area separately:

(a) number of cases appealed to arbitration;

(b) number of cases scheduled for hearing;

(c) number of cases heard;

(d) number of scheduled hearing dates, if any, which were not used;

(e) the total number of cases pending but not scheduled at the end of the quarter.

(The preceeding Article, Article 15, shall apply to **City Carrier Assistant** Employees. **Additional grievance procedure provisions regarding City Carrier Assistant Employees are found in Appendix B.**)

[see Memos, pages **197-206**]

**These Memos are located on *JCAM* pages 15-21 through 15-26.**

**Administration.** Article 15.5 establishes that the efficient functioning of the grievance procedure and effective use of arbitration is the *joint* responsibility and prerogative of the NALC and the Postal Service. Neither party may make unilateral decisions concerning any aspect of the process. As provided by Article 15.4.A.3, the actual administration of the scheduling process, including any necessary correspondence con-

cerning scheduling, is done by the Postal Service in accordance with mutually agreed upon procedures. However, the administrative responsibility for scheduling does not include the right to unilaterally cancel an arbitration date after it has been scheduled (H7N-3A-D 8257, September 19, 1989, M-00945).

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE AND**
**THE JOINT BARGAINING COMMITTEE**
**(American Postal Workers Union, AFL-CIO, and**
**National Association of Letter Carriers, AFL-CIO)**

**Re: Processing of Post-Removal Grievances**

The parties agree that the processing and/or arbitration of a nondisciplinary grievance is not barred by the final disposition of the removal of the grievant, if that nondisciplinary grievance is not related to the removal action.

(The preceding Memorandum of Understanding, Processing of Post-Removal Grievances, applies to **City Carrier Assistant** Employees.)

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**JOINT BARGAINING COMMITTEE**
**(American Postal Workers Union, AFL-CIO**
**National Association of Letter Carriers, AFL-CIO)**

**Re: Processing of Grievances**

It is agreed by the United States Postal Service, the National Association of Letters, AFL-CIO; and the American Postal Workers Union, AFL-CIO, that the processing and/or arbitration of a grievance is not barred by the separation of the grievant, whether such separation is by resignation, retirement, or death.

Date: October 16, 1981.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: Article 15—Dispute Resolution Process**

The NALC National Business Agents, Area Managers, Labor Relations and District Managers are responsible for ensuring that the Dispute Resolution Process is effective in all ways, including the timeliness of decision-making. All parties are expected to monitor the functioning of the new process and, generally, to assume a proactive role regarding the labor/management relationship. In the event the National Business Agent and District Manager or Area Manager, Labor Relations are unable to resolve any differences, the issue will be referred to the national parties for resolution, an event which is expected to be an infrequent occurrence. To facilitate this oversight responsibility, Step B Teams should copy both their respective National Business Agent and Area Manager, Labor Relations on all decisions.

     Additionally, in any district where there are more cases pending arbitration than can be arbitrated in a timely manner using the existing arbitration scheduling process, the appropriate Area Manager, Labor Relations and National Business Agent are responsible for ensuring an ongoing review of the backlogged cases in an effort to settle cases, select representative cases, reduce the backlog, and provide direction to the local parties.

The primary role of the Step B Dispute Resolution Team is to decide the grievance presented to them and to communicate the basis for the decision to the parties at Step A, using a format agreed upon at the national level. Additionally, with the joint concurrence of the District Manager and National Business Agent, the Teams may be called upon to provide training and other assistance to the local parties. The national parties encourage the use of the Step B Dispute Resolution Teams to provide contract training throughout the district, especially when grievance activity suggests a lack of understanding of contract application or local responsibilities to address disputes in a timely manner. As noted above, however, the primary role of the Step B Dispute Resolution Team is to process and resolve disputes. No other secondary activities should be undertaken if the timely processing of grievances is negatively impacted.

The Step B Dispute Resolution Team (and back-up team) will be made up of one management representative and one union representative. Although the Postal Service and the NALC will each determine their own method of selection for Step B representatives, it is anticipated that the National Business Agents and District Managers will discuss their separate recommendations for appointment to the Step B Dispute Resolution Teams prior to submitting recommendations.

Back-up Step B representatives will be designated for each Step B Dispute Resolution Team to provide coverage for vacations or other lengthy absences or, when warranted by the workload, to ensure timely grievance processing. Back-up teams also may be effectively utilized to provide training or such other assistance as may be agreed upon by the District Manager and National Business Agent.

The Step B Dispute Resolution Team is responsible to track and monitor its Step B workload. When the Step B Dispute Resolution Team believes its current workload exceeds its ability to render Step B decisions in a timely manner (within fourteen days of receipt of the Step B appeal), the Step B Dispute Resolution Team will contact the Area Manager, Labor Relations and the National Business Agent jointly.

The National Business Agent and the Area Manager, Labor Relations will determine jointly whether there is a need to activate back-up Step B representatives to address a backlog. If back-up activation is necessary the Area Manager, Labor Relations and the National Business Agent will determine the most efficient and effective way to ensure timely Step B processing. They will either:

1. Activate the back-up Step B Dispute Resolution Team without undue delay, normally within 48 hours, subject to availability. The back-up team will remain activated until the backlog is eliminated. For this purpose, "availability" means certified, employed by the Postal Service and fit for duty consistent with the provisions of this MOU.
2. Send Step B appeals to another primary Step B Dispute Resolution Team under the jurisdiction of the Area Manager, Labor Relations and the National Business Agent if they determine that this Step B Dispute Resolution Team can handle the workload without causing the team's regular work to become untimely. If the National Business Agent and the Area Manager, Labor Relations do not agree that another primary Step B Dispute Resolution Team under their jurisdiction can handle the additional work without becoming untimely, the back-up team will be activated as provided above.

In the event the National Business Agent and the Area Manager, Labor Relations determine neither the back-up team nor another primary Step B Dispute Resolution Team under their jurisdiction is available for this additional work based on the above, the

Area Manager, Labor Relations and the National Business Agent will activate another back-up Step B Dispute Resolution Team under their jurisdiction until the backlog is cleared.

If the National Business Agent and the Area Manager, Labor Relations are unable to identify a primary or back-up Step B Dispute Resolution Team for this work, they will promptly contact and fully inform their respective parties at the headquarters level.

In the interest of providing stability and developing expertise, the parties expect that Step B representatives will serve for no less than 2 to 3 years, absent special circumstances such as retirement, promotion, relocation, decertification, etc.

Replacement or removal of any Step B representative from Step B duties prior to fulfillment of this expectation will be discussed in advance by the parties at the headquarters level.

Step B representatives will undergo a joint comprehensive training and certification program. Training and certification of Step B representatives (including back-up Step B representatives) is required before Step B representatives may assume their duties. The national parties are jointly responsible for both the content and the delivery of the training and will meet at least once each calendar year to discuss training needs and schedule training sessions, if needed. The NALC and the Postal Service reserve the right to certify their respective nominees to serve as Step B representatives.

Step B Dispute Resolution Teams are responsible for issuing decisions that are fair and consistent with the contract and the Joint Contract Administration Manual (JCAM), and written in a manner that is both educational and informative. The national parties encourage the Step B Dispute Resolution Teams to jointly respond to questions concerning the proper interpretation or application of their decisions.

Step B teams are not responsible for building the grievance file. It is the responsibility of the parties at Step A to exchange documentary evidence and place copies in the file. If, however, a file lacking proper documentation is received, the grievance should be remanded to the local level, or the Step B Dispute Resolution Team should jointly call the local parties with a request for the submission of specific information within a specific timeframe, whichever is more effective. The primary responsibility of the Step B team is making timely decisions on the merits of disputes.

Step B representatives will not be involved in arbitrations or other hearings involving letter carriers except as jointly approved by the Area Manager, Labor Relations and National Business Agent.

Step B representatives may not be subjected to instruction or coercion while carrying out their duties.

Unless alternate arrangements are agreed upon by the District Manager and National Business Agent, the Step B Dispute Resolution Teams will work at the District office. If the District Manager and the National Business Agent agree to use an alternate location, any additional expenses will be shared equally by the local parties. The Step B Dispute Resolution Teams should be provided suitable office space, clerical support as typically provided in that office, a telephone, and computers with CD-ROM, and such other support as may be needed to perform their assignments.

Concerns about the performance of a Step B representative may be forwarded to the national level by either the Area Manager, Labor Relations or the National Business Agent. When this occurs, the Vice President, Labor Relations, and the National President, NALC, or their designees, will review relevant evidence and determine jointly whether the subject of the complaint should be decertified from Step B responsibilities. In the event the parties are unable to agree on the issue of decertification, the matter will be submitted to mediation.

If a Step B representative's original duty assignment becomes a holddown assignment, the NALC will not seek the conversion of a PTF employee to full-time as a consequence of a PTF serving in that assignment and meeting the maximization criteria of Article 7.3.C or the Memorandum on Maximization.

Removal actions, subject to the thirty (30) day notification period in Article 16.5 of the National Agreement, will be deferred until after the Step B decision has been rendered, or fourteen (14) days after the appeal is received at Step B, whichever comes first, except for those removals involving allegations of crime, violence, or intoxication or cases where retaining the employee on duty may result in damage to postal property, loss of mails, or funds, or where the employee may be injurious to self or others, pursuant to Article 16.6 and 16.7.

The national parties will update the current JCAM at least once each calendar year during the life of the National Agreement.

Date: September 11, 2007

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: Article 15—Intervention Process**

The parties mutually agree that the continued nationwide success of the Dispute Resolution Process (DRP) is dependent on the successful operation of the process in each district. In keeping with our mutual oversight responsibility, we agree to establish a Task Force on Process Intervention for the purpose of assisting the local parties when the need arises.

The national parties recognize that when the DRP in a district is not meeting expectations of timely responses, appropriate resolution rates, educational and contractually compliant grievance decisions, there may be a need for some form of intervention from the offices of the NBA and area Labor Relations. To provide joint guidelines for such activity, the Task Force on Process Intervention will formulate the various triggering criteria indicating a need for intervention, and evaluate and recommend various options of process intervention for use based on circumstances.

The Task Force will be comprised of three members from the NALC and three from the Postal Service. The national parties will convene to discuss Process Intervention within sixty (60) days of the signing of the 2001 National Agreement. The Task Force will report to the NALC President and USPS Vice President, Labor Relations, or designees. A final report will be issued not later than one year from the date this memorandum is signed.

Date: April 25, 2002

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS
UNION, AFL-CIO

**Re: Arbitration Task Force**

The parties have a shared interest in reducing the cost and improving the efficiency of the arbitration process. **To that end, a national level Task Force will be established for the purpose of evaluating the current arbitration process and developing improvements and cost reduction measures.**

The Task Force will consist of three members appointed by the NALC and three members appointed by the Postal Service.

**The Task Force will consider various aspects of arbitration scheduling and procedure including but not limited to:**

- **district and/or expedited arbitration panels**
- **procedures used to hire, educate and compensate arbitrators**
- **communications with arbitrators, including post-hearing briefs**
- **ensuring that accepted hearing dates are fully utilized**
- **avoiding settlements/withdrawal less than five days before the scheduled hearing date**
- **eliminating hearings for cases where there is no material issue in dispute**
- **centralized arbitration scheduling**

**The Task Force will provide status reports that include recommendations to the NALC President and the Vice President, Labor Relations, or their designees on a quarterly basis. The Task Force is prohibited from implementing any test or issuing instructions related to its mission without the agreement of the NALC President and the Vice President of Labor Relations.**

The Task Force will function during the term of the 2011 National Agreement.

**Date: January 10, 2013**

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO

**Re: Dispute Resolution Process Testing**

A national Task Force will be established for the purpose of jointly exploring methods to improve the dispute resolution process.

The Task Force will consist of three members appointed by the NALC and three members appointed by the Postal Service. The Task Force will consider improvements and, as appropriate, conduct testing on various aspects of the Dispute Resolution Process.

The Task Force will provide status reports that include recommendations to the NALC President and the Vice President, Labor Relations, or their designees on a quarterly

basis. The Task Force is prohibited from implementing any test or issuing instructions related to its mission without the agreement of the NALC President and the Vice President of Labor Relations.

The Task Force will function for the term of the 2011 National Agreement.

**Date: January 10, 2013**

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Article 15—ELM 436—Back Pay**

The following applies solely to back pay claims covered by Section 436 of the Employee and Labor Relations Manual (ELM):

A pay adjustment required by a grievance settlement or arbitration decision will be complet- ed promptly upon receipt of the documentation required by ELM part 436.4 Documents in Support of Claim. An employee not paid within sixty (60) days of submission of the required documentation will receive an advance, if requested by the employee, equivalent to seventy (70) percent of the approved adjustment. If a disagreement exists over the amount due, the advance will be set at seventy (70) percent of the sum not in dispute.

Date: April 25, 2002

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE AND
THE JOINT BARGAINING COMMITTEE
(American Postal Workers Union, AFL-CIO, and
National Association of Letter Carriers, AFL-CIO)**

**Re: Interest on Back Pay**

Where an arbitration award specifies that an employee is entitled to back pay in a case involving disciplinary suspension or removal, the Employer shall pay interest on such back pay at the Federal Judgment Rate. This shall apply to cases heard in arbitration after the effective date of the 1990 Agreement.

(The preceding Memorandum of Understanding, Interest on Back Pay, applies to NALC **City Carrier Assistant** Employees.)

# ARTICLE 16 DISCIPLINE PROCEDURE

16.1

**Section 1. Principles**

In the administration of this Article, a basic principle shall be that discipline should be corrective in nature, rather than punitive. No employee may be disciplined or discharged except for just cause such as, but not limited to, insubordination, pilferage, intoxication (drugs or alcohol), incompetence, failure to perform work as requested, violation of the terms of this Agreement, or failure to observe safety rules and regulations. Any such discipline or discharge shall be subject to the grievance-arbitration procedure provided for in this Agreement, which could result in reinstatement and restitution, including back pay.

## Just Cause Principle

The principle that any discipline must be for "just cause" establishes a standard that must apply to any discipline or discharge of an employee. Simply put, the "just cause" provision requires a fair and provable justification for discipline.

"Just cause" is a "term of art" created by labor arbitrators. It has no precise definition. It contains no rigid rules that apply in the same way in each case of discipline or discharge. However, arbitrators frequently divide the question of just cause into six sub-questions and often apply the following criteria to determine whether the action was for just cause. These criteria are the *basic* considerations that the supervisor must use before initiating disciplinary action.

- **Is there a rule?** If so, was the employee aware of the rule? Was the employee forewarned of the disciplinary consequences for failure to follow the rule? It is not enough to say, "Well, everybody knows that rule," or "We posted that rule ten years ago." You may have to prove that the employee should have known of the rule. Certain standards of conduct are normally expected in the industrial environment and it is assumed by arbitrators that employees should be aware of these standards. For example, an employee charged with intoxication on duty, fighting on duty, pilferage, sabotage, insubordination, etc., may be generally assumed to have understood that these offenses are neither condoned nor acceptable, even though management may not have issued specific regulations to that effect.

- **Is the rule a reasonable rule?** Management must make sure rules are reasonable, based on the overall objective of safe and efficient work performance. Management's rules should be reasonably related to business efficiency, safe operation of our business, and the performance we might expect of the employee.

- **Is the rule consistently and equitably enforced?** A rule must be applied fairly and without discrimination. Consistent and equitable

enforcement is a critical factor. Consistently overlooking employee infractions and then disciplining without warning is improper. If employees are consistently allowed to smoke in areas designated as *No Smoking* areas, it is not appropriate suddenly to start disciplining them for this violation. In such cases, management loses its right to discipline for that infraction, in effect, unless it first puts employees (and the unions) on notice of its intent to enforce that regulation again. Singling out employees for discipline is usually improper. If several similarly situated employees commit an offense, it would not be equitable to discipline only one.

- **Was a thorough investigation completed?** Before administering the discipline, management must make an investigation to determine whether the employee committed the offense. Management must ensure that its investigation is thorough and objective. This is the employee's *day in court* privilege. Employees have the right to know with reasonable detail what the charges are and to be given a reasonable opportunity to defend themselves *before* the discipline is initiated.

- **Was the severity of the discipline reasonably related to the infraction itself and in line with that usually administered, as well as to the seriousness of the employee's past record?** The following is an example of what arbitrators may consider an inequitable discipline: If an installation consistently issues five-day suspensions for a particular offense, it would be extremely difficult to justify why an employee with a past record similar to that of other disciplined employees was issued a thirty-day suspension for the same offense. There is no precise definition of what establishes a good, fair, or bad record. Reasonable judgment must be used. An employee's record of previous offenses may never be used to establish guilt in a case you presently have under consideration, but it may be used to determine the appropriate disciplinary penalty.

- **Was the disciplinary action taken in a timely manner?** Disciplinary actions should be taken as promptly as possible after the offense has been committed.

### Corrective Rather than Punitive

The requirement that discipline be "corrective" rather than "punitive" is an essential element of the "just cause" principle. In short, it means that for most offenses management must issue discipline in a "progressive" fashion, issuing lesser discipline (e.g., a letter of warning) for a first offense and a pattern of increasingly severe discipline for succeeding offenses (e.g., short suspension, long suspension, discharge). The basis of this principle of "corrective" or "progressive" discipline is that it is issued for the purpose of correcting or improving employee behavior and not as punishment or retribution.

Just cause for the discipline of City Carrier Assistant Employees is addressed in Appendix B, 3. Other Provisions, Section E – Article 16 of

the 2011 National Agreement. This section is reprinted on page 16-12 of the JCAM.

**Unadjudicated Discipline.** The parties agree that arbitrators may not consider unadjudicated discipline cited in a disciplinary notice when determining the propriety of that disciplinary notice. When removal cases are scheduled for a hearing before the underlying discipline has been adjudicated, an arbitrator may grant a continuance of a hearing on the removal case pending resolution of the unadjudicated discipline (National Arbitrator Snow, E94N-4E-D 96075418, April 19, 1999, C-19372).

**Examples of Behavior.** Article 16.1 states several examples of misconduct which may constitute just cause for discipline. Some managers have mistakenly believed that because these behaviors are specifically listed in the contract, any discipline of employees for such behaviors is "automatically" for just cause. The parties agree these behaviors are intended as examples only. Management must still meet the requisite burden of proof, e.g. prove that the behavior took place, that it was intentional, that the degree of discipline imposed was corrective rather than punitive, and so forth. Principles of just cause apply to these specific examples of misconduct as well as to any other conduct for which management issues discipline.

**Remedies.** The last sentence of Article 16.1 establishes the principle that discipline may be overturned in the grievance/arbitration procedure and that remedies may be provided to the aggrieved employee—"reinstatement and restitution, including back pay." If union and management representatives settle a discipline grievance, the extent of remedies for improper discipline is determined as part of the settlement. If a case is pursued to arbitration, the arbitrator states the remedy in the award.

**Back Pay.** The regulations concerning back pay are found in the ELM Section 436. The parties agree that, while all grievance settlements or arbitration awards providing for a monetary remedy should be promptly paid, the following Memorandum of Understanding applies only to those back pay claims covered by the ELM Section 436.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Article 15—ELM 436—Back Pay**

The following applies solely to back pay claims covered by Section 436 of the Employee and Labor Relations Manual (ELM):

A pay adjustment required by a grievance settlement or arbitration decision will be completed promptly upon receipt of the documentation required by ELM part 436.4 Documents in Support of Claim. An employee not paid within sixty (60) days of submission of the required documentation will receive an advance, if requested by the

employee, equivalent to seventy (70) percent of the approved adjustment. If a disagreement exists over the amount due, the advance will be set at seventy (70) percent of the sum not in dispute.

Date: April 25, 2002

The following Memorandum of Understanding provides that where an arbitration award specifies that an employee is entitled to back pay in a case involving disciplinary suspension or removal, the Postal Service must pay interest on the back pay at the Federal Judgment Rate.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE AND**
**THE JOINT BARGAINING COMMITTEE**
**(American Postal Workers Union, AFL-CIO, and**
**National Association of Letter Carriers, AFL-CIO)**

**Re: Interest on Back Pay**

Where an arbitration award specifies that an employee is entitled to back pay in a case involving disciplinary suspension or removal, the Employer shall pay interest on such back pay at the Federal Judgment Rate. This shall apply to cases heard in arbitration after the effective date of the 1990 Agreement.

(The preceding Memorandum of Understanding, Interest on Back Pay, applies to NALC **City Carrier Assistant** Employees.)

16.2

**Section 2. Discussion**

For minor offenses by an employee, management has a responsibility to discuss such matters with the employee. Discussions of this type shall be held in private between the employee and the supervisor. Such discussions are not considered discipline and are not grievable. Following such discussions, there is no prohibition against the supervisor and/or the employee making a personal notation of the date and subject matter for their own personal record(s). However, no notation or other information pertaining to such discussion shall be included in the employee's personnel folder. While such discussions may not be cited as an element of prior adverse record in any subsequent disciplinary action against an employee, they may be, where relevant and timely, relied upon to establish that employees have been made aware of their obligations and responsibilities.

Although included in Article 16, a "discussion" is non-disciplinary and thus is *not* grievable. Discussions are conducted in private between a supervisor and an employee.

Both the supervisor and the employee may keep a record of the discussion for *personal* use, however these are not to be considered official Postal Service records. They may not be included in the employee's personnel folder, nor may they be passed to another supervisor.

Discussions cannot be cited as elements of an employee's past record in any future disciplinary action. Discussions may be used (when they are

relevant and timely) only to establish, that an employee has been made aware of some particular obligation or responsibility.

16.3

**Section 3. Letter of Warning**

A letter of warning is a disciplinary notice in writing, identified as an official disciplinary letter of warning, which shall include an explanation of a deficiency or misconduct to be corrected.

Letters of warning are official discipline and should be treated seriously. They may be cited as elements of prior discipline in subsequent disciplinary actions subject to the two year restriction discussed in Article 16.10. Arbitrator Fasser held in NB-E 5724, February 23, 1977 (C-02968), that a letter of warning which fails to advise the recipient of grievance appeal rights is procedurally deficient.

16.4

**Section 4. Suspensions of 14 Days or Less**

In the case of discipline involving suspensions of fourteen (14) days or less, the employee against whom disciplinary action is sought to be initiated shall be served with a written notice of the charges against the employee and shall be further informed that he/she will be suspended. A suspended employee will remain on duty during the term of the suspension with no loss of pay. These disciplinary actions shall, however, be considered to be of the same degree of seriousness and satisfy the same corrective steps in the pattern of progressive discipline as the time-off suspensions. Such suspensions are equivalent to time-off suspensions and may be cited as elements of past discipline in subsequent discipline in accordance with Article 16.10.

Employees issued discipline involving suspensions of fourteen days or less will remain on duty during the term of the suspension with no loss of pay. These disciplinary actions are of the same degree of seriousness and satisfy the same requirements to be corrective progressive discipline as time-off suspensions. Such suspensions are equivalent to time-off suspensions and may be cited as elements of past record in subsequent discipline in accordance with Article 16.10.

Suspensions issued under the provisions of Article 16.4 must advise the recipient of grievance appeal rights.

The Postal Service has agreed that letters of warning must be used instead of suspensions of less than five work (not calendar) days. If suspensions of five days or more are reduced unilaterally, it must be to a letter of warning rather than to a suspension of four days or less. The only exception is in cases where a suspension of less than five days is the result of a grievance settlement (USPS Letters M-00582 and M-01234).

16.5    **Section 5. Suspensions of More Than 14 Days or Discharge**

In the case of suspensions of more than fourteen (14) days, or of discharge, any employee shall, unless otherwise provided herein, be entitled to an advance written notice of the charges against him/her and shall remain either on the job or on the clock at the option of the Employer for a period of thirty (30) days. Thereafter, the employee shall remain on the rolls (non-pay status) until disposition of the case has been had either by settlement with the Union or through exhaustion of the grievance-arbitration procedure. A preference eligible who chooses to appeal a suspension of more than fourteen (14) days or his/her discharge to the Merit Systems Protection Board (MSPB) rather than through the grievance-arbitration procedure shall remain on the rolls (non-pay status) until disposition of the case has been had either by settlement or through exhaustion of his/her MSPB appeal. When there is reasonable cause to believe an employee is guilty of a crime for which a sentence of imprisonment can be imposed, the Employer is not required to give the employee the full thirty (30) days advance written notice in a discharge action, but shall give such lesser number of days advance written notice as under the circumstances is reasonable and can be justified. The employee is immediately removed from a pay status at the end of the notice period.

Letter carriers must be given thirty days advance written notice prior to serving a suspension of more than fourteen days or discharge.  During the notice period they must remain either on the job or on the clock at the option of the Postal Service.  The only exceptions are for emergency or crime situations as provided for in Article 16.6 & Article 16.7.

Removals are also subject to the Dispute Resolution Process Memorandum which provides in part:

> Removal actions, subject to the thirty (30) day notification period in Article 16.5 of the National Agreement, will be deferred until after the Step B decision has been rendered, or fourteen (14) days after the appeal is received at Step B, whichever comes first, except for those removals involving allegations of crime, violence, or intoxication or cases where retaining the employee on duty may result in damage to postal property, loss of mails, or funds, or where the employee may be injurious to self or others, pursuant to Article 16.6 & 16.7.

Thus, when an Article 16.5 removal action is deferred, the employee remains either on the job or on the clock until after the Step B decision has been rendered, or fourteen days after the appeal is received at Step B, whichever comes first.  This is true even if it results in the employee remaining on the job or on the clock for longer than the thirty days provided for in Article 16.5.

Issues concerning the MSPB appeal rights afforded preference eligible employees are discussed under Article 16.9.

16.6.A

**Section 6. Indefinite Suspensions—Crime Situation**

A. The Employer may indefinitely suspend an employee in those cases where the Employer has reasonable cause to believe an employee is guilty of a crime for which a sentence of imprisonment can be imposed. In such cases, the Employer is not required to give the employee the full thirty (30) days advance notice of indefinite suspension, but shall give such lesser number of days of advance written notice as under the circumstances is reasonable and can be justified. The employee is immediately removed from a pay status at the end of the notice period.

16.6.B

B. The just cause of an indefinite suspension is grievable. The arbitrator shall have the authority to reinstate and make the employee whole for the entire period of the indefinite suspension.

16.6.C

C. If after further investigation or after resolution of the criminal charges against the employee, the Employer determines to return the employee to a pay status, the employee shall be entitled to back pay for the period that the indefinite suspension exceeded seventy (70) days, if the employee was otherwise available for duty, and without prejudice to any grievance filed under B above.

16.6.D

D. The Employer may take action to discharge an employee during the period of an indefinite suspension whether or not the criminal charges have been resolved, and whether or not such charges have been resolved in favor of the employee. Such action must be for just cause, and is subject to the requirements of Section 5 of this Article.

Article 16.6.B, which deals with indefinite suspensions in crime situations, provides the following:

- The full thirty-day notice is not required in such cases. (See also Article 16.5.)
- Just cause of an indefinite suspension is grievable. An arbitrator has the authority to reinstate and make whole. In NC-NAT 8580, September 29, 1978 (C-03216), National Arbitrator Garrett wrote that an indefinite suspension is:

  > reviewable in arbitration to the same extent as any other suspension to determine whether 'just cause' for the disciplinary action has been shown. Such a review in arbitration necessarily involves considering at least (a) the presence or absence of 'reasonable cause' to believe the employee guilty of the crime alleged, and (b) whether such a relationship exists between the alleged crime and the employee's job in the USPS to warrant suspension.

- If the Postal Service returns an employee who was on an indefinite suspension to duty, the employee is automatically entitled to back pay for all but the first seventy days of pay. The indefinite suspension and entitlement to the first seventy days of pay still remains subject to the grievance provisions stated in Subsection (B).

- During an indefinite suspension, the Employer can take final action to remove the employee. Such removals must be for just cause and are subject to Article 16.5, like any other removal.

16.7 **Section 7. Emergency Procedure**

An employee may be immediately placed on an off-duty status (without pay) by the Employer, but remain on the rolls where the allegation involves intoxication (use of drugs or alcohol), pilferage, or failure to observe safety rules and regulations, or in cases where retaining the employee on duty may result in damage to U.S. Postal Service property, loss of mail or funds, or where the employee may be injurious to self or others. The employee shall remain on the rolls (non-pay status) until disposition of the case has been had. If it is proposed to suspend such an employee for more than thirty (30) days or discharge the employee, the emergency action taken under this Section may be made the subject of a separate grievance.

The purpose of Article 16.7 is to allow the Postal Service to act "immediately" to place an employee in an off-duty status in the specified "emergency" situations.

**Written Notice**. Management is not required to provide advance written notice prior to taking such emergency action. However, an employee placed on emergency off-duty status is entitled to written charges within a reasonable period of time. In H4N-3U-C 58637, August 3, 1990 (C-10146), National Arbitrator Mittenthal wrote as follows:

> The fact that no "advance written notice" is required does not mean that Management has no notice obligation whatever. The employee suspended pursuant to Section 7 has the right to grieve his suspension. He cannot effectively grieve unless he is formally made aware of the charge against him, the reason why Management has invoked Section 7. He surely is entitled to such notice within a reasonable period of time following the date of his displacement. To deny him such notice is to deny him his right under the grievance procedure to mount a credible challenge against Management's action.

**What Test Must Management Satisfy?** Usually employees are placed on emergency non-duty status for alleged misconduct. However, the provisions of this section are broad enough to allow management to invoke the emergency procedures in situations that do not involve misconduct—for example, if an employee does not recognize that he or she is having an adverse reaction to medication. The test that management must satisfy to justify actions taken under this Article 16.7 depends upon the nature of the "emergency." In H4N-3U-C 58637, August 3, 1990 (C-10146), National Arbitrator Mittenthal wrote as follows:

> My response to this disagreement depends, in large part, upon how the Section 7 "emergency" action is characterized. If that action is

discipline for alleged misconduct, then Management is subject to a "just cause" test. To quote from Section 1, "No employee may be disciplined...except for just cause." If, on the other hand, that action is not prompted by misconduct and hence is not discipline, the "just cause" standard is not applicable. Management then need only show "reasonable cause" (or "reasonable belief") a test which is easier to satisfy.

One important caveat should be noted. "Just cause" is not an absolute concept. Its impact, from the standpoint of the degree of proof required in a given case, can be somewhat elastic. For instance, arbitrators ordinarily use a "preponderance of the evidence" rule or some similar standard in deciding fact questions in a discipline dispute. Sometimes, however, a higher degree of proof is required where the alleged misconduct includes an element of moral turpitude or criminal intent. The point is that "just cause" can be calibrated differently on the basis of the nature of the alleged misconduct.

**Separate Grievances.** If, subsequent to an emergency suspension, management suspends the employee for more than thirty (30) days or discharges the employee, the emergency action taken under this section should be grieved separately from the later disciplinary action.

**16.8**

**Section 8. Review of Discipline**

In no case may a supervisor impose suspension or discharge upon an employee unless the proposed disciplinary action by the supervisor has first been reviewed and concurred in by the installation head or designee.

In post offices of twenty (20) or less employees, or where there is no higher level supervisor than the supervisor who proposes to initiate suspension or discharge, the proposed disciplinary action shall first be reviewed and concurred in by a higher authority outside such installation or post office before any proposed disciplinary action is taken.

Concurrence is a specific contract requirement to the issuance of a suspension or a discharge. It is normally the responsibility of the immediate supervisor to initiate disciplinary action. Before a suspension or removal may be imposed, however, the discipline must be reviewed and concurred in by a manager who is a higher level than the initiating, or issuing, supervisor. This act of review and concurrence must take place prior to the issuance of the discipline. While there is no contractual requirement that there be a written record of concurrence, management should be prepared to identify the manager who concurred with a disciplinary action so he/she may be questioned if there is a concern that appropriate concurrence did not take place.

For additional information on the 'Review of Discipline' section, see National Arbitration Eischen, E95R-4E-D-01027978, December 3, 2002, C-23828. (Note that this is a NRLCA case. The NRLCA's 'Review of Discipline' is in their Article 16.6 and requires written concurrence.)

16.9

**Section 9. Veterans' Preference**

A preference eligible is not hereunder deprived of whatever rights of appeal are applicable under the Veterans' Preference Act. If the employee appeals under the Veterans' Preference Act, however, the time limits for appeal to arbitration and the normal contractual arbitration scheduling procedures are not to be delayed as a consequence of that appeal; if there is an MSPB appeal pending as of the date the arbitration is scheduled by the parties, the grievant waives access to the grievance-arbitration procedure beyond Step B.

**MSPB Dual Filings.** The Veterans' Preference Act guarantees "preference eligible" employees certain special rights concerning their job security. (Federal law defines a "preference eligible" veteran at Title 5 United States Code Section 2108; see EL-312, Section 483). A preference eligible employee may file both a grievance and an MSPB appeal on a removal or suspension of more than fourteen days. However, Article 16.9 provides that an employee who exercises appeal rights under the Veterans' Preference Act waives access to arbitration when they have an MSPB appeal pending as of the date the grievance is scheduled for arbitration by the parties. The date of the arbitration scheduling letter is considered "the date the arbitration is scheduled by the parties" for the purposes of Article 16.9.

This language has been modified to reflect the parties' agreement that an employee should receive a hearing on the merits of an adverse action. It supercedes the 1988 Memorandum of Understanding on Article 16.9. While a preference eligible city letter carrier may appeal certain adverse actions to the MSPB, as well as file a grievance on the same action, the employee is not entitled to a hearing on the merits in both forums. This provision is designed to prevent the Postal Service from having to defend the same adverse action in an MSPB hearing as well as in an arbitration hearing. If a city letter carrier has an MSPB appeal pending on or after the date the arbitration scheduling letter is dated, the employee waives the right to arbitration.

The parties agree that the union will be permitted to reactivate an employee's previously waived right to an arbitration hearing if that employee's appeal to the MSPB did not result in a decision on the merits of the adverse action, or the employee withdraws the MSPB appeal prior to a decision on the merits being made. It is understood that this agreement does not preclude the parties from raising other procedural issues from the original arbitration appeal. Additionally, the Union is not pre-

cluded from raising as an issue in arbitration whether any Postal Service backpay liability should include the period between the time the right to arbitration was waived by the employee and the time the Union reactivated the arbitration appeal.

**EEO and EEO/MSPB Mixed Cases—Dual Filings.** Article 16.9 does not bar the arbitration of a grievance where a grievant has asserted the same claim in an Equal Employment Opportunity (EEO) complaint. Nor does it apply where a preference eligible grievant has appealed the same matter through the EEOC and then to the MSPB under the "mixed case" federal regulations (National Arbitrator Snow, D90N-4D-D 95003945, April 24, 1997, C-16650).

**16.10**

**Section 10. Employee Discipline Records**

The records of a disciplinary action against an employee shall not be considered in any subsequent disciplinary action if there has been no disciplinary action initiated against the employee for a period of two years.

Upon the employee's written request, any disciplinary notice or decision letter will be removed from the employee's official personnel folder after two years if there has been no disciplinary action initiated against the employee in that two-year period.

(Additional **discipline procedure** provisions regarding **City Carrier Assistant Employees are** found in **Appendix B.**).

The purpose of Article 16.10 is to protect employees from having their past records considered when they have shown over a two-year period that they performed their job without incurring any further disciplinary action.

Additional information on the retention and disposal of discipline records may be found in Handbook AS-353 (National Prearbitration, Q94N-4Q-C-96044119, March 2, 2004, M-01511).

The Step 4 settlement H4N-5G-D 7167, January 5, 1989 (M-00889), provides the following:

> A notice of discipline which is subsequently fully rescinded, whether by settlement, arbitration award, or independent management action, shall be deemed not to have been "initiated" for purposes of Article 16, Section 10, and may not be cited or considered in any subsequent disciplinary action.

Last Chance Agreements (LCA) are not "records of disciplinary action." LCAs are not covered by the provisions of Article 16.10. If an LCA contains a reference to a disciplinary record that exceeds the limitation in Article 16.10, the following instruction from Arbitrator Briggs in case D98N-4D-D 00114765, January 15, 2002 (C-22941), is to be followed:

LCAs "...can logically be divided into disciplinary and administrative categories, and only those elements falling into the former category are subject to the Article 16.10 time restriction."

**City Carrier Assistants.**

Appendix B, 3. Other Provisions, Section E – Article 16 of the 2011 National Agreement addresses access to the greivance procedure for separated or disciplined CCAs.

**APPENDIX B**

**Appendix B is the reprinting of Section I of the 2013 Das Award, the creation of a new non-career employee category.**

**3. OTHER PROVISIONS**

**E. Article 16 - Discipline Procedure**

CCAs may be separated for lack of work at any time before the end of their term. Separations for lack of work shall be by inverse relative standing in the installation. Such separation of the CCA(s) with the lowest relative standing is not grievable except where it is alleged that the separation is pretextual. CCAs separated for lack of work before the end of their term will be given preference for reappointment ahead of other CCAs with less relative standing in the installation, provided the need for hiring arises within 18 months of their separation.

CCAs may be disciplined or removed within the term of their appointment for just cause and any such discipline or removal will be subject to the grievance arbitration procedure, provided that within the immediately preceding six months, the employee has completed ninety (90) work days, or has been employed for 120 calendar days (whichever comes first) of their initial appointment. A CCA who has previously satisfied the 90/120 day requirement either as a CCA or transitional employee (with an appointment made after September 29, 2007), will have access to the grievance procedure without regard to his/her length of service as a CCA. Further, while in any such grievance the concept of progressive discipline will not apply, discipline should be corrective in nature.

In the case of removal for cause within the term of an appointment, a CCA shall be entitled to advance written notice of the charges against him/her in accordance with the provisions of Article 16 of the National Agreement.

# ARTICLE 17 REPRESENTATION

17.1

**Section 1. Stewards**

Stewards may be designated for the purpose of investigating, presenting and adjusting grievances.

**Contractual Authorization for Stewards.** Although shop stewards are union representatives and NALC officials chosen according to NALC rules, stewards are also given important rights and responsibilities by the National Labor Relations Act and by the National Agreement. The contract authorizes stewards to represent carriers in the investigation, presentation and adjustment of grievances, and requires the employer to cooperate with stewards in various ways as they accomplish their grievance-handling jobs. The specific steward rights and responsibilities set forth in Article 17.3 and 17.4 are supplemented in other parts of the National Agreement, including:

- Article 6.C.4 (superseniority in layoff or reduction in force)
- Article 15 (grievance handling)
- Article 27 (employee claims)
- Article 31.3 (right to information)
- Article 41.3.H (right to use telephones)

17.2.A

**Section 2. Appointment of Stewards**

A. The Union will certify to the Employer in writing a steward or stewards and alternates in accordance with the following general guidelines. Where more than one steward is appointed, one shall be designated chief steward. The selection and appointment of stewards or chief stewards is the sole and exclusive function of the Union. Stewards will be certified to represent employees in specific work location(s) on their tour; provided no more than one steward may be certified to represent employees in a particular work location(s). The number of stewards certified shall not exceed, but may be less than, the number provided by the formula hereinafter set forth.

Employees in the same craft per tour or station

| | |
|---|---|
| Up to 49 | 1 steward |
| 50 to 99 | 2 stewards |
| 100 to 199 | 3 stewards |
| 200 to 499 | 5 stewards |
| 500 or more | 5 stewards plus additional steward for each 100 employees |

**Steward Certification.** Article 17.2.A obligates the NALC to certify each steward and alternate to the employer in writing. Once certified, the steward represents employees in a specific work location. The steward from Station A, for example, must investigate any grievance occurring at his or her location, even the grievance of a carrier who is detailed temporarily from Station B and whose grievance arose at Station A. This is true even if the Station A steward must travel to interview the grievant in Station B, as provided in Article 17.3 (Step 4, NC-C-8435, October 6, 1977, M-00455).

The appointment of CCAs as union stewards is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**37. Can a CCA serve as a union steward?**

Yes.

**17.2.B** B. At an installation, the Union may designate in writing to the Employer one Union officer actively employed at that installation to act as a steward to investigate, present and adjust a specific grievance or to investigate a specific problem to determine whether to file a grievance. The activities of such Union officer shall be in lieu of a steward designated under the formula in Section 2.A and shall be in accordance with Section 3. Payment, when applicable, shall be in accordance with Section 4.

**17.2.C** C. To provide steward service to installations with twenty or less craft employees where the Union has not certified a steward, a Union representative certified to the Employer in writing and compensated by the Union may perform the duties of a steward.

**17.2.D** D. At the option of the Union, representatives not on the Employer's payroll shall be entitled to perform the functions of a steward or chief steward, provided such representatives are certified in writing to the Employer at the area level and providing such representatives act in lieu of stewards designated under the provisions of 2.A or 2.B above.

**Acting as Steward.** Article 17.2 establishes four alternate ways individuals may be certified as stewards as circumstances warrant.

- **Article 17.2.B** The union may designate in writing one union officer actively employed at that installation to act as a steward to investigate, present and adjust a specific grievance or to investigate a specific problem to determine whether to file a grievance. The individual designated will act in lieu of a steward designated under the formula in Section 2.A and is paid in accordance with Section 4. For

the purposes of this section, full-time union officials are considered to be "actively employed" (Prearbitration Settlement, H94N-4H-C 96084996, October 2, 1997, M-01267).

- The union may designate in writing, one union officer, who may also be a steward in a different section, actively employed at an installation to act as a steward to investigate, present and adjust a specific grievance or to investigate a specific problem to determine whether to file a grievance.

- **Article 17.2.C** In offices with twenty or less total craft employees which have no steward certified under Article 17.2.A, the union may certify a representative who is compensated by the union.

- **Article 17.2.D** The union may certify a representative not on the employer's payroll to perform the functions of a steward or chief steward. Such representatives must be certified in writing to the appropriate Area office and will act in lieu of stewards designated under the provisions of Article 17.2.A or Article 17.2.B.

  Representatives certified by the union pursuant to Article 17.2.D may be anyone who is not on the employer's official time. This would include, for example, employees from another installation (Prearbitration Settlement, H8N-2B-C 12054, May 26, 1982, M-00233) and former employees (Step 4, H4C-1M-C 2986, April 29, 1987, M-00798).

**17.2.E**

E. A steward may be designated to represent more than one craft, or to act as a steward in a craft other than his/her own, whenever the Union or Unions involved so agree, and notify the Employer in writing. Any steward designations across craft lines must be in accordance with the formula set forth in Section 2.A above.

**17.3**

**Section 3. Rights of Stewards**

When it is necessary for a steward to leave his/her work area to investigate and adjust grievances or to investigate a specific problem to determine whether to file a grievance, the steward shall request permission from the immediate supervisor and such request shall not be unreasonably denied.

In the event the duties require the steward leave the work area and enter another area within the installation or post office, the steward must also receive permission from the supervisor from the other area he/she wishes to enter and such request shall not be unreasonably denied.

The steward, chief steward or other Union representative properly certified in accordance with Section 2 above may request and shall obtain access through the appropriate supervisor to review the documents, files and other records necessary for processing a grievance or determining if a grievance exists and shall have the right to interview the aggrieved employee(s), supervisors and witnesses during working hours. Such requests shall not be unreasonably denied.

While serving as a steward or chief steward, an employee may not be involuntarily transferred to another tour, to another station or branch of the particular post office or to another independent post office or installation unless there is no job for which the employee is qualified on such tour, or in such station or branch, or post office.

If an employee requests a steward or Union representative to be present during the course of an interrogation by the Inspection Service, such request will be granted. All polygraph tests will continue to be on a voluntary basis.

17.4 **Section 4. Payment of Stewards**

The Employer will authorize payment only under the following conditions:

Grievances—Informal and Formal Step A: The aggrieved and one Union steward (only as permitted under the formula in Section 2.A) for time actually spent in grievance handling, including investigation and meetings with the Employer. The Employer will also compensate a steward for the time reasonably necessary to write a grievance. In addition, the Employer will compensate any witnesses for the time required to attend a Formal Step A meeting.

Meetings called by the Employer for information exchange and other conditions designated by the Employer concerning contract application.

Employer authorized payment as outlined above will be granted at the applicable straight time rate, providing the time spent is a part of the employee's or steward's (only as provided for under the formula in Section 2.A) regular work day.

The Postal Service will compensate the Union's primary Step B representatives at their appropriate rate of pay on a no loss, no gain basis. Activated back up Step B representatives will be compensated on the same basis for time actually spent as Step B representatives.

**Steward Rights.** Article 17.3 & 17.4 establish several steward rights:

- The right to investigate and adjust grievances and problems that may become grievances;
- The right to paid time to conduct those activities;
- The right to obtain management information;
- Superseniority concerning being involuntarily transferred;
- An employee's right to steward representation during an Inspection Service interrogation.

**Steward Rights—Activities Included.** A steward may conduct a broad range of activities related to the investigation and adjustment of grievances and of problems that may become grievances. These activities include the right to review relevant documents, files and records, as well as interviewing a potential grievant, supervisors and witnesses. Specific

settlements and arbitration decisions have established that a steward has the right to do (among other things) the following:

- Complete grievance forms and write appeals on the clock (see below).

- Interview witnesses, including postal patrons who are off postal premises (National Arbitrator Aaron, N8-NA-0219, November 10, 1980, C-03219; Step 4, H1N-3U-C 13115, March 4, 1983, M-01001; Step 4, H8N-4J-C 22660, May 15, 1981, M-00164);

- Interview supervisors (Step 4, H7N-3Q-C 31599, May 20, 1991, M-00988);

- Interview postal inspectors (Management Letter, N8-N-0224, March 10, 1981, M-00225);

- Review relevant documents (Step 4, H4N-3W-C 27743, May 1, 1987, M-00837);

- Review an employee's Official Personnel Folder when relevant (Step 4, NC-E 2263, August 18, 1976, M-00104);

- Write the union statement of corrections and additions to the Formal Step A decision (Step 4, A8-S-0309, December 7, 1979, M-01145).

- Interview Office of Inspector General [OIG] Agents.

A steward has the right to conduct all such activities *on the clock* (see below).

**Right to Steward Time on the Clock.**  Although a steward must ask for supervisory permission to leave his or her work area or enter another one to pursue a grievance or potential grievance, management cannot "unreasonably deny" requests for paid grievance-handling time.

Management may not determine in advance how much time a steward reasonably needs to investigate a grievance (National Arbitrator Garrett, MB-NAT-562/MB-NAT-936, January 19, 1977, C-00427).  Rather, the determination of how much time is considered reasonable is dependent on the issue involved and the amount of information needed for investigation purposes (Step 4, NC-S-2655, October 20, 1976, M-00671).

Steward time to discuss a grievance may not be denied solely because a steward is in overtime status (Prearbitration Settlement, W4N-5C-C 41287, September 13, 1988, M-00857).  It is the responsibility of the union and management to decide mutually when the steward will be allowed, subject to business conditions, an opportunity to investigate and adjust grievances (Step 4, N-S-2777, April 5, 1973, M-00332).

If management delays a steward from investigating a grievance, it should inform the steward of the reasons for the delay and when time will be

available. Likewise, the steward has an obligation to request additional time and give the reasons why it is needed (Step 4, NC-C-16045, November 22, 1978, M-00127).

An employee must be given reasonable time to consult with his or her steward, and such reasonable time may not be measured by a predetermined factor (Step 4, H1C-3W-C 44345, May 9, 1985, M-00303).

Although Article 17.4 provides that the grievant and a steward shall be paid for time actually spent in grievance handling and meetings with management, there are no contractual provisions requiring the payment of travel time or expenses in connection with attendance at a Formal Step A meeting (Step 4, N8-S-0330, June 18, 1980, M-00716). Nor does the National Agreement require the payment of a steward who accompanies an employee to a medical facility for a fitness-for-duty examination (Step 4 Settlement, NC-N-12792, December 13, 1978, M-00647).

The appropriate remedy in a case where management has unreasonably denied a steward time on the clock is an order or agreement to cease and desist, plus payment to the steward for the time spent processing the grievance off-the-clock which should have been paid time.

**Right to Information.** The NALC's rights to information relevant to collective bargaining and to contract administration are set forth in Article 31. This section states stewards' specific rights to review and obtain documents, files and other records, in addition to the right to interview a grievant, supervisors and witnesses.

Steward requests to review and obtain documents should state how the request is relevant to the handling of a grievance or potential grievance. Management should respond to questions and to requests for documents in a cooperative and timely manner. When a relevant request is made, management should provide for review and/or produce the requested documentation as soon as is reasonably possible.

A steward has a right to obtain supervisors' personal notes of discussions held with individual employees in accordance with Article 16.2 if the notes have been made part of the employee's Official Personnel Folder or if they are necessary to processing a grievance or determining whether a grievance exists (National Arbitrator Mittenthal, H8N-3W-C 20711, February 16, 1982, C-03230; Step 4, NC-S-10618, October 8, 1978, M-00106; and Step 4, G90N-4G-C 93050025, February 23, 1994, M-01190).

### Weingarten Rights

Federal labor law, in what is known as the *Weingarten* rule, gives each employee the right to representation during any *investigatory interview which he or she reasonably believes may lead to discipline (NLRB v. J. Weingarten, U.S. Supreme Court, 1975).*

The *Weingarten* rule does not apply to other types of meetings, such as:

- **Discussions.** Article 16.2 provides that "for minor offenses by an employee ... discussions ... shall be held in private between the employee and the supervisor.  Such discussions are not discipline and are not grievable."  So an employee does not have *Weingarten* representation rights during an official discussion (National Arbitrator Aaron, H1T-1E-C 6521, July 6, 1983, C-03769).

- Employees do not have the right to union representation during fitness-for-duty physical examinations.

The *Weingarten* rule applies only when the meeting is an *investigatory interview*—when management is searching for facts and trying to determine the employee's guilt or decide whether or not to impose discipline.  The rule does not apply when management calls in a carrier for the purpose of issuing disciplinary action—for example, handing the carrier a letter of warning.

An employee has *Weingarten* representation rights only where he or she *reasonably believes* that discipline could result from the investigatory interview.  Whether or not an employee's belief is "reasonable" depends on the circumstances of each case.  Some cases are obvious, such as when a supervisor asks an employee whether he discarded deliverable mail.

The steward cannot exercise *Weingarten* rights on the employee's behalf.  And unlike "*Miranda* rights," which involve criminal investigations, the employer is not required to inform the employee of the *Weingarten* right to representation.

Employees also have the right under W*eingarten* to a pre-interview consultation with a steward.  Federal Courts have extended this right to pre-meeting consultations to cover Inspection Service interrogations (*U.S. Postal Service  v. NLRB*, D.C. Cir. 1992, M-01092).

In a *Weingarten* interview the employee has the right to a steward's *assistance*—not just a silent presence.  The employer would violate the employee's *Weingarten* rights if it refused to allow the representative to speak or tried to restrict the steward to the role of a passive observer.

Although the ELM Section 665.3 requires all postal employees to cooperate with postal investigations, the carrier still has the right under *Weingarten* to have a steward present before answering questions in this situation.  The carrier may respond that he or she will answer questions once a steward is provided.

**Superseniority in Transfers**

The contract  contains special provisions protecting steward positions from transfer or reassignment.  These special steward rights are known

as "superseniority." The steward superseniority provision is contained in the second to last paragraph of Article 17.3. That language protects stewards from being transferred from a facility or tour where letter carriers are working—unless there is *no other city letter carrier job left.*

National Arbitrator Britton ruled in H4N-5C-C 17075, November 28, 1988 (C-08504), that Article 17.3 bars both temporary and permanent reassignments of stewards, and that the prohibition applies even if there are no vacant job assignments. In other words, superseniority rights must be observed even if it requires an involuntary transfer of another, more senior carrier, whether full- or part-time (Step 4, H1N-2B-C 7422, October 25, 1983, M-00077).

The steward's superseniority rights override the excessing provisions of Article 12, *Principles of Seniority, Posting and Reassignments.* So NALC stewards are always the last letter carriers to be excessed from a section, the craft or an installation, regardless of their seniority or their full- or part-time status.

17.5

**Section 5. Labor-Management Committee Meetings**

A. The Union through its designated agents shall be entitled at the national, area, and local levels, and at such other intermediate levels as may be appropriate, to participate in regularly scheduled Joint Labor-Management Committee meetings for the purpose of discussing, exploring, and considering with management matters of mutual concern; provided neither party shall attempt to change, add to or vary the terms of this Collective Bargaining Agreement.

B. All other national level committees established pursuant to the terms of this Agreement shall function as subcommittees of the national level Labor-Management Committee.

C. Meetings at the national and area (except as to the Christmas operation) levels will not be compensated by the Employer. The Employer will compensate one designated representative from the Union for actual time spent in the meeting at the applicable straight time rate, providing the time spent in such meetings is a part of the employee's regular scheduled work day.

17.6

**Section 6. Union Participation in New Employee Orientation**

During the course of any employment orientation program for new employees, a representative of the Union representing the craft to which the new employees are assigned shall be provided ample opportunity to address such new employees, provided that this provision does not preclude the Employer from addressing employees concerning the same subject.

Health benefit enrollment information and forms will not be provided during orientation until such time as a representative of the Union has had an opportunity to address such new employees.

**New Employee Orientation.** During new letter carrier orientation, a representative of the NALC shall be provided "ample" opportunity to address the new employees while they are on the clock.

Management must permit new employees to complete PS Form 1187 during new employee orientation time (Step 4, H4N-4J-C 2536, August 29, 1985, M-00317). Article 17 does not preclude management from being present during the union's new employee orientation (Step 4, H1C-5D-C 21764, December 17, 1984, M-00084).

New employee orientation for CCAs is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**38. Will the union be allowed to address newly hired CCAs as part of the new employee orientation process?**

Yes. The provisions of Article 17.6 of the National Agreement apply to CCAs. Accordingly, the union is to be provided ample opportunity to address all newly hired CCAs as part of the hiring process.

**40. Do former transitional employees go through the full orientation process when hired as CCAs?**

Only if the employee was not provided orientation when hired as a transitional employee. However, the union will be provided time, as defined in Article 17.6 of the National Agreement to address those CCAs that went through the full orientation process as transitional employees.

The opportunity to discuss health insurance when a CCA becomes a career employee is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**39. Is the union provided an opportunity to discuss health insurance, pursuant to Article 17.6, when a CCA becomes a career employee?**

Yes, the union will be provided time to address the NALC Health Benefit Plans available to career employees.

**17.7.A**

**Section 7. Checkoff**

A. In conformity with Section 2 of the Act, 39 U.S.C. 1205, without cost to the Union, the Employer shall deduct and remit to the Union the regular and periodic Union dues from the pay of employees who are members of the Union, provided that the Employer has received a written assignment which shall be irrevocable for a period of not more than one year, from each employee on whose account such deductions are to be made. The Employer agrees to remit to the Union

all deductions to which it is entitled fourteen (14) days after the end of the pay period for which such deductions are made. Deductions shall be in such amounts as are designated to the Employer in writing by the Union.

**17.7.B** B. The authorization of such deductions shall be in the following form:

**UNITED STATES POSTAL SERVICE**
**AUTHORIZATION FOR DEDUCTION**
**OF UNION DUES**

I hereby assign to the *National Association of Letter Carriers, AFL-CIO*, from any salary or wages earned or to be earned by me as your employee (in my present or any future employment by you) such regular and periodic membership dues as the Union may certify as due and owing from me, as may be established from time to time by said Union. I authorize and direct you to deduct such amounts from my pay and to remit same to said Union at such times and in such manner as may be agreed upon between you and the Union at any time while this authorization is in effect, which includes a $8.00 yearly subscription to the Postal Record as part of the membership dues.

Notice: Contributions or gifts to the National Association of Letter Carriers, AFL-CIO are not tax deductible as charitable contributions for Federal income tax purposes. However, they may be tax deductible under other provisions of the Internal Revenue Code.

This assignment, authorization and direction shall be irrevocable for a period of one (1) year from the date of delivery hereof to you, and I agree and direct that this assignment, authorization and direction shall be automatically renewed, and shall be irrevocable for successive periods of one (1) year, unless written notice is given by me to you and the Union not more than twenty (20) days and not less than ten (l0) days prior to the expiration of each period of one (1) year. This assignment is freely made pursuant to the provisions of the Postal Reorganization Act and is not contingent upon the existence of any agreement between you and my Union.

(Form to be revised to conform to Postal Service Machine Requirements as on SF 1187.)

**17.7.C** C. Notwithstanding the foregoing, employees' dues deduction authorizations (Standard Form 1187) which are presently on file with the Employer on behalf of the Union shall continue to be honored and given full force and effect by the Employer unless and until revoked in accordance with their terms.

**17.7.D** D. The Employer agrees that it will continue in effect, but without cost to employees, its existing program of payroll deductions at the request and on behalf of employees for remittance to financial institutions including credit unions. In addition the Employer agrees without cost to the employee to make payroll deductions on behalf of such organization or organizations as the Union shall designate to receive funds to provide group automobile insurance and/or homeowners/ten-

ant liability insurance for employees, provided only one insurance carrier is selected to provide such coverage.

(The preceding **Article,** Article 17, shall apply to **City Carrier Assistant** Employees.)

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: Article 17.7.D Payroll Deductions/Allotments**

No later than January 4, 2008, the Postal Service will increase the maximum allotments in the existing program by providing one additional allotment for the use of NALC bargaining unit employees.

Date: September 11, 2007

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 288 of 472. PageID #: 1106

Page 17-12 NALC-USPS Joint Contract Administration Manual -June 2014

USPS000828

# ARTICLE 18 NO STRIKE

18.1 **Section 1. Statement of Principle**

The Union in behalf of its members agrees that it will not call or sanction a strike or slowdown.

18.2 **Section 2. Union Actions**

The Union or its local Unions (whether called branches or by other names) will take reasonable action to avoid such activity and where such activity occurs, immediately inform striking employees they are in violation of this Agreement and order said employees back to work.

18.3 **Section 3. Union Liability**

It is agreed that the Union or its local Unions (whether called branches or by other names) which comply with the requirements of this Article shall not be liable for the unauthorized action of their members or other postal employees.

18.4 **Section 4. Legal Impact**

The parties agree that the provisions of this Article shall not be used in any way to defeat any current or future legal action involving the constitutionality of existing or future legislation prohibiting Federal employees from engaging in strike actions. The parties further agree that the obligations undertaken in this Article are in no way contingent upon the final determination of such constitutional issues.

(The preceding Article, Article 18, shall apply to **City Carrier Assistant** Employees.)

**Prohibition on Strikes**. Federal law has long prohibited strikes by postal and most other federal employees, and provided criminal penalties for violations. The Postal Reorganization Act of 1970 continued to apply the strike prohibitions of Title 5, Section 7511 of the U.S. Code (5 U.S.C. §7511) to postal employees, as well as the federal criminal penalties for violations contained in 18 U.S.C. §1918.

# ARTICLE 19 HANDBOOKS AND MANUALS

Those parts of all handbooks, manuals and published regulations of the Postal Service, that directly relate to wages, hours or working conditions, as they apply to employees covered by this Agreement, shall contain nothing that conflicts with this Agreement, and shall be continued in effect except that the Employer shall have the right to make changes that are not inconsistent with this Agreement and that are fair, reasonable, and equitable. This includes, but is not limited to, the Postal Service Manual and the F-21, Timekeeper's Instructions.

Notice of such proposed changes that directly relate to wages, hours, or working conditions will be furnished to the Union at the national level at least sixty (60) days prior to issuance. At the request of the Union, the parties shall meet concerning such changes. If the Union, after the meeting, believes the proposed changes violate the National Agreement (including this Article), it may then submit the issue to arbitration in accordance with the arbitration procedure within sixty (60) days after receipt of the notice of proposed change. Copies of those parts of all new handbooks, manuals and regulations that directly relate to wages, hours or working conditions, as they apply to employees covered by this Agreement, shall be furnished the Union upon issuance.

Article 19 shall apply in that those parts of all handbooks, manuals and published regulations of the Postal Service, which directly relate to wages, hours or working conditions shall apply to **CCA** employees only to the extent consistent with other rights and characteristics of **CCA** employees **provided for** in this Agreement and otherwise as they apply to the supplemental work force. The Employer shall have the right to make changes to handbooks, manuals and published regulations as they relate to **CCA** employees pursuant to the same standards and procedures found in Article 19 of **the National** Agreement.

[see Memo, page **207**]

**This Memo is located on *JCAM* pages 19-2 and 19-3.**

**Handbooks and Manuals.** Article 19 provides that those postal handbook and manual provisions directly relating to wages, hours, or working conditions are enforceable as though they were part of the National Agreement. Changes to handbook and manual provisions directly relating to wages, hours, or working conditions may be made by management at the national level and may not be inconsistent with the National Agreement. A challenge that such changes are inconsistent with the National Agreement or are not fair, reasonable, or equitable may be made only by the NALC at the national level.

A memorandum included in the 2011 National Agreement establishes a process for the parties to communicate with each other at the national level regarding changes to handbooks, manuals and published regulations that directly relate to wages, hours, or working conditions. The purpose of the memorandum is to provide the national parties with a better understanding of their respective positions in an effort to eliminate

unnecessary appeals to arbitration and clearly identify and narrow the issue(s) in cases that are appealed to arbitration under Article 19.

**Local Policies.** Locally developed policies may not vary from nationally established handbook and manual provisions (National Arbitrator Aaron, H1N-NAC-C-3, February 27, 1984, C-04162). Additionally, locally developed forms must be approved consistent with the *Administrative Support Manual* (ASM) and may not conflict with nationally developed forms found in handbooks and manuals.

National Arbitrator Garrett held in MB-NAT-562, January 19, 1977 (C-00427), that "the development of a new form locally to deal with stewards' absences from assigned duties on union business—as a substitute for a national form embodied in an existing manual (and thus *in conflict* with that manual)—thus falls within the second paragraph of Article 19. Since the procedure there set forth has not been invoked by the Postal Service, it would follow that the form must be withdrawn."

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: Article 19**

1. When the Postal Service provides the Union with proposed changes in handbooks, manuals, or published regulations pursuant to Article 19 of the National Agreement, the Postal Service will furnish a final draft copy of the **revisions** and a **document that identifies** the changes being made from the existing handbook, manual, or published regulation. When the handbook, manual, or published regulation is available in electronic form, the Postal Service will provide, in addition to a hard copy, an electronic version of the final draft copy clearly indicating the changes and another unmarked final draft copy of the changed provision with the changes incorporated.

2. The **document that identifies the changes will indicate** language that has been added, deleted, or moved, and the new location of language moved. Normally, the changes will be identified by striking through deleted language, underlining new language, and placing brackets around language that is moved, with the new location indicated. If another method of identifying the changes is used, the method will be clearly explained, and must include a means to identify which language is added, deleted, and moved, as well as the new location of any language moved.

3. When notified of a change(s) to handbooks, manuals, and published regulations, pursuant to Article 19 of the National Agreement, the Union will be notified of the purpose and anticipated impact of the change(s) on **city letter carrier** bargaining unit employees.

4. At the request of the Union, the parties will meet to discuss the change(s). If the Union requests a meeting on the change(s), the Union will provide the Postal Service with **notice identifying** the **specific** change(s) the Union wants to discuss.

5. Within sixty (60) days of the Union's receipt of the notice of proposed change(s), the Union will notify the Postal Service in writing of any change(s) it believes is directly related to wages, hours, or working conditions and not fair, reasonable or equitable and/or in conflict with the National Agreement. The Union may request a meeting on the change(s) at issue.

6. The Postal Service will provide the Union with a written response addressing each issue raised by the Union, **pursuant to paragraph 5, within thirty (30) days of receipt,** provided the Union identifies the issue(s) within sixty (60) days of the Union's receipt of the notice of proposed change(s).

7. If the Union, after receipt of the Postal Service's written response, believes the proposed change(s) violates the National Agreement, it may submit the issue to arbitration within sixty (60) days of receipt of the notice of proposed change or thirty (30) days after the Union receives the Postal Service's written response, whichever is later. **If the Postal Service fails to provide a response to the Union pursuant to paragraph 6, the Union may submit the issue(s) to arbitration provided it does so within thirty (30) days after the Postal Service's response was due.** The Union's appeal shall specify the change(s) it believes is not fair, reasonable or equitable and/or in conflict with the National Agreement, and shall state the basis for the appeal.

8. If modifications are made to the final draft copy as a result of meetings with employee organizations, the Postal Service will provide NALC with a revised final draft copy clearly indicating only the change(s) which is different from the final draft copy.

9. When the changes discussed **in paragraph 8** are incorporated into **the final** version of a handbook, manual, publication, or published regulation, and there is not an additional change(s) which would require notice under Article 19, the Union will be provided a courtesy copy. **In such case, a** new **Article 19** notice period is **not** necessary.

10. Lastly, in any case in which the Postal Service has affirmatively represented that there is no change(s) that directly relates to wages, hours, or working conditions pursuant to Article 19 of the National Agreement, time limits for an Article 19 appeal will not be used by the Postal Service as a procedural argument if the Union determines afterwards that there has been a change to wages, hours, or working conditions.

Nothing contained in this memorandum modifies the Postal Service's right to publish a change(s) in a handbook, manual or published regulation, sixty (60) days after notification to the Union.

Date: **January 10, 2013**

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 294 of 472. PageID #: 1112

Page 19-4 NALC-USPS Joint Contract Administration Manual - July 2014

USPS000834

# ARTICLE 20 PARKING

20.1 **Section 1. National Study Committee**

The existing parking program will remain in effect. A National Study Committee on Parking will be established in order to improve the parking program at existing facilities and to recommend such programs for new facilities.

20.2 **Section 2. Security**

Recognizing the need for adequate security for employees in parking areas, and while en route to and from parking areas, the Employer will take reasonable steps, based on the specific needs of the individual location, to safeguard employee security, including, but not limited to, establishing liaison with local police authorities, requesting the assignment of additional uniformed police in the area, improving lighting and fencing, and, where available, utilizing mobile security force patrols.

20.3 **Section 3. Labor-Management Committee**

Parking is a proper subject for discussion at local Labor-Management Committee meetings. The location of new, additional, or improved parking facilities; the number of parking spaces; security and lighting in the parking areas as well as similar subjects are proper agenda items for such meetings. The local Labor-Management Committee may make recommendations to the installation head concerning such subjects.

(The preceding Article, Article 20, shall apply to **City Carrier Assistant** Employees.)

**Employee Parking**. Article 20 requires the Postal Service to continue the existing parking program, discuss improvements in a national study committee, and take reasonable steps to safeguard employee security in parking areas. Furthermore, parking is a proper subject for discussion in local labor-management committee meetings.

**Article 30 Local Implementation.** Article 30.B lists "The assignment of employee parking spaces" as Item 19 of the 22 subjects for local implementation.

The intent of Article 30.B.19 is to enable the parties to negotiate over the number of *existing* parking spaces which will be allocated to letter carriers—rather than over the construction of new spaces. Local memorandum provisions may, for instance, determine the number of spaces allocated to letter carriers, may assign spaces based on seniority (or first-come, first-served or any other method), and may provide for carrier parking in other available parking spaces.

Negotiation between NALC branches and Postal Service installation heads over a local memorandum of understanding takes place during the "local implementation" period following the execution of each successive National Agreement (Article 30).

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 296 of 472. PageID #: 1114

Page 20-2 NALC-USPS Joint Contract Administration Manual - July 2014

USPS000836

# ARTICLE 21 BENEFIT PLANS

21.1

**Section 1. Health Benefits**

The method of determining the Employer bi-weekly contributions to the cost of employee health insurance programs under the Federal Employees Health Benefits Program (FEHBP) will be as follows:

A. The Office of Personnel Management shall calculate the subscription charges under the FEHBP that will be in effect the following January with respect to self only enrollments and self and family enrollments.

B. **For career employees on the rolls prior to January 12, 2013,** the bi-weekly Employer contribution for self only and self and family plans is adjusted to an amount equal to **80% in 2013, 78% in 2014, 77% in 2015, and 76% in 2016,** of the weighted average bi-weekly premiums under the FEHBP as determined by the Office of Personnel Management. **For career employees hired on or subsequent to January 12, 2013, the bi-weekly Employer contribution for self only and self and family plans is adjusted to an amount equal to 77% in years 2013 through 2015, and 76% in 2016, of the weighted average bi-weekly premiums under the FEHBP as determined by the Office of Personnel Management.** The adjustment begins on the effective date determined by the Office of Personnel Management in **January 2013, January 2014, January 2015, and January 2016.**

C. The weight to be given to a particular subscription charge for each FEHB plan and option will be based on the number of enrollees in each such plan and option for whom contributions have been received from employers covered by the FEHBP as determined by the Office of Personnel Management.

D. The amount necessary to pay the total charge for enrollment after the Employer's contribution is deducted shall be withheld from the pay of each enrolled employee. To the extent permitted by law, the Employer shall permit employees covered by this Agreement to make their premium contributions to the cost of each plan on a pre-tax basis, and shall extend eligibility to such employees for the U.S. Postal Service's flexible spending account plans for unreimbursed health care expenses and work-related dependent child care and elder care expenses as authorized under Section 125 of the Internal Revenue Code.

E. **For career employees on the rolls prior to January 12, 2013,** the limitation upon the Employer's contribution towards any individual employee shall be **83.5% in 2013, 81.25% in 2014, 80.25% in 2015, and 79.25% in 2016** of the subscription charge under the FEHBP in **2013, 2014, 2015, and 2016. For career employees hired on or subsequent to January 12, 2013, the limitation shall be 80.25% for years 2013 through 2015, and 79.25% for 2016.**

**[see Memo, page 210]**

**This Memo is located on JCAM pages 21-5 through 21-7.**

**Health Benefits Contribution Formula.** Article 21.1 specifies the percentage of career employee health benefit premium costs paid by the Postal Service.

Letter carriers are covered by the Federal Employees' Health Benefit Program (FEHBP), which enables each carrier to choose among many plans offering different levels and types of coverage. The premium amounts differ among different FEHBP health insurance plans and also by the option chosen—self-only versus family plan—so the actual amounts of employee and employer contributions vary from one plan option to another.

The Postal Service's contributions for City Letter Carriers' health benefits is calculated using the Federal Government's weighted average formula. The weighted average formula is based on the number of federal and postal employees who elect coverage in any given plan and option.

The Office of Personnel Management (OPM) calculates the subscription charges that will be in effect the following January for both individual and family plans. The Postal Service contribution of the weighted average biweekly premiums as determined by OPM is shown in Article 21.1. The maximum that the Postal Service will pay towards any given plan of the subscription charge under the Federal Employees Health Benefit Program (FEHBP) is shown in Article 21.1.

**Regulations.** More information about letter carriers' FEHBP coverage is contained in the ELM Section 520.

Employees of the U.S. Postal Service who are called to active duty may be eligible for full payment of FEHBP premiums by the Postal Service (Management Instruction, EL-520-2008-1, January 1, 2008).

**City Carrier Assistant Employees.** Health benefit entitlement for CCAs is addressed in Appendix B, 3. Other Provisions, Section F – Article 21 in the 2011 National Agreement.

**APPENDIX B**

**Appendix B is the reprinting of Section I of the 2013 Das Award, the creation of a new non-career employee category.**

**3. OTHER PROVISIONS**

**F. Article 21 - Health Insurance**

After an initial appointment for a 360-day term and upon reappointment to another 360-day term, any eligible noncareer CCA employee who wants to pay health premiums to participate in the Federal Employees Health Benefits (FEHB) Program on a pre-tax basis will be required to make an election to do so in accordance with applicable procedures. A previous appointment as a transitional employee will

count toward qualifying for participation in FEHB, in accordance with the Office of Personnel Management (OPM) regulations. The total cost of health insurance is the responsibility of the noncareer CCA employee except as provided below.

Beginning in Plan Year 2014, the Postal Service will make a bi-weekly contribution to the total premium for any CCA employee who wishes to participate in the USPS Noncareer Health Care Plan (USPS Plan) equal to the greater of (a) $125, or (b) the minimum required by the Patient Protection and Affordable Care Act, and applicable regulations, for self-only. The CCA employee is fully responsible for the cost of premiums for any health insurance plan beyond a self-only plan. Any CCA employee wishing to make their health care contribution on a pre-tax basis will be required to make an election to do so in accordance with applicable procedures. All CCA employees will be eligible for the USPS Plan within a reasonable period from the date of hire and entry into a pay status, consistent with the requirements established under the Patient Protection and Affordable Care Act.

If for any reason the USPS Plan is not available to a CCA, or if a CCA elects more than self-only coverage, the Postal Service will make a bi-weekly contribution for any eligible CCA who selects an NALC Consumer Driven Health Plan equal to the greater of (a) $125, or (b) the minimum required by the Patient Protection and Affordable Care Act, and applicable regulations, for self-only.

Health benefits for City Carrier Assistant Employees is further addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**42. Are CCAs allowed to participate in the Federal Employees Health Benefits Program?**

The following applies until health benefits plan year 2014. After an initial appointment for a 360-day term and upon reappointment to another 360-day term, any eligible noncareer CCA who wants to pay health care premiums to participate in the Federal Employees Health Benefits (FEHB) Program on a pre-tax basis will be required to make an election to do so in accordance with applicable procedures. A previous appointment as a transitional employee will count toward qualifying for participation in FEHB, in accordance with the Office of Personnel Management (OPM) regulations. The total cost of health insurance is the responsibility of the noncareer CCA. Health benefits available for CCAs beginning with health plan year 2014 are addressed at page 20 of the January 10, 2013 Interest Arbitration Award (Das).

**43. To qualify for Health Benefits must a CCA serve the entire 360-day initial appointment before a second 360-day appointment?**

To qualify for the Federal Employees Health Benefits program, CCAs must first have completed one full year (365 days) of current continuous employment, including breaks of five days or less, regardless of when the five-day break occurs.

21.2

**Section 2. Life Insurance**

The Employer shall maintain the current life insurance program in effect during the term of this Agreement.

**FEGLI Coverage.** Letter carriers are covered by the Federal Employees' Group Life Insurance (FEGLI) program. More information about FEGLI coverage is contained in the ELM Section 530.

Employees of the U.S. Postal Service who are called to active duty may be eligible for full payment of FEGLI premiums by the Postal Service (Management Instruction, EL-520-2008-1, January 1, 2008).

21.3

**Section 3. Retirement**

The provisions of Chapter 83 and 84 of Title 5 U.S. Code, and any amendments thereto, shall continue to apply to employees covered by this Agreement.

**CSRS and FERS Retirement.** Letter carriers are covered by federal retirement law guaranteeing them retirement annuities. Each carrier is covered by either the Civil Service Retirement System (CSRS) or by the newer Federal Employees Retirement System (FERS). More detailed retirement information is contained in the ELM Sections 560 and 580.

21.4

**Section 4. Injury Compensation**

Employees covered by this Agreement shall be covered by Subchapter I of Chapter 81 of Title 5, and any amendments thereto, relating to compensation for work injuries. The Employer will promulgate appropriate regulations which comply with applicable regulations of the Office of Workers' Compensation Programs and any amendments thereto.

**Workers' Compensation.** Letter carriers who sustain occupational injury or disease are entitled to workers' compensation benefits under the Federal Employees' Compensation Act (FECA), administered by the U.S. Department of Labor's Office of Workers' Compensation Programs (OWCP).

Sources of information concerning federal workers' compensation benefits are:

- ELM Section 540—USPS regulations governing workers' compensation;
- USPS Handbook EL-505, *Injury Compensation* (December 1995);
- Title 5 United States Code Section 8101 (5 U.S.C. 8101)—the Federal Employees' Compensation Act (FECA);

- Title 20 Code of Federal Regulations Section Chapter 1 (20 C.F.R. 1) —regulations of the Office of Workers' Compensation Programs;
- Title 5 Code of Federal Regulations Part 353 (5 C.F.R. 353)— regulations concerning the restoration to duty of employees who sustain compensable injuries.

21.5

**Section 5. Health Benefit Brochures**

When a new employee who is eligible for enrollment in the Federal Employee's Health Benefit Program enters the Postal Service, the employee shall be furnished a copy of the Health Benefit Plan brochure of the Union which represents the craft in which the employee is to be employed.

**(Additional health insurance provisions regarding City Carrier Assistant Employees are found in Appendix B.)**

Whether or not Article 21.5 applies when a CCA becomes a career employee is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**44. Do the provisions of Article 21.5 (Health Benefit Brochures) apply when a CCA becomes a career employee?**

Yes.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: Resolution of Health Benefits Issues**

Health benefits issues shall be resolved in accordance with the following principles and obligations:

1. Preserving high-quality health benefits and controlling their costs have been a special focus in this round of bargaining. The parties agree that it is critical to restrain the cost of health care, especially retiree health care, both in the 2011 round of collective bargaining and through legislative action in order to preserve the long term viability of the United States Postal Service.

2. Although health care issues are complex, with many moving parts - including accounting rules, the pre-funding mandate, the preservation of choice, retiree coverage, and Medicare integration - there is much common ground in their respective positions and goals.

3. The Postal Service and the Union shall explore the establishment of a plan providing health benefits to employees in the city letter carrier bargaining unit and letter carrier retirees (the Plan) in accordance with this MOU.

4. The parties will consider the benefit/cost structure for the Plan and all issues regarding governance of the Plan, including procedures for establishing future changes in benefits and costs. Such consideration will be governed by the following objectives: improving the health of covered participants; preserving health benefits for employees and retirees together with changes in Plan design, Plan option, and coverage level structure; achieving efficiencies to reduce the costs of the Plan; and structuring the Plan to reduce the Postal Service's long-term liability for retiree health benefits.

5. The parties will establish a Health Benefits Task Force consisting of three representatives of the Union, three representatives of the Employer, and such expert consultants as the parties jointly wish to retain. The Task Force will explore all issues pertaining to the establishment of a new Plan, including, but not necessarily limited to, the following:

   a. whether the new Plan will be inside or outside the Federal Employees Health Benefits Program (FEHB);

   b. the number and content of Plan options;

   c. the number of tiers comprising the coverage level structure;

   d. integration of retiree benefits with Medicare Part A and B, coordination of the Plan benefits with Medicare, including a possible carve-out provision;

   e. the inclusion of an Employer Group Waiver Plan (EGWP) for prescription drug benefits;

   f. the allocation of employer, employee, and retiree contributions to the Plan;

   g. alternatives for coverage of non-career employees consistent with the Patient Protection and Affordable Care Act (PPACA); and

   h. an appropriate joint governance structure for the Plan.

6. Upon reaching agreement, the parties will jointly support the enactment of legislation which may be necessary to permit the establishment of the Plan.

7. Absent an alternative agreement on premium contributions by employees and the Postal Service pursuant to this MOU, the bi-weekly employer contribution for self only and self and family plans for current employees will be adjusted to an amount equal to the percentages reflected below of the weighted average bi-weekly premiums under the FEHB as determined by the Office of Personnel Management. The adjustments begin on the effective date determined by the Office of Personnel Management:

| | Weighted average | Not to exceed for any individual plan |
|---|---|---|
| January 2014 | 78% | 81.25% |
| January 2015 | 77% | 80.25% |
| January 2016 | 76% | 79.25% |

8. The employer contributions for plans for new career employees will be an amount equal to 77% of the weighted average bi-weekly premiums under FEHB as determined by the Office of Personnel Management. The adjustment for new career employees begins on the effective date determined by the Office of Personnel Management in January 2013

and continues through plan year 2015. Thereafter, the employer contribution for new career employees will be adjusted to 76% effective in January 2016.

Date: January 10, 2013

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 304 of 472. PageID #: 1122

Page 21-8 NALC-USPS Joint Contract Administration Manual - July 2014

USPS000844

# ARTICLE 22 BULLETIN BOARDS

The Employer shall furnish separate bulletin boards for the exclusive use of the Union, subject to the conditions stated herein, if space is available. If sufficient space is not available, at least one will be provided for all Unions. The Union may place its literature racks in swing rooms, if space is available. Only suitable notices and literature may be posted or placed in literature racks. There shall be no posting or placement of literature in literature racks except upon the authority of officially designated representatives of the Union.

(The preceding Article, Article 22, shall apply to **City Carrier Assistant** Employees.)

National Arbitration Howard Gamser ruled in N8-W-0214, July 14, 1981 (C-03224), that the Postal Service may not interfere with the posting of material on NALC bulletin boards unless management "can prove that this material is unsuitable for posting because it has caused or will cause an adverse impact upon the ability of postal authorities to direct the work force and to manage its operations efficiently and productively." Arbitrator Gamser sustained an NALC grievance in which management unilaterally removed a list of non-members from a bulletin board because the Postal Service was unable to demonstrate "that the notices did, in fact, cause sufficient disruption or dissension so as interfere with the orderly conduct of business, or that a failure to remove such notice would inevitably lead to such a result."

In the Step 4 decision E90N-1E-C 93023117, December 16, 1993 (M-01159), Management sustained a grievance challenging the removal from a bulletin board of an *NALC Bulletin* listing endorsements of political candidates.

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 306 of 472. PageID #: 1124

Page 22-2 NALC-USPS Joint Contract Administration Manual - July 2014

USPS000846

# Article 23 Rights of Union Officials To Enter Postal Installations

Upon reasonable notice to the Employer, duly authorized representatives of the Union shall be permitted to enter postal installations for the purpose of performing and engaging in official union duties and business related to the Collective Bargaining Agreement. There shall be no interruption of the work of employees due to such visits and representatives shall adhere to the established security regulations.

(The preceding Article, Article 23, shall apply to **City Carrier Assistant** Employees.)

Article 23 establishes the right of NALC officials to enter postal installations for any official purpose related to collective bargaining or labor relations. Step 4 settlements regarding this provision have established that:

- The union needs to give management reasonable notice prior to entering a postal facility—a phone call to an appropriate management official is sufficient (Step 4, H1N-5C-C 1479, June 25, 1982, M-00440);
- There should be no unreasonable delays in granting a requesting union official access to a postal facility (Step 4, NC-C-10535, April 12, 1978, M-00032); and
- High mail volume on a particular day is not a legitimate reason to prevent union officials from entering a facility (Step 4, NC-S-8831, November 14, 1977, M-00441).

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 309 of 472. PageID #: 1127

# ARTICLE 24 EMPLOYEES ON LEAVE WITH REGARD TO UNION BUSINESS

24.1 **Section 1. Continuation of Benefits**

Any employee on leave without pay to devote full or part-time service to the Union shall be credited with step increases as if in a pay status. Retirement benefits will accrue on the basis of the employee's step so attained, provided the employee makes contributions to the retirement fund in accordance with current procedure. Annual and sick leave will be earned in accordance with existing procedures based on hours worked.

24.2 **Section 2. Leave for Union Conventions**

A. Full or part-time employees will be granted annual leave or leave without pay at the election of the employee to attend National, State and Regional Union Conventions (Assemblies) provided that a request for leave has been submitted by the employee to the installation head as soon as practicable and provided that approval of such leave does not seriously adversely affect the service needs of the installation.

B. If the requested leave falls within the choice vacation period and if the request is submitted prior to the determination of the choice vacation period schedule, it will be granted prior to making commitments for vacations during the choice period, and will be considered part of the total choice vacation plan for the installation, unless agreed to the contrary at the local level. Where the specific delegates to the Convention (Assembly) have not yet been determined, upon the request of the Union, the Employer will make provision for leave for these delegates prior to making commitments for vacations.

C. If the requested leave falls within the choice vacation period and the request is submitted after the determination of the choice vacation period schedule, the Employer will make every reasonable effort to grant such request, consistent with service needs.

(The preceding Article, Article 24, shall apply to **City Carrier Assistant** Employees.)

Types of leave for union business include: (1) leave for union employment, (2) leave for union conventions, and (3) leave for other union activities.

**Reason for leave—NALC employment.** Article 24.1 addresses leave from postal employment taken because of a full- or part-time job with the NALC—typically with a local union or the national union. Article 24.1 guarantees that such NALC employees on leave from postal employment continue to accrue retirement credit (so long as payment is made) and earn credit toward step increases. As a general rule, a letter carrier who takes long-term leave without pay (LWOP) from postal employment does not continue to accrue retirement benefits or time toward periodic step increases.

**Reason for leave—NALC Conventions.** Article 24.2.A provides for a union member's right to annual leave or leave without pay (LWOP), at the employee's election, to attend a national, state or regional NALC convention. This is an exception to the general rule that the granting of LWOP is at the discretion of management (ELM Section 514). Once a carrier gives management appropriate notice of the need for leave, management should grant it unless the leave would "seriously adversely affect the service needs of the installation."

Article 24.2.B establishes three rules. First, it provides that employees requesting leave for union conventions during the choice vacation period will receive priority over other carriers, even those with greater seniority. Second, unless the local memorandum provides otherwise, such leave for conventions will be counted toward the "quota" of employees that must be given leave during that period. Third, the union may reserve a specified number of "slots" during the choice vacation period for convention purposes, even if the names of delegates are not yet known.

Under Article 24.2.C, if an employee requests convention leave after the choice vacation period selection process is done, management must follow the usual rule (Article 10.4.D) which provides that "all advance commitments for granting annual leave must be honored except in serious emergency situations." So although management cannot cancel another employee's leave to honor the convention leave request, this section requires management to "make every reasonable effort to grant such request."

**Reason for Leave—Other Union Activities.** Requests for leave to attend other sorts of NALC activities are handled under the usual leave rules (Articles 10 and 30).

**Article 30—Local Implementation.** Article 30.B lists the following two items for local implementation which involve leave for union activities:

**Article 30.B.8. Whether jury duty and attendance at National or State Conventions shall be charged to the choice vacation period.** Under Article 30.B.8 a branch may negotiate language to alter the effect of Article 24.2.B above, under which leave for union conventions during the choice vacation period is counted toward the "quota" of employees that must be given leave during that period.

**Article 30.B.20. The determination as to whether annual leave to attend Union activities requested prior to determination of the choice vacation schedule is to be a part of the total choice vacation plan.** "Union activities" in Article 30.B.20 differ from the "national and state conventions" addressed by Article 30.B.8. "Union activities" may

include a wide variety of union programs other than conventions, for example, legislative rallies or training seminars.

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 312 of 472. PageID #: 1130

Page 24-4 NALC-USPS Joint Contract Administration Manual - July 2014

USPS000852

# ARTICLE 25 HIGHER LEVEL ASSIGNMENTS

25.1 **Section l. Definitions**

Higher level work is defined as an assignment to a ranked higher level position, whether or not such position has been authorized at the installation.

25.2 **Section 2. Higher Level Pay**

An employee who is detailed to higher level work shall be paid at the higher level for time actually spent on such job. An employee's higher level rate shall be determined as if promoted to the position. An employee temporarily assigned or detailed to a lower level position shall be paid at the employee's own rate.

25.3 **Section 3. Written Orders**

Any employee detailed to higher level work shall be given a written management order, stating beginning and approximate termination, and directing the employee to perform the duties of the higher level position. Such written order shall be accepted as authorization for the higher level pay. The failure of management to give a written order is not grounds for denial of higher level pay if the employee was otherwise directed to perform the duties.

**All Higher Level Assignments.** Article 25.1, 25.2 and 25.3 apply to *all* details to higher level work, whether or not such work is within a bargaining unit.

25.4 **Section 4. Higher Level Details**

Detailing of employees to higher level bargaining unit work in each craft shall be from those eligible, qualified and available employees in each craft in the immediate work area in which the temporarily vacant higher level position exists. However, for details of an anticipated duration of one week (five working days within seven calendar days) or longer to those higher level craft positions enumerated in the craft Article of this Agreement as being permanently filled on the basis of promotion of the senior qualified employee, the senior, qualified, eligible, available employee in the immediate work area in which the temporarily vacant higher level position exists shall be selected.

**Higher Level Bargaining Unit Work.** Article 25.4 sets forth rules for filling temporarily vacant, bargaining unit, higher level positions. The rules depend upon the duration of the vacancy. For a vacancy of less than five working days, any employee may be selected from those who are "eligible, qualified and available" in the immediate work area in which the vacancy occurs. For a vacancy of five working days or more, the "*senior* qualified, eligible and available" volunteer in the immediate work area must be selected. All qualified letter carriers, including part-time flexibles and full-time regular letter carriers with bid positions are

eligible to apply for higher level assignments under the provisions of this section.

An employee properly selected for a higher level assignment may voluntarily remain on the assignment as long as they remain eligible, qualified, and available in the immediate work area. However, unlike the provisions of Article 41.2.B.3-5, Article 25.4 does not have a "duration clause". Therefore, the assignment to higher level does not limit or supersede management's right to assign full-time unassigned regular employees under the provision of Article 41.1.A.7 which could possibly remove the employee from the immediate work area of the available position. Likewise, the assignment to higher level does not limit or supersede a carrier's right to bid, opt, or return to their bid position.

**Carrier Technician Positions.** Temporarily vacant Carrier Technician positions are higher level assignments and thus are not subject to opting under the provision of Article 41.2.B. Rather, temporarily vacant Carrier Technician positions must be filled in accordance with this section (Step 4, H8N-3P-C 25550, May 6, 1981, M-00276). National Arbitrator Snow held in H7N-5R-C 316, September 10, 1990 (C-10254), that management may not assign different employees on an "as needed" basis to carry a route on a Carrier Technician string when a vacancy of five or more days is involved; instead such vacancies must be filled according to Article 25. Note that most settlements and memorandums that referred to "T-6" positions also to apply to "Carrier Technician" positions.

Employees who are detailed to Carrier Technician positions under the provisions of Article 25.4 are entitled to higher level pay, for all work performed for the duration of the detail, as if promoted to the position.

Letter carriers who fill temporarily vacant Carrier Technician positions assume the hours of the vacancy as provided by the prearbitration settlement H8N-3P-C 32705, January 27, 1982 (M-00431), which states:

> Details of anticipated duration of one week (five working days within seven calendar days) or longer to temporarily vacant Carrier Technician (T-6) positions shall be filled per Article 25, 1981 National Agreement. When such temporary details involve a schedule change for the detailed employee, that employee will assume the hours of the vacancy without obligation to the employer for out-of-schedule overtime.

The Step 4 Settlement H4N-5R-C 44093, February 10, 1989 (M-00902), provides that the following management document known as the "Brown Memo" (November 5, 1973, M-00452) is a contractual commitment and remains in effect. The memorandum explains when a replacement employee is entitled to higher level pay when no employee is detailed under the provisions of Article 25.4.

When a carrier technician (T-6) is absent for an extended period and another employee serves the series of 5 routes assigned to the absent T-6, the replacement employee shall be considered as replacing the T-6, and he shall be paid at the T-6 level of pay for the entire time he serves those routes, whether or not he performs all of the duties of the T-6 When a carrier technician's absence is of sufficiently brief duration so that his replacement does not serve the full series of routes assigned to the absent T-6, the replacement employee is not entitled to the T-6 level of pay. In addition, when a T-6 employee is on extended absence, but different carriers serve the different routes assigned to the T-6, those replacements are not entitled to the T-6 level of pay. The foregoing should be implemented in a straight-forward and equitable manner. Thus, for example, an employee who has carried an absent T-6 carrier's routes for four days should not be replaced by another employee on the fifth day merely in order to avoid paying the replacement higher level pay.

**City Carrier Assistant Employees.** Article 25 does not apply to City Carrier Assistant Employees. The pay rate of CCAs assigned to Carrier Technician positions is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**45. Are CCAs entitled to higher level pay under Article 25 of the National Agreement?**

No.

**46. How does a CCA who is hired as a grade CC-01 receive proper compensation when assigned to a City Carrier Technician (grade CC-02) position?**

In such case the CCA's PS Form 50 must be revised to reflect that he/she is assigned to a Carrier Technician position. This will require designation to the proper City Carrier Assistant Tech occupational code (either 2310-0047 or 2310-0048).

25.5

**Section 5. Leave Pay**

Leave pay for employees detailed to a higher level position will be administered in accordance with the following:

Employees working short term on a higher level assignment or detail will be entitled to approved sick and annual paid leave at the higher level rate for a period not to exceed three days.

Short term shall mean an employee has been on an assignment or detail to a higher level for a period of 29 consecutive work days or less at the time leave is taken and such assignment or detail to the higher level position is resumed upon return to work. All short term assignments or details will be automatically canceled if replacements are required for absent detailed employees.

Long term shall mean an employee has been on an assignment or detail to the higher level position for a period of 30 consecutive workdays or longer at the time leave is taken and such assignment or detail to the higher level position is resumed upon return to work.

> Terminal leave payments resulting from death will be paid at the higher level for all employees who are assigned or detailed to higher level assignments on their last workday.

**Leave During Higher Level Assignments.** Article 25.5 provides that a carrier working a higher level detail for less than thirty working days will receive sick or annual leave pay at the higher rate, but only for up to three leave days. If a replacement for the detailed employee is required, the detail is automatically canceled. An employee detailed to a Carrier Technician position is considered replaced when another employee is assigned to the vacancy for "five working days within seven calendar days or longer" under the provisions of Article 25.4.

# ARTICLE 26 UNIFORMS AND WORK CLOTHES

26.1

**Section 1. Uniform Control Committee**

The parties agree that the National Joint Labor-Management Uniform Control Committee shall be continued.

The Committee shall be composed of a representative of the Union and a representative of the Employer. The Chair of the Committee shall alternate each meeting between the Union and the Postal Service.

The Committee shall meet at least once each three months and at such other times as may be necessary or as requested by either of the parties.

The Committee shall have jurisdiction to consider the matters set out below and all non-cost matters pertaining to the Uniform Allowance Program, including but not limited to, the uniform items or work clothes items for which allowances are applicable; the design, color, quality and fabrics of authorized reimbursable items.

All employees who are required to wear uniforms or work clothes shall be furnished uniforms or work clothes or shall be reimbursed for purchases of authorized items from duly licensed vendors.

The current administration of the Uniform and Work Clothes Program shall be continued unless otherwise changed by this Agreement or by the Employer based on recommendations of the Committee.

"Wear-out" periods for uniform items being changed or replaced shall be determined by the Committee and appropriate recommendations made after giving full consideration to the type of changes being made, the economic effect upon the employees involved for replacement, and the overall appearance of the uniform.

The Committee shall establish its own rules of procedure. Recommendations of the Committee shall be addressed to the Postmaster General or his designee.

**Uniform Program and National Committee.** Article 26.1 guarantees the continuation of the current uniform and work clothes program, whose detailed regulations are contained in the ELM Section 930. It also sets up a joint NALC-USPS committee at the national level to discuss this topic and to recommend changes in the uniform program.

26.2

**Section 2. Annual Allowance**

The annual allowance for eligible employees in the reimbursable uniform program shall be as follows:

A. **Effective November 21, 2012** the annual allowance for all eligible employees shall be increased from present **$371.00** per annum to **$390.00** per annum. The increase shall become effective on the employee's anniversary date.

**Effective November 21, 2013** the annual allowance for all eligible employees shall be increased from **$390.00** per annum to **$399.00** per annum. The increase shall become effective on the employee's anniversary date.

**Effective November 21, 2014** the annual allowance for all eligible employees shall be increased from **$399.00** per annum to **$409.00** per annum. The increase shall become effective on the employee's anniversary date.

**Effective November 21, 2015** the annual allowance for all eligible employees shall be increased from **$409.00** per annum to **$420.00** per annum. The increase shall become effective on the employee's anniversary date.

B. A newly eligible employee entering the reimbursable uniform program will receive an additional credit to the employee's allowance as follows:

**Effective November 21, 2012 - $90.00 if entitled to $390.00 per annum.**

**Effective November 21, 2013 - $93.00 if entitled to $399.00 per annum.**

**Effective November 21, 2014 - $95.00 if entitled to $409.00 per annum.**

**Effective November 21, 2015 - $97.00 if entitled to $420.00 per annum.**

An eligible employee cannot receive this additional credit more than once; however, the current procedures regarding employees transferring from one allowance category to another shall be continued.

**Uniform Allowance.** Each employee required to wear a uniform receives a uniform allowance, increased annually as listed above, and credited on the employee's uniform allowance anniversary date (ELM Section 935.11). The credit may then be spent at approved uniform vendors who sell approved uniform items. Full- and part-time letter carriers who work at least four hours per day performing letter carrier duties are eligible for the allowance. Newly eligible career employees receive an additional credit as listed above. A CCA converted to career status will receive the additional credit upon their first anniversary date after being converted.

26.3

**Section 3. City Carrier Assistant (CCA)**

**When the CCA has completed ninety (90) work days, or has been employed for 120 calendar days, whichever comes first, the CCA will be provided with an annual uniform allowance equal to the amount provided to career employees in Section 2.A. Time served as a Transitional Employee will count toward the 90/120 day requirement.**

**The uniform purchases are reimbursed by the Postal Service directly to the vendor. Uniforms will be returned by CCAs separated and not reappointed.**

**[see Memo, page 212]**

**This Memo is located on *JCAM* page 26-4.**

**City Carrier Assistant Employee Uniforms.** Uniform issues for CCAs are addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**47. When does a CCA become eligible for a uniform allowance?**

Upon completion of 90 work days or 120 calendar days of employment as a CCA, whichever comes first. CCAs who have previously satisfied the 90/120 day requirement as a transitional employee (with an appointment made after September 29, 2007), become eligible for a uniform allowance when they begin their first CCA appointment.

**48. What defines the anniversary date for the purpose of annual uniform allowance eligibility for a CCA?**

The calendar date the CCA initially becomes eligible for a uniform allowance.

**49. How is the uniform anniversary date determined for a CCA who is converted to career status?**

The employee retains the same anniversary date held as a CCA.

**50. How is a uniform allowance provided to a CCA?**

When a CCA becomes eligible for a uniform allowance, funds must be approved through an eBuy submission by local management. After approval, a Letter of Authorization form must be completed and provided to the employee within 14 days of the eligibility date. The CCA takes the completed form to a USPS authorized vendor to purchase uniform items. The Letter of Authorization can be located on the Uniform Program website on the Blue Page under Labor Relations.

**51. How are uniform items purchased?**

Uniform items can only be purchased from USPS licensed vendors. A list of all authorized Postal Service Uniform vendors is located under the Labor Relations website: *Uniform Program* from the Blue Page and also on Liteblue under *My HR,* and look for the link for *Uniform Program*.

**52. How does a licensed uniform vendor receive payment for uniform items purchased by a CCA?**

The licensed vendor creates an itemized invoice of the sale, provides a copy of the invoice to the CCA, and sends the original invoice for payment to the local manager identified on the Letter of Authorization. Upon receipt, the local manager certifies the invoice and pays the vendor using the office Smartpay card.

**53. If a CCA does not use the full allowance before his/her appointment ends, does the allowance carry-over into the next appointment when the appointment begins before the next uniform anniversary date?**

Yes, however, the CCA cannot purchase uniform items during his/her five calendar day break between appointments. If the full annual uniform allowance is not used before the next anniversary date, the remaining balance for that year is forfeited.

**54. Does the annual uniform anniversary date change when a CCA is separated for lack of work and then rehired as a CCA after his/her anniversary date has passed?**

Yes, in this situation a new anniversary date is established on the date of reappointment and the CCA is provided a full annual uniform allowance within 14 days of the new anniversary date.

**55. What happens to the annual uniform allowance for a CCA that has an anniversary date, is separated for lack of work, and then rehired as a CCA before their next uniform anniversary date?**

A CCA that is separated under this circumstance retains his/her anniversary date. If there is no uniform allowance balance remaining at the point of separation, the matter will be considered closed. If the CCA had any part of the annual uniform allowance available at the point of separation, the remaining balance will be redetermined upon reappointment as follows: If the period of separation exceeded 89 calendar days, the remaining balance will be reduced by 10 percent of the annual uniform allowance for the first 90 calendar days and then by 10 percent for each full 30 calendar days thereafter. In no event will such redetermination result in a negative balance for the employee.

**56. Will CCAs receive the additional credit authorized under Article 26.2.B with their first uniform allowance following conversion to career status?**

Yes.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Centralized Uniform Program**

The parties agree to the joint development, establishment, and phase-in through the National Joint Labor-Management Uniform Control Committee (Uniform Committee) of a centralized system of purchasing and distributing uniforms and work clothes. By allowing the U.S. Postal Service to procure the items directly from the manufacturer(s), uniform items can be acquired at a reduced cost, in comparison to the current system. As a result of such volume purchasing, the parties anticipate that employees can be supplied with more uniform items with the U.S. Postal Service realizing monetary savings in the Uniform Program.

1. Under this system, the U.S. Postal Service will enter into contract(s) with uniform manufacturer(s) for authorized uniform items which would provide for a controlled price on uniform items. The contract(s) will also address matters such as the quality of items and the method of distribution to the employees and other requirements as agreed upon by the Uniform Committee.

2. Under the new program, the annual dollar allowance will be replaced by an allowance of points to be spent by employees on authorized uniform items. The parties agree to meet for the purpose of negotiating the specific elements of the uniform and work clothes allowance, including, but not limited to, the points assigned to each authorized item, the allowance of total points or number of items available for eligible employees in the distribution of such items.

3. Until phased in, the employees will acquire uniforms under the current system. It is further understood that the current system remains in effect until such time as the parties agree upon the matters enumerated above and the new system, meeting the requirements set by the Uniform Committee, is operational. During the phase-in period, the Uniform Committee will monitor the progress of the program to ensure the success of the new system and address matters of concern that may arise. Issues not resolved by this Memorandum will be discussed and resolved by the parties through the Uniform Committee.

4. It is understood by the parties that any increase in the existing uniform allowance in Article 26 of this Agreement will be credited toward the authorized uniform items to be negotiated as set forth in paragraph 2.

# ARTICLE 27 EMPLOYEE CLAIMS

Subject to a $10 minimum, an employee may file a claim within fourteen (14) days of the date of loss or damage and be reimbursed for loss or damage to his/her personal property except for motor vehicles and the contents thereof taking into consideration depreciation where the loss or damage was suffered in connection with or incident to the employee's employment while on duty or while on postal premises. The possession of the property must have been reasonable, or proper under the circumstances and the damage or loss must not have been caused in whole or in part by the negligent or wrongful act of the employee. Loss or damage will not be compensated when it resulted from normal wear and tear associated with day-to-day living and working conditions.

Claims should be documented, if possible, and submitted with recommendations by the Union steward to the Employer at the local level. The Employer will submit the claim, with the Employer's and the steward's recommendation, within 15 days, to the Step B Team for determination. An impasse on the claim may be appealed to arbitration pursuant to Article 15, Step B (d) of this Agreement.

A decision letter impassing a claim in whole or in part will include notification of the Union's right to appeal the decision to arbitration under Article 15.

The Step B Team will provide the National Business Agent a copy of the impasse referenced above, the claim form, and all documentation submitted in connection with the claim.

The Step B Team will also provide a copy of the impasse to the steward whose recommendation is part of the claim form.

The above procedure does not apply to privately owned motor vehicles and the contents thereof. For such claims, employees may utilize the procedures of the Federal Tort Claims Act in accordance with Part 250 of the Administrative Support Manual.

The procedure specified therein shall be the exclusive procedure for such claims, which shall not be subject to the grievance-arbitration procedure.

A tort claim may be filed on SF 95 which will be made available by the installation head, or designee.

(The preceding Article, Article 27, shall apply to **City Carrier Assistant** Employees.)

**Summary**. A letter carrier whose personal property is lost or damaged at work may file a claim for reimbursement with the Postal Service. Article 27 sets forth the rules for such "employee claims:"

**1. Personal Property.** The property must be "personal property." This includes cash, jewelry, clothing and carrier uniforms as well as other items that are worn or otherwise brought to work. Personal property does *not* include automobiles (See "Automobile Exclusion," below).

**2. Automobile Exclusion.**  Privately owned motor vehicles and their contents are excluded from Article 27 claims. However, if a letter carrier's automobile is damaged by "the negligent or wrongful act" of the Postal Service, the carrier may seek recovery under the Federal Tort Claims Act.  To initiate a Tort Claim a carrier should complete and submit a Form 95.  Note that the standard for establishing liability under the Tort Claims Act is different than the standard for reimbursement under Article 27, because they treat fault differently.  The Postal Service must pay a claim under Article 27 unless it was "caused in whole or in part by the negligent or wrongful act of the employee"—whether or not there was also negligence on the part of the Postal Service.  However, to recover under the Tort Claims procedure the employee must establish that the damage was the fault of the Postal Service.

Non-motorized vehicles are not considered "privately-owned vehicles" within the meaning of Article 27.  A claim for the loss or damage to non-motorized bicycles can be made and decided in accordance with the provisions of Article 27 (Prearbitration Settlement, F90N-4F-C 95004286, April 19, 2001, M-01440).

**3. Reasonable Possession at Work and Loss Connected With Employment.**  Under Article 27, possession of the personal property at work must have been reasonable or proper under the circumstances, and the loss or damage must have been suffered "in connection with or incident to the employee's employment while on duty or while on Postal premises."  These two requirements are often interrelated.  In determining whether these requirements were met, arbitrators generally evaluate: (1) whether it was necessary for the employee to have the lost or damaged item in his or her possession at work, and (2) whether the item's value was so great that the employee should not have risked losing or damaging it at work.

**4. Not Caused by Employee Negligence.**  The Postal Service need not pay a claim when a loss was caused in whole or part by the negligent act of the employee.  "Negligent" means failure to act with reasonable prudence or care.

**5. Not Normal Wear and Tear.** The loss or damage will not be compensated when it resulted from normal wear and tear associated with day-to-day living and working conditions.

**6. Depreciated Value.** The amount of the loss claimed must reflect the depreciated value of the property.

**7. Fourteen Days to File a Claim**.  Article 27 requires an employee to file a timely claim within fourteen days after the loss or damage occurred.  Generally, the employee is expected to know the proper procedures to file, including the time limits.

**8. Written Claim.** PS Form 2146, Employee's Claim for Personal Property, is filed to document a claim.  However, any written document

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 323 of 472. PageID #: 1141

may be treated as a proper claim if it provides substantiating information. Claims should be supported with evidence such as a sales receipt, a statement from the seller showing the price and date of purchase, or a statement from the seller concerning replacement value.

**9. Appeal Procedure.** The Employer must submit the claim form, which must include the supervisor's and steward's recommendation, together with all documentation submitted in connection with the claim to the Step B Team within fifteen days for determination. The Step B Team will review the claim and issue a decision within fourteen days of the receipt of the claim at Step B. The Step B Team may 1. resolve the claim, 2. declare an impasse, or 3. remand the case for specific information needed for a decision at Step B.

If the Step B Team impasses the claim in whole or in part, the team must provide the National Business Agent a copy of the impasse, the claim form, and all documentation submitted with the claim. The team must also provide a copy of the impasse decision to the steward and supervisor whose recommendations are part of the claim form. The National Business Agent may appeal an impasse to expedited arbitration within fourteen days after receipt of the Step B impasse. This procedure is the exclusive procedure for resolving employee claims.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Article 27**

To clarify the appeal process after a Step B Team has impassed an employee claim, the parties agree to revise the language of the third, fourth, and fifth paragraphs of Article 27 of the National Agreement as follows:

A decision letter impassing a claim in whole or in part will include notification of the Union's right to appeal the decision to arbitration under Article 15.

The Step B Team will provide the National Business Agent a copy of the impasse referenced above, the claim form, and all documentation submitted in connection with the claim.

The Step B Team will also provide a copy of the impasse to the steward whose recommendation is part of the claim form.

Date: August 8, 2002

# ARTICLE 28 EMPLOYER CLAIMS

> The parties agree that continued public confidence in the Postal Service requires the proper care and handling of the USPS property, postal funds and the mails. In advance of any money demand upon an employee for any reason, the employee must be informed in writing and the demand must include the reasons therefor.

**Employer Claims.** An employer claim is a demand made by management that a letter carrier pay for certain types of losses or damage, to the mail or to other postal property. This paragraph requires the employer to inform an employee in writing in advance of the reasons for any money demand.

In addition to the employee protections in Article 28, ELM Section 437 sets forth procedures under which an employee may request a waiver of an employer claim. See the discussion of waiver provisions at the end of this article.

28.1

> **Section 1. Shortages in Fixed Credits**
>
> Employees who are assigned fixed credits or vending credits shall be strictly accountable for the amount of the credit. If any shortage occurs, the employee shall be financially liable unless the employee exercises reasonable care in the performance of his/her duties. In this regard, the Employer agrees to:
>
> A. Continue to provide adequate security for all employees responsible for postal funds;
>
> B. Prohibit an employee from using the fixed credit or other financial accountability of any other employee without permission;
>
> C. Grant the opportunity to an employee to be present whenever that employee's fixed credit is being audited and if the employee is not available to have a witness of the employee's choice present;
>
> D. Absolve an employee of any liability for loss from cashing checks if the employee follows established procedures; and
>
> E. Audit each employee's fixed credit no less frequently than once every four months.

**Not Applicable.** Letter carriers are not ordinarily assigned fixed credits or vending credits, so this language does not apply to the letter carrier craft. However, note that language protecting letter carriers from employer claims involving faulty checks appears in Article 41.3.C.

28.2

> **Section 2. Loss or Damage of the Mails**
>
> An employee is responsible for the protection of the mails entrusted to the employee. Such employee shall not be financially liable for any

> loss, rifling, damage, wrong delivery of, or depredation on, the mails or failure to collect or remit C.O.D. funds unless the employee failed to exercise reasonable care.

**Reasonable Care.** Article 28.2 protects letter carriers against management claims resulting from the loss or damage of mails, unless the employee "failed to exercise reasonable care."

28.3

> **Section 3. Damage to USPS Property and Vehicles**
>
> An employee shall be financially liable for any loss or damage to property of the Employer including leased property and vehicles only when the loss or damage was the result of the willful or deliberate misconduct of such employee.

**Willful or Deliberate.** Article 28.3 protects letter carriers against management claims for the loss or damage to Postal Service property, including vehicles, unless the loss or damage resulted from the "willful or deliberate misconduct" of the letter carrier.

28.4.A

> **Section 4. Collection Procedure**
>
> A. If a grievance is initiated and advanced through the grievance/arbitration procedure or a petition has been filed pursuant to the Debt Collection Act, regardless of the amount and type of debt, collection of the debt will be delayed until disposition of the grievance and/or petition has (have) been had, either through settlement or exhaustion of contractual and/or administrative remedies.

**Due Process Delay in Collection.** Article 28.4.A prohibits the Postal Service from collecting a debt, regardless of the amount or type of debt, until all grievances concerning the debt have been resolved.

28.4.B

> B. No more that 15 percent of an employee's disposable pay or 20 percent of the employee's biweekly gross pay, whichever is lower, may be deducted each pay period to satisfy a postal debt, unless the parties agree, in writing, to a different amount.
>
> (The preceding Article, Article 28, shall apply to **City Carrier Assistant** Employees.)

**Limit on Deduction Amount.** Article 28.4.B sets absolute limits on the amount the employer may deduct from an employee's pay in collection of a debt, unless the employee agrees otherwise, voluntarily and in writing.

**Waiver of Employer Claims.** Many employer claims involve mistakes in which carriers were overpaid. Section 437 of the ELM gives carriers the right to file for waiver of a claim for overpayment. This section, titled "Waiver of Claims for Erroneous Payment of Pay," outlines the steps that carriers must follow to request a waiver.

Under this process the carrier files PS Form 3074, *Request for Waiver of Claim for Erroneous Payment of Pay.* ELM Section 437.32 states:

**Section 437.32 PS Form 3074**

The applicant requests a waiver of a claim or a refund of money paid as a result of a claim by submitting PS Form 3074, *Request for Waiver of Claim for Erroneous Payment of Pay,* in triplicate to the installation head. The completed PS Form 3074 must contain:

a. Information sufficient to identify the claim for which the waiver is sought including the amount of the claim, the period during which the erroneous payment occurred, and the nature of the erroneous payment.

b. A copy of the invoice and/or demand letter sent by the Postal Service, if available, or a statement setting forth the date the erroneous payment was discovered.

c. A statement of the circumstances that the applicant feels would justify a waiver of the claim by the Postal Service.

d. The dates and amount of any payments made by the employee in response to the claim.

The installation head investigates the claim, and writes a report of the investigation on the reverse side of the PS Form 3074. The report should contain the data and/or attachments indicated in the ELM Section 437.4. The form is then forwarded to Human Resources for review and further completion. The entire file is then sent to the Eagan Accounting Service Center (ASC). ELM Section 437.6 provides that:

**Section 437.6 Action by Eagan Accounting Service Center**

The Eagan ASC waives the claim if it can determine from a review of the file that all of the following conditions are met:

a. The overpayment occurred through administration error of the Postal Service. Excluded from consideration for waiver of collection are overpayments resulting from errors in timekeeping, key- punching, machine processing of time cards or time credit, coding, and any typographical errors that are adjusted routinely in the process of current operations.

b. Everyone having an interest in obtaining a waiver acted reasonably under the circumstances, without any indication of fraud, misrepresentation, fault, or lack of good faith.

c. Collection of the claim would be against equity and good conscience and would not be in the best interests of the Postal Service.

Nothing contained in Section 437 of the ELM precludes an employee from requesting a waiver where the employer erroneously failed to withhold any employee insurance premiums (Step 4, Q98N-4Q-C 00187353, September 20, 2001, M-01446).

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 328 of 472. PageID #: 1146

Page 28-4 NALC-USPS Joint Contract Administration Manual - July 2014

USPS000868

# ARTICLE 29 LIMITATION ON REVOCATION OF DRIVING PRIVILEGES

An employee's driving privileges may be revoked or suspended when the on-duty record shows that the employee is an unsafe driver.

Elements of an employee's on-duty record which may be used to determine whether the employee is an unsafe driver include but are not limited to, traffic law violations, accidents or failure to meet required physical or operation standards.

The report of the Safe Driver Award Committee cannot be used as a basis for revoking or suspending an employee's driving privileges. When a revocation, suspension, or reissuance of an employee's driving privileges is under consideration, only the on-duty record will be considered in making a final determination. An employee's driving privileges will be automatically revoked or suspended concurrently with any revocation or suspension of State driver's license and restored upon reinstatement. Every reasonable effort will be made to reassign such employee to non-driving duties in the employee's craft or in other crafts. In the event such revocation or suspension of the State driver's license is with the condition that the employee may operate a vehicle for employment purposes, the employee's driving privileges will not be automatically revoked. When revocation or suspension of an employee's driving privileges is under consideration based on the on-duty record, such conditional revocation or suspension of the state driver's license may be considered in making a final determination.

Initial issuance—an employee shall be issued a Certificate of Vehicle Familiarization and Safe Operation when such employee has a valid State driver's license, passes the driving test of the U.S. Postal Service, and has a satisfactory driving history.

An employee must inform the supervisor immediately of the revocation or suspension of such employee's State driver's license.

[see Memo, page **214**]

**This Memo is located below.**

The reinstatement of driving privileges is addressed in the national Memorandum of Understanding below.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Reinstatement of Driving Privileges**

It is hereby agreed by the United States Postal Service and the National Association of Letter Carriers, AFL-CIO, that:

1. The safety and health of employees is of significant concern to the parties. Accordingly, the parties further agree that the following is not intended to provide driving privileges to an employee when such privilege would place the safety of the public or the employee at risk.

2. The mere fact that an employee was involved in a vehicle accident is not sufficient to warrant automatic suspension or revocation of driving privileges or the automatic application of discipline.

3. When an employee's driving privilege is temporarily suspended as a result of a vehicle accident, a full review of the accident will be made as soon as possible, but not later than fourteen (14) days, and the employee's driving privileges must either be reinstated, suspended for a specified period of time not to exceed sixty (60) days, or revoked as warranted. If the decision is to suspend or revoke the employee's driving privileges, the employee will be provided, in writing, the reason(s) for such action.

4. If an employee requests that revoked or suspended driving privileges be reinstated, Management will review the request and make a decision as soon as possible but not later than 45 days from the date of the employee's request. If the decision is to deny the request, the employee will be provided with a written decision stating the reasons for the decision.

The Management review must give careful consideration to:

— the nature, severity and recency of the incident(s) which led to the revocation or suspension;

— any driver's training or retraining courses completed from private schools, state sponsored courses, or Postal Service training programs, especially when directly relevant to the incident(s) that led to the revocation;

— successful participation in an EAP program, when relevant to the reasons for revocation;

— the employee's state driving record consistent with the criteria for initial certification of driving privileges as stated in the applicable Handbook. The Employer may waive these criteria if warranted in light of the other factors listed above.

5. This Memorandum of Understanding is not intended to define the conditions or circumstances for which an employee's driving privileges may be suspended or revoked.

Date: August 19, 1995

**Revocation or Suspension of Driving Privileges.** "Driving privileges" is a relatively new term in the Postal Service. For many years USPS issued special postal "Operator's Identification Cards" known as the OF-346 and, before that, the SF-46. This practice has been discontinued and currently there is no special postal driver's certificate.

Management may suspend or revoke a carrier's driving privileges under certain specified circumstances:

- Automatically, concurrently with the suspension or revocation of the employee's state driver's license. Automatic reinstatement of postal driving privileges must follow reinstatement of the state driver's license.
- Temporarily following a vehicle accident, in which case "a full review of the accident will be made as soon as possible, but not later

than fourteen days, and the employee's driving privileges must either be reinstated, suspended for a specified period of time not to exceed sixty days, or revoked as warranted" (Memorandum, paragraph 3).

- Where management can demonstrate that "the on-duty record shows that the employee is an unsafe driver" (Article 29, paragraph 1).

Additional rules regarding the suspension or revocation of driving privileges are contained in Section 42 of the Handbook EL-804, *Safe Driver Program.* Portions of this section are reprinted below:

421.2 **For Unsafe Driving**

421.21 **On-duty Record**

When the on-duty record shows that an employee is an unsafe driver, management may suspend or revoke the employee's Postal Service driving privileges. Elements of the on-duty record that may be used to suspend or revoke driving privileges include:

a. Traffic law violations.

b. Accidents.

c. Failure to meet motor vehicle operational standards.

d. Disregard for personal safety.

421.22 **Procedures**

The following guidelines apply:

a. When management is considering the suspension, revocation, or reissuance of an employee's driving privileges, the final determination must be based solely on the employee's on-duty driving record.

b. Management must automatically:

(1) Suspend or revoke an employee's driving privileges when a state driver's license is suspended or revoked.

(2) Restore an employee's driving privileges when the state driver's license is restored.

c. If the suspension or revocation states that the employee may operate a vehicle for employment purposes, then Postal Service driving privileges must not be suspended or revoked automatically.

d. When management is considering the suspension, revocation, or reissuance of an employee's driving privileges based on the on-duty driving record, the conditional suspension or revocation of a state driver's license may be considered in making the final determination.

e. When a state driver's license is reinstated, the employee must provide documentation to that effect.

421.3 **In Case of Accident**

When an employee is involved in a motor vehicle accident:

a. There are no provisions for the automatic suspension of an employee's driving privilege based on the fact that the employee was involved in a motor vehicle accident.

b. The individual circumstances surrounding each accident are assessed at the time of the accident to determine whether a temporary suspension of driving privileges is warranted.

c. The supervisor must consider whether public safety or the employee's safety will be jeopardized if the employee is allowed to continue driving.

d. The supervisor (and/or other Postal Service managers) must assess factors related to the accident, to include the following:
   (1) Employee's condition. For example:
      (a) Shock.
      (b) Fatigue.
      (c) Impairment caused by use of alcohol or controlled substances.
      (d) Other physical or emotional factors.
   (2) Seriousness of the unsafe driving practice (if any) that contributed to the accident.

422 **Temporary Suspension of Driving Privileges**

If the supervisor cannot make an immediate determination based upon a review of the factors listed in 421.3, the supervisor may temporarily suspend the employee's driving privileges pending completion of an investigation. Once the investigation is completed, the supervisor can make the decision to suspend, revoke, or reinstate driving privileges.

Driving privileges may be withheld pending investigation for no more than 14 calendar days, after which the employee's driving privileges must be:

a. Reinstated;
b. Suspended up to 60 days; or
c. Revoked.

If the employee's driving privileges are suspended or revoked, the supervisor must explain to the employee, in writing, the reasons for the action.

423 **Decision Criteria**

Management makes a decision to suspend or revoke driving privileges according to the following criteria:

a. Investigate and determine the driver's:
   (1) Fault or lack of fault (were the driver's actions the primary cause of the accident?).
   (2) Degree of error.
   (3) Record (on-duty driving history, prior corrective actions related to motor vehicle operation).
b. Consider the severity of the accident.
c. Consider factors about the driver such as:
   (1) Training (quality or absence of training in a particular driving activity).
   (2) Physical condition (did the employee meet the physical standards required by state licensing laws at the time of the accident?).

*Note:* A Safe Driver Award Committee determination about the preventability of an accident is *not* a factor to be considered when suspending or revoking driving privileges.

**Every Reasonable Effort to Reassign.** Even if a revocation or suspension of a letter carriers driving privileges is proper, Article 29 provides that, "every reasonable effort will be made to reassign the employee in non-driving duties in the employee's craft or other crafts." This requirement is not contingent upon a letter carrier making a request for non-driving duties. Rather, it is management's responsibility to seek to find suitable work.

National Arbitrator Snow held in I94N-4I-D 96027608, April 8, 1998 (C-18159), that management may not reassign an employee to temporary non-driving duties in another craft if doing so would result in a violation of other craft's agreement. If it is not possible to accommodate temporary cross-craft assignments in a way that does not violate another craft's agreement, a letter carrier who is deprived of the right to an otherwise available temporary cross-craft assignment to a position in another craft must be placed on leave with pay until such time as he may return to work without violating either unions' agreement. In accordance with Arbitrator Snow's award, in situations where city letter carriers temporarily lose driving privileges, the following applies:

- Management should first attempt to provide non-driving city letter carrier craft duties within the installation on the carrier's regularly scheduled days and hours of work. If sufficient carrier craft work is unavailable on those days and hours, an attempt should be made to place the employee in carrier craft duties on other hours and days, anywhere within the installation.
- If sufficient work is still unavailable, a further attempt should be made to identify work assignments in other crafts, as long as placement of carriers in that work would not be to the detriment of employees of that other craft.
- If there is such available work in another craft, but the carrier may not perform that work in light of the Snow award, the carrier must be paid for the time that the carrier otherwise would have performed that work.

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 334 of 472. PageID #: 1152

Page 29-6 NALC-USPS Joint Contract Administration Manual - July 2014

USPS000874

# ARTICLE 30    LOCAL IMPLEMENTATION

**Local Implementation.**  Article 30 of the National Agreement enables the local parties to negotiate over certain work rules and other terms and conditions of employment.  Since the start of full postal collective bargaining in 1971, most of letter carriers' contractual rights and benefits have been negotiated at the national level.  However, some subjects have been left to the local parties to work out according to their own preferences and particular circumstances.  A period of "local implementation," has followed the completion of each National Agreement.

**30.A**

> A.  Presently effective local memoranda of understanding not inconsistent or in conflict with the **2011** National Agreement shall remain in effect during the term of this Agreement unless changed by mutual agreement pursuant to the local implementation procedure set forth below or, as a result of an arbitration award or settlement arising from either party's impasse of an item from the presently effective local memorandum of understanding (LMOU).

**Local Memorandums of Understanding (LMOU).**  Local implementation procedures result in the execution of a Local Memorandum of Understanding—a local, enforceable agreement between the NALC and the Postal Service.

Article 30.A provides that a currently effective LMOU remains in effect during the term of a new National Agreement unless the parties change it through subsequent local implementation or the related impasse procedures.  It states the rule that no provision of a Local Memorandum of Understanding may be "inconsistent or in conflict" with the National Agreement.  This means that an LMOU may add to the National Agreement's rules but may not contradict them.  An LMOU may not, for example, alter the Article 9 wage provisions or the Article 8 overtime rules.  See the discussion under the national Memorandum of Understanding on local implementation, below, concerning claims that an LMOU provision is "inconsistent or in conflict" with the National Agreement. As indicated in items six and seven of the MOU, the parties' rights to challenge provisions as inconsistent or in conflict are limited.

**30.B**

> B.  There shall be a 30-day period of local implementation to commence **April 1, 2013** on the 22 specific items enumerated below, provided that no LMOU may be inconsistent with or vary the terms of the **2011** National Agreement:

**Thirty-day period.**  Local negotiations take place during a thirty-day local implementation period following completion of each National Agreement.  National Arbitrator Mittenthal held in decision H7N-1F-C 39072, June 2, 1995 (C-14489), that the local parties may not negotiate

wholesale changes to Local Memorandums of Understanding except during the thirty-day period provided by Article 30.

**The 22 Items.** Article 30.B lists 22 Items which the parties may discuss during the period of local implementation. The local parties are required to discuss any of these items if they are raised by either party. This means that if one party raises one of the listed items, the other must discuss it in good faith. These are "mandatory subjects" of discussion if raised during the period of local implementation.

The local parties are free to discuss other subject areas as well, but neither party is required to discuss subjects other than the 22 items listed in Article 30.B.

**30.B.1**

1. Additional or longer wash-up periods.

**Article 8.** See the discussion of Article 30.B.1 under Article 8.9.

**30.B.2**

2. The establishment of a regular work week of five days with either fixed or rotating days off.

**Article 41.** See the discussion of Article 30.B.2 under Article 41.1.A.3.

**30.B.3**

3. Guidelines for the curtailment or termination of postal operations to conform to orders of local authorities or as local conditions warrant because of emergency conditions.

**Article 3.** See the discussion of Article 30.B.3 under Article 3.F.

**30.B.4**

4. Formulation of local leave program.
5. The duration of the choice vacation period(s).
6. The determination of the beginning day of an employee's vacation period.
7. Whether employees at their option may request two selections during the choice vacation period, in units of either 5 or 10 days.
8. Whether jury duty and attendance at National or State Conventions shall be charged to the choice vacation period.
9. Determination of the maximum number of employees who shall receive leave each week during the choice vacation period.
10. The issuance of official notices to each employee of the vacation schedule approved for such employee.
11. Determination of the date and means of notifying employees of the beginning of the new leave year.
12. The procedures for submission of applications for annual leave during other than the choice vacation period.

**Article 10.** See the discussion of Article 30.B.4-12, as well as Article 30.B.20, under Article 10.

**30.B.13**

> 13. The method of selecting employees to work on a holiday.

**Article 11.** See the discussion of Article 30.B.13 under Article 11.6.

**30.B.14**

> 14. Whether "Overtime Desired" lists in Article 8 shall be by section and/or tour.

**Article 8.** See the discussion of Article 30.B.14 under Article 8.5.B.

**30.B.15**

> 15. The number of light duty assignments within each craft or occupational group to be reserved for temporary or permanent light duty assignment.
>
> 16. The method to be used in reserving light duty assignments so that no regularly assigned member of the regular work force will be adversely affected.
>
> 17. The identification of assignments that are to be considered light duty within each craft represented in the office.

**Article 13.** See the discussion of Article 30.B.15, 16 & 17 under Article 13.3.A & 13.3.C.

**30.B.18**

> 18. The identification of assignments comprising a section, when it is proposed to reassign within an installation employees excess to the needs of a section.

**Article 12.** See the discussion of Article 30.B.18 under Article 12.5.C.4.

**30.B.19**

> 19. The assignment of employee parking spaces.

**Article 20.** See the discussion of Article 30.B.19 under Article 20.

**30.B.20**

> 20. The determination as to whether annual leave to attend Union activities requested prior to determination of the choice vacation schedule is to be part of the total choice vacation plan.

**Article 10.** See the discussion of Article 30.B.20, as well as the leave-related Article 30.B.4-12, under Article 10.

**30.B.21**

> 21. Those other items which are subject to local negotiations as provided in the craft provisions of this Agreement.
>
> 22. Local implementation of this Agreement relating to seniority, reassignments and posting.

**Articles 41 and 12.** See the discussion of Article 30.B.21 & 22 under Article 41.1.A.3, 1.A.5, 1.B.2, 1.B.3, 1.C.4 & 3.O, and Article 12.5.C.4.

**30.C**

C. All proposals remaining in dispute may be submitted to final and binding arbitration, with the written authorization of the National Union President or the Vice President, Labor Relations. The request for arbitration must be submitted within 10 days of the end of the local implementation period. However, where there is no agreement and the matter is not referred to arbitration, the provisions of the former LMOU shall apply. The parties may challenge a provision(s) of an LMOU as inconsistent or in conflict with the National Agreement only under the following circumstances:

1. Any LMOU provision(s) added or modified during one local implementation period may be challenged as inconsistent or in conflict with the National Agreement only during the local implementation period of the successor National Agreement.

2. At any time a provision(s) of an LMOU becomes inconsistent or in conflict as the result of a new or modified provision(s) of the National Agreement.

3. At any time a provision(s) of an LMOU becomes inconsistent or in conflict as the result of the amendment or modification of the National Agreement subsequent to the local implementation period.

In such case, the party declaring a provision(s) inconsistent or in conflict must provide the other party a detailed written explanation of its position during the period of local implementation, but no later than seven (7) days prior to the expiration of that period. If the local parties are unable to resolve the issue(s) during the period of local implementation, the union may appeal the impasse to arbitration pursuant to the procedures outlined above. If appealed, a provision(s) of an LMOU declared inconsistent or in conflict will remain in effect unless modified or eliminated through arbitration decision or by mutual agreement.

[see Memo, page **215**]

**This Memo is located on *JCAM* pages 30-5 and 30-6.**

**Impasses.** Certain subjects of local implementation may be "impassed." That is, when an impasse occurs—a failure to reach agreement in local negotiations—the union or management may appeal the dispute for resolution in final binding arbitration, subject to certain rules. Rules on which sorts of proposals may be impassed are set forth under Article 30.F. The detailed rules for processing impasses are contained in a national Memorandum of Understanding on local implementation, below. Note that the time limits in the memorandum supersede the time limit specified in Article 30.C.

**30.D**

D. An alleged violation of the terms of an LMOU shall be subject to the grievance-arbitration procedure.

An LMOU is enforceable. After the local memo is negotiated and signed, all of its provisions may be enforced through the grievance pro-

cedure—both those provisions within the 22 items and those outside the 22 items.

30.E

> E. When installations are consolidated or when a new installation is established, the parties shall conduct a thirty (30) day period of local implementation, pursuant to Section B. All proposals remaining in dispute may be submitted to final and binding arbitration, with the written authorization of the National Union President or the Vice President, Labor Relations. The request for arbitration must be submitted within 10 days of the end of the local implementation period.

**New or Consolidated Installations.** Article 30.E provides for a new period of local implementation upon the consolidation of installations or the creation of a new one.

30.F

> F. Where the Postal Service, pursuant to Section C, submits a proposal remaining in dispute to arbitration, which proposal seeks to change a presently-effective LMOU, the Postal Service shall have the burden of establishing that continuation of the existing provision would represent an unreasonable burden to the USPS.
>
> **[see Memo, page 146]**

**What May be Impassed.** The interest arbitrator who determined the provisions of the 1994 National Agreement imposed certain changes in the *impasse rules* for local implementation. Under those changed rules, management gained a limited right to bring any of the 22 listed bargaining items to impasse. The rules are, in short:

- Either party may impasse an item.
- Only a subject within Article 30's 22 items may be impassed.
- Where management submits a proposal to arbitration to change an existing local memo provision, it has the burden of establishing that continuation of the existing provision would represent an *unreasonable burden* to the Postal Service. (There is no such burden on the union when it seeks to change a local memorandum.)

National Arbitrator Mittenthal, in decision H0C-NA-C 3, July 12, 1993 (C-13080), ruled that management may *not* impasse a subject that is *outside* the 22 items.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: Local Implementation**

It is hereby agreed by the United States Postal Service and the National Association of Letter Carriers, AFL-CIO that the following procedures will apply to the imple-

mentation of Article 30 during the **2011** local implementation period.

1. **2011** local implementation will commence on **April 1, 2013** and terminate on **April 30, 2013.**

2. In the event that any issue(s) remain in dispute at the end of the thirty (30) day local implementation period, each party shall identify such issue(s) in writing. Initialed copies of this written statement and copies of all proposals and counter-proposals pertinent to the issue(s) in dispute will be furnished by the appropriate local party to the appropriate management official at the **Labor Relations Service Center** with copies to the Postmaster and the Union's Regional Representative within fifteen (15) days of the expiration of the local implementation period. Inclusion of any matter in the written statement does not necessarily reflect the agreement of either of the parties that such matter is properly subject to local implementation.

3. The Representative of the Employer and the Union's Regional Representative shall attempt to resolve the matters in dispute within seventy-five (75) days after the expiration of the local implementation period. The Representatives of both the Union and the Employer will have full authority to resolve all issues still in dispute.

4. If the parties identified above are unable to reach agreement by the end of the seventy-five (75) day period provided for above, the issue(s) may be appealed to final and binding arbitration by the National Union President or the Vice President, Labor Relations within twenty-one (21) days of the end of the seventy-five (75) day period.

5. Where there is no agreement and the matter is not referred to the **Labor Relations Service Center** or to arbitration, the provision(s), if any, of the former Local Memorandum of Understanding (LMOU) shall apply.

6. LMOU items existing prior to the **2006** local implementation period may not be challenged as inconsistent or in conflict, unless already subject to a pending arbitration appeal. The parties may challenge an LMOU item added or modified during a National Agreement's local implementation period as inconsistent or in conflict only during the period of local implementation of the successor National Agreement.

7. The national parties will establish an impasse arbitration panel in each area for challenges to LMOU items as inconsistent or in conflict with the National Agreement or an unreasonable burden. A sufficient number of arbitrators will be selected so that all such appeals will be scheduled and heard within thirty (30) days of receipt of the appeal to arbitration. In those areas where the impasse backlog will not allow the parties to meet these time limits, it is understood that steps will be taken to process them as expeditiously as possible. Impasse appeals addressing whether an item is inconsistent or in conflict will be scheduled prior to unreasonable burden cases.

This Memorandum of Understanding expires at 12 midnight **May 20, 2016**.

Date: **January 10, 2013**

**Impasse Procedure.** This Memorandum, which has been updated in successive national agreements, sets forth the procedural rules for handling impasses from local implementation. Where the parties do not reach agreement on a subject (or subjects) the impasse is submitted to higher levels of the NALC and Postal Service for settlement discussions. If the

settlement discussions are not successful, the matter may be taken before a neutral arbitrator. The arbitrator hears evidence from both sides and decides what the language of the disputed Local Memorandum provision will be. The resulting arbitration award is final and binding.

**Inconsistent or in Conflict.** Local memorandums must agree with the National Agreement—that is, no local memo provision may be inconsistent or in conflict with the National Agreement. However, the 2001 National Agreement contained new language in Article 30.C and the Article 30 Memorandum which now limits the parties' right to challenge existing LMOU provisions on the grounds that they are inconsistent or in conflict with the National Agreement.

Under the current rules, LMOU items existing prior to the 2006 local implementation period may not be challenged as inconsistent or in conflict unless one of the following conditions was met:

1. The provision(s) was already subject to a pending arbitration appeal as of January 10, 2013.

2. The provision(s) becomes inconsistent or in conflict as a result of a new or modified provision(s) of the National Agreement.

3. The provision(s) becomes inconsistent or in conflict as a result of an amendment or a modification of the National Agreement after the implementation period.

However, challenges under Article 30.C.2 or 30.C.3 above must be made during the local implementation period following the change to the National Agreement. LMOU items added or modified during 2013 local implementation will not be subject to challenge on the grounds that they are inconsistent or in conflict with the National Agreement, except as a result of new or modified provision(s) of the National Agreement, until the period of local implementation of the 2016 National Agreement.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: City Carrier Assistant (CCA) Annual Leave**

Article 30 of the National Agreement and Local Memorandum of Understanding provisions do not apply to city carrier assistant employees, except as follows:

During the local implementation period, the parties may agree to include provisions into the local memorandum of understanding to permit city carrier assistant employees to apply for annual leave during choice vacation periods, as defined in Article 10.3.D of the National Agreement. Granting leave under such provisions must be contingent upon the employee having a leave balance of at least forty (40) hours. In addition, the parties will explore at the national level appropriate options regarding current policies for paying terminal leave.

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 342 of 472. PageID #: 1160

Page 30-8 NALC-USPS Joint Contract Administration Manual - July 2014

USPS000882

# ARTICLE 31 UNION-MANAGEMENT COOPERATION

31.1

**Section 1. Membership Solicitation**

The Union may, through employees employed by the Employer, solicit employees for membership in the Union and receive Union dues from employees in non-work areas of the Employer's premises, provided such activity is carried out in a manner which does not interfere with the orderly conduct of the Employer's operation.

**Organizing and Dues Collection on Postal Service Premises.** Article 31.1 gives NALC representatives the right to engage in membership organizing and to collect dues from members in non-work areas of postal facilities.

31.2

**Section 2. Computer Tapes**

The Employer shall, on an accounting period basis, provide the Union at its national headquarters with a computer tape containing information as set forth in the Memorandum of Understanding regarding Article 31.

[see Memo, page **217**]

**This Memo is located on *JCAM* pages 31-3 and 31-4.**

**Bargaining Unit Information.** Article 31.2, supplemented by the more specific description of information in the Memorandum of Understanding on Bargaining Information below requires the Postal Service to provide detailed information about each member of the letter carrier bargaining unit represented by the NALC. The NALC uses this information to conduct its representative functions and administer its membership information system.

31.3

**Section 3. Information**

The Employer will make available for inspection by the Union all relevant information necessary for collective bargaining or the enforcement, administration or interpretation of this Agreement, including information necessary to determine whether to file or to continue the processing of a grievance under this Agreement. Upon the request of the Union, the Employer will furnish such information, provided, however, that the Employer may require the Union to reimburse the USPS for any costs reasonably incurred in obtaining the information.

Requests for information relating to purely local matters should be submitted by the local Union representative to the installation head or designee. All other requests for information shall be directed by the National President of the Union to the Vice President, Labor Relations.

Nothing herein shall waive any rights the Union may have to obtain information under the National Labor Relations Act, as amended.

(The preceding Article, Article 31, shall apply to **City Carrier Assistant** Employees.)

**Information.** Article 31.3 provides that the Postal Service will make available to the union all relevant information necessary for collective bargaining or the enforcement, administration or interpretation of the Agreement, including information necessary to determine whether to file or to continue the processing of a grievance. It also recognizes the union's legal right to employer information under the National Labor Relations Act. Examples of the types of information covered by this provision include:

- attendance records
- payroll records
- documents in an employee's official personnel file
- internal USPS instructions and memorandums
- disciplinary records
- route inspection records
- patron complaints
- handbooks and manuals
- photographs
- reports and studies
- seniority lists
- overtime desired and work assignment lists
- bidding records
- wage and salary records
- training manuals
- Postal Inspection Service Investigative Memoranda (IM)
- Office of Inspector General Report of Investigation (ROI)

To obtain employer information the union need only give a reasonable description of what it needs and make a reasonable claim that the information is needed to enforce or administer the contract. The union must have a reason for seeking the information—it cannot conduct a "fishing expedition" into Postal Service records.

Settlements and arbitration awards have addressed the union's entitlement to information in certain specific areas. For example, the union has a right to any and all information which the employer has relied upon to support its position in a grievance (Step 4, H1C-3U-C 6106, November 5, 1982, M-00316). Note that the union also has an obligation to provide the Postal Service with information it relies upon in a grievance (Article 15). The union is also entitled to medical records necessary to investigate or process a grievance, even without an employee's authorization, as provided for in Handbook AS-353, *Guide*

*to Privacy, the Freedom of Information Act, and Records Management* and by Articles 17 and 31 of the National Agreement.

If requests for copies are part of the information request, then USPS must provide the copies (Step 4, H7N-5K-C 23406, May 21, 1992, M-01094).  A national prearbitration settlement established that if the union provides the Postal Service with a list of officers and stewards, the Postal Service must indicate which (if any) applied for a supervisory position within the previous two years (National Prearbitration Settlement, H4C-3W-C 27068, February 13, 1990, M-01150).  When the union is provided with information, for example medical records, it is subject to the same rules of confidentiality as the Postal Service.

**Cost.** The costs which management may charge the NALC for providing information are governed by the Handbook AS-353 [*Guide to Privacy, the Freedom of Information Act, and Records Management*] Section 4-6.5. While the following Step 4 resolutions cite the ASM they are applicable to the AS-353 (Step 4, H4N-5R-C 30270, May 22, 1987, M-00826 and Step 4, H7C-3B-C 37176, June 26, 1992, M-01141). Currently the AS-353, Section 4-6.5 provides for a waiver of information fees for 1) the *first 100 pages of duplication (currently 15 cents per page)*, 2) the *first two hours of manual search time,* and  3) the *first two hours of computer search time*. Furthermore, this section also provides that if the fee does not exceed $10, there is no charge for the information.

Additionally, the parties have agreed that if search fees apply to information requests from the union pursuant to Handbook AS-353, Section 4-6.5; and the "Computer personnel" cost involves "Operator time" and the "Computer processing" is "PC usage", the Postal Service will not charge the union at the higher "Computer personnel" or "Computer processing" rate only because the PC reads stored data from a mainframe computer (Prearbitration, Q01N-4Q-C 07278400, December 5, 2008, M-01698).

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: Bargaining Information**

Pursuant to the provisions of Article 31 of the National Agreement between the United States Postal Service and the **National Association of Letter Carriers, AFL-CIO,** the Employer shall, on a **monthly** basis, provide the Union with the following information on those in the **city letter carrier** bargaining unit **by either encrypted/password protected disc or Automated File Transfer:**

1. SSN
2. Last Name
3. First Name (Full)
4. Middle Initial
5. Address
6. City
7. State
8. ZIP Code
9. Post Office Name
10. PO State
11. PO ZIP
12. PO Finance Number
13. PO CAG
14. Rate Schedule
15. Nature of Action
16. Effective Date
17. Pay Grade
18. Pay Step
19. Health Benefit Plan
20. Designation Activity
21. Enter on Duty Date
22. Retire on Date
23. Layoff
24. Occupation Code
25. Pay Location
26. **Next Step Date**
27. **Retiree FICA Code**
28. **Gender**
29. **Veteran Preference Code**
30. **Date of Birth**
31. **Life Insurance Code**
32. **Handicap Code**
33. **TSP (Thrift Savings Plan) Status Code**
34. **TSP Deduction Amount**
35. **TSP Deduction Percentage Amount**
36. **USPS EIN (Employee Identification Code)**

The Postal Service will provide the Union with the information above without charge.

Date: **January 10, 2013**

# ARTICLE 32 SUBCONTRACTING

32.1.A

**Section 1. General Principles**

A. The Employer will give due consideration to public interest, cost, efficiency, availability of equipment, and qualification of employees when evaluating the need to subcontract.

**Factors.** Article 32.1.A sets forth five factors which the employer must give due consideration when evaluating the need to subcontract.

32.1.B

B. The Employer will give advance notification to the Union at the national level when subcontracting which will have a significant impact on bargaining unit work is being considered and will meet to consider the Union's view on minimizing such impact. No final decision on whether or not such work will be contracted out will be made until the matter is discussed with the Union.

**Notification and Consultation.** Article 32.1.B provides that the Postal Service will provide advance notice to the NALC at the national level when subcontracting is being considered which will have a "significant impact" on bargaining unit work. In those qualifying circumstances in which the impact is significant on the bargaining unit, the Postal Service will meet with the union at the national level to discuss its views on how to minimize the impact prior to making a decision. No decision will be made pending consultation with the union.

32.1.C

C. The Employer and the Union agree that upon the request of the NALC National President, the Employer will furnish relevant cost information prior to the commencement or renewal of any contract delivery route which performs service formerly performed in a particular installation by a city letter carrier. The Employer's decision as to whether to commence or renew the contract delivery route will be made on a cost effective basis.

**Information.** When it is decided to subcontract pursuant to a local initiative, the NALC National President may request and be provided the relevant cost information upon which the decision to subcontract was made. This request may be made for a new contract or a renewed contract on a route that was formally serviced by the city letter carrier craft. Additional information beyond cost information thought by a branch to be relevant and necessary for the processing of a grievance on this level of subcontracting initiative should be requested by the local branch authorized to represent the affected delivery unit. It is the responsibility of local management initiating the action to respond to this request. This section also establishes the criterion that the employer's decision is to be made on "...a cost effective basis."

32.2 **Section 2. Joint Committee**

A joint committee is established at the national level to study the problems in this area leading towards a meaningful evolutionary approach to the issue of subcontracting.

(The preceding Article, Article 32, shall apply to **City Carrier Assistant** Employees.)

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Article 32 Committee**

The Joint Committee established pursuant to Article 32.2 shall be tasked with reviewing existing policies and practices concerning the contracting out of mail delivery. The Committee shall seek to develop a meaningful evolutionary approach to the issue of subcontracting, taking into account the legitimate interests of the parties and relevant public policy considerations.

The Committee shall have reasonable access to all relevant data maintained by the Postal Service, and may seek and obtain data and information from other relevant sources.

The parties agree that if the National Rural Letter Carriers' Association seeks to participate in the work of the Committee, it will be permitted to do so.

The Committee shall complete its study within six months of ratification of the 2006 National Agreement, unless the parties mutually agree to extend this deadline. Pending final resolution of the work of the Committee, all grievances pertaining to subcontracting which are pending at the national level shall be held in abeyance.

If the work of the Committee does not result in a mutually agreeable approach to subcontracting, the Union may submit any of its pending national level grievances pertaining to subcontracting to rights arbitration in accordance with the existing provisions of the National Agreement.

In addition, beginning with the ratification of the 2006 National Agreement, there will be a six-month moratorium on any new subcontracting of delivery in offices in which city letter carriers are currently employed. This moratorium does not include any ingrowth or new growth on current rural routes. Contracts in existence as of the date of the execution of this MOU may be maintained or renewed in offices that are not exclusively city delivery.

Date: September 11, 2007

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

---

**Re: Subcontracting**

The substantial changes in work force structure and compensation reflected in the 2006 National Agreement have been negotiated by the parties in the spirit of a long-term partnership. Consistent with this basic understanding, the parties have agreed to some restrictions on the subcontracting of letter carrier work.

Effective upon ratification of the 2006 National Agreement, there will be a modification to the subcontracting of city deliveries. This modification includes restrictions on contracting out the following:

- City delivery work at the 3,071 city delivery offices (offices with only city delivery), including new growth and in-growth within those offices
- Any existing city delivery in offices other than those referenced above
- Any assignments awarded as city delivery by settlement or arbitration of any pending or future grievance

The above restrictions shall be in effect for the duration of the **2011** National Agreement, unless extended by mutual agreement.

Date: **January 10, 2013**

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Subcontracting MOU Issues**

The parties recognize that, in light of continuing changes in technology and the competitive environment in which the Postal Service operates, the Employer cannot commit itself to the maintenance of the MOU on subcontracting on an indefinite basis, and reciprocally, the Union may seek additional restrictions on subcontracting. Accordingly, while the parties' practice has been to keep in place the terms and conditions of the expired contract until a successor agreement is reached voluntarily or by interest arbitration, the Postal Service reserves its rights with regard to not continuing the MOU upon expiration of the National Agreement. Likewise, the NALC reserves its rights with regard to such issue. Further, in the event that the parties do not achieve an agreement for modification or extension of the next collective bargaining agreement, and the continuation of the MOU on subcontracting is an issue to be resolved in interest arbitration, there shall be no presumption that those restrictions are to be carried forward based upon the fact that the provisions of the MOU on subcontracting have been in effect.

The subcontracting modifications provided in the MOU on subcontracting are without prejudice to the positions of the parties with respect to any interpretive issue. Accordingly, the MOU shall not be admissible in any future rights arbitration, except to enforce its terms.

Dated: September 11, 2007

**LETTER OF INTENT**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: Subcontracting—List of 3,071 City Delivery Offices**

This will confirm our discussions regarding the Memorandum of Understanding (MOU), Re: Sub-contracting included in the tentative agreement. This MOU includes restrictions on contracting out "City delivery work at the 3,071 city delivery offices (offices with only city delivery)."

The Postal Service has provided the Union with a list of the 3,071 city delivery offices referenced above. However, the parties have not had the opportunity to mutually verify the list's accuracy. Accordingly, the parties agree that they will work together to verify the list's accuracy and will make adjustments to the list, if necessary. The parties recognize that this review could result in offices being added to or subtracted from the list. The parties will undertake this review and prepare a final list as soon as practicable after ratification of the tentative agreement.

Dated: September 11, 2007

After further review by the parties pursuant to the preceding Letter of Intent, *Re: MOU Re: Subcontracting - List of 3,071 City Delivery Offices,* the following list identifies approximately 3,580 'city delivery offices' covered by the Memorandum of Understanding, *Re: Subcontracting.* The list is intended to represent all city delivery offices (delivery units that have city delivery routes, but do not have rural routes) as of September 11, 2007. The parties agree to discuss and make adjustments to this list, if necessary, consistent with that intent.

**Alaska**

| | |
|---|---|
| Anchorage | Eastchester |
| | Elmendorf AFB |
| | Fort Richardson |
| | Huffman |
| | Lake Otis |
| | Main Office/GMF |
| | Midtown |
| | Muldoon |
| | Russian Jack |
| | Sand Lake |
| | Spenard |
| Eagle River | Main Post Office |
| Fairbanks | College |
| | Main Office/GMF |
| | North Pole |
| | North Pole Eielson AFB |
| Homer | Main Post Office |
| Kenai | Main Post Office |
| Kodiak | Main Post Office |
| Palmer | Main Post Office |
| Sitka | Main Post Office |
| Soldotna | Main Post Office |
| Wasilla | Main Post Office |

**Alabama**

| | |
|---|---|
| Anniston | Fort McClellan |
| Bayou La Batre | Main Post Office |
| Birmingham | Cahaba Heights |
| | Crestline |
| | Downtown Carrier Annex |
| | East Lake Roebuck |
| | Fairview |
| | Green Springs Annex |
| | River Run |
| | Woodlawn |
| Huntsville | Downtown Station |
| Mobile | Loop Station |
| | Midtown Station |
| Montgomery | Capital Heights |
| | Downtown |
| | Shakespeare |
| Sheffield | Main Post Office |

**Arkansas**

| | |
|---|---|
| Fort Smith | Fianna Hills |
| | GMF |
| | Midland |
| Harrison | Main Post Office |
| Little Rock | Brady |
| | Forest Park |
| | Industrial |
| | Main Post Office |
| | Pleasant Ridge |
| | Westside |
| North Little Rock | Park Hill |
| Russellville | Main Post Office |
| West Memphis | Main Post Office |

**Arizona**

| | |
|---|---|
| Ajo | Main Post Office |
| Bullhead City | Carrier Annex |
| Cottonwood | Main Post Office |
| Glendale | Downtown |
| | Main Post Office |
| Holbrook | Main Post Office |
| Kingman | Main Post Office |
| Mesa | Dobson |
| | Main Post Office |
| | Pioneer |
| | Sherwood |
| Payson | Main Post Office |
| Peoria | Downtown |
| Phoenix | Ahwatukee |
| | Arcadia |
| | Cactus |
| | Capitol |
| | Downtown |
| | Indian School |
| | McDowell |
| | Northeast |
| | Northwest |
| | Osborn |
| | Pecos |
| | Rio Salado |
| | Shaw Butte |
| | Sierra Adobe |
| | South Mountain |
| | Sunnyslope |
| | Washington |
| San Manuel | Main Post Office |
| Scottsdale | Air Park |
| | Hopi |
| | Main Post Office |
| Sun City West | Main Post Office |
| Superior | Main Post Office |
| Tempe | Apache |
| | Main Post Office |
| Tucson | Casas Adobes |
| | Coronado |
| | Davis Monthan Air Force Base |
| | Downtown |
| | Kino |
| | Midtown |
| | Old Pueblo Annex |
| | Sun |
| Winslow | Main Post Office |

**California**

| | |
|---|---|
| Adelanto | Main Post Office |
| Agoura Hills | Main Post Office |
| Alameda | Main Post Office |
| Alamo | Main Post Office |
| Alhambra | Main Post Office |
| | South Alhambra |
| Altadena | Main Post Office |
| Alturas | Main Post Office |
| Anaheim | Anaheim Hills |
| | Brookhurst |
| | Canyon |
| | Holiday |
| | Main Post Office |
| | Sunkist |
| Arcadia | Main Post Office |
| Artesia | Main Post Office |
| Avenal | Main Post Office |
| Bakersfield | Downtown |
| | East Bakersfield |
| | South Bakersfield |
| | Stockdale Annex |
| Baldwin Park | Main Post Office |
| Banning | Main Post Office |

| | |
|---|---|
| Barstow | Fort Irwin |
| Beaumont | Main Post Office |
| Bell/Bell Gardens/ Maywood | Main Post Office |
| Bellflower | Main Post Office |
| Belmont | Main Post Office |
| Belvedere Tiburon | Main Post Office |
| Benicia | Main Post Office |
| Berkeley | Detached Delivery Delivery Unit |
| | Elmwood |
| | Main Post Office |
| | Station A |
| Beverly Hills | Main Post Office |
| Bloomington | Main Post Office |
| Bonita | Main Post Office |
| Boron | Main Post Office |
| Brisbane | Main Post Office |
| Buena Park | La Palma |
| | Main Post Office |
| Burbank | Main Post Office |
| Burlingame | Annex |
| | Main Post Office |
| California City | Main Post Office |
| Calimesa | Main Post Office |
| Campbell | Main Post Office |
| Canoga Park | Main Post Office |
| | West Hills |
| | Winnetka |
| Capitola | Main Post Office |
| Carlsbad | Main Post Office |
| Carmichael | Main Post Office |
| Carson | Main Post Office |
| Cathedral City | Main Post Office |
| Cayucos | Main Post Office |
| Chatsworth | Main Post Office |
| Chico | Midtown |
| Citrus Heights | Main Post Office |
| Clayton | Main Post Office |
| Compton | Main Post Office |
| Concord | Main Post Office |
| Corte Madera | Main Post Office |
| Costa Mesa | Main Post Office |
| | Mesa Center |
| Covina | Federal Station |
| | Main Post Office |
| Crockett | Main Post Office |
| Culver City | Gateway |
| | Main Post Office |
| Cupertino | Main Post Office |
| Cypress | Main Post Office |
| Daly City | Main Post Office |
| | West Lake |
| Dana Point | Main Post Office |
| Danville | Main Post Office |
| Desert Hot Springs | Main Post Office |
| Downey | Main Post Office |
| | South |
| Duarte | Main Post Office |
| Dublin | Main Post Office |
| Dunsmuir | Main Post Office |
| Edwards | Main Post Office |
| El Cerrito | Main Post Office |
| El Monte | Main Post Office |
| El Segundo | Bay Cities Annex |
| El Sobrante | Main Post Office |
| Fair Oaks | Main Post Office |
| Fairfield | Main Post Office |
| Fontana | Southside |
| Freedom | Main Post Office |
| Fremont | DDU |
| | Irvington |
| | Main Post Office |
| Fresno | Ashlen Park |
| | Cardwell |
| | Clinter |
| | Pinedale |
| Fullerton | Annex |
| | Main Post Office |
| | Sunny Hills |
| Garberville | Main Post Office |
| Garden Grove | Main Post Office |
| | West Garden Grove |
| Gardena | Main Post Office |
| Glendale | Grand Central |
| | LaCrescenta |
| | Main Post Office |
| | North Glendale |
| | Tropico |
| | Verdugo Viejo |
| Glendora | Main Post Office |
| Guadalupe | Main Post Office |
| Harbor City | Main Post Office |
| Hawthorne | Main Post Office |
| Hayward | Main Post Office |
| Highland | Main Post Office |
| Huntington Beach | Beach Center |
| | Haxton |
| | Main Post Office |
| Huntington Park | Main Post Office |
| | Soto |
| | State Street |
| Imperial Beach | Main Post Office |
| Inglewood | Carrier Annex |
| | North Inglewood |
| Irvine | Harvest |
| | Northwood |
| Ivanhoe | Main Post Office |
| Joshua Tree | Main Post Office |
| La Canada | Main Post Office |
| La Habra | Main Post Office |
| La Jolla | La Jolla Annex |
| La Mesa | Annex |
| | Main Post Office |
| La Mirada | Main Post Office |
| La Puente | Main Post Office |
| La Verne | Main Post Office |
| Lafayette | Carrier Annex |
| Laguna Beach | Aliso Viejo |
| | Journey (S Laguna Carrier Annex) |
| | Laguna Hills |
| | Laguna Niguel |
| Lake Forest | El Toro |
| Lakeside | Main Post Office |
| Lakewood | Hawaiian Gardens |
| | Main Post Office |
| Lamont | Main Post Office |
| Lawndale | Main Post Office |
| Lemon Grove | Main Post Office |
| Loma Linda | Loma Linda Annex |
| Lomita | Main Post Office |
| Long Beach | Bixby |
| | Downtown |
| | East Long Beach |
| | GMF |
| | Loma |
| | North Carrier Annex |
| | Pacific |
| | Spring Annex |
| | Trade Center |
| Los Alamitos | Main Post Office |
| Los Altos | Loyola |
| | Main Post Office |
| Los Angeles | Alameda |
| | Barrington |
| | Bicentennial |
| | Boyle Heights |
| | Broadway |
| | Commerce |
| | Crenshaw |
| | Dockweiler |
| | Dosan Ahn Chung Ho |
| | Downtown Carrier Annex |
| | Eagle Rock |
| | East Los Angeles |
| | Edendale |
| | El Serano |
| | Foy |
| | Glassell |
| | Greenmead |
| | Griffith |
| | Hancock (John Marshall) |
| | Hazard |
| | Hollywood |
| | Julian Dixon/La Tijera |
| | Lincoln Heights |
| | Los Feliz |
| | Lugo Heights |
| | Main Post Office |
| | Mar Vista |
| | Market |
| | Oakwood/Nat King Cole |
| | Palms |
| | Pico Heights |
| | Preuss |
| | Rancho Park |
| | Ray Charles |
| | RIMPAU |
| | Sunset |
| | Vernon |
| | Village |
| | Wagner |
| | Washington |
| | West Branch |
| | West Los Angeles |
| | Westchester |
| | Wilcox |
| Los Gatos | Dell |
| Los Osos | Main Post Office |
| Lynwood | Main Post Office |
| Malibu | Colony Annex |
| Marina | Main Post Office |
| Menlo Park | Main Post Office |
| Mill Valley | Main Post Office |
| Millbrae | Main Post Office |
| Milpitas | Main Post Office |
| Mission Viejo | Main Post Office |
| | San Juan Capistrano |
| Modesto | Main Post Office |
| Mojave | Main Post Office |
| Monrovia | Main Post Office |
| Montclair | Main Post Office |
| Montebello | Main Post Office |
| Monterey | Main Post Office |
| Monterey Park | Main Post Office |
| Moraga | Main Post Office |
| Mountain View | Annex |
| | Blossom Valley |
| | Main Post Office |
| National City | Main Post Office |
| Needles | Main Post Office |
| Newark | Main Post Office |
| Newport Beach | Bay |
| | Main Post Office |
| Norco | Main Post Office |
| North Hollywood | Chandler |
| | Main Post Office |
| | Studio City |
| Northridge | Main Post Office |
| Norwalk | Main Post Office |
| Novato | Main Post Office |
| Oakland | Airport Station |
| | Civic Center |
| | Eastmont |
| | Emeryville |
| | Laurel Station |
| | North Oakland |
| | Piedmont |
| | West Grand Annex |
| Oceanside | Brooks Street |
| Ontario | Downtown |
| | Plaza Center |
| Orange | Main Post Office |
| Orangevale | Main Post Office |
| Orinda | Main Post Office |
| Pacific Grove | Main Post Office |
| Pacific Palisades | Main Post Office |
| Pacifica | Linda Mar |
| | Main Post Office |
| Pacoima | Main Post Office |
| Palm Springs | Main Post Office |
| Palo Alto | Main Post Office |
| Palos Verdes | Main Post Office |
| Paramount | Main Post Office |
| Pasadena | East Pasadena |
| | Raymond Annex / Main Office |
| | Robinson |
| | San Marino |
| Pebble Beach | Main Post Office |
| Pico Rivera | Main Post Office |
| Pinole | Main Post Office |
| Pittsburg | Main Post Office |
| Placentia | Main Post Office |
| Pomona | Diamond Bar |
| | Main Post Office |
| Port Hueneme | Main Post Office |
| Poway | Main Post Office |
| Rancho Cordova | Main Post Office |
| Rancho Mirage | Main Post Office |
| Redding | Downtown |
| Redondo Beach | Main Post Office |
| Redwood City | Main Post Office |
| Reseda | Main Post Office |
| Rialto | Annex |
| Richmond | McVittie |
| Rio Dell | Main Post Office |
| Rio Linda | Main Post Office |
| Riverside | Downtown |
| | Rubidoux |
| Rodeo | Main Post Office |
| Rosemead | Main Post Office |
| | South San Gabriel |
| Roseville | Main Post Office |
| Sacramento | Arden |
| | Colonial |
| | Del Paso Heights |
| | Foothill Farms |
| | Fort Sutter |
| | Land Park |
| | Oak Park |
| | Town And Country |
| Salinas | Bataan Annex |
| San Anselmo | Main Post Office |
| San Bernardino | Del Rosa |
| | Main Post Office |
| | Northpark |
| | Uptown |
| | Westside |
| San Bruno | Main Post Office |
| San Carlos | Main Post Office |
| San Clemente | Main Post Office |
| San Diego | Andrew Jackson |
| | City Heights |
| | Coronado |
| | Downtown |
| | Encanto |
| | Grantville |
| | Hillcrest |
| | Linda Vista |
| | Mira Mesa |
| | Navajo |
| | Ocean Beach |
| | Pacific Beach |
| | Paradise Hills |
| | Point Loma |
| | Riverfront |
| | San Ysidro |
| | Scripps Ranch |
| | Serra Mesa |
| | Sorrento Valley |
| | Southeastern |
| | University City |
| | Washington |
| | William Taft |
| San Dimas | Main Post Office |
| San Fernando | Mission City Annex |
| | Sylmar |
| San Francisco | Bayview |
| | Bryant Street Annex C & G |
| | Collections (no delivery) |
| | Diamond Heights |
| | Embarcadero Postal CTR |
| | Golden Gate |
| | Marina |
| | Napoleon Street Carrier CPLX |
| | North Beach |
| | Pacific Carrier Annex |

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 352 of 472. PageID #: 1170

| | |
|---|---|
| | Parkside |
| | Pine St |
| | Steiner St |
| | Sunset |
| San Gabriel | Main Post Office |
| San Jacinto | Main Post Office |
| San Jose | Almaden Valley |
| | Bayside |
| | Blossom Hill |
| | Cambrian Park |
| | Foothill Annex |
| | Parkmoor |
| | Robertsville |
| | Saint James Park |
| | Station D |
| | Westgate |
| | Willow Glen |
| San Leandro | Main Post Office |
| | South San Leandro |
| | Main Post Office |
| San Mateo | Main Post Office |
| | St. Matthew |
| San Pedro | Main Post Office |
| San Rafael | Civic Center |
| | Main Post Office |
| | Mission |
| San Ramon | Main Post Office |
| Santa Ana | Annex |
| | Bristol |
| | Fountain Valley |
| | King |
| | Main Post Office |
| | North Grand |
| | Spurgeon |
| Santa Barbara | East Beach Carrier Annex |
| | Main Post Office |
| | San Roque |
| Santa Clara | Mission |
| | Sanchez Annex |
| Santa Clarita | Golden Valley |
| Santa Cruz | Main Post Office |
| | Santa Cruz University |
| | Scotts Valley |
| Santa Fe Springs | Main Post Office |
| Santa Monica | Carrier Annex |
| | Colorado |
| | Main Post Office |
| | Will Rogers |
| Santa Rosa | Carrier Annex |
| Santee | Main Post Office |
| Sausalito | Main Post Office |
| Seal Beach | Main Post Office |
| Seaside | Main Post Office |
| Sierra Madre | Main Post Office |
| Solana Beach | Main Post Office |
| South Gate | Main Post Office |
| South Pasadena | Main Post Office |
| South San Francisco | Annex |
| Stanton | Main Post Office |
| Stockton | Main Post Office |
| Sun Valley | Main Post Office |
| Sunland | Main Post Office |
| Sunnyvale | Encinal |
| | Main Post Office |
| Susanville | Eagle |
| | Main Post Office |
| Tarzana | Main Post Office |
| Tehachapi | Main Post Office |
| Temple City | Main Post Office |
| Thousand Oaks | Main Post Office |
| Thousand Palms | Main Post Office |
| Torrance | Main Post Office |
| | North Torrance |
| Travis AFB | Travis AFB |
| Trona | Main Post Office |
| Tujunga | Main Post Office |
| Tustin | Main Post Office |
| Twentynine Palms | Main Post Office |
| Union City | Main Post Office |
| Upland | Main Post Office |
| Van Nuys | Carrier Annex |
| | Civic Center |
| Venice | Carrier Annex |
| Ventura | East Ventura |
| Vista | Annex |
| Walnut | Main Post Office |
| Walnut Creek | Dollar Ranch |
| | Main Post Office |
| West Covina | Main Post Office |
| Westminster | Main Post Office |
| Whittier | Bailey |
| | Main Post Office |
| Wilmington | Main Post Office |

## Colorado

| | |
|---|---|
| Akron | Main Post Office |
| Arvada | Main Post Office |
| Aspen | Main Post Office |
| Aurora | Altura |
| | Fletcher |
| | Gateway |
| | Hoffman Heights |
| Boulder | Hi Mar |
| | Main Post Office |
| Castle Rock | Main Post Office |
| Colorado Springs | Antares |
| | Cheyenne Mountain |
| | Cimarron Hills |
| | Fort Carson |
| | General Mail Facility |
| | Main Post Office |
| | North End |
| | Templeton |
| | West End |
| Denver | Alcott |
| | Bear Valley |
| | Capitol Hill Annex |
| | Downtown |
| | Edgewater |
| | Glendale |
| | Lakewood |
| | Mile High |
| | Montclair |
| | North Pecos |
| | Northview Annex |
| | Park Hill |
| | South Denver |
| | South Denver Annex |
| | Stockyards |
| | Sullivan |
| | Sunnyside |
| | University Park |
| | Wellshire |
| | Westwood |
| Englewood | Mail Processing Center |
| | Main |
| Grand Junction | Fruitvale |
| Gunnison | Main Post Office |
| Leadville | Main Post Office |
| Littleton | Centennial |
| | Columbine Hills |
| | Main Post Office |
| Manitou Springs | Manitou Springs |
| Pueblo | Belmont |
| | Sunset |
| Rangely | Main Post Office |
| Springfield | Springfield |
| US Air Force Academy | US Air Force Academy |
| Vail | Main Post Office |
| Walsenburg | Main Post Office |
| Westminster | Harris Park |
| | Main Post Office |
| Wheat Ridge | Wheat Ridge |

## Connecticut

| | |
|---|---|
| Ansonia | Main Post Office |
| Beacon Falls | Main Post Office |
| Branford | Main Post Office |
| Bridgeport | Barnum |
| | Bayview |
| | Stratford Station |
| Cheshire | Main Post Office |
| Cos Cob | Main Post Office |
| Cromwell | Main Post Office |
| Danbury | Main Post Office |
| Darien | Main Post Office |
| Derby | Main Post Office |
| Hartford | East Hartford |
| | Elmwood Village |
| | Murphy Rd Carrier Annex |
| | Newington |
| | Old Statehouse |
| | Silver Lane |
| | Station A-Washington St |
| | Weston ST |
| Meriden | Main Post Office |
| Middletown | Main Post Office |
| Milford | Main Post Office |
| Monroe | Easton |
| New Britain | Main Post Office |
| New Haven | East Haven |
| | Fairhaven |
| | Hamden |
| | Main Post Office |
| | Mt. Carmel |
| | Westville |
| | Whitneyville |
| New London | Main Post Office |
| Norwalk | Main Post Office |
| Oakville | Main Post Office |
| Old Greenwich | Main Post Office |
| Old Saybrook | Main Post Office |
| Shelton | Main Post Office |
| Southport | Main Post Office |
| Stamford | Barry Place Annex |
| | Camp Avenue |
| Stratford | Main Post Office |
| Taftville | Main Post Office |
| Wallingford | Main Post Office |
| Waterbury | Brass City Annex |
| | Lakewood |
| | Main Post Office |
| | Plaza |
| West Haven | Allingtown |
| Westport | Main Post Office |
| Windsor | Main Post Office |

## District of Columbia

| | |
|---|---|
| Washington | Brookland |
| | Chillum Place Annex |
| | Cleveland Park Carrier Annex |
| | Columbia Heights Carrier Annex |
| | Congress Heights |
| | Customs House |
| | Friendship |
| | Georgetown Carrier Annex |
| | Lamond Riggs |
| | Southwest |
| | Ward Place |
| | Anacostia |
| | College Park |
| | River Terrace |
| | Section 1 Carrier Annex |

## Delaware

| | |
|---|---|
| Claymont | Claymont |
| New Castle | Centre Point |
| Wilmington | Edgemoor |
| | Greenville Carrier Annex |
| | Lancaster Avenue |
| | Marshallton |
| | Newport |
| | Rodney Square |
| | Talleyville |

## Florida

| | |
|---|---|
| Altamonte Springs | East Side |
| Apalachicola | Main Post Office |
| Belle Glade | Main Post Office |
| Boca Raton | Blue Lake—Collections Only |
| | Boca Rio |
| | Downtown |
| | Main Post Office |
| | Palmetto Park |
| | Spanish Isles Annex |
| | West Boca Carrier Annex |
| Boynton Beach | Downtown |
| | Gateway Annex |
| | Main Post Office |
| Bradenton | 57th Avenue |
| Bradenton Beach | Main Post Office |
| Cape Canaveral | Main Post Office |
| Casselberry | Main Post Office |
| Clearwater | Cleveland Street |
| | Lincoln |
| | Main Post Office |
| | Sunset Point |
| | Beach |
| Cocoa Beach | Cocoa Beach Annex |
| Coral Gables | Main Post Office |
| Coral Springs | Atlantic |
| | Coral Springs |
| Dania | Main Post Office |
| Davie | Main Post Office |
| | Westside Branch |
| Daytona Beach | Downtown |
| Debary | Main Post Office |
| Deerfield Beach | Main Post Office |
| Delray Beach | Annex |
| Deltona | Deltona Blvd |
| | Main Post Office |
| Destin | Destin |
| Eglin Air Force Base | Eglin Air Force Base |
| Ellenton | Main Post Office |
| Fort Lauderdale | Alridge |
| | Everglades |
| | Melrose Vista |
| | North Andrews |
| | North Ridge Annex |
| | Oakland Park |
| | Southside |
| | Sunrise |
| | Tamarac |
| Fort Myers | Downtown |
| | Miracle Mile |
| Fort Myers Beach | Fort Myers Beach |
| Fort Saint Lucie | Port Saint Lucie |
| Gainesville | University |
| Hallandale | Hallandale |
| Hialeah | Annex |
| | Bright |
| | Main Post Office |
| | Miami Gardens |
| | Palmetto Lakes |
| | Promenade |
| Hollywood | Central Carrier Annex |
| | Hollywood Hills |
| | Main Post Office |
| | Pembroke Pines Annex |
| Howey in the Hills | Main Post Office |
| Indian Rocks Beach | Main Post Office |
| Jacksonville | Arlington |
| | Carver |
| | Jacksonville Beach |
| | Mandarin |
| | Naldo |
| | South Jacksonville |
| Jupiter | Main Post Office |
| | Tequesta |
| Key West | Main Post Office |
| Lake Helen | Main Post Office |
| Lake Mary | Main Post Office |
| Lake Park | Annex |
| Lake Worth | Lucerne Avenue |
| | Main Post Office |
| Lauderhill | Crossroads Annex |
| | Inverrary |
| Longboat Key | Main Post Office |
| Lynn Haven | Main Post Office |
| Maitland | Main Post Office |
| Marco Island | Main Post Office |
| Melbourne | Apollo Annex |
| | Indiatlantic |
| | Main Post Office |
| | Satellite Beach |
| Miami | Allapattah |
| | Blue Lagoon |

| City | Station |
|---|---|
| | Buena Vista |
| | Coconut Grove |
| | County Line |
| | Doral |
| | Dr Martin Luther King |
| | Flagler |
| | Gratigny |
| | Hibiscus Annex |
| | Jose Marti |
| | Kendall |
| | Key Biscayne |
| | Little River |
| | Ludlam |
| | Milam Dairy |
| | Norland |
| | North Miami |
| | North Miami Beach |
| | Quail Heights |
| | Shenandoah Annex |
| | Snapper Creek |
| | Tamiami |
| Miami Beach | Main Post Office |
| | Normandy |
| | Ocean view |
| | Surfside |
| Miami Gardens | Carol City |
| Miramar | Main Post Office |
| Miramar Beach | Main Post Office |
| Naples | East Naples Annex |
| North Lauderdale | Main Post Office |
| North Miami | Main Post Office |
| Oakland Park | Main Post Office |
| Opa Locka | Main Post Office |
| Orange City | Main Post Office |
| Orlando | Azalea Park |
| | College Park |
| | Dixie Village |
| | Gore Street |
| | Lee Vista |
| | Mall Annex |
| | Pine Castle |
| | Sand Lake |
| | Union Park |
| Ormand Beach | Beachside |
| Pahokee | Main Post Office |
| Palm Bay East | Main Post Office |
| Palm Beach | Main Post Office |
| | Worth Avenue |
| Panama City | Downtown |
| Pembroke Pines | Annex |
| | Flamingo |
| | Main Post Office |
| Pensacola | Downtown |
| | East Hill |
| | Warrington—Naval Air Station |
| Pinellas Park | Pinellas Park |
| Plantation | Plantation |
| Pompano Beach | Lighthouse Point |
| | Main Post Office |
| | Tropical Reef |
| Port Richey | Main Post Office |
| Port Saint Joe | Main Post Office |
| Port Saint Lucie | Main Post Office |
| Rockledge | Rockledge |
| Saint Petersburg | Central |
| | Crossroads |
| | Euclid |
| | Gateway Mall |
| | Gulfwinds |
| | Madeira Beach |
| | Midtown |
| | Northside |
| | Open Air |
| | Saint Petersburg Beach |
| Sarasota | Gulf Gate |
| | Southgate |
| Satellite Beach | Satellite Beach - Patrick AFB |
| Shalimar | Main Post Office |
| South Bay | Main Post Office |
| South Miami | Main Post Office |
| Stuart | Main Post Office |
| Tallahassee | Main Post Office |
| Tamarac | Main Post Office |
| Tampa | Annex |
| | Carrollwood |
| | Commerce |
| | Forest Hills |
| | Hyde Park |
| | Interbay |
| | MacDill AFB |
| | Seminole Heights |
| | Sulphur Springs |
| | Ybor |
| Valparaiso | Main Post Office |
| West Palm Beach | City Place |
| | Haverhill |
| | Palm Central |
| | Palm West |
| | Southboro |
| Weston | Weston Branch |
| Winter Park | Aloma |
| | Main Post Office |

## Georgia

| City | Station |
|---|---|
| Atlanta | Ben Hill |
| | Briarcliff |
| | Broadview |
| | Brookhaven |
| | Cascade Heights |
| | Central City Carrier Annex |
| | Chamblee |
| | Civic Center |
| | College Park |
| | Cumberland Carrier Annex |
| | Dunwoody Carrier Annex |
| | East Atlanta |
| | East Point |
| | Eastwood |
| | Federal Reserve |
| | Glenridge |
| | Hapeville |
| | Howell Mill |
| | Industrial |
| | Lakewood |
| | Martech Carrier Annex |
| | Midtown |
| | Morris Brown |
| | North Atlanta Carrier Annex |
| | Northside Carrier Annex |
| | Ralph McGill Carrier Annex |
| | Sandy Springs Carrier Annex |
| | West End |
| Augusta | Main Post Office |
| Avondale Estates | Main Post Office |
| Clarkston | Main Post Office |
| Columbus | Downtown |
| Decatur | Annex |
| | Main Post Office |
| Fort Oglethorpe | Main Post Office |
| Marietta | Main Post Office |
| | Mount Bethel |
| Morrow | Main Post Office |
| Peach Tree City | Main Post Office |
| Riverdale | Main Post Office |
| Savannah | Eastside |
| Scottdale | Scottdale |

## Guam

| City | Station |
|---|---|
| Barrigada | Barrigada |
| Hagatna | Downtown |

## Hawaii

| City | Station |
|---|---|
| Aiea | Pearl City |
| Ewa Beach | Main Post Office |
| Honolulu | Collections |
| | Downtown |
| | Hawaii Kai |
| | Kapalama |
| | Main Post Office |
| | Makiki |
| | Sand Island |
| | Waialae-Kahala |
| | Waikiki |
| Kahulii | Main Post Office |
| Kailua | Main Post Office |
| Kaneohe | Main Post Office |
| Laie | Main Post Office |
| Mililani | Main Post Office |
| Pearl City | Pearl City / Aiea |
| Wahiawa | Main Post Office |
| Waianae | Main Post Office |
| Waimanalo | Main Post Office |
| Waipahu | Main Post Office |

## Iowa

| City | Station |
|---|---|
| Cedar Rapids | Downtown |
| Des Moines | Beaverdale |
| | Metro Carrier Annex |
| | Morgan Street |
| | University |
| | Seymour |
| | Morningside |

## Idaho

| City | Station |
|---|---|
| Boise | Main Post Office |
| | Oregon Trail |
| | Overland Trail |
| Kellogg | Main Post Office |
| Mountain Home | Mountain Home/AFB |
| Saint Maries | Main Post Office |
| Soda Springs | Main Post Office |
| Wallace | Main Post Office |

## Illinois

| City | Station |
|---|---|
| Arlington Heights | Main Post Office |
| Bellwood | Main Post Office |
| Benld | Main Post Office |
| Bensenville | Main Post Office |
| Berwyn | Main Post Office |
| Bloomington | Normal |
| Bradley | Main Post Office |
| Bridgeview | Main Post Office |
| | Moraine Valley Facility |
| Brookfield | Main Post Office |
| Calumet City | Main Post Office |
| Carol Stream | Main Post Office |
| Champaign | Main Post Office |
| Chicago | Ashburn |
| | Auburn Park |
| | Cesar Chavez / Pilson |
| | Charles A Hayes |
| | Chicago Central Carrier Annex |
| | Cicero |
| | Clearing |
| | Cragin |
| | Daniel J Doffyn |
| | Elmwood Park |
| | Englewood |
| | Evergreen Park |
| | Fort Dearborn |
| | Graceland |
| | Grand Crossing Carrier Annex |
| | Harwood Heights Carrier Annex |
| | Hegewisch |
| | Henry W McGee |
| | Irving Park |
| | Jackson Park |
| | James E Worsham/ Grand Crossing Annex |
| | Jefferson Park |
| | John J Buchanan |
| | Lakeview |
| | Lincoln Park |
| | Lincolnwood/Edgebrook |
| | Loop Section Station |
| | Mary Alice Henry |
| | Merchandise Mart |
| | Morgan Park |
| | Mount Greenwood |
| | Nancy B Jefferson |
| | Northtown |
| | Norwood Park |
| | Ogden Park |
| | Otis Grant Collins |
| | Ravenswood |
| | Reverend Milton R Brunson |
| | Riverdale |
| | Robert LeFlore Jr |
| | Roberto Clemente |
| | Roger P McAuliffe |
| | Rogers Park |
| | Roseland |
| | Southwest Carrier Annex |
| | Stockyard |
| | Twenty Second Street |
| | Uptown |
| | Wicker Park |
| Clarendon Hills | Main Post Office |
| Cottage Hills | Main Post Office |
| Decatur | Annex |
| Deerfield | Main Post Office |
| Des Plaines | Main Post Office |
| Dolton | Main Post Office |
| Downers Grove | Main Post Office |
| | Woodbridge |
| East Saint Louis | Main Post Office |
| | Fairview Heights |
| Elk Grove Village | Main Post Office |
| Elmhurst | Main Post Office |
| Evanston | Main Post Office |
| Forest Park | Main Post Office |
| Fox River Grove | Main Post Office |
| Franklin Park | Main Post Office |
| Glen Ellyn | Glendale Heights |
| | Main Post Office |
| Glencoe | Main Post Office |
| Glenview | Main Post Office |
| Hazel Crest | Main Post Office |
| Highland Park | Highland Park |
| Highwood | Main Post Office |
| Hillside | Main Post Office |
| Itasca | Main Post Office |
| Kenilworth | Main Post Office |
| La Grange | Main Post Office |
| | La Grange Park |
| Lake Bluff | Main Post Office |
| Lake Forest | Main Post Office |
| Lansing | Main Post Office |
| Lincolnwood | Lincolnwood/Edgebrook |
| Lisle | Main Post Office |
| Lyons | Main Post Office |
| Madison | Main Post Office |
| Maywood | Main Post Office |
| Melrose Park | Main Post Office |
| Midlothian | Main Post Office |
| Morton Grove | Main Post Office |
| Mound City | Main Post Office |
| Mount Prospect | Main Post Office |
| Niles | Main Post Office |
| North Brook | Main Post Office |
| North Chicago | Great Lakes |
| | Main Post Office |
| Oak Brook | Main Post Office |
| Oak Forest | Main Post Office |
| Oak Park | Main Post Office |
| | Oak Park South |
| Palatine | Main Post Office |
| Park Forest | Main Post Office |
| Park Ridge | Main Post Office |
| Peoria | Persimmon Annex |
| | West Glen |
| Posen | Main Post Office |
| Richton Park | Main Post Office |
| River Forest | Main Post Office |
| River Grove | Main Post Office |
| Riverside | North Riverside |
| Robbins | Main Post Office |
| Rockford | Main Post Office |
| Rolling Meadows | Rolling Meadows |
| Schaumburg | Main Post Office |
| Silvis | Main Post Office |
| Skokie | Main Post Office |
| Springfield | Downtown |
| | Northeast |
| Steger | Main Post Office |
| Summit Argo | Main Post Office |
| Thornton | Main Post Office |
| Venice | Main Post Office |

| | |
|---|---|
| Villa Park | Elmhurst Carrier Annex |
| | Main Post Office |
| Waukegan | Main Post Office |
| Westchester | Main Post Office |
| Western Springs | Main Post Office |
| Westmont | Main Post Office |
| Wheeling | Main Post Office |
| Willow Springs | Main Post Office |
| Willowbrook | WBD Carrier Annex |
| Wilmette | Main Post Office |
| Winnetka | Main Post Office |
| Winthrop Harbor | Main Post Office |
| Wood Dale | Main Post Office |
| Zeigler | Main Post Office |

## Indiana

| | |
|---|---|
| Beech Grove | Main Post Office |
| East Chicago | East Chicago |
| | Harbor |
| Evansville | Downtown |
| | Lawndale |
| | Main Post Office |
| | River City |
| Fort Wayne | Fort Wayne |
| | Hazelwood |
| Gary | Brunswick |
| | Glen Park |
| | Lake |
| | Main Post Office |
| | Merrillville |
| | Miller |
| | Tolleston |
| Griffith | Main Post Office |
| Hammond | Hessville |
| | Highland |
| | Main Post Office |
| | Munster |
| Indianapolis | Bacon |
| | Brightwood |
| | Circle City |
| | Eastgate |
| | Lawrence |
| | Linwood |
| | Mapleton |
| | Nora |
| | Rainbow |
| | Speedway |
| South Bend | Brademas / Main |
| | Edison Park |
| Whiting | Main Post Office |

## Kansas

| | |
|---|---|
| Florence | Main Post Office |
| Fort Leavenworth | Main Post Office |
| Fort Riley | Main Post Office |
| Kansas City | Argentine |
| | Civic Center |
| | Indian Springs |
| | Rosedale |
| Leawood | Main Post Office |
| Mission | Shawnee Mission |
| Overland Park | Blue Valley |
| | Brookridge |
| | Indian Creek |
| | Main Post Office |
| Prairie Village | Main Post Office |
| Shawnee | Main Post Office |
| Topeka | Main Post Office |
| Wichita | Chisholm |
| | Downtown |
| | Munger |
| | North Wichita |
| | River City |

## Kentucky

| | |
|---|---|
| Barbourville | Main Post Office |
| Cloverport | Main Post Office |
| Covington | Main Post Office |
| Cumberland | Main Post Office |
| Earlington | Main Post Office |
| Fort Campbell | Main Post Office |
| Fort Knox | Main Post Office |
| Fort Thomas | Main Post Office |
| Harlan | Main Post Office |
| Highland Heights | Cold Springs- Highland Heights |
| Irvine | Ravenna |
| Lexington | Post Rider |
| Louisville | Annshire |
| | Downtown |
| | Hikes Point |
| | Iroquois |
| | Lyndon |
| | Martin Luther King |
| | Okolona |
| | Pleasure Ridge Park |
| | Saint Matthews |
| | Shelby |
| | Shively |
| Paintsville | Main Post Office |
| Russell | Main Post Office |
| South Williamson | Williamson WV |
| Whitesburg | Main Post Office |

## Louisiana

| | |
|---|---|
| Arabi | Arabi/Chalmette |
| Barsksdale AFB | Barksdale AFB |
| Baton Rouge | Audubon |
| | Broadview |
| | Downtown |
| | Istrouma |
| | Old Hammond |
| Berwick | Main Post Office |
| Chalmette | Main Post Office |
| Delcambre | Main Post Office |
| Fort Polk | Main Post Office |
| Gretna | Main Post Office |
| Harvey | Main Post Office |
| Kenner | Kenner North |
| | Main Post Office |
| Lake Arthur | Main Post Office |
| Lake Charles | Main Post Office |
| Mandeville | Main Post Office |
| Marreo | Main Post Office |
| Metairie | Johnson Street |
| | Park Manor |
| | Main Post Office |
| Monroe | Northside |
| Natchitoches | East Natchitoches |
| New Orleans | Algiers |
| | Bywater |
| | Carrollton |
| | Central |
| | Elmwood |
| | Main Post Office |
| | Uptown |
| New Roads | Main Post Office |
| Norco | Main Post Office |
| Shreveport | Main Post Office |
| | Meriwether |
| Thibodaux | Houma-Thibodaux-Lockport (has rural and CDS) |
| Vidalia | Main Post Office |
| Westwego | Main Post Office |

## Massachusetts

| | |
|---|---|
| Abington | Main Post Office |
| Ashland | Main Post Office |
| Avon | Main Post Office |
| Ayer | Main Post Office |
| Baldwinville | Main Post Office |
| Bedford | Main Post Office |
| Beverly | Main Post Office |
| Boston | Allston |
| | Arlington |
| | Auburndale |
| | Back Bay Annex |
| | Belmont |
| | Brighton |
| | Chestnut Hill |
| | Dorchester Station |
| | East Weymouth |
| | Fenway |
| | Fields Corner |
| | Fort Point |
| | Hyde Park |
| | IMC Charlestown Station |
| | IMC Chelsea |
| | IMC East Boston |
| | IMC Everett |
| | IMC Winthrop Station |
| | Jamaica Plain |
| | JFK-Back Bay (All JFK many zones) |
| | Kenmore |
| | Malden |
| | Mattapan |
| | Medford |
| | Milton |
| | Needham |
| | Newton Center |
| | Newton Highlands St |
| | Newtonville |
| | North Quincy |
| | North Weymouth |
| | Quincy |
| | Revere |
| | Roslindale |
| | Roxbury |
| | Somerville |
| | South Boston |
| | South Weymouth |
| | Stoneham |
| | Waban |
| | Watertown |
| | Wellesley Hills |
| | Wellesley Station |
| | West Newton |
| | West Roxbury |
| | Weston |
| | Weymouth Landing |
| | Wollaston |
| Braintree | Main Post Office |
| Brockton | Main Post Office |
| Brookline | Main Post Office |
| Burlington | Main Post Office |
| Cambridge | Cambridge-Central Square St |
| | Cambridge-Porter Square Carrier Annex |
| | East Cambridge Annex |
| Canton | Main Post Office |
| Chelmsford | Main Post Office |
| Chicopee | Main Post Office |
| Clinton | Main Post Office |
| Cohasset | Main Post Office |
| Danvers | Main Post Office |
| Dedham | Main Post Office |
| East Falmouth | Main Post Office |
| East Walpole | Main Post Office |
| | Walpole Carriers |
| Fairhaven | Fairhaven |
| Fall River | Flint |
| | Highland |
| | Main Post Office |
| | Somerset |
| | South |
| Falmouth | Main Post Office |
| Foxboro | Main Post Office |
| Gloucester | Main Post Office |
| Hanover | Main Post Office |
| Harwich Port | Main Post Office |
| Haverhill | Main Post Office |
| Hingham | Hull |
| | Main Post Office |
| Holbrook | Main Post Office |
| Hopedale | Main Post Office |
| Hyannis | Main Post Office |
| Lawrence | Lawrence-Sub-Station |
| | Main Post Office |
| | Methuen |
| Lexington | Main Post Office |
| Lowell | Sub Station DDC |
| Lynn | Main Post Office |
| | Nahant |
| | Saugus |
| | Swampscott |
| | West Lynn |
| Lynnfield | Lynnfield Annex |
| Manchester | Main Post Office |
| Marblehead | Main Post Office |
| Maynard | Main Post Office |
| Merrimac | Main Post Office |
| Milford | Main Post Office |
| Nantucket | Main Post Office |
| Natick | Main Post Office |
| Needham | Needham Heights |
| New Bedford | New Bedford-Sub Station |
| Newburyport | Main Post Office |
| | Newbury |
| Newton Center | Newton Center Carrier Annex |
| Newtonville | Main Post Office |
| North Attleboro | Main Post Office |
| North Chelmsford | Main Post Office |
| Northampton | Main Post Office |
| Norwood | Main Post Office |
| | Westwood |
| Osterville | Main Post Office |
| Peabody | Annex |
| | Main Post Office |
| Pittsfield | Main Post Office |
| Provincetown | Main Post Office |
| Randolph | Main Post Office |
| Reading | Main Post Office |
| Rockland | Main Post Office |
| Rockport | Main Post Office |
| Salem | Main Post Office |
| Scituate | Main Post Office |
| Sharon | Main Post Office |
| Somerset | Main Post Office |
| South Grafton | Main Post Office |
| South Hamilton | Main Post Office |
| | Wenham |
| South Yarmouth | Main Post Office |
| | West Yarmouth Branch |
| | Yarmouth Port |
| Springfield | East Longmeadow |
| | Forest Park Station |
| | Main Post Office |
| | Main Street Station-Indian Orchard |
| | Riverdale Station |
| Stoughton | Main Post Office |
| Wakefield | Main Post Office |
| Waltham | Waltham Station |
| Wayland | Main Post Office |
| Whitinsville | Main Post Office |
| Whitman | Main Post Office |
| Winchester | Annex |
| Woburn | Main Post Office |
| Worcester Office | Joseph D Early Main Post |

## Maryland

| | |
|---|---|
| Aberdeen Proving | Aberdeen Proving Grounds |
| Ashton | Main Post Office |
| Baltimore | Arlington |
| | Brooklyn South Carrier Annex |
| | Carroll |
| | Catonsville |
| | Clifton East End |
| | Downtown Delivery Annex |
| | Druid |
| | Dundalk Sparrows Point |
| | Franklin |
| | Govans |
| | Gwynn Oak |
| | Halethorpe |
| | Hamilton |
| | Hampden/Roland |
| | Highlandtown |
| | Loch Raven |
| | Mount Washington |
| | Northwood |
| | Nottingham |
| | Parkville |
| | Raspeburg |
| | Walbrook |
| | Waverly |
| Beltsville | Main Post Office |
| Bethesda | Arlington |

| | |
|---|---|
| | West Lake |
| Bladensburg | Main Post Office |
| Brentwood | Main Post Office |
| Burtonsville | Main Post Office |
| Cabin John | Main Post Office |
| Capitol Heights | Main Post Office |
| Cheltenham | Main Post Office |
| College Park | North College Park |
| Columbia | Main Post Office |
| Crofton | Main Post Office |
| Damascus | Main Post Office |
| District Heights | District Heights |
| | Forestville |
| Fort George Meade | Fort George Meade |
| Fort Washington | Main Post Office |
| Gaithersburg | Main Post Office |
| Glen Echo | Main Post Office |
| Greenbelt | Main Post Office |
| Hyattsville | Calvert Delivery Distribution Center |
| | Landover |
| Kensington | Main Post Office |
| Lanham | Lanham Seabrook |
| Linthicum Heights | Main Post Office |
| Lonaconing | Main Post Office |
| Mount Rainier | Main Post Office |
| Oxon Hill | Main Post Office |
| Patuxent River | Main Post Office |
| Rockville | Derwood |
| | Main Post Office |
| | Pike Annex |
| | Potomac |
| | Twinbrook |
| Sandy Spring | Main Post Office |
| Silver Spring | Ashton |
| | Aspen Hill |
| | Colesville |
| | Colesville Carrier Annex |
| | Main Post Office |
| | Silver Spring Carrier Annex |
| | Takoma Park |
| | Wheaton |
| Suitland | Main Post Office |
| Temple Hills | Andrews Air Force Base |
| | Main Post Office |

## Maine

| | |
|---|---|
| Booth Bay Harbour | Main Post Office |
| East Millinocket | East Millinocket |
| Eastport | Main Post Office |
| Gardiner | Randolph |
| Mexico | Main Post Office |
| Millinocket | Main Post Office |
| Old Orchard Beach | Main Post Office |
| Peaks Island | Main Post Office |
| Portland | Main Station |
| | Main Station Portland-North |
| | Main Station Portland-West (dispute) |

## Michigan

| | |
|---|---|
| Allen Park | Main Post Office |
| Birmingham | Main Post Office |
| Bloomfield Hills | Annex |
| Center Line | Main Post Office |
| Clawson | Main Post Office |
| Dearborn | Carrier Annex |
| | Main Post Office |
| | Teleford |
| Dearborn Heights | Main Post Office |
| Detroit | Brightmoor |
| | College Park |
| | Fenkell |
| | Fox Creek |
| | Grand Shelby |
| | Gratiot |
| | Grosse Pointe |
| | Hamtramck Carrier Annex |
| | Harper |
| | Highland Park |
| | Jefferson |
| | Joyfield |
| | Kensington |
| | Livernois |
| | Mt Elliott |
| | North End |
| | Northwestern |
| | Oak Park |
| | Old Redford Carrier Annex |
| | Park Grove |
| | Redford |
| | River Rouge |
| | Seven Oaks |
| | Springwells |
| | Strathmoor |
| Eastpointe | Main Post Office |
| Farmington Hills | Farmington Carrier Annex |
| | Main Post Office |
| Flint | Cody |
| | Main Post Office |
| | Northeast |
| | Northside |
| | Southeast |
| Fraser | Main Post Office |
| Garden City | Main Post Office |
| Grand Rapids | East Town |
| | Kentwood |
| | Main Post Office |
| Grosse Ile | Main Post Office |
| Hazel Park | Main Post Office |
| Inkster | Main Post Office |
| Kinchelo | Main Post Office |
| Lanse | Main Post Office |
| Lansing | Downtown |
| | South West Carrier Annex |
| Lincoln Park | Main Post Office |
| Livonia | Greenmead |
| | Main Post Office |
| Michigan Center | Main Post Office |
| Mount Clemens | Main Post Office |
| Muskegon | Muskegon Heights |
| | North Muskegon |
| Norway | Main Post Office |
| Okemos | Main Post Office |
| Pontiac | Auburn Hills |
| | Main Post Office |
| Port Huron | Marysville |
| Portage | Portage Carrier Annex |
| Rochester | Rochester Hills |
| Roseville | Main Post Office |
| Royal Oak | Madison Heights |
| | Main Post Office |
| Saint Clair Shores | Main Post Office |
| Saint Ignace | Main Post Office |
| Sault St. Marie | Kinchelo |
| Southfield | Main Post Office |
| Southgate | Main Post Office |
| Sterling Heights | Main Post Office |
| Taylor | Main Post Office |
| Trenton | Main Post Office |
| Troy | Main Post Office |
| | Minnesota Bldg / Carrier Annex |
| Warren | Main Post Office |
| | West Bloomfield |
| Wayne | Main Post Office |
| Westland | Main Post Office |
| Wyandotte | Main Post Office |
| | Riverview Branch |

## Minnesota (This is a correction to the National Agreement)

| | |
|---|---|
| Babbitt | Main Post Office |
| Bayport | Main Post Office |
| Burnsville | Main Post Office |
| Champlin | Main Post Office |
| Circle Pines | Main Post Office |
| Ely | Main Post Office |
| Hopkins | Main Post Office |
| Hoyt Lakes | Main Post Office |
| International Falls | Main Post Office |
| Minneapolis | Blaine |
| | Bloomington |
| | Brooklyn Center |
| | Brooklyn Park |
| | Burnett |
| | Columbia Heights |
| | Commerce |
| | Coon Rapids |
| | Crystal |
| | Diamond Lake |
| | Dinky Town |
| | Eastside |
| | Edina |
| | Elmwood |
| | Fridley Annex |
| | Golden Valley |
| | Lake Street |
| | Loring |
| | Lowry |
| | Main Post Office |
| | Minnehaha |
| | Nokomis |
| | Normandale |
| | Penn James |
| | Powderhorn |
| | Richfield |
| | Robbinsdale |
| | Saint Louis Park |
| | Twin Cities Metro |
| | University |
| | West Edina |
| Minnetonka | Annex |
| | Main Post Office |
| Saint Paul | Dayton's Bluff |
| | Eagan |
| | Eastern Heights |
| | Elway |
| | Industrial |
| | Main Post Office |
| | New Brighton |
| | North Saint Paul |
| | Rice Street |
| | Riverview |
| | Roseville |
| | Twin Cities |
| | Vadnais Heights Annex |
| | West Saint Paul |
| | White Bear Lake |
| Saint Paul Park | Main Post Office |
| Silver Bay | Main Post Office |
| South Saint Paul | South Saint Paul |
| Virginia | Main Post Office |

## Missouri

| | |
|---|---|
| Ballwin | Manchester |
| Carterville | Main Post Office |
| Fort Leonard Wood | Main Post Office |
| Grandview | Main Post Office |
| Independence | Englewood |
| | Sugar Creek |
| Jefferson City | Capital View |
| Kansas City | Center Square |
| | Civic Center |
| | Executive Park |
| | GPO Carrier Annex |
| | James Crew |
| | Leon Jordan |
| | Main Post Office |
| | Plaza |
| | South Troost |
| | Southeast |
| | Stockyards |
| | Waldo |
| | Westport |
| | William Chick |
| Saint Ann | Main Post Office |
| Saint Louis | Afton |
| | Baden |
| | Benton Park |
| | Berkeley |
| | Brentwood |
| | Carrier Square |
| | Chambers |
| | Chouteau |
| | Clayton |
| | Coyle |
| | Creve Coeur |
| | Des Peres |
| | Ferguson |
| | Gaffney |
| | Giles |
| | Gravois |
| | Jennings |
| | Kirkwood |
| | Mackenzie Point |
| | Maplewood |
| | Maryville Gardens |
| | North County |
| | Oldham |
| | Olivette |
| | Reid |
| | Richmond Heights |
| | South County |
| | Southwest |
| | University City |
| | Weathers |
| | West County |
| | Wheeler |
| Valley Park | Main Post Office |

## Mississippi

| | |
|---|---|
| Biloxi | Main Post Office |
| | West Station |
| Gulfport | Downtown Station |
| | East Station |
| Jackson | Lefleur |
| | Moody Street |
| | North Jackson |
| | Southwest |
| Pascagoula | East Lawn Station Closed Hurricane |
| | Main Post Office |
| Waveland | Main Post Office |

## Montana

| | |
|---|---|
| Billings | Centennial |
| | Pioneer |
| Bozeman | Babcock |
| Cut Bank | Main Post Office |
| Glendive | Main Post Office |
| Great Falls | C.M. Russell |
| Havre | Main Post Office |
| Kalispell | Main Post Office |
| Livingston | Main Post Office |
| Plentywood | Main Post Office |
| Round Up | Main Post Office |
| Shelby | Main Post Office |
| Wolf Point | Main Post Office |

## North Carolina

| | |
|---|---|
| Butner | Main Post Office |
| Carolina Beach | Main Post Office |
| Charlotte | 30th Street |
| | Downtown |
| | Idlewild Annex |
| | Independence |
| | Park Road |
| | Randolph |
| Cramerton | Main Post Office |
| East Flat Rock | Main Post Office |
| Fayetteville | Eutaw |
| | Haymount |
| Fort Bragg | Fort Bragg |
| Jacksonville | Camp LeJeune |
| Landis | Main Post Office |
| Lowell | Main Post Office |
| Raleigh | Avent Ferry |
| Southern Pines | Main Post Office |
| Southport | Main Post Office |
| Spencer | Main Post Office |
| Spindale | Main Post Office |
| Weldon | Main Post Office |
| Wilmington | Azalea |
| | Main Post Office |
| Winston Salem | Main Post Office |
| Wrightsville Beach | Main Post Office |

## North Dakota

| | |
|---|---|
| Minot AFB | Minot AFB |

## Nebraska

| | |
|---|---|
| Bellevue | Main Post Office |
| Chadron | Main Post Office |
| Crawford | Main Post Office |
| Lincoln | Woods Park |
| Omaha | Ames |
| | Benson |
| | Elmwood |
| | Millard |
| | Pierce |
| | Ralston |
| | Saddle Creek |
| | South Omaha |
| | West Omaha |
| Valentine | Main Post Office |

## New Hampshire

| | |
|---|---|
| Hampton | Main Post Office |
| Manchester | Downtown |
| Somersworth | Main Post Office |

## New Jersey

| | |
|---|---|
| Allendale | Allendale Carrier Annex |
| Allenhurst | Main Post Office |
| Asbury Park | Main Post Office |
| | Ocean |
| Atlantic City | Main Post Office |
| Atlantic Highlands | Main Post Office |
| Avalon | Main Post Office |
| Avenel | Main Post Office |
| Avon by the Sea | Main Post Office |
| Barrington | Main Post Office |
| Bayonne | Main Post Office |
| Bayville | Main Post Office |
| Beachwood | Main Post Office |
| Belford | Main Post Office |
| Bellmawr | Annex |
| | Main Post Office |
| Bergenfield | Main Post Office |
| Berkeley Heights | Main Post Office |
| Bloomfield | Main Post Office |
| Bloomingdale | Main Post Office |
| Bound Book | Main Post Office |
| Bradley Beach | Main Post Office |
| Bridgewater | Main Post Office |
| Brielle | Main Post Office |
| Brigantine | Main Post Office |
| Budd Lake | Main Post Office |
| Caldwell | Caldwell/West Caldwell |
| Camden | Main Post Office |
| | Main Post Office Carrier Annex |
| Carlstadt | Main Post Office |
| Carteret | Main Post Office |
| Cedar Grove | Main Post Office |
| Cedar Knolls | Main Post Office |
| Chatham | Main Post Office |
| Cherry Hill | Main Post Office |
| | Woodcrest |
| Cinnaminson | Main Post Office |
| Clementon | Annex |
| Cliffside Park | Main Post Office |
| Cliffwood | Main Post Office |
| Clifton | Delawanna |
| | Main Post Office |
| Closter | Main Post Office |
| Cranford | Main Post Office |
| Cresskill | Main Post Office |
| Deal | Main Post Office |
| Demarest | Main Post Office |
| Deptford | Deptford/Woodbury |
| Dover | Carrier Annex |
| Dumont | Main Post Office |
| Dunellen | Main Post Office |
| East Brunswick | Main Post Office |
| East Hanover | Main Post Office |
| East Orange | Main Post Office |
| Edgewater | Main Post Office |
| Edison | Main Post Office |
| | Nixon |
| | Raritan Center |
| Elizabeth | Main Post Office |
| Elmwood Park | Main Post Office |
| Emerson | Hillsdale |
| Englewood | Englewood Annex |
| Essex Falls | Main Post Office |
| Fair Lawn | Main Post Office |
| | River Road |
| | Warren Point |
| Fairview | Main Post Office |
| Fanwood | Main Post Office |
| Florence | Main Post Office |
| Florham Park | Main Post Office |
| Fords | Main Post Office |
| Fort Lee | Fort Lee Annex |
| Franklin Lakes | Main Post Office |
| Franklin Park | Main Post Office |
| Garfield | Main Post Office |
| Garwood | Main Post Office |
| Gibbsboro | Main Post Office |
| Gibbstown | Main Post Office |
| Gillette | Main Post Office |
| Glen Ridge | Main Post Office |
| Glen Rock | Main Post Office |
| Glendora | Main Post Office |
| Gloucester City | Main Post Office |
| Hackensack | Hasbrouck Heights |
| | Leonia |
| | Main Post Office |
| | Maywood |
| | South Hackensack |
| Haddon Heights | Main Post Office |
| Haddonfield | Main Post Office |
| Harrington Park | Main Post Office |
| Harrison | Main Post Office |
| Haskell | Main Post Office |
| Haworth | Main Post Office |
| Hazlet | Main Post Office |
| High Bridge | Main Post Office |
| Highlands | Main Post Office |
| Hillsdale | Washington Township |
| Hillside | Industrial Hillside |
| Ho Ho Kus | Main Post Office |
| Hoboken | Main Post Office |
| Holmdel | Main Post Office |
| Hopatcong | Main Post Office |
| Iselin | Main Post Office |
| Jersey City | Bergen North |
| | Bergen South |
| | Hudson |
| | Main Post Office |
| | Journal Square |
| | Main Post Office |
| Keansburg | Main Post Office |
| Kearny | Main Post Office |
| Keasbey | Main Post Office |
| Kendall Park | Main Post Office |
| Kenilworth | Main Post Office |
| Keyport | Main Post Office |
| Lake Hiawatha | Main Post Office |
| Lakewood | Main Post Office |
| Landing | Main Post Office |
| Lavallette | Main Post Office |
| Lawnside | Main Post Office |
| Leonardo | Main Post Office |
| Lincoln Park | Main Post Office |
| Lincroft | Main Post Office |
| Linden | Main Post Office |
| Linwood | Main Post Office |
| Little Falls | Main Post Office |
| Little Ferry | Main Post Office |
| Little Silver | Main Post Office |
| Livingston | Main Post Office |
| Lodi | Main Post Office |
| Long Beach Township | Long Beach |
| Long Branch | Main Post Office |
| Longport | Main Post Office |
| Lyndhurst | Main Post Office |
| Madison | Carrier Annex |
| Magnolia | Main Post Office |
| Mahwah | Mahwah Carrier Annex |
| Manasquan | Main Post Office |
| Mantoloking | Main Post Office |
| Mantua | Main Post Office |
| Manville | Main Post Office |
| Maplewood | Main Post Office |
| Margate | Main Post Office |
| Margate City | Main Post Office |
| Metuchen | Brainy Boro |
| | Main Post Office |
| Middlesex | Main Post Office |
| Middletown | Main Post Office |
| Midland Park | Main Post Office |
| Millburn | Main Post Office |
| Millington | Main Post Office |
| Milltown | Main Post Office |
| Monmouth Beach | Main Post Office |
| Montclair | Main Post Office |
| | Upper Montclair |
| Montvale | Main Post Office |
| Morris Plains | Main Post Office |
| Morristown | Main Post Office |
| Mount Arlington | Main Post Office |
| Mount Ephraim | Mount Ephraim |
| Mountain Lakes | Main Post Office |
| National Park | Main Post Office |
| Neptune | Main Post Office |
| Netcong | Main Post Office |
| New Brunswick | Highland Park |
| | Home News Row |
| New Milford | Main Post Office |
| New Providence | Main Post Office |
| Newark | Irvington |
| | Main Post Office |
| | Roseville |
| | South |
| | Springfield Avenue |
| | Vailsburg |
| | Belleville Annex |
| | Ironbound |
| North Bergen | Main Post Office |
| | Woodcliff |
| Northfield | Main Post Office |
| Northvale | Main Post Office |
| Norwood | Main Post Office |
| Oakhurst | Main Post Office |
| Oakland | Main Post Office |
| Ocean City | Main Post Office |
| Ocean Grove | Main Post Office |
| Oceanport | Main Post Office |
| Ogdensburg | Main Post Office |
| Oradell | Main Post Office |
| Orange | Main Post Office |
| | West Orange |
| Palisades Park | Main Post Office |
| Palmyra | Main Post Office |
| Paramus | Main Post Office |
| Park Ridge | Main Post Office |
| Parlin | Main Post Office |
| Parsippany | Main Post Office |
| Passaic | Main Post Office |
| | Wallington |
| Paterson | Haledon |
| | Hawthorne |
| | Main Post Office |
| | Park |
| | River Street |
| | South Patterson |
| | Totowa |
| Paulsboro | Main Post Office |
| Pennsville | Main Post Office |
| Pequannock | Main Post Office |
| Perth Amboy | Main Post Office |
| Phillipsburg | Main Post Office |
| Pine Beach | Main Post Office |
| Piscataway | Main Post Office |
| Pitman | Main Post Office |
| Plainfield | Main Post Office |
| | Muhlenberg |
| | Netherwood |
| Plainsboro | Main Post Office |
| Point Pleasant | Point Pleasant |
| | Point Pleasant Beach |
| | Point Pleasant Boro |
| Pompton Lakes | Main Post Office |
| Pompton Plains | Main Post Office |
| Port Monmouth | Main Post Office |
| Port Reading | Main Post Office |
| Princeton | Palmer Square |
| Rahway | Main Post Office |
| Raritan | Main Post Office |
| Red Bank | Fort Monmouth |
| | Main Post Office |
| Ridgefield | Main Post Office |
| Ridgefield Park | Main Post Office |
| Ridgewood | Main Post Office |
| Ringwood | Main Post Office |
| Rio Grande | Villas Carrier Annex |
| River Edge | Main Post Office |
| Riverdale | Main Post Office |
| Riverton | Main Post Office |
| Roebling | Main Post Office |
| Roseland | Main Post Office |
| Roselle | Main Post Office |
| Roselle Park | Main Post Office |
| Rumson | Main Post Office |
| | Sea Bright |
| Runnemede | Main Post Office |
| Rutherford | East Rutherford |
| | Main Post Office |
| | Wood-Ridge |
| Saddle Brook | Main Post Office |
| Sayreville | Main Post Office |
| Scotch Plains | Main Post Office |
| Sea Girt | Main Post Office |
| Sea Isle City | Main Post Office |
| Seaside Heights | Main Post Office |
| Seaside Park | Main Post Office |
| Secaucus | Main Post Office |
| Sewaren | Main Post Office |
| Short Hills | Main Post Office |
| Somerdale | Main Post Office |
| Somers Point | Linwood Annex |
| | Main Post Office |
| Somerset | Main Post Office |
| Somerville | Main Post Office |
| South Amboy | Laurence Harbor |
| | Main Post Office |
| South Bound Brook | Main Post Office |
| South Orange | Main Post Office |
| South Plainfield | Main Post Office |
| South River | Main Post Office |
| Spotswood | Main Post Office |
| Spring Lake | Main Post Office |
| Springfield | Main Post Office |
| Stirling | Main Post Office |
| Stone Harbor | Main Post Office |
| Stratford | Somerdale Carrier Annex |
| | Main Post Office |
| Succasunna | Main Post Office |
| Summit | Main Post Office |
| Teaneck | Main Post Office |
| Tenafly | Main Post Office |
| Trenton | Downtown |
| | Fort Dix |
| | Station E |
| | Villa Park |
| | West Trenton |
| Union | Main Post Office |
| Union City | Main Post Office |
| Vauxhall | Main Post Office |
| Ventor | Main Post Office |
| | Ventnor City |
| Waldwick | Main Post Office |
| Wanaque | Main Post Office |
| Wayne | Main Post Office |
| Wenonah | Main Post Office |
| West Long Branch | Main Post Office |
| West New York | Main Post Office |
| Westfield | Main Post Office |
| | Mountainside |
| Westwood | Main Post Office |
| | River Vale |
| Whippany | Main Post Office |
| Wildwood | Main Post Office |
| Willingboro | Main Post Office |
| Woodbridge | Main Post Office |

| | |
|---|---|
| Woodbury Heights | Woodbury Heights |
| Wyckoff | Main Post Office |

## New Mexico

| | |
|---|---|
| Albuquerque | Academy |
| | Airport Mail Facility |
| | Highland |
| | Highland Station |
| | Main Post Office |
| | Manzano |
| | Steve Schiff |
| | Uptown |
| Bloomfield | Main Post Office |
| Farmington | Main Post Office |
| Gallup | Main Post Office |
| Grants | Main Post Office |
| Hobbs | Main Post Office |
| Holloman AFB | Holloman Air Force Base |
| Las Cruces | White Sands |
| Los Alamos | Main Post Office |
| | White Rock |
| Raton | Main Post Office |
| Ruidoso | Main Post Office |
| Santa Rosa | Main Post Office |
| Silver City | Main Post Office |
| Socorro | Main Post Office |
| Taos | Main Post Office |
| Truth Or Consequences | Main Post Office |
| Tucumcari | Main Post Office |
| Tularosa | Main Post Office |

## Nevada

| | |
|---|---|
| Battle Mountain | Main Post Office |
| Boulder City | Main Post Office |
| Carson City | Main Post Office |
| | Ormsby |
| Elko | Aspen |
| | Spring Creek |
| Ely | Main Post Office |
| Las Vegas | Collections |
| | East Las Vegas |
| | Emerald |
| | Garside |
| | Huntridge |
| | King |
| | Paradise |
| | Red Rock Vista |
| | Spring Valley |
| | Strip Station |
| | Sunrise |
| | Topaz |
| | Winterwood |
| North Las Vegas | Main Post Office |
| Reno | Downtown |
| | Washington |
| Sparks | Main Post Office |
| Sun Valley | Main Post Office |
| Winnemucca | Main Post Office |

## New York

| | |
|---|---|
| Albany | Broderick Street Annex |
| | Henry Johnson Carrier Annex |
| | Main Post Office |
| | Terminal Street |
| Albertson | Main Post Office |
| Alfred | Main Post Office |
| Amityville | Main Post Office |
| Ardsley | Main Post Office |
| Armonk | Main Post Office |
| Arverne | Main Post Office |
| Atlantic Beach | Main Post Office |
| Babylon | Main Post Office |
| | North Babylon |
| Baldwin | Main Post Office |
| | Baldwin North |
| Bay Shore | Main Post Office |
| | Penataquit |
| Bayport | Main Post Office |
| Bayville | Main Post Office |
| Beacon | Main Post Office |
| Bedford Hills | Main Post Office |
| Bellerose | Main Post Office |
| Bellmore | Main Post Office |
| Bellmore North | Main Post Office |
| Bellport | Main Post Office |
| Bethpage | Main Post Office |
| Blauvelt | Main Post Office |
| Blue Point | Main Post Office |
| Bohemia | Main Post Office |
| Bowmansville | Main Post Office |
| Brentwood | Main Post Office |
| Briarcliff Manor | Main Post Office |
| Brightwaters | Main Post Office |
| Bronx | Baychester |
| | Boulevard |
| | City Island |
| | Co-op City |
| | Cornell |
| | Fordham |
| | GPO |
| | Highbridge |
| | HUB |
| | Hunts Point |
| | Jerome |
| | Kingsbridge |
| | Morris Heights |
| | Morrisania |
| | Mott Haven |
| | Parkchester |
| | Riverdale |
| | Soundview |
| | Throggs Neck |
| | Tremont |
| | Wakefield |
| | West Farms |
| | Westchester Square |
| | Williamsbridge |
| | Woodlawn |
| Brooklyn | Adelphi |
| | Bath Beach |
| | Bay Ridge |
| | Bay Station |
| | Blythebourne |
| | Brevoort |
| | Brownsville |
| | Bush Terminal |
| | Bushwick |
| | Cadman Plaza |
| | Canarsie |
| | Coney Island |
| | Dedicated Collections |
| | Dyker Heights |
| | East New York |
| | Flatbush |
| | Fort Hamilton |
| | Gravesend |
| | Green Point |
| | Homecrest |
| | Kensington |
| | Lefferts/James E Davis |
| | Metropolitan |
| | Midwood |
| | New Lots |
| | Parkville |
| | Pratt |
| | Red Hook |
| | Rugby |
| | Ryder |
| | Saint Johns |
| | Starret City/Spring Creek |
| | Stuyvesant/Chisholm |
| | Times Plaza |
| | Van Brunt |
| | Vanderveer |
| | Williamsburg |
| | Wyckoff |
| Buchanan | Main Post Office |
| Buffalo | Blasdell |
| | Central Park |
| | Cheektowaga |
| | Eastside |
| | Ellicott |
| | Hiler |
| | Kenmore |
| | Lackawanna |
| | Niagara Square |
| | Northside |
| | Southside |
| | West Seneca |
| | Westside |
| | Williamsville |
| Carle Place | Main Post Office |
| Cedarhurst | Main Post Office |
| Center Moriches | Main Post Office |
| Centereach | Main Post Office |
| Centerport | Main Post Office |
| Central Islip | Main Post Office |
| Chappaqua | Main Post Office |
| Cold Spring Harbor | Main Post Office |
| Commack | Main Post Office |
| Congers | Main Post Office |
| Copiague | Main Post Office |
| Coram | Main Post Office |
| Cornwall | Main Post Office |
| Cornwall On Hudson | Main Post Office |
| Deer Park | Main Post Office |
| Dobbs Ferry | Main Post Office |
| East Hampton | Main Post Office |
| East Islip | Main Post Office |
| East Meadow | Main Post Office |
| East Northport | Main Post Office |
| East Rochester | Main Post Office |
| East Rockaway | Main Post Office |
| East Setauket | Main Post Office |
| Elmont | Main Post Office |
| Elmsford | Annex |
| Endicott | Main Post Office |
| | Union Station |
| Far Rockaway | Arverne |
| | Main Post Office |
| Farmingdale | Farmingdale Annex |
| | Main Post Office |
| Farmingville | Main Post Office |
| Floral Park | Main Post Office |
| Flushing | Bayside |
| | Collection Unit |
| | College Point |
| | Corona |
| | East Elmhurst |
| | Elmhurst |
| | Forest Hills |
| | Fresh Meadows |
| | Kew Garden Hills |
| | Linden Hill |
| | Little Neck |
| | Main Post Office |
| | Maspeth |
| | Middle Village |
| | Oakland Gardens |
| | Rego Park |
| | Ridgewood |
| | Station A |
| | Whitestone |
| | Woodside |
| Franklin Square | Main Post Office |
| Freeport | Main Post Office |
| Garden City | Main Post Office |
| | Roosevelt Field Postal Facility |
| Garnerville | Main Post Office |
| Glen Cove | Main Post Office |
| Glen Head | Main Post Office |
| Glen Oaks | Glen Oaks |
| Glenwood Landing | Main Post Office |
| Grand Island | Main Post Office |
| Great Neck | Kings Point |
| | Main Post Office |
| | Old Village |
| Greenlawn | Main Post Office |
| Greenvale | Main Post Office |
| Hamburg | Main Post Office |
| Harrison | Main Post Office |
| Hartsdale | Main Post Office |
| Haverstraw | Main Post Office |
| Hawthorne | Main Post Office |
| Hempstead | Main Post Office |
| Hewlett | Main Post Office |
| Hicksville | Main Post Office |
| | Plainview |
| Holbrook | Main Post Office |
| Holtsville | Main Post Office |
| Huntington Station | Dix Hills |
| | Main Post Office |
| | Melville |
| Inwood | Main Post Office |
| Irvington | Main Post Office |
| Island Park | Main Post Office |
| Islip | Main Post Office |
| Islip Terrace | Main Post Office |
| Jackson Heights | Main Post Office |
| Jamaica | Archer Ave. |
| | Archie Spigner |
| | Cambria Heights |
| | Hollis |
| | Howard Beach |
| | JFK Airport |
| | Kew Gardens |
| | Main Post Office |
| | Ozone Park |
| | Queensvillage |
| | Richmond Hill |
| | Rochdale Village |
| | Rosedale |
| | South Ozone Park |
| | South Richmond Hill |
| | Springfield Gardens |
| | Woodhaven |
| Jericho | Main Post Office |
| Kings Park | Main Post Office |
| Lake Grove | Main Post Office |
| Lake Placid | Main Post Office |
| Larchmont | Main Post Office |
| Latham | Main Post Office |
| Lawrence | Main Post Office |
| Levittown | Main Post Office |
| Lindenhurst | Main Post Office |
| Liverpool | Bayberry |
| | Main Post Office |
| Locust Valley | Main Post Office |
| Long Beach | Main Post Office |
| Long Island City | Astoria |
| | Broadway |
| | Main Post Office |
| | Parcel Post |
| | Steinway |
| | Sunnyside |
| | Woolsey |
| Lynbrook | Main Post Office |
| Malverne | Main Post Office |
| Mamaroneck | Main Post Office |
| Manhasset | Main Post Office |
| Manhattan | Ansonia |
| | Audubon |
| | Bowling Green Annex |
| | Canal Street |
| | Cathedral |
| | Church Street |
| | College |
| | Colonial Park / HG Annex |
| | Cooper |
| | F.D.R. |
| | Fort George |
| | Gracie |
| | Grand Central |
| | Hamilton Grange |
| | Inwood |
| | James A. Farley |
| | Knickerbocker |
| | Lenox Hill |
| | Lenox Hill North & South |
| | Lincolnton |
| | Madison Square |
| | Manhattanville |
| | Midtown |
| | Morningside |
| | Murray Hill Annex |
| | Old Chelsea |

| | |
|---|---|
| | Oscar Garcia Rivera |
| | Peck Slip |
| | Peter Stuyvesant |
| | Planetarium |
| | Prince Street |
| | Radio City |
| | Roosevelt Island |
| | Times Square |
| | Times Square RCU Annex |
| | Triborough |
| | Trinity Annex |
| | Village |
| | Wall Street |
| | Washington Bridge/Sgt Ryan A.Tejad |
| Massapequa | Main Post Office |
| | North Massapequa |
| Massapequa Park | Main Post Office |
| Mastic | Main Post Office |
| Mastic Beach | Main Post Office |
| Maybrook | Main Post Office |
| Merrick | Bank Plaza |
| | Merrick |
| Mineola | Main Post Office |
| Minoa | Main Post Office |
| Monsey | Main Post Office |
| | Suffern Carrier Annex |
| Montrose | Main Post Office |
| Mount Vernon | Main Post Office |
| Nanuet | Main Post Office |
| Nesconset | Main Post Office |
| New City | Main Post Office |
| New Hyde Park | New Hyde Park Carrier Annex |
| New Rochelle | Main Post Office |
| | Pelham |
| | Wykagyl |
| New York Mills | Main Post Office |
| Niagara Falls | LaSalle |
| | Main Post Office |
| North Chili | Main Post Office |
| Northport | Main Post Office |
| Nyack | Main Post Office |
| Oakdale | Main Post Office |
| Oceanside | Main Post Office |
| Old Bethpage | Main Post Office |
| Orangeburg | Main Post Office |
| Ossining | Main Post Office |
| Patchogue | Main Post Office |
| Pearl River | Main Post Office |
| Pleasantville | Main Post Office |
| Port Chester | Main Post Office |
| Port Henry | Main Post Office |
| Port Jefferson | Port Jefferson Station |
| Port Washington | Main Post Office |
| Purchase | Main Post Office |
| Rochester | Beechwood |
| | Brighton |
| | Downtown |
| | Federal |
| | General Mail Facility |
| | Greece |
| | Irondequoit |
| | Lexington |
| | Midtown |
| | Panorama |
| | Ridgemont |
| | West Ridge |
| | Westgate |
| Rockaway Beach | Main Post Office |
| Rockaway Park | Main Post Office |
| Rockville Center | Main Post Office |
| Ronkonkoma | Main Post Office |
| Roosevelt | Main Post Office |
| Roslyn | Main Post Office |
| Roslyn Heights | Main Post Office |
| Rouses Point | Main Post Office |
| Rye | Main Post Office |
| Sayville | Main Post Office |
| Scarsdale | Carrier Annex |
| | Heathcote |
| | Main Post Office |
| Schenectady | Glenview |
| | Main Post Office |
| | Niskayuna |
| Sea Cliff | Main Post Office |
| Seaford | Main Post Office |
| Selden | Main Post Office |
| Sherrill | Main Post Office |
| Shirley | Main Post Office |
| Sidney | Main Post Office |
| Smithtown | Hauppage |
| | Industrial Park |
| | Main Post Office |
| Spring Valley | Main Post Office |
| Staten Island | Eltingville/South Shore Annex |
| | Great Kills |
| | Main Post Office GPO |
| | Mariner's Harbor |
| | New Dorp |
| | Port Richmond |
| | Prince's Bay/South Shore Annex |
| | Rosebank |
| | Saint George |
| | Stapleton |
| | Tottenville |
| | West Brighton (same as "West New") |
| Stony Brook | Main Post Office |
| Suffern | Main Post Office |

| | |
|---|---|
| Syosset | Main Post Office |
| Syracuse | Colvin |
| | Dewitt |
| | Franklin Square |
| | GMF/Carrier |
| | Teall |
| Tappan | Main Post Office |
| Tarrytown | Main Post Office |
| Thornwood | Main Post Office |
| Tonawanda | Main Post Office |
| Tupper Lake | Main Post Office |
| Uniondale | Main Post Office |
| Utica | Kernan |
| Valhalla | Main Post Office |
| Valley Stream | Main Post Office |
| Wantagh | Main Post Office |
| | Station A (North) |
| Warrensburg | Main Post Office |
| Washingtonville | Main Post Office |
| Waterford | Main Post Office |
| Watervliet | Main Post Office |
| West Hampton Beach | Main Post Office |
| West Haverstraw | Main Post Office |
| West Hempstead | Main Post Office |
| West Islip | Main Post Office |
| West Nyack | Main Post Office |
| West Point | Main Post Office |
| West Sayville | Main Post Office |
| Westbury | Main Post Office |
| White Plains | Main Post Office |
| | North White Plains |
| Williston Park | Main Post Office |
| Woodmere | Main Post Office |
| Wyandanch | Main Post Office |
| | Wheatly Heights |
| Yonkers | Bronxville |
| | Centuck |
| | East |
| | Greystone |
| | Hastings |
| | North |
| | South |
| | Tuckahoe |
| Yorkville | Main Post Office |

## Ohio

| | |
|---|---|
| Akron | Copley |
| | East Akron |
| | Ellet |
| | Firestone |
| | Five Points |
| | Kenmore |
| | Maple Valley |
| | North Hill |
| | South Arlington |
| Avon | Main Post Office |
| Avon Lake | Main Post Office |
| Barberton | Main Post Office |
| | Norton |
| Berea | Main Post Office |
| Brewster | Main Post Office |
| Brilliant | Main Post Office |
| Brunswick | Main Post Office |
| Campbell | Main Post Office |
| Canton | Country Fair |
| | Dueber |
| | Jackson Belden |
| | New Market |
| | North Canton |
| | Northeast Waterworks |
| Chagrin Falls | Main Post Office |
| Cincinnati | Anderson |
| | College Hill |
| | Corryville |
| | Groesbeck |
| | Lockland |
| | Mid City |
| | Mount Healthy |
| | Mount Washington |
| | Murray |
| | Norwood |
| | Parkdale |
| | Price Hill |
| | Saint Bernard |
| | Sharonville |
| | Sycamore |
| | Symmes |
| | Taft |
| | Walnut Hills |
| | Western Hills |
| | Westwood |
| Cleveland | Bay Village |
| | Beachland |
| | Beachwood |
| | Bedford |
| | Briggs |
| | Broadview Heights |
| | Brooklyn |
| | Brookpark |
| | Cleveland Heights |
| | Collinwood |
| | Cranwood |
| | Euclid |
| | Fairview Park |
| | Garfield Heights |
| | Glenville Bratenhal Station H |
| | GMF Carrier Unit |
| | Independence |
| | Lakewood |
| | Lyndhurst/Mayfield |
| | Maple Heights |
| | Midpark |
| | Newburgh |
| | Noble |
| | North Royalton |
| | Parma |
| | Pearlbrook |
| | Puritas Park |
| | Richmond Heights |
| | Rocky River |
| | Shaker Heights |
| | Solon |
| | South Euclid |
| | Station A |
| | Station B & C |
| | Strongsville |
| | University Center/East Cleveland |
| | Westlake |
| | Westpark |
| Columbus | Beechwold |
| | Bexley |
| | Central Point |
| | Clintonville |
| | Columbus |
| | Eastland |
| | German Village |
| | Hilltop Carrier Unit |
| | Linden |
| | Livingston |
| | Mount Vernon Carrier Unit |
| | Northeast |
| | Northland |
| | Northwest |
| | Oakland Park |
| | Olde Towne Carrier Unit |
| | Polaris Carrier Unit |
| | Rickenbacker Carrier Unit |
| | Shepard Carrier Unit |
| | Short North Carrier Unit |
| | South Columbus |
| | Tri Village Carrier Unit |
| | University |
| | Upper Arlington |
| | West Worthington |
| | Whitehall |
| | Worthington |
| Cuyahoga Falls | Main Post Office |
| | Stow |
| Dayton | Beavercreek |
| | Dabel |
| | Dayton View |
| | Forest Park |
| | Huber Heights |
| | Kettering |
| | North Dayton |
| | Northridge |
| | P.L.Dunbar |
| | Trotwood |
| | West Carrollton |
| | Wright Brothers |
| | Wright Patterson Air Force Base |
| Girard | Main Post Office |
| Hamilton | Fairfield |
| | Lindenwald |
| | Rossville |
| Hudson | Main Post Office |
| Kent | Main Post Office |
| Lorain | Annex |
| | Main Post Office |
| Macedonia | Northfield |
| McDonald | Main Post Office |
| Miamisburg | Main Post Office |
| Munroe Falls | Main Post Office |
| Niles | Main Post Office |
| North Olmsted | Main Post Office |
| Northfield | Main Post Office |
| Olmstead Falls | Main Post Office |
| Sebring | Main Post Office |
| South Lebanon | Main Post Office |
| Struthers | Main Post Office |
| Tallmadge | Main Post Office |
| Terrace Park | Main Post Office |
| The Plains | Main Post Office |
| Tiltonsville | Main Post Office |
| Toledo | Central Station |
| | Franklin Park |
| | Kenwood |
| | Manhattan Plaza |
| | Midtown |
| | Old West End |
| | Point Place |
| | Reynolds Corners |
| | Rossford |
| | South Toledo |
| | Station A |
| | Wernert |
| | West Toledo |
| Twinsburg | Main Post Office |
| Warren | Annex |
| | Warren West |
| Westerville | Main Post Office |
| Wickliffe | Main Post Office |
| Yorkville | Main Post Office |
| Youngstown | Austintown |
| | Boardman |
| | Cornersburg |
| | Main Post Office |
| | Poland |
| | Youngstown North |

## Oklahoma

| | |
|---|---|
| Bethany | Main Post Office |
| Commerce | Main Post Office |
| Enid | Enid Air Force Base |
| Hartshorne | Main Post Office |
| Healdton | Main Post Office |
| Norman | Norman college drop by city carrier |
| Oklahoma City | 39th Street |
| | Center City |
| | Farley |
| | Martin Luther King Jr |
| | Midwest City |
| | Northwest |
| | Shartel |
| Picher | Main Post Office |
| Tulsa | Donaldson |
| | Downtown Station |
| | Robert W Jenkins |
| | Sheridan |

## Oregon

| | |
|---|---|
| Beaverton | Main Post Office |
| | Evergreen Detached Carrier Unit |
| Bend | Main Post Office |
| Burns | Main Post Office |
| Eugene | Main Post Office |
| John Day | Main Post Office |
| Lake Oswego | Lake Grove |
| | Main Post Office |
| Lakeview | Main Post Office |
| Myrtle Point | Main Post Office |
| Newport | Main Post Office |
| Portland | Cherry Blossom |
| | Creston |
| | East Portland |
| | Forest Park |
| | Holladay Park |
| | Kenton |
| | Lents |
| | Multnomah |
| | Oak Grove |
| | Park Rose |
| | Piedmont |
| | Rose City Park |
| | Sellwood Detached Carrier Unit |
| | University |
| | West Slope |
| Reedsport | Main Post Office |
| Salem | Main Post Office - Collections only |
| Seaside | Main Post Office |
| Vernonia | Main Post Office |

## Pennsylvania

| | |
|---|---|
| Abington | Main Post Office |
| Akron | Main Post Office |
| Aliquippa | Main Post Office |
| Allison Park | Main Post Office |
| Ambridge | Main Post Office |
| Archbald | Main Post Office |
| Ardmore | Main Post Office |
| Bala Cynwyd | Main Post Office |
| Beaver Falls | Main Post Office |
| Bensalem | Bensalem/Cornwell Heights |
| | Main Post Office |
| Bethel Park | Main Post Office |
| Brackenridge | Main Post Office |
| Braddock | Main Post Office |
| Bridgeville | Main Post Office |
| Bristol | Main Post Office |
| Broomall | Main Post Office |
| Bryn Mawr | Main Post Office |
| Burnham | Main Post Office |
| Camp Hill | Main Post Office |
| Catasauqua | Main Post Office |
| Chester | Main Post Office |
| Cheswick | Main Post Office |
| Clairton | Main Post Office |
| Clifton Heights | Main Post Office |
| Coaldale | Main Post Office |
| Conshohocken | Conshohocken Carrier Annex |
| | Main Post Office |
| Conway | Main Post Office |
| Creighton | Main Post Office |
| Cresson | Main Post Office |
| Cressona | Main Post Office |
| Darby | Main Post Office |
| Delmont | Main Post Office |
| Donora | Main Post Office |
| Dravosburg | Main Post Office |
| Drexel Hill | Main Post Office |
| | Pilgrim Gardens |
| Duquesne | Main Post Office |
| East McKeesport | Main Post Office |
| East Petersburg | Main Post Office |
| East Pittsburgh | East Pittsburgh |
| Elkins Park | Main Post Office |
| Enola | Main Post Office |
| Erie | Downtown |
| | South Erie |
| Essington | Main Post Office |
| Exton | Main Post Office |
| Fairchance | Main Post Office |
| Farrell | Main Post Office |
| Flourtown | Main Post Office |
| Folcroft | Main Post Office |
| Folsom | Main Post Office |
| Fort Washington | Main Post Office |
| Gallitzin | Main Post Office |
| Girardville | Main Post Office |
| Gladwyne | Main Post Office |
| Glassport | Main Post Office |
| Glen Lyon | Main Post Office |
| Glenolden | Main Post Office |
| Glenshaw | Main Post Office |
| Glenside | Main Post Office |
| Gwynedd | Main Post Office |
| Harrisburg | Keystone |
| | Steelton |
| | Uptown |
| Hatboro | Main Post Office |
| Hatfield | Main Post Office |
| Haverford | Main Post Office |
| Havertown | Main Post Office |
| Herminie | Main Post Office |
| Highspire | Main Post Office |
| Homestead | Main Post Office |
| Horsham | Main Post Office |
| Houston | Main Post Office |
| Huntingdon Valley | Main Post Office |
| Jenkintown | Main Post Office |
| Jessup | Main Post Office |
| Kulpmont | Main Post Office |
| Lafayette Hill | Main Post Office |
| Landisville | Main Post Office |
| Lansdowne | Main Post Office |
| Lansford | Main Post Office |
| Leetsdale | Main Post Office |
| Lemoyne | Main Post Office |
| Levittown | Main Post Office |
| Lyndora | Main Post Office |
| Mahanoy City | Main Post Office |
| Marcus Hook | Main Post Office |
| Matamoras | Main Post Office |
| McAdoo | Main Post Office |
| McKees Rocks | Main Post Office |
| McKeesport | Main Post Office |
| McSherrystown | Main Post Office |
| Media | Main Post Office |
| Merion Station | Main Post Office |
| Minnersville | Main Post Office |
| Monaca | Main Post Office |
| Monessen | Main Post Office |
| Monroeville | Main Post Office |
| Morrisville | Main Post Office |
| Morton | Main Post Office |
| Mount Carmel | Main Post Office |
| Mount Holly Springs | Main Post Office |
| Mount Pocono | Main Post Office |
| Mountville | Main Post Office |
| Nanticoke | Main Post Office |
| Narberth | Main Post Office |
| New Philadelphia | Main Post Office |
| Newtown Square | Main Post Office |
| Norristown | King of Prussia Annex |
| | Main Post Office |
| North Versailles | Main Post Office |
| Norwood | Main Post Office |
| Oakmont | Main Post Office |
| Oreland | Main Post Office |
| Paoli | Paoli Carrier Annex |
| | Paoli/Berwyn |
| Peckville | Main Post Office |
| Philadelphia | Boulevard |
| | Bustleton |
| | Cheltenham |
| | David P Richardson |
| | East Falls |
| | East Germantown |
| | Fairmont |
| | Foxchase |
| | Frankford |
| | Kensington |
| | Kingsessing |
| | Logan |
| | Main Office - Mid City |
| | Manayunk |
| | Market Square |
| | North Philadelphia |
| | Olney |
| | Over Brook |
| | Pascall |
| | Point Breeze |
| | Richmond |
| | Roxanne Jones |
| | Roxborough |
| | Schuylkill |
| | Southwark |
| | Spring Garden |
| | Tacony |
| | Torresdale |
| | West Market |
| | West Park |
| | William Penn Annex |
| Pittsburgh | Allegheny |
| | Arsenal |
| | Bellevue |
| | Blawnox |
| | Bloomfield |
| | Brentwood |
| | Brookline |
| | Carson |
| | Castle Shannon |
| | Cedarhurst |
| | Collections |
| | Crafton |
| | East Liberty |
| | Etna |
| | Grant Street |
| | Hazelwood |
| | Homewood |
| | Kilbuck |
| | Mc Knight |
| | Millvale |
| | Mount Lebanon |
| | Mount Oliver |
| | Mount Washington |
| | Oakland |
| | Observatory |
| | Penn Hills |
| | Pleasant Hills |
| | Plum |
| | Shadyside |
| | Sharpsburg |
| | South Hills |
| | Squirrel Hill |
| | Swissvale |
| | Upper Saint Clair |
| | West Mifflin |
| | West View |
| | Wilkinsburg |
| | Woods Run |
| | Woods Run Annex |
| Plymouth Meeting | Main Post Office |
| Port Carbon | Main Post Office |
| Presque Isle | Main Post Office |
| Prospect Park | Main Post Office |
| Reading | Downtown |
| | Wyomissing |
| Ridley Park | Main Post Office |
| Royersford | Main Post Office |
| Saint Clair | Main Post Office |
| Scranton | Dunmore |
| Sharon | Main Post Office |
| Sharon Hill | Main Post Office |
| Shenandoah | Main Post Office |
| Shrewsbury | Main Post Office |
| Southampton | Main Post Office |
| Springdale | Main Post Office |
| State College | Main Post Office |
| Swarthmore | Main Post Office |
| Sykesville | Main Post Office |
| Topton | Main Post Office |
| Tremont | Main Post Office |
| Trevorton | Main Post Office |
| Turtle Creek | Main Post Office |
| Upper Darby | Main Post Office |
| Verona | Main Post Office |
| Villanova | Main Post Office |
| Warminster | Main Post Office |
| Warrington | Main Post Office |
| Wayne | Main Post Office |
| Whitehall | Main Post Office |
| Willow Grove | Main Post Office |
| Wilmerding | Main Post Office |
| Wind Gap | Main Post Office |
| Woodlyn | Main Post Office |
| Wyncote | Main Post Office |
| Wynnewood | Main Post Office |
| Youngwood | Main Post Office |

## Puerto Rico

| | |
|---|---|
| Adjuntas | Main Post Office |
| Aguada | Main Post Office |
| Aguadilla | Main Post Office |
| | Ramey/ Parcel Post |
| Aguas Buenas | Main Post Office |
| Aibonito | Main Post Office |
| Arecibo | Main Post Office |
| Arroyo | Main Post Office |
| Barceloneta | Main Post Office |
| Barranquitas | Main Post Office |
| Bayamon | Main Post Office |
| | Main Post Office |
| Cabo Rojo | Main Post Office |
| Caguas | Main Post Office |
| Camuy | Main Post Office |
| Canovanas | Main Post Office |
| Carolina | Main Post Office |
| | Roberto Clemente |
| Cayey | Main Post Office |
| Ceiba | Main Post Office |
| Ciales | Main Post Office |
| Cidra | Main Post Office |
| Coamo | Main Post Office |
| Comerio | Main Post Office |
| Corozal | Main Post Office |
| Coto Laurel | Main Post Office |
| Dorado | Main Post Office |
| Ensenada | Main Post Office |
| Fajardo | Main Post Office |
| Florida | Main Post Office |
| Guanica | Main Post Office |
| Guayanilla | Main Post Office |
| Guaynabo | Main Post Office |
| Gurabo | Main Post Office |
| Hattillo | Main Post Office |
| Hormigueros | Main Post Office |
| Humacao | Main Post Office |
| Jayuya | Main Post Office |
| Juana Diaz | Main Post Office |
| Juncos | Main Post Office |
| Lajas | Main Post Office |
| Lares | Main Post Office |
| Las Piedras | Main Post Office |

| | |
|---|---|
| Levittown | Main Post Office |
| Loiza | Main Post Office |
| Luquillo | Main Post Office |
| Maunabo | Main Post Office |
| Mayaguez | Main Post Office |
| | Marina Station |
| Mercedita | Main Post Office |
| Moca | Main Post Office |
| Morovis | Main Post Office |
| Naguabo | Main Post Office |
| Naranjito | Main Post Office |
| Orocovis | Main Post Office |
| Patillas | Main Post Office |
| Penuelas | Main Post Office |
| Ponce | Atocha |
| | Main Post Office |
| Puerto Real | Main Post Office |
| Quebradillas | Main Post Office |
| Rincon | Main Post Office |
| Sabana Grande | Main Post Office |
| Salinas | Main Post Office |
| San Antonio | Main Post Office |
| San German | Main Post Office |
| San Juan | 65th Infantry |
| | Barrio Obrero |
| | Bayamon Gardens |
| | Caparra Heights |
| | Catano |
| | Fernandez Juncos |
| | GPO Delivery & Collections |
| | Hato Rey |
| | Loiza Street |
| | Loiza Street CCU |
| | Main Post Office |
| | Mows San Juan |
| | Old San Juan |
| | Puerta de Tierra |
| | Rio Piedras |
| San Lorenzo | Main Post Office |
| San Sebastain | Main Post Office |
| Santa Isabel | Main Post Office |
| Toa Alta | Main Post Office |
| Toa Baja | Levittown |
| | Main Post Office |
| Trujillo Alto | Main Post Office |
| Utuado | Main Post Office |
| Vega Alta | Main Post Office |
| Vega Baja | Main Post Office |
| Vieques | Main Post Office |
| Villalba | Main Post Office |
| Yabucoa | Main Post Office |
| Yauco | Main Post Office |

### Rhode Island

| | |
|---|---|
| Barrington | Main Post Office |
| Greenville | Main Post Office |
| Manville | Main Post Office |
| Newport | Broadway |
| | Main Post Office |
| Pawtucket | Central Falls |
| | Darlington |
| | Lincoln |
| | Main Post Office |
| Providence | Annex |
| | Corliss Park St-Centerdale |
| | Corliss Park St-East Side |
| | Corliss Park St-GPO-4 |
| | Corliss Park St-Special Delivery |
| | East Bay St-East Providence |
| | East Bay St-Riverside |
| | East Bay St-Rumford |
| | Elmwood St-Cranston |
| | Elmwood St-Edgewood |
| | Garden City |
| | North Station |
| | Olneyville |
| Wakefield | Kingston |
| Warwick | Main Post Office |
| | Pilgrim Carriers |
| West Warwick | Main Post Office |
| Woonsocket | Main Post Office |

### South Carolina

| | |
|---|---|
| Charleston | Cross Country Branch - AFB |
| | East Bay |
| Clemson | Main Post Office |
| | Clemson University—Collection |
| Columbia | Dutch Fork |
| | Edgewood |
| | Five Points Annex |
| | Forest Acres |
| | Main Post Office |
| Isle of Palms | Isle of Palms |
| Joanna | Main Post Office |
| Mauldin | Main Post Office |
| Myrtle Beach | Live Oak |
| New Ellenton | Main Post Office |
| Port Royal | Main Post Office |
| Sumter | Shaw Air Force Base |

### South Dakota

| | |
|---|---|
| Deadwood | Main Post Office |
| Lead | Main Post Office |
| Lemmon | Main Post Office |
| Pierre | Main Post Office |

### Tennessee

| | |
|---|---|
| Alcoa | Main Post Office |
| Chattanooga | Brainerd |
| | Downtown |
| | East Chattanooga |
| | East Lake |
| | East Ridge |
| | Eastgate |
| | Highland Park |
| | Red Bank |
| Knoxville | Downtown Knoxville |
| | North Station |
| Madison | Main Post Office |
| | Binghamton/Hollywood |
| | Crosstown Carrier Annex |
| | Desoto Carrier Annex |
| | East/Lamar Carrier Annex |
| | Front Street |
| | Highland Heights |
| | Holiday City |
| | Mendenhall |
| | North Memphis |
| | White |
| | Whitehaven |
| Nashville | Acklen |
| | Arcade |
| | Belle Meade |
| | Church Street |
| | Donelson |
| | East Nashville |
| | Glenview |
| | Green Hills |
| | Jere Baxter |
| | Melrose |
| | Northeast |
| | South Nashville |
| | Woodbine |
| Oakridge | Main Post Office |

### Texas

| | |
|---|---|
| Addison | Main Post Office |
| Alpine | Main Post Office |
| Andrews | Main Post Office |
| Arlington | Main Post Office |
| | Oakwood |
| | Watson Community |
| Austin | Balcones |
| | Central Park |
| | Downtown |
| | East Austin |
| | North Austin |
| | Northcross |
| | Northeast Austin |
| | South Congress |
| | Southeast |
| | University |
| Beaumont | General Mail Facility |
| Bedford | Main Post Office |
| Bellaire | Main Post Office |
| Big Lake | Main Post Office |
| Borger | Main Post Office |
| Bridge City | Main Post Office |
| Canadian | Main Post Office |
| Carrizo Springs | Main Post Office |
| Carrollton | Main Post Office |
| Channelview | Main Post Office |
| Clute | Main Post Office |
| Corpus Christi | Downtown |
| | Lamar |
| | Roy Miller |
| | Six Points |
| | Stonewall |
| Cotulla | Main Post Office |
| Crane | Main Post Office |
| Crystal City | Main Post Office |
| Dalhart | Main Post Office |
| Dallas | Airlawn |
| | Brookhollow |
| | Downtown |
| | Dr Caesar A W Clark Sr |
| | Farmers Branch |
| | Hamilton Park/ Price |
| | Inwood |
| | Juanita Craft |
| | Lake Highlands |
| | Lakewood |
| | Medrano |
| | Northaven |
| | Northwest |
| | Oaklawn |
| | Parkdale |
| | Pleasant Grove |
| | Preston |
| | Richland |
| | Robert E Price |
| | Spring Valley |
| | Station A |
| | University |
| | Vickery |
| | White Rock |
| Deer Park | Main Post Office |
| Del Rio | Main Post Office |
| Denver City | Main Post Office |
| Dimmitt | Main Post Office |
| Dumas | Main Post Office |
| Duncanville | Main Post Office |
| Eagle Pass | Main Post Office |
| El Paso | Downtown |
| | Five Points |
| | Fort Bliss Branch |
| | Mesa Hills |
| | Northgate |
| | Pebble Hills |
| | Ranchland |
| | Summit Heights |
| | Sunrise |
| | Washington Park |
| | Ysleta |
| Fort Hood | Main Post Office |
| Fort Worth | Downtown |
| | Eighth Avenue |
| | Haltom City |
| | Oaks |
| | Polytechnic |
| | Ridglea |
| | Riverside |
| | Stockyards |
| | Trinity River |
| Friendswood | Main Post Office |
| Friona | Main Post Office |
| Galena Park | Main Post Office |
| Galveston | Bob Lyons |
| | Main Post Office |
| Garland | Kingsley |
| | Main Post Office |
| | North Garland |
| | South Garland |
| Grand Prairie | Main Post Office |
| Groves | Main Post Office |
| Hebbronville | Main Post Office |
| Hidalgo | Main Post Office |
| Highlands | Main Post Office |
| Houston | Albert Thomas |
| | Anson Jones |
| | Ashford West |
| | Astrodome |
| | Beechnut |
| | Cornerstone |
| | De Moss |
| | Debora Sue Shatz |
| | Denver Harbor |
| | East Houston |
| | Eastwood |
| | Fleetwood |
| | Foster Place |
| | Genoa |
| | Granville Elder |
| | Greenbriar |
| | Irvington |
| | Jensen |
| | John Dunlap |
| | Julius Melcher |
| | Long Point |
| | Martin Luther King |
| | Medical Center |
| | Memorial Park |
| | Nassau Bay |
| | North Shepherd |
| | Oak Forest |
| | Park Place |
| | Rich Hill |
| | River Oaks |
| | Roy Royal |
| | Sage |
| | Sam Houston |
| | South Post Oak |
| | Southmore |
| | T W House |
| | University |
| | Westbrae |
| | Westbury |
| | William Rice |
| | Windmill |
| Irving | Downtown |
| | Valley Ranch |
| Junction | Main Post Office |
| Katy | Katy Annex |
| | Main Post Office |
| Keene | Main Post Office |
| Kermit | Main Post Office |
| La Marque | Main Post Office |
| Lake Jackson | Main Post Office |
| Laredo | Downtown |
| Llano | Main Post Office |
| Lubbock | Monterey |
| Monahans | Main Post Office |
| Pasadena | D L Atkinson |
| | Main Post Office |
| Pearsall | Main Post Office |
| Pecos | Main Post Office |
| Plano | Coit Station |
| Port Isabel | Port Isabel |
| Port Neches | Main Post Office |
| Richardson | Huffhines |
| Rockport | Main Post Office |
| San Antonio | Airmail Facility/Wainwright |
| | Alamo Heights |
| | Arsenal |
| | Beacon Hill |
| | Cedar Elm |
| | Cresthaven |
| | Downtown |
| | Fort Sam Houston |
| | Hackberry |
| | Laurel Heights |
| | Lockhill |
| | Los Jardineres |
| | Nimitz |

| | |
|---|---|
| | North Broadway |
| | Serna |
| | South Texas Medical Center |
| | Thousand Oaks |
| | University Park |
| | Valley Hi |
| San Diego | Main Post Office |
| Seminole | Main Post Office |
| Sonora | Main Post Office |
| South Houston | Main Post Office |
| South Padre Island | Main Post Office |
| Spearman | Main Post Office |
| Spring | Main Post Office |
| | Panther Creek |
| | Woodlands |
| Stafford | Main Post Office |
| Universal City | Main Post Office |
| Uvalde | Main Post Office |
| Waco | Westview |
| Webster | Main Post Office |
| Zapata | Main Post Office |

## Utah

| | |
|---|---|
| Bingham Canyon | Main Post Office |
| Blanding | Main Post Office |
| Bountiful | Main Post Office |
| Clearfield | Clearfield (Hill AFB) |
| Dugway | Main Post Office |
| Ephraim | Main Post Office |
| Hurricane | Main Post Office |
| Hyrum | Main Post Office |
| Kanab | Main Post Office |
| Logan | Logan Northside |
| Magna | Main Post Office |
| Manti | Main Post Office |
| Midvale | Main Post Office |
| Moab | Main Post Office |
| Mount Pleasant | Main Post Office |
| Nephi | Main Post Office |
| Ogden | Mount Ogden |
| Orem | Main Post Office |
| | Mountain Shadows |
| Provo | East Bay |
| Salt Lake City | "Collections only, no delivery" |
| | Cottonwood |
| | Custer Annex |
| | Downtown |
| | Foothill |
| | Holliday |
| | Millcreek |
| | Murray |
| | Northwest |
| | South Salt Lake |
| | Sugarhouse |
| Salina | Main Post Office |

## Virginia

| | |
|---|---|
| Alexandria | Belleview |
| | Community |
| | Engleside |
| | Franconia |
| | Jefferson Manor |
| | Kingstowne |
| | Lincolnia |
| | Main Post Office |
| | Memorial Annex |
| | Park Fairfax |
| | Trade Center |
| Annandale | Main Post Office |
| Appalachia | Main Post Office |
| Arlington | Buckingham |
| | Eads |
| | Forte Myer (del out of 22201) |
| | Main Post Office |
| | North |
| | Preston King |
| | Rosslyn |
| | Shirlington Annex |
| | South |
| Chesapeake | Indian River |
| | South Norfolk |
| Collinsville | Collinsville |
| Fairfax | Turnpike |
| Falls Church | Baileys |
| | Main Post Office |
| | Mosby |
| Fort Belvoir | Fort Belvoir |
| Hampton | Langley AFB |
| | Main Post Office |
| | Phoebus |
| | Poquoson |
| McLean | McLean |
| Newport News | Denbigh |
| | Fort Eustis |
| | Hidenwood |
| | Main Post Office |
| | Parkview |
| | Patrick Henry |
| | Warwick |
| Norfolk | Berkley |
| | Debree |
| | Lafayette |
| | LC Page (Naval Amphibian Base) |
| | Milan |
| | Norview |
| | Ocean View |
| | Paige |
| | Wright |
| | Thomas Corner |
| Portsmouth | Churchland |
| | Main Post Office |
| Quantico | Quantico |
| Reston | Main Post Office |
| Richlands | Main Post Office |
| Richmond | Ampthill |
| | Bon Air |
| | Stewart |
| | Bellevue |
| | Capital |
| | East End |
| | Forest Hill |
| | Lakeside |
| | Northside |
| | Pocoshock Creek |
| | Regency |
| | Saunders |
| | Southside |
| | West End |
| | Westhampton |
| Roanoke | Grandin |
| | Melrose |
| Springfield | Burke |
| | Main Post Office |
| | North Springfield |
| | West Springfield |
| Suffolk | Driver |
| Virginia Beach | Acredale Annex |
| | Bayside |
| | London Bridge |
| | Lynnhaven |
| | Seapines |
| | Witchduck |
| Wallops Island | Main Post Office |
| Woodbridge | Dale City |
| | Main Post Office |

## Virgin Islands

| | |
|---|---|
| Saint Thomas | Charlotte Amaile |

## Vermont

| | |
|---|---|
| Bellows Falls | North Walpole New Hampshire |
| Burlington | North Burlington |
| | Pine Street |
| | South Burlington |
| | Winooski |

## Washington

| | |
|---|---|
| Auburn | Federal Way |
| | Twin Lakes |
| Bellevue | Crossroads |
| | Midlakes |
| Bellingham | Main Post Office |
| Bothell | Main Post Office |
| Cle Elum | Main Post Office |
| College Place | Main Post Office |
| Coulee Dam | Main Post Office |
| Edmonds | Main Post Office |
| | Perrinville |
| Fairchild | Fairchild Air Force Base |
| Kent | Carrier Annex |
| | Main Post Office |
| Kirkland | Main Post Office |
| Lynnwood | Main Post Office |
| Mercer Island | Main Post Office |
| Olympia | Tumwater |
| Port Townsend | Main Post Office |
| Redmond | Main Post Office |
| Renton | Downtown |
| | Highland |
| | Main Post Office |
| Ritzville | Main Post Office |
| Seattle | Ballard |
| | Bitter Lake |
| | Broadway |
| | Burien |
| | Columbia |
| | Des Moines |
| | East Union |
| | Georgetown |
| | Interbay |
| | International |
| | Lake City |
| | Midtown |
| | North City |
| | Queen Anne |
| | Riverton Heights |
| | Skyway |
| | Terminal Operations (Collections) |
| | Tukwila/Riverton Heights |
| | University |
| | Wallingford |
| | Wedgwood |
| | West Seattle |
| | Westwood |
| Spokane | Hays Park |
| | Manito |
| | Metro Carrier Annex |
| | Riverside |
| | Shadle |
| Tacoma | 6th Avenue |
| | Fort Lewis |
| | Lakewood |
| | Lincoln |
| | Parkland |
| | Proctor |
| | Tacoma Central Carrier Facility |
| | Tacoma/University Place |
| | Tacoma/Steilacoom |
| Vancouver | Downtown |
| Yakima | Central |

## Wisconsin

| | |
|---|---|
| Brookfield | Main Post Office |
| Butler | Main Post Office |
| Cudahy | Main Post Office |
| Elm Grove | Main Post Office |
| Greendale | Main Post Office |
| Hales Corners | Main Post Office |
| Kimberly | Main Post Office |
| Little Chute | Main Post Office |
| Madison | Capitol Carrier Annex |
| | Hilldale |
| | Southside |
| | University |
| Milwaukee | Doctor Martin Luther King |
| | Hilltop |
| | Juneau |
| | Mid City |
| | North Milwaukee |
| | North Shore |
| | Park Lawn |
| | Shorewood |
| | Teutonia |
| | Tuckaway |
| | Wauwatosa |
| | West Allis |
| | West Milwaukee |
| | Western |
| | Bay View/Saint Francis |
| | Bradley Carrier Annex |
| | Fred John |
| | Greenfield |
| | Hampton |
| New Berlin | Main Post Office |
| Oak Creek | Main Post Office |
| Port Edwards | Main Post Office |
| Racine | West Racine |
| South Milwaukee | Main Post Office |

## West Virginia

| | |
|---|---|
| Belle | Main Post Office |
| Benwood | Main Post Office |
| Charleston | Cross Lanes |
| | South Charleston |
| | Stonewall |
| | Venable |
| Dunbar | Main Post Office |
| Follansbee | Main Post Office |
| Gassaway | Main Post Office |
| Glendale | Main Post Office |
| Huntington | Main Post Office |
| Logan | Main Post Office |
| Madison | Main Post Office |
| Man | Main Post Office |
| McMechan | Main Post Office |
| Montgomery | Main Post Office |
| Moorefield | Main Post Office |
| Morgantown | Main Post Office |
| Mullens | Main Post Office |
| Newell | Main Post Office |
| Nitro | Main Post Office |
| Paden City | Main Post Office |
| Petersburg | Main Post Office |
| Piedmont | Piedmont |
| Rainelle | Main Post Office |
| Richwood | Main Post Office |
| Romney | Main Post Office |
| Webster Springs | Main Post Office |
| Welch | Main Post Office |
| White Sulfur Spring | Main Post Office |
| Williamson | "Serves S. Williamson, KY" |

## Wyoming

| | |
|---|---|
| Casper | Main Post Office |
| Gillette | Main Post Office |
| Greybull | Main Post Office |
| Kemmerer | Main Post Office |
| Lander | Main Post Office |
| Laramie | Carrier Annex |
| New Castle | Main Post Office |
| Rawlins | Main Post Office |
| Rock Springs | Main Post Office |
| Thermopolis | Main Post Office |

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 362 of 472. PageID #: 1180

Page 32-16 NALC-USPS Joint Contract Administration Manual - July 2014

USPS000902

# ARTICLE 33 PROMOTIONS

33.1

**Section 1. General Principles**

The Employer agrees to place particular emphasis upon career advancement opportunities. First opportunity for promotions will be given to qualified career employees. The Employer will assist employees to improve their own skills through training and self-help programs, and will continue to expand the Postal Employee Development Center concept.

**Principles.** Article 33.1 requires that the Postal Service provide qualified career employees the opportunity for promotions prior to hiring new employees. Furthermore, this section obligates the Postal Service to assist employees seeking advancement through training and self-help programs.

33.2

**Section 2. Craft Promotions**

When an opportunity for promotion to a craft position exists in an installation, an announcement shall be posted on official bulletin boards soliciting applications from employees of the appropriate craft. Craft employees meeting the qualifications for the position shall be given first consideration. Qualifications shall include, but not be limited to, ability to perform the job, merit, experience, knowledge, and physical ability. Where there are qualified applicants, the best qualified applicant shall be selected; however, if there is no appreciable difference in the qualifications of the best of the qualified applicants and the Employer selects from among such applicants, seniority shall be the determining factor. Written examinations shall not be controlling in determining qualifications. If no craft employee is selected for the promotion, the Employer will solicit applications from all other qualified employees within the installation.

Promotions to positions enumerated in the craft Article of this Agreement shall be made in accordance with such Article by selection of the senior qualified employee bidding for the position.

**Craft Promotions.** The second paragraph of Article 33.2 provides that all letter carrier craft positions must be filled by seniority, in accordance with the provisions of Article 41.

There are no "best qualified" positions in the letter carrier craft, so the first paragraph of Section 2 does not apply to the filling of letter carrier craft positions. However, it does apply to letter carriers seeking "best qualified" positions in other crafts.

33.3

**Section 3. Examinations**

When an examination is given, there shall be no unreasonable limitation on the number of examinations that may be taken by an applicant.

**Examinations.** Management may not unreasonably limit the number of examinations an employee applicant may take.  However, it does not require management to allow employees to take examinations on the clock.

# ARTICLE 34 WORK AND/OR TIME STANDARDS

A. The principle of a fair day's work for a fair day's pay is recognized by all parties to this Agreement.

B. The Employer agrees that any work measurement systems or time or work standards shall be fair, reasonable and equitable. The Employer agrees that the Union concerned through qualified representatives will be kept informed during the making of time or work studies which are to be used as a basis for changing current or instituting new work measurement systems or work or time standards. The Employer agrees that the National President of the Union may designate a qualified representative who may enter postal installations for purposes of observing the making of time or work studies which are to be used as the basis for changing current or instituting new work measurement systems or work or time standards.

C. The Employer agrees that before changing any current or instituting any new work measurement systems or work or time standards, it will notify the Union concerned as far in advance as practicable. When the Employer determines the need to implement any new nationally developed and nationally applicable work or time standards, it will first conduct a test or tests of the standards in one or more installations. The Employer will notify the Union at least 15 days in advance of any such test.

D. If such test is deemed by the Employer to be satisfactory and it subsequently intends to convert the test to live implementation in the test cities, it will notify the Union at least 30 days in advance of such intended implementation. Within a reasonable time not to exceed 10 days after the receipt of such notice, representatives of the Union and the Employer shall meet for the purpose of resolving any differences that may arise concerning such proposed work measurement systems or work or time standards.

E. If no agreement is reached within five days after the meetings begin, the Union may initiate a grievance at the national level. If no grievance is initiated, the Employer will implement the new work or time standards at its discretion.

If a grievance is filed and is unresolved within 10 days, and the Union decides to arbitrate, the matter must be submitted to priority arbitration by the Union within five days. The conversion from a test basis to live implementation may proceed in the test cities, except as provided in Paragraph I.

F. The arbitrator's award will be issued no later than 60 days after the commencement of the arbitration hearing. During the period prior to the issuance of the arbitrator's award, the new work or time standards will not be implemented beyond the test cities, and no new tests of the new standards will be initiated. Data gathering efforts or work or time studies, however, may be conducted during this period in any installation.

G. The issue before the arbitrator will be whether the national concepts involved in the new work or time standards are fair, reasonable and equitable.

H.  In the event the arbitrator rules that the national concepts involved in the new work or time standards are not fair, reasonable and equitable, such standards may not be implemented by the Employer until they are modified to comply with the arbitrator's award. In the event the arbitrator rules that the national concepts involved in the new work or time standards are fair, reasonable and equitable, the Employer may implement such standards in any installation. No further grievances concerning the national concepts involved may be initiated.

I.  After receipt of notification provided for in Paragraph D of this Article, the Union shall be permitted through qualified representatives to make time or work studies in the test cities. The Union shall notify the Employer within ten (10) days of its intent to conduct such studies. The Union studies shall not exceed one-hundred fifty (150) days, from the date of such notice, during which time the Employer agrees to postpone implementation in the test cities for the first ninety (90) days. There shall be no disruption of operations or of the work of employees due to the making of such studies. Upon request, the Employer will provide reasonable assistance in making the study, provided, however, that the Employer may require the Union to reimburse the USPS for any costs reasonably incurred in providing such assistance. Upon request, the Union representative shall be permitted to examine relevant available technical information, including final data worksheets, that were used by the Employer in the establishment of the new or changed work or time standards. The Employer is to be kept informed during the making of such Union studies and, upon the Employer's request the Employer shall be permitted to examine relevant available technical information, including final data worksheets, relied upon by the Union.

(The preceding Article, Article 34, shall apply to **City Carrier Assistant** Employees.)

# ARTICLE 35 EMPLOYEE ASSISTANCE PROGRAM

35.1

**Section 1. Programs**

The Employer and the Union express strong support for programs of self-help. The Employer shall provide and maintain a program which shall encompass the education, identification, referral, guidance and follow-up of those employees afflicted by the disease of alcoholism and/or drug abuse. When an employee is referred to the EAP by the Employer, the EAP staff will have a reasonable period of time to evaluate the employee's progress in the program. This program of labor-management cooperation shall support the continuation of the EAP for alcohol, drug abuse, and other family and/or personal problems at the current level.

An employee's voluntary participation in the EAP for assistance with alcohol and/or drug abuse will be considered favorably in disciplinary action proceedings.

**Employee Assistance Program (EAP).** Article 35.1 affirms the parties' continued joint support for a national program of employee counseling for alcohol or drug abuse as well as for other types of family or personal problems. The EAP provides free confidential counseling to all postal employees and their family members by trained outside professionals.

NALC officials participate in EAP matters at both the national and local levels (Article 35.2). The joint National EAP Committee administers the EAP at the national level. Within each of the Postal Service's Customer Service Districts, a joint Labor/Management Advisory Committee oversees the process. The committee, which meets at least quarterly, has both union and management representatives.

Except in those districts specifically designated by the National EAP Committee, EAP counseling is provided through a contract between the Postal Service and the U.S. Department of Health and Human Services' Division of Federal Occupational Health (FOH). The FOH hires the EAP vendor who, in turn, provides EAP services to postal employees and their families.

**Confidentiality.** Confidentiality is the cornerstone of EAP counseling. EAP counselors are bound by very strict codes of ethics, as well as federal and state laws, requiring that information learned from counseled employees remains private. EAP counselors have licenses and master's degrees in their fields of expertise.

Management officials and union officials have no right to breach the confidentiality of EAP counseling sessions. What an EAP counselor learns in confidential counseling or other treatment of an employee may be released only with the employee's completely voluntary, written consent, except in the limited circumstances provided for in the ELM Section 944.4.

**Referral.** EAP Counselor services are available, through voluntary self-referrals, to letter carriers and their family members. A management official may also refer an employee to EAP. However, participation is entirely voluntary. Currently the national contact number for such self-referrals is 1-800-EAP4YOU, or 1-800-327-4968. Additional information is also available at the website www.eap4you.com.

35.2

**Section 2. Joint Committee**

For the term of the **2011** National Agreement, the Employer and the Union agree to establish at the national level a National EAP Committee. The Committee will have responsibility for jointly assessing the effectiveness of EAPs operating inside and outside the USPS, and for developing on an ongoing basis the general guidelines with respect to the level of services and the mechanisms by which the services will be provided.

The Committee is not responsible for day-to-day administration of the program.

The Committee shall convene at such times and places as it deems appropriate during the term of the **2011** National Agreement. No action or recommendations may be taken by the Committee except by consensus of its members. In the event that the members of the Committee are unable to agree within a reasonable time on an appropriate course of action with respect to any aspect of its responsibility, the Vice President, Labor Relations, and the National Union President shall meet to resolve such issues.

The Committee is authorized to obtain expert advice and assistance to aid its pursuit of its objectives. The apportionment of any fees and expenses for any such experts shall be by consensus of the Committee.

The Employer and the Union agree that they will cooperate fully at all levels towards achieving the objectives of the EAP. This joint effort will continue for the term of the **2011** National Agreement.

**(The preceding Article, Article 35, shall apply to City Carrier Assistant Employees.)**

**National EAP Committee.** The joint National EAP Committee oversees the National EAP program, assessing program effectiveness and providing overall policy guidance. The Committee takes action only through a consensus of its members.

# ARTICLE 36 CREDIT UNIONS AND TRAVEL

36.1 **Section 1. Credit Unions**

In the event that the Union or its local Unions (whether called branches or by other names) presently operate or shall hereafter establish and charter credit unions, the Employer shall, without charge, authorize and provide space, if available, for the operation of such credit unions in Federal buildings, in other than workroom space.

Any postal employee who is an employee of any such credit union or an officer, official, or Board member of any such credit union, shall, if such employee can be spared, be granted annual leave or leave without pay, at the option of the employee, for up to eight (8) hours daily, to perform credit union duties.

36.2 **Section 2. Travel, Subsistence and Transportation**

A. The Employer shall continue the current travel, subsistence and transportation program.

B. Employees will be paid a mileage allowance for the use of privately owned automobiles for travel on official business when authorized by the Employer equal to the standard mileage rate for use of a privately owned automobile as authorized by the General Services Administration (GSA). Any change in the GSA standard mileage rate for use of a privately owned automobile will be put into effect by the Employer within sixty (60) days of the effective date of the GSA change.

(The preceding Article, Article 36, shall apply to **City Carrier Assistant** Employees.)

**Credit unions.** Article 36.1 guarantees free space, if available, in federal buildings for branch-operated credit unions. It also guarantees time off of up to eight hours daily for a postal employee who is an employee, officer or Board member of a branch-operated credit union.

**Travel.** Article 36.2.A continues the current travel, subsistence and transportation program, which includes the regulations contained in Section 438 of the *Employee and Labor Relations Manual (ELM)* and *Handbook F-15, Travel and Relocation.*

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 370 of 472. PageID #: 1188

Page 36-2 NALC-USPS Joint Contract Administration Manual - July 2014

USPS000910

# ARTICLE 41 LETTER CARRIER CRAFT

**Section 1. Posting**

**Section 2. Seniority**

**Section 3. Miscellaneous Provisions**

**Section 4. City Carrier Transportation (Driveout) Agreement**

**Section 5. National Joint City Delivery Committee**

**Article 41—Letter Carrier Craft Article.** Article 41 is known as the *letter carrier craft article*, negotiated specifically to cover letter carriers. (Prior to 1994 negotiations the National Agreement was negotiated jointly with other postal unions.) Article 41 establishes fundamental letter carrier rights under the contract—a regular carrier's right to accumulate seniority, and the right to bid on, obtain and hold specific duty assignments based on seniority.

**41.1.A**

**Section 1. Posting**

A. In the Letter Carrier Craft, vacant craft duty assignments shall be posted as follows:

1. A vacant or newly established duty assignment not under consideration for reversion shall be posted within fourteen calendar days from the day it becomes vacant or is established, unless a longer period of time is negotiated locally.

   All city letter carrier craft full-time duty assignments other than letter routes, Carrier Technician assignments, parcel post routes, collection routes, combination routes, official mail messenger service, special carrier assignments and night routers, shall be known as full-time Reserve Letter Carrier duty assignments. The term "unassigned regular" is used in those instances where a full-time letter carrier does not hold a duty assignment.

   Positions currently designated in the Letter Carrier Craft:

   City Carrier (includes the duty assignment of Official Mail Messenger Service in the Washington, D.C. Post Office)

   Special Carrier

   Carrier Technician

   Positions that may in the future be designated in the Letter Carrier Craft.

   Changes in the foregoing position titles shall not affect the application of this provision.

**41.1.A.1**

> When a position is under consideration for reversion, the decision to revert or not to revert the position shall be made not later than 30 days after it becomes vacant. If the decision is made not to revert, the assignment must be posted within 30 days of the date it becomes vacant. The Employer shall provide written notice to the Union, at the local level, of the assignments that are being considered for reversion and of the results of such consideration.

The issue of reverting a vacant full-time route without current inspection data was addressed in the settlement for case Q06N-4Q-C 09038594, October 4, 2012 (M-01796), as follows: "The parties recognize the employer's right to revert vacant duty assignments pursuant to Article 41.1.A.1 of the National Agreement. However, under current regulations, determining whether an established city delivery route is full time (as defined by Handbooks M-39, section 242.122 and M-41, section 911.2) will be made using one of the following procedures:

- A six day mail count and inspection in accordance with the provisions of Handbook M-39
- A route adjustment pursuant to Section 141 of Handbook M-39 (provided the data used is reasonably current and from the regular carrier assigned to the route)
- Evaluation through a national jointly agreed upon route evaluation process
- Evaluation through an authorized developed joint route evaluation process"

**Unassigned Regulars.** The definition of unassigned regular was changed in the 2001 National Agreement by removing that part of the prior definition that provided that they "are excess to the needs of the delivery unit." This change makes clear that any full-time regular letter carriers not holding a bid assignment are unassigned regulars. Whether or not they are excess to the needs of the delivery unit is irrelevant. This change was made to remove inconsistencies with other sections of the contract such as Article 41.1.A.2 and Article 12.

**Posting for Bid.** Article 41.1.A.1 provides for the posting of a vacant duty assignment for bid within 14 days after it becomes vacant, or in the case of a newly established assignment, within 14 days of its creation (unless a longer term is locally negotiated). However, when a newly vacated duty assignment is under consideration for reversion, management has a maximum of thirty days after the date the duty assignment is vacated to make the decision to either revert the position or post it for bid.

The time limit for posting was changed in the 2006 National Agreement. Note that the number of days was only part of the change. The time limit that was once 5 working days is now 14 calendar days. Notwithstanding negotiated language in the local parties' LMOU, the

intent of this change is to accommodate those offices with an automated bidding process that requires 14 days for posting. In such situations, the controlling language would be the 14 days in Article 41.1.A.1.

- A duty assignment is a set of duties and responsibilities within a recognized position regularly scheduled during specific hours of duty.

- The five routes on a Carrier Technician swing, or group constitute a full-time duty assignment. Carrier Technicians perform all the duties of the assignments they work.

- Reserve letter carrier (formerly known as floater, leave replacement, vacation regular, etc.) is a bid position with scheduled hours of duty and work days.

**41.1.A.2**

2. Letter carriers temporarily detailed to a supervisory position (204b) may not bid on vacant Letter Carrier Craft duty assignments while so detailed. However, nothing contained herein shall be construed to preclude such temporarily detailed employees from voluntarily terminating a 204b detail and returning to their craft position. Upon return to the craft position, such employees may exercise their right to bid on vacant letter carrier craft duty assignments.

The duty assignment of a full-time carrier detailed to a supervisory position, including a supervisory training program in excess of four months shall be declared vacant and shall be posted for bid in accordance with this Article. Upon return to the craft the carrier will become an unassigned regular. A letter carrier temporarily detailed to a supervisory position will not be returned to the craft solely to circumvent the provisions of Section l.A.2.

Form 1723, **Assignment Order**, shall be used in detailing letter carriers to temporary supervisor positions (204b). The Employer will provide the Union at the local level with a copy of Form(s) 1723 showing the beginning and ending of all such details.

While city letter carriers temporarily detailed to a supervisory position (204b) may not bid on vacant city letter carrier craft duty assignments while so detailed, they may bid on the multi-craft positions of VOMA or Examination Specialist while on detail (National Arbitrator Aaron, H1N-4J-C 8187, March 19, 1985, C-04925).

**41.1.A.3**

3. The existing local procedures for scheduling fixed or rotating non-work days and the existing local method of posting and of installation-wide or sectional bidding shall remain in effect unless changes are negotiated locally.

**Local Implementation.**  NALC branches may establish local rules regarding fixed or rotating days off and the scope of posting and bidding—by section or installation-wide—through local implementation procedures under Article 30 of the National Agreement.  Such rules are

then contained in a Local Memorandum of Understanding, which must be read in conjunction with Article 41. Fixed or rotating days off are negotiated pursuant to Article 30.B.2, and the scope and method of posting are negotiated pursuant to Article 30.B.21 and 30.B.22.

**41.1.A.4**

> 4. No assignment shall be posted because of a change in starting time or in non-scheduled days (except as provided in Section 1.A.5 below). No overtime payment will be made for a permanent change in starting time.
>
> 5. Whether or not a letter carrier route will be posted when there is a change of more than one (1) hour in starting time shall be negotiated locally.

**Local Implementation.** Local negotiations pursuant to Article 30.B.21 and 30.B.22 may determine whether a route will be posted when there is a change of more than one hour in starting time.

**41.1.A.6**

> 6. When a fixed schedule non-work day is permanently changed, the new non-work day shall be posted.
>
> 7. Unassigned full-time carriers and full-time flexible carriers may bid on duty assignments posted for bids by employees in the craft. If the employee does not bid, assignment of the employee may be made to any vacant duty assignment for which there was no senior bidder in the same craft and installation. In the event there is more than one vacancy due to the lack of bids, these vacancies may be filled by assigning the unassigned full-time carriers and full-time flexible carriers, who may exercise their preference by use of their seniority. In the event that there are more unassigned full-time carriers and full-time flexible carriers than vacancies, these vacancies may be filled by assigning the unassigned employees by juniority.

In the event there are more unassigned full-time carriers and/or full-time flexible letter carriers than residual vacancies, the residual vacancies may be filled by assigning the unassigned employees by juniority (inverse seniority).

- Reserve Regulars are not unassigned regulars and this section does not apply to them.
- When there is no bid, the assignment of an unassigned regular or full-time flexible letter carrier shall be by juniority (inverse seniority).
- When there is more than one vacancy and there are no bids, the unassigned carriers or full-time flexible carriers assigned to the vacancies may select their individual assignments by seniority.
- If a 204b loses his/her bid assignment under the provisions of Article 41.1.A.2, management may assign the 204b to a residual vacancy under the provisions of Article 41.1.A.7 while the employee remains in a 204b status (National Arbitrator Snow, E94N-4E-C 96060312, October 2, 1998, C-18743).

41.1.B

**B. Method of Posting**

1. The notice inviting bids for Letter Carrier Craft assignments, and to such other assignments to which a letter carrier is entitled to bid, shall be posted on all official bulletin boards at the installation where the vacancy exists, including stations and branches, as to assure that it comes to the attention of employees eligible to submit bids. Copies of the notice shall be given to the local Union. When an absent employee has so requested in writing, stating a mailing address, a copy of any notice inviting bids from the craft employees shall be mailed to the employee by the installation head.

2. Posting and bidding for duty assignments and/or permanent changes in fixed non-work days shall be installation-wide, unless local agreements or established past practice provide for sectional bidding or other local method currently in use.

**Local Implementation—Scope of Posting and Bidding.** Article 41.1.B.2 provides that posting and bidding for duty assignments and/or permanent changes in fixed non-work days shall be installation-wide, unless the parties have negotiated a different method—for instance, bidding by specified sections—pursuant to Article 30.B.21 and 30.B.22.

41.1.B.3

3. The notice shall remain posted for 10 days, unless a different length for the posting period is established by local negotiations.

**Local Implementation—Length of Posting.** Article 41.1.B.3 requires that the notice be posted for ten days, unless the parties have negotiated a different time period pursuant to Article 30.B.21 and 30.B.22.

41.1.B.4

4. Information on notices shall be shown as below and shall be specifically stated:

   (a) The duty assignment by position title and number (e.g., Key or Standard).

   (b) Grade.

   (c) Hours of duty (beginning and ending), including, in the case of a Carrier Technician assignment, the hours of duty for each of the component routes.

   (d) The fixed or rotating schedule of days of work, as appropriate.

   (e) The principal assignment area (e.g., section and/or location of activity).

   (f) Invitation to employees to submit bids.

   (g) Physical requirement unusual to the assignment.

   (h) If a city carrier route is involved, the carrier route number shall be designated. If a Carrier Technician assignment is involved, the route number of the Carrier Technician assignment and the route numbers of the component routes shall be designated.

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 376 of 472. PageID #: 1194

(i) Date of last inspection and date of last adjustment.

[see Memo, page 222]

This Memo is located below.

A duty assignment may include a permanent schedule which consists of different starting times on certain days of the service week. However the decision to do so may not be arbitrary. The starting time(s) of a Carrier Technician assignment is the same as the component routes which comprise the Carrier Technician assignment (Prearbitration Settlement, E94N-4E-C 99119612, June 17, 2003, M-01490).

**MEMORANDUM OF UNDERSTANDING BETWEEN THE UNITED STATES POSTAL SERVICE AND THE NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Article 41—Bid Process**

The parties agree that where telephone bidding is an alternative form of bidding, bids may be submitted by telephone. When computerized and telephone bidding are available to all employees in an installation, telephone and computerized bidding is mandatory.

Date: August 14, 2000

**41.1.C**

**C. Successful Bidder**

1. The senior bidder meeting the qualification standards established for that position shall be designated the "successful bidder."

The national parties agreed to a national Memorandum of Understanding on March 16, 1987 (M-00752) setting forth specific rules governing the bidding rights of a carrier who is temporarily disabled and unable to work his or her normal assignment. Such a carrier has the right to bid and be awarded a bid assignment so long as the carrier will be able to assume the bid-for position within six months from the time the bid is placed. Upon management's request the carrier must provide medical documentation showing that he or she will be able to do so. If the carrier is still unable to perform the duties of the bid-for position at the end of six months, a second six-month period is permitted if supported by new medical certification. The carrier must relinquish the assignment if he or she cannot work the bid-for position within one year after the bid. A carrier who bids on a higher-level position under these rules will not receive higher level pay until he or she is physically able to, and actually performs work in the bid-for higher-level position.

Successful bidders who develop a disability after a position is awarded are entitled to retain the position if the disability is temporary (National Arbitrator Mittenthal, H8N-5B-C 22251, November 14, 1983, C-03855).

If the letter carrier's personal physician determines that the disability results from a medical condition that is permanent and stationary, and prevents the letter carrier from performing the functions of the position, the letter carrier may be removed from the position and the position posted for bid. In cases where the medical condition is not a result of a job-related illness or injury and there is a dispute over whether the disabling condition is permanent or temporary based upon medical evaluations of the letter carrier's personal physician and the USPS physician, a third physician selected by the parties will be final concerning the employee's medical condition and limitations, if any (Article 13.2.B.2). In cases where the disability is the result of a job-related illness or injury, the Postal Service is bound by the medical opinion accepted by the OWCP.

**41.1.C.2**

2. Within ten (10) days after the closing date of the posting, the Employer shall post a notice indicating the successful bidder, seniority date and number.
3. The successful bidder must be placed in the new assignment within 15 days except in the month of December.

The fifteen day period begins on the date the notice of the successful bidder is posted. Application of the December exception does not begin a new fifteen day period.

**41.1.C.4**

4. The successful bidder shall work the duty assignment as posted. Unanticipated circumstances may require a temporary change in assignment. This same rule shall apply to Carrier Technician assignments, unless the local agreement provides otherwise.

**Carrier Technician Assignments.** The five routes on a Carrier Technician's string or group which constitute a full-time duty assignment are normally carried in the posted sequence. In the absence of any Local Memorandum of Understanding provisions or binding past practice concerning this issue (Article 5), management has discretion to move a Carrier Technician off the assignment he or she is working in the regular rotation to another route on the Carrier Technician's string. If a Carrier Technician is moved to another route on the string, that route becomes the carrier's assignment on that day for the purposes of Article 41.1.C.4 and the application of the overtime provisions of Article 8.5.

If a Carrier Technician is moved to another route on the string with a different starting time, he/she still retains and is still entitled to be paid for the hours of his/her regular schedule. However, if appropriate advance notice of a schedule change is given, the carrier receives out-of-schedule pay instead. (See the explanation of out-of-schedule pay under Article 8.4.)

Management may *not* move the Carrier Technician off the string entirely, unless the Local Memorandum of Understanding so provides or "unanticipated circumstances" arise. It is *not* an "unanticipated circumstance" when the regular carrier, whose route the Carrier Technician is working, comes in and works his or her non-scheduled day.

**41.1.D**

**D. Other Positions**

City letter carriers shall continue to be entitled to bid or apply for all other positions in the U.S. Postal Service for which they have, in the past, been permitted to bid or apply, including the positions listed below and any new positions added to the list:

SP 2-188 Examination Specialist

SP 2-195 Vehicle Operations-Maintenance Assistant

Examination Specialist and Vehicle Operations-Maintenance Assistant (VOMA) positions are multi-craft assignments. Clerks, Maintenance, Level 5 and 6 Mail Handlers and Motor Vehicle employees are also eligible to bid for Examination Specialist positions. Clerks, Maintenance and Level 5 and 6 Motor Vehicle employees are also eligible to bid for VOMA positions.

Letter carriers in these positions continue in the carrier craft bargaining unit with seniority, bidding and representation rights. If selected, the employee remains in his/her craft and in the installation (USPS Letter, March 31, 2004, M-01514). However, a VOMA carrier is not eligible to place his or her name on an Overtime Desired List (Step 4, H1N-4B-C 11747, April 5, 1983, M-00051).

**41.2**

**Section 2. Seniority**

**A. Coverage**

1. This seniority section applies to all regular work force Letter Carrier Craft employees when a guide is necessary for filling assignments and for other purposes and will be so used to the maximum extent possible.

Conversions from part-time flexible to full-time status are made in strict seniority order even if an employee is on limited or light duty. In the letter carrier craft there are currently no exceptions for any reason, either voluntary or involuntary.

National Arbitrator Richard Mittenthal ruled in H8N-4B-C 16721, March 8, 1982 (C-03225), that management did not violate Article 41.2.A.1 when it refused to allow letter carriers to use their seniority to choose from among assignments which were available on a certain day. Mittenthal also ruled in H1N-5D-C 2120, July 22, 1983 (C-03807), that a past practice of assigning available work to the senior PTF carrier was not binding.

41.2.A.2

> 2. Seniority is computed from date of appointment in the Letter Carrier Craft and continues to accrue so long as service is uninterrupted in the Letter Carrier Craft in the same installation, except as otherwise specifically provided.

Article 41.2.A.2 establishes the general rule that a letter carrier's seniority is computed continuously from the date of appointment in the Letter Carrier craft if the carrier serves without interruption in the Carrier craft and works in the same installation.

Note that Article 41.2.D provides for exceptions to Article 41.2.A.2's requirements that for a carrier's seniority to be computed continuously from the date of appointment in the Letter Carrier craft, the carrier must serve without interruption in the carrier craft and work in the same installation.

41.2.A.3

> 3. No employee solely by reason of this Article shall be displaced from an assignment the employee gained in accordance with former rules.

The purpose of Article 41.2.A.3 is to avoid displacing employees from bid assignments gained under earlier National Agreements if there are any changes in the National Agreement's seniority rules.

41.2.B

> **B. Definitions**
>
> 1. Seniority for bidding on preferred Letter Carrier Craft duty assignments and for other purposes for application of the terms of the National Agreement shall be restricted to all full-time and full-time flexible regular city letter carriers.

41.2.B.2

> 2. Part-time regular letter carriers are considered to be a separate category and seniority for assignment and other purposes shall be restricted to this category.

Part-time regulars may use their seniority only in that category. Upon reassignment to part-time flexible or full-time status, part-time regulars begin a new period of seniority.

41.2.B.3

> 3. Full-time reserve letter carriers, and any unassigned full-time letter carriers whose duty assignment has been eliminated in the particular delivery unit, may exercise their preference by use of their seniority for available craft duty assignments of anticipated duration of five (5) days or more in the delivery unit within their bid assignment areas, except where the local past practice provides for a shorter period.
>
> 4. Part-time flexible letter carriers may exercise their preference by use of their seniority for vacation scheduling and for available full-time craft duty assignments of anticipated duration of five (5) days or more in the delivery unit to which they are assigned. **City carrier assistants may exercise their preference (by use of**

**their relative standing as defined in Section 1.f of the General Principles for the Non-Career Complement in the Das Award) for available full-time craft duty assignments of anticipated duration of five (5) days or more in the delivery unit to which they are assigned that are not selected by eligible career employees.**

General opting rules for CCAs are further addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**66. Is there a difference in the application of opting (hold-down) rules between part-time flexible city carriers and CCAs?**

No.

**68. What is the pecking order for awarding hold-down assignments?**

Hold-down assignments are awarded to eligible career letter carriers by highest to lowest seniority first and then to eligible CCAs by highest to lowest relative standing in the installation.

5. A letter carrier who, pursuant to subsections 3 and 4 above, has selected a craft duty assignment by exercise of seniority shall work that duty assignment for its duration.

**Opting on Temporary Vacancies.** Article 41.2.B.3, 41.2.B.4 and 41.2.B.5 provide a special procedure for exercising seniority in filling temporary vacancies in full-time duty assignments. This procedure, called "opting," allows carriers to "hold-down" vacant duty assignments of regular carriers who are on leave or otherwise unavailable to work for five or more days.

Full-time reserve, full-time flexibles and unassigned full-time letter carriers may opt on vacancies of fewer than five days where there is an established local past practice (Article 41.2.B.3).

**Eligibility for opting.** Full-time reserve letter carriers, full-time flexible schedule letter carriers, unassigned full-time carriers, part-time flexible carriers, and city carrier assistants may all opt for hold-down assignments.

Opting eligibility for CCAs is further addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**65.  Is there a waiting period for a new CCA (no former experience as a career city letter carrier or city carrier transitional employee) before the employee can opt on a hold-down?**

Yes, 60 calendar days from the date of appointment as a CCA. Once the CCA has met this requirement there is no additional waiting period for applying for/being awarded a hold-down when the employee is converted to career.

All unassigned regulars have opting rights, regardless of the reason for the unassigned status (Step 4, H94N-4H-C 96007241, September 25, 2000, M-01431).

Although Article 12.3 of the National Agreement provides that "an employee may be designated a successful bidder no more than seven (7) times" during the contract period, a national settlement (H1N-1E-C 25953, May 21, 1984, M-00513) establishes that these restrictions do not apply to the process of opting for vacant assignments.  Moreover, opting is not "restricted to employees with the same schedule as the vacant position" (H1N-1J-C 6766, April 17, 1985, M-00843).  Rather, an employee who opts for a hold-down assignment assumes the scheduled hours and non-scheduled day of the opted assignment. (See "Schedule Status and Opting".)

National Arbitrator Bernstein held (H1N-3U-C 10621, September 10, 1986, C-06461) that an employee may not be denied a hold-down assignment by virtue of his or her potential qualification for overtime pay.  For example, an employee who works forty hours Saturday through Thursday is eligible for a hold-down which begins on Friday even though he or she will earn overtime pay for work in excess of forty hours during the service week.  If a full-time letter carrier on the ODL works overtime solely as a result of such circumstances, the overtime is not counted or considered in determining equitability at the end of the quarter under the provisions of Article 8.5.C.2.b.

An otherwise qualified employee on light duty may not be denied hold-down assignments as long as the employee can perform all the duties of the assignment.

Some employees are not permitted to opt.  Probationary employees may not opt (H8N- 2W-C 7259, November 25, 1980, M-00594).  However, this restriction was modified with the following question and answer from the Questions and Answers 2011 USPS/NALC National Agreement:

**Is there a waiting period for a new CCA (no former experience as a career city letter carrier or city carrier transitional employee) before the employee can opt on a hold-down?**

Yes, 60 calendar days from the date of appointment as a CCA.  Once the CCA has met this requirement there is no additional waiting period

for applying for/being awarded a hold-down when the employee is converted to career.

Carriers acting in 204b supervisory positions may not opt for hold-down positions while in a supervisory status (Step 4, H1N-4B-C 16840, October 24, 1983, M-00552). A national prearbitration settlement (H1N-5W-C 26031, January 12, 1989, M-00891) established that an employee's supervisory status is determined by PS Form 1723, which shows the times and dates of an employee's 204b duties.

**Duty Assignments Eligible for Opting**. Vacancies in full-time Grade One assignments, including Reserve Regular assignments, are available for opting. When a Reserve Regular letter carrier opts on an available assignment, his/her temporarily vacated Reserve Regular position becomes available for opting if vacated for five days or more. However, as is the case with any opt, a carrier on an opt for a Reserve Regular assignment must work the assignment for its duration and is not eligible to opt on any other assignments for the duration of the opt. Vacant routes under consideration for reversion are available for opting until they are reverted or filled, provided the anticipated vacancy is for five days or more (Step 4, H0N-5R-C 6380, January 21, 1993, M-01128).

However, not all anticipated temporary vacancies create opting opportunities. Carrier Technician positions are not available for opting because they are higher level assignments which are filled under Article 25 of the National Agreement. Auxiliary routes are not available as hold-downs because they are not full-time (Step 4, H8N-5B-C 14553, May 15, 1981, M-00625). Full-time flexible positions are not subject to opting because they are not bid assignments.

Except where a local past practice provides for a shorter period, vacancies lasting less than five days need not be filled as hold-downs. Clarifying the meaning of this five-day requirement, National Arbitrator Kerr held that opting is permitted when vacancies are expected to include five or more *work days*, rather than vacancies that span a period of five calendar days but may have fewer than five days of scheduled work (W1N-5G-C 11775, March 20, 1986, C-05865). However, these anticipated five days may include a holiday (H8N-4E-C 14090, July 1, 1982, M-00237).

An employee does not become entitled to a hold-down assignment until the "anticipated" vacancy actually occurs. Thus, an employee who successfully opts for a vacancy that fails to materialize is not guaranteed the assignment.

**Temporarily Vacant Carrier Technician Assignments.** Temporarily vacant Carrier Technician assignments are not filled under the opting provisions of Article 41.2.B.3 & 41.2.B.4. Rather, they are higher level assignments filled under the provisions of Article 25 (Step 4, H8N-3P-C 25550, May 6, 1981, M-00276).

**Posting and Opting.** The National Agreement does not set forth specific procedures for announcing vacancies available for hold-downs. However, procedures for announcing vacancies and procedures for opting for hold-down assignments may be governed by Local Memorandums of Understanding (LMOU) or past practice (Memorandum, February 7, 1983, M-0446). The LMOU or past practice may include: method of making known the availability of assignments for opting, method for submission, a cutoff time for submission, and duration of hold-down. In the absence of an LMOU provision or mutually agreed-upon local policy, the bare provisions of Article 41.2.B apply. In that case, there is no requirement that management post a vacancy, and carriers who wish to opt must learn of available assignments by word of mouth or by reviewing scheduling documents.

**Duration of Hold-Down.** Article 41.2.B.5 provides that once an available hold-down position is awarded, the opting employee "shall work that duty assignment for its duration." An opt is not necessarily ended by the end of a service week. Rather, it is ended when the incumbent carrier returns, even if only to perform part of the duties—for example, to case but not carry mail.

**Exceptions to the Duration Clause.** There are situations in which carriers temporarily vacate hold-down positions for which they have opted—for example for vacation. Such an employee may reclaim and continue a hold-down upon returning to duty (Step 4, H4N-3U-C 26297, April 23, 1987, M-00748). If the opting employee's absence is expected to include at least five days of work, then the vacancy qualifies as a new hold-down *within* the original hold-down. Such openings are filled as regular hold-downs, such that the first opting carrier resumes his or her hold-down upon returning to duty—until the regular carrier returns.

An exception to the duration cause for CCAs on a five-day service break between 360-day terms is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**69. Will the 5-day break in service between 360-day terms end an opt (hold-down)?**

No.

**70. Does the 5-day break at the end of a 360-day appointment create another opt (hold-down) opportunity?**

Only where the break creates a vacancy of five workdays. In such case the opt is for the five day period of the break.

An opting employee may bid for and obtain a new, permanent full-time assignment during a hold-down. A national prearbitration settlement (H1N-5G-C 22641, February 24, 1987, M-00669) established that such

an employee must be reassigned to the new assignment. If there are five or more days of work remaining in the hold-down, then the remainder of the hold-down becomes available to be filled by another opting carrier.

An employee on a hold-down assignment may accept a temporary supervisory position (204b). However, the hold-down must be reposted for the duration of the remainder of the original vacancy provided it is for five days or more. A carrier who has accepted a 204b detail only retains the right to the hold-down until it is awarded to another letter carrier.

An employee on a hold-down assignment may voluntarily terminate the assignment to accept a higher level assignment under the provisions of Article 25. In such cases, the vacancy must be made available for opting for the duration of the original vacancy, provided it is for five days or more.

**Involuntary Reassignment and Hold-Downs.** The duration provision in the National Agreement generally prevents the involuntary removal of employees occupying continuing hold-down positions.

National Arbitrator Bernstein (H1N-3U-C 10621, September 10, 1986, C-06461) held that an employee may not be involuntarily removed from (or denied) a hold-down assignment in order to prevent his or her accrual of overtime pay (See "Eligibility for opting"). For example, suppose an employee who worked eight hours on a Saturday then began a forty-hour Monday-through-Friday hold-down assignment. Such an employee may not be removed from the hold-down even though he or she would receive overtime pay for the service week.

Article 41.1.A.7 of the National Agreement states that unassigned full-time regular carriers may be assigned to vacant residual full-time duty assignments for which there are no bidders. However, National Arbitrator Mittenthal ruled that an unassigned regular may not be involuntarily removed from a hold-down to fill a residual full-time vacancy (H1N-3U-C 13930, November 2, 1984, C-04484). Of course, management may decide to assign an employee to a residual vacancy pursuant to Article 41.1.A.7 at any time, but the employee may not be required, and may not volunteer, to work the new assignment until the hold-down ends.

**Removal From Hold-Down.** There are exceptions to the rule against involuntarily removing employees from their hold-downs. Part-time flexible employees and city carrier assistants may be "bumped" from their hold-downs to provide sufficient work for full-time employees. Full-time employees are guaranteed forty hours of work per service week. Thus, they may be assigned work on routes held down by part-time or city carrier assistant employees if there is not sufficient work available for them on a particular day (H1N-5D-C 6601, September 11, 1985, M-00097).

In such situations, the part-time flexible or city carrier assistant employee's opt is not terminated. Rather, the employee is temporarily "bumped" on a day-to-day basis. Bumping is still a last resort, as reflected in a Step 4 settlement (H1N-5D-C 7441, October 25, 1983, M-00293), which provides that:

> A PTF or city carrier assistant, temporarily assigned to a route under Article 41, Section 2.B, shall work the duty assignment, unless there is no other eight-hour assignment available to which a full-time carrier could be assigned. A regular carrier may be required to work parts or "relays" of routes to make up a full-time assignment. Additionally, the route of the "hold-down" to which the PTF or city carrier assistant opted may be pivoted if there is insufficient work available to provide a full-time carrier with eight hours of work.

The opting (hold-down) rules for CCAs are further addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**66. Is there a difference in the application of opting (hold-down) rules between part-time flexible city carriers and CCAs?**

No.

**67. Can a CCA be taken off an opt (hold-down) in order to provide a part-time flexible employee assigned to the same work location with 40 hours of straight-time work over the course of a service week (Article 7, Sectio 1.C)?**

Yes, a CCA may be "bumped" from an opt if necessary to provide 40 hours of straight-time work over the course of a service week to part-time flexible letter carriers assigned to the same work location. In this situation the opt is not terminated. Rather, the CCA is temporarily taken off the assignment as necessary on a day-to-day basis.

Another exception occurs if the Local Memorandum allows the regular carrier on a route to "bump" the Carrier Technician to another route when the regular carrier is called in on a non-scheduled day to work on his/her own route. In such cases, the Carrier Technician is allowed to displace an employee who has opted on an assignment on the technician's string if none of the other routes on the string are available. In such cases a part-time flexible or city carrier assistant employee's opt is not terminated. Rather, he/she is temporarily "bumped" on a day-to-day basis (Step 4, N8-N-0176, January 9, 1980, M-00154).

**PTF and CCA Pay Status and Opting.** Although a part-time flexible or city carrier assistant employee who obtains a hold-down must be allowed to work an assignment for the duration of the vacancy, he or she does not assume the pay status of the full-time regular carrier being

replaced. A part-time flexible or city carrier assistant carrier who assumes the duties of a full-time regular by opting is still paid as a part-time flexible or city carrier assistant as appropriate during the hold-down. While they must be allowed to work the assignment for the duration of the vacancy, PTFs and city carrier assistants are not guaranteed eight hours daily or forty hours weekly work by virtue of the hold-down alone.

Nor do PTFs or city carrier assistants receive holiday pay for holidays which fall within the hold-down period by virtue of the hold-down. Rather, part-time flexibles continue to be paid for holidays as PTFs per Article 11.7. City carrier assistants are not covered by Article 11.7.

**Schedule Status and Opting.** Employees on hold-downs are entitled to work the regularly scheduled *days* and *the daily hours of duty* of the assignment (H8N-1M-C 23521, June 2, 1982, M-00239). These scheduling rights assumed by all hold-down carriers, whether full-time or part-time, create some of the most perplexing problems in the opting process. In the area of schedule status, two key distinctions must be considered. First, there is a difference between a guarantee to work and a right to days off. The second distinction involves the appropriate remedy when an opting employee is denied work within the regular hours of a hold-down.

**Scheduled Days and Opting.** The distinction between the guarantee to work certain scheduled days and the right to specific days off is important. An employee who successfully opts for a hold-down assignment is said to be guaranteed the right to work the hours of duty and scheduled days of the regular carrier. It must be noted, however, that days off are "assumed" only in the sense that a hold-down carrier will not work on those days *unless* otherwise scheduled. In other words, a hold-down carrier is not guaranteed the right to *not* work on non-scheduled days. Of course, this is the same rule that applies to the assignment's regular carrier, who may, under certain conditions, be required to work on a non-scheduled day.

For example, suppose there is a vacant route with Thursday as the scheduled day off. The carrier who opts for such a route is guaranteed the right to work on the scheduled work days, but is not guaranteed work on Thursday. This does not necessarily imply that Thursday is a guaranteed day off; the carrier on a hold-down *may* be scheduled to work that day as well, either on or off the opted-for assignment. However, management may not swap scheduled work days with days off in order to shift hours into another service week to avoid overtime or for any other reason. To do so would violate the guarantee to work all of the scheduled days of the hold-down.

**Remedies and Opting.** Where the record is clear that a PTF or city carrier assistant was the senior available employee exercising a prefer-

ence on a qualifying vacancy, but was denied the opt in violation of Article 41.2.B.4, an appropriate remedy would be a "make whole" remedy in which the employee would be compensated for the difference between the number of hours actually worked and the number of hours he/she would have worked had the opt been properly awarded.

In those circumstances in which a PTF or city carrier assistant worked forty hours per week during the opting period (or forty-eight hours in the case of a six day opt), an instructional "cease and desist" resolution would be appropriate. This would also be an appropriate remedy in those circumstances in which a reserve letter carrier or an unassigned letter carrier was denied an opt in violation of Article 41.2.B.3.

In circumstances where the violation is egregious or deliberate or after local management has received previous instructional resolutions on the same issue and it appears that a "cease and desist" remedy is not sufficient to insure future contract compliance, the parties may wish to consider a further, appropriate compensatory remedy to the injured party to emphasize the commitment of the parties to contract compliance. In these circumstances, care should be exercised to insure that the remedy is corrective and not punitive, providing a full explanation of the basis of the remedy.

**41.2.B.6**

6. **Relative Seniority Standing**

(a) In cases of appointment on the same day, where there is a tie in seniority, the relative standing on the appointment register will determine the more senior carrier.

CCAs do not have seniority, but do have relative standing. Relative standing for CCAs is addressed in Appendix B, 1. General Principles, Sections f, g, and h of the 2011 National Agreement.

**APPENDIX B**

**Appendix B is the reprinting of Section I of the 2013 Das Award, the creation of a new non-career employee category.**

**1. GENERAL PRINCIPLES**

f. When hired, a CCA's relative standing in an installation is determined by his/her original CCA appointment date to the installation, using Article 41.2.B.6.(a) where applicable, and adding the time served as a city letter carrier transitional employee for appointments made after September 29, 2007 in any installation.

g. When the Postal Service hires new city letter carrier career employees, CCA employees within the installation will be converted to full-time regular career status to fill such vacancies based on their relative standing. A CCA who does not accept the career opportunity will not lose his/her relative standing for future career opportunities.

h. CCA employees may be separated at any time during their term of appointment for lack of work. Separations for lack of work shall be by inverse relative standing in the installation. Such separations are not grievable except where the separations are pretextual. CCAs separated for lack of work will be given preference for reappointment ahead of other CCAs with less relative standing in the installation if the need for hiring arises within 18 months of their separation.

Relative standing for CCAs is further addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**57. How is time credited for transitional employee employment when determining relative standing for CCAs?**

All time spent on the rolls as a city letter carrier transitional employee after September 29, 2007 will be added to CCA time in an installation to determine relative standing. Breaks in transitional employee service are not included in the relative standing period.

**58. How is placement on the relative standing roster determined when two or more CCAs have the same total time credited for relative standing?**

First, the relative standing on the hiring list (appointment register) will be used to determine the CCA with higher relative standing (See Article 41.2.B.6.[a]). If a tie remains then the formula outlined in Article 41.2.B.7 is applied.

**59. For time spent as a city letter carrier transitional employee, does it matter where an individual was employed when determining relative standing?**

No. All time on the rolls as a transitional employee after September 29, 2007 counts toward relative standing regardless of the installation(s) in which the transitional employee was employed.

**60. Does time credited toward relative standing for time worked as a transitional employee after September 29, 2007 trarnsfer from one installation to another once hired as a CCA?**

Yes.

**61. Does relative standing earned as a CCA in one installation move with a CCA who is separated and is later employed in another installation?**

No.

**66. Is there a difference in the application of opting (hold-down) rules between part-time flexible city carriers and CCAs?**

No.

**41.2.B.6**

(b) Part-time flexible letter carriers shall be converted to full-time positions of the same designation and PS salary level in the order of their standing on the part-time flexible roll.

The pecking order for filling full-time positions with PTFs and CCAs is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**72. When there is an opportunity for conversion to career status in an installation and that installation has both part-time flexible and CCA employees available for conversion, who is converted?**

The part-time flexible employees are converted to full-time regular prior to offering conversion to CCAs.

**73. When there is a career conversion opportunity for CCA, how are CCA employees converted?**

CCAs are offered conversion opportunities to full-time regular on a highest to lowest relative standing order basis within an installation.

**74. May a CCA decline an opportunity for conversion to full-time regular?**

Yes, rejection of a conversion offer does not impact the employee's relative standing as a CCA.

**41.2.B.7**

7. **Seniority Tie Breaker**

Except as otherwise specifically provided for in this Agreement, effective the date of this Agreement, when it is necessary to resolve a tie in seniority between two or more Carrier Craft employees, the following criteria shall apply in the order set forth below:

(a) Total continuous postal career service in the Carrier Craft within the installation.

(b) Total postal career service in the Carrier Craft within the installation.

(c) Total postal career service in the Carrier Craft.

(d) Total postal career service.

(e) Total postal service.

(f) Total federal service as shown in the service computation date on the employee's Form 50.

**Seniority Tie Breaker.** The seniority tie breaker provisions of Article 41.2.B.7 come into play only if the "relative standing on the appointment register" rule of Article 41.2.B.6 fails to resolve a tie in seniority. In that case the tie is resolved by applying the tie-breaking steps of Article 41.2.B.7(a)-(f). Each step is applied in sequence until the tie is broken; i.e., if (a) does not resolve the tie then (b) is applied, and so forth. The "leave computation date," currently box 15 of PS Form 50, is used to determine "total federal service" for the purpose of applying

Article 41.2.B.7(f) (Step 4, E90N-4E-C 95058006, August 29, 2002, M-01469).

Seniority tie breakers for when more than one employee is placed in a full-time career city letter carrier duty assignment in an installation on the same date through either transfer/reassignment or CCA conversion to full-time is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**63. How is a tie addressed when more than one employee is placed in full-time career city letter carrier duty assignments in an installation on the same date through either transfer/reassignment or CCA conversion to full-time?**

Placement on the seniority list is determined by the following:

• If two or more full-time career assignments in an individual installation are filled on the same date by only CCAs, placement on the career city letter carrier craft seniority list will be determined based on the relative standing in the installation.

• When two or more full-time career assignments in an individual installation are filled on the same date by only career employees through reassignment/transfer, placement on the city carrier craft seniority list will be determined by application of Article 41.2.B.7 of the National Agreement, as appropriate.

• Current career employees will normally be placed ahead of CCAs on the seniority list when two or more full-time career assignments are being filled in an individual installation on the same date from both reassigned/transferred and CCA employees. An exception may occur when the CCA(s) with the highest relative standing has previous career service. In such case the CCA(s) will be placed ahead of the career employee only if he/she is determined to be senior to the transferred/reassigned employee by application of Article 41.2.B.7 of the National Agreement. In no case will a CCA with lower relative standing be placed on the seniority list ahead of a CCA with higher relative standing who is converted to career on the same date in the installation.

41.2.C

**C. Responsibility for Administration**
The Employer shall be responsible for the day-to-day administration of seniority rules. Every installation, station, branch, and/or delivery unit shall have a roster posted in an appropriate place listing all carriers in order of seniority number. Said roster shall be updated during the months of July and January of every calendar year.

**D. Transfers, Separations, etc.**

Changes in which seniority is restored as if service had been continuous:

Article 41.2.C and 41.2.D contains some of the exceptions to Article 41.2.A.2's requirement that for a carrier's seniority to be computed continuously from the date of appointment in the Letter Carrier craft, the carrier must serve without interruption in the carrier craft and work in the same installation.

**41.2.D.1**

1. On reinstatement or reemployment after separation caused by disability, retirement or injury on duty or resignation because of personal illness, and the employee so stated in the resignation and furnished satisfactory evidence for inclusion in the personnel folder, the employee shall receive seniority credit for past service and for time on the disability retirement or for the injury or the illness if reinstated or reemployed in the same postal installation and in the same or lower PS salary level from which originally separated; provided application for reinstatement or reemployment is made within six months from the date of recovery. The date of recovery in the case of disability must be supported by notice of recovery from the Bureau of Retirement, Insurance and Occupational Health, Office of Personnel Management, or the Office of Workers' Compensation Programs; and in the case of injury on duty or resignation due to illness, by a statement from the applicant's attending physician or practitioner.
2. Letter carriers who enter the military shall not have their seniority broken or interrupted because of military service.

Letter carriers restored to duty following military service will have their full uninterrupted seniority restored *even if* involuntarily returned to an installation other than the one they left.

**Historical Note.** The 1971 National Agreement, which covered all seven crafts, contained the following provision in Article 12, Seniority, Section 2:

> On restoration in the same craft in the same installation after return from military service, transfer under letter of authority or unjust removal, employee shall regain the same seniority rights he would have if not separated (emphasis added).

In the 1973 National Agreement the new letter carrier craft seniority provisions deleted the "in the same installation" language in the new Article 41.2.D.2 language. In contrast, all the other crafts have retained the "in the same installation" language in their craft seniority provisions. Consequently letter carriers returning from military service are provided a different level of seniority protection than those returning to other crafts which only allow uninterrupted seniority if the employee returns to the same installation.

**41.2.D.3**

3. Letter carriers in leave without pay status while serving as Union officers on either part-time or full-time basis shall retain their former seniority and have their seniority computed as though they had remained in an active duty status.

**41.2.D.4**

4. Letter carriers who are restored to duty in the same installation after unwarranted or unjustified separation shall have their seniority computed as though they had remained in an active duty status.

5. Letter carriers who are changed from a higher level position within the Letter Carrier Craft to a lower level position in the Letter Carrier Craft, whether voluntary or involuntary, shall not have their seniority broken.

There are other exceptions to Article 41.2.A.2's requirement that for a carrier's seniority to be computed continuously from the date of appointment in the Letter Carrier craft, the carrier must serve without interruption in the carrier craft and work in the same installation.

- On returning to the Letter Carrier craft following assignment to another craft to work a permanent light- or limited-duty assignment (Article 13.4.I).
- Upon involuntary reassignment because of: (a) the discontinuation or consolidation of an independent installation; (b) the transfer of a classified station or branch to the jurisdiction of another installation; (c) the creation of an independent installation out of a classified station or branch; or (d) a delivery unit optimization (DUO) event (Article 12.5.C.1.b & d; 12.5.C.2.a; 12.5.C.3.a; 12.5.C.5.b(1)(a)).

41.2.E

**E. Change in Which Seniority is Modified**

When mutual exchanges are made between letter carriers from one installation to another, the carriers will retain their seniority or shall take the seniority of the other exchangee, whichever is the lesser.

Article 41.2.E applies only to mutual exchanges—between part-time flexible carriers as well as between full-time carriers. This contractual provision does not mean that exchanging carriers exchange their routes as well as their positions. The routes involved in the exchange are posted in accordance with the provisions of Article 41.1. Note that the *Employee and Labor Relations Manual (ELM)* provides the following:

**351.61 Mutual Exchanges—General Policy** Career employees may exchange positions (subject, when necessary, to the provisions of the appropriate collective-bargaining agreement) if the officials in charge at the installations involved approve the exchange of positions. Mutual exchanges must be made between employees in positions at the same grade levels. The following employees are not permitted to exchange positions:

a. Part-time flexible employees with full-time employees.

b. Bargaining unit employees with nonbargaining employees.

c. Nonsupervisory employees with supervisory employees.

Effective with the 2006 National Agreement, for the purposes of mutual exchanges, city letter carriers in grades CC-01 and CC-02 are considered as being in the same grade.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Mutual Exchanges**

The parties agree that in applying the relevant provisions of Section 351.6 of the Employee and Labor Relations Manual, city letter carriers in grades CC-01 and CC-02 are considered as being in the same grade. This agreement applies solely to determining whether employees are eligible for mutual exchanges.

Date: September 11, 2007

For additional information on mutual exchanges, see JCAM pages 12-50 through 12-51.

**41.2.F**

**F. Return From Any Position for Which Selection Was Based on Best Qualified**

Effective July 21, 1978, when an employee, either voluntarily or involuntarily returns to the Letter Carrier Craft at the same installation, seniority shall be established after reassignment as the seniority the employee had when leaving the Letter Carrier Craft without seniority credit for service outside the craft.

Permanent supervisory positions, but not 204b positions (Article 41.1.A.2), are among the position(s) for which selection is "based on best qualified." This provision can be understood only when read in conjunction with Article 12.2.B.2. When these two sections are read together, they provide for three different situations concerning the seniority of a carrier who leaves the bargaining unit for a position based on best qualified, and who then returns to the carrier craft *in the same* installation on or after July 21, 1978:

1. If the Carrier left the unit prior to July 21, 1973, then Article 41.2.F would apply, and the Carrier would pick up whatever seniority he or she had at the time of departure from the unit, but would not receive credit for time spent out of the unit.

2. If the Carrier left the unit on or after July 21, 1973 and returned within two years, then Article 41.2.F again applies and the Carrier would receive credit for the seniority he or she had prior to leaving the Unit.

3. A Carrier who left the unit on or after July 21, 1973 and returns later than two years following the date of departure, begins a new period of seniority. (Article 41.2.F does not apply; rather Article 12.2.B.2 takes care of the entire matter.)

CARRIERS RETURNING TO THE BARGAINING UNIT AT THE SAME INSTALLATION AFTER JULY 21, 1978
(HAVING NEVER LEFT THE INSTALLATION)

| | Left craft before July 21, 1973 | Left craft on or after July 21, 1973 |
|---|---|---|
| Outside of bargaining unit two years or less | Not Applicable | *Loses only time spent outside of the bargaining unit* |
| Outside of bargaining unit two years or more | *Loses only time spent outside of the bargaining unit* | *Begins a new period of seniority* |

Note that the above rules do not apply in situations where an employee is awarded a best qualified position in a different installation and later returns to the letter carrier craft in the original installation. In such cases Article 41.2.A.2 requires that the employee begin a new period of seniority.

Arbitrator Snow held in H7N-4U-C 3766, August 13, 1990 (C-10147), that when a former supervisor is reassigned to the letter carrier craft, his/her full-time or part-time status is to be determined by reference to the seniority provisions of the Agreement. If a former letter carrier in a supervisory status transfers to another installation, all seniority is lost and the former supervisor can only be reinstated as a part-time flexible. Seniority cannot be regained even if the employee subsequently returns to the installation where he/she served as a letter carrier. The loss of seniority is permanent regardless of whether the employee spent more or less than two years as a supervisor.

**41.2.G**

**G. Changes in Which a New Period of Seniority is Begun:**

1. When an employee from another agency transfers to the Letter Carrier Craft.
2. Except as otherwise provided in this Agreement, when an employee from another USPS craft is reassigned voluntarily or involuntarily to the Letter Carrier Craft.

An employee from another Postal Service craft who is transferred, either voluntarily or involuntarily, to the letter carrier craft will begin a new period of seniority—except when the assignment qualifies under the provisions of Article 13.6.A, pertaining to cross-craft reassignments of employees for the purpose of assuming light-duty assignments.

3. When a letter carrier transfers from one postal installation to another at the carrier's own request (except as provided in subsection E of this Article).

4. Any former employee of the U.S. Postal Service entering the Letter Carrier Craft by reemployment or reinstatement shall begin a new period of seniority, except as provided in subsections D.1 and D.4 above.

5. Any surplus employees from non-processing and non-mail delivery installations, area offices or the United States Postal Service Headquarters, begin a new period of seniority effective the date of reassignment.

41.3.A **Section 3. Miscellaneous Provisions**

A. The carrier may use stools while casing mail and performing other office duties, provided the use of such stools does not interfere with or affect efficiency and standard job performance.

B. The Employer will not assess or hold a carrier responsible for incorrect fees collected on mail improperly rated prior to being distributed to the carrier, who is expected to exercise reasonable care and judgment in the matter.

C. The Employer will not assess or hold a carrier responsible for faulty checks accepted in payment for postal fees or postal charges provided the carrier follows regulations governing the acceptance of checks.

The regulations governing the acceptance of checks are contained in Chapter 3 of Handbook F-1. However, it is local management's responsibility to insure that letter carriers are trained in the procedure for properly accepting a check for postal fees and/or services.

D. The Union has the right to appeal the granting of an exception to the 52 calendar day period to make route adjustments pursuant to Section 211.3 of the M-39 directly to Step B of the grievance procedure. Such appeal must be made within 14 days of receipt of the written notification.

Article 41.3.D provides that the Union may appeal the granting of an exception to the fifty-two calendar day period to make route adjustments pursuant to Section 211.3 of the M-39 directly to Step B of the grievance procedure. However, if a grievance concerning the granting of an exception is filed at Informal or Formal Step A instead, it is not procedurally defective for that reason. This section was added to the 2001 National Agreement to incorporate a prior agreement on this issue into the contract in a manner consistent with the revised provisions of Article 15.

In accordance with M-39, Section 211.3, adjustments to routes, if needed as a result of either management-initiated or employee-initiated inspections, must be made within fifty-two days of the completion of the mail count unless an exception is approved by the district manager.

> 211.3 In selecting the count period, remember that all route adjustments must be placed in effect within 52 calendar days of the completion of the mail count, and no major scheme changes should be made between the period November 15 and January 1.

Exceptions must be approved by the district manager. The local union will be notified promptly of any exception(s) granted.

These provisions are addressed in the following Memorandum of Understanding dated July 21, 1987.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Special Count and Inspection - City Delivery Routes**

The United States Postal Service and the National Association of Letter Carriers, AFL-CIO, agree that it is in the best interests of the Postal Service for letter carrier routes to be in proper adjustment.

Therefore, where the regular carrier has requested a special mail count and inspection, and the criteria set forth in Part 271g of the Methods Handbook, M-39, have been met, such inspection must be completed within four weeks of the request, and shall not be delayed. If the results of the inspection indicate that the route is to be adjusted, such adjustment must be placed in effect within 52 calendar days of the completion of the mail count in accordance with Section 211.3 of the M-39 Methods Handbook. Exceptions may be granted by a Division General Manager only when warranted by valid operational circumstances, substantiated by a detailed written statement, which shall be submitted to the local union within seven days of the grant of the exception. The union shall then have the right to appeal the granting of the exception directly to Step 3 of the grievance procedure within 14 days.

Date: July 21, 1987

Exceptions may be granted by the *District* Manager when warranted by valid operational circumstances.  In such cases management must provide the local union a detailed written statement substantiating the circumstance(s). The parties have not defined what constitutes "valid operational circumstances."  Challenges to the basis for granting extensions should be considered on a case by case basis on individual merits.  The union may appeal the granting of  an extension to Step B within fourteen days of notification of the extension.

**41.3.E**

E. When the Employer requires the use of certain supply items for the proper performance of a carrier's functions, such items will be supplied by the Employer.

F. A newly appointed carrier or a carrier permanently assigned to a route with which the carrier is not familiar will be allowed a reasonable period to become familiar with the route and to become proficient.

G. The Employer will advise a carrier who has properly submitted a Carrier Auxiliary Control Form 3996 of the disposition of the request

promptly after review of the circumstances at the time. Upon request, a duplicate copy of the completed Form 3996 and Form 1571, Report of Undelivered Mail, etc., will be provided the carrier.

If, while in the normal course of picking up DPS mail, a letter carrier determines the need to file a request for overtime or auxiliary assistance (or to amend a request that was previously filed), the carrier may do so at that time. The supervisor will advise the letter carrier of the disposition of the request or amended request promptly after review of the circumstances. This does not apply if the local parties have agreed upon a practice where the letter carrier has access to their DPS mail prior to filling out the request for overtime/auxiliary assistance (Prearbitration Settlement, H90N-4H-C 94048405, October 21, 1998, M-01366).

**41.3.H**

H. The Postal Service recognizes that representatives of the NALC should be permitted to use available telephones. Accordingly, the Employer at the local level shall establish a reasonable policy regarding the use of telephones by authorized Union officials and stewards for calls relating to the administration of the National Agreement. The policy will be made known to the President of the NALC Branch.

**41.3.I**

I. Carriers shall not finger mail when driving, or when walking up or down steps or curbs, when crossing streets, or at any time it would create a safety hazard to the carriers or the public. Consistent with the efficiency of the operation, mail shall be placed in the delivery sequence in a bundle(s) during strapping out. The Employer shall not be required to conduct a special count or route inspection as a result of this Agreement.

Although there have been no significant Step 4 settlements or arbitration awards interpreting Article 41.3.I, it is wise to bear in mind how arbitrators have generally approached the question of whether employees are justified for refusing to work in a particular place or in a particular fashion because of what the employee believes are unsafe conditions. First, there is the "iron rule" stating that an employee must "obey now and grieve later." Second, there is a narrow exception to that rule which permits an employee to disobey where he or she has a reasonable or good-faith belief that to obey would cause *imminent danger to life or limb*. A mere belief that a safety hazard exists is usually insufficient reason to disobey an order.

**41.3.J**

J. The Employer agrees that, except in matters where there is reasonable cause to suspect criminal activity, postal management or inspectors shall not inspect lockers unless the employee or the Union representative has been given the opportunity to be present. For a general inspection, in which a number of lockers are to be inspected, where employees have had prior notification of at least a week, the above is not applicable.

K. Supervisors shall not require, nor permit, employees to work off the clock.

**Rest Breaks.** National Arbitrator Britton ruled that the Postal Service must ensure that all employees stop working during an office break. Contractual breaks must be observed and cannot be waived by employees (H4N-3D-C 9419, December 22, 1988, C-08555).

**41.3.L**

L. In the interest of safety and health and other appropriate considerations, representatives designated by the NALC will be given an opportunity to examine, comment and to submit recommendations on new vehicle specifications during their development and before the specifications are transmitted to potential contractors, before manufacturing and upon completion of vehicles.

M. The NALC will be informed concerning changes in existing regulations relating to the duties and functions of city letter carriers. Further, it is agreed that when changes of a substantive nature are made they will only be made in accordance with the contractual obligations already binding upon the parties under Article 34, "Work and/or Time Standards."

N. Letter Carriers may cross lawns while making deliveries if customers do not object and there are no particular hazards to the carrier.

**Lawn Crossing.** Although in his Cincinnati Lawn Crossing decision (NC-NAT-13212, August 20, 1979, C-03228), National Arbitrator Sylvester Garrett did not set down clear standards for determining when customers have objected to "carriers" crossing their lawns and when hazards exist which would make crossing lawns unsafe. Garrett did set down the following general guidelines:

1. A carrier may be instructed broadly to take all "obvious shortcuts" and to cross all lawns where there is no reason to believe the customer may object. However, the determination of what constitutes an obvious shortcut or whether a hazard exists is made in the first instance by the carrier. The carrier's judgment can be exercised only in the light of the specific conditions at the location involved.

2. A supervisor may conclude, after personal observation and discussion with the carrier, that a particular lawn should be crossed and order the carrier to cross the lawn. The carrier may not ignore such an order with impunity. His remedy is to file a grievance. However, discipline should not be imposed upon a carrier who had exercised his discretion and not crossed lawns, merely because a supervisor later decides that some of the lawns could have been crossed.

3. The only proper instruction before and during route inspection is that the carrier deliver the route "in exactly the same manner as he does throughout the year." During the route inspection the Examiner "observes but does not supervise." Therefore, "A car-

rier cannot…be directed on the day of a route inspection to take any shortcuts which the carrier does not use throughout the year."

**41.3.O**

O. The following provision without modification shall be made a part of a local agreement when requested by the local branch of the NALC during the period of local implementation; provided, however, that the local branch may on a one-time basis during the life of this Agreement elect to delete the provision from its local agreement:

> "When a letter carrier route or full-time duty assignment, other than the letter carrier route(s) or full-time duty assignment(s) of the junior employee(s), is abolished at a delivery unit as a result of, but not limited to, route adjustments, highway, housing projects, all routes and full-time duty assignments at that unit held by letter carriers who are junior to the carrier(s) whose route(s) or full-time duty assignment(s) was abolished shall be posted for bid in accordance with the posting procedures in this Article."

That provision may, at the local NALC Branch's request during local implementation, be made applicable (including the right to delete it) to selected delivery units within an installation. For purposes of applying that provision, a delivery unit shall be a postal station, branch or ZIP code area. Any letter carrier in a higher level craft position who loses his/her duty assignment due solely to the implementation of that provision shall be entitled to the protected salary rate provisions (Article 9, Section 6) of this Agreement.

**Branch Option on Article 41, Section 3.O.** It is a branch's option to insert (or not insert) the Article 41.3.O language in its Local Memorandum of Understanding during local implementation. Management may not refuse the branch's request to insert the language during local implementation. The branch also may change its mind and, once during the term of the National Agreement, elect to delete the provision from the LMOU.

The protected salary rate provisions are currently found in Article 9.6.

National Arbitrator Briggs held in J94N-4J-C 98009292, October 31, 2003 (C-24768), that a route change of greater than 50 percent does not constitute an abolishment under Article 41.3.O of the National Agreement. This rule does not negate the provisions of Article 30.C or the Article 30 Memorandum, which address existing LMOU provisions (See JCAM pages 30-4 through 30-6).

National Arbitrator Snow held that when routes are posted under the provisions of Article 41.3.O it must be done "in accordance with the posting procedures in this Article" (B90N-4B-C 92021294, March 22, 1996, C-15248). This reference is to Article 41.1.B.2 which provides that postings shall be installation-wide unless the local agreement or established past practice provides otherwise. Thus, if a branch has installation-wide bidding for vacant or newly created duty assignments,

then all assignments in the affected carrier's delivery unit which are junior to that carrier's assignment must be posted for bid on an installation-wide basis. Incumbent letter carriers retain their assignments unless and until displaced by another letter carrier as a result of the bidding process.

An exception to this rule occurs if a branch has defined separate sections for excessing purposes and if an employee has been excessed from the section under the provisions of Article 12.5.C.4. Since Article 12.5.C.4(c) provides the reassigned employee with retreat rights in such cases, as long as an employee has such retreat rights to the section, bidding under the provisions of Article 41.3.O is also limited to employees from the section at the same salary level as the vacancy.

**Carrier Technician Assignments.** In a national level settlement (H1N-3A-C 30176, February 6, 1987, M-00694), the parties agreed that:

> If a local Memorandum of Understanding contains the Article 41.3.O language and changes in T-6 [Carrier Technician] strings are so great that the assignments are abolished, they should be reposted in accordance with Article 41.3.O. If a local Memorandum of Understanding does not contain 41.3.O language, reposting is not required. Changing one route in a T-6 [Carrier Technician] string is not a cause for reposting regardless of local Memorandum of Understanding provisions.

The parties have agreed that Carrier Technician positions should be included in postings under Article 41.3.O (Step 4, H4N-3A-C 62482, July 26, 1990, M-00986).

**VOMA Positions Not Included.** Vehicle Operations Maintenance Assistant (VOMA) positions are multicraft positions. The abolishment of a VOMA position does not trigger the provisions of Article 41.3.O; nor are VOMA positions included when assignments are posted under Article 41.3.O.

**Excessing.** In accordance with the Memorandum of Understanding, *Re: Involuntary Reassignment Without Regard to Level,* "Withheld residual duty assignments that would be part of an Article 41.3.O posting if the positions were occupied, will be made available for selection during the 41.3.O bidding process, unless such withheld residual assignment(s) has already been selected by or assigned to an employee subject to involuntary or a senior in lieu of a junior reassignment pursuant to Article 12." The entire text of this MOU can be found on JCAM page 12-21.

If Article 41.3.O is triggered in a unit where full-time employees have received advance notice of the date of excessing, such employees have the right to participate in the bidding under Article 41.3.O until the excessing actually occurs. However, if an employee is actually excessed prior to the closing date of the posting, the bid is void.

**41.3.P** P. The Employer shall promptly notify the local Union President of any job-related vehicle accidents involving city letter carriers.

Q. The Employer agrees to continue efforts to improve the comfort and temperature level in postal vehicles.

R. A seasonal route is a route on which the weekly hours of required service are substantially increased as a result of an increase in the number of customers served during a specific period each year. These routes are generally located in resort or vacation areas. The following steps will be taken in regard to the service of those routes during the abnormal period or periods:

(a) The duration of the seasonal periods shall be determined by management after discussion with the local Union.

(b) During those periods, auxiliary assistance if requested shall be provided to the maximum extent possible.

**41.3.S** S. City letter carrier mail counts and route inspections and adjustments shall be conducted in accordance with Methods Handbook M-39, Management of Delivery Services, as modified by the parties' Memorandum of Understanding dated July 21, 1981 and October 22, 1984 (incorporated into December 24, 1984 Award).

[see Memos, pages **223, 224, 226, 232, 234, 237 and 242**]

**These Memos are located in the *JCAM*, pages 41-39 through 41-62.**

Article 41.3.S requires that city letter carrier routes be inspected and adjusted in accordance with the Methods Handbook M-39. The memorandums of understanding referenced in this section have been incorporated into the current version of the M-39 and thus no longer appear in the printed version of the contract.

**Special Route Inspections** are governed by the provisions of M-39, Section 270 reprinted below:

**270 SPECIAL ROUTE INSPECTIONS**
**271 WHEN REQUIRED**

Special route inspections may be required when one or more of the following conditions or circumstances is present:

*a.* Consistent use of overtime or auxiliary assistance. (When the X-Route process is utilized, routes may be "built up" no more than 8 Hours and 20 Minutes during the interim period, see Memorandum of Understanding dated September 17, 1992.)

*b.* Excessive undertime.

*c.* New construction or demolition which has resulted in an appreciable change in the route.

*d.* A simple adjustment to a route cannot be made.

*e.* A carrier requests a special inspection and it is warranted.

*f.* Carrier consistently leaves and/or returns late.

*g.* If over any 6 consecutive week period (where work performance is otherwise satisfactory) a route shows over 30 minutes of over-

time or auxiliary assistance on each of 3 days or more in each week during this period, the regular carrier assigned to such route shall, upon request, receive a special mail count and inspection to be completed within 4 weeks of the request. The month of December must be excluded from consideration when determining a 6 consecutive week period. However, if a period of overtime and/or auxiliary assistance begins in November and continues into January, then January is considered as a consecutive period even though December is omitted. A new 6 consecutive week period is not begun.

*h.* Mail shall not be curtailed for the sole purpose of avoiding the need for special mail counts and inspections.

**272 MANNER IN WHICH CONDUCTED**

When special inspections are made because of conditions mentioned in 271, they must be conducted in the same manner as the formal count and inspection.

Management initiated regular or special route inspections are conducted between the first week of September and May 31, excluding December. Employee-initiated special inspections, conducted pursuant to Section 271.g, of the M-39, must be completed within four weeks of the request for a route that qualifies even if the inspection has to be conducted during the months of June, July, or August (National Arbitrator Britton, H7N-NA-C 68, August 12, 1991, C-11099). Neither management-initiated nor employee-initiated route inspections are conducted during the month of December. The special route inspections provided for in this section are conducted in exactly the same manner as regular counts and inspections.

To qualify for a special route inspection, a route must show over thirty minutes of overtime or auxiliary assistance on each of three days or more in each of six consecutive weeks. The month of December is excluded from this six consecutive week period. Only the incumbent letter carrier on a route may make a request for a special route inspection under the provisions of M-39, Section 271.g. The Carrier Technician or a letter carrier who has opted on a route, or the union, for example, may not make the request.

The provisions of Section 271 refer to the route and not the carrier on the route, despite the fact that the purpose of any such inspection is to adjust the route to the individual carrier. Thus the fact that the regular carrier on a route may have been absent for part of the six-week period is not a factor in determining whether a route qualifies for a special inspection (Step 4, H1N-5D-C 12264, July 19, 1983, M-01262; Step 4, H1N-5C-C 22733, August 10, 1984, M-01263; Step 4, H8N-4B-C 21531, July 2, 1982, M-00688).

Once a route qualifies and the incumbent requests a special route inspection it can not be avoided by unilaterally providing relief, or mak-

ing an adjustment. Special route inspections are not unit and route reviews. The right to a special route inspection is unaffected by the fact that the office involved may be undergoing, or be scheduled for, a unit and route review.

**Time Limits.** The time limit for initiating an Informal Step A dispute over the denial of a request for a special route inspection begins on the day the request is denied or on the last day the inspection could be started to comply with M-39 Section 271.g, whichever comes first. The time limit for initiating an Informal Step A dispute does not begin at the end of the six week qualifying period unless that is the date the request was denied (Step 4, E98N-4E-C 02007370, April 29, 2003, M-01486).

Performance deficiencies should be addressed in a timely manner. Once the request is made by the incumbent letter carrier, management should not try to avoid conducting the special route inspection by attempting to identify performance deficiencies after-the-fact. Unsatisfactory performance can be a reason for denying a special route inspection if reasonable efforts towards improving performance to a satisfactory level have not been successful and the reasons have been documented and discussed with the carrier during the six week period. Additionally, "Unsatisfactory conditions such as 'poor case labels,' 'poor work methods,' or 'no route examiners available,' should not be used as an excuse not to conduct the inspection within the 4-week time frame."

**DPS ISSUES**

Adjustments in a DPS environment may be implemented by using the "Hempstead Methodology." (See Memorandum, September 17, 1992, M-01114, Chapter 3, *Building Our Future By Working Together.*) Note that the Hempstead Methodology is used for two separate purposes: to establish TE entitlement and to adjust routes in a DPS environment.

In the unilateral process, management may use either the Hempstead Methodology or the traditional M-39 count and inspection procedures to implement route adjustments to capture DPS savings. In the X-Route process, the parties must agree to use the traditional M-39 count and inspection process. Upon completion of such M-39 count and inspections, the delivery unit may no longer use the Hempstead Methodology to adjust routes (Prearbitration Settlement, H94N-4Q-C 97026594, April 17, 1997, M-01284).

Before the Hempstead Methodology is used, management must first develop a final target percentage for each delivery unit. In the X-Route process this percentage must be between 70 and 85 percent. Adjustments may occur when the target percentage has been reached and maintained for two weeks with a variance of no more than plus or minus 5 percent (Step 4, H90N-4H-C 96002907, April 21, 1998, M-01312). When making Hempstead adjustments, the unit target percentage is applied to each individual route. Total DPS savings for the unit is the sum of the savings

for the individual routes (Step 4, B94N-4B-C 97044293, July 28, 1997, M-01294).

**SIXTY-DAY REVIEWS.** The September 17, 1992 Memorandum entitled *Resolution of Issues Left Open by Mittenthal Award of July 10, 1992* (M-01114) provides that:

> Within 60 days of implementing the planned adjustments for future automated events, the parties will revisit those adjustments to ensure that routes are as near to 8 hours daily, as possible. Both the planned adjustments and subsequent minor adjustments that may be necessary to ensure compliance will be based on the most recent route inspection data for the route. However, if the future event occurs after the 18-month time limit expires, a new mail count, route inspection and evaluation must occur, unless the local parties agree otherwise.

Adjustments required pursuant to the sixty-day review should be implemented within the sixty-day review period. The parties recognize, however, that adjustments within the sixty-day review period may not be possible where there are valid operational circumstances which warrant an exception. When management asserts that valid operational circumstances warrant an exception to the sixty-day period, it must submit a detailed written statement substantiating the asserted circumstances to the local union within seven days following the expiration of the sixty-day period. Disputes concerning the asserted operational circumstances will be resolved through the grievance/arbitration procedure (Prearbitration Settlement, Q94N-4Q-C 96091697, December 3, 1997, M-01268).

No prohibition exists that restricts management from also conducting a one-day count in conjunction with the sixty-day reexamination of planned adjustments. Special Office Mail Counts (See M-39, Section 141.2) are conducted when management desires to determine the efficiency of a carrier in the office, and cannot form the sole basis for route adjustments. The only time restraint imposed by the M-39 is that the carrier must be given one-day's advance notification (Step 4, H90N-4H-C 96077604, January 6, 1997, M-01278).

**Case Configuration.** Upon implementation of DPS, local managers and union representatives jointly determine, on a route by route basis, which of the two currently approved casing work methods is the most efficient for a route (Chapter 5, *Building Our Future By Working Together).*

Selection of a route's work method is by agreement of the local union and management and must be based on efficiency, taking into consideration the impact on street time as well as office time, and the need for additional space and casing equipment. If the local parties cannot agree, the matter should be quickly forwarded to the parties at the national level for a joint resolution (See the March 21, 2000 Memorandum of Understanding on City Letter Carrier DPS Work Methods on JCAM page 41-51).

The two currently approved work methods are:

**Vertical Flat Casing Work Method** (VFC) allows for the casing of residual letters with vertically cased flats and carrying the combined flats/residual mail as a single bundle and carrying the DPS letters as a second bundle.

**Composite Bundle Work Method** allows for the casing and pulling down of residual letter mail separately, and carrying it separately as a third bundle.

The local parties are encouraged to develop efficient new work methods. If one is developed, it must be submitted to the national parties for evaluation of efficiency and approval prior to implementation.

The VFC work method is not the "One-Bundle System" as found in Section 222 a. of the M-41. The "One-Bundle System," the "Two-Bundle System," (Section 222 b.) and the "Modified Two-Bundle System" (Section 222 c.) are pre-DPS systems for casing and preparing mail. As noted above, when a delivery unit implements DPS, the local managers and local union representatives must select one of the two approved work methods, whichever is most efficient.

In non-DPS offices the "Two-Bundle System" and the "Modified Two-Bundle System" casing systems may be used with four or five shelf letter cases. The use of the "One-Bundle System" on other than the standard six shelf letter case requires joint agreement (Chapter 1, *Building Our Future By Working Together)*.

The vertical casing of flats is an option in both non-DPS and DPS delivery units. When first introduced, the vertical casing of flats was implemented through a Memorandum dated January 10, 1990 (M-00983), with accompanying guidelines, that dealt with the number of shelves (four, five, or six) and the prerogative of letter carriers to have input into the size and number of separations within the case(s) on their routes. Section 221.7 of the M-41 (March 1, 1998) provides the authority to configure flat cases for vertically cased flats using four, five, or six shelves.

**Casing Accommodations.** In his June 9, 1997 arbitration award in case Q90N-4Q-C 93034541 (C-16863), Arbitrator Snow ruled that a city letter carrier on a park and loop route in a DPS environment who uses the Composite Bundle Work Method may not be required to work "marriage mail" behind addressed flats.

While his award settled the "Fourth Bundle" dispute over the handling of unaddressed flats on park and loop routes using the Composite Bundle Work Method on unaddressed flat days, it did not settle the issue of how unaddressed flats should be handled on the affected routes. Snow remanded this issue to the national parties for discussion and resolution. (Note: While the arbitration award dealt only with park and loop routes, the parties agreed that the ruling also impacted foot routes and foot delivery portions of mixed routes.)

By Memorandum dated August 12, 1997 (M-01303), the Postal Service and the NALC agreed to conduct a study to determine the relative efficiency of the composite bundle and vertical flat casing work methods, with and without unaddressed flats (See the March 21, 2000 Memorandum of Understanding on City Letter Carrier DPS Work Methods on JCAM page 41-51).

Pending the findings of the study, the Memorandum instructed the local parties to select the most efficient approach for handling unaddressed flats on those park and loop and foot routes in a DPS environment for which the composite bundle work method has been selected. This was to be done by September 6, 1997.

During this period, many delivery units were unable to agree on an accommodation for affected routes. As a consequence, by Memorandum dated September 12, 1997 (M-01304), those offices without an agreement were instructed to meet again, avoid extreme positions, and try to reach a resolution on the accommodation issue on affected routes by September 26, 1997. Absent agreement by the local parties on that date, the Memorandum stated that the national parties would impose a procedure for determining an interim approach. It additionally provided that until the local parties reached an agreement or began the resolution procedure specified by the national parties, the regular carrier on the route would determine the most efficient approach for handling unaddressed flats.

On September 26, 1997, the USPS-NALC Procedure for Determining Interim Approach was sent to the field (M-01305). The document established a procedure to compare the efficiency of a carrier's selected approach to the efficiency of a baseline period, and was to be applied to each affected route on which the local parties had failed to reach an agreement. For each such route, all time used on the route on the first six days unaddressed flats were delivered after September 26, 1997, using the carrier's selected approach, including auxiliary assistance and overtime, would be averaged to determine the average daily total work hours used on the route on those days. This daily total would be compared to the average daily total work hours used on each of the six days unaddressed flats were delivered immediately prior to August 4, 1997.

If the average daily total work hours using the carrier's selected approach did not exceed the average daily total work hours of the comparison period prior to August 4, 1997, the carrier would continue with that approach during the interim period as long as the same level of efficiency was maintained.

If the comparison showed an increase in average daily total work hours with the carrier's selected method, the delivery unit manager and the shop steward were to review the data to determine whether the increase was the result of an increase in office or street time. If an increase in office time was not the result of an increase in volume, or if the street

time increased for any reason, or the carrier's level of efficiency is not maintained during the interim period, management can select the approach for handling unaddressed flats for the remainder of the interim period.

41.4 **Section 4. City Carrier Transportation (Driveout) Agreements**

It is agreed by and between the United States Postal Service and the National Association of Letter Carriers, AFL-CIO, that the following terms and conditions represent the basic understanding of the parties as to the administration of transportation agreements (driveout) of city carriers for the period of this Agreement.

1. The furnishing of a vehicle by a city carrier for transportation to and from the route shall be voluntary; no carrier may be coerced into furnishing a vehicle or carrying passengers or relays without the carrier's consent. A written authorization (Form 1311) shall be executed by the installation head in every instance, with a copy of said authorization to be retained by the installation head and the carrier. Carriers shall not drive their cars to and from the route for their own personal convenience.

2. Reimbursement to a carrier who provides a vehicle shall be determined locally by written agreement between the carrier and installation head and shall be not less nor more than the sum of the amounts computed under each of the factors listed below, as applicable to the individual case.

3. All carriers furnishing a vehicle for transporting themselves, passengers and mail to and from the assigned routes shall be reimbursed on a mileage-zone basis as follows:

   a. For transportation of carrier and carry-out swing from delivery unit to beginning of route when distance is ½ mile or more or from end of route if route begins less than, but ends more than ½ mile from delivery unit.

   REIMBURSEMENT RATES

   | Mileage | Daily Rate |
   | --- | --- |
   | 0.5 to 1.0 | $2.40 |
   | 1.1 to 1.5 | $2.65 |
   | 1.6 to 2.0 | $2.75 |
   | 2.1 to 3.0 | $2.90 |
   | 3.1 to 4.0 | $2.95 |
   | 4.1 to 5.0 | $3.25 |
   | Over 5 | $3.30 plus 20 cents per each additional mile (one way) over five miles to beginning of route. |

   b. When carriers use their vehicles as transportation for distances of more than ½ mile between segments of a route or routes, they will be reimbursed sixty cents for each such movement;

   c. Sixty cents for each mail relay carried, up to a maximum of $3.00 daily;

d. Sixty cents per authorized ride for each carrier or supervisory passenger; and

e. Thirty cents for each article transported larger than the size required to be delivered by foot letter carriers (2 lbs).

Article 41.4.3.e. Prior to the 1978 National Agreement "article" was "parcel." The change was made so that the provision would apply to all classes of mail.

**41.4.3.f**

f. Part-time flexibles providing auxiliary assistance on one or more routes shall be paid at mileage-zone rates indicated above for the first route served, plus sixty cents for each additional authorized move of ½ mile or more.

**41.4.4**

4. Carrier Agreements in effect which provide allowances more favorable than those provided by the schedule in subsection 3 above shall continue in force for the duration of this Agreement unless terminated by either party upon thirty days written notice, or reassignment of the carrier.

**[see Memo, page 228]**

**This Memo is located in the *JCAM*, page 41-40.**

Article 41.4 of the National Agreement does not apply to city carrier assistants. This issue is addressed by the parties' joint Questions and Answers 2011 USPS/NALC National Agreement, dated March 6, 2014. The complete joint Q&As are found on JCAM pages 7-20 through 7-30.

**QUESTIONS AND ANSWERS**
**2011 USPS/NALC NATIONAL AGREEMENT**

**77. May CCAs enter into City Carrier Transportation (Driveout) Agreements, as defined in Article 41.4 of the National Agreement?**

No, Article 41.4 does not apply to CCAs. However, the Memorandum of Understanding, *Re: Use of Privately Owned Vehicles* applies to CCAs. In circumstances where the postmaster or station manager determines that use of a personal vehicle is necessary for business purposes, a CCA may voluntarily elect to use his/her vehicle. Such agreement must be made through PS Form 8048, Commercial Emergency Vehicle Hire, with the daily rate for vehicle use mutually agreed to by the postmaster or station manager and the employee. The postmaster or station manager must then forward the completed form to the servicing Vehicle Maintenance Facility manager.

**41.5**

**Section 5. National Joint City Delivery Committee**

There will be established at the national level a Joint City Delivery Committee. The Committee will be comprised of representatives of the Employer and five Union representatives appointed by the President of the NALC and will meet for the purpose of advising on problems affecting city delivery service and to present suggested changes and improvements in operating procedures. Such meetings will be held semiannually at Postal Service Headquarters.

Agenda items shall be exchanged 15 working days in advance of the scheduled meeting, and written minutes shall be kept of all such

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 409 of 472. PageID #: 1227

Committee meetings. The City Delivery Committee shall receive notice of any proposed changes in any instructional booklet regarding the mail count and route inspection and adjustment system. Recommendations of the NALC representatives will be considered and may be adopted by mutual agreement of the Committee provided they are not in conflict with the National Agreement.

**[see Memos, pages 224 and 226]**

**These Memos are located in the *JCAM*, pages 41-39, 41-40 and 41-61.**

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: Router, Carrier Craft**

1. Router is a Grade 1 city letter carrier assignment.
2. Router duties consist of casing, routing and sequencing of mail for a specific group of routes. Assignments may include specific street duties as reflected in the assignment posting.
3. Router assignments shall be formed and bid as full-time duty assignments. Part-time router work assignments may be utilized consistent with 4 below.
4. The number of full-time router assignments shall be determined consistent with Article 7, Section 3 of the National Agreement.
5. The notice inviting bids shall include a listing of routes for which router's duties will be performed by the posted assignment.
6. A router may be temporarily moved from his/her bid assignment only in "unanticipated circumstances," pursuant to the provisions of Article 41, Section l.C.4. of the National Agreement.
7. A Grade 1 replacement router may be utilized where practical to cover the non-scheduled days of other router assignments.

Date: November 21, 2001

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE AND
THE JOINT BARGAINING COMMITTEE
(American Postal Workers Union, AFL-CIO, and
National Association of Letter Carriers, AFL-CIO)**

**Re: Training Committee**

The Postal Service reaffirms its commitment to provide employees with training consistent with organizational needs. Additionally, the Postal Service recognizes the desirability of affording employees opportunities for self-development and will make training programs available to meet such needs.

The Postal Service will afford the Unions, at the national level, the opportunity to discuss concerns about specific training opportunities or programs. A Joint Committee on Training is hereby established at the national level which will consist of representatives of both parties. The Committee shall meet to discuss matters of mutual interest and ben-

efit relating to training programs and opportunities. The Assistant Postmaster General, Training and Development Department, shall be the Employer's chief representative on such Committee. The Committee may consider and develop pilot programs, improved training methods and strategies, and other matters related to employee training and educational opportunities. Issues concerning local training and educational opportunities including the use of postal facilities for noncompensable training in college accredited courses, publicity of self-development training opportunities, and other training and educational matters of mutual interest and benefit are appropriate subjects for resolution at local labor-management committee meetings.

Consistent with established regulations and operational needs, the Postal Service will give consideration to requests for leave without pay by employees for training and educational opportunities.

The parties agree to consult at the national level to define which specific training courses and/or programs are job-related and those which are self-developmental, including the conditions in which a particular course or set of courses could be either. The parties further agree to initiate such discussions at the national level within 90 days of the effective date of this agreement, and to jointly pursue agreed upon strategies and initiatives.

Date: July 21, 1987

**MEMORANDUM OF UNDERSTANDING BETWEEN THE UNITED STATES POSTAL SERVICE AND THE AMERICAN POSTAL WORKERS UNION, AFL-CIO**

**Re: Use of Privately Owned Vehicles**

The parties agree that the following represents the policy of the U.S. Postal Service and the American Postal Workers Union concerning the furnishing of privately owned vehicles (POV) by employees of the crafts represented by the APWU:

No craft employee represented by the APWU may be coerced into furnishing a vehicle or carrying passengers without the employee's consent. The use of a personal vehicle is the decision of the employee and it is not the intent of the parties to discourage such use of personal vehicles when transportation is needed from one postal facility to another or in the completion of the employee's assignment. When an employee begins his/her work day at one postal unit and is provided transportation to another unit to complete his/her tour of duty, that employee will be provided transportation back to the unit where his/her tour began if transportation is needed. If the employee ends tour at the new location the return trip will not be on the clock but transportation will be provided promptly by management upon request.

Date: July 21, 1987

(The preceding Memorandum of Understanding, Use of Privately Owned Vehicles, applies to **City Carrier Assistant** Employees.)

**SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES POSTAL SERVICE AND THE NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Segmentation**

The United States Postal Service and the National Association of Letter Carriers, AFL-CIO, in joint discussion and consultation, have agreed on a set of principles governing

the implementation of the segmentation concept as provided in the M-39 Handbook (see attachment).

These principles will ensure the efficiencies and effective implementation of the segmentation concept and ensure the fair and appropriate utilization of letter carriers in the performance of the work involved in segmentation.

Statement of Principles:

1. Segmentation of mail can efficiently be processed on automated or mechanized equipment. Such processing will be done by the craft designated to operate that equipment.

2. A manual, tertiary or delivery preparation operation is the manual sortation or preparation of mail that occurs after an incoming secondary operation and does not require memorization of distribution scheme items. A manual tertiary or delivery operation will be done by city delivery letter carriers provided the mail is for city delivery routes or post office box sections served by these routes and provided there is space available at the delivery unit. If space is not available, and sortation is done at a General Mail Facility, a mail processing center, or any other postal installation or facility within the installation, letter carriers will perform the manual tertiary sortation at such facilities. An incoming secondary operation normally requires memorization of distribution scheme items and is one which results in mail being sorted to carrier routes, firms, box section, nixies, postage dues, and other separations necessary for the efficient processing of mail.

3. Routers can be used to perform the manual tertiary sortation of mail segmentation whenever that is operationally feasible. Tertiary sortation duties may also be combined with other forms of letter carriers' work to create full-time assignments.

4. Even though no arbitrary limitation is placed on the number of pieces in a segmentation, a limitation will, in effect, be imposed by whatever number of pieces is operationally effective and efficient for each operation in an installation.

   Standard manual distribution cases that are used in delivery units should be fully utilized for sorting mail to carrier routes, box sections, postage dues, etc. Segmentations should contain sufficient volumes that can be sorted and pulled down efficiently. For example, a single delivery point or ZIP + 4 segment (blockface, apartment building, etc.) that averages two or three pieces a day should not normally take up space on the incoming, manual secondary case. Exceptions could be holdouts such as nixies, postage dues, etc., that require special treatment regardless of volume.

   Segmentations are not necessarily static; therefore, manual secondary cases should be reviewed periodically to ensure that all cells are properly utilized in the most effective and efficient manner possible, consistent with operational or service needs.

5. Each installation will determine the type of equipment to be used in a tertiary sortation. Performance on that equipment will be done in accordance with the principle of a fair day's work for a fair day's pay which will normally be reflected in the general performance expectations for that equipment.

6. The parties understand that the tertiary sortation referenced here is the result of the implementation of the segmentation concept, which is presently described in the changes to the M-39 Handbook as presented to the National Association of Letter Carriers, AFL-CIO, on August 15, 1985. Any tertiary sortation established prior to June 16, 1983, will remain in effect unless changed by the installation. Changes made after June 16, 1983, but prior to implementation of this understanding, which are in conflict with this document, will be changed to conform.

7. The Employee Involvement process will be utilized to develop recommendations for use by the installations affected by this Agreement.

   The National Association of Letter Carriers, AFL-CIO, and the United States Postal Service acknowledge that this Settlement Agreement is not an admission of fault or lia-

bility on the part of either party to this Agreement. The United States Postal Service and the National Association of Letter Carriers, AFL-CIO, also acknowledge that this Agreement sets forth all the terms for settling pending grievance H4N-NA-C 35. The parties agree to meet as soon as practicable to resolve all other outstanding grievances involving segmentation in a manner consistent with this Agreement. The United States Postal Service and the National Association of Letter Carriers, AFL-CIO, agree that the terms of the settlement contained in this document may not be added to or subtracted from, in any way. This Settlement Agreement is without prejudice to the positions of either party with respect to the interpretation or application of the National Agreement in any future proceeding between the parties. The effective date of this agreement is March 9, 1987.

MANAGEMENT OF DELIVERY SERVICES

Handbook M-39

Transmittal Letter 11

November 15, 1985

116.8 Segmentation of Mail

.81 Definition. A major characteristic of the ZIP+4 data file is the segment, or the smallest unit to which distribution can be made. Segmentation is the sortation or preparation of mail into clusters or groupings for the purpose of achieving greater processing and/or carrier sortation efficiency. Using the ZIP+4 segment concept, segmentations may be prepared by customers or contract personnel prior to entry, or in postal operations prior to dispatch or receipt by the carrier. Examples of Segmentations include but are not limited to mail grouped by: unique ZIP+4 code, ZIP+4 blockface, multi-tenant buildings, box sections (including NDCBUs), or individual addresses.

Date: March 9, 1987

**MEMORANDUM FOR POSTMASTERS,**
**CITY DELIVERY OFFICES**
**LOCAL PRESIDENTS, NATIONAL ASSOCIATION**
**OF LETTER CARRIERS, AFL-CIO**

**SUBJECT: Joint Agreements**

The NALC and USPS recognize that our continued existence as a viable organization is heavily dependent upon our ability to meet our customers' needs while empowering employees to levels not previously envisioned.

As many of you are aware, we have strived at the National level to obtain an agreement on the implementation of automation of letter mail on carrier routes. We agreed then, and we agree now, on three basic principles:

—Provide the best service to postal customers (mailers and recipients).
—Minimize impact on letter carrier craft employees.
—Create an opportunity for increased efficiency.

Our mutual hope is that the following agreements will provide a basis for trust and cooperativeness, and that they will form a basis on which to satisfy our customers' needs. While each agreement may not accomplish all that each party may desire, collectively they will form the basis for a positive working relationship of mutual trust and respect, and the foundation for continued empowerment of all employees.

**Case Configuration/Letter-Sized Mail**

This agreement provides for a standard definition of letter-sized mail and provides guidelines for conducting route inspections when letter mail is cased into four- and five-shelf case configurations that have been established as a result of a joint agreement.

**Transitional Employees—Issue Resolutions**

Provides information on the transitional employee and highlights areas of apparent disparity of interpretation where mutual understanding has now been reached. Further, this agreement provides that a joint booklet on the transitional employee will follow.

**X-Route Alternative**

An optional alternative joint process is provided for preparing installations for the future automated letter mail environment. This agreement has many unique features and should be reviewed in detail before deciding its applicability.

**Delivery Point Barcoding Work Methods**

This agreement recognizes the substantial contributions that city letter carriers can make in the development of new work methods. It provides a five-step process that ensures a review of alternative methods and continued upgrading of work methods as the process evolves.

**Route Adjustments—The Future**

The parties have fashioned an agreement that provides clear guidance on procedures to be followed when preparing future route adjustments for letter mail automation in delivery units not selecting the X-route alternative.

**Hempstead Resolution—The Past**

We are remanding all pending grievances on route adjustments to the local parties for resolution. The parties will be guided by the principles of the above-cited agreements and must take into consideration the following factors.

—Was there a current event; that is, were the routes out of adjustment?

—How far in advance was the future event that was used to adjust the route? The parties have made no determination as to the appropriate time period.

—What was the projected timing of the upcoming event?

—What was the basis for determining the effect of the future event?

—How certain is that future event?

As you review each case, you will find that either:

—Management preplanned properly and the current structure is within the purview of this agreement; therefore, the current structure is valid;

or

—Management preplanned inappropriately or time frames have changed, negating the validity of the adjustment.

It is your obligation to make these joint determinations and to decide what remedy to apply and how to fix the problem if one is discovered. The parties should consider the impact of any decision on our employees who serve our customers and the impact on the customers which they serve. If the parties cannot resolve these cases, they may be appealed to regional arbitration.

Date: September 17, 1992.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO
RESOLUTION OF ISSUES LEFT OPEN BY
MITTENTHAL AWARD OF JULY 10, 1992**

**Current Events and Adjustments**

A current event is defined as a route or routes which are shown to be out of adjustment by a recent route inspection and evaluation. All current adjustments to existing routes will place the route on as near an 8-hour daily basis as possible, in accordance with Handbook M-39.

**Adjustments Near Term—Automation**

When routes require a current adjustment and Delivery Point Sequencing will commence within 6 months, management will adjust the routes using non-territorial, non-scheme change adjustments by the use of router assistance, segmentation or permanent handoffs as outlined in the M-39 Handbook Section 243.21b. The 6-month period runs from the first day after the week of route inspection.

**Future Events and Adjustments—Automation**

Management may utilize the results of a recent route inspection and evaluation to estimate and plan route adjustments, including realignment of assignments, that will be required by a future event which is to take place within 18 months. Management must provide documentation to the local union to support the deployment if they intend to plan the adjustments for a future event. The planned adjustments for future events will not be implemented until automation is on line and operative. Management may implement the planned adjustments if the actual percentage of Delivery Point Sequence (DPS) mail received at the unit is within plus or minus 5 percentage points of the targeted (in Step l) level. Should the actual percentage of DPS mail be outside these limits, then management must recalculate the estimated impact on carrier routes, based on the actual percentage of DPS mail being received at the unit. The results of the recent route inspection and evaluation will be used to determine a new impact and construct a new plan or management may wait for the plan levels to be received. The 18-month period runs from the first day after the week of route inspection. For purposes of this agreement, a future event is defined as mail being received at a delivery unit in DPS order.

Within 60 days of implementing the planned adjustments for future automated events, the parties will revisit those adjustments to ensure that routes are as near to 8 hours daily, as possible. Both the planned adjustments and subsequent minor adjustments that may be necessary to ensure compliance will be based on the most recent route inspection data for the route. However, if the future event occurs after the 18-month time limit expires, a new mail count, route inspection and evaluation must occur, unless the local parties agree otherwise.

**Methodology**

Where the future event is the introduction of Delivery Point Bar Coding (DPBC) for existing equipment or equipment that will cause a certain percentage of letter mail to be received by the unit in DPS, the following methodology will be used to *estimate* the impact of the event on city delivery routes:

Step 1. Determine the percentage of letter-sized mail *targeted* to be received in DPS order on the date when the adjustments will be implemented.

Step 2. Multiply percentage determined in Step 1 by the average letter-sized mail received during the week of count and inspection (from PS Form 1840, Column 1) to determine the number of letters for each route, *targeted* to be received in DPS order.

Step 3. Divide letters *targeted* to be received in DPS order (as determined in Step 2) by 18.

Step 4. Divide letters targeted to be received in DPS order (as determined in Step 2) by 70.

Step 5. Add results of Steps 3 and 4 to determine estimated impact.

Step 6. For routes where the carrier was under standard time during the week of count and inspection, multiply results of Step 5 by percentage of standard office time used during the week of inspection. The result is the estimated impact.

**EXAMPLE 1:**

80 Percent Target for Letter Mail Carrier at/over*
Standard Time Allowance

2,700 Letters
80 Percent Automated

2,160 divided by 18 = 120 minutes
2,160 divided by 70 = 31 minutes
151 minutes = estimated impact

Note: If actual performance is over standard time allowance, the standard casing allowance of 18 pieces per minute is used.

**EXAMPLE 2:**

80 Percent Target for Letter Mail Carrier used 85 Percent of Standard Time Allowance

2,700 Letters
80 Percent Automated

2,160 divided by 18 = 120 minutes
2,160 divided by 70 = 31 minutes
151 minutes = estimated impact

(Step 6) 151 x 85 Percent = 128 minutes = estimated impact.

It is mutually agreed that as the parties develop experience in estimating the impact of future events, adjustments to the above described methodology may be jointly adopted at the national level.

**Pending Grievances**

All pending grievances which involve the adjustment of routes for future events will be remanded to the local parties for resolution.

Date: September 17, 1992.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**X-Route Alternative**

The parties have reached agreement on an alternative Route Adjustment strategy—X-Route. The decision to use the X-Route Concept is made on an installation wide basis, even though inspections and planning for individual units/zones may not occur at the

same time. In units with more than one delivery unit/zone the planning process is repeated as each delivery unit/zone is inspected, assignments are evaluated and adjustments are planned.

**X-Route Process**

The X-Route process is an alternative approach to route adjustment in preparation for automation, particularly delivery point sequencing. An X-Route is, in effect, a letter carrier craft assignment held pending reversion. The workload will be divided among remaining routes when agreed upon percentage(s) of letter mail is being received at a unit/zone in delivery point sequence order. The process allows changes to be planned in advance and permits carriers to know what their assignments are expected to be in the automated environment. The X-Route process and time period are considered completed when the unit/zone has achieved the final targeted level of Delivery Point Sequence letter mail and the X-Route work has been distributed.

**Pre-Agreement Phase**

If there is interest in attempting to utilize the X-Route alternative, local management will meet with the local union to review the provisions of this agreement. This includes a review of the attached Memorandum of Understanding on case configuration, the Work Methods Memorandum, guidance on the Hempstead case resolution and current base count and inspection data. If current route inspection data is not available, plans should be made to conduct route inspections in accordance with Article 41.3.S of the National Agreement to provide a basis to implement the remainder of this agreement.

If the parties are considering pursuing this alternative, they must be committed to mutual resolution of the outcome. Management will share the following information with the union:

The expected accounting period(s) and year that increases in bar-coded mail generated by the Automation Programs will impact the delivery unit/zone, such as customer prebarcoding, MLOCR, DBCS, and RBCS.

The projected impact on the delivery unit/zone of automated sort schemes, and the basis for the estimate.

**Agreement Phase**

It must be understood, once the decision to use the X-Route process has been finalized, that decision can only be changed through joint agreement between the local union and management.

Since the planning and adjustment(s) in a delivery unit/zone using the X-Route alternative are a joint endeavor, the parties at the local level must first agree to a joint resolution process, should there be a barrier to full implementation of the parties agreement to use the X-Route alternative.

The parties will then meet to review route examinations for the unit/zone. This exercise is intended to result in agreed upon evaluations.

If the parties fail to reach agreement regarding the use of the X-Route alternative, management may proceed to implement strategies in concert with handbooks and manuals, the Hempstead Resolution, and the National Agreement to accomplish route adjustments. However, the provisions of this agreement are specific to application of the X-Route concept only and are not applicable to any other route adjustment method.

In working out the X-Route adjustment process for the delivery unit/zone, it is recognized and agreed that:

Management must develop the final targeted Delivery Point Sequencing percentage (from a low of 70% to a high of 85%) of delivery point sequencing letter mail for the X-Route period. That percentage is then used to estimate the impact on the unit/zone using the projection methodology outlined in the Hempstead resolution. The parties will joint-

ly determine the number and identity of the routes that will be designated as X-Routes using the above estimates of the impact on the delivery unit. While the X-Route concept may not be applicable to all routes within an installation because of limiting circumstances (i.e., geographic considerations), such circumstances will not be a barrier to implementing the concept. This determination as to the non-applicability to certain routes will be made jointly.

The parties must jointly determine what realignment of routes (in-office or street territory) will be necessary to assure that X-Routes are strategically placed to facilitate the transfer of workload as delivery point sequencing evolves. The decision as to when to realign the routes should be based upon the current need for realignment in order to place the routes on as near an eight-hour-basis as possible based upon the current evaluation from a recent inspection. The parties could decide to defer the proposed realignment of routes until Delivery Point Sequencing was implemented if no significant scheme changes were required to keep routes near eight hours, or they could decide to make the necessary scheme changes for the realignment of routes now if significant scheme changes were going to be needed to adjust routes to eight hours as currently evaluated. In no instance will the parties effect adjustment now based on the future event, except as provided under interim adjustments (below). The regular carrier on any route whose street territory is changed as a result of this adjustment and realignment may elect, on a one-time basis, to vacate his/her route and become an unassigned regular. Such action will not trigger the provisions of Article 41.3.O. All positions vacated in this manner will be posted and filled in accordance with the procedures set forth in Article 41.1.

Where exceptional circumstances require further adjustments, they must be jointly agreed to by the parties. The objective is to provide a smooth transition to the Delivery Point Sequencing environment. Such an outcome requires no change in day-to-day administration of curtailment procedures, auxiliary assistance or overtime.

The parties agree that adjustment strategies for Delivery Point Sequencing will vary based on individual offices, deployment schedules and types of deliveries. For instance, offices that will be impacted by RBCS destinating keying prior to Delivery Point Barcoding and offices further along in the deployment schedule may be at final targeted barcoding levels when Delivery Point sequencing commences and therefore require only one adjustment.

Some offices may initiate DPBC and Delivery Point Sequencing prior to full barcoding levels and require an interim adjustment strategy. Adjustment strategy decisions will be made jointly based on deployment schedules and current automation.

Once the Postal Service has implemented delivery point sequencing and can demonstrate that the routes in a delivery unit/zone are receiving volumes at the targeted percentage, the local parties will implement the preplanned adjustments. Where an interim adjustment strategy will be necessary as described above due to the gradual increasing of DPBC levels, the local parties will meet and make interim adjustments by removing work from the X-Routes and assigning that work to the regular routes which will remain after full implementation of delivery point sequencing.

After the completion of each interim adjustment, the parties will jointly determine the amount of hours remaining on the X-Routes and will jointly decide how to efficiently combine assignments to provide the maximum number of full-time assignments. If this cannot be accomplished in an efficient manner, the parties may jointly decide to either form auxiliary assignments or split the remaining hours from these assignments to the regular routes that will remain once the final delivery point sequencing adjustments have been made. Where this latter option is agreed upon, it is understood that routes will be built up (not to exceed 8:20). If less than 100% of the routes will be built up, the following priority should be observed if efficiency can be maintained:

(1) By seniority, routes whose regular carrier are on the Work Assignment List.

(2) By seniority, routes whose regular carrier are on the Overtime Desired List.

(3) By inverse seniority, carriers not on any Overtime Desired List.

Incumbents of, and bidders for, routes that are projected to continue after full implementation of automation will know, in advance, what portions of the X-Route a delivery route will receive after full delivery point sequencing is on-line. X-Routes will be posted for bid when vacant, as long as they remain full-time assignments. When an X-Route becomes vacant and is posted for bid, the bid notice will include the anticipated date of elimination.

When an X-Route is abolished, the full-time carrier assigned to that route will become an unassigned regular. He/she may, within 30 days, review the list of residual vacancies within his/her bidding area and use his/her seniority to exercise a preference for that assignment. This may be accomplished by a bid posting limited to unassigned full-time carriers displaced by abolishment of X-Routes or by other means agreed to locally between the parties. (The provisions of Article 41.3.O., where they have been incorporated in the local memorandum, will not be triggered by this process.)

The use of transitional employees in a unit where route adjustments are achieved under the X-Route concept will be in accordance with the relevant National Interest Arbitration Award and any subsequent agreement(s) between the United States Postal Service and the National Association of Letter Carriers, AFL-CIO.

Date: September 17, 1992.

**MEMORANDUM OF UNDERSTANDING BETWEEN THE UNITED STATES POSTAL SERVICE AND THE NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

The U.S. Postal Service and the National Association of Letter Carriers, AFL-CIO, recognize the importance of the work methods that will be used in a delivery point sequence environment. The parties also realize the substantial contribution that letter carriers can make in the development of these work methods. Towards facilitating that involvement, the following principles have been agreed to by the parties at the national level:

1. The following are the approved work methods:

    - Case residual letters in the same separations with vertically cased flat mail, pull down and carry as one bundle.
    - Case residual letter mail separately into delivery sequence order, pull down and carry as a composite (third) bundle.

2. As implementation of the delivery point bar coding impacts a delivery unit, local parties will select the most efficient work method possible from the delivery point sequence work methods authorized in number 1 above. If the local parties cannot agree on the most efficient work method, the issue will be presented to the parties at the Headquarters level to determine the most efficient work method.

3. Local parties will also be encouraged to develop efficient new work methods and to share their ideas with the parties at the national level for joint review and evaluation. The purpose of this joint review and evaluation will be to determine the efficiency of the local method. After the review and evaluation of the new work method and if the method proves to be efficient, it will be added to Item 1 above.

4. The parties agree that the work method in place at the delivery unit will be utilized in the day-to-day management of letter carrier routes and in the procedures for inspection, evaluation and adjustment of routes.

5. The parties at the national level will continually review alternative methods in an effort to improve efficiency. Both parties agree that the process of continual joint review of new and more efficient work methods will result in the continued upgrading at the local delivery unit of the most efficient work method.

Date: September 17, 1992.

---

(See the March 21, 2000 Memorandum of Understanding on City Letter Carrier DPS Work Methods on page 41-51).

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

For the purpose of conducting mail counts and route inspections on traditional casing equipment, letter size is defined as mail that can be cased into the letter separations of a standard six-shelf case without folding or bending (approximately six inches in height). Letter size does not include newspapers, rolls, small parcels, flats, magazines, or catalogs under two pounds, even though these items may be cased into the letter separations of a standard case without folding or bending.

When mail counts and route inspections are conducted in a unit where letter mail is cased into four- and/or five-shelf case configurations that have been established as a result of any joint agreement, the existing definition of letter-sized mail will not change; the 18 and 8 standard remains applicable. Under these conditions, local management will meet with the local union prior to the dry run training to determine an efficient means to verify mail of questionable size during the week of count and inspection, e.g., a measuring strip on each case or use of a template as a reference point.

The acceptance by the parties of this approach to letter size definition and case configuration is without prejudice to the parties' rights under Article 34 of the National Agreement, and shall not be cited by either party in the grievance or arbitration procedure or any other forum which does not pertain to the implementation of this agreement.

Date: September 17, 1992.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**RE: TRANSITIONAL EMPLOYEES/PART-TIME FLEXIBLE CONVERSIONS**

1. All part-time flexibles (PTFs) currently on the rolls will be offered an opportunity to convert to full-time regular status by November 20, 1994. The conversion opportunity may be contingent on the PTF's agreement to move to an available full-time assignment during this period. However, it is the intent of the parties that any such requirement to change offices will not be utilized by management as a device to discourage conversions and that inconvenience and disruption to PTFs will be minimized.

PTFs will be converted to available full-time assignments in their current installation. If insufficient full-time assignments are available to accommodate all PTFs in an installation, the remaining PTFs will be offered the opportunity to transfer to available full-time assignments within the commuting area, and the local union will be provided a list of all such assignments. The local union representative will be responsible for ascertaining the preferences, by use of seniority, of the PTFs who decide to accept a conversion opportunity in another installation and for communicating that preference to management. If PTFs from different installations seek the same assignment in another installation, craft seniority will determine which PTF gets that conversion opportunity.

If the foregoing process does not result in the offer of a conversion to all PTFs in an installation, the Postal Service will identify other conversion opportunities, including assignments outside the commuting area, during the conversion period. Any decision by a PTF to transfer to another office under this agreement will be considered voluntary.

2. In lieu of the DSSA analysis provided in the January 16, 1992, NALC Transitional Employee (TE) arbitration award, the parties will use the impact formula contained in the September 21, 1992, Hempstead Memorandum of Understanding to determine the number of TE hours allowed in a delivery unit due to automation impact. All such TEs will be separated in a delivery unit when Delivery Point Sequencing (DPS) is on-line and operational.

3. The parties further agree that in offices (automation impacted or non-impacted) where the number of PTF conversions exceeds the number of TEs allowed under the above impact formula, additional TEs may be hired to replace such PTF attrition. All such TEs will be separated from the rolls by November 20, 1994.

4. All pending national grievances seeking conversion of PTFs will be resolved by offering the affected PTFs the opportunity to convert to full-time regular assignments on a priority basis pursuant to this agreement. This agreement is without prejudice to the positions of either party with respect to any interpretive issue.

5. The parties at the local level will meet to review the current TE complement and pending TE or PTF grievances as follows:

   - The meeting will occur after the joint training and during the local meeting on Hempstead issues;
   - The parties will attempt to resolve any pending grievances, including appropriate remedies for violations, if any. The Postal Service's liability, if any, will be limited to any TE hours in excess of that allowed by paragraphs 2 and 3 above which occurred prior to the date of this agreement;
   - If TE hours in a delivery unit exceed that allowed by paragraphs 2 and 3 above, management must, no later than 3/1/93, either: (1) relocate TEs to another delivery unit to stay within the allowable limits; or (2) reduce work hours per TE, so as to stay within the allowable limits; or (3) remove excess TEs from the rolls.

6. The parties herein express the desirability of affording future career employment opportunities to TEs. Consistent with that view, the parties agree to jointly explore the feasibility of such career opportunities, consistent with applicable law.

Date: December 21, 1992.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: City Letter Carrier DPS Work Methods**

This Memorandum of Understanding (MOU) represents the parties' final agreement regarding the October 8, 1998, Joint Work Methods Study to determine the more efficient work method for city delivery routes in delivery units where Delivery Point Sequence (DPS) has been, or will be, implemented. This MOU is based on the results of a joint study conducted by the parties pursuant to Chapter 5 of Building Our Future By Working Together to determine the relative efficiency of the composite bundle and vertical flat casing work methods in a DPS environment. Further, any interim or local agreements for handling the fourth bundle on park and loop and foot routes will continue until conversion to the DPS vertical flat casing work method. In accordance with paragraph 3 of the October 8, 1998, Joint Work Methods Study Agreement the following are the parties' joint instructions to the field:

1. There continue to be two approved DPS work methods: the composite bundle work method and the vertical flat casing work method. Any other work methods must be approved by Postal Service Headquarters prior to testing or implementation.

2 The parties have analyzed the results of the joint study and have determined that the vertical flat casing work method is the more efficient work method at all sampled percentage levels of DPS. Management may convert those routes that have vertical flat cases and are currently using the composite bundle work method to the vertical flat casing DPS work method.

3. On curbline routes and business routes where DPS is planned, but not implemented, management will determine the most efficient DPS work method. All other routes not yet converted to DPS which have vertical flat cases will use the vertical flat casing DPS work method.

4. On those routes where DPS is not currently planned but where DPS is implemented in the future, management will determine the DPS work method.

5. City letter carriers on a park and loop or foot route will not be required to carry more than three bundles.

Date: March 21, 2000

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

It is hereby agreed by the U.S. Postal Service and the National Association or Letter Carriers, AFL-CIO that the following represents the parties' agreement with regard to implementation of the upgrade issue emanating from the September 19, 1999, Fleischli Award, our agreement regarding case configuration when using the vertical flat casing work method, and additional provisions relative to the 1998 National Agreement.

1. Effective November 18, 2000, all city letter carriers grade 5 will be upgraded and the pay differential of grade 6 carrier technicians shall be maintained in accordance with the procedures set forth in the attached Memorandum of Understanding.

2. The provisions of Article 35, Section 2, concerning the national joint EAP committee will be renewed for the remainder of the term of the 1998 National Agreement.

3. The Memorandum of Understanding Re: Leave Sharing found on page 161 of the 1994 National Agreement will be renewed for the remainder of the term of the 1998 National Agreement.

4. The Memorandum of Understanding Re: Sick Leave for Dependent Care found on page 162 of the 1994 National Agreement will be renewed for the remainder of the term of the 1998 National Agreement.

5. The 30-day period of local implementation specified in Article 30 and the Memorandum of Understanding Re: Local Implementation will commence on October 2, 2000.

6. When management elects to reassess the case configuration of a route currently using the DPS Vertical flat casing work method or changes the DPS work method on a route from the composite bundle work method to the vertical flat casing work method, management will determine for each route, whether 4, 5, or 6 shelves will be used.

Date: March 21, 2000

**PRE-ARBITRATION SETTLEMENT**
**Q94N-4Q-C-99022154 (M-01444)**

The issue in these grievances is whether or not the Piece Count Recording System (PCRS), Projected Office Street Time (POST), or the Delivery Operations Information System (DOIS) violate the National Agreement.

After reviewing this matter, we mutually agreed to settle these grievances as follows;

Daily piece counts (PCRS) recorded in accordance with the above-referenced systems (POST or DOIS) will not constitute the sole basis for discipline. However, daily counts recorded in accordance with these procedures may be used by the parties in conjunction with other management records and procedures to support or refute any performance-related discipline. This does not change the principle that, pursuant to Section 242.332 of the M-39, "No carrier shall be disciplined for failure to meet standards, except in cases of unsatisfactory effort which must be based on documented, unacceptable conduct that led to the carrier's failure to meet office standards." Furthermore, the pre-arbitration settlement H1N-1N-D 31781, dated October 22, 1985, provides that "there is no set pace at which a carrier must walk and no street standard for walking."

This settlement is made without prejudice to the parties' rights under Article 19 or Article 34 of the National Agreement.

It is additionally understood that the current city letter carrier route adjustment process is outlined in Subchapter 141 and Chapter 2 of the M-39 Handbook. All those functionalities in DOIS, which relate to the route inspection and adjustment process, must be in compliance with these two parts of the M-39 as long as they are in effect.

It is understood that no function performed by POST or DOIS, now or in the future, may violate the National Agreement.

Date: July 30, 2001

**STEP 4 SETTLEMENT**
**Q98N-4Q-C 01045840 (M-01458)**
**WASHINGTON, DC**

The Managed Service Points (MSP) initiative is a national program intended to facilitate management's ability to assess and monitor city delivery route structure and consistency of delivery service. The following reflects the parties' understanding of MSP:

The parties agree that management will determine the number of scans on a city delivery route. Time credit will continue to be given during route count and inspections and will be credited in total street time.

MSP does not set performance standards, either in the office or on the street. With current technology, MSP records of scan times are not to be used as timecard data for pay purposes. MSP data may not constitute the sole basis for disciplinary action. However, it may be used by the parties in conjunction with other records to support or refute disciplinary action issued pursuant to Article 16 of the National Agreement.

City letter carriers have the option of using a personal identification number (PIN) other than the last four digits of their social security number.

Section 432.33 of the Employee and Labor Relations Manual (ELM) remains in full force and effect when MSP is implemented. It provides that "Except in emergency situations, or where service conditions preclude compliance, no employee may be required to work more than 6 continuous hours without a meal or rest period of at least ½ hour."

Lunch locations for both the incumbent and carrier technician on a city delivery route continue to be determined in compliance with Section 126.5.b(2) of the M-39. PS Form 1564A "Delivery Instructions" lists the place and time that city letter carriers are authorized to leave the route for lunch. However, the parties recognize that, consistent with local instructions and operational conditions, city letter carriers may be authorized to leave at a different time and/or place. Notwithstanding this, the parties agree that city letter carriers will scan MSP scan points as they reach them during the course of their assigned duties.

Date: March 13, 2002

When letter carriers leave their office and begin delivery before or after their normal leaving time, they may reach the point at which they are authorized to leave their route for lunch at other than the time they are authorized to leave based on the current PS Form 1564-A. The parties should continue to handle those situations as they have in the past. The settlement states that "City letter carriers will scan MSP scan points as they reach them during the course of their assigned duties." This means that the "lunch" scans are to be treated no differently than any other scans on a route. They should simply be scanned whenever the carrier reaches them.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**RE: FSS Implementation**

The United States Postal Service and National Association of Letter Carriers, AFL-CIO mutually recognize that the delivery point sequencing of flat mail will change the delivery environment, ultimately producing better service for postal customers. The Postal Service experienced significant benefits in 1993 by automating the processing and sequencing of letter mail, as the parties worked together to implement that technology. In the interest of working jointly on this technology the parties agree to the following:

1. Once FSS is fully implemented in a delivery unit, management will determine the methods to estimate impact in a delivery unit and make route adjustments accordingly.

2. Sixty days after implementing route adjustments for FSS, the local parties will review the adjustments to ensure that routes are as near 8 hours as possible. This sixty day period will not count toward the special route inspection process (Section 271, Handbook M-39; Section 918, Handbook M-41). If either party determines that the route(s) is not properly adjusted, then the route(s) will be adjusted in accordance with the provisions of Handbook M-39 or, if applicable, a locally agreed upon adjustment formula.

The terms of this Memorandum are effective immediately and continue through all phases of Flats Sequencing System (FSS) implementation.

Date: September 11, 2007

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**RE: FSS Work Methods**

The Flat Sequencing System (FSS) provides the means to present flats to letter carrier routes in Delivery Point Sequence (DPS) order. Recognizing that a substantial investment has been made in the FSS and in order for the Postal Service to remain efficient and competitive, it is necessary to explore alternative methods of handling DPS flat mail by city letter carriers. Understanding that the parties' respective interests are best served through a cooperative effort, the United States Postal Service (USPS) and National Association of Letter Carriers (NALC) agree to jointly examine methods and procedures related to handling DPS flats.

Effective with the signing of this Memorandum, a Joint Task Force comprised of four members from the NALC and four from the Postal Service will be established to explore alternative work methods necessary for handling mail in an FSS environment. The Task Force will attempt to reach agreement on necessary studies and potential work method changes, as well as implementation and operating procedures. The Task Force will submit a final report outlining findings and recommendations to the NALC President and the Postal Service Vice President, Labor Relations no later than February 18, 2008.

In the event the Task Force is unable to reach agreement on any or all issues involved with handling mail in an FSS environment, the Postal Service may implement FSS work methods by providing the union with written notification. The parties agree that city letter carriers on park and loop or foot deliveries will not be required to carry more than three bundles. If the union believes that any management initiated work method is not fair, reasonable, or equitable the union may, within twenty-one days of notice, initiate a national-level dispute. Such dispute will be scheduled for arbitration on a priority basis; beginning no later than March 25, 2008, with a final award rendered no later than July 15, 2008. The scope of the national-level dispute is limited to whether the disputed work method(s) is fair, reasonable, or equitable.

The parties agree that the above is the sole and exclusive process for establishing methods for handling mail in an FSS environment by city letter carriers and that no other procedural requirements (e.g., Article 34, Article 19) are necessary or relevant. This agreement is without prejudice or precedent and may only be cited by either party to enforce its terms.

Date: September 11, 2007

**FLAT SEQUENCING SYSTEM (FSS) SETTLEMENT**
**Q01N-4Q-C 07091320 (M-01665)**

Recently our representatives met in discussion of the above-referenced grievance.

The issue in this grievance concerns the method of determining Flat Sequencing System (FSS) impact and the associated employment of Transitional Employees.

As a result of our discussions, it is agreed that the above referenced grievance is withdrawn and that this agreement resolves and closes all outstanding disputes at all levels of the grievance-arbitration procedure concerning FSS impact and the associated employment of Transitional Employees.

Date July 30, 2007

The terms of this settlement became effective September 11, 2007 with the ratification of the 2006-2011 National Agreement.

**FLAT SEQUENCING SYSTEM (FSS) SETTLEMENT**
**Q06N-4Q-C 11288800 (M-01831)**

Recently our representatives met in prearbitration discussion of the above-referenced grievance.

After reviewing this matter, the parties agree to the following:

Under the Memorandum of Understanding Re: FSS Implementation, management has the right to plan for Flat Sequencing System (FSS) implementation. The parties agree the intent of the subject memorandum is that once FSS is fully implemented, management will determine the final method used to estimate the impact FSS has on individual route(s) and when initial route adjustments will be made.

If the Carrier Optimal Routing (COR) program is used to make route adjustments pursuant to paragraph 1 of the Memorandum of Understanding, Re: FSS Implementation, the back of the PS Form 1840 will indicate, by sector-segment, any change in street credit from the actual street time used in sector-segment on PS Form 3999; including all relay, allied, parcels, accountables, etc. Any such adjustment to the carrier's actual street time must be documented and explained by appropriate comments on the reverse of PS Form 1840 and discussed during the carrier's route adjustment consultation. Travel To, Travel From, and Travel Within times must be validated, documented, and discussed during carrier consultation.

If either party determines sixty days after an initial adjustment is made pursuant to the MOU Re: FSS Implementation that a route(s) is not properly adjusted and there is no locally agreed upon adjustment formula, then the route(s) will be adjusted in accordance with the provisions of Handbook M-39. This refers to a traditional six day count and inspection conducted pursuant to Chapter 2 of Handbook M-39

Any grievance currently held for this case will be discussed to determine whether any issues remain in dispute. Such cases will, as appropriate, either be closed or processed in accordance with Article 15.Step B or Article 15.4.B.5.

**CARRIER OPTIMAL ROUTING (COR) SETTLEMENT**
**Q01N-4Q-C 05022605 (M-01661)**

After reviewing this matter, the parties agree to the following:

The Carrier Optimal Routing (COR) process is a management tool to assist with the adjustment of letter carrier routes pursuant to Chapter 2 of Handbook M-39. No components of the COR program or application of the COR process will be inconsistent with the route inspection, evaluation, or adjustment process found in Chapter 2 of the M-39 Handbook.

Should the Postal Service develop COR for use in the minor route adjustment process, related components of the COR program or application of the COR process will be consistent with the specific minor route adjustment formula in Section 141.19 of Handbook M-39. Local parties that have established, by mutual agreement, an alternate route adjustment method may also use applications of COR consistent with their alternate route adjustment process.

To facilitate the practical application of this understanding, when transferring territory the back of the PS Form 1840 will indicate, by sector segment, any change in street credit from the actual street time used in sector-segment on PS Form 3999; including all relay, travel, allied time, etc. Any such adjustment to the carrier's actual street time must be documented and explained by appropriate comments on the reverse of PS Form 1840. Additionally, any time adjustment to the base street time, which must be selected pursuant to M-39 Section 242.321, will be documented and explained under the comments section on the reverse of PS Form 1840. Travel To, Travel From, and Travel Within times must be validated, documented, and discussed during carrier consultation. The actual time should be taken from the Inspection PS Form 3999, unless a new pattern is created during the route adjustment process. If a new travel pattern has been created, the new times must be validated.

Notwithstanding any disputes regarding documentation of and/or justification for time adjustments made, the intent of the previous paragraph is for the letter carrier to be made aware of any proposed time adjustment to the carrier's base street time and/or to the street time of the territory being transferred. Time adjustments for territory being transferred will be by sector-segment, including all relay, allied, parcels, accountables, etc. Any time adjustment to a carrier's base street time must comply with the M-39 Section 242.345 through 242.347.

Any grievance held pending a decision on this case will be resolved consistent with the principles of this agreement.

Date July 30, 2007

The terms of this settlement became effective September 11, 2007 with the ratification of the 2006-2011 National Agreement.

**S-999 MAIL SETTLEMENT**
**Q01-N-4Q-C 06187579 (M-01662)**

The issue in this case is whether S-999 mail (hold mail, caller mail, change of address mail, non-delivery day mail) processed on Delivery Point Sequence (DPS) automation equipment must receive piece credit on section 1 of PS Form 1838-C or actual time recorded on line 21 of 1838-C during route count and inspection.

The parties discussed how to record S-999 mail, multi point mail, 9 digit mail that is not finalized in DPS order, and mail that is brought back from the street in the afternoon during a count and inspection. The parties agree that if this mail is cased in the carrier case it will be recorded on PS Form 1838-C sections 1 or 2, as applicable. Any of this mail that is not cased in the carrier case will be handled and recorded on line 21.

Date: July 30, 2007

The terms of this settlement became effective September 11, 2007 with the ratification of the 2006-2011 National Agreement.

**THIRD BUNDLE SETTLEMENT**
**Q98N-4Q-C 00189552 (M-01663)**

Case Q98N-4Q-C 01045570 arose as a result of the application of the March 21, 2000, Memorandum of Understanding (MOU) Re: City Letter Carrier DPS Work Methods. The issue in this grievance is whether city letter carriers in a DPS environment using the vertical flat case (VFC) work method on park and loop or foot deliveries may be required to carry pre-sequenced addressed mail as a third bundle, when DPS letters and cased mail (flats and non-DPS letters) constitute the first and second bundles.

The parties agree that:

1.The March 21, 2000 MOU did not provide the Postal Service with the right to require letter carriers on park and loop or foot deliveries to carry pre-sequenced addressed mail as a third bundle.

2.The parties' prior agreements for carrying third bundles were not modified in any way by the March 21, 2000 MOU. These prior agreements include the following two circumstances:

a. pursuant to the 1980 'simplified address mail' agreement, which allows the placement of such unaddressed mail on the bottom of the appropriate mail bundle; and

b. in accordance with the 1992 memorandum providing for the DPS composite work method, which includes residual letters, DPS letters, and flats.

Case #Q98N-4Q-C 00189552 arose as a result of handbook modifications indicating that city letter carriers on park and loop or foot deliveries may be required to carry up to three bundles of mail.

Notwithstanding the above agreement, the parties recognize that the Postal Service and its employees have an obligation to the American public to provide cost effective quality mail service. We also recognize that the changing nature of the mail (e.g., decreasing First-Class Mail volume, increasing parcels and increasing automation) necessitate changes in our work methods. Therefore, the parties further agree that:

1. In accordance with the recognitions cited in the above paragraph, effective with the signing of this agreement the parties agree that city letter carriers on park and loop or foot deliveries who currently carry three bundles will continue to carry as a third bundle, within weight restrictions, Enhanced Carrier Route (ECR) and Periodicals walk sequenced letter or flat mailings (WSS) that have either 90% or more coverage of the total active residential addresses, or 75% or more coverage of the total number of active deliveries on a route.

2. The parties will establish a joint work group to examine the various methods of mail delivery on park and loop and foot deliveries. The objective of the work group will be to develop safe and efficient delivery methods for handling three bundles of addressed and/or unaddressed mail on routes with these types of deliveries. The work group will develop appropriate methods in the current DPS letter environment and it will complete its mission within sixty days of this agreement. After that sixty day period all city carriers on park and loop and walking deliveries will be required to carry three bundles using methods from the work group, unless management determines that fewer than three bundles will be used. If the work group does not reach agreement within sixty days, all city carriers on park and loop and walking deliveries will, unless otherwise determined by management, be required to carry three bundles, but the individual city carrier will determine whether he/she carries the third bundle on the arm or in the satchel. Regardless of the work method, the third bundle must meet the requirements of paragraph 1 above.

3. The parties agree that under no circumstances will city letter carriers on park and loop or foot deliveries be required to carry more than three bundles.

This agreement resolves and closes all outstanding disputes at all levels of the grievance-arbitration procedure concerning city carriers on park and loop or foot routes being required to carry three bundles. The parties will meet at the appropriate level on all held cases to determine if they involve other issues. If a grievance contains issues other than third bundle, those issues will be addressed pursuant to Article 15 of the National Agreement. Please sign below to agree to resolve these disputes and remove these cases from the national arbitration docket.

Date July 30, 2007

The terms of this settlement became effective September 11, 2007 with the ratification of the 2006-2011 National Agreement.

**DELIVERY OPERATIONS INFORMATION SYSTEM (DOIS) SETTLEMENT Q01N-4Q-C 05022610 (M-01664)**

After reviewing this matter, the parties agree to resolve this dispute based on the following:

The Delivery Operations Information System (DOIS) is a management tool for estimating a carrier's daily workload. The use of DOIS does not change the letter carrier's reporting requirements outlined in section 131.4 of Handbook M-41, the supervisor's scheduling responsibilities outlined in section 122 of Handbook M-39, or the letter carrier's and supervisor's responsibilities contained in Section 28 of Handbook M-41. DOIS projections are not the sole determinant of a carriers leaving or return time, or daily workload. As such, the projections cannot be used as the sole basis for corrective action. A five minute time credit for lines 8-13 will be added or when route inspection data is available for lines 8-13 the actual average information will be used for daily workload projections.

Management is responsible for accurately recording volume and other data in DOIS. Other than obvious data entry errors, route based information may only be changed through a full-count and inspection or minor route adjustment. Additionally, the parties have previously agreed that functions in DOIS which relate to the route inspection and adjustment process must be in compliance with the city letter carrier route adjustment process in Subchapter 141 and Chapter 2 of the M-39 Handbook. Exceptions are offices that have jointly established an alternate route adjustment method. DOIS base information in such offices shall, as appropriate, comply with the alternate route adjustment method.

Date: July 30, 2007

The terms of this settlement became effective September 11, 2007 with the ratification of the 2006-2011 National Agreement.

**OFFICE EFFICIENCY TOOL (OEI) SETTLEMENT**
**Q06N-4Q-C-11022051 (M-01769)**

Recently, our representatives met in prearbitration discussion of the above-referenced grievance.

The issue in this grievance is whether the office efficiency tool used to project office and street time in the Greater Indiana District violates the National Agreement.

After reviewing this matter, we mutually agree to settle the grievance as follows:

The subject office efficiency tool is a management tool for estimating a carrier's daily workload. The office efficiency tool used in the Greater Indiana District or any similar time projection system/tool(s) will not be used as the sole determinant for establishing office or street time projections. Accordingly, the resulting projections will not constitute the sole basis for corrective action. This agreement does not change the principle that, pursuant to Section 242.332 of Handbook M-39, "No carrier shall be disciplined for failure to meet standards, except in cases of unsatisfactory effort which must be based on documented, unacceptable conduct that led to the carrier's failure to meet office standards." Furthermore, as stated in the agreement for case H1N-1N-D 31781, "there is no set pace at which a carrier must walk and no street standard for walking."

Projections are not the sole determinant of a carrier's leaving or return time, or daily workload. The use of any management created system or tool that calculates a workload projection does not change the letter carrier's reporting requirements outlined in section 131.4 of Handbook M-41, the supervisor's scheduling responsibilities outlined in section 122 of Handbook M-39, or the letter carrier's and supervisor's responsibilities contained in Section 28 of Handbook M-41.

This settlement is made without prejudice to the parties' rights under the National Agreement.

Please sign and return the enclosed copy of this decision as acknowledgement of our agreement to resolve this case, removing it from the national arbitration docket.

Time limits were extended by mutual consent.

Date: September, 16, 2011

**DELIVERY UNIT SATURATION MAIL SCANNING SETTLEMENT**
**Q06N-4Q-C 10254972 (M-01782)**

On several occasions our representatives met at the Interpretive Step on the above-captioned grievance. Time limits were extended by mutual consent.

The issue is whether the scanning process used for Delivery Unit Saturation Mail Scanning violates the National Agreement.

After reviewing this matter we mutually agree to settle this case based on the following:

Under this process the letter carrier scans the mailing's barcode in the office on the day he/she is scheduled to take the last of the saturation mailing to the street for delivery. By scanning the mailings barcode, the letter carrier is not verifying that he/she has delivered the mailing. The subject scanning process is an internal measurement system used to verify when a saturation mailing is scheduled for delivery.

Please sign and return the enclosed copy of this decision as acknowledgment of your agreement to resolve this case.

Date: April 24, 2012

**Reverting a Route Without Current Inspection Data Settlement**
**Q06N-4Q-C 09038594 (M-01796)**

Recently our representatives met at the Interpretive Step of the grievance-arbitration procedure to discuss the above-referenced case. Time limits were extended by mutual consent.

The issue is whether a vacant duty assignment for a full-time route may be reverted without current route inspection data. After reviewing this matter, the parties agree to the following:

The parties recognize the employer's right to revert vacant duty assignments pursuant to Article 41.1.A.1 of the National Agreement. However, under current regulations, determining whether an established city delivery route is full time (as defined by Handbooks M-39, section 242.122 and M-41, section 911.2) will be made using one of the following procedures:

- A six day mail count and inspection in accordance with the provisions of Handbook M-39
- A route adjustment pursuant to Section 141 of Handbook M-39 (provided the data used is reasonably current and from the regular carrier assigned to the route)
- Evaluation through a national jointly agreed upon route evaluation process
- Evaluation through an authorized developed joint route evaluation process

The parties further agree that cases held pending resolution of this case will be addressed by the appropriate parties where the cases are being held. The parties will give consideration to the above agreement and any action taken by the joint route adjustment teams subsequent to the reversion.

This agreement in no way alters the current maximization provisions contained in Article 7.3 of the National Agreement.

Please sign and return the enclosed copy of this decision as acknowledgment of your agreement to resolve this case.

Date: October 4, 2012

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: Multiple Days of Inspection**

The following will apply when conducting a six-day route count and inspection pursuant to Chapter 2 of Handbook M-39:

Management will, if it determines it necessary when scheduling an inspection to inspect on more than one day, inspect on no more than three days during the week of count and inspection. If management elects to inspect on two or three days during the week of count and inspection, management will be responsible for completion of the 1838-C one of the days. The letter carrier will count the mail and complete the 1838-C on the other days of inspection. When management elects to inspect on two or three days, the PS

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 431 of 472. PageID #: 1249

Form 3999 closest to the selected street time on the PS Form 1840 will be used to transfer territory.

Date: January 10, 2013

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**NATIONAL ASSOCIATION OF LETTER CARRIERS,**
**AFL-CIO**

**Re: City Delivery Task Force**

In the interest of increasing operational efficiency and improving relationships on the workroom floor, both parties recognize the need to adapt in order to accommodate advances in technology and changes and in the types and volumes of mail. With the mutual understanding that the parties' respective interests are best served through a cooperative effort, a Task Force will be established for the purpose of jointly seeking methods to improve the work environment, and examine and develop improved methods and procedures related to the city delivery function. At a minimum, the Task Force will:

- Jointly develop methods for eliminating or reducing conflicts between management and city letter carriers. Emphasis will be placed on disagreements over the amount of time an individual city letter carrier needs to complete his/her daily assignment.
- Jointly explore the modification of current case configurations and work methods to identify more efficient techniques for handling residual and sequenced mail volumes.
- Jointly examine current casing standards and times for associated line items.
- Explore various combinations of office and street functions and other alternatives for structuring city carrier routes and for capturing undertime associated with variable daily workloads.

The Task Force is established the effective date of the 2011 National Agreement, and will consist of four members appointed by the NALC and four members appointed by the Postal Service. The Task Force is authorized to jointly test techniques directed to improving work relationships between city letter carriers and supervisors as well as alternate methods and procedures related to city delivery functions. These initiatives may be tested separately or in concert with each other, as jointly determined by the Task Force. The Task Force's guiding principles should be to improve the work climate and daily relationships on the workroom floor, and to increase operational efficiency in city delivery.

The Task Force shall convene within 15 days of the effective date of this Agreement and will function for the term of the 2011 National Agreement. Testing will commence no later than 45 days from the initial meeting. The Task Force will provide reports and recommendations no less frequently than on a quarterly basis to the NALC National President and the Postal Service Vice President, Labor Relations.

Date: January 10, 2013

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**Re: Alternate Route Evaluation and Adjustment Process**

The National Association of Letter Carriers, AFL-CIO (NALC) and United States Postal Service recognize the **success the parties have experienced the past four years working jointly to evaluate and adjust city delivery routes.**

**In order to continue efforts to jointly develop a city delivery route evaluation and adjustment process that reduces disputes and is more efficient and less intrusive, a National Task Force will be established to continue efforts to jointly explore alternative methods of evaluating, adjusting and maintaining routes.**

The Task Force will be established with the signing of this Memorandum, and will include four members from the NALC, and four members of the Postal Service. The Task Force will report to the NALC National President and the Postal Service Vice President, Labor Relations. A report outlining findings and recommendations will be issued by the Task Force **as appropriate, but at least once per year** from the date of this Memorandum.

**The Task Force will function throughout the term of the 2011 National Agreement.**

Date: **January 10, 2013**

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO**

**RE: Customer Connect Program**

The National Association of Letter Carriers, AFL-CIO and United States Postal Service mutually recognize that revenue growth through the increased use of Postal Service products and services is vital to the current and future success of the Postal Service. To that end, the parties jointly developed the Customer Connect Program in which city letter carriers use their access and special relationships with customers to encourage increased use of Postal Service products and services.

The parties reemphasize their joint commitment to the growth and long-term success of the Customer Connect Program and pledge to continue to work jointly at all levels of our organizations to enhance this important effort.

Date: September 11, 2007

# ARTICLE 42 ENERGY SHORTAGES

In the event of an energy crisis, the Employer shall make every reasonable attempt to secure a high priority from the appropriate Federal agency to obtain the fuel necessary for the satisfactory maintenance of postal operations. In such a case, or in the event of any serious widespread energy shortage, the Employer and the Union shall meet and discuss the problems and proposed solutions through the Labor-Management Committee provided in Article 17.

(The preceding Article, Article 42, shall apply to **City Carrier Assistant** Employees.)

**Energy shortages.** Article 42 was first added to the 1975-1978 National Agreement, following a national energy crisis during the early 1970s. It makes provision for the parties to discuss an energy crisis or shortage at the national Labor-Management Committee provided by Article 17.5.

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 434 of 472. PageID #: 1252

Page 42-2 NALC-USPS Joint Contract Administration Manual - July 2014

USPS000974

# ARTICLE 43 SEPARABILITY AND DURATION

43.1 **Section 1. Separability**

Should any part of this Agreement or any provision contained herein be rendered or declared invalid by reason of any existing or subsequently enacted legislation or by a court of competent jurisdiction, such invalidation of such part or provision of this Agreement shall not invalidate the remaining portions of this Agreement, and they shall remain in full force and effect.

43.2 **Section 2. Duration**

Unless otherwise provided, this Agreement shall be effective **January 10, 2013,** and shall remain in full force and effect to and including 12 midnight **May 20, 2016,** and unless either party desires to terminate or modify it, for successive annual periods. The party demanding such termination or modification must serve written notice of such intent to the other party, not less than 90 or more than 120 days before the expiration date of the Agreement.

(The preceding Article, Article 43, shall apply to **City Carrier Assistant** Employees.)

**Separability.** Article 43.1 guarantees that in case a part of the National Agreement is rendered or ruled invalid either by a court or by legislation, the remainder of the agreement will remain in effect.

**Duration.** This National Agreement, which was entered into pursuant to an Interest Arbitration Award, is effective January 10, 2013 through midnight May 20, 2016 unless otherwise provided. Some article provisions and/or memorandums of understanding included as parts of this Agreement may also have an effective date other than January 10, 2013. In such cases the implementation date and implementation procedures are explained under the applicable contract provision.

The Agreement would continue in effect for additional one-year periods beyond May 20, 2016 if neither party gave the required notice of intent to terminate or modify it between 120 and 90 days prior to the expiration date. In the past the parties have always begun negotiations for a new multi-year National Agreement as the termination date of the current contract approached.

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 436 of 472. PageID #: 1254

Page 43-2 NALC-USPS Joint Contract Administration Manual - July 2014

USPS000976

# ACRONYM GLOSSARY

| | |
|---|---|
| **204-b** | Acting Supervisory Position |
| **AFL-CIO** | American Federation of Labor-Congress of Industrial Organizations |
| **APWU** | American Postal Workers Union |
| **ASM** | Administrative Support Manual |
| **BLS** | Bureau of Labor Statistics |
| **CCA** | City Carrier Assistant |
| **C.F.R.** | Code of Federal Regulations |
| **C.O.D.** | Collect On Delivery |
| **C-0000** | NALC Arbitration System Citation |
| **COLA** | Cost-of-Living Adjustment |
| **COP** | Continuation of Pay |
| **CPI-U** | Consumer Price Index for All Urban Consumers |
| **CPI-W** | National Consumer Price Index, Urban Wage Earners and Clerical Workers |
| **CSRS** | Civil Service Retirement System |
| **DBCS** | Delivery Bar Code Sorter |
| **DOIS** | Delivery Operations Information System |
| **DPS** | Delivery Point Sequencing |
| **DSSA** | Delivery Service Staffing Analysis |
| **DUO** | Delivery Unit Optimization |
| **EAP** | Employee Assistance Program |
| **EEO** | Equal Employment Opportunity |
| **EEOC** | Equal Employment Opportunity Commission |
| **ELM** | Employee and Labor Relations Manual |
| **eRMS** | Enterprise Resource Management Systems |
| **EWIA** | Employee Workplace Intervention Analyst |
| **FECA** | Federal Employees Compensation Act |
| **FEGLI** | Federal Employees Group Life Insurance |
| **FEHBP** | Federal Employees Health Benefits Program |
| **FERS** | Federal Employees Retirement System |
| **FLSA** | Fair Labor Standards Act |
| **FMLA** | Family Medical Leave Act |
| **FOH** | Federal Occupational Health |
| **FSS** | Flat Sequencing System |
| **FTF** | Full-time Flexible |
| **FTR** | Full-time Regular |
| **GSA** | General Services Administration |
| **IM** | Investigative Memorandum |
| **JCAM** | Joint Contract Administration Manual |
| **LMOU** | Local Memorandum of Understanding |
| **LMU** | Local Memorandum of Understanding–Variant |
| **LWOP** | Leave Without Pay |
| **M-0000** | NALC Materials Reference System (MRS) Citation |
| **MOU** | Memorandum of Understanding |

| | |
|---|---|
| **MSC** | Management Sectional Center |
| **MSP** | Managed Service Point |
| **MSPB** | Merit Systems Protection Board |
| **N.T.E.** | Not to Exceed (date) |
| **NALC** | National Association of Letter Carriers |
| **NBA** | National Business Agent–NALC |
| **NLRB** | National Labor Relations Board |
| **NPMHU** | National Postal Mail Handlers Union |
| **NRLCA** | National Rural Letter Carriers' Association |
| **O.P.M.** | Office of Personnel Management |
| **ODL** | Overtime Desired List |
| **OF-346** | Former Postal Drivers' License |
| **OSHA** | Occupational Safety and Health Act |
| **OTDL** | Overtime Desired List |
| **OWCP** | Office of Workers' Compensation Programs |
| **PCRS** | Piece Count Recording System |
| **PDC** | Postal Data Center |
| **PMG** | Postmaster General |
| **POST** | Projected Office and Street Time |
| **PRA** | Postal Reorganization Act |
| **PS** | Postal Service |
| **PTF** | Part-time Flexible |
| **PTR** | Part-time Regular |
| **RBCS** | Remote Bar Code Sorter |
| **RIF** | Reduction In Force |
| **RMD** | Resource Management Database |
| **SF** | Standard Form |
| **SF-46** | Former Postal Drivers' License |
| **T-6** | Letter Carrier Technician–Obsolete Term |
| **TCOLA** | Territorial Cost of Living Adjustment |
| **TE** | Transitional Employee |
| **U.S.C.** | United States Code |
| **USPS** | United States Postal Service |
| **VFC** | Vertical Flat Case |
| **VOMA** | Vehicle Operations-Maintenance Assistant |

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 439 of 472. PageID #: 1257

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **A** | | | |
| **Abolishment of assignment, posting after** | 41 | 3-O | 41-29 |
| **Accidents** | | | |
| Effect on driving privileges | 29 | | 29-1 |
| Injury on the job, Workers' Compensation | 21 | 4 | 21-4 |
| Injury on the job, health services for | 14 | 3-C | 14-3 |
| Investigation Board, fatal or serious industrial | 14 | 8-C | 14-6 |
| MOU—Reinstatement of Driving Privileges | 29 | | 29-1 |
| Notification to union | 41 | 3-P | 41-31 |
| Prevention, Safety and Health Committee | 14 | 8-A | 14-5 |
| Report Form 1769 | 14 | 2 | 14-1 |
| **Active duty** | | | |
| Health Benefit plans | 21 | | 21-1 |
| Life Insurance | 21 | 2 | 21-4 |
| **Advance notice** | | | |
| Emergency procedure | 16 | 7 | 16-8 |
| Employer Claims | 28 | 1 | 28-1 |
| Handbook, manual, and regulation changes | 19 | | 19-1 |
| Holiday Schedule | 11 | 6 | 11-2 |
| Suspensions, indefinite | 16 | 6-A | 16-7 |
| Suspensions of more than 14 days | 16 | 5 | 16-6 |
| **Alcohol and drug recovery** | 35 | 1 | 35-1 |
| **Annual Leave**—See Leave | | | |
| **Application for employment, falsified** | 12 | 1-B | 12-4 |
| **Arbitration** | | | |
| Administration | 15 | 5 | 15-20 |
| Arbitrability | 15 | 4-A-9 | 15-16 |
| Cancellations | 15 | | 15-13 |
| Ex parte communication | 15 | | 15-13 |
| Expedited | 15 | 4-C | 15-18 |
| Bench Decisions | 15 | 4-C-3-f | 15-19 |
| Briefs | 15 | 4-C-3-b | 15-19 |
| Referral to Regular Arbitration | 15 | 4-C-2 | 15-18 |
| Panel | 15 | 4-B-1 | 15-16 |
| Scheduling | 15 | 4-B-2 | 15-16 |
| Time limit for award | 15 | 4-C-3-f | 15-19 |
| Transcripts | 15 | 4-C-3-b | 15-19 |
| Without precedent | 15 | 4-C-4 | 15-19 |
| General provisions | 15 | 4-A | 15-13 |
| Impasse—Local Implementation MOU | 30 | | 30-5 |
| Impasse—Local Negotiations | 30 | C | 30-4 |
| Intervention by other parties | 15 | 4-A-9 | 15-16 |
| National Level | 15 | 4-D | 15-20 |
| Priority Scheduling | | | |
| Article 4—Technological and Mechanization | 4 | 2 | 4-1 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Article 6—No Layoffs or Reduction in Force | 6 | F-1 | 6-5 |
| Article 14—Safety and Health | 14 | 2 | 14-1 |
| Article 34—Work and/or Time Standards | 34 | E | 34-1 |
| Removals/suspensions | 15 | 4-B-4 | 15-17 |
| Regular arbitration | 15 | 4-B | 15-16 |
| Briefs | 15 | 4-B-7 | 15-18 |
| Panel | 15 | 4-B-1 | 15-16 |
| Referral to Interpretive Step | 15 | 4-B-5 | 15-17 |
| Scheduling | 15 | 4-B-2 | 15-16 |
| Time limit for award | 15 | 4-B-8 | 15-18 |
| Transcripts | 15 | 4-B-7 | 15-18 |
| Withdrawal | 15 | 4-A-4 | 15-14 |
| **Assignment** | | | |
| Combining craft duties into one assignment | 7 | 2-A | 7-30 |
| Cross Craft Assignments | 7 | 2-C | 7-31 |
| Higher level details | 25 | 3, 4 | 25-1 |
| Involuntary assignment to vacant position | 41 | 1-A-7 | 41-4 |
| New positions to a craft | 1 | 5 | 1-4 |
| Temporary changes | 7 | 2-B,C | 7-31 |
| Vacant assignment due to 204b status | 41 | 1-A-2 | 41-3 |
| Working duty assignment as posted | 41 | 1-C-4 | 41-7 |
| **Auxiliary assistance** | | | |
| Carrier Auxiliary Control Form 3996 | 41 | 3-G | 41-26 |
| Seasonal routes | 41 | 3-R | 41-31 |
| **Auxiliary route conversion** | 7 | 3-D | 7-37 |
| **B** | | | |
| **Bad checks** | 41 | 3-C | 41-25 |
| **Bargaining unit work** | | | |
| Subcontracting | 32 | | 32-1 |
| Supervisors prohibited from performing | 1 | 6 | 1-4 |
| **Benefit Plans** | | | |
| Auto insurance | 17 | 7-D | 17-10 |
| Health Benefit Plans | | | |
| Continuation during layoff | 6 | E-2 | 6-5 |
| Contribution formula | 21 | | 21-1 |
| Employer contribution | 21 | 1-B | 21-1 |
| Health Benefit Brochures | 21 | 5 | 21-5 |
| City Carrier Assistant employees | 21 | | 21-2 |
| Injury Compensation | 21 | 4 | 21-4 |
| Liability insurance | 17 | 7-D | 17-10 |
| Life Insurance | 21 | 2 | 21-4 |
| Continuation during layoff | 6 | E-2 | 6-5 |
| Retirement | 21 | 3 | 21-4 |
| Accrual while on union LWOP | 24 | 1 | 24-1 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **Bidding** | | | |
| Abolishment of assignment | 41 | 3-O | 41-29 |
| Employees with a disability | 41 | 1-C | 41-6 |
| Light or limited duty | 13 | | 13-9 |
| Limit on number of bids | 12 | 3-A | 12-7 |
| Prohibition against 204b's bidding | 41 | 1-A-2 | 41-3 |
| Restricted bidding while retreat rights are pending | 12 | | 12-31 |
| Right to bid prior to excessing | 41 | | 41-30 |
| Successful bidder | 41 | 1-C | 41-6 |
| While on an opt | 41 | | 41-13 |
| **Breaks** | 41 | | 41-28 |
| **Bulletin Boards** | 22 | | 22-1 |
| **Bumping** | | | |
| Carrier Technicians | 41 | 1-C-4 | 41-7 |
| Permitted in limited circumstances | 41 | 3-O | 41-29 |
| Prohibition during excessing | 12 | 5-B-3 | 12-16 |
| **C** | | | |
| **Carrier Technicians** | | | |
| Changes to string | 41 | | 41-30 |
| Exception to withholding | 12 | 5-C-5-b | 12-36 |
| Excessing by juniority | 12 | | 12-19 |
| Filling vacancies | 25 | | 25-2 |
| Minimum qualifications | 12 | 5-B-9 | 12-18 |
| Movement off assignment | 41 | 1-C-4 | 41-7 |
| Overtime Desired List | 8 | | 8-14 |
| Positions not available for opting | 41 | | 41-12 |
| Work Assignment List | 8 | | 8-21 |
| **Casual employees** | | | |
| Excessing, casuals to be separated | 12 | 4-D | 12-10 |
| Holiday scheduling | 11 | 6-B | 11-2 |
| Layoffs, casuals to be separated | 6 | B-4 | 6-3 |
| Reassignments, casuals to be separated | 12 | 4-D | 12-11 |
| Reduction of employees in an installation | 12 | 5-C-5-a-2 | 12-33 |
| **Choice Vacation Period** | 30 | B-5 | 30-2 |
| **City Carrier Assistant Employees-CCAs** | | | |
| Appendix B | 7 | | 7-8 |
| Annual leave accrual | 10 | | 10-4 |
| Disciplinary separation | 16 | | 16-12 |
| Effect on layoff of career employees | 6 | | 6-7 |
| Guarantees | 8 | 8-D | 8-26 |
| Health benefits | 21 | | 21-2 |
| Higher level | 25 | | 25-3 |
| Holiday scheduling | 11 | | 11-3 |
| Limited term of employment | 7 | 1.C.3 | 7-5 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Limits on the number of | 7 | 1.C.1,2 | 7-3 |
| Moving – Temporary assignments | 8 | | 8-16 |
| Opting | 41 | 2.B.4 | 41-9 |
| Pay Status | 41 | | 41-15 |
| Remedies | 41 | | 41-16 |
| Rights | 41 | 2.B.4 | 41-9 |
| PTF straight-time hours priority | 7 | 1.C.4 | 7-6 |
| Questions and answers | 7 | | 7-20 |
| Relative Standing | 41 | | 41-17 |
| Separating prior to excessing career employees | 12 | | 12-20 |
| Sick leave | 10 | | 10-12 |
| Stand by | 8 | | 8-3 |
| Uniforms | 26 | 3 | 26-2 |
| Union stewards | 17 | | 17-2 |
| Wages | 9 | 7 | 9-11 |
| **COLA, Cost of Living Adjustments** | | | |
| Consumer Price Index | 9 | 3-A | 9-1 |
| Effective dates | 9 | 3-B | 9-2 |
| Formula | 9 | 3-C | 9-2 |
| Roll-ins | 9 | | 9-4 |
| **Collective bargaining history** | 1 | 1 | 1-1 |
| **Combining work of different crafts** | 7 | 2-A | 7-30 |
| **Committees at the National Level** | | | |
| City Delivery | 41 | 5 | 41-38 |
| EAP | 35 | 1 | 35-1 |
| Human Rights | 2 | 2 | 2-1 |
| Labor-Management | 17 | 5-A | 17-8 |
| Parking | 20 | 1 | 20-1 |
| Safety | 14 | 3 | 14-2 |
| Subcontracting | 32 | 2 | 32-2 |
| Technological or Mechanization Changes | 4 | 2 | 4-1 |
| Training | 41 | 5 | 41-38 |
| Uniform Control Committee | 26 | 1 | 26-1 |
| **Comparative Work Hour Report** | 12 | 4-C | 12-10 |
| **Consolidated installations** | | | |
| Local negotiations | 30 | E | 30-5 |
| Reassignments | 12 | 5-C-2 | 12-28 |
| **Continuing violations** | 15 | | 15-2 |
| **Conventions, union** | 24 | 2 | 24-1 |
| **Conversion** | | | |
| Maximization MOU | 7 | | 7-38 |
| PTF on same assignment for six months | 7 | 3-C | 7-37 |
| 39-Hour Report | 7 | | 7-40 |
| **Crafts** | | | |
| Combining craft duties to create full-time assignments | 7 | 2-A | 7-30 |
| Cross-craft assignments | 7 | 2-C | 7-31 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Limits on cross-craft assignments | 7 | | 7-31 |
| Remedy for violations of cross-craft assignments | 7 | | 7-32 |
| Rural Carriers excluded from cross-craft assignments | 7 | | 7-33 |
| **Credit Unions** | | | |
| Leave granted | 36 | 1 | 36-1 |
| Mileage allowance | 36 | 2-B | 36-1 |
| Providing space in Federal buildings | 36 | 1 | 36-1 |
| **Crossing lawns** | 41 | 3-N | 41-28 |
| **D** | | | |
| **Damage to USPS property and vehicles** | 28 | 3 | 28-2 |
| **Deaf and Hard of Hearing MOU** | 2 | | 2-2 |
| **Delivery Unit Optimization-DUO** | 12 | | 12-23 |
| **Demotion** | | | |
| Job elimination | 4 | 3 | 4-1 |
| Salary rate protection | 9 | 6 | 9-10 |
| Seniority retained | 41 | 2-D-5 | 41-22 |
| **Details** | | | |
| Higher level | 25 | 4 | 25-1 |
| Lower level | 25 | 2 | 25-1 |
| Supervisor 204b positions | 41 | 1-A-2 | 41-3 |
| **Disability** | | | |
| Bidding | 41 | 1-C | 41-6 |
| Discrimination prohibited | 2 | 1 | 2-1 |
| Injury Compensation | 21 | 4 | 21-4 |
| Level of pay after bidding higher-level position | 41 | | 41-6 |
| Light duty requests | 13 | | 13-1 |
| Rehabilitation Act | 2 | 1 | 2-1 |
| Retaining bid position after developing disability | 41 | 1-C | 41-6 |
| Seniority upon reinstatement or reemployment | 41 | 2-D-1 | 41-21 |
| **Disagreement on medical condition** | | | |
| Permanent Light Duty request | 13 | 2-B-2 | 13-3 |
| Periodic review of light duty assignment | 13 | 4-F | 13-6 |
| **Discharge** | 16 | 5 | 16-6 |
| **Discipline Procedure** | | | |
| Alcohol intoxication | 16 | 7 | 16-8 |
| Back pay | 16 | | 16-3 |
| Basic principle | 16 | 1 | 16-1 |
| Discipline records | 16 | 10 | 16-11 |
| Discharge | 16 | 5 | 16-6 |
| Discussions | 16 | 2 | 16-4 |
| DOIS not sole basis for discipline | 41 | | 41-58 |
| Drug use on the clock | 16 | 7 | 16-8 |
| Emergency procedure | 16 | 7 | 16-8 |
| Indefinite suspensions—crime situation | 16 | 6-A | 16-7 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Just Cause | 16 | | 16-1 |
| Last Chance Agreements | 16 | | 16-11 |
| Letter of Warning | 16 | 3 | 16-5 |
| Principles of discipline | 16 | 1 | 16-1 |
| Records | 16 | 10 | 16-11 |
| Review of discipline | 16 | 8 | 16-9 |
| Suspensions of 14 days or less | 16 | 4 | 16-5 |
| Suspensions of more than 14 days or discharge | 16 | 5 | 16-6 |
| City Carrier Assistant employees | 16 | | 16-12 |
| Unadjudicated discipline | 16 | | 16-3 |
| Veterans' Preference | 16 | 9 | 16-10 |
| **Discrimination** | | | |
| Bar against | 2 | 1 | 2-1 |
| **Discussion records** | 16 | 2 | 16-4 |
| **Dog Bite Prevention** | 14 | 8-A | 14-5 |
| **DPS mail** | | | |
| Form 3996 | 41 | | 41-27 |
| Issues | 41 | | 41-33 |
| Work Methods, MOU | 41 | | 41-51 |
| **Driveout Reimbursement** | 41 | 4 | 41-37 |
| **Driving privileges** | | | |
| Reassignment to non-driving duties | 29 | | 29-4 |
| Reinstatement of Driving Privileges MOU | 29 | | 29-1 |
| Revocation or suspension of | 29 | | 29-2 |
| Safe Driver Award Committee report | 29 | | 29-1 |
| State Driver's License revocation | 29 | | 29-1 |
| **Drug Recovery programs** | 35 | | 35-1 |
| **Dues Checkoff** | 17 | 7-A | 17-9 |
| **Duration of Agreement** | 43 | 2 | 43-1 |

**E**

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **EAP, Employee Assistance Program** | | | |
| Confidentiality | 35 | | 35-1 |
| Establishment of EAP program | 35 | 1 | 35-1 |
| National EAP Committee | 35 | 2 | 35-2 |
| Participation's effect in disciplinary actions | 35 | 1 | 35-1 |
| Participation's effect on driving privileges | 29 | | 29-2 |
| Referral | 35 | | 35-2 |
| **EEO, dual filing with grievance or MSPB** | 16 | | 16-11 |
| **Eight-hour workday** | 8 | 1 | 8-1 |
| **Emergencies** | | | |
| Annual leave commitments | 10 | 4-D | 10-11 |
| Defined | 3 | F | 3-1 |
| Discipline procedures | 16 | 7 | 16-8 |
| Cross-craft assignments | 7 | | 7-31 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| LMOU provisions | 3 | | 3-1 |
| Management's rights | 3 | F | 3-1 |
| Supervisor performance of bargaining unit work | 1 | 6-A | 1-4 |
| **Employee claims** | | | |
| Appeal procedure | 27 | | 27-3 |
| Automobile exclusion | 27 | | 27-2 |
| Impasse | 27 | | 27-1 |
| Requirements | 27 | | 27-2 |
| Timeline | 27 | | 27-3 |
| Tort claims | 27 | | 27-1 |
| **Employee classifications** | | | |
| Regular workforce defined | 7 | 1-A | 7-1 |
| Full-time flexible carriers | 7 | | 7-1 |
| Full-time regular carriers | 7 | 1-A | 7-1 |
| Part-time flexible carriers | 7 | 1-A | 7-1 |
| Part-time regular carriers | 7 | | 7-1 |
| **Employer claims** | | | |
| Bad checks | 41 | 3-C | 41-25 |
| Collection procedure | 28 | 4-A | 28-2 |
| Damage to USPS property and vehicles | 28 | 3 | 28-2 |
| Defined | 28 | | 28-1 |
| Limit on deduction amount | 28 | 4-B | 28-2 |
| Loss or damage of the mails | 28 | 2 | 28-1 |
| Waiver of Employer Claims | 28 | 4-B | 28-2 |
| **Employer Rights** | | | |
| Determine the methods, means, and personnel | 3 | D | 3-1 |
| Direct employees | 3 | A | 3-1 |
| Hire, promote, transfer, assign, retain | 3 | B | 3-1 |
| Maintain the efficiency of the operation | 3 | C | 3-1 |
| Prescribe a uniform dress | 3 | E | 3-1 |
| Take action in emergencies | 3 | F | 3-1 |
| **Employment application, falsification of** | 12 | 1-B | 12-4 |
| **Energy shortages** | 42 | | 42-1 |
| **Equipment** | | | |
| Employer provides | 41 | 3-E | 41-26 |
| Protective equipment for hazardous materials | 14 | 8-D-5 | 14-7 |
| Safe condition of equipment | 14 | 2 | 14-1 |
| **Ergonomics** | 14 | 1 | 14-1 |
| **Examination Specialist** | 41 | 1-D | 41-8 |
| **Excessing and Withholding** | | | |
| Comparative Work Hour Report | 12 | 4-C | 12-10 |
| Excessing | | | |
| Bidding rights prior to effective date | 12 | | 12-19 |
| Carrier Technicians as exception to excessing | 12 | 5-B-9 | 12-18 |
| City Carrier Assistant employees | 12 | | 12-3 |
| Choice of residual vacancies in new unit | 12 | 5-B-3 | 12-16 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Consolidation of an independent installation | 12 | 5-C-2 | 12-28 |
| Delivery Unit Optimization | 12 | | 12-23 |
| Involuntary Reassignment Without Regard to Level MOU | 12 | | 12-21 |
| Involuntary Reassignment – Preference Eligible MOU | 12 | | 12-21 |
| Employees excess to a section | 12 | 5-C-4 | 12-30 |
| Bidding while retreat rights are pending | 12 | | 12-31 |
| Loss of retreat rights | 12 | | 12-31 |
| Excessing by juniority | 12 | | 12-19 |
| Excessing to letter carrier craft outside of installation | | | |
| First choice of duty assignment | 12 | 5-C-5-b-4 | 12-39 |
| Seniority | 12 | 5-C-5-b | 12-36 |
| Transfer of assignments to another installation | 12 | 5-C-5-b | 12-36 |
| Option to become a PTF | 12 | 5-C-5-b-5 | 12-39 |
| Involuntary reassignment | 12 | 5-C-5-b-2 | 12-38 |
| Excessing to letter carrier craft within an installation | | | |
| Voluntary reassignment effect on retreat rights | 12 | 5-C-5-b-3 | 12-39 |
| Excessing to other crafts outside of installation | 12 | 5-C-5-b-2 | 12-38 |
| First choice of duty assignments | 12 | 5-C-5-b-4 | 12-39 |
| Option to become a PTF | 12 | 5-C-5-b-5 | 12-39 |
| Seniority | 12 | 5-C-8-a | 12-43 |
| Voluntary reassignment | 12 | 5-C-5-b-3 | 12-39 |
| Excessing to other crafts within an installation | 12 | 5-C-5-a-4 | 12-34 |
| First choice of duty assignment | 12 | 5-C-5-b-4 | 12-39 |
| Mandatory return to craft | 12 | 5-C-5-a-5 | 12-34 |
| Option to become a PTF | 12 | 5-C-5-b-5 | 12-39 |
| Seniority | 12 | 5-C-8-a | 12-43 |
| Restored seniority | 12 | 5-C-5-a-6 | 12-34 |
| Full-time flexibles | 12 | | 12-20 |
| Grievances on excessing | 12 | | 12-20 |
| Light and limited duty employees | 12 | 5-B-12 | 12-19 |
| Overtime | 12 | | 12-33 |
| Part-time flexibles | | | |
| Retreat rights | 12 | 5-C-8-f | 12-44 |
| Return to craft after excessing | 12 | 5-C-8-d | 12-44 |
| Seniority if excessed to another installation | 12 | 5-C-8-b | 12-43 |
| Voluntary reassignment | 12 | 5-C-8-c | 12-43 |
| Part-time regulars | | | |
| Retreat rights | 12 | 5-C-8-f | 12-44 |
| Return to craft after excessing | 12 | 5-C-8-d | 12-44 |
| Seniority if excessed to another installation | 12 | 5-C-8-b | 12-43 |
| Voluntary reassignment | 12 | 5-C-8-c | 12-43 |
| Relocation expenses | 12 | 5-B-5 | 12-16 |
| Seniority of excessed employees | 12 | 5-B-10 | 12-18 |
| Signing the ODL | 12 | 5-B-12 | 12-19 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Transfer of station/branch to another installation | 12 | 5-C-3-a | 12-29 |
| City Carrier Assistant employees | 12 | | 12-33 |
| Voluntary reassignment | 12 | 5-B-6 | 12-18 |
| Principles of reassignments | 12 | 4-A | 12-8 |
| Priority order of reassignments/excessing | 12 | 4-A | 12-9 |
| Retreat Rights | | | |
| After unnecessary excessing | 12 | 4-C | 12-10 |
| Re-establishment of discontinued installation | 12 | 5-C-1-g | 12-27 |
| Superseniority | 12 | | 12-8 |
| Voluntary reversion to PTF | 12 | 4-D | 12-10 |
| Withholding positions | 12 | 5-B-2 | 12-13 |
| Carrier Technicians as exception to withholding | 12 | | 12-14 |
| Length of withholding | 12 | | 12-13 |
| Limit on number of withheld positions | 12 | | 12-14 |
| Lower level positions as exception to withholding | 12 | | 12-15 |
| Management's obligation to anticipate need for | 12 | 5-B-2 | 12-13 |
| **F** | | | |
| **Familiarity with route** | 41 | 3-F | 41-26 |
| **Fingering mail** | 41 | 3-I | 41-27 |
| **Forms** | | | |
| SF 95—Tort Claim | 27 | | 27-1 |
| 1187—Dues Withholding | 17 | 7-B,C | 17-10 |
| 1311—Carrier Transportation Agreement | 41 | 4 | 41-37 |
| 1571—Report of Undelivered Mail | 41 | 3-G | 41-26 |
| 1723—Assignment Order | 41 | 1-A-2 | 41-3 |
| 1769—Accident Report | 14 | 2 | 14-1 |
| 2146—Employee Claim for Personal Property | 27 | | 27-2 |
| 3074—Request for Waiver for Erroneous Payment of Pay | 28 | | 28-3 |
| 3189—Request for Temporary Schedule Change | | | |
| Non-availability for overtime | 8 | | 8-12 |
| Out-of-schedule premium not paid | 8 | | 8-6 |
| 3971—Request for or Notification of Absence | | | |
| Leave Without Pay | 10 | | 10-16 |
| Sick leave | 10 | | 10-12 |
| 3996—Carrier Auxiliary Control Form | 41 | 3-G | 41-26 |
| **Full-time employees** | | | |
| Definition | 7 | 1-A-1 | 7-1 |
| Guarantees | | | |
| Non-scheduled day | 8 | 8-B | 8-25 |
| Outside of regular schedule | 8 | 8-A | 8-25 |
| Obligation to create full-time regular positions | 7 | 3 | 7-33 |
| Schedules | 8 | | 8-1 |
| **Full-time flexibles** | | | |
| Assignment to residual positions | 41 | 1-A-6 | 41-4 |
| Conversion from PTF | 7 | | 7-41 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Counted to measure compliance with 88% requirement | 7 | 3-A | 7-40 |
| Excessing | 12 | | 12-20 |
| Guarantees | 8 | 8-A,B | 8-25 |
| Maximization requirement | 7 | | 7-36 |
| Nature of position | 7 | | 7-41 |
| Opting rights | 41 | | 41-10 |
| Overtime equitability | 8 | | 8-11 |
| Overtime Lists | 8 | 5-A | 8-9 |
| Position not available for opting | 41 | | 41-12 |
| Seniority for bidding | 41 | 2-B | 41-9 |
| 39-Hour Report | 7 | | 7-40 |

**G**

**Grievances**

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Arbitration | | | |
| Awards | 15 | 4-B-8 | 15-18 |
| Back up cases | 15 | 4-A-4 | 15-14 |
| Cancellations | 15 | | 15-13 |
| Decisions | 15 | 4-A-6 | 15-15 |
| Dual filings, MSPB & EEO | 16 | 9 | 16-11 |
| Ex parte communication | 15 | | 15-13 |
| Expedited | 15 | 4-C | 15-18 |
| Handbook and manual changes | 19 | | 19-1 |
| Initiating an interpretive dispute | 15 | 4-B-5 | 15-17 |
| Intervention | 15 | 4-A-9 | 15-16 |
| National level | 15 | 4-D | 15-20 |
| Panels | 15 | 4-A-7 | 15-15 |
| Post-hearing briefs | 15 | 4-B-7 | 15-18 |
| Regular | 15 | 4-B | 15-16 |
| Time limits | 15 | 4-A | 15-13 |
| Transcripts | 15 | 4-B-7 | 15-18 |
| Witnesses | 15 | 4-A-5 | 15-15 |
| Defined | 15 | 1 | 15-1 |
| Discussions not grievable | 16 | 2 | 16-4 |
| Initiated at other steps | | | |
| Formal Step A | | | |
| Article 2 grievances, discrimination | 2 | 3 | 2-1 |
| Article 14 grievances, safety | 14 | 2-c | 14-1 |
| Step B | | | |
| Article 6 grievances, layoffs | 6 | F-1 | 6-5 |
| Employee Claims | 27 | | 27-3 |
| 52-day extensions for route adjustments | 41 | 3-D | 41-25 |
| National level | | | |
| Handbook and manual changes | 19 | | 19-1 |
| Interpretive issues | 15 | 3-F | 15-12 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Joint Contract Administration Manual | 15 | 3-A | 15-10 |
| Representative grievances | 15 | 3-D | 15-11 |
| Steps | | | |
| Formal Step A | | | |
| Additions and corrections | 15 | 2-g | 15-7 |
| Appeal to Step B | 15 | 2-f | 15-6 |
| Authority to resolve | 15 | 2-c | 15-5 |
| Decisions | 15 | 2-e | 15-6 |
| Grievances initiated at Formal Step A | 15 | 2-b | 15-4 |
| Meeting | 15 | 2-d | 15-5 |
| Informal Step A | 15 | 2 | 15-2 |
| Appeal to Formal Step A | 15 | 2-A-c | 15-3 |
| Authority to resolve | 15 | 2-A-b | 15-3 |
| Continuing violations | 15 | | 15-2 |
| Time limits | 15 | 2-A-a | 15-2 |
| Interpretive Step | | | |
| Appeal to National arbitration | 15 | | 15-10 |
| Grievances initiated at the National level | 15 | 3-F | 15-12 |
| Step B | | | |
| Appeal to arbitration | 15 | 2-B-d | 15-9 |
| Decision types | 15 | | 15-8 |
| Dispute Resolution Teams | 15 | 2-B-a | 15-7 |
| Interpretive issues | 15 | 2-B-e | 15-9 |
| Step B Decision | 15 | 2-B-c | 15-8 |
| Timeliness | 15 | 3-B | 15-11 |
| Union's right to initiate | 15 | 2 | 15-2 |
| **Guarantees** | | | |
| Call-In guarantee | | | |
| Full-time, part-time regulars | 8 | 8-A | 8-25 |
| Part-time flexibles | 8 | 8-C | 8-25 |
| Full-time employees on non-scheduled days | 8 | 8-B | 8-25 |
| Holiday work | 11 | 4 | 11-2 |
| City Carrier Assistant employees | 8 | 8-D | 8-26 |
| Waiving guarantees | 8 | | 8-27 |

**H**

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **Handbooks and manuals** | | | |
| Article 19 MOU | 19 | | 19-2 |
| Changes to | 19 | | 19-1 |
| Local forms | 19 | | 19-2 |
| Local policies | 19 | | 19-2 |
| **Handbooks and manuals, cited** | | | |
| Administrative Support Manual | | | |
| Local forms | 19 | | 19-2 |
| Tort claims, part 250 | 27 | | 27-1 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| EL-307-*Reasonable Accommodation, An Interactive Process* | 2 | 1 | 2-1 |
| EL-312, Section 483—Veteran's Preference | 16 | 9 | 16-10 |
| EL-804, Section 42-Safe Driver Program | 29 | | 29-3 |
| EL-505—Injury Compensation | 21 | 4 | 21-4 |
| ELM, Employee and Labor Relations Manual | | | |
|   Back pay, Section 436 | 16 | | 16-3 |
|   EAP disclosure, Section 944.4 | 35 | 1 | 35-1 |
|   FLSA Overtime regulations, Section 444.21 | 8 | | 8-4 |
|   Holidays and overtime, Section 434.131 | 8 | | 8-13 |
|   Leave, Section 510 | 10 | | 10-1 |
|     Administrative, Section 519 | 10 | | 10-16 |
|     Annual, Section 512 | 10 | | 10-2 |
|     Court, Section 516 | 10 | | 10-2 |
|     Holiday, Section 518 | 10 | | 10-2 |
|     Leave sharing, Section 512.64 | 10 | | 10-5 |
|     Life Insurance, Section 530 | 21 | 2 | 21-4 |
|     LWOP, Section 514 | 10 | | 10-2 |
|     Military, Section 517 | 10 | | 10-2 |
|     Sick, Section 513 | 10 | | 10-12 |
|   Limited Duty, Section 546.14 | 13 | | 13-10 |
|   Maximum hours, Section 432.32 | 8 | | 8-19 |
|   Mutual exchanges, Section 351.61 | 41 | 2-E | 41-22 |
|   Re-promotion, Section 422.123a(4) | 9 | | 9-9 |
|   Retirement, Sections 560 and 580 | 21 | 3 | 21-4 |
|   Safety and Health inspections, Section 824 | 14 | 8-D-4 | 14-7 |
|   Salary rate retention, Section 421.5 | 9 | | 9-10 |
|   Saved grade, Section 421.53 | 4 | 3 | 4-2 |
|   Separation under probation, Section 365.32 | 12 | 1-A | 12-2 |
|   Severance pay, Section 435 | 6 | E | 6-5 |
|   Step Increases, Section 422.13 | 9 | | 9-5 |
|   Travel, Section 438 | 36 | 2-A | 36-1 |
|   Uniforms, Section 935.11 | 26 | 2 | 26-2 |
|   Waiver of claims, Section 437 | 28 | | 28-2 |
| F-1, Chapter 3, check acceptance | 41 | 3-A | 41-25 |
| F-15-C, Relocation Policy -Bargaining Employees | 12 | 5-B-5 | 12-16 |
| F-15, Travel and Relocation | 36 | 2-A | 36-1 |
| F-21, Timekeeper's Instructions | 19 | | 19-1 |
| M-39, Management of Delivery Services | | | |
|   Route inspections and adjustments | 41 | 3-S | 41-31 |
|   Special counts, Section 271g | 41 | 3-S | 41-31 |
|   52-day deadline, Section 211.3 | 41 | 3-A | 41-25 |
| M-41, City Delivery Carriers' Duties & Responsibilities | | | |
|   Bundle systems, Section 222 | 41 | | 41-35 |
|   Flat case configuration, Section 221.7 | 41 | | 41-35 |
| Publication 52, Hazardous Materials | 14 | 8-D | 14-7 |

**Health and Life Insurance**

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Following layoffs or reduction in force | 6 | E-2 | 6-5 |
| **Hempstead Methodology** | 41 | | 41-33 |
| **Higher level assignments** | | | |
| Carrier Technician positions | 25 | | 25-2 |
| Defined | 25 | 1 | 25-1 |
| Details | 25 | 4 | 25-1 |
| Employees with disabilities | 41 | | 41-6 |
| Filling vacancies | 25 | 4 | 25-1 |
| Leave pay | 25 | 5 | 25-3 |
| Pay | 25 | 2 | 25-1 |
| City Carrier Assistants employees | 25 | | 25-3 |
| **Holidays** | | | |
| Christmas work and pay | 11 | 4 | 11-2 |
| City Carrier Assistant employees | 11 | 6-D | 11-3 |
| Eligibility | 11 | 2 | 11-1 |
| Exception to the holiday premium | 11 | | 11-4 |
| Holiday on non-work day | 11 | 5 | 11-2 |
| Holiday pay defined | 11 | 3-B | 11-1 |
| Holiday work | | | |
| Christmas holiday work | 11 | 4 | 11-2 |
| Guarantees | 11 | 4 | 11-2 |
| Pay rate | 11 | 4 | 11-2 |
| Observed holidays | 11 | 1 | 11-1 |
| Overtime and holiday scheduling | 8 | | 8-13 |
| Part-time flexibles | 11 | 7 | 11-5 |
| Pay rate | 11 | 3 | 11-1 |
| Schedule | 11 | 6 | 11-2 |
| Pecking order in absence of LMOU provisions | 11 | | 11-3 |
| Posting | 11 | | 11-4 |
| Volunteers | 11 | | 11-5 |
| Limit on hours | 8 | | 8-13 |

**I**

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **Injury Compensation** | 21 | 4 | 21-4 |
| **Information** | | | |
| Bargaining Information MOU | 31 | | 31-3 |
| Computer Tapes | 31 | 2 | 31-1 |

**J**

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **Jobs** | | | |
| Combining craft duties to create full-time assignments | 7 | 2-A-2 | 7-30 |
| Elimination | | | |
| Rate protection | 4 | 3 | 4-1 |
| Saved grade | 4 | 3 | 4-1 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **L** | | | |
| **Labor-Management Committees** | 17 | 5-A | 17-8 |
| **Last Chance Agreements** | 16 | | 16-11 |
| **Layoffs and Reduction in Force** | | | |
| Achieving protected status | 6 | A-3 | 6-2 |
| Non-protected employees | 6 | A-2 | 6-2 |
| Protected employees | 6 | A-1 | 6-1 |
| Preconditions | 6 | B | 6-3 |
| Defined | 6 | C-1 | 6-4 |
| Determination of number | 6 | B-3 | 6-3 |
| Health and life insurance coverage | 6 | E-2 | 6-5 |
| Management's requirements prior to | 6 | B-4 | 6-3 |
| Notification to employee | 6 | B-2 | 6-3 |
| Notification to Union | 6 | B-1 | 6-3 |
| Recall rights | 6 | D-1 | 6-5 |
| Reduction in Force | 6 | C-5 | 6-4 |
| Retreat rights | 6 | D-2 | 6-5 |
| Severance pay | 6 | E-1 | 6-5 |
| Six-year service requirement detailed | 6 | A-3 | 6-2 |
| Steward seniority during layoffs | 6 | C-4 | 6-4 |
| Union representation rights | 6 | F | 6-5 |
| **Law Citations** | | | |
| National Labor Relations Act | 5 | | 5-1 |
| Postal Reorganization Act | 3 | | 3-1 |
| Rehabilitation Act | 2 | 1 | 2-1 |
| **Lawn crossing** | 41 | 3-N | 41-28 |
| **Leave** | | | |
| Administrative | 10 | | 10-16 |
| Annual leave | | | |
| Accrual | | | |
| Full-time employees | 10 | | 10-2 |
| Part-time employees | 10 | | 10-3 |
| City Carrier Assistant employees | 10 | | 10-4 |
| Avoiding forfeiture | 10 | 3-B | 10-7 |
| Bidding single blocks or two blocks | 10 | 3-D-3 | 10-8 |
| Bidding outside of choice period | 10 | 4-C | 10-11 |
| Carryover | 10 | 3-B | 10-7 |
| Choice Vacation Period | 10 | 3-C | 10-7 |
| Defined | 10 | | 10-2 |
| Emergency annual leave | 10 | 4-D | 10-11 |
| Honoring advance commitments for annual leave | 10 | 4-D | 10-11 |
| Jury Duty interrupting annual leave | 10 | 3-F | 10-9 |
| Leave requests during the year | 10 | 3-D-4 | 10-9 |
| Leave Year | | | |
| Notification of start of new leave year | 10 | 4-A | 10-10 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| 27-pay period leave year | 10 | | 10-4 |
| LWOP in conjunction with annual leave | 10 | 6 | 10-16 |
| NALC Convention interrupting | 10 | 3-F | 10-9 |
| Negotiation of Local Vacation Planning | 30 | B-4 | 30-2 |
| Number of continuous days off | 10 | 3-D | 10-8 |
| Overtime | 8 | | 8-12 |
| Requests for annual leave during the year | 10 | 4-C | 10-11 |
| Sharing | 10 | | 10-5 |
| Start of vacation period | 10 | 3-E | 10-9 |
| Union business | 24 | 1,2 | 24-1 |
| Vacation planning—local implementation | 10 | 3-A | 10-6 |
| Credit Union duties | 36 | 1 | 36-1 |
| Higher level assignments, leave taken during | 25 | 5 | 25-3 |
| Leave Without Pay | | | |
| General rules | 10 | | 10-16 |
| NALC Conventions | 24 | | 24-1 |
| Minimum charge for leave | 10 | 6 | 10-15 |
| Sick leave | | | |
| Accrual | 10 | | 10-12 |
| Advance sick leave | 10 | | 10-15 |
| Applying for | 10 | | 10-12 |
| Authorization | 10 | | 10-14 |
| Defined | 10 | | 10-12 |
| Medical certification | 10 | | 10-14 |
| Part-time employees | 10 | | 10-13 |
| Restricted sick leave | 10 | | 10-15 |
| Sick Leave for Dependent Care | 10 | | 10-15 |
| City Carrier Assistant employees | 10 | | 10-12 |
| 27-pay period leave year | 10 | | 10-12 |
| Sources for leave rules | 10 | | 10-1 |
| Leave for Union Conventions | 24 | 2 | 24-1 |
| **Letter size, defined** | 41 | | 41-49 |
| **Light duty** | | | |
| Bidding | 13 | | 13-9 |
| Disagreements concerning medical condition | 13 | 2-B-2 | 13-3 |
| Excessing | 12 | 5-B-12 | 12-19 |
| Local implementation | 13 | 3-A | 13-4 |
| Management responsibility toward | 13 | 2-C | 13-4 |
| Opting rights | 41 | | 41-10 |
| Permanent reassignment | 13 | 2-B | 13-2 |
| Reassignment to another craft | | | |
| Filling vacancies due to reassignments | 13 | 5 | 13-8 |
| Seniority in new craft | 13 | 5-D | 13-9 |
| Reduction of casuals in order to provide | 13 | 4-A | 13-5 |
| Return to craft | 13 | 4-I | 13-7 |
| Return to duty assignment | 13 | 4-H | 13-7 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Seniority upon return to craft | 13 | 4-I | 13-7 |
| Temporary reassignment | 13 | 2-A | 13-2 |
| **Limited duty** | | | |
| Assignments | | | |
| Grievances | 13 | | 13-12 |
| Representation | 13 | | 13-12 |
| Bidding | 13 | | 13-9 |
| Defined | 13 | | 13-10 |
| Disability partially overcome | 13 | | 13-10 |
| Excessing | 12 | 5-B-12 | 12-19 |
| Return to craft | 13 | 4-I | 13-7 |
| Return to duty assignment | 13 | 4-H | 13-7 |
| Seniority upon return to craft | 13 | 4-I | 13-7 |
| **Local Implementation** | | | |
| Enforcement | 30 | D | 30-4 |
| Impasses | | | |
| Items that may be impassed | 30 | F | 30-5 |
| Procedure | 30 | | 30-6 |
| Inconsistent or in Conflict | 30 | | 30-7 |
| LMOUs | 30 | A | 30-1 |
| Negotiable items | 30 | B | 30-1 |
| Negotiation period | 30 | B | 30-1 |
| New or consolidated installations | 30 | E | 30-5 |
| Posting | | | |
| Installation-wide posting | 41 | 1-B | 41-5 |
| Length of posting | 41 | 1-B-3 | 41-5 |
| **Locker inspection** | 41 | 3-J | 41-27 |
| **Lunch scans** | 41 | | 41-53 |
| **M** | | | |
| **Management** | | | |
| Limits on management rights | 3 | | 3-1 |
| Rights | 3 | | 3-1 |
| **Maximization obligations** | | | |
| Offices with 200 or more workyears | 7 | 3-A | 7-34 |
| Employees counted as full-time employees | 7 | 3-A | 7-34 |
| Full-time flexible positions | 7 | | 7-39 |
| General obligation to maximize | 7 | 3-B | 7-36 |
| Holiday Weeks | 7 | | 7-37 |
| PTF working letter carrier duties for 6 months | 7 | | 7-37 |
| PTF working same assignment for 6 months | 7 | 3-C | 7-37 |
| Remedy for violation | 7 | 3-A | 7-36 |
| 39-hour report | 7 | | 7-40 |
| Withholding situations | 7 | | 7-42 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **Memorandums of Understanding** | | | |
| Alternate Route Evaluation and Adjustment Process | 41 | | 41-62 |
| Arbitration Task Force | 15 | | 15-25 |
| Article 7.1 | 1 | | 1-3 |
| Article 7, 12, and 13—Cross Craft and Office Size | 7 | | 7-32 |
| Article 7.3 | 7 | | 7-38 |
| Article 8 | 8 | | 8-29 |
| Article 8 Task Force | 8 | | 8-33 |
| Article 15—ELM 436—Back Pay | 16 | | 16-3 |
| Article 17.7.D Payroll Deductions/Allotments | 17 | | 17-11 |
| Article 19 | 19 | | 19-2 |
| Article 27 | 27 | | 27-3 |
| Article 32 Committee | 32 | | 32-2 |
| Article 41—Bid Process | 41 | | 41-6 |
| Automation | 41 | | 41-44 |
| Bargaining Information | 31 | | 31-3 |
| Bereavement Leave | 10 | | 10-17 |
| Bidding while on light or limited duty | 13 | | 13-9 |
| Centralized Uniform Program | 26 | | 26-4 |
| City Delivery Task Force | 41 | | 41-61 |
| City Letter Carrier DPS Work Methods | 41 | | 41-51 |
| Customer Connect Program | 41 | | 41-62 |
| Deaf and Hard of Hearing | 2 | | 2-2 |
| Delivery and Collection of Competitive Products | 7 | | 7-43 |
| Delivery Unit Optimization | 12 | | 12-23 |
| Delivery Unit Optimization – Retreat Rights | 12 | | 12-25 |
| Dispute Resolution Process | 15 | | 15-21 |
| Dispute Resolution Process Testing | 15 | | 15-25 |
| District Safety Committees Pilot Program | 14 | | 14-8 |
| DOIS | 41 | | 41-58 |
| Ex parte communications | 15 | | 15-14 |
| Expedited Arbitration | 15 | | 15-19 |
| FSS Implementation | 41 | | 41-54 |
| FSS Work Methods | 41 | | 41-54 |
| Granting Step Increases | 9 | | 9-12 |
| Interest on Back Pay | 16 | | 16-4 |
| Intervention Process | 15 | | 15-24 |
| Involuntary Reassignment – Preference Eligible | 12 | | 12-21 |
| Involuntary Reassignment Without Regard to Level | 12 | | 12-21 |
| Joint Committee on Subcontracting | 32 | 2 | 32-2 |
| Joint Safety and Accident Control Teams | 14 | | 14-8 |
| Joint Statement on Overtime | 8 | | 8-31 |
| Leave Policy | 10 | | 10-19 |
| Leave Sharing | 10 | | 10-18 |
| Local Memorandum of Understanding under Delivery Unit Optimization | 12 | | 12-24 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Local Implementation | 30 | | 30-5 |
| Managed Service Points | 41 | | 41-53 |
| Maximization | 7 | | 7-38 |
| Maximization/Full-time Flexible—NALC | 7 | | 7-38 |
| Multiple Days of Inspection | 41 | | 41-60 |
| Mutual Exchanges | 41 | | 41-23 |
| National Day of Observance | 10 | | 10-20 |
| Paid Leave and LWOP | 10 | | 10-19 |
| Processing of Grievances | 15 | | 15-21 |
| Processing of Post-Removal Grievances | 15 | | 15-21 |
| PTF Court Leave | 10 | | 10-21 |
| Reinstatement of Driving Privileges | 29 | | 29-1 |
| Resolution of Health Benefits | 21 | | 21-5 |
| Return to Duty | 10 | | 10-19 |
| RMD or eRMS | 10 | | 10-22 |
| Router, Carrier Craft | 41 | | 41-39 |
| Segmentation | 41 | | 41-40 |
| Sick Leave for Dependent Care | 10 | | 10-17 |
| Special Count and Inspection—City Delivery Routes | 41 | | 41-26 |
| Subcontracting | 32 | | 32-3 |
| Subcontracting-List of 3,071 City Delivery Offices | 32 | | 32-4 |
| Subcontracting MOU Issues | 32 | | 32-3 |
| Training Committee | 41 | | 41-39 |
| Transfers | 12 | | 12-45 |
| Transitional Employees/Part-time Flexible Conversions | 41 | | 41-49 |
| Transitional Employees—Questions and Answers | 7 | | 7-53 |
| Upgrade of NALC Represented Employees | 9 | | 9-12 |
| Use of Privately Owned Vehicles | 41 | | 41-40 |
| Work Assignment Overtime | 8 | | 8-30 |
| **Mileage allowance** | 36 | 2 | 36-1 |
| **MSPB** | | | |
| Dual filings with EEOs | 16 | | 16-11 |
| Dual filings with grievances | 16 | | 16-11 |
| Layoffs and reduction in force | 6 | | 6-7 |
| **Mutual Exchanges** | | | |
| Generally | 12 | | 12-50 |
| Seniority | 41 | 2-E | 41-22 |

**N**

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **National Agreement** | | | |
| Covered employees | 1 | 4 | 1-3 |
| Excluded employees | 1 | 2 | 1-2 |
| Excluded facilities | 1 | 3 | 1-3 |
| **New employees** | | | |
| Health Benefits Brochures | 21 | 5 | 21-5 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **Newly created positions** | | | |
| Craft assignment | 1 | 5 | 1-4 |
| Offered to current employees | 4 | 3 | 4-1 |
| **Night Shift Differential** | 8 | 7 | 8-23 |
| Paid while on administrative leave | 10 | | 10-16 |
| **Non-scheduled days** | | | |
| Scheduling of fixed or rotating | 41 | 1-A-3 | 41-3 |
| **Notice to employee** | | | |
| Emergency procedure | 16 | 7 | 16-8 |
| Employer Claims | 28 | 1 | 28-1 |
| Excessing to another installation | 12 | 5-B-5 | 12-16 |
| Holiday Schedule | 11 | 6 | 11-2 |
| Involuntary details of PTFs to other installations | 12 | 5-B-5 | 12-16 |
| Layoffs | 6 | B-2 | 6-3 |
| Locker inspection | 41 | 3-J | 41-27 |
| Office count | 41 | | 41-34 |
| Recall rights after layoffs or reduction in force | 6 | D-1 | 6-5 |
| Suspensions, indefinite | 16 | 6-A | 16-7 |
| Suspensions of more than 14 days or discharge | 16 | 5 | 16-6 |

**O**

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **Opting** | | | |
| Assignment to a residual vacancy while on an opt | 41 | | 41-14 |
| Assuming the schedule of the assignment | 41 | | 41-11 |
| Bidding while on an opt | 41 | | 41-13 |
| City Carrier Assistant employees | 41 | 2.B.4 | 41-9 |
| Detail to 204b position while on opt | 41 | | 41-14 |
| Duration | | | |
| Exceptions | 41 | | 41-13 |
| General rule | 41 | | 41-13 |
| Eligible duty assignments | 41 | | 41-12 |
| Eligibility | 41 | | 41-10 |
| Ineligible duty assignments | 41 | | 41-12 |
| Ineligible employees | 41 | | 41-11 |
| Length of vacancy | 41 | | 41-10 |
| Overtime status as a result of an opt | 41 | | 41-14 |
| PTF and CCA pay status | 41 | | 41-15 |
| Recording overtime for a 6-day workweek | 8 | | 8-12 |
| Remedies | 41 | | 41-16 |
| Removal from hold-down | 41 | | 41-14 |
| Scheduled days | 41 | | 41-16 |
| Temporary vacancies | | | |
| Five or more days | 41 | 2-B-3 | 41-9 |
| Less than five days | 41 | | 41-12 |
| On a hold-down | 41 | | 41-13 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Posting vacancies for opt | 41 | | 41-13 |
| **Out-of-Schedule Premium** | 8 | | 8-4 |
| **Overtime** | | | |
| Assignments | 8 | 5 | 8-8 |
| FLSA Overtime | 8 | | 8-4 |
| Holiday scheduling | 8 | | 8-13 |
| Letter Carrier Paragraph | 8 | | 8-14 |
| Limits on overtime | 8 | 5-F | 8-18 |
| Mandatory overtime | 8 | 5-D | 8-17 |
| By juniority, on a rotating basis | 8 | 5-D | 8-17 |
| Exceptional situations | 8 | 5-E | 8-17 |
| Volunteers | 8 | | 8-17 |
| No pyramiding | 8 | 4-F | 8-8 |
| Overtime Lists | | | |
| Overtime Desired List | 8 | 5-A | 8-9 |
| Annual leave | 8 | | 8-12 |
| Carrier Technicians | 8 | | 8-14 |
| Equitable distribution of overtime opportunities | 8 | 5-C-2-b | 8-11 |
| Establishment | 8 | 5-B | 8-10 |
| Excessed employees | 12 | | 12-19 |
| Holiday work, how to record | 8 | | 8-13 |
| Maximum Hours—60-hour limit | 8 | 5-G | 8-18 |
| Remedies for violation | 8 | | 8-20 |
| Maximum Hours—12-hour limit | 8 | | 8-20 |
| Overtime worked as a result of an opt | 41 | | 41-17 |
| Remedies for inequitable distribution | 8 | | 8-12 |
| 10-Hour preference | 8 | | 8-19 |
| VOMA ineligibility | 41 | | 41-8 |
| Work performed on own route | 8 | 5-C-2-d | 8-13 |
| Removing name | 8 | | 8-10 |
| Signing, rules and exceptions | 8 | 5-A | 8-9 |
| Work Assignment List | 8 | | 8-21 |
| Pay rate | 8 | | 8-3 |
| Penalty rate | 8 | | 8-4 |
| Full-time employees | 8 | | 8-7 |
| Part-time employees | 8 | | 8-8 |
| Postal Overtime | 8 | | 8-3 |

**P**

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **Parking** | | | |
| Employee parking | 20 | | 20-1 |
| Local implementation | 20 | | 20-1 |
| Security | 20 | 2 | 20-1 |
| **Part-Time Flexibles** | | | |
| Call-In Guarantees | 8 | 8-C | 8-25 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Court Leave MOU | 10 | | 10-21 |
| Excessing to same craft in another installation | 12 | 5-C-8-b | 12-43 |
| Holidays | 11 | 7 | 11-5 |
| Involuntary temporary details to other installations | 12 | 5-B-5 | 12-16 |
| No guaranteed annual salary | 9 | | 9-1 |
| Opting | | | |
| Pay Status | 41 | | 41-15 |
| Remedies | 41 | | 41-16 |
| Rights | 41 | 2-B-4 | 41-9 |
| Overtime pay rate | 8 | | 8-3 |
| Permanent light duty | | | |
| Recovery after reassignment to another craft | 13 | 4-L | 13-7 |
| Seniority in new craft | 13 | 6-B | 13-9 |
| Reduction of employees in an installation | 12 | 5-C-5-a-1 | 12-33 |
| Schedules | 8 | 3 | 8-2 |
| Split shifts | 8 | | 8-26 |
| **Part-Time Regulars** | | | |
| Holiday pay | 11 | 3-A | 11-1 |
| Light duty | 13 | 1-A | 13-1 |
| Schedules | 8 | 3 | 8-2 |
| Seniority | 41 | 2-B-2 | 41-9 |
| **Past practice** | 5 | | 5-1 |
| Changing | 5 | | 5-3 |
| Defined | 5 | | 5-2 |
| Functions | 5 | | 5-3 |
| **Payroll** | | | |
| Basic annual salary | 9 | 1 | 9-1 |
| Basic salary vs. base salary | 9 | | 9-4 |
| COLA formula | 9 | 3-C | 9-3 |
| Deductions, group insurance | 17 | 7-D | 17-10 |
| Holiday pay | 11 | 3 | 11-1 |
| Holiday work pay | 11 | 4 | 11-2 |
| Night shift differential | 8 | 7 | 8-23 |
| Overtime pay rate | 8 | 4-A | 8-3 |
| Part-time flexible holiday compensation | 11 | 7 | 11-5 |
| Penalty Overtime pay rate | 8 | 4-C | 8-3 |
| Rate protection | 4 | 3 | 4-2 |
| Saved grade | 4 | 3 | 4-2 |
| Sunday premium | 8 | 6 | 8-23 |
| Step increases | 9 | 5 | 9-5 |
| Wage increases | 9 | 1 | 9-1 |
| **Postage and fees** | | | |
| Bad checks | 41 | 3-C | 41-25 |
| Improper | 41 | 3-B | 41-25 |
| **Posting** | | | |
| Abolishment of assignment | 41 | 3-O | 41-29 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Change in starting time | | | |
| Not a cause for posting | 41 | 1-A-4 | 41-4 |
| More than 1 hour | 41 | 1-A-5 | 41-4 |
| Duty assignments of 204b's | 41 | 1-A-2 | 41-3 |
| Fixed schedule non-work day | 41 | 1-A-6 | 41-4 |
| Information required on posting | 41 | 1-B-4 | 41-5 |
| Installation wide posting | 41 | 1-B | 41-5 |
| Limit on number of successful bids | 12 | 3-A | 12-7 |
| Local implementation of posting | 41 | 1-A-3 | 41-3 |
| Required information on posting | 41 | 1-B-4 | 41-5 |
| Reversion | 41 | 1-A-1 | 41-2 |
| Successful bidder | | | |
| Requirement to meet the qualifications | 41 | 1-C | 41-6 |
| Working the duty assignment as posted | 41 | 1-C-4 | 41-7 |
| Time limits | | | |
| Length of time for assignments to remain posted | 41 | 1-B-3 | 41-5 |
| To announce the successful bidder | 41 | 1-C-2 | 41-7 |
| To place successful bidder in new assignment | 41 | 1-C-3 | 41-7 |
| To post assignments | 41 | 1-A | 41-1 |
| **Preference eligible** | | | |
| Appeal rights during layoffs and reduction in force | 6 | F-3 | 6-5 |
| Grievances for proposed removal actions | 15 | | 15-6 |
| MSPB appeal concurrent with grievance on layoffs | 6 | | 6-8 |
| Reassignment during layoffs | 6 | B-5 | 6-3 |
| Recall rights after layoffs or reduction in force | 6 | D-1 | 6-5 |
| **Premium pay** | | | |
| Exception to the holiday premium | 11 | | 11-4 |
| No pyramiding of premiums | 8 | 4-F | 8-8 |
| Out-of-Schedule Premium | 8 | | 8-4 |
| Sunday Premium | 8 | 6 | 8-23 |
| **Probationary employees** | | | |
| Falsification of employment application | 12 | 1-B | 12-4 |
| No opting rights | 41 | | 41-11 |
| No seniority | 12 | 1-C | 12-4 |
| Probationary period | 12 | 1-A | 12-2 |
| Rehires | 12 | 1-D | 12-4 |
| **Promotions** | | | |
| Craft promotions | 33 | 2 | 33-1 |
| Examinations | 33 | 3 | 33-1 |
| General principles | 33 | 1 | 33-1 |
| **Promotion Pay Anomaly** | 9 | | 9-7 |
| Affected carriers | 9 | | 9-8 |
| Repromotion to a higher grade | 9 | | 9-8 |
| Return to former lower grade | 9 | | 9-8 |
| **Protected Salary Rates** | | | |
| Protected rate | 9 | | 9-10 |

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 461 of 472. PageID #: 1279

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Saved grade | 9 | | 9-10 |
| Saved rate | 9 | | 9-10 |
| **R** | | | |
| **Representation** | | | |
| Dues checkoff | 17 | 7-A | 17-9 |
| Excessed letter carriers represented by NALC | 12 | | 12-20 |
| Exclusions | 1 | 2 | 1-2 |
| Health benefits | 17 | 6 | 17-8 |
| Labor-Management Committee Meetings | 17 | 5 | 17-8 |
| Limited duty assignment with change in craft | 13 | | 13-12 |
| NALC as exclusive bargaining agent | 1 | 1 | 1-1 |
| New Employee Orientation | 17 | 6 | 17-8 |
| Stewards | | | |
| Acting as steward | 17 | 2-B | 17-2 |
| Certification | 17 | 2 | 17-1 |
| Payment | 17 | 4 | 17-4 |
| Rights | 17 | 3 | 17-3 |
| Superseniority in transfers | 17 | | 17-7 |
| Weingarten Rights | 17 | | 17-6 |
| **Reserve Letter Carriers** | 41 | 1-A | 41-1 |
| Opting rights | 41 | 2-B-3 | 41-9 |
| Position available for opting | 41 | | 41-12 |
| **Retreat rights** | | | |
| After unnecessary excessing | 12 | 4-C | 12-10 |
| Employees excessed from a section | 12 | 5-C-4 | 12-30 |
| Bidding while retreat rights are pending | 12 | | 12-31 |
| Loss of retreat rights | 12 | | 12-31 |
| Reassignment to another craft outside of installation | 12 | 5-C-5-b-6 | 12-40 |
| Reassignment to same craft in same installation | | | |
| Volunteering to take place of excessed employee | 12 | 5-C-5-b-3 | 12-39 |
| Reassignment to same craft in another installation | 12 | 5-C-5-b-6 | 12-40 |
| Following layoffs or reduction in force | 6 | D-2 | 6-5 |
| Reduction of employees in an installation | 12 | 5-C-5-a-1 | 12-33 |
| Re-establishment of consolidated installation | 12 | 5-C-2-b | 12-28 |
| Re-establishment of discontinued installation | 12 | 5-C-1-g | 12-27 |
| Transfer of stations/branches to another installation | 12 | 5-C-3-b | 12-29 |
| **Reversion** | 41 | 1-A-1 | 41-2 |
| Opting routes considered for reversion | 41 | | 41-12 |
| **Routers** | 41 | | 41-39 |
| **Routes** | | | |
| Abolishment | 41 | 3-O | 41-29 |
| Adjustments | | | |
| 52-day extensions | 41 | 3-D | 41-25 |
| 60-day reviews | 41 | | 41-34 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Auxiliary routes | | | |
| Growth to a full-time route | 7 | 3-D | 7-37 |
| Ineligible for opting | 41 | | 41-12 |
| Inspections | 41 | 3-S | 41-31 |
| One-day counts | 41 | | 41-34 |
| Reasonable time to become familiar | 41 | 3-F | 41-26 |
| Seasonal routes | 41 | 3-R | 41-31 |
| Special Inspection MOU | 41 | | 41-26 |
| **Rural Carriers** | | | |
| Exclusion from combining craft duties | 7 | | 7-30 |

**S**

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **Safety and Health** | | | |
| Field Federal Safety and Health Councils | 14 | 9 | 14-7 |
| Grievances | 14 | 2-c | 14-1 |
| Joint Labor-Management Safety Committees | | | |
| Area | 14 | 3-B | 14-3 |
| Headquarters level | 14 | 3-A | 14-2 |
| Local | 14 | 4 | 14-3 |
| Meetings | 14 | 6 | 14-4 |
| Responsibilities | 14 | 8 | 14-5 |
| Subjects for discussion | 14 | 5 | 14-4 |
| Management responsibilities | 14 | 1 | 14-1 |
| OSHA | 14 | | 14-3 |
| Priority arbitration scheduling | 14 | 2 | 14-1 |
| Unsafe conditions | 41 | 3-I | 41-27 |
| **Salary, basic salary vs. base salary** | 9 | | 9-4 |
| **Schedules** | | | |
| Days off | 8 | | 8-2 |
| Five-minute leeway rule | 8 | | 8-2 |
| Full-time employees | 8 | | 8-1 |
| Non-availability for overtime | 8 | | 8-12 |
| Opted assignments | 41 | | 41-16 |
| Voluntary schedule changes | | | |
| Non-availability for overtime | 8 | | 8-12 |
| Out-of-schedule premium paid | 8 | | 8-7 |
| Part-time Regulars | 8 | | 8-2 |
| Work schedules | 8 | 2 | 8-1 |
| Work week | 8 | 1,2 | 8-1 |
| **Seniority** | | | |
| Bidding | 41 | 2-B-1 | 41-9 |
| Conversion from part-time flexible to full-time | 41 | 2 | 41-8 |
| Coverage | 41 | 2-A | 41-8 |
| Computation | | | |
| General rule | 41 | 2-A-2 | 41-9 |

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 463 of 472. PageID #: 1281

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Exceptions | | | |
| Involuntary reassignments | 41 | 2-D-5 | 41-22 |
| Mutual Exchanges | 41 | 2-E | 41-22 |
| Reinstatement following illness or injury | 41 | 2-D-1 | 41-21 |
| Return after unwarranted separation | 41 | 2-D-4 | 41-21 |
| Return from military service | 41 | 2-D-2 | 41-21 |
| Union officers on LWOP | 41 | 2-D-3 | 41-21 |
| New period of seniority | | | |
| Reassignment of surplus employees | 41 | 2-G-5 | 41-25 |
| Reinstatement | 41 | 2-G-4 | 41-25 |
| Transfer from another agency | 41 | 2-G-1 | 41-24 |
| Transfer from another craft | 41 | 2-G-2 | 41-24 |
| Transfer from another installation | 41 | 2-G-3 | 41-24 |
| Delivery Unit Optimization | 41 | | 41-22 |
| Excessing to another craft outside of installation | 12 | 5-C-5-b-2 | 12-38 |
| Excessing to another craft within installation | 12 | 5-C-5-a-4 | 12-34 |
| Excessing to letter carrier craft outside of installation | 12 | 5-C-5-b | 12-36 |
| Excessed employees | 12 | 5-B-10 | 12-18 |
| Inverse seniority for layoffs | 6 | C-5 | 6-4 |
| Mutual Exchanges | 12 | | 12-50 |
| Principle of Article 41 prevailing over Article | 12 | 2-A | 12-5 |
| Re-establishment of a discontinued installation | 12 | 5-C-1-g | 12-27 |
| Return from being excessed to another craft | 12 | 5-C-5-a-6 | 12-34 |
| Return to craft from light/limited duty | 13 | 4-I | 13-7 |
| Returning to same installation after excessing | 12 | 2-B | 12-5 |
| Roster requirement | 41 | 2-C | 41-20 |
| Stewards, during layoffs | 6 | C-4 | 6-4 |
| Superseniority | 12 | | 12-8 |
| Superseniority in transfers | 17 | | 17-7 |
| Supervisor returning to craft | 41 | 2-F | 41-23 |
| Tie breaker | 41 | 2-B-7 | 41-19 |
| Transfers, voluntary | 12 | 1-G | 12-48 |
| Transfer of station/branch to another installation | 12 | 5-C-3-a | 12-29 |
| Voluntary reassignment under excessing | 12 | 5-B-6 | 12-18 |
| **Separability** | 43 | 1 | 43-1 |
| **Special Inspections** | | | |
| MOU | 41 | | 41-26 |
| **Split Shifts** | | | |
| Part-time flexibles | 8 | | 8-26 |
| City Carrier Assistant employees | 8 | | 8-27 |
| **Stewards** | | | |
| Acting as steward | 17 | 2-B | 17-2 |
| Certification | 17 | 2 | 17-1 |
| Payment | 17 | 4 | 17-4 |
| Rights | 17 | 3 | 17-3 |
| Seniority during layoffs | 6 | C-3 | 6-4 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Superseniority in transfers | 17 | | 17-7 |
| Telephone access | 41 | 3-H | 41-27 |
| City Carrier Assistant employees | 17 | | 17-2 |
| Weingarten Rights | 17 | | 17-6 |
| **Stools, use of while casing** | 41 | 3-A | 41-25 |
| **Strike prohibition** | 18 | 1 | 18-1 |
| **Subcontracting** | | | |
| General principles | 32 | 1-B | 32-1 |
| Joint Committee | 32 | 2 | 32-2 |
| Notifying and consulting with Union | 32 | 1-B | 32-1 |
| Right to information | 32 | 1-C | 32-1 |
| **Supervisors** | | | |
| Prohibition against performing bargaining unit work | 1 | 6-A | 1-4 |
| 100 or less bargaining unit employees | 1 | 6-B | 1-5 |
| 100 or more bargaining unit employees | 1 | 6-A | 1-4 |
| Remedy | 1 | 6-A | 1-5 |
| Seniority upon returning to craft | 41 | 2-F | 41-23 |
| 204bs | | | |
| Assignment to a residual vacancy | 41 | | 41-4 |
| PS Form 1723 | 1 | 6-A | 1-5 |
| Overtime | 1 | 6-A | 1-5 |
| Posting the duty assignment of | 41 | 1-A-2 | 41-3 |
| Prohibition against bidding | 41 | 1-A-2 | 41-3 |
| Voluntary termination of detail | 41 | 1-A-2 | 41-3 |
| VOMA, right to bid | 41 | 1-A-2 | 41-3 |
| **Supplies** | 41 | 3-E | 41-26 |

**T**

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **Technological and Mechanization Changes** | | | |
| Labor-Management Committee | 4 | 2 | 4-1 |
| Notice to the union | 4 | 1 | 4-1 |
| **Telephone access** | 41 | 3-H | 41-27 |
| **Transfers, voluntary** | | | |
| Grievances for denied transfers | 12 | 6 | 12-45 |
| Lock-in period | | | |
| Local reassignments | 12 | 2-A | 12-49 |
| Reassignments to other geographical areas | 12 | 1-C | 12-46 |
| For transfers to increase number of hours | 12 | 2-B | 12-50 |
| Memorandum of Understanding | 12 | | 12-45 |
| Mutual Exchanges | 12 | | 12-50 |
| Exclusions | 12 | | 12-50 |
| Seniority | 41 | 2-E | 41-22 |
| Relocation expenses | 12 | 1-H | 12-48 |
| Reporting date | 12 | 1-E | 12-47 |
| Seniority | 12 | 1-G | 12-48 |

|  | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Reassignments, local | 12 | 2-A | 12-49 |
| Reassignments to other geographical areas | 12 |  | 12-45 |
| **Transitional Work Force—TEs** |  |  |  |
| Limited term of employment | 7 | 1-B-4 | 7-3 |
| Limits on the number of | 7 | 1-B-1,2 | 7-2 |
| Phase out | 7 | 1.B | 7-2 |
| PTF straight-time hours priority | 7 | 1-B-3 | 7-2 |
| Questions and answers | 7 |  | 7-53 |
| Memorandums of Understanding | 7 |  | 7-45 |
| **Travel** | 36 | 2 | 36-1 |
| **U** |  |  |  |
| **Unassigned Regular** |  |  |  |
| Assignment to residual positions | 41 | 1-A-6 | 41-4 |
| Defined | 41 | 1-A | 41-1 |
| Opting rights | 41 |  | 41-10 |
| **Uniforms** |  |  |  |
| Annual allowance | 26 | 2 | 26-1 |
| Joint Uniform Control Committee | 26 | 1 | 26-1 |
| **Unilateral action** |  |  |  |
| Prohibition against | 5 |  | 5-1 |
| **Union** |  |  |  |
| Employees on leave with regard to Union business | 24 |  | 24-1 |
| Continuation of benefits | 24 | 1 | 24-1 |
| Leave for Union Conventions | 24 | 2 | 24-1 |
| Management's requirement to consult with Union: |  |  |  |
| Changes to instruction booklet on inspections | 41 | 5 | 41-38 |
| Energy shortages | 42 |  | 42-1 |
| Newly created positions | 1 | 5 | 1-4 |
| Subcontracting | 32 | 1-B | 32-1 |
| Vehicle specifications | 41 | 3-L | 41-28 |
| Management's requirement to notify the Union: |  |  |  |
| Accident investigation board | 14 | 8-C | 14-6 |
| Changes in duties and functions of letter carriers | 41 | 3-M | 41-28 |
| Changes to instruction booklet on inspections | 41 | 5 | 41-38 |
| Combining craft duties to create assignments | 7 | 2-A-2 | 7-30 |
| Excessing from another craft into carrier craft | 12 | 5-B-4 | 12-16 |
| Handbook and manuals, changes to | 19 |  | 19-1 |
| Intent to terminate or modify Agreement | 43 | 2 | 43-1 |
| Layoffs | 6 | B-1 | 6-3 |
| Locker inspection | 41 | 3-J | 41-27 |
| New mechanization | 4 | 1 | 4-1 |
| New positions | 1 | 5 | 1-4 |
| Reassignment Plan | 12 | 4-B | 12-9 |
| Referral of Expedited case to Regular Arbitration | 15 | 4-C-2 | 15-18 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| Referral of Regular case to Interpretive Step | 15 | 4-B-5 | 15-17 |
| Reversion | 41 | 1-A-1 | 41-2 |
| Seeking to change a past practice | 5 | | 5-3 |
| Subcontracting | 32 | 1-B | 32-1 |
| Termination of Agreement | 43 | 2 | 43-1 |
| Vehicle accidents | 41 | 3-P | 41-31 |
| Work or time standards | 34 | C | 34-1 |
| Work or time studies | 34 | B | 34-1 |
| Management's requirement to report to the Union: | | | |
| Comparative Work Hour Report | 12 | 4-C | 12-10 |
| Computer Tapes/Bargaining Information | 31 | 2 | 31-1 |
| Quarterly Arbitration Report | 15 | 5 | 15-20 |
| Reassignments, layoffs and reduction in force | 6 | F-2 | 6-5 |
| 39-hour report for PTF hours worked | 7 | | 7-40 |
| Membership solicitation | 31 | 1 | 31-1 |
| Right to information | 31 | 3 | 31-1 |
| Right of Union officials to enter Postal installations | 23 | | 23-1 |
| Telephone access | 41 | 3-H | 41-27 |

**V**

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **Vehicles** | | | |
| Accident notification | 41 | 3-P | 41-31 |
| Consulting with the Union | 41 | 3-M | 41-28 |
| Driveout agreements | 41 | 4 | 41-37 |
| Agreements already in effect | 41 | 4 | 41-37 |
| Part-time flexibles' reimbursement | 41 | 4-3-f | 41-38 |
| Reimbursement rate | 41 | 4-3 | 41-37 |
| Voluntary nature | 41 | 4-1 | 41-37 |
| Written authorization | 41 | 4-1 | 41-37 |
| Temperature | 41 | 3-Q | 41-31 |
| **Veterans' Preference** | | | |
| Discipline | 16 | 9 | 16-10 |
| MSPB Dual Filings | 16 | | 16-10 |
| **VOMA** | | | |
| Abolishment of assignment | 41 | | 41-30 |
| Eligible crafts | 41 | 1-D | 41-8 |
| Non-application to Article | 12 | | 12-36 |
| Overtime Desired List | 41 | | 41-8 |
| 204b's right to bid | 41 | 1-A-2 | 41-3 |

**W**

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **Wash-Up Time** | 8 | 9 | 8-27 |
| **Weingarten Rights** | 17 | | 17-6 |

| | ARTICLE | SEC. | PAGE(S) |
|---|---|---|---|
| **Withholding** | | | |
| Maximization provisions | 7 | | 7-42 |
| **Work** | | | |
| Breaks | 41 | | 41-28 |
| Insufficient work on a given day | | | |
| Management rights to assign work | 7 | 2-B | 7-31 |
| Application to employee classes | 7 | | 7-30 |
| Work schedules | 8 | 2 | 8-1 |
| Work week defined | 8 | 1 | 8-1 |
| Methods | | | |
| Case configuration | 41 | | 41-34 |
| Case configuration, MOU | 41 | | 41-51 |
| Composite Bundle | 41 | | 41-35 |
| DPS Work Methods, MOU | 41 | | 41-51 |
| Unaddressed flats | 41 | | 41-36 |
| Vertical Flat Casing | 41 | | 41-35 |
| Off-the-clock work prohibited | 41 | 3-K | 41-27 |
| Unsafe conditions | 41 | 3-I | 41-27 |
| **Work and/or Time Standards** | | | |
| Notice to union | 34 | B | 34-1 |
| Principle of fair day's work | 34 | A | 34-1 |
| Priority scheduling in arbitration | 34 | E | 34-1 |
| Tests of work and/or time standards | 34 | C | 34-1 |
| Union right to observe time or work studies | 34 | B | 34-1 |

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 468 of 472. PageID #: 1286

Index—30 NALC-USPS Joint Contract Administration Manual - July 2014

USPS001008

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 469 of 472. PageID #: 1287

USPS001009

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 470 of 472. PageID #: 1288

USPS001010

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 471 of 472. PageID #: 1289

USPS001011

Case: 5:16-cv-02151-JRA Doc #: 28-7 Filed: 06/30/17 472 of 472. PageID #: 1290

USPS001012