UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRANDEN R. SIMONE, | ) | CASE NO. 5:16-CV-2151 |
| Plaintiff, | ) | |
| v. | ) | JUDGE JOHN R. ADAMS |
| MEGAN J. BRENNAN, *et al.*, | ) | |
| Defendants. | ) | **MEMORANDUM OPINION AND ORDER** |

This matter comes before the Court on Motions for Summary Judgment filed by Defendant National Association of Letter Carriers Branch 148 (the "Union"), Doc. #24, and Defendant Megan J. Brennan (the "Postmaster General"), Doc. #28. Plaintiff Branden R. Simone ("Simone") has filed a single combined response to the motions. Doc. # 35. The Court has reviewed the parties' pleadings, motions, opposition, replies, exhibits, and applicable law. For the reasons that follow, Defendants' Motions are GRANTED.

**I. Facts**

On April 5, 2016, Simone arrived for work at the Ellet branch post office where he was assigned to postal route number 1277 ("Route 77"). Simone began his work day at the post office by sorting and organizing mail for delivery, a process referred to as "casing." Casing is conducted by each mail carrier standing at a work bench or "case" that contains various slots representing the

1

physical addresses on each mail route as well as narrow shelves to hold the material to be sorted and parcels to be delivered. The parties agree that on that particular morning, Simone was the only carrier that had full tray of mail to sort. Initially, Simone, who wanted overtime, was pleased because the tray meant it was unlikely he could complete his route without additional time.

Simone informed his supervisor that he would not be able to sort and deliver his assigned mail that day within eight hours. His supervisor, Ron Miller, told him that overtime would not be approved and suggested that he "curtail the red plums" if he found himself behind schedule. His supervisor's instruction meant that Simone was permitted to deliver fewer of the bulk mail Red Plum advertising circulars that were scheduled for delivery that day in favor of other classes of mail. At some point before leaving the post office to walk his route, Simone said to Joe White, the clerk who delivered his tray, "You know where this is going to end up" in reference to the full tray of mail. Doc. #28-2, p 119.

Simone ultimately left the post office for his route between forty-five minutes and two hours later (accounts vary) than his normal time around 10:15 a.m. When Simone left his father who is also a mail carrier was the only carrier remaining in the office who was still preparing to deliver mail. Simone had been delivering mail for a few hours when around 1:00 p.m. he was pulled from his route by his supervisor. Simone returned to the post office as instructed to retrieve his things. He stopped by the office of branch manager Tracey Hopkins before leaving the building as instructed. Simone's next contact with his supervisor and management was through the disciplinary process prescribed by the Collective Bargaining Agreement ("CBA").

According to the statements produced by the Union and the Postmaster General, when clerks were clearing waste from the sorting stations, they noticed a large number of non-bulk business mail pieces in Route 77's undeliverable bulk business mail container ("UBBM"). The

individual who noticed the mail was not aware that Simone was assigned to Route 77. She brought the mail in the Route 77 UBBM to the attention of her supervisor, Jim Pekarek, around noon. Pekarek then took the letters out of the UBBM and proceeded to case them to determine if they were deliverable mail for Route 77. Pekarek determined that 121 pieces of what appeared to be deliverable mail had been placed in the Route 77 UBBM and informed the branch manager Tracey Hopkins that apparently deliverable mail had been discarded.

Pekarek, Hopkins, and the Goodyear branch manager then took the recovered mail out to Route 77 to verify whether it was in fact deliverable and to see whether Red Plums were delivered to the residential addresses. The three individuals determined that there was a noticeable amount of good mail among the pieces discarded. Hopkins then instructed Pekarek and Simone's supervisor, Ron Miller, to take Simone off his route. Simone was placed on "emergency placement in a non-pay status" pending his Pre-Disciplinary Interview ("PDI") during which he would be asked to explain the presence of deliverable mail in the Route 77 UBBM. Doc. #28-8, p. 2.

During his April 13, 2016 PDI, Simone avoided answering questions about any reference he made to the additional tray of mail at his station:

> Do you remember making a comment to the clerks when they brought you the mail?
> *I don't really talk to the clerks I only talk to Dustin, Jay and Carl.*
> Did you make a comment about[sic] to them about throwing mail away?
> *No we just joke around.*
> A clerk said you made a comment about you know what's going to happen to this mail.[sic]
> *The mail was already at my case when I came in; no one brought the mail to me.*

Doc. #28-10, p. 4. Simone was later able to recall the referenced statement during his deposition:

> Q. Did you say anything about the tray to anyone?
> A. I joked around about it with Joe, if that's what you're asking.
> Q. What did you say to Joe?
> A. 'You know where this is going to end up.'
> Q. Did Joe say anything to you?
> A. He laughed and walked away.

3

Doc. #28-2, p. 119. The "Joe" referenced in the exchange has been identified as Joe White, the Station Clerk who placed the full tray on Simone's station that morning. Simone's deposition testimony further altered his stated relationship with Joe. During his PDI, Simone emphasized the absence of any relationship with clerks, stating he "didn't really speak" to them. Doc. 28-10, p. 4. In contrast, during Simone's deposition, Joe White became a "[w]ork buddy, I joked around with him a lot" and someone he spoke to "[e]very day." Doc. #28-2, p. 83.

When questioned during his PDI about his deliveries and his subsequent interaction with the Ellet Station Manager Tracey Hopkins when he returned to the station on April 5th, Simone appears unable to recall events one week prior:

> Did you get a full tray of mail to deliver that day that was walk sequence mail?
> *Yes.*
> Did you deliver it?
> *Yes.*
> When you came back from the street that day you said that it was undeliverable mail.
> *No I do not remember.*
> . . .
> How many pieces did you have in the tray that day?
> *Crammed full, probably about 500.*
> How many did you deliver?
> *All of them before I got pulled of*[sic] *the route, I was in the office an extra 45 minutes to an hour.*
> . . .
> When you came back into the office on Tuesday, April 5, 2016 you stated that it was a bad mailing list and you did not throw away good mail. If that is the case why were there so many pieces of good deliverable mail thrown in the UBBM?
> *I never made that statement.*
> So I made it up?
> *I don't remember making that statement, I was under duress, I did not know what was going on, and I didn't want to say anything without union representation.*
> So you deny talking to me that day?
> *I just asked you what was going on.*

Doc. #28-10, p. 1, 2, 4. The PDI concluded with Simone acknowledging that placing deliverable mail in the UBBM was conduct unbecoming of a postal employee but emphasizing that he did not

4

know how the mail ended up in the UBBM and that "anyone could have thrown it in." Doc. #28-10, p. 4.

As part of the investigation conducted on April 5, 2016, Hopkins and the other staff members involved wrote down their recollections of the day. According to Hopkins's contemporaneous statement, when Simone came to her office she informed him that he was on non-pay status until otherwise instructed because good deliverable mail was found in his waste bin and that a full investigation would be conducted. Hopkins stated that Simone responded that the mail in his waste bin was not good mailing. Doc. #28-9, p. 4. The statements of other employees confirm that the mail to be delivered that day on Route 77 was placed at the Route 77 case for Simone to sort and that the clerk who found the mail discarded in the Route 77 bin did not know which carrier was assigned to Route 77.

On April 21, 2016, the United States Postal Service ("USPS") issued a Notice of Removal for "Improper Conduct/Disposal of Deliverable Mail" to Simone. Doc. #28-11, p. 1. Simone, a Union member, informed Union Steward Dustin DeCastro that he would like to file a grievance regarding the Notice of Removal. DeCastro filed the grievance and handled the matter at the "informal" Step A level. The matter was then handled by John Shackelford, the Branch 148 President, at the "formal" Step A level. Shackelford attempted to negotiate a "Last Chance Agreement" that would reinstate Simone subject to termination for any future misconduct. The USPS rejected the Union argument that the mail in Route 77 UBBM's bin was a coincidence, had nothing to do with Simone's statement to Joe White, and could have been placed there by anyone because it was in a common area. Pursuant to his practice of appealing all unresolved grievances to Step B, Shackelford appealed Simone's grievance. According to the Union, at Step B the process moves from the local branch to a designated regional team. The Union and the USPS

deadlocked at Step B. The decision whether or not to pursue arbitration after a failed negotiation at the Step B level is made by the National Business Agent for the Region. In this matter, the regional agent was Jim Toth who was assisted by John Collins, the Regional Administrative Assistant.

Initially, a demand for arbitration was filed. According to the Union, this is a blanket practice that occurs without any actual review of the grievance due to the limited fourteen day window for requesting arbitration. Once the ability to arbitrate is preserved, the regional representatives conduct a review of the grievance as part of the decision whether to schedule arbitration or otherwise resolve the dispute. In this instance, Collins, acting as Toth's designee, reached a settlement agreement with the USPS that would allow Simone to resign, preserving his ability to be rehired. The Union agreed that the grievance would be withdrawn regardless of Simone's decision.

The Union noted that in addition to Simone's grievance, nine other pre-arbitration settlements resolving grievances were reached on July 6, 2016. In his time as Regional Administrative Assistant, Collins has taken part in more than eight hundred pre-arbitration settlements in which the Region had initially requested arbitration. According to Collins, the Union does not have the resources to arbitrate every case and seeks to avoid adverse decisions that the USPS could rely on in future grievances. Collins concluded Simone's grievance would not succeed at arbitration for multiple reasons. Collins believed that an arbitrator would construe Simone's statement as a declaration of intent, not a joke, because it was made the same day the mail appeared in the UBBM bin. Collins thought that an arbitrator would believe Simone was annoyed that he was the only carrier with a full tray. Collins did not believe there was a due process defect in the USPS investigation and decision. Collins believed Simone's short tenure in

6

the position would weigh against him because in his experience arbitrators are less likely to reverse discipline for a short-term employee. Collins further interpreted Simone's statements during the PDI to mean that Simone had cased all the mail from the tray, which Collins believed was inconsistent with Simone's denial that he had placed mail in the UBBM bin. Finally, in his experience, arbitrators often found circumstantial evidence of misconduct sufficient. Thus, Simone's emphasis on the absence of an eyewitness was misplaced.

Simone rejected the opportunity to resign before the grievance was withdrawn, and his removal became final. Simone filed the instant suit alleging that he was removed by the USPS without just cause and that the Union breached its duty of fair representation when it withdrew his grievance without pursuing arbitration.

## II. Legal Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Estate of Smithers v. City of Flint*, 602 F.3d 758, 761 (6th Cir. 2010). A fact must be essential to the outcome of a lawsuit to be "material." *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 248 (1986). Summary judgment will be entered when a party fails to make a "showing sufficient to establish . . . an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). "Mere conclusory and unsupported allegations, rooted in speculation, do not meet [the] burden." *Bell v. Ohio State Univ*., 351 F.3d 240, 253 (6th Cir. 2003).

Summary judgment creates a burden-shifting framework. *Anderson*, 477 U.S. at 250. The moving party has the initial burden of showing there is no genuine issue of material fact. *Plant v. Morton Int'l, Inc*., 212 F.3d 929, 934 (6th Cir. 2000). When evaluating a motion for summary

7

judgment, the Court construes the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party may not simply rely on its pleadings; rather it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1996).

**III. Law and Analysis**

Simone filed suit pursuant to 39 USC § 1208(b), which "provides for jurisdiction of district courts over 'suits for violation of contracts between the Postal Service and a labor organization representing Postal Service employees. . .'" *Bacashihua v. U.S. Postal Service*, 859 F.2d 402, 405 (6th Cir. 1988). Section 1208(b) is the "analogue" of § 301(a) of the Labor Management Relations Act of 1957. *Lawson v. Truck Drivers, Chauffeurs & Helpers, Local Union 100*, 698 F.2d 250, 255 (6th Cir. 1983). As such, § 301 law is applied to suits brought pursuant to 39 U.S.C. § 1208(b). *Id.* Where, as here, an employee challenges a removal that was subject to a union negotiated grievance process, the result is a "hybrid" claim composed of two "inextricably interdependent" claims against his employer and his union. *DelCostello v. International Broth. of Teamsters*, 462 U.S. 151, 164-165 (1983) (internal quotation marks omitted). To prevail on either of the interdependent claims, an employee must prove both "(1) that the employer breached the collective bargaining agreement and (2) that the union breached its duty of fair representation." *Vencl v. International Union of Operating Engineers, Local 18*, 137 F.3d 420, 424 (6th Cir. 1998). The Sixth Circuit has explained:

> If the union member fails to prove that the union breached its duty, he will, obviously recover nothing from the union. If the union member fails to prove that the employer breached the collective bargaining agreement, he will also recover nothing, because the union member's grievance would have failed regardless of union representation.

8

*Id.* When determining whether a breach of the CBA has occurred, this Court must "look to the plain meaning of the agreement." *Roeder v. American Postal Workers Union, AFL-CIO*, 180 F.3d 733, 737 (6th Cir. 1999).

### 1. The USPS removal decision

Simone filed the instant suit alleging he was terminated by the USPS without just cause under the applicable CBA. The USPS seeks summary judgment on the issue of just cause. Article 16, Section 1 is the relevant section of the CBA, which provides:

> No employee may be disciplined or discharged except for just cause such as, but not limited to, insubordination, pilferage, intoxication (drugs or alcohol), incompetence, failure to perform work as requested, violation of the terms of this Agreement, or failure to observe safety rules and regulations."

Doc. #28-6, p. 85. By its plain language, the CBA does not limit "just cause" to the examples provided. The USPS and the National Association of Letter Carriers cooperated to produce a Joint Contract Administration Manual ("JCAM") as guidance for the application of the CBA based on "national level grievance settlements, arbitration awards and agreements." Doc. #28-7, p. 2. According to the JCAM, under the CBA that governs Simone's suit, "the 'just cause' provision requires a fair and provable justification for discipline. 'Just cause' is a 'term of art' created by labor arbitrators. It has no precise definition." Doc. #28-7, p. 265. The JCAM enumerates a set of six sub questions generally used by arbitrators to determine whether an action was for just cause: (1) Is there a rule and was the employee aware of the rule?; (2) Is the rule a reasonable rule?; (3) Is the rule consistently and equitably enforced?; (4) Was a thorough investigation completed?; (5) Was the severity of the discipline reasonably related to the infraction itself and in line with the usually administered, as well as to the seriousness of the employee's past record?; (6) Was the disciplinary action taken in a timely manner? Doc. #28-7, p. 265-6.

9

In this matter, Simone acknowledged during his PDI that placing deliverable mail in the UBBM is throwing away good mail which is conduct unbecoming of a postal employee. Doc. #28-10, p. 4. Simone also signed a statement acknowledging the penalties for mishandling, delaying, disposing, or stealing U.S. Mail as a condition of employment on May 30, 2013. Doc. #28-5, p. 47. Thus, there is no meaningful dispute that Simone was aware of and violated a workplace rule. Similarly, Simone does not dispute that the rule against disposing of deliverable mail is reasonable and consistently enforced or that disciplinary action was taken in a timely manner. Simone states that removal for an initial infraction was punitive in nature, not corrective as the JCAM recommends, but offers no support suggesting that removal was out of line with actions taken for similar offenses. Nothing in this record identified by Simone suggests that removal for disposing of deliverable mail was a disproportionate penalty.

With regard to "just cause," Simone does not address the definition in the CBA or the decision-making rubric in the JCAM. Instead, Simone contends that the JCAM was not relied on in the disciplinary or grievance record. This contention is not supported by the record. The Formal A Decision letter, dated May 24, 2016, includes an explicit discussion of each of the six JCAM questions, termed "tenets" therein, explaining the USPS's conclusion that there was just cause to remove Simone. Doc. 26, p. 50-51. The record now before the Court clearly indicates (1) the JCAM was intended by the Union and the USPS for use in determining just cause for termination under the CBA and (2) the JCAM was in fact used in this matter to determine whether there was just cause for termination. Simone's reference to an Ohio Supreme Court decision defining just cause in "the statutory sense" as "that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act" has no bearing on the use of the term in the context of his removal. *Irvine v. Stat Unemployment Compensation Bd. of Review*, 19 Ohio St.3d 15, 17,

482 N.E.2d 587 (1985). Simone simply ignores the proffered material explaining the decision. Simone offers no precedent, no arbitration record, and no factual material demonstrating that other individuals who management concluded had improperly disposed of deliverable mail were treated differently. In short, Simone offers no legal or factual support for his argument that the USPS lacked just cause for his removal.

The remainder of Simone's argument addresses the nature of the investigation conducted by the USPS and similarly ignores the full range of the material cited in management decisions. Simone echoes the arguments made by the Union during the grievance process and seeks to focus the Court's attention on the absence of an eyewitness who saw him discard mail and the fact that his work station is in shared space and accessible to multiple employees. In essence, Simone contends that something other than circumstantial evidence of wrongdoing is required to demonstrate just cause for removal. Simone neglects to place his contention in the context of the just cause definition contained in the CBA and applied in other removal decisions made pursuant to that CBA. Simone's references to jury instructions, criminal case law (*United States v. Morrison*, 220 Fed. Appx. 389 (6th Cir. 2007)), and mental states required in criminal proceedings with regard to circumstantial evidence are irrelevant. Simone offers no legal basis for his apparent belief that in lieu of investigating the deliverability of the mail in the UBBM bin, the USPS was required to develop a list of suspects with access to the bin. Simone does not acknowledge the fact that deliverability is what made improper disposal of the mail a violation of a carrier's duties and postal service policies.

In contrast, the USPS's explanations of the removal decision reference multiple removals of local carriers for improperly disposing of mail and further indicate that circumstantial evidence of wrongdoing is frequently used as the basis of those and other removal decisions. Doc. #26, Ex.

11

8 & 9. Furthermore, federal courts have accepted circumstantial evidence of wrongdoing as sufficient in similar actions, including one in which a criminal prosecution was unsuccessful. *See e.g., McNair v. United States Postal Service*, 768 F.2d 730 (5th Cir. 1985) (in which the Fifth Circuit found no error in prior decisions that the USPS had just cause for removal despite a jury having acquitted McNair of the alleged crime underlying the removal). Illustratively, the Court notes that decision making by employers is not generally held to the same standard as a criminal investigation:

> In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather the key inquiry is whether the employer made a reasonable informed and considered decision before taking an adverse employment action.

*Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir. 1998). The Court further notes, comparatively, that circumstantial evidence is commonly accepted in diverse employment related proceedings, including suits filed under the Americans with Disabilities Act (42 USC § 1201 *et seq.*) and Title VII (42 USC § 2000e-2(a)(2)) among other statutes including those underlying the suit herein, as potential evidence of both wrongdoing by employers and wrongdoing by employees. *See, e.g., Smith v. Chrysler*, 155 F.3d 799 (6th Cir. 1998); *Robinson v. Runyon*, 149 F.3d 507 (6th Cir. 1998); *Schoonover v. Consolidated Freightways Corp. of Delaware Local 24*, 147 F.3d 492 (6th Cir. 1998); and *Devore v. Rolls-Royce Energy Systems, Inc.*, 373 F.Supp.2d 750 (S.D. Ohio 2005).

Simone does not identify any portion of the governing CBA, the JCAM, or other applicable material that precludes the USPS from taking Simone's admitted statements literally and electing to rely on contemporaneous statements made by other individuals. Simone has not identified any portion of the applicable CBA that precludes the USPS from relying on circumstantial evidence or

from evaluating the credibility of available evidence when making removal decisions. Simone's response to the USPS motion for summary judgment does not address whether a first offense of discarding deliverable mail is just cause for removal under the applicable CBA. As stated above, an identifiable breach of the plain language of the CBA is necessary to sustain Simone's cause of action. *Roeder*, 180 F.3d at 737. Simone has not identified any triable issue of material fact as to whether the USPS breached the applicable CBA when it ended his employment after finding that he had improperly disposed of deliverable mail.

### 2. Union Representation

A union breaches its duty of fair representation when its conduct is arbitrary, discriminatory, or in bad faith *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). A union's conduct is arbitrary, however, "only if in light of the factual and legal landscape at the time of the union's actions, the union's behavior was so far outside a wide range of reasonableness as to be irrational." *Airline Pilots Assn. International v. O'Neill*, 499 U.S. 65, 67 (1991). Here, Collins explained at length the basis of the Union's decision, which included the perceived weaknesses in Simone's version of events, the burdens arbitration would place on limited resources, and Collins's educated opinion of the probable outcome of mediation. The Union's decision may not have been the decision Simone desired, but that does not make the decision arbitrary, discriminatory, or in bad faith. Although Simone has not identified a breach of the CBA applicable to the USPS decision to end his employment and, as the Sixth Circuit explains, in the absence of a breach of the CBA the issue of fair representation is moot, the Court nevertheless concludes that had a breach occurred this record could not support a finding that the Union's decision not to arbitrate Simone's grievance was arbitrary, discriminatory, or made in bad faith. *Vencl v. International Union of Operating Engineers, Local 18*, 137 F.3d at 424.

**IV. Conclusion**

For the foregoing reasons, Defendants' Motions for Summary Judgment, Docs. #24 and #28, are GRANTED.

IT IS SO ORDERED.

                                                                  */s/ John R. Adams*
                                                                  JUDGE JOHN R. ADAMS
                                                                  UNITED STATES DISTRICT COURT

Date: March 12, 2018